# 70-Doc. 9, R-44

 

IN THE SUPERIOR COURT OF DAWSON COUNTY
STATE OF GEORGIA

STATE OF GEORGIA,       )
                        )
        Prosecutor,     )
                        )
    vs.                 ). CASE NO. 91-CR-300C
                        )
TOMMY WALDRIP,          )
                        )
        Defendant.      )
                        )
--------------------------------------------------------

COMPETENCY TO STAND TRIAL Jury Trial proceedings

held in the above-entitled case, commencing on the

12th day of September, 1994; the Honorable John E.

Girardeau, Judge Presiding; taken down by Valerie N.

Almand, Certified Court Reporter.

--------------------------------------------------------

APPEARANCES OF COUNSEL:

COPY

    On Behalf of the Prosecutor:

        LYDIA JACKSON SARTAIN, District Attorney
        LEE DARRAGH, Assistant DA

    On Behalf of the Defendant:

        J. RICHARDSON BRANNON, Attorney at Law
        ANN WATSON, Attorney at Law

            - - -

        VOLUME V

            - - -

```
 1                  P R O C E E D I N G S
 2              THE COURT:  Good morning, Ladies and
 3    Gentlemen.  Anything for the record before we proceed?
 4    Apparently not.
 5              MR. DARRAGH:  Your Honor, I think I'd be
 6    remiss in not moving for a directed verdict, and so
 7    I will.
 8              THE COURT:  Very well.
 9              MR. DARRAGH:  I have heard all the testimony
10    and I understand that there has been some testimony that
11    might be considered prima facie in this matter.
12    However, I do not believe that the testimony in this
13    case has risen to the level to overcome the basic
14    presumption of competency to stand trial on which a jury
15    could rely, whether or not there's any positive evidence
16    of competency or whatever, and particularly also in
17    light of the testimony of Dr. Currie that he understood
18    the nature of the object of the proceedings against him
19    and his own relationship to those particular charges,
20    what the possible consequences were, et cetera, although
21    he has testified that he feels like he'd have some
22    difficulty communicating with counsel.
23              I believe when you take the evidence that's
24    been presented thus far as a whole, we have a matter
25    where he's simply choosing not to as opposed to not
```

1  being capable of that.  However, all of those taken

2  together, the evidence presented thus far presents a

3  situation where a directed verdict of competency to

4  stand trial is appropriate, should be granted at this

5  time, and we therefore move for that.

6          THE COURT:  The defense has presented

7  evidence on really all three points.  Whether that would

8  be sufficient to overcome the presumption I think would

9  be a matter which the jury may well be able to conclude

10 that it would, and so I'm going to deny the motion for

11 directed verdict and we'll proceed with the evidence.

12         MR. DARRAGH:  Yes, sir.

13         THE COURT:  Ms. Pittman, bring in the jury,

14 please.

15         MR. DARRAGH:  I'm going to be calling Dr.

16 Robert Storms first.  I believe he's out in the hallway.

17         MS. WATSON:  At this time, Your Honor, I'd

18 like to ask if the State has the copies of the raw data.

19         MR. DARRAGH:  He just arrived a few minutes

20 ago.  I'll ask him.

21         (Jury returned to the box).

22         THE COURT:  Ladies and Gentlemen, if you

23 would just bear with us a few minutes.  We had a little

24 difficulty getting started this morning.

25              DR. ROBERT J. STORMS,

645

1  after being first duly sworn, testified as follows:

2                      DIRECT EXAMINATION

3  BY MR. DARRAGH:

4      Q      Thank you for the delay, Your Honor.  We're

5  making an effort to comply with defense counsel's

6  request for copies of raw data.

7              Sir, will you state your name and your

8  occupation, please?

9      A      Robert J. Storms, S-T-O-R-M-S.  I'm the

10  director of Forensic Evaluation Services at Georgia

11  Mental Health Institute in Atlanta.

12      Q      Okay.  And how long have you been the

13  director of forensic services there?

14      A      I've been there since December of 1990 --

15  last December of 1993.  Prior to that I was the chief

16  psychologist for the forensic services division at

17  Central State Hospital in Milledgeville from February,

18  1988 through December of 1993, and then prior to that I

19  was a forensic psychologist at Washington State

20  Reformatory, Monroe, Washington, which is the maximum

21  security prison for western Washington State.  I don't

22  know how much further you want me to go back.

23      Q      Please go back as far as your experience.

24      A      Prior to that I was the director of

25  psychological services at HSA Coastal Carolina Hospital

646

1    Q     Have you reached conclusions that people were

2    competent to stand trial?

3    A     Yes.

4    Q     And have you testified to those conclusions?

5    A     Yes.

6    Q     Do you regard yourself as having --

7          MR. DARRAGH:  Well, at this time, Judge, I'll

8    go ahead and ask the Court to declare him an expert.

9    I'll tender him as an expert in forensic psychology and

10   clinical psychology to be able to testify as to the

11   issues involved here.

12         THE COURT:  Mr. Brannon?

13         MR. BRANNON:  I don't wish to voir dire the

14   witness, Your Honor.

15         THE COURT:  Very well.  He may so testify.

16         MR. DARRAGH:  Thank you.

17   BY MR. DARRAGH:

18   Q     Now, in the context of performing these

19   evaluations can you state whether or not you regard

20   yourself as having any particular disposition as to

21   results you should or should not find in performing

22   these evaluations?

23   A     No, we're set up as a neutral, basically,

24   friend of the Court service.  We have -- as a matter of

25   fact, there is at least one state supreme court ruling

1  that designates us as a neutral, unbiased evaluation

2  service.  We don't have any investment in whether

3  somebody's competent or incompetent, and we just

4  basically call them the way we see them.

5      Q     Would that be in the Tolbert versus the

6  State, a White County case --

7      A     Yes.

8      Q     -- you were referring to?

9      A     Yes, I was the subject of that.  I think the

10  supreme court basically ruled that I was the judge's

11  witness in that case.

12      Q     In that particular matter, there was a

13  defendant in which you found him incompetent to stand

14  trial based on your findings, is that right?

15      A     That's correct.

16      Q     Now, how often do you perform such

17  evaluations?

18      A     Well, regularly, and I would say that in

19  Milledgeville it was at least five times a week, but in

20  Atlanta I have somewhat more administrative duties, so I

21  would say that -- you know, but those are -- competency

22  evaluations are a regular part of our general operating

23  procedures and we operate solely on the basis of

24  court-ordered evaluations, and those court orders always

25  include an opinion as to their competency to stand

651

1    trial.

2         Q     All right, sir.  And can you tell me whether

3    or not you find it helpful or not helpful to have some

4    information concerning prior psychiatric/psychological

5    interviews and testing of a person that you're looking

6    at?

7         A     Well, like everything else, it depends.  It

8    can be useful, depending on who did the evaluation and

9    how experienced they are in forensic issues, or it

10   cannot be.  I mean, it just really depends.  I like to

11   have as much data as possible, but any one particular

12   evaluation may or may not be helpful to me.

13        Q     Why is it that you find, as you use the

14   phrase "as much data as possible" useful to you?

15        A     Well, we like to get a comprehensive look at

16   the individual, and we as -- as comprehensive a look as

17   we can, and sometimes that has to come from sources like

18   other evaluations or from family members or from, you

19   know, if -- since we work with a lot of criminal

20   defendants, jailers can be quite useful and sometimes,

21   you know, even the janitors in the jails can be quite

22   useful, and so we just take in as many observations as

23   possible trying to get a large amount of data.

24        Q     And that's to the extent that you're able to

25   do that in the time frame offered, is that correct?

1    the charges against you.

2              THE COURT:  Let me offer this explanation to

3    the jury.  Ladies and Gentlemen, the issue of whether or

4    not the defendant in this case is competent to stand

5    trial is a matter solely for your determination, and it

6    is not a matter for determination of any person or

7    entity other than the jury.

8              No witness may give an opinion as to

9    competency to stand trial.  The witness may testify as

10   to whether or not the defendant is capable of

11   understanding the circumstances, the charges against

12   him, whether he was capable of assisting his counsel in

13   the case and other matters which the Court will instruct

14   you at the conclusion of the trial.  The issue of

15   competency to stand trial is a matter that will be left

16   solely for your determination.

17             Go ahead, Mr. Darragh.

18   BY MR. DARRAGH:

19        Q    How does -- let me see, let me start with a

20   very basic question.  What would you describe the word

21   "diagnosis" as being?

22        A    Basically to determine whether somebody has

23   some type of illness, whether it's a specific type of

24   illness, either physical or mental.

25        Q    Okay.  Can a person have a diagnosis of some

667

1    mental illness and nonetheless in your opinion meet all

2    the standards by which a jury can determine whether or

3    not he's competent to stand trial?

4         A    Sure, yes.

5         Q    In reference to your examinations of Tommy

6    Waldrip, can you state whether or not you observed

7    anything that you would describe as psychosis?

8         A    No, not during my examination, no.

9         Q    Assume for a minute that -- well, before

10   I get to that question let me ask you this.

11        MR. DARRAGH:  And may I approach with

12   counsel, please?

13        (Recorded bench conference).

14        MR. DARRAGH:  I believe the Court has already

15   ruled in my favor on this issue, but I want to make sure

16   before I go into it.  He gave a history, Tommy Waldrip

17   gave a history to him, described that he was arrested

18   for burglary, received probation, said he'd been

19   arrested several times for DUI, 22 months in prison for

20   DUI and possession of stolen goods, had been in Dawson

21   County Jail since April 17, 1991.  That's part of his

22   history.

23        Again, it goes into his understanding of the

24   legal system.  So I want to be asking him about that as

25   well as the other history that he gave him, and I might

668

1   as well go ahead and raise this at this time.   I at one

2   point want to introduce in the trial of this case the

3   certified copies of prior convictions of Mr. Waldrip,

4   which indicate that either pleas, verdicts, et cetera,

5   but also his understanding of being involved in the

6   criminal system before, and as it relates to

7   understanding the nature and object of the proceedings

8   against him, and I believe it does, and it goes to those

9   issues, so I wanted to go ahead and raise both of those

10   to the Court.

11        THE COURT:   Let's take those one at a time.

12        MR. BRANNON:   First, my response would be

13   that we're talking about does he understand the legal

14   system presently, and I think evidence that he has had

15   legal problems before this at some time in the future

16   does not lend any relevance to the present hearing.   The

17   present hearing is strictly his present ability to

18   understand the system and communicate with his lawyers.

19   So first, for that reason it would not be relevant to

20   any issue in this case.

21        Secondarily, I will continue to state that

22   character evidence is not relevant in a civil

23   proceeding.   In this proceeding it's not relevant

24   because the only issue is the present state of mind as

25   to incompetency of Mr. Waldrip.

669

1    So for both of those reasons, we would
2  object.  Anne, do you have anything you want to add?
3         MS. WATSON:  (Shakes head negatively).
4         THE COURT:  I have some concern about that.
5  I think it's marginal.  I understand what you're
6  arguing, basically that one having gone through things
7  in the past would permit an inference that that would
8  assist them in understanding similar circumstances now.
9         MR. DARRAGH:  Yes, sir.
10        THE COURT:  And that's a logical -- I think
11 that's a logical conclusion.  I guess the part of that
12 that troubles me most is in that the issue is whether he
13 understands -- that he's mentally capable of under-
14 standing his present circumstances and his relation to
15 the proceedings and the people involved, whether he's
16 capable of doing it.  That issue is not informed by
17 whether he may have done it in the past.  I mean, one
18 may have been tried five times, but that fact does not
19 inform us of whether he's currently capable.
20        If it were a question of does he have
21 information, it would, because one's gone through it
22 before.  If the question were is one experienced then it
23 would be an obvious conclusion.  But when we're focusing
24 on capability to understand, that's a function of his
25 mind and not a function of prior experience, it seems to

670

1  me.  So come back again at me.

2          MR. DARRAGH:  Yes, sir.

3          THE COURT:  You hear my concerns.

4          MR. DARRAGH:  I hear your concerns, all of

5  which, respectfully, seem to go to the issue, the sole

6  issue of capability.  But it's also the understanding of

7  the nature and object of the proceedings against him and

8  his own condition in relation to those.

9          THE COURT:  Whether he's capable of doing

10  that.

11          MR. DARRAGH:  Yes, and having had previous

12  knowledge and previous experience with the criminal

13  justice system lends to that capability.

14          THE COURT:  Does it?  Capability?

15          MR. DARRAGH:  Yes, sir.  And yes, sir,

16  certainly it does.  An analogy, for instance, can be

17  drawn, an analogy can be drawn from if we're in a

18  Jackson-Denno hearing, for instance, this Court can

19  determine -- now, in a criminal case you can't bring in

20  prior record except for all the exceptions that might be

21  there, but you can't bring in prior record in the

22  criminal case.

23          This is, of course, a different situation.

24  But in that case if we're in a Jackson-Denno hearing,

25  for example, the Court can hear and consider evidence

671

1  that he had been given Miranda warnings before in

2  determining whether or not he understands Miranda

3  warnings now, and even, I would suggest, is capable of

4  understanding Miranda warnings now, because the issue to

5  be decided is whether or not he was voluntarily giving

6  it up and all that sort of situation there.  And so I

7  think an analogy can be drawn there.

8          Further, I was allowed to ask these questions

9  of Dr. Currie yesterday.  Now, we have not explored the

10  second part of what I said, but I was able to ask these

11  questions of Dr. Currie yesterday.

12          THE COURT:  I think in a Jackson-Denno

13  hearing at least part of the question involved there is

14  whether there is a knowing waiver; that is, whether or

15  not a defendant has received information to which he may

16  then intelligently respond.  And on the issue of whether

17  or not he has received information, whether one has

18  received that same information in the past would bear on

19  that issue.

20          The issue in a Jackson-Denno hearing is --

21  sometimes does not involve but is never limited to the

22  question of whether a defendant is capable of

23  understanding that which he has been told.  It may

24  involve that issue, but it's never just limited to that.

25  Part of the inquiry is always has he received

672

1   information to which he can then respond, and on that

2   aspect of the inquiry, of course if he's been given that

3   information, one, two, three, four, five times in the

4   past, it informs us of his possession of that

5   information to which he could respond.

6          We did go into it yesterday and, you know,

7   I'm thinking at the time something of the marginal

8   nature of it.

9          MR. DARRAGH:  And another thing is, Judge,

10  that --

11         THE COURT:  Let me go -- I'm sorry, I'm

12  sorry.  My thoughts are running here.

13         MR. DARRAGH:  I understand.

14         THE COURT:  If we had involved here a

15  question something similar to that which we have, if we

16  have a knowing and intelligent -- if part of the

17  question were here is he capable of and is there a

18  knowing and intelligent participation or understanding

19  the nature of the consequences and his relationship to

20  proceedings, things of that sort, then we would be

21  delving into the information supplied him and his,

22  secondly, capability of understanding that and response.

23  But really, no part of our inquiry here is his receiving

24  and response to information, but whether he is capable

25  of understanding that information which has either been

673

1    supplied or would be supplied him.

2            MR. DARRAGH:  Sure, and part of that

3    capability is memory.  Part of that capability is a

4    memory that a person has of what his past has been, what

5    he's been involved in, what consequences he's had.

6    Memory is certainly directly relevant to the ability of

7    being able to communicate with counsel, whether or not

8    he has a memory of things, you know.

9            One thing that I've asked the judge to charge

10   the jury eventually is it's not whether he chooses to

11   provide his counsel with information, but whether he's

12   capable of providing his counsel with the information.

13   We contend that he's capable, and part of that

14   capability is shown by what he's able to bring up in his

15   memory concerning his own past, concerning his own

16   history.

17           THE COURT:  What about that?  Because part of

18   -- why is that not part of it?

19           MR. BRANNON:  Memory?

20           THE COURT:  Yes.  I mean, part of what we're

21   going into is both short-term and long-term memory here,

22   and if a person has gone through something in the past,

23   participated in the process, why wouldn't his ability to

24   remember at least certain aspects of it, what your role

25   is, what the prosecutor's role is, what the judge's role

674

1  is or what the nature of the proceedings are, that is

2  they're there to determine his guilt or innocence on the

3  charges, why wouldn't his memory of that from the past

4  be relevant?

5           MS. WATSON:  May I respond?

6           THE COURT:  Yes.

7           MS. WATSON:  Your Honor, I would say you've

8  got to have the engine running first before memory has

9  any significance.  He's got to be capable of

10 understanding that.  No matter if he can pull it up from

11 his memory, he's got to be capable of understanding that

12 memory, and it can be there and he can parrot the words,

13 but he's got to be able to comprehend the words, too.

14          THE COURT:  Yeah, that's true.  That's true.

15 He would have -- it would have to be shown that he's

16 capable of doing it.

17          MR. DARRAGH:  And Your Honor, he's also

18 charged in this case with possession of firearm by a

19 convicted felon.  His past record is -- and his

20 understanding of that particular charge, it's fully

21 relevant to that particular issue.  This is a charge

22 that he's got, part of that is the fact that he is a

23 convicted felon and knows he's a convicted felon, and

24 that goes to understanding the nature of the proceedings

25 against him, the nature of that charge, and --

1      THE COURT:  All right.  What was your second

2   request was to do what, offer what evidence?

3      MR. DARRAGH:  It was, eventually, eventually,

4   not through this witness, but I wanted to go ahead and

5   raise the issue, to present certified copies of the

6   prior convictions of Mr. Waldrip.

7      THE COURT:  Okay.

8      MR. DARRAGH:  I mean, that's not something

9   that necessarily has to be decided right now because

10  I won't do it with this witness.

11     THE COURT:  It sort of goes with this.

12     MR. DARRAGH:  It does, that's why I raised

13  it.

14     THE COURT:  I'm going to take a short break

15  at this point and then I'll rule when we return.

16     (Recorded bench conference concluded).

17     THE COURT:  Ladies and Gentlemen, we're going

18  to recess for ten minutes.

19     (Short recess).

20     THE COURT:  Mr. Darragh, outside the presence

21  of the jury, let me have you elicit from Dr. Storms'

22  evidence which would connect/not connect Mr. Waldrip's

23  prior history to his current capability as it would

24  relate to one or more of the three elements of

25  competency to stand trial, and then I'll give Mr.

676

1  Brannon and Ms. Watson an opportunity to cross-examine

2  that issue.

3        Do you see what I'm asking you to do or do

4  you understand?

5        MR. DARRAGH:  I think so, Judge.  I'll try,

6  and if we're not on base if you could redirect me I'd

7  appreciate it, but I think I know where you're coming

8  from.

9        THE COURT:  Let me try one more shot at it.

10 You had made the argument at the bench that his prior

11 criminal history would help inform the jury as to his

12 current capability as it relates to competency to stand

13 trial.  It seems, though, that may be a more of a

14 psychological than a legal issue.

15       MR. DARRAGH:  Perhaps.

16       THE COURT:  So why don't we explore that with

17 this witness and we'll give Mr. Brannon an opportunity

18 to cross-examine on that, and depending upon the

19 information offered then I'll rule on the issue.

20       MR. DARRAGH:  Yes, sir.

21 BY MR. DARRAGH:

22    Q    Dr. Storms, I'll try to make my questions

23 clear so you'll understand where we're coming from here.

24 Starting first with the history/identifying information

25 you reported to me, what did Mr. Waldrip report to you

677

1  that you denominated identifying information?

2      A      Specifically about his criminal history, is

3  that what you're asking?

4      Q      Well, it's kind of brief.  Would you include

5  that -- I want to include that and that's the major

6  issue here, but also the other, since it is brief.

7      A      Basically that he was born and raised in

8  Georgia, he completed high school, attended Emmanuel

9  College, obtained a degree in theology from Georgia

10  Baptist College.  He worked for -- he reported that his

11  longest period of work was when he founded and pastored

12  a church in South Carolina and he was with that church

13  for I guess eight years, and he also has been

14  self-employed as a house painter and also as a barber.

15         He stated that in 1984 he was arrested for

16  burglary and he received a probation for that.  He

17  stated that he'd been arrested several times for DUI and

18  spent twenty-two months in prison for DUI, I don't know

19  where, and possession of stolen goods, and that he's

20  been in the Dawson County Jail since April 17th, 1991,

21  that he's been married two times to the same woman, and

22  they have three grown sons, ages twenty-five,

23  twenty-seven, twenty-nine, and that his parents are

24  still alive.

25      Q      Okay.  Having stated to you some of his past,

1  particularly in reference to his criminal history, can

2  you state whether or not you can relate to him being

3  able to recount that information to capability of

4  understanding the nature and object of the proceedings

5  against him and the issues that we're exploring here as

6  to competency?

7       A    Well, if I understand your -- let me try to

8  take a stab at it here.  We take a criminal history as a

9  natural -- as a matter of course in our job with the

10 forensic division statewide.  Basically that's because a

11 number of our defendants naturally are -- you know, have

12 prior criminal histories.

13      This is -- the reason that it's important

14 that we do this is because sometimes somebody who has a

15 lengthy criminal history or at least a criminal history

16 certainly has been involved with the justice system

17 before and certainly understands probably their Miranda

18 rights, that becomes an issue at various times.

19      They certainly understand, you know, what an

20 attorney does and basically what officers of the Court

21 do if they've been involved in courtroom -- in the

22 judicial system before, and they certainly understand,

23 have firsthand knowledge of what a conviction can lead

24 to on various charges.  So from that standpoint it is --

25 you know, it is an aspect of our standard competency

679

1   evaluation to ask about criminal history.

2           THE COURT:  It would certainly show

3   information, but how would it inform us as to capability

4   to understand?

5           THE WITNESS:  Are you asking me, Your Honor?

6           THE COURT:  Yes, sir.

7           THE WITNESS:  Well, capability means just

8   basically the capacity to understand something or other.

9   If somebody can -- one of our rule of thumbs is if

10  somebody can communicate to us directly and logically

11  and coherently, then they are certainly able to

12  communicate to an attorney directly and logically and

13  coherently.

14          In terms of a specific criminal history,

15  again a lot of it depends.  We don't really go into the

16  nature of the charges, past charges, but if they're

17  relatively sophisticated crimes or at least crimes that

18  involve sequential thought, that in my opinion goes to a

19  capability of understanding charges and capability of

20  communicating with an attorney, if they're able to carry

21  out some kind of sequential action.

22          And generally, and I know that it's a very

23  anecdotal rule of thumb, but the less sophisticated the

24  crime, such as terroristic threats or criminal trespass,

25  generally we have more of a chance of some kind of

1 | mental illness than we do in terms of things like

2 | burglary or armed robbery, because those events indicate

3 | the ability to think in sequence and to plan and to

4 | understand the ramifications of your actions.

5 | BY MR. DARRAGH:

6 | Q    And can you relate any of that, his ability

7 | to remember those things, to an ability, for instance,

8 | to remember facts of some three and a half years ago

9 | now?

10 | A    Sure.  I mean, if he's able to remember -- if

11 | he's able to remember the facts or, you know, if he's

12 | able to remember prior arrests and what he was arrested

13 | for and why he was arrested and his version of the story

14 | in a prior arrest, I see no reason why he would not be

15 | able to remember other things.

16 | Q    Including facts of the crime, for example, in

17 | order to be able to communicate them to counsel?

18 | A    Sure.  Yes.  I mean, I see no reason why he

19 | can't remember facts of a crime.

20 | Q    Is there a difference between can't and

21 | won't?

22 | A    Yes.

23 | Q    Psychologically speaking?

24 | A    Yes.

25 | Q    So that a person --

1     A     The can't is basically an inability, and

2   won't is a choice.

3     Q     And --

4           MR. DARRAGH:   I think that's all I have at

5   this time.

6           THE COURT:   Mr. Brannon.

7           MR. BRANNON:   Yes, sir.

8                       CROSS-EXAMINATION

9   BY MR. BRANNON:

10    Q     He's been able to relate this history that

11  you've given about high school education, parents, wife

12  and children, even previously on Dr. Jerold Lower's

13  evaluation, did he not?

14    A     To my understanding.   You'll have to ask

15  Dr. Lower, but I think he did, yes.

16    Q     Have you not read Dr. Lower's evaluation?

17    A     I've skimmed it.   I haven't read it in

18  detail.

19    Q     So you don't know whether he gave Dr. Lower

20  any history or not then, is that your answer?

21    A     No.   I'm assuming he gave Dr. Lower a

22  history, because it's a standard operating procedure in

23  the forensic services division statewide to ask for a

24  history.

25    Q     Okay.   And you have evaluated many people who

682

1  were, indeed, mentally ill who could give you a family

2  history, have you not?

3      A      Yes, that's true, and I've evaluated many who

4  couldn't.

5      Q      You evaluated mentally retarded people who

6  could tell you who their parents were, who their

7  brothers or sisters were, where they lived, where they

8  were born, those sort of superficial events they could

9  tell you about, correct?

10     A      Sure.

11     Q      So there's nothing unusual, if somebody has a

12 mental illness there's nothing unusual with that person

13 being able to relate those sort of items to you from

14 memory.

15     A      No, they can often do that.

16     Q      And your testimony today is that if they can

17 relate those sort of items to you by memory that

18 therefore it follows up logically that they're able to

19 understand the charges against them, understand their

20 position in relation to those charges and communicate

21 effectively with their lawyers, is that your testimony?

22     A      Well, my testimony is --

23            THE COURT:  Mr. Brannon, you can pursue this,

24 but I want you to know your line of questioning here

25 goes to a conclusion which a jury would have to draw.

683

1  I'm not trying to draw a conclusion from his testimony

2  other than whether this witness has information which

3  should be offered to the jury for the jury to consider

4  as to whether or not prior history would inform us on

5  the issue of current capability.

6          MR. BRANNON:  I don't know that a

7  cross-examination at this point would be effective.

8  I could argue to the Court from what's already in the

9  record.

10         THE COURT:  I don't know, and you can pursue

11  that, but the line of your examination there goes to the

12  conclusion that ought to be drawn from the information

13  that he could give on that issue, and I'm not doing

14  that.   That would be for the jury, if it is allowed.

15         MR. BRANNON:  Okay.  Maybe I'm confused.

16  I was under the impression that we were --

17         THE COURT:  Maybe Ms. Watson understands

18  that, I don't know.

19         MS. WATSON:  I think I do.

20         THE COURT:  Speak to your co-counsel, then.

21         MS. WATSON:  May I ask him a few questions?

22  Because I think I understand --

23         THE COURT:  No, I won't do that.  I mean,

24  once we've got one lawyer on a witness we're just going

25  to have to deal with one lawyer.

1    BY MR. BRANNON:

2        Q       An inmate being able to recall a prior crime

3    for which he was arrested or incarcerated, that is also

4    information that it's not unusual to receive from

5    someone even when they're mentally retarded or mentally

6    ill sometimes, is it?

7        A       No, they can remember that.

8        MR. BRANNON:  That's all the questions

9    I have.  I'll make argument.

10       THE COURT:  I'm sorry?

11       MR. BRANNON:  I have argument to make before

12   the Court.

13       THE COURT:  Anything new?

14       MR. BRANNON:  Well, one thing that I didn't

15   point out that I would like to point out we've heard in

16   court is from another expert, since we're voir diring

17   this one a little bit, Dr. Currie testified that he did,

18   he was able to relate superficial information from

19   memory, but that didn't necessarily automatically

20   interpolate into a formula whereby he could communicate

21   with his lawyers and understand the charges, so I just

22   am reminding the Court that that's how I understood

23   Dr. Currie's testimony in this matter.

24       THE COURT:  And that may well be.  That's a

25   conclusion for the jury to draw, and to the extent that

1  there would be any differences between that witness and

2  this witness would be a matter for the jury, and not for

3  the Court to exclude this witness' testimony because of

4  another witness' testimony.  I'll allow it over

5  objection.

6          MR. DARRAGH:  Thank you, Your Honor.

7          MR. BRANNON:  Now let me perfect that

8  objection and make sure that the record is clear.

9          THE COURT:  Go ahead.

10          MR. BRANNON:  We are objecting on Fifth

11  Amendment grounds, Sixth Amendment grounds and also on

12  Eighth Amendment grounds, all that apply to the

13  Fourteenth Amendment due process clause.

14          THE COURT:  Very well, counsel's final

15  argument there is incorporated in the prior objection

16  made.

17          MR. BRANNON:  Thank you.

18          THE COURT:  And the Court would renew its

19  overruling of the objection.  The testimony may be

20  offered, Mr. Darragh, as is proper, and Ms. Pittman, you

21  may bring in the jury.

22          MR. DARRAGH:  Thank you, Your Honor.

23          (Jury returned to the box).

24          THE COURT:  Ladies and Gentlemen, even after

25  our break there was a matter I need to take up with the

686

1    attorneys outside of your presence, so I just called you

2    into the jury room there and rather than bringing you in

3    and having a bench conference, I think we're ready to

4    proceed at this point.

5              Mr. Darragh, further examination of this

6    witness.

7              MR. DARRAGH:   Thank you.

8    BY MR. DARRAGH:

9        Q     You had provided a report to the Court in

10   conjunction with Dr. Kugler and a copy of that to Mr.

11   Brannon and a copy to the district attorney concerning

12   your evaluation, is that correct, sir?

13       A     That's correct.

14       Q     And as a part of your interview process with

15   Tommy Waldrip can you state whether or not you sought to

16   find out anything which you denominated as identifying

17   information in your report?

18       A     Yes.

19       Q     And what was the identifying information that

20   was given to you by Tommy Waldrip?

21       A     Basically that -- this comes under the

22   section of identifying information, that he's

23   forty-eight years old, he was -- he's charged with a

24   crime.  He was born and raised in Georgia, he completed

25   high school, he attended Emmanuel College, obtained a

1      A     Do you mean do I think he would be -- which

2  particular charge, the convicted felon?

3      Q     This particular Charge Number Sixteen.

4      A     The possession charge?  I mean, I see no

5  reason why he would not be able to understand this

6  charge.  I mean, when somebody is a convicted felon and

7  they're out, they certainly know that they're not

8  supposed to be in possession of a firearm.

9      Q     That's not what I'm asking, I guess, Dr.

10 Storms, and it is this:  If the charge states that he

11 had been convicted of burglary and then alleges that he

12 was in possession of a firearm, how can you relate his

13 knowledge of having been convicted of a burglary to his

14 being able to understand what this charge is?

15     A     Okay.  Basically I'll just have to go back,

16 as I said, that burglary and types of crimes such as

17 that involve some type, you know, basically involve an

18 ability to think and an ability to think about the

19 judicial system, and so I guess the answer to your

20 question would be that he would certainly be able to

21 understand the charge, this particular charge against

22 him based on his prior history of involvement with the

23 criminal justice system.

24     Q     As far as the physical description of Mr.

25 Waldrip as you made a part of your report, what did you

692

1  describe there?

2      A     That he was of medium height with a muscular

3  body build for his frame.  He had no apparent physical

4  defects, sensory problems.  He wore glasses for reading,

5  he reported no serious illnesses or operations in his

6  lifetime, and his history for neurological trauma, that

7  is serious head injury, is negative or he doesn't have

8  any.

9      Q     Okay.  Did Mr. Waldrip have any record of any

10 psychiatric hospitalizations?

11     A     No, he did not.  He was not a -- had not been

12 an inpatient in a psychiatric hospital and had not,

13 until his current incarceration, had any history of any

14 outpatient psychiatric treatment with a mental health

15 center.

16     Q     All right.  Would you describe, please, the

17 -- tell us some of your observations that relate to Mr.

18 Waldrip's ability to communicate with you as you talked

19 with him?

20     A     Well, Mr. Waldrip was -- well, first of all,

21 he was, throughout the entire testing period, he was

22 oriented to time, place, person and situation, and what

23 that means is he was basically well-oriented to reality.

24 He knew where he was, why he was there, what his name

25 was.  He generally, he knew the time of day.

693

1          Basically his reality contact was excellent.

2  He talked to us, he was a very -- fairly articulate, his

3  communications with us were coherent, they were logical

4  and they made sense.  He did exhibit some mild paranoia

5  when he was -- during the course of the interview

6  because he stated that he believed that the sheriff's

7  department had a device that monitors his thoughts

8  twenty-four hours a day, and he felt that he could --

9  believed he could hear the sheriff's voice as well as

10  the voice of various jailers continually.  However, he

11  didn't seem to be hearing voices when we talked to him,

12  nor did he seem to be responding to voices.

13          I don't know how much further you want me to

14  go with that.

15      Q    Okay.  Let me ask a few questions, then.

16      A    Sure.

17      Q    Did he state to you whether or not the

18  monitoring that he described was presently taking place

19  while you interviewed him?

20      A    He said it was, yes.

21      Q    Was there anything about your observations of

22  him which gave you any indication or thought that

23  anything was going on to which he was responding?

24      A    No.  If I can amplify that a little bit.

25      Q    Please do.

694

1      A      People that state that they hear voices or

2  have intrusive thoughts like this often usually respond

3  like they're hearing the voices at the present time,

4  unless they're on some type of medication.  We see a

5  great many people that are diagnosed with schizophrenia,

6  for example, that generally hear voices talking to them

7  and they act like they're responding, they act like

8  they're listening or they're talking back to them, and

9  Mr. Waldrip just didn't appear to be hearing voices.

10      Q      Okay.  Have you used the term in connection

11  with your evaluation of him or the phrase,

12  "idiosyncratic thought process?"

13      A      Yes.

14      Q      And what do you mean by that and how does

15  that relate to Mr. Waldrip?

16      A      Well, my opinion is that sitting in the

17  Dawson County Jail for this number of years basically in

18  isolation, you know, I mean he's got a fairly vivid

19  imagination and he's a fairly bright guy, and so he's

20  kind of created this idea, you know, that there's this

21  device that can monitor his thoughts all the time

22  because there, I guess, somewhere in connection with his

23  jail cell is a monitor where people do communicate with

24  each other.

25          This isn't very unusual for people that have

695

1  demeanor and -- indicated that he perfectly well

2  understood what I was saying to him.

3       Q    Okay.  Did he take the opportunity to read

4  those things himself?

5       A    Yes, he read them while I explained them to

6  him.

7       Q    Now, can you state whether or not you were

8  charged in the order from the Court not only to

9  determine issues related to competency to stand trial

10  but whether or not there was any criminal responsibility

11  at the time of the act alleged?

12       A    Yes, it was a standard court order asking us

13  for a degree of criminal responsibility or mental

14  competency at the time of the act.

15       Q    In seeking to carry out that part of the

16  order can you state whether or not you sought to ask

17  Tommy Lee Waldrip about the facts of this case?

18       A    Yes, we did.

19       Q    And what did he respond?

20       A    He said he didn't -- well, his exact response

21  was he wasn't there.

22       Q    Okay.  Did you ask him to go into any more

23  detail with you?

24       A    No.

25       Q    In your report can you state whether or not

702

1    you recounted Mr. Waldrip declined to discuss his case,

2    as is his legal right?

3        A    Yes.

4        Q    And what did you mean by that?

5        A    I mean that when we wanted -- he basically

6    requested that he not discuss the facts of his case,

7    which is his legal right to do, his legal and

8    constitutional right not to, and so we did not press it.

9        Q    And did he ask you not to discuss the facts

10   of his case?

11       A    I really don't remember.  I just know that he

12   indicated he didn't want to discuss the facts of his

13   case, and our policy is that we don't press them.

14       Q    All right.  How, if you can, can you relate

15   that to his understanding of his legal situation?

16       A    Well, it certainly indicates that he is able

17   to cooperate with his attorney and that he -- that many

18   -- he also, in my opinion, realizes that anything that

19   he could have said, as we explained in his rights, could

20   be brought out in court, so that if he -- you know, we

21   didn't press it, he realized the legal ramifi- -- he

22   realized the ramifications of anything that he could

23   tell us about the facts of the case, and he chose not to

24   tell us.

25       Q    All right.  What is a Ray test?  Do you know

                            703

1   about that?

2        A      Well, the Ray Auditory Verbal Learning Test,

3   I guess that's what it is, is basically, it's a part, a

4   neuropsychological screening inventory for -- basically

5   it's used to test memory functions and brain damage.

6        Q      Okay.  Did you find that -- you didn't

7   perform such a test in this particular evaluation, is

8   that correct?

9        A      No, no.

10       Q      And why did you not?

11       A      It's not relevant to what I needed to find

12   out.

13       Q      And how so?

14       A      Well, for its purpose, it's a pretty good

15   test.  If somebody has been in an automobile wreck and

16   has had diagnosed brain damage from an MRI it's a pretty

17   good test to see how impaired your memory is.  But in

18   terms of this, it had nothing to do with the things that

19   I had to find, that I had to figure out, which is, you

20   know, the three aspects of competency.  So it was just,

21   as far as I was concerned, it's an irrelevant test for

22   forensic purposes.

23       Q      Based on your -- one moment, please.

24              (Short pause).

25       Q      Based on your examination, your testing, your

704

1  opinion, at least the way my practice has seemed to have

2  gone, that somebody that's charged with a crime that's

3  basically reactive, such as criminal trespass often is

4  or public drunk or something like terroristic threats,

5  there is oftentimes -- there are many times more mental

6  illness at play than in more sophisticated crimes such

7  as burglary and armed robbery and things like that.

8      Q      Just because it's a serious crime does not

9  really impact the issue of mental illness, does it?

10     A      I'm not sure what you -- could you repeat the

11 question, rephrase it?

12     Q      Well, if somebody commits a voluntary

13 manslaughter, all of a sudden they shoot somebody in the

14 heat of passion, how do you relate that?  That's a more

15 serious type of crime.

16     A      Well, that's true.  And I'm talking about --

17 that's true, and oftentimes murder and manslaughter are

18 often heat of passion crimes, and that's very true.

19     Q      Wouldn't fit your mold?

20     A      No, that wouldn't fit that particular aspect

21 of it.

22     Q      So there are many serious crimes that are

23 committed that would not fit the mold, is that correct?

24     A      Sure.

25     Q      When you saw Mr. Waldrip on Briarcliff Road

1  down in Atlanta, I wasn't there, correct?

2      A     That's correct.

3      Q     And Ms. Watson, the lady seated over here

4  closest to me, she wasn't there, was she?

5      A     No, she wasn't.

6      Q     You knew we were her attorneys, did you not?

7      A     I knew you were.

8      Q     Okay.  So you had Mr. Waldrip all to yourself

9  without his lawyers being there for his evaluation.

10      A     In a manner of speaking, sure.

11      Q     You would call that neutral ground, wouldn't

12  you?  From your standpoint that's neutral ground, not

13  having the lawyers there to deal with, isn't it?

14      A     It can -- yeah, generally.

15      Q     Thank you.  Now, I believe you testified that

16  the clinical portion lasted one half hour, am I right

17  about that?

18      A     No.

19      Q     Okay.  What did you --

20      A     The clinical interview lasted around three

21  hours altogether and the testing probably lasted

22  another, oh, two, two hours and forty-five minutes or

23  three hours and fifteen minutes.  They got out of there

24  about 4:30.  But we had a pretty good -- what we're

25  talking about when we're saying the clinical -- what I'm

1   referring to is that that's both the clinical interview

2   as well as, you know, the competency portion of the

3   interview.

4        Q     Okay.  Maybe I wrote it down wrong.  I

5   thought you said there was one half hour spent on the

6   clinical portion and one hour on competency issues.

7        A     No, it was a good hour and a half to two

8   hours at least on clinical interviews.

9        Q     All right.  And did you personally --

10  I believe you did -- administer the MMPI?

11       A     Yes, I did.

12       Q     And you testified about the MMPI being a

13  self-administering test, self-administered test?

14       A     Well, in the sense that you don't stand there

15  and read the questions to them if they're capable of

16  reading.

17       Q     Okay.  It has just a little instruction page

18  at the front that's very short?

19       A     Yes.

20       Q     That says that you answer the questions true

21  and false, am I right?

22       A     That's correct.

23       Q     And that you take a pencil and you darken for

24  either true or false, whatever you choose?

25       A     That's correct.

1  had to say, about hearing voices and things he sees on

2  TV and radiation burns on his face and all the things

3  that the jury has heard, you came to the conclusion that

4  he has mild paranoid ideation.

5      A     Yes, this was fairly mild in comparison to a

6  lot of paranoids that I see.  I didn't say that it

7  wasn't real, I just said it was mild.

8      Q     When does it start to get beyond mild?

9      A     Well, I can give case examples.

10     Q     Let me ask you this:  Would you define

11  paranoid ideation as suspicious thinking that is

12  persecutory, accompanied by feelings that one is being

13  harassed, treated wrongly or being judged critically?

14     A     That's a good definition, sure.

15     Q     Okay.  Were you able to come to some

16  conclusion about why it is that he hears voices and has

17  radio waves go through his teeth and when he brushes his

18  teeth he can cut off the thought processes?  Were you

19  able to form a diagnosis on that?

20     A     Well, as I stated, I think a lot of this

21  arose, a lot of this type of thinking arose while he's

22  been sitting for this number of years in the Dawson

23  County Jail.  He was very clear with us that he didn't

24  think about this prior to his incarceration, and he was

25  very clear about that.

1       I've announced my opinion that this was

2  basically stress induced.  I didn't say that it wasn't

3  real because it certainly is probably real to him, but

4  at the same time it just, you know, he doesn't have a

5  history of, for instance, schizophrenia or any type of

6  psychiatric hospitalization or outpatient treatment.

7  He does have a history of drinking.

8       So it's my best opinion based on this data

9  that this is basically a stress in that this is

10 basically stress-induced stuff, and once the stress is

11 relieved this type of thinking may very well clear up by

12 itself.

13      Q    So if a person is under a lot of stress, such

14 as Ms. Watson during this jury trial, and she starts

15 telling me she's hearing voices and radio waves are

16 going through her face and all of those various things,

17 she's just suffering from stress and you would come up

18 with a diagnosis of mild paranoid ideation.

19      A    Well, with all due respect to a number of

20 paranoid trial attorneys, many -- this is a very -- many

21 attorneys get a little bit paranoid during trial.

22 I don't know if I would come up with that diagnosis or

23 not.

24      Q    It would be stress, though, stress-related.

25      A    It would certainly be stress-related.

726

1     Q     And the relating of those events to you by

2   Tommy Waldrip does not meet your category for a

3   delusion, correct?

4     A     I mean, it could be a mild delusion.  I mean,

5   that's not a -- that's not something that particularly

6   has an impact on my thinking about his relevancy.  He

7   may have some kind of mildly delusional thinking.  At

8   this point it's kind of quibbling because his reality

9   contact in general is so good, his ability to

10  communicate is so good, and he certainly didn't seem to

11  be responding to voices when we were interviewing him,

12  and over the course of a three-hour interview usually

13  people who hear voices and have auditory hallucinations

14  start to respond to them.

15    Q     Okay.  Would the definition of a delusion be

16  a conception of a disordered mind which imagines facts

17  to exist which there is no evidence in and belief?

18    A     That's -- yeah, that's a definition of

19  delusion.

20    Q     Okay.  You came to the conclusion that he did

21  not suffer from psychosis, that he's in touch with

22  reality at all times.

23    A     Yes, I think he's in touch with reality.

24    Q     Okay.  And you testified earlier to the jury

25  that mentally retarded people, and I wrote down, know

727

1   perfectly well why they're on trial and how to

2   communicate with counsel.

3         A     Well, that's fine, except you need to have

4   said some mentally retarded people know perfectly well.

5   There is a wide range of variation of skills and

6   cognitive abilities among the mentally retarded, so some

7   mentally retarded individuals know very well why they're

8   on trial and what they're charged with.

9         Q     That's the reason I was asking it.  I

10  understood it to be mentally retarded people in general.

11  So some mentally retarded people would know.

12        A     Some would.

13        Q     And some would not.

14        A     Some would not.

15        Q     And on Mr. Waldrip, what is your specific

16  diagnosis of the mental disorder?

17        A     I think we might have given him a delusional

18  disorder of some type.  It was not a very firm -- I

19  mean, the problem is that this was not a very firm

20  delusion in my opinion, so it's some type of delusional

21  disorder.

22        Q     As a matter of fact, as you look through the

23  four pages of your psychological you didn't give him a

24  final diagnosis, did you?

25        A     Well, not in the -- we have to for

728

1  statistical purposes, but he would not have a final

2  diagnosis, that's correct, in terms of this letter he

3  would not have a final diagnosis.

4      Q      So today he could be delusional, according to

5  your diagnosis today.

6      A      Well, I'm not sure what you mean by that

7  statement.

8      Q      Well, you said it, I didn't, so I'm asking

9  you.

10      A      Well, could you hold on just a second while

11  I look through my records to make sure?

12      Q      Sure.

13      A      He was at one time given a diagnosis of a

14  paranoid delusional disorder, but I don't know if this

15  is the one that we gave him or Dr. Lower gave him, so I

16  would suggest you'd have to ask Dr. Lower about that.

17      Q      Okay.  And you and I have already agreed that

18  a delusion is a conception of a disordered mind which

19  imagines facts to exist of which there's no evidence and

20  belief.

21      A      Basically, yes.

22      Q      Thank you.  You are familiar, I assume, with

23  -- let me read off some more tests and see if you're

24  familiar with these.  You're familiar with the Wide

25  Range Achievement Test.

729

1     A     Yes.

2     Q     And you're familiar with the, is it Rorschach

3  Psychodiagnostic?

4     A     The Rorschach Psychodiagnostic Test, yes.

5     Q     And you're familiar with the Millon Clinical

6  Multiaxial Inventory, II.

7     A     Yes.

8     Q     You're familiar with the Weschler Adult

9  Intelligence Scale.

10     A     Yes.

11     Q     And you are familiar with the -- you've

12  already said you're familiar with the Ray Functional

13  Test.

14     A     Yes.

15     Q     Okay.  Would you agree or disagree with the

16  concept that someone can parrot the correct words to a

17  question but not comprehend the significance of those

18  words?

19     A     Well, in a very broad general sense, not in

20  this particular instance.

21     Q     I understand your opinion is that he

22  understood.  I'm just asking if that's possible.

23          MR. BRANNON:  I'm almost through, Judge, just

24  a minute.

25  BY MR. BRANNON:

730

1      Q      All the problems which have been related in

2   your psychological and in Dr. Lower's psychological

3   affecting Tommy Lee Waldrip does not, according to you,

4   affect his ability to understand his situation, to

5   understand his situation as it applies directly to him,

6   and it does not impact his ability to communicate with

7   me or Ms. Watson, correct?

8      A      That's correct.

9      Q      You have never seen him communicate with an

10  attorney.

11     A      That also is correct.

12     Q      By the way, are you board certified?

13     A      In forensic psychology?

14     Q      Yes, sir.

15     A      Not yet.  I haven't applied.

16     Q      Have you taken your APBS board?

17     A      No, I haven't applied.

18     Q      You've also testified that Mr. Waldrip's

19  looks, manner and demeanor made it perfectly clear to

20  you that he understood what you were talking to him

21  about.

22     A      He understood what I was talking about.

23     Q      Your words were perfectly clear, weren't

24  they?

25     A      That's correct.

731

1      Q     Okay. And when you asked him specifically

2 about the crime, his response was he wasn't there.

3      A     That's correct.

4         MR. BRANNON: That's all.

5         THE COURT: Redirect?

6         MR. BRANNON: Judge, one thing, please, sir.

7 BY MR. BRANNON:

8      Q     Dr. Storms, if you could just identify these

9 three tests which you did.

10     A     This is trail making parts A and B, which is

11 I guess Exhibit 8, the MMPI, and the Weschler Adult

12 Intelligence Scale, I think they're all labeled

13 Exhibit 8.

14     Q     Okay.

15        MR. BRANNON: We would move to tender those

16 three exhibits into evidence at this point in time,

17 Judge.

18        THE COURT: Mr. Darragh?

19        MR. DARRAGH: Your Honor, I'll object simply

20 for this reason. Both Dr. Currie and Dr. Storms have

21 testified about these tests, about the results of the

22 tests, about their conclusions concerning them. Both of

23 those -- all of those tests are available as to each of

24 these individuals.

25        To put the tests in front of the jury without

732

1  also all of the other information in front of the jury

2  would be to overemphasize particular tests as opposed to

3  the overall testimony that was provided, and so

4  therefore I'm going to object to that simply because of

5  the overemphasis that may be placed on particular tests

6  that were given by each of the individuals by Dr.

7  Currie, by Dr. Storms, by anyone else who gave tests.

8        THE COURT:  Very well.  Defendant's Exhibit 1

9  is admitted.

10       MR. BRANNON:  Thank you, Judge.

11       THE COURT:  Redirect.

12              REDIRECT EXAMINATION

13  BY MR. DARRAGH:

14    Q    Can you draw a distinction in psychological

15  terms between can't and won't?

16    A    Yes.

17    Q    And what distinction would you draw between

18  those things?

19    A    Can't means unable, won't means that they

20  choose not to.

21    Q    Okay.  Based on your evaluations of Tommy Lee

22  Waldrip, the testing that you gave and the other

23  evaluations that you've testified to, can you testify as

24  -- assume, for example, that an attorney testifies that

25  her client won't give her and her co-counsel information

733

1    about the crimes for which he is charged.  Based on your

2    evaluations of Tommy Lee Waldrip, if that can be

3    accepted, that is that that attorney testified to that,

4    and if it can be accepted that that is, in fact, the

5    case, based on your evaluations of Tommy Lee Waldrip is

6    it a matter for him that he can't or he won't?

7         A     It's a matter that he won't.

8         Q     If a person has delusions, can you state

9    whether or not those can be compartmentalized to a

10   degree?

11        A     Sure, they may or may not have a thing to do

12   with the charges and they may or may not have any -- I

13   mean, they may or may not have any relevance whatsoever

14   to legal proceedings or to the charges against him or

15   anything like that.  They can be, you know, one area

16   they're delusional and one area of their life they're

17   fine and all the others.

18        Q     If there's any sort of delusion on the part

19   of Mr. Waldrip concerning being monitored, in your

20   opinion based on your evaluations of Mr. Waldrip can you

21   state whether or not that's a compartmentalized thing

22   and whether or not it affects his ability to communicate

23   with his attorney concerning the issues?

24        A     It's fairly compartmentalized.  It's not

25   unusual for prison inmates, and we deal with many, many

734

1   prison inmates as well as many, many seriously

2   disordered, mentally disordered people, to have some

3   sort of stress-related, maybe delusions like this, but

4   that doesn't -- I mean, they're -- in one area they're

5   actually fairly, you know, reasonable.  He is paranoid

6   about the sheriff's department being against him.  Well,

7   he's, I mean, been arrested and sitting in the Dawson

8   County Jail for three years, that's a pretty good

9   indication they probably are.

10          So, I mean, it has -- it's compartmentalized,

11  there's no reason it shouldn't clear up once he's under

12  -- from under this stress, and it really in my opinion

13  doesn't have anything to do with the case against him.

14          MR. DARRAGH:  Thank you.  No further

15  questions.

16          MR. BRANNON:  Could I ask one more question,

17  Judge?

18                  RECROSS-EXAMINATION

19  BY MR. BRANNON:

20      Q     Which one of the tests gives you the

21  compartmentalization?

22      A     Well, Mr. Brannon -- is that your name?

23      Q     Yes.

24      A     Basically a forensic evaluation is getting as

25  many sources of data and basing your opinion on as many

1  sources of data, cross data sources as possible.  For

2  one thing, he, during his clinical interview, aside from

3  talking about these, the monitor, he gave no indication

4  of psychosis.

5          Secondly, his MMPI results give no indication

6  of psychosis.

7          Third, he was too well oriented to reality to

8  be psychotic.  So, you know, those three sources taken

9  together give me the idea that he is not -- that he is

10 able to communicate with his attorney.

11     Q     As to the compartmentalization concept --

12     A     He talks about that --

13     Q     May I finish my question, please?

14     A     Sure.

15     Q     Is there a particular test that can be

16 administered that directly affects that and interprets

17 compartmentalization?

18     A     No, I think I answered that, there would be

19 none.

20          MR. BRANNON:  Okay, thank you.

21          MR. DARRAGH:  That's all I have of him.

22          THE COURT:  Excuse this witness, then?

23          MR. DARRAGH:  Yes, sir, please.

24          THE COURT:  We're going to take a ten-minute

25 break, and Dr. Storms may be excused.  Thank you very

736

1    much.

2              (Short recess).

3              THE COURT:  Anything for the record before we

4    bring in the jury?

5              MR. DARRAGH:  I don't think so, Judge.  I'm

6    going to call Dr. Lower as my next witness.

7              THE COURT:  Go ahead and bring him in and

8    then bring the jury in.  Go ahead and bring the jury in.

9              (Jury returned to the box).

10             THE COURT:  All right, Mr. Darragh, you may

11   proceed.

12             MR. DARRAGH:  Thank you, Your Honor.

13                DR. JEROLD STEPHEN LOWER,

14   after being first duly sworn, testified as follows:

15                   DIRECT EXAMINATION

16   BY MR. DARRAGH:

17       Q     Sir, would you state your name and your

18   occupation, please?

19       A     I am Dr. Jerold Stephen Lower.  I am a

20   psychologist, and specifically I'm senior psychologist

21   in the forensic services division at Central State

22   Hospital in Milledgeville.

23       Q     You are a lawyer as well, is that true, sir?

24       A     Well, I have a degree from law school, but

25   I've never practiced law nor taken the bar exam.

1    that are specific to the legal issues, such as

2    competency for trial and criminal responsibility in

3    terms of, you know, what their understanding is of their

4    legal situation, how well they are aware of it, how well

5    they are aware of the way the criminal justice system

6    functions and the kind of proceedings they have to go

7    through, what their role will be and what the roles of

8    the other people will be and so on.

9         Q     Yes, sir.  When you used the term, "criminal

10   responsibility," are you talking about a person's mental

11   state at the alleged time of the act charged?

12        A     Yes.

13        Q     Now, this particular order that came down

14   from Judge Girardeau concerning your evaluation of him

15   that you conducted on June 24th, 1993, were you asked to

16   find criminal responsibility at the time of the act in

17   terms of that particular order?

18        A     No, not on that particular order.

19        Q     Now, would you describe specifically, in

20   describing the Dawson County Jail, where it was that you

21   met with Tommy Lee Waldrip on June the 24th?

22        A     Well, I don't have a really clear picture

23   because I don't ordinarily take notes on that thing.

24   I'm not ordinarily asked about that.  But it was like a

25   hallway or anteroom or some sort of space that had other

744

1    doors to other rooms going off of it.  It, as I recall,

2    had some shelves or counters around the sides and there

3    was some office machinery and maybe boxes of things that

4    were being stored in it.  It was a fairly large space

5    and neat and clean, an interior room without windows.

6    It was fairly well lighted.

7        Q    Did you find anything to be particularly

8    uncomfortable about the room?

9        A    No, no more so than the average place that we

10   do these things in.

11       Q    Okay.  And, sir, can you describe to the best

12   of your recall how much time you spent with Tommy Lee

13   Waldrip on June 24th, 1993?

14       A    About, oh, between an hour and fifteen

15   minutes and an hour and a half, I would say.

16       Q    Okay.  Before beginning your clinical

17   interview with him, can you state whether or not you

18   advised him anything concerning his rights, limits of

19   confidentiality and that sort of thing?

20       A    Yes.  We have a disclosure form, a set of

21   statements that we give to every defendant before we see

22   them, and I always not only give them to the person to

23   read or read it to the person, if they cannot read, but

24   I also, if the person can read, have them read it aloud

25   and I go over it with them, explain each one of the

745

1  statements a little bit more fully to try to be sure

2  that they do, in fact, understand the disclosures that

3  are on this form.

4      Q    As you talked with him about those things,

5  can you state whether or not there was any indication

6  given to you based on your observations of Tommy Lee

7  Waldrip that he did not understand the rights that you

8  were giving him and the limitations of confidentiality?

9      A    No such indication.

10         MR. BRANNON:  Your Honor, I'm going to

11 interpose an objection, excuse me, sir.  At this point

12 in time I think a foundation needs to be laid about how

13 much time he had spent with Mr. Waldrip prior to making

14 this particular observation, and so we object to it at

15 this point that no foundation has been laid to support

16 that conclusion.

17         THE COURT:  Your objection is overruled.

18 You may proceed.

19         MR. DARRAGH:  Thank you, Your Honor.

20 BY MR. DARRAGH:

21     Q    Now, you then went about conducting a

22 clinical interview, is that correct?

23     A    Yes.  After -- you know, we were in the

24 process of administering this disclosure, Mr. Waldrip

25 was reluctant to participate and he went to call his

1  attorney and clear it with him, and then we got on to

2  the clinical interview.

3        Q      Describe more particularly how that

4  particular thing occurred.

5        A      Well, he said that he was not expecting me,

6  didn't know anything about the evaluation, and even

7  though I read him these disclosures he still was --

8  I don't recall his exact words, but was somewhat

9  suspicious about our purpose and my, or my purpose and

10  whether he should participate, and so he asked if he

11  could call his attorney and I, of course, said, "By all

12  means."

13        Q      And did he go to do that?

14        A      Yes, he did.

15        Q      Did he do that in the same room or a

16  different room?

17        A      He did that in a different room.

18        Q      Okay.  Did he return to you?

19        A      Yes, he returned to me and we proceeded.

20        Q      Okay.  Did he tell you what happened as he

21  came back from going to call his attorney?

22        A      Well, just simply that his attorney said it

23  was all right to talk to us, but that he was not going

24  to discuss any of the facts of the offense.

25        Q      Okay.  Did he tell you anything about a

747

1   letter that had been sent to him?

2      A      Yes.   He told us that a letter had been sent

3   to him by his attorney but that he had not received it

4   at the time I showed up.

5      Q      When you were evaluating him can you state

6   whether or not one of your purposes was to determine

7   whether Tommy Lee Waldrip was capable of understanding

8   the nature and the object of the proceedings against

9   him?

10     A      Yes, that's always one of the objects in a

11  competency evaluation.

12     Q      Can you state whether or not one of your

13  purposes was to seek to determine whether Tommy Lee

14  Waldrip comprehends his own condition in reference to

15  the proceedings that were against him?

16     A      Yes, my answer to that is the same as the

17  last question.

18     Q      Can you state whether or not one of your

19  purposes was to seek to determine whether Tommy Lee

20  Waldrip was capable of rendering to counsel assistance

21  in providing a proper defense?

22     A      Yes.

23     Q      Okay.   Can you state based on your

24  evaluation, your experience, your training in conducting

25  such evaluations, can you relate his refusal to talk

748

1  with you about the facts of the offense, his getting up

2  to call his attorney when he wasn't sure whether he

3  should cooperate with you or not, and after having

4  talked with his attorney coming back and agreeing to

5  cooperate, can you relate those things to any of the

6  issues that you were seeking to find out about as just

7  discussed?

8      A    Well, certainly considering the seriousness

9  of the charges that he's facing and the fact that I came

10  unannounced and he didn't know anything about it, I

11  think that was a rational thing for him to do, and it

12  showed comprehension of the role of his attorney and the

13  need for his attorneys' assistance and the fact that he

14  might have some potential for getting himself in

15  trouble, and so in general it would tend to show that he

16  was thinking rationally about his own self-interest

17  there.

18      Q    Can you state whether or not you reached any

19  conclusions concerning orientation to time, place,

20  person and situation?

21      A    Yes, that was perfect.

22      Q    Okay.  And would you describe what you mean

23  by orientation to those things?

24      A    Well, whether the person knows the date, the

25  place he's in, who he is, who you are and what's going

749

1   on around him, like in this case the fact that he's in

2   jail awaiting trial and so forth.

3        Q     Did you make any findings concerning whether

4   or not he seemed in touch with reality or not in touch

5   with reality?

6        A     Yes.   I concluded that he was generally in

7   good touch with reality.

8        Q     Okay.   Can you state the degree of his -- I

9   hope I get this word correct, artic -- well, his ability

10  to articulate, his ability to talk with you clearly and

11  coherently?

12       A     Yes, yes, he talked clear, coherent sentences

13  and good English.   There were no particular flaws in his

14  logic or anything like this.

15       Q     Did he voice to you anything that you noted

16  and made observations about concerning any sorts of

17  delusions?

18       A     Yes.   He said that there was a monitor in the

19  jail that was aware of not only of everything he said

20  and did, but that could read his thoughts, and that this

21  monitor was causing him to do things that got him in

22  trouble, telling him things to do that got him into

23  trouble and things like that.

24       Q     Were you aware that there was a, in fact, a

25  monitoring system at the Dawson County Jail in terms of

1    two-way intercoms between cells and a control room and

2    such as that?

3        A      No, I wasn't aware specifically of that,

4    although most jails do have some kind of arrangements

5    like that.

6        Q      Okay.  Did he describe by whom the monitoring

7    system was in control?

8        A      Well, that it was controlled by the jail

9    staff, but he also at one point said it was part of a

10   communist plot and some things like that.

11       Q      Okay.  Did he report to you any previous

12   mental health care?

13       A      The only previous mental health care he

14   reported was that he had seen Susan Kirkland from the

15   Dawson County Mental Health Center one time while he was

16   in jail as a result of being locked down and having some

17   reaction to that.

18       Q      To what did you relate these things, if to

19   anything, that he was reporting to you?

20       A      Well, I couldn't relate them to too much of

21   anything because he didn't really relate them to much of

22   anything, aside from the statements about making him do

23   bad things, but certainly this kind of idea, this kind

24   of delusion, if you will, tend to be fairly common with

25   people that have been in jail awaiting trial for a time.

1  tests are very valuable tools in some instances, but

2  they are just tools, and I've always been trained that

3  it's the responsibility of the clinician to decide what

4  tests are appropriate, when they're appropriate and when

5  they're not, and so my procedure is to do formal testing

6  only when I have a specific question that I think I need

7  a formal test to answer and I know how that test is

8  going to help me reach that answer, and if I don't have

9  a specific reason for giving a specific test then I

10  don't test.

11      Q      In your particular evaluation of Mr. Waldrip,

12  was there anything about his functioning as you were

13  able to talk with him and he was able to articulate, you

14  were able to discuss with him the issues that this jury

15  will be deciding, was there anything about the way you

16  observed him that led you to the conclusion that you

17  wanted some additional testing?

18      A      No, there was not.

19      Q      When -- let me ask you this:  When you

20  evaluated him, can you state whether or not, just a yes

21  or no to this, Tommy Lee Waldrip at the time of your

22  evaluation, whether or not you reached an opinion, this

23  is what I'm asking, whether or not you reached an

24  opinion at the time of your evaluation that Tommy Lee

25  Waldrip was capable of understanding the nature and the

1  object of the proceedings against him?

2      A    Yes.

3      Q    And what was your opinion about whether he

4  was able to do so?

5      A    Yes, that he was.

6      Q    Can you state whether or not you reached an

7  opinion based on your conversations in June of 1993

8  whether he comprehended his own condition in reference

9  to the proceedings against him?

10      A    Yes.

11      Q    And what was your conclusion of that?

12      A    Again, my conclusion was that he did

13  understand.

14      Q    Can you state whether or not based on your

15  clinical evaluation of him on June the 24th, 1993 that

16  you reached -- whether or not you reached a conclusion

17  that he was capable of -- well, whether or not you

18  reached any conclusions as to whether he was capable of

19  rendering to counsel assistance in providing a proper

20  defense?

21      A    Yes.

22      Q    And what were your conclusions concerning

23  that issue?

24      A    That he was capable of that.

25      Q    Now, assume for a moment that an attorney for

1    an individual testifies that he won't tell me the facts

2    of his case.  Can you state whether or not based on your

3    observations of Tommy Lee Waldrip you could draw any

4    conclusions as to whether that is a matter of can't or

5    won't for him?

6         A    Not based on that bit of information alone.

7         Q    Okay.  Can you state whether or not you

8    reached any conclusion concerning whether he was able to

9    communicate with his attorneys sufficiently to assist in

10   the preparation of his defense if he so chose?

11        A    Yes.

12        Q    And what was your conclusion concerning that?

13        A    Yes, that he would be capable of it.

14        Q    And what did you mean by the phrase that if

15   he so chose, or if he so chooses?

16        A    Well, certainly we encounter people that for

17   one reason or another either make false statements to

18   their attorneys or won't talk to them about this or

19   that, for whatever reasons they may have, and I know

20   this happens.  And so sometimes I include that phrase,

21   particularly with someone that's not been very open with

22   me about those matters.

23             MR. DARRAGH:  No further questions.  Your

24   witness.

25                  CROSS-EXAMINATION

                           757

1    BY MR. BRANNON:

2        Q     Do you pronounce your last name Lower or

3    Lower?

4        A     Lower.

5        Q     Dr. Lower, you gave us a history of your

6    educational background and you're presently, am I right,

7    employed at Central State Hospital in Milledgeville, is

8    that correct?

9        A     That's correct.

10       Q     And what is that position there?

11       A     Senior psychologist.

12       Q     All right.  And that is a state employment

13   position, am I right?

14       A     Yes.

15       Q     Okay.  So you're paid by the State of

16   Georgia, is that correct?

17       A     Yes, I am.

18       Q     Okay.  And prior to going to the Central

19   State Hospital in Milledgeville you were employed by the

20   Georgia Mental Health Institute.

21       A     That is correct.

22       Q     How long were you there?

23       A     About six years, six and a half.

24       Q     That's also a state employment position,

25   is it not?

                        758

1   to have his lawyer present.

2        Q      Okay.  You said Tommy was somewhat

3   suspicious, but you didn't find anything unusual about

4   that, did you?

5        A      No.  A lot of defendants are suspicious of

6   us.

7        Q      Yes, sir.  And did you know when you went to

8   visit him that he had been held at the Dawson County

9   Jail without ever going outside and for long periods of

10  isolation for some years, not weeks or months?  Were you

11  aware of that?

12       A      Yes, he told me he'd been there for some

13  twenty-six months, and he did complain about the

14  isolation.

15       Q      Did you ever see the size of the cell he was

16  in?

17       A      No.

18       Q      You did?

19       A      I don't remember specifically whether he

20  complained about the size of the cell.

21       Q      Did you see it?

22       A      No.

23       Q      You concluded in your report in that hour and

24  a half interview that he was in good touch with reality.

25       A      Yes.

763

1      Q      As a matter of fact, you concluded that in

2  the first six or seven minutes, or you wouldn't have had

3  him sign the waiver, would you?

4      A      We always do that beforehand so that the

5  person is on notice about what the situation is.   There

6  have been instances where after conducting the interview

7  I've had my doubts about whether the person really did,

8  in fact, understand that document, and when I have had

9  such doubts I've always mentioned that in my report.

10     Q      And in this report you state that he --

11 voiced, after you say he's in good touch with reality,

12 on the next line you say, "However, he voiced a number

13 of rather florid delusions."  Do you recall that?

14     A      Yes.

15     Q      Not illusions or illustrations, but

16 delusions, that's the word you used in your report,

17 isn't it?

18     A      Yes.

19     Q      He told you that he thought there was a

20 monitor that was able to read his thoughts.

21     A      Yes.

22     Q      Correct?  As a matter of fact, he told you

23 quite a few bizarre things about that, didn't he?

24     A      Yes.

25     Q      He told you about walls closing in on him,

1    correct?

2        A    Yes, he said that, that was one of the

3    symptoms that caused him to go see Susan Kirkland, and

4    it was clear to me from the context he meant that he had

5    experienced it at that time but that he was not

6    currently experiencing that.

7        Q    Okay.  And he told you that patches of hair

8    were missing on his body and that there were places of

9    skin where radiation had somehow burned him because this

10   system is run on radiation, correct?

11       A    Yes.

12       Q    Now, when you were telling the jury what he

13   told you and you were looking at some notes, it's a fact

14   as you have testified that you don't have his verbatim

15   responses that he gave you, nor do you recall them over

16   a year later, do you?

17       A    No.

18       Q    Okay.  So what you're really reading to the

19   jury is your shorthand, what you wrote down, correct?

20       A    Yes.

21       Q    All right.  And it's your conclusion that the

22   best thing you can do is a good interview, and if you

23   get a good interview you feel no need for any follow-up

24   intelligence testing or function testing, emotion

25   testing, anything like that?

1      A      No, that's not quite what I said or what

2   meant to say.  What I said, I believe, was that

3   depending on what the interview discloses that testing

4   may or may not be necessary.

5      Q      Well, you said you've always thought that the

6   best thing is a good interview.

7      A      Yes, yes.

8      Q      Did I hear you right?

9      A      Yes, yes, I did say that and I'll stick to

10   that.

11      Q      All right, sir.  And as a matter of fact,

12   that's what you decided in this case, a good interview

13   was good enough.

14      A      Yes.

15      Q      Okay.  Even with Mr. Waldrip relating these

16   delusions to you, you felt like that was enough.

17      A      Yes.

18      Q      Do you know why they would have come back

19   over a year later and done another one where they added

20   testing to the psychological?

21           MR. DARRAGH:  Objection, that sounds

22   argumentative to me, Your Honor.

23           THE COURT:  If he knows the answer he can

24   give it, if he doesn't -- I'll allow it.

25   BY MR. BRANNON:

766

1      Q     Do you know?

2      A     The only thing I know is that Dr. Kugler told

3  me they were requested to do another one.

4      Q     Okay.

5          MR. BRANNON:  Thank you, sir, that's all,

6  Judge.

7                  REDIRECT EXAMINATION

8  BY MR. DARRAGH:

9      Q     Requested to do another evaluation?

10     A     Another evaluation, that's right.

11     Q     But not that they were requested to do any

12  particular tests or not any particular tests.

13     A     No, just that they were requested to do

14  another evaluation.

15          MR. DARRAGH:  No further questions.

16         THE COURT:  Very well.  We'll excuse

17  Dr. Lower and we'll take our noon recess at this point.

18  Remember your precautionary instructions, we'll be in

19  recess until 1:00 o'clock.

20         (Noon recess).

21         THE COURT:  Anything for the record before we

22  proceed?

23         MR. DARRAGH:  I don't believe so, Your Honor.

24  Dr. Kugler is going to be my next witness.

25         THE COURT:  Very well, Ms. Pittman may bring

1  in the jury, and --

2          MR. BRANNON:  Your Honor, could I raise one

3  issue?

4          THE COURT:  Just a moment, Ms. Pittman.

5  We'll have to extend that delay from 30 seconds to about

6  a minute.  All right.

7          MR. BRANNON:  I would like to interpose an

8  objection of Dr. Kugler's coming.  I know nothing that

9  he can add.  He was a co-evaluator on the test and

10  evaluation of Dr. Storms, which we've been through at

11  length, both on direct and cross-examination, and he was

12  present and I'm assuming that we'll be going over the

13  same materials, and so I object to that as being

14  cumulative and repetitive and slowing down the trial

15  process, and that's my objection.

16          THE COURT:  Very well.

17          MR. DARRAGH:  If I need to respond I will,

18  Your Honor.

19          THE COURT:  Very briefly.

20          MR. DARRAGH:  He is an expert who also

21  evaluated.  Even though they may have been looking at

22  some of the --

23          THE COURT:  Very well, very well.  He may

24  testify.  Ms. Pittman, you may bring the jury in.

25          (Jury returned to the box).

768

1  county jail where he is currently located, that these

2  monitors basically have some ability to communicate with

3  him or to try to influence his thoughts.

4        It was interesting, he always said they tried

5  to influence his thoughts, and that in addition to these

6  monitors there may be radiation coming from them that he

7  feels is causing him some damage, i.e. especially to his

8  facial hair.  He indicated he had wondered about damage

9  to the heart but then went on to say he had been to

10  doctors, they told him his heart was all right.

11        He also believes that there are speakers,

12  phones or some manner where the jail personnel, jail

13  staff, those people that are in the jail, he hears

14  messages, quote, from them.

15     Q     Are you commenting that he does, in fact,

16  believe those things or that he was reporting to believe

17  those things?

18     A     Well, he was reporting to believe those

19  things.  These things which are a mixture that he's

20  talking about of delusions and hallucinations, there is

21  no clearcut test that one can say yes, this person

22  believes this or yes, this person is probably hearing

23  these voices or sounds that don't exist.

24        There are usually, when an individual --

25  almost always when an individual is having these kinds

781

1  of symptoms, certain other signs and symptoms present.

2  We didn't see any of those.  Usually an individual

3  having these has some trouble with attention span, in

4  paying attention to you, in staying with a conversation.

5  Very often their affect, which is a way of saying facial

6  expression or mood, is strange, it's either -- appears

7  to be frightened, it appears at the time to be highly

8  anxious, appears to be flat, that is show little or no

9  emotion.  The individual will often ramble on subjects

10  when these things are there.  They often appear to be

11  listening if they are hearing these things, and that's

12  one reason why you have difficulty carrying on this very

13  coherent and rational conversation.

14        We did not see any of those things.

15  Certainly it raises some index of suspicion whether they

16  exist or not, but again there is no way, since our

17  profession as a whole has to depend somewhat upon the

18  individual reporting these things, it is the only way of

19  our knowing about them for sure.

20        Now, we have some other things that we can

21  corroborate with an individual who is having these kinds

22  of things.  They usually have a pretty significantly

23  elevated score on one of the psychological tests, i.e.

24  the MMPI-II, which is the one that we gave, Dr. Storms

25  actually administered.  There was no elevation there to

782

1    lead us to believe these sort of things exist.

2           So I'm not going to sit here and say no,

3    he doesn't believe any of this, that this is all

4    malingering.  But I don't see how, based upon the

5    findings and the lack of findings, that anyone can say

6    hey, they really do exist, either.

7      Q    All right, sir.  To what extent can you

8    associate stress, if you can, of incarceration to any of

9    the things that he reported?

10     A    Well, stress does -- can play strange games

11   on people and do strange things to people.  Certainly it

12   is not uncommon for us to see individuals who have been

13   incarcerated, especially in county jails where

14   confinement is rather limited and this kind of thing, to

15   become suspicious and to develop idiosyncratic or

16   specific strange ideas about their given situation which

17   usually clears up when they're no longer in that type of

18   environment, and especially if they have serious legal

19   charges against them at the time.

20     Q    All right, sir.  Though these reports were

21   being made to you by Mr. Waldrip, can you state whether

22   or not based on your evaluation of him that there was

23   any indication to you of a serious mental illness being

24   present in Tommy Lee Waldrip?

25     A    Well, serious mental illness in the sense of

1  causing him gross dysfunction in his ability to carry

2  on, to communicate, to behave logically, use good

3  judgment in the sense of the situation that he is in,

4  no, none of those things were present.  He didn't show

5  any symptoms except the fact that he volunteered on his

6  own to tell us about these things which he was thinking,

7  feeling, hearing and sensing, so to speak.

8       Q    Okay.  Did you find him to be psychotic?

9       A    I don't think he's psychotic.

10      Q    And on what would you base that opinion?

11      A    I would base it on the overall evaluation,

12  the testing that Dr. Storms did, and then we looked at

13  and evaluated, the man's ability, as I say, to be

14  rational, coherent, used good judgment in protecting

15  himself in his own defense, the fact that he could pay

16  attention, he didn't stare off into space, he had none

17  of these ancillary symptoms which we often see with a

18  psychotic individual, so we could find no real evidence

19  of psychosis.

20        Certainly there are other kinds of psychosis

21  one can have, there are two or three or four kinds.

22  Schizophrenia, usually a disease of youth, the man gave

23  no significant past history of a mental illness.  At his

24  age if he'd had schizophrenia you would have expected

25  some obvious signs of deterioration to be present.

784

1          He was not manic.  That particular type of

2    psychosis, a person is going to be hypoverbal, there are

3    going to be flight of ideas, they're going to be

4    restless, jumping around all over the place.  There was

5    no evidence that he had depression to the extent that he

6    was psychotically depressed and no evidence that there

7    was any type of organic psychosis present, so we could

8    find no evidence for his being psychotic.

9          Q     Yes, sir.  Was there -- let me go ahead and

10   ask this question.  Were you charged in the order that

11   you received to also seek to determine his criminal

12   responsibility at the time of the act, the acts that

13   were alleged in what he was charged with, even though

14   that's not an issue for this jury, were you charged with

15   seeking to try to find out that?

16         A     That was part of the court order, yes.

17         Q     In doing so, can you testify as to whether or

18   not you would seek to ask a person charged with a

19   criminal case, as Mr. Waldrip was and is, about his

20   version of the facts of the situation?

21              MR. BRANNON:  Judge --

22              MR. DARRAGH:  I'm just asking yes or no at

23   this time, I'm not asking to go into substance.

24   BY MR. DARRAGH:

25         Q     Well, let me just ask you a yes-or-no at this

1  time.  Is it, sir, something that you seek to do to try
2  to talk to somebody about the alleged facts of their
3  situation, of the crimes with which they're charged?
4     A     Yes, I think it's part of your responsibility
5  evaluation, you certainly would like to hear what the
6  person has to say about his own life surrounding that
7  event and any statements that he might want to give you
8  in relation to that, try to ascertain if there was
9  anything going on with him at that time that was
10  different, et cetera.  That would be part of that
11  responsibility evaluation.
12     Q     Stop right there for a moment.  Just a yes or
13  no on this and that's all I'm looking for, just a yes or
14  no.  Did you ask him to discuss his case with you, that
15  is, the facts of this case with you?
16     A     I think more than asking him, because first
17  of all we read the individual his rights and tell them
18  that they don't have to answer any questions about their
19  case.  Certainly we give them this opportunity.  So the
20  answer I think would be yes to the question that you are
21  posing.
22     Q     Did he decline to or agree to discuss the
23  facts of his case?
24     A     He refused to discuss anything related to
25  this case and was very clear about that.

786

1      Q      How can you, if you can, relate that refusal

2  to talk about the facts of the alleged crime to any

3  issues that this jury will be concerned with about

4  competency to stand trial?

5      A      I don't think I would like to equate the two.

6  I think they're two separate issues.  There are specific

7  standards for those things which are related to an

8  individual being competent to stand trial.  These things

9  are basically does the person understand what he's

10  charged with, does he know what the charges are, does he

11  understand what can happen to him, that he could be

12  found guilty, innocent, et cetera, does he have some

13  rudimentary knowledge of how the criminal justice system

14  works, in other words what's the judge and the jury and

15  witnesses and the prosecuting and defense attorney

16  trying to do during this thing, and what are the logical

17  sequences that can happen if he is found guilty or

18  innocent or these kinds of things, what should happen in

19  the courtroom in the sense of his ability, i.e. one of

20  the standard questions, if someone is on the stand lying

21  about your case or whatever, what should you do, the

22  right answer is tell my lawyer about it.  Well, that's

23  certainly the right answer.

24          The final thing is can he communicate with

25  his attorney in his defense, and certainly if he can

787

1  communicate in a logical manner with the examiner it

2  stands to reason he can communicate with his attorney in

3  the preparation of his defense.

4      Criminal responsibility has to do with does

5  the person understand that if he did such a crime,

6  whatever it is he's charged with, is it wrong, would it

7  be wrong to do that, were there any sort of reasons that

8  you can give us that might lead into evidence of a

9  significant mental disease causing it, et cetera.  So

10 they're very different standards, and I don't know how

11 you can say one --

12     Q     All right.  And I guess my question may have

13 been misunderstood, so let me try to make it more

14 succinct.  Even though this jury won't be deciding that

15 issue, that is criminal responsibility at the time of

16 the act, how does his refusal to talk with you about

17 that relate to his understanding of the nature and

18 objects of the proceedings against him, relate to

19 whether he's capable of rendering counsel assistance and

20 providing a proper defense, et cetera?

21     A     It can have a great deal to do with his

22 understanding of the proceedings and the ramifications

23 of being found guilty in this kinds of thing, if that's

24 sort of what you're asking.

25     Q     It has a what?  I'm sorry, I didn't hear the

788

1  answer, and so I do object to it.  I think that question

2  is out of bounds.

3          THE COURT:  The objection is overruled.

4  BY MR. DARRAGH:

5      Q    I want to try to make my question clear, sir.

6  If a person understands or is capable of rendering to

7  his counsel assistance in preparing a proper defense --

8      A    Okay.

9      Q    Okay, and if, for example, he has on some

10  occasions or at least one occasion, taking a

11  hypothetical here, been advised not to talk about the

12  facts of his case with other individuals, how would his

13  refusal to talk about the facts of this case to you

14  relate to his capability of rendering effective

15  assistance to his counsel?

16     A    Well, it would generally tell me he's

17  following the advice of his counsel, but it's very

18  common for folks who are being evaluated not to want to

19  tell us anything about their case, because they

20  understand that this is not truly a confidential thing

21  and if the Court so requires us we can bring it out.

22  But to me, I think to answer your question, certainly

23  it's one good indicator that he can cooperate with his

24  counsel and follow instructions.

25     Q    Thank you, sir.

1          Can you comment -- assume for the purpose of

2    argument that the things that Tommy Waldrip talks about

3    concerning monitoring and all of those things that he

4    related to you represent some sort of delusions.  Can

5    you comment on whether or not those things can be

6    compartmentalized and be separate and apart from the

7    issues which this jury is to determine?

8          A      Yes, I think that's the very answer.  To me

9    the key issue is not whether he believes that he may be

10   being monitored or that these monitors are saying things

11   to him to get him to confess or that he hears the voices

12   of the sheriff or deputies or this kinds of thing.

13   What does this have to do with the key standards of

14   competency?  So that an individual can, indeed, have

15   some degree of mental illness, i.e. delusions primarily

16   in this case, and it doesn't really affect his

17   competency as long as he fulfills the basic standards.

18   That's why to me it is not a great issue of whether or

19   not he does believe these things.

20          I think frankly it's going to be impossible

21   -- I've done this for 34 years -- he may believe some of

22   this, but I don't believe it interferes with his

23   competency to stand trial.

24          Q      Psychiatrically speaking, sir, is there a

25   difference between a person -- is there a difference

791

1  between can't communicate and won't communicate?

2      A      Absolutely.

3      Q      And how so?

4      A      Well, I think that you could take this about

5  anything in life, you know.  Many times my children

6  could do what I ask them but they wouldn't do what I

7  asked them, and so a person who can't communicate is

8  probably suffering from something, i.e. we're talking

9  about mental disorders here, so that he couldn't

10  communicate with his attorneys, since that's the subject

11  we're on.  Won't simply means the person chooses not to,

12  for whatever his reason, good or bad.

13      Q      Okay.  In evaluating Tommy Lee Waldrip in

14  particular, sir, can you comment on, again assuming for

15  the purpose of argument that he won't tell his attorney

16  about the facts of this case, just assuming that for the

17  purpose of argument, in reference to Tommy Lee Waldrip

18  would your opinion be that that is a matter of can't

19  tell them or won't tell them?

20      A      Well, I think based upon the interview that

21  we did in our evaluation, he has the ability to tell his

22  attorney things that occurred if he so chooses.  I might

23  point out that in my twenty or so years of doing this,

24  many times a defendant chooses not to tell his attorney

25  certain facts of the case or many times the attorney

1   competent when a forensic evaluation is requested by the

2   Court.  So the answer is that about 4 or 5 percent of

3   the people that I see when I see them are not competent

4   to stand trial at the time of the evaluation, since

5   competency is a here-and-now thing.

6        Q      So in the evaluations you've done, 90

7   something percent of the people have been competent to

8   stand trial at the time you did the evaluation.

9        A      That is correct.

10       Q      Thank you.  Since you co-authored the report

11  of August the 19th, 1994 with Dr. Storms, then I assume

12  you agree with the report and what's in it.

13       A      Yes.

14       Q      And you were a part of the development and

15  publication of this report.

16       A      That is correct.

17       Q      All right.  And I believe we've already

18  tendered into evidence three tests, an MMPI, a trail

19  making part A and B --

20       A      Yes .

21       Q      -- and a Weschler Adult, and those were the

22  three tests which were given to Dr. Waldrip by yourself

23  -- Dr. Waldrip, excuse me, Tommy Lee Waldrip by yourself

24  and Dr. Storms.

25       A      That is correct.

800

1      Q      Therefore would I be correct to assume that

2   you agree with Dr. Storms that no other testing was

3   relevant to Tommy Lee Waldrip?

4      A      I don't think any more tests were necessary.

5   One can do tests forever, since the number now goes into

6   the dozens.  These are certainly the most commonly used

7   tests.  One tests the individual's intelligence, the

8   other one is one of the most standard, most widely used

9   personality tests, and the third one is the most widely

10  used currently screening test for ruling out the

11  possibility of any organic brain syndrome.  The trails

12  test and the Bender make up about 90 percent, I believe,

13  of the usage of a screening test to rule out organicity.

14     Q      Was he given the Bender test?

15     A      He did not.

16     Q      I didn't see it.

17     A      No, I say one or the other is generally used,

18  those two probably are used 90 percent of the time, not

19  together but one or the other.

20     Q      All right.  And there were times during the

21  testing and evaluation of Mr. Waldrip that you were not

22  present with Dr. Storms, I understand?

23     A      There was probably a period of roughly one

24  hour, give or take a few minutes, when he was actually

25  administering the Weschler and the MMPI when I was not

801

1    in the room, yes.

2        Q    All right.  And on this occasion when you all

3    did the August 19, 1994 interview with Tommy Waldrip, it

4    was decided at this time at least three tests ought to

5    be given, rather than just a personal interview,

6    correct?

7        A    That's correct.  We just think in cases where

8    there are potentially serious charges existing, we

9    usually do this more or less as a matter of routine.

10       Q    Okay.  And throughout any meetings with Tommy

11   Lee Waldrip, both by Jerold Lower and by yourself and

12   Dr. Storms, he has been able to be in contact with time,

13   place, where he was, and carry on to some degree a

14   normal conversation with you, can't he?

15       A    I can't speak for -- you put Dr. Lower in

16   there.  I can't speak for Dr. Lower, I can speak for

17   Dr. Storms and myself since we were there almost the

18   same time, and the answer is yes, during those periods

19   of time he was coherent, he was logical, his

20   conversation that we talked about was very relevant to

21   his current situation.

22       Q    And your testimony is that he is in contact

23   with reality, even though all these matters that he

24   related to you about the monitor and radiation and hair

25   falling out and burned places, even in the face of all

1  whether he would be comfortable with that or not.

2  BY MR. BRANNON:

3      Q      You're comfortable with the fact based on

4  your testimony, then, that Tommy Lee Waldrip is

5  communicating with me, so apparently I have the tools

6  I need to defend him.  Are you comfortable with that?

7      A      I don't know whether he's communicating with

8  you or not.  I said I thought he had the ability to.

9  I don't know what he tells you.

10      Q      Yes, sir.  If you were the lawyer and he was

11  your client and he was telling you these things, would

12  you be comfortable with defending him in a murder case?

13      A      I would give --

14             MR. DARRAGH:  Objection, objection --

15             THE COURT:  Sustained.

16      A      I would give --

17             THE COURT:  Sustained.  That means you don't

18  answer the question, Doctor, thank you, sustained.

19             THE WITNESS:  Oh, okay.

20  BY MR. BRANNON:

21      Q      Your conclusion is the same as Dr. Storms'

22  that all this is based on stress.

23      A      I think being in a county jail for -- since

24  1991 and having potentially very serious criminal

25  charges is a very stressful thing, and having evaluated

1  several hundred people in this same situation I find

2  that most of them are under stress.

3      Q      Did you find him to have any delusions,

4  Dr. Kugler?

5      A      He talked about that these beliefs, that, you

6  know, they were -- voices were trying to get -- you

7  know, hearing is one thing, but trying to get him to

8  confess and other things, so he reports things which are

9  delusions.

10          Again, what I have said is that I don't know

11  anybody who could sit there and say and say yes, he has

12  delusions.  But at the same time, these are always in

13  the context of his telling you in relation to what he

14  feels like are his problems and not in relation to his

15  understanding the charges, being able to communicate,

16  understanding the role of the judge and jury, et cetera.

17      Q      You're co-author of the August '94

18  therapeutic -- not therapeutic report, but psychological

19  evaluation, states that he may have a delusional

20  disorder of some type.  Do you agree or disagree with

21  Dr. Storms?

22      A      I agree he may have a delusional disorder of

23  some type.

24      Q      All right.

25      A      But I think, you know, each one of those

806

1    words stands by themselves.  Certainly we see people

2    where there are enough of the ancillary symptoms to say

3    we believe that they do.  In this case what we said was

4    he may have, because the ancillary symptoms aren't

5    there.  Only his statements that these are the things

6    that he's hearing and -- hearing and feeling.

7        Q    The truth of the matter would be that based

8    on your evaluation and what you told the jury today that

9    we don't really know if he's capable of communicating

10   with myself and Ms. Watson and we don't really know if

11   he understands, not superficially, but at a substantive

12   level what's going on in the courtroom, do we?

13            MR. DARRAGH:  And I'll object to the latter

14   question.  Number one, it was compound, number two --

15            THE COURT:  Break it up.

16            MR. DARRAGH:  -- the legal standard doesn't

17   have anything to do with superficial or not.

18            THE COURT:  Just break it up, Mr. Brannon.

19   BY MR. BRANNON:

20       Q    Would you agree with Mr. Darragh that if he

21   views things from a superficial standpoint that that

22   doesn't have any bearing on the standard?

23       A    I'm not sure I know what you mean.  I mean,

24   work with it again.

25            THE COURT:  Let's don't go that way,

1   very much.

2           We've run a little more than an hour, I

3   suppose we ought to take a break at this point.  We're

4   in recess for ten minutes.

5           (Short recess).

6           THE COURT:  Anything for the record before we

7   proceed?

8           MR. DARRAGH:  Well, I'll advise the Court the

9   State intends to rest presently.

10          THE COURT:  Very well.  Let me ask informally

11  while the jury is out, would the defendant have any

12  rebuttal?

13          MR. BRANNON:  I do need just a minute to talk

14  to Ms. Watson.

15          THE COURT:  All right.  Go ahead, take a

16  minute.

17          MR. BRANNON:  Okay.

18          (Short pause).

19          MR. DARRAGH:  Your Honor, may Mr. Pulliam and

20  I approach the bench?

21          THE COURT:  Sure.

22          (Recorded bench conference).

23          THE COURT:  Yes.

24          MR. DARRAGH:  Judge, I just wanted to report

25  that Mr. Pulliam and I were in the restroom together and

810

1   there was a juror present at the time and Don simply
2   made the comment, "Looks like we might finish up today,
3   Lee," and I said, "Well, looks like it," and I said, "I
4   think there's a gentleman nearby that may be a juror,"
5   and the juror responded, "Yes," and we didn't have any
6   further conversation, didn't talk about the case.  But
7   just out of an abundance of caution I feel like any
8   juror contact at all I ought to tell you about, and I'm
9   not raising any issues concerning it and I don't think
10  Mr. Pulliam is either.
11          MR. PULLIAM:  I agree.  I think that's what
12  was said.
13          THE COURT:  Very well.  And I think the
14  record has identified Mr. Pulliam as being associated
15  with the defendant.
16          MR. PULLIAM:  Yes, sir, I believe so.
17          THE COURT:  And assisting counsel for the
18  defendant in this case.  I think that was on the front
19  end.  Very well.  Thank you for reporting it.
20          MR. DARRAGH:  Thank you, Judge.
21          (Bench conference concluded).
22          MS. WATSON:  Your Honor, could we possibly go
23  into a room and talk with our client for five minutes?
24          THE COURT:  You can, but the question is do
25  you have any rebuttal evidence?

811

1          MS. WATSON:  That's the discussion.

2          THE COURT:  Very well, I'll give you five

3     more minutes.  I'm just going to remain in place.

4          MS. WATSON:  Okay, thank you.

5          (Short recess).

6          MR. BRANNON:  May we approach the bench,

7     Judge?

8          THE COURT:  Yes, sir.

9          (Recorded bench conference).

10         MR. BRANNON:  Ms. Watson and I are in a

11    position where we have a client that's insistent that he

12    go to the stand, and he has been so throughout the

13    proceedings, and, of course, my advice is against it

14    because I don't have an idea whatsoever as what the

15    person may or may not say when he gets to the witness

16    stand.

17         Since we're both in the dark we do not wish

18    for him to go up, no matter what, and so now his last

19    opportunity has arrived and he wants to go to the stand.

20    And to tell you the truth, we feel kinds of entrapped

21    and we need to spend a few minutes with him just the

22    three of us to see if we can resolve this issue that

23    I want the record to reflect that my advice and Anne's

24    advice has been and continues to be that he should not

25    do this because he does not communicate with us, so

812

1    therefore we do not know what will happen if he goes to

2    the witness stand, and I want to put that on the record

3    because I'm not sure what's going to happen.

4        THE COURT:  Well, I'm sure the record will

5    reflect this is a bench conference and the defendant is

6    not standing here, and that's fine at this point.  But

7    why don't you go out, why don't you talk with him, why

8    don't you come back in, make your announcement as to

9    whether or not you'll have any rebuttal evidence at that

10   point.

11       If your client decides not to follow your

12   advise and wants to testify in rebuttal then I would

13   like for you to state on the record in his presence

14   where he can hear it what the -- outside of the presence

15   of the jury but on the record in his presence where he

16   can hear it what your advice is to him on that issue,

17   and let me determine from him whether or not he agrees

18   with that or whether he wants to take the stand and

19   testify.

20       Now, if he does testify I'm going to have to

21   limit the testimony to rebuttal testimony, and I know

22   that given what you've said that you've experienced that

23   you may not have full control of that, but in any event,

24   he's going to have to follow the general parameters of

25   offering rebuttal testimony if he does testify.

813

1          So why don't you all go out for a few minutes
2    and talk with him and further advise him and then report
3    to the Court as to what the decision is.

4          MR. DARRAGH:  And I'll state briefly that I
5    certainly agree with the Court about rebuttal testimony.
6    I anticipate, though, that he may try to go further than
7    that, and therefore I'll object to him being called to
8    the stand at this point, because Mr. Waldrip may try to
9    go further than rebuttal testimony.  So I'll leave it at
10   that.

11         THE COURT:  All right.  Why don't you all
12   talk with him and then report back.

13              (Bench conference concluded).

14              (Short recess).

15         THE COURT:  Mr. Brannon, it's been about a
16   half an hour.  I certainly don't want to rush you, but
17   we're going to have to move forward with the trial one
18   way or the other, and the decision is whether or not the
19   defendant will have evidence to offer in rebuttal.

20         MR. BRANNON:  Judge, the defendant, Mr.
21   Waldrip, wishes to testify in rebuttal.  As his counsel
22   it's against my wishes, and I've told him that.  He
23   still wishes to testify.  I am not aware of what the
24   substance of the testimony will end up being, but that's
25   the position that Ms. Watson and I are in at this point

1  in time.

2          THE COURT: Very well.

3          Mr. Waldrip, you can testify in this matter

4  if you choose to do so. If you do testify it will be

5  under oath and you'll be subject to being questioned by

6  the district attorney or by Mr. Darragh, the chief

7  assistant district attorney. Anything that you say in

8  that testimony could be used against you and would be

9  used against you if it helped the State's case.

10          Mr. Brannon has informed the Court that he

11  and Mrs. Watson have advised you as your lawyers not to

12  testify in this proceeding, and that's advice that you

13  can either choose to accept or not accept.

14          Do you wish to testify in rebuttal?

15          THE DEFENDANT: Yes.

16          THE COURT: Very well.

17          Ms. Pittman, you may bring in the jury.

18          (Jury returned to the box).

19          THE COURT: Mr. Darragh.

20          MR. DARRAGH: Your Honor, the State rests its

21  case.

22          THE COURT: The State rests its case, Ladies

23  and Gentlemen.

24          Will the defense have rebuttal?

25          MS. WATSON: Your Honor, we will have

1   rebuttal, and we'll call Mr. Waldrip to the stand.

2           THE COURT:  Very well.  Mr. Waldrip, will you

3   step up, please?

4                   TOMMY LEE WALDRIP,

5   after being first duly sworn, testified as follows:

6                   DIRECT EXAMINATION

7   BY MS. WATSON:

8       Q    Would you state your name, please?

9       A    Tommy Lee Waldrip.

10      Q    Where are you currently residing,

11  Mr. Waldrip?

12      A    At Dawson County at the detention center.

13      Q    How long have you been there?

14      A    I believe it was April the 17th, 1991.

15      Q    How large is the cell where you're staying?

16      A    It's probably about five by ten, five foot by

17  ten foot.

18      Q    Are you allowed to go outside?

19           MR. DARRAGH:  Your Honor, I will object to

20  the testimony because it's cumulative of other

21  testimony, it's not rebuttal evidence, and this is

22  rebuttal, after all, it's not an opportunity to present

23  direct evidence, which was before --

24           THE COURT:  Very well.  I understand your

25  objection.  I'll allow it over objection.

816

1       A       No, ma'am.

2       Q       Why is that?

3       A       Well, I cannot communicate with my attorneys.

4   Only thing it would do is just prolong it for another

5   what, six months.  It's hard people to comprehend, to

6   understand the pressure I've been under.  I've had three

7   doctors that got up here and they gave their testimony

8   of what they feel and these other different things.  But

9   I've been under something that I have that I never have

10  experienced in my life, something I have fought all my

11  life against, and there I am right in the midst of

12  something that's the most cruelest thing that's ever

13  happened in my life to be under this type of monitor

14  that reads my thought and my actions.

15      Q       Will you tell the jury what this monitor is

16  and how it reads your thoughts?

17      A       I'd like to look at my notes.  The first

18  thing that it does is messes up your memory.  It's hard

19  for people to comprehend other people will do something

20  like something like this, but it's happened to me.

21              I would first of all, if it would be all

22  right with the judge, I'd like to give a copy to each

23  one of the

24  jurors --

25              THE COURT:  Mr. Waldrip, if you would just

818

1  respond to the question that was asked you.  What was

2  the question, Ms. Watson?

3  BY MS. WATSON:

4      Q      If you would just describe, Mr. Waldrip, what

5  the monitor is.

6      A      The monitor is a device that I feel, it

7  monitors my thoughts and my actions.  All right, I'll

8  try to explain it to you because it's very hard.  At all

9  times, twenty-four hours a day, seven days a week

10  there's someone on the monitor.  All right.  Anything

11  that I bring out, for example if I wanted to think about

12  this jury, how nice they look or what have you, they

13  could have a comment back through my thoughts because

14  that I can hear them talking to me.

15           I know it sounds kinds of weird, but the very

16  same thing that has happened to me since '91, it started

17  about a -- my memory, I can't remember everything, but

18  it's around June of '91 when it started, and finally it

19  has more of an illustration about what the monitor is

20  all about come out in Newsweek this year of May, it's

21  about the computer as the mind reader.

22           MR. DARRAGH:  Your Honor, I'm going to object

23  to the testimony again.

24           THE COURT:  Counsel approach the bench,

25  please.

819

1          (Recorded bench conference).

2          THE COURT:  Mr. Darragh, I'm going to allow

3  it because if he sounds bizarre, he sounds looney, I

4  mean, that goes to the issue we're dealing with.

5          MR. DARRAGH:  Yes, sir.

6          THE COURT:  And I mean the more looney it

7  gets the more relevant almost it becomes.

8          MR. DARRAGH:  But that testimony -- you know,

9  they presented their case first.  This is a choice that

10  they could have discussed with him and he could have

11  made a decision about when it was still time to present

12  their case.

13          THE COURT:  I'm going to allow it.  You don't

14  need to argue it.

15          MR. BRANNON:  Thank you, Your Honor.

16          (Recorded bench conference concluded).

17  BY MS. WATSON:

18      Q     What is that article you were describing?

19      A     All right.  It come out in Newsweek of this

20  year, the title of it is Computer as Mind Reader.  I

21  have some copies here that I was wanting to hand to the

22  DA as well as the jurors.  It's hard for me to explain

23  this, but this article here can explain it a little bit

24  better than I can.

25      Q     Do you want the jury to see this article?

1          A        I'd like for them just to have it.

2                   THE COURT:  Ms. Watson, no.

3          A        If it's permissible.  It's not permissible,

4      okay, fine.

5      BY MS. WATSON:

6          Q        Does that article have anything to do with

7      the monitor you're under in -- are you under it now?

8          A        Yes, ma'am.

9          Q        Does that article have anything to do with

10     the monitor that you're being exposed to?

11         A        This is just the ways that it operates,

12     through your nervous system, through these type of brain

13     waves and et cetera, and it is a -- comes out on a

14     computer screen, and it is not just something, you know,

15     that on, oh, you know, some people maybe can't believe

16     in the future a computer type of deals, but it's already

17     here.

18         Q        Mr. Waldrip, what voices do you hear?

19         A        It's different people that work at the jail,

20     Randy Chester, Maynard Waters, Henry George, Ann Martin,

21     Kevin Tanner, John Anderson, and I don't know all the

22     lady's name that works the front office, but they're on

23     the computer.

24                   It's generally one woman and one man that

25     operates it.  They have a lot of little bitty tapes that

821

1  A  Sure.

2  Q  How does the monitor enter your brain?

3  A  I feel that it comes through brain waves.

4 The reason why I say that is because I can put earplugs

5 in my ears and I can still hear it, so it would have to

6 come through brain waves.

7  Q  Are there any ways that you can stop it that

8 you've learned?

9  A  No, ma'am, there's no way that you can stop

10 it.

11  Q  Is the monitor on you now?

12  A  Yes, ma'am.

13  Q  Does it follow you?

14  A  Anywhere I go, it's there.

15  Q  You were taken to GMHI for examination, you

16 were taken to Mr. Brannon's office for testing.  Did the

17 monitor follow you there?

18  A  Yes, ma'am.

19  Q  Is that why you don't want to delay the

20 trial?

21  A  Yes, ma'am, that is the reason why I do not

22 want to delay the trial, for the simple fact I cannot --

23 I'm just deteriorating, and I've got to -- I'm looking

24 forward to the trial.

25  Q  Will the trial end the monitor?

1     A      Yes, ma'am, I'm sure it will.

2     Q      Since June of '91 have you been able to talk

3  to me and to Mr. Brannon about your case?

4     A      I've tried to communicate with you and

5  Mr. Brannon, I've tried, but this has blocked our

6  communications because what I think, to have a private

7  session with you, I can't do it because I'm monitored

8  right when we're there talking, and I can't be

9  open-minded or anything with you.

10     Q      Has the monitor damaged you at all?

11     A      Yes, ma'am, it has damaged me.  It has

12  damaged me.  Right now my forehead and my eyes, I have

13  to wash them out continuously.  My nerves are shot.

14  I have no feelings.  I wish I could, I wish I could

15  describe.  I wish I could -- my memory is going to --

16     Q      I'm sorry, I interrupted you, but what took

17  your feelings away?

18     A      I don't know exactly how to explain it, but

19  it's just a constantly slandering my family, threatening

20  to kill me, threatening to if I don't become their slave

21  and if I don't do exactly what they want me to do

22  they're going to kill me and all this.  It would be easy

23  if I could just cut it off, and I do, and the way that I

24  cut it off, I have to get my mind on something else.

25  I have to daydream or get into a radio program or

825

1    something like that.  But if I just sit there or think

2    about that, they're right there needling away, trying to

3    get me to go off or go crazy or et cetera.

4         Q    Has your memory been affected by the monitor?

5         A    Yes, ma'am.

6         Q    How so?

7         A    I just don't know, maybe it was because of my

8    first few weeks or months being into the jail where I've

9    lost sleep and all the many games that they run on me to

10   -- it's just -- there's just so much that I don't

11   remember after I was first locked up.

12        Q    Do you recall what you talked to me and

13   Mr. Brannon about the first two times we met?

14        A    No, ma'am, I don't even have the first idea.

15   I remember -- I remember after a period of time you all

16   did come to see me, but what we talked about or where we

17   met at, I have no idea.

18        Q    Do you recall talking about any particulars

19   of your case with us after June of '91?

20        A    Do I remember what, now?

21        Q    Talking about any of the details of your case

22   after June of '91?

23        A    Well, we had motion hearings and things like

24   that coming up.  But as far as details, I don't --

25   explain that, what you mean.