# 72-Doc. 9, R-67

AUG 19 1996

P7-002

ORIGINAL

# IN THE SUPREME COURT
## OF THE STATE OF GEORGIA

No. S96P1753

---

## *TOMMY LEE WALDRIP,*

### Appellant

v.

## *STATE OF GEORGIA,*

### Appellee.

---

## APPELLANT'S BRIEF

---

J. RICHARDSON BRANNON
Ga. Bar No. 077650
The Brannon Law Office
J. Richardson Brannon
400 Jessie Jewell Parkway, SW
Gainesville, GA 30501
(770) 503-0140

CHARLOTTA NORBY
Ga. Bar No. 545645
83 Poplar Street, NW
Atlanta, GA 30303
(404) 688-1202

*Counsel for Tommy Lee Waldrip*

RECEIVED BY HAND DELIVERY
AND FILED:

8/19/96

SUPREME COURT OF GEORGIA

# IN THE SUPREME COURT
## OF THE STATE OF GEORGIA

No. S96P1753

---

### *TOMMY LEE WALDRIP,*

Appellant

v.

### *STATE OF GEORGIA,*

Appellee.

---

## APPELLANT'S BRIEF

---

J. RICHARDSON BRANNON
Ga. Bar No. 077650
The Brannon Law Office
J. Richardson Brannon
400 Jessie Jewell Parkway, SW
Gainesville, GA 30501
(770) 503-0140

CHARLOTTA NORBY
Ga. Bar No. 545645
83 Poplar Street, NW
Atlanta, GA 30303
(404) 688-1202

*Counsel for Tommy Lee Waldrip*

# TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . .   i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . .   v

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . .   3

ENUMERATION OF ERRORS. . . . . . . . . . . . . . . . . . . .   5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . .   8

GUILT-INNOCENCE PHASE

I.    THE TRIAL COURT COMMITTED REVERSIBLE ERROR
      WHEN IT FAILED TO EXCUSE THREE PROSPECTIVE
      JURORS, LARUE DAVIS, PERRY GANT AND MARGARET
      LYNCH, FOR CAUSE . . . . . . . . . . . . . . . . . . .   8

      A.    The Trial Court Should Have Excused Venire-
            member LaRue Davis for Cause. . . . . . . . . .   9

      B.    The Trial Court Erred in Failing to Excuse
            Juror Perry Gant for Cause. . . . . . . . . . .  15

      C.    The Trial Court Erred in Failing to Excuse
            Prospective Juror Margaret H. Lynch for Cause .  19

II.   THE COURT UNDULY RESTRICTED COUNSEL'S VOIR
      DIRE ON THE ISSUE OF CAPITAL PUNISHMENT. . . . . . .  21

III.  MR. WALDRIP'S RIGHTS TO CONFRONTATION WERE
      VIOLATED BY ADMISSION INTO EVIDENCE OF STATE-
      MENTS MADE BY HIS CODEFENDANT. . . . . . . . . . . .  29

IV.   THE STATE WAS ALLOWED TO INTRODUCE IRRELEVANT
      AND PREJUDICIAL TESTIMONY ABOUT MR. WALDRIP'S
      PRIOR CRIMINAL HISTORY WHICH IMPROPERLY
      PLACED MR. WALDRIP'S CHARACTER IN ISSUE. . . . . . .  37

      A.    Improper Use of Character Evidence at Compe-
            tency Trial . . . . . . . . . . . . . . . . . .  39

      B.    Improper Use of Character Evidence at Crimi-
            nal Trial . . . . . . . . . . . . . . . . . . .  42

V.    THE STATE IMPROPERLY READ INTO EVIDENCE TES-
      TIMONY PREVIOUSLY GIVEN BY THE NOW DECEASED
      VICTIM . . . . . . . . . . . . . . . . . . . . . . . . 44

      A.    The Reading of Keith Evans' Testimony Violat-
            ed Georgia's Hearsay Statute Regarding the
            Admission of Testimony From a Former Trial,
            Because Tommy Lee Waldrip Was Not a Party in
            John Mark Waldrip's Armed Robbery Trial, and
            Thus Had No Opportunity To Cross-examine
            Evans, and the Issues in the Two Trials Were
            Different . . . . . . . . . . . . . . . . . . . . 45

      B.    Admission of Evans' Testimony Was Reversible
            Error Given the Prejudicial Manner of Its
            Introduction. . . . . . . . . . . . . . . . . . . 49

VI.   THE STATE FAILED TO PROVE THAT VENUE FOR THE
      CRIME OF CONCEALING A DEATH WAS IN DAWSON
      COUNTY WHERE MR. WALDRIP WAS PROSECUTED. . . . . . . 52

VII.  THE TRIAL COURT'S JURY INSTRUCTION ON INTENT
      IMPROPERLY SHIFTED THE BURDEN OF PROOF . . . . . . . 53

VIII. THE STATE SHOULD NOT HAVE BEEN ALLOWED TO
      INTRODUCE PREJUDICIAL, INFLAMMATORY, AND
      GRUESOME PHOTOGRAPHS WHICH WERE NOT NECESSARY
      TO ASSIST THE TESTIMONY OF ANY WITNESS BUT
      WERE ONLY USED TO INFLAME THE JURY. . . . . . . . . 59

IX.   THE COURT ERRED IN ALLOWING MR. WALDRIP'S
      FELONY MURDER CONVICTION, PREDICATED ON POS-
      SESSION OF A FIREARM, TO STAND . . . . . . . . . . . 63

X.    THE TRIAL COURT ERRED IN DENYING MR. WAL-
      DRIP'S REQUEST FOR A NEW TRIAL BASED UPON A
      VIOLATION OF BRADY V. MARYLAND . . . . . . . . . . . 65

XI.   THE COURT ERRONEOUSLY PERMITTED ADMISSION OF
      EVIDENCE WHICH HAD PREVIOUSLY BEEN SUPPRESSED
      BECAUSE IT WAS OBTAINED IN AN ILLEGAL SEARCH . . . . 72

XII.  THE TRIAL COURT ERRED IN DENYING MR. WAL-
      DRIP'S MOTION FOR A NEW TRIAL ON THE GENERAL
      GROUNDS THAT THE EVIDENCE WAS LEGALLY INSUF-
      FICIENT TO SUSTAIN THE VERDICT AND SENTENCE. . . . . 73

XIII. THE TRIAL COURT ERRED IN DENYING MR. WAL-
      DRIP'S REQUEST THAT DR. JOHN CURRIE, DEFENSE
      PSYCHOLOGIST, BE PAID IN FULL FOR HIS
      SERVICES. . . . . . . . . . . . . . . . . . . . . . 75

**PENALTY PHASE**

XIV.  THE SENTENCE OF DEATH IS DISPROPORTIONATE IN
      THIS CASE IN LIGHT OF THE SENTENCES IMPOSED
      ON MR. WALDRIP'S CODEFENDANTS AND MR. WAL-
      DRIP'S PERSONAL CIRCUMSTANCES. . . . . . . . . . . . 79

XV.   THE TRIAL COURT IMPROPERLY COMMENTED ON MR.
      WALDRIP'S FAILURE TO TESTIFY DURING THE PEN-
      ALTY PHASE OF HIS TRIAL. . . . . . . . . . . . . . . 83

XVI.  THE TRIAL COURT ERRED BY ALLOWING THE PROSE-
      CUTION TO USE EVIDENCE OF OTHER CRIMES IN
      AGGRAVATION WITHOUT PROPER NOTICE AND WITHOUT
      FIRST MEETING ITS BURDEN TO SHOW THAT PRIOR
      GUILTY PLEAS WERE THE RESULT OF KNOWING,
      VOLUNTARY AND INTELLIGENT WAIVERS. . . . . . . . . 86

      A.   The Prosecution Failed to Give Timely Notice
           of the Evidence to Be Used in Aggravation . . . 87

      B.   The State Improperly Asserted That It Had No
           Burden of Showing That the Convictions Used
           in Aggravation Were Valid and Resulted from
           Knowing, Voluntary, and Intelligent Waivers
           of Mr. Waldrip's Rights . . . . . . . . . . . . 89

XVII.    THE PROSECUTOR ENGAGED IN IMPROPER CONDUCT
         WHEN HE ARGUED FACTS NOT IN EVIDENCE DURING
         HIS CLOSING ARGUMENT AT THE PENALTY PHASE . . . 93

XVIII.   THE JURY WAS IMPROPERLY ALLOWED TO FIND TWO
         AGGRAVATING CIRCUMSTANCES BASED ON THE SAME
         CONDUCT . . . . . . . . . . . . . . . . . . . . . 95

**COMPETENCY TRIAL**

XIX.  THE COURT ERRED DURING THE COMPETENCY TRIAL
      BY ALLOWING THE PROSECUTOR TO MAKE IMPROPER
      REFERENCES TO THE DEFENDANT'S CONSTITUTIONAL-
      LY PROTECTED REFUSAL TO DISCUSS THE FACTS OF
      HIS CASE WITH THE STATE'S EXPERT WITNESSES
      AND HIS ALLEGED ATTEMPT TO CONTACT COUNSEL . . . . . 97

XX.   THE CHANGE OF VENUE GRANTED FOR PURPOSES OF
      THE COMPETENCY TRIAL WAS INSUFFICIENT TO
      AVOID PERVASIVE PRETRIAL PUBLICITY AND OBTAIN
      A FAIR JURY. . . . . . . . . . . . . . . . . . . . .105

XXI.  THE PROSECUTOR MISLEAD THE JURY BY ARGUING
      AND IMPLYING THAT THE DEFENSE WAS REQUIRED TO
      TREAT THE DEFENDANT'S MENTAL ILLNESS . . . . . . . .107

XXII.    THE TRIAL COURT IMPROPERLY LIMITED DEFENSE
         COUNSEL'S VOIR DIRE AT THE COMPETENCY TRIAL . .112

XXIII.   IT WAS ERROR TO ALLOW THE STATE'S EXPERT
         WITNESS TO REFER TO HIMSELF AS THE "JUDGE'S
         WITNESS". . . . . . . . . . . . . . . . . . .115

XXIV.    THE TRIAL COURT ERRED BY ALLOWING THE STATE
         DURING THE COMPETENCY PROCEEDINGS REPEATEDLY
         TO REFER TO AND ELICIT TESTIMONY ABOUT THE
         PENDING CHARGES . . . . . . . . . . . . . . .118

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . .121

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . .122

iv

## TABLE OF AUTHORITIES

**CASES**

Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . .                10

Ake v. Oklahoma, 470 U.S. 68 (1985)  . . . . . . .        78, 79,111

Almond v. State, 180 Ga.App. 475, 349 S.E.2d 482
    (1986)  . . . . . . . . . . . . . . . . . . . .            107

Bacon v. State, 188 Ga.App. 782, 374 S.E.2d 351
    (1993)  . . . . . . . . . . . . . . . . . . . .             88

Bacon v. State, 209 Ga. 261, 71 S.E.2d 615 (1952)              37

United States v. Bagley, 473 U.S. 667 (1985) . . .             67

Baker v. State, 236 Ga. 754, 225 S.E.2d 269 (1976)            63

Barnes v. State, 244 Ga. 302, 260 S.E.2d 40 (1979)            94

Bass v. State, 183 Ga.App. 349, 358 S.E.2d 837
    (1987)  . . . . . . . . . . . . . . . . . . . .          18, 19

State v. Beers, 8 Ariz.App. 534, 448 P.2d 104
    (1968)  . . . . . . . . . . . . . . . . . . . .             60

Bennett v. State, 262 Ga. 149, 414 S.E.2d 218
    (1992)  . . . . . . . . . . . . . . . . . . . .             21

Black v. State, 261 Ga. 791, 410 S.E.2d 740 (1991)   102,103,120

United States v. Boulahanis, 677 F.2d 586 (7th Cir.
    1982) . . . . . . . . . . . . . . . . . . . . .             45

Boyd v. State, 146 Ga.App. 359, 246 S.E.2d 396
    (1978)  . . . . . . . . . . . . . . . . . . . .          38, 39

Boyde v. California, 494 U.S. 370 (1990) . . . . .             57

Bradham v. State, 243 Ga. 638, 256 S.E.2d 331
    (1979)  . . . . . . . . . . . . . . . . . . . .              8

Brady v. Maryland, 373 U.S. 83 (1963)  . . . . . .        65, 66, 67,
                                                          70, 71, 72

Bright v. State, 265 Ga. 265, 455 S.E.2d 37 (1995)        56, 90

Bright v. State, 265 Ga.App. 265, 455 S.E.2d 37
    (1994)  . . . . . . . . . . . . . . . . . . . .             90

v

Brown v. Matheson, 142 Ga. 396 (1914) . . . . . .          51

Brown v. State, 256 Ga. 387, 349 S.E.2d 452 (1986)        41

Bryant v. State, 656 So.2d 426 (Fla. 1995) . . . .        12

Burden v. State, 250 Ga. 313, 297 S.E.2d 242 (1982)       96

Burgess v. State, 264 Ga. 777, 450 S.E.2d 680
     (1994) . . . . . . . . . . . . . . . . . . . .     27, 28

Burgett v. Texas, 389 U.S. 109 (1967) . . . . . .      86, 90

Caldwell v. Mississippi, 472 U.S. 320 (1985) . . .       109

Carnley v. Cochran, 369 U.S. 506 (1962) . . . . .      87, 90

Cates v. State, 245 Ga. 30, 262 S.E.2d 796 (1980)   45, 48, 49

Chandler v. State, 261 Ga. 402, 405 S.E.2d 669
     (1991) . . . . . . . . . . . . . . . . . . . .       88

Chapman v. California, 386 U.S. 18 (1967) . . . .         85

Chapman v. State, 593 So.2d 605 (Fla.App. 4 Dist.
     1992) . . . . . . . . . . . . . . . . . . . .        17

Childs v. State, 257 Ga. 243, 357 S.E.2d 48 (1987),
     cert. denied, 484 U.S. 970 (1987) . . . . . .       10

State v. Clark, 772 P.2d 322 (N.M. 1989) . . . . .       84

Clark v. State, 609 So.2d 513 (Fla. 1992) . . . .        82

Clark v. Tansy, 882 P.2d 527 (N.M. 1994) . . . . .       29

Coleman v. Kemp, 778 F.2d 1487 (11th Cir. 1985) .        18

Cook v. State, 369 So.2d 1251 (Ala. 1979) . . . .        96

Corn v. State, 240 Ga. 130, 240 S.E.2d 694 (1977)        98

Craft v. State, 154 Ga.App. 682, 269 S.E.2d 490
     (1980) . . . . . . . . . . . . . . . . . . . .       45

Crawford v. State, 240 Ga. 321, 240 S.E.2d 824
     (1977) . . . . . . . . . . . . . . . . . . . .       98

Crowe v. State, 265 Ga. 582, 458 S.E.2d 799 (1994)       11

D'Ambrosio v. Fay, 349 F.2d 957 (2nd Cir. 1965) .        84

DeAngelo v. State, 616 So.2d 440 (Fla. 1993) . . .   82

Dowdy v. State, 209 Ga.App. 95, 432 S.E.2d 827
    (1993) . . . . . . . . . . . . . . .   90

Drope v. Missouri, 420 U.S. 162 (1975) . . . . . .   107

Dusky v. United States, 362 U.S. 402 (1960) . . .   98

Dutton v. Evans, 400 U.S. 74 (1970) . . . . . . .   34, 37

Edwards v. Arizona, 451 U.S. 477 (1981) . . . . .   104

Erwin v. State, 848 S.W.2d 476 (Mo. 1993) . . . .   55, 56

Estelle v. Smith, 451 U.S. 454 (1981) . . . . . .   102,103

Estelle v. Smith, 469 U.S. 454 (1981) . . . . . .   85, 86

Falsetta v. State, 158 Ga.App. 392, 280 S.E.2d 411
    (1981) . . . . . . . . . . . . . . . . . .   113

Felton v. State, 93 Ga.App. 48, 90 S.E.2d 607
    (1955) . . . . . . . . . . . . . . . . . .   117

Fleming v. State, 240 Ga. 142, 240 S.E.2d 37 (1977)   110

Ford v. State, 262 Ga. 602, 423 S.E.2d 255 (1992)   63, 64

Francis v. Franklin, 471 U.S. 307 (1985) . . . . .   57, 58

Freeman v. State, 132 Ga.App. 615, 208 S.E.2d 625
    (1974) . . . . . . . . . . . . . . . . . .   113

French v. State, 237 Ga. 620, 229 S.E.2d 410 (1976)   39

United States v. Gerald, 624 F.2d 1291 (5th Cir.
    1980), cert. denied, 450 U.S. 920 (1981) . .   18

Gideon v. Wainwright, 372 U.S. 335 (1963) . . . .   90,105

Giglio v. United States, 405 U.S. 150 (1971) . . .   67

Goodwin v. Allen, 89 Ga.App. 187, 78 S.E.2d 804
    (1953) . . . . . . . . . . . . . . . . . .   51

Gregg v. Georgia, 428 U.S. 153 (1976) . . . . . .   80

Griffin v. California, 380 U.S. 609 (1965) . . . .   83, 84, 85,
                                                     97, 98,104

Gunter v. State, 243 Ga. 651, 256 S.E.2d 341 (1979)   36

vii

Hall v. State, 241 Ga. 252, 244 S.E.2d 833 (1978)     81

Ham v. South Carolina, 409 U.S. 524 (1973) . . . .     22

Hance v. Zant, 696 F.2d 940 (11th Cir. 1983), cert.
    denied, 463 U.S. 1210 (1983), overruled on
    other grounds, 762 F.2d 1383 (11th Cir. 1985)     10

Hart v. State, 174 Ga.App. 134, 329 S.E.2d 178
    (1985) . . . . . . . . . . . . . . . . . . .     37

Hearn v. Mintzes, 708 F.2d 1072 (6th Cir. 1983) .     84

Henderson v. Kibbe, 431 U.S. 145 (1977) . . . . .     55

Henderson v. State, 251 Ga. 398, 306 S.E.2d 645
    (1983) . . . . . . . . . . . . . . . . . . .     113,114

Hicks v. State, 256 Ga. 715, 352 S.E.2d 762 (1987)     61

Hill v. State, 263 Ga. 37, 427 S.E.2d 770 (1993),
    cert. denied, 114 S.Ct. 396 (1993) . . . . .     20

Holcomb v. State, 130 Ga.App. 154, 202 S.E.2d 529
    (1973) . . . . . . . . . . . . . . . . . . .     61

Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991) . .     34

Huguley v. State, 120 Ga.App. 332, 170 S.E.2d 450
    (1969), cert. denied, 400 U.S. 834 (1970) . .     108

State v. Hunter, 627 P.2d 1339 (Wash.App. 1981) .     84

Irvin v. Dowd, 366 U.S. 717 (1961) . . . . . . . .     17, 18

Isaacs v. State, 259 Ga. 717, 386 S.E.2d 316
    (1989), cert. denied, 497 U.S. 1032 (1990) .     10

Jackson v. State, 180 Ga.App. 774, 350 S.E.2d 484
    (1986) . . . . . . . . . . . . . . . . . . .     110,111

Jackson v. Virginia, 443 U.S. 307 (1979) . . . . .     73

Jenkins v. State, 606 So.2d 604 (Miss. 1992) . . .     96

Johnson v. United States, 318 U.S. 189 (1943) . .     99

Jones v. State, 189 Ga.App. 232, 375 S.E.2d 648
    (1988) . . . . . . . . . . . . . . . . . . .     111

Jones v. State, 245 Ga. 592, 266 S.E.2d 201 (1980)     53

Jones v. State, 261 Ga. 665, 409 S.E.2d 642 (1991)                106

Jordan v. Lippman, 763 F.2d 1265 (11th Cir. 1985)                 18

Knop v. McCain, 561 So.2d 229 (Ala. 1989) . . . .                 19

Knowles v. United States, 224 F.2d 168 (10th Cir.
      1955) . . . . . . . . . . . . . . . . . . .                 84

Kotteakos v. United States, 328 U.S. 750 (1946)  .                34

Lefkowitz v. Turley, 414 U.S. 70 (1973) . . . . .                 99

Legare v. State, 256 Ga. 302, 348 S.E.2d 881 (1986)            22, 23

United States v. Lequire, 943 F.2d 1554 (11th Cir.
      1991) . . . . . . . . . . . . . . . . . . .                104

Lesko v. Lehman, 925 F.2d 1527 (3rd Cir. 1991) . .                85

Lightsey v. State, 188 Ga.App. 801, 374 S.E.2d 335
      (1988) . . . . . . . . . . . . . . . . . . .                41

State v. Lincoln, 643 P.2d 807 (Haw.App. 1982) . .                84

Lindsey v. State, 254 Ga. 444, 330 S.E.2d 563
      (1985) . . . . . . . . . . . . . . . . . . .               110

Logue v. State, 155 Ga.App. 476, 271 S.E.2d 42
      (1980) . . . . . . . . . . . . . . . . . . .           9, 17, 18

Lussier v. Gunter, 552 F.2d 385 (1st Cir.), cert.
      denied, 434 U.S. 854 (1977) . . . . . . . . .              84

Lyles v. United States, 254 F.2d 725 (D.C. Cir.
      1957) . . . . . . . . . . . . . . . . . . .               118

Lynd v. State, 262 Ga. 58, 414 S.E.2d 5 (1992),
      cert. denied, 113 S.Ct. 420 (1992) . . . . .               20

Lyon v. State, 262 Ga. 247, 416 S.E.2d 523 (1992)               109

Mapp v. Ohio, 367 U.S. 643 (1961) . . . . . . . .                73

Marlow v. State, 152 Ga.App. 218, 262 S.E.2d 460
      (1979) . . . . . . . . . . . . . . . . . . .               84

Marshall v. Lonberger, 459 U.S. 422 (1983) . . . .            87, 90

United States v. Martin, 749 F.2d 1514 (11th Cir.
      1985) . . . . . . . . . . . . . . . . . . .                18

ix

Mattox v. United States, 156 U.S. 237 (1895) . . .    45

McCorquodale v. State, 705 F.2d 1553 (11th Cir.
  1983), cert. denied, 466 U.S. 954 (1984) . .    23

McCracken v. State, 431 P.2d 513 (Alaska 1967) . .    84

State v. McIlvoy, 629 S.W.2d 333 (Mo.banc 1982) .    82

McKee v. State, 168 Ga.App. 214, 308 S.E.2d 574
  (1983) . . . . . . . . . . . . . . . . . . .    16

McKenzie v. State, 28 Ga.App. 33 (1921) . . . . .    51

McNeal v. State, 551 So.2d 151 (Miss. 1989) . . .    61

Melson v. Dickson, 63 Ga. 682 (1879) . . . . . . .    16

Michelson v. United States, 335 U.S. 469 (1948) .    39

Minnick v. Mississippi, 111 S.Ct. 486 (1990) . . .    104

Morgan v. Illinois, 504 U.S. 719 (1992) . . . . .    10, 12, 17,
                                                     20, 21, 23

Morrison v. United States, 6 F.2d 809 (8th Cir.
  1925) . . . . . . . . . . . . . . . . . . . .    84, 85

Mullaney v. Wilbur, 421 U.S. 684 (1975) . . . . .    55, 56

Nathaniel v. Estelle, 493 F.2d 794 (5th Cir. 1974)    98

United States v. Norton, 867 F.2d 1354 (11th Cir.),
  cert. denied, 109 S.Ct. 3192 (1989) . . . . .    83

Parisie v. State, 178 Ga.App. 857, 344 S.E.2d 727
  (1986) . . . . . . . . . . . . . . . . . . .    8, 17

Parke v. Raley, 113 S.Ct. 517 (1992) . . . . . . .    89, 90, 93

Parks v. State, 254 Ga. 403, 330 S.E.2d 686 (1985)    93

Pate v. Robinson, 383 U.S. 375 (1966) . . . . . .    107

Patterson v. New York, 432 U.S. 197 (1977) . . . .    55, 57

Patterson v. State, 239 Ga. 409, 238 S.E.2d 2
  (1977) . . . . . . . . . . . . . . . . . . .    55

Penson v. Ohio, 488 U.S. 75 (1988) . . . . . . . .    104

Pointer v. Texas, 380 U.S. 400 (1965) . . . . . .    45

Pope v. State, 256 Ga. 196, 345 S.E.2d 831 (1986),
    cert. denied, 484 U.S. 872 (1987) . . . . . .    8, 10, 12,
    13, 20, 86
    90, 93

Powell v. Alabama, 287 U.S. 45 (1964) . . . . . .    104

Prater v. State, 148 Ga.App. 831, 253 S.E.2d 223
    (1979) . . . . . . . . . . . . . . . . .    46, 47, 48

Ranger v. State, 249 Ga. 315, 290 S.E.2d 63 (1982)    84,104

Reid v. State, 129 Ga.App. 657, 200 S.E.2d 454
    (1973) . . . . . . . . . . . . . . . . .    113

Reynolds v. United States, 98 U.S. 145 (1878) . .    45

Richardson v. State, 199 Ga.App. 10, 403 S.E.2d 877
    (1991) . . . . . . . . . . . . . . . . .    117

State v. Rivera, 602 A.2d 775 (N.J.App. 1992) . .    85

Roberts v. State, 335 So.2d 285 (Fla. 1976) . . .    118

Robinson v. State, 7 S.E.2d 758 (Ga.App. 1940) . .    39

Rogers v. McMullen, 673 F.2d 1185 (11th Cir. 1982),
    cert. denied, 459 U.S. 1110 (1983) . . . . .    17

Rosales-Lopez v. United States, 451 U.S. 182 (1981)    22

Samuels v. United States, 398 F.2d 964 (5th Cir.
    1968) . . . . . . . . . . . . . . . . .    84

Sands v. State, 262 Ga. 367 (1992) . . . . . . . .    75

Sandstrom v. Montana, 442 U.S. 510 (1979) . . . .    55, 56, 57,
    58

Sawyer v. State, 217 Ga.App. 406, 457 S.E.2d 685
    (1995) . . . . . . . . . . . . . . . . .    53

Sellers v. Estelle, 657 F.2d 1075 (5th Cir. 1981)    68, 70

Simmons v. South Carolina, 114 S.Ct. 2187, 129
    L.Ed.2d 133 (1994) . . . . . . . . . . . .    14, 26, 27,
    29

Skipper v. South Carolina, 476 U.S. 1 (1986) . . .    94

Skipper v. State, 257 Ga. 802, 364 S.E.2d 835
    (1988) . . . . . . . . . . . . . . . . .    10, 12

Slater v. State, 316 So.2d 539 (Fla. 1975) . . . .     81

State v. Sloan, 298 S.E.2d 92 (S.C. 1982) . . . .     85

Spivey v. State, 253 Ga. 187, 319 S.E.2d 420
     (1984), cert. denied, 469 U.S. 1132 (1985) .   11, 21, 24

Standbridge v. State, 158 Ga.App. 482, 280 S.E.2d
     850 (1981) . . . . . . . . . . . . . . . .     41

Stanley v. State, 250 Ga. 3, 295 S.E.2d 315 (1982)     117

Stephens v. State, 261 Ga. 467, 405 S.E.2d 483
     (1991) . . . . . . . . . . . . . . . . . .     42

Stidem v. State, 246 Ga. 637, 272 S.E.2d 338 (1980)     46

State v. Stokes, 352 S.E.2d 653 (N.C. 1987) . . .     81

Stripling v. State, 261 Ga. 1, 401 S.E.2d 500
     (1991) . . . . . . . . . . . . . . . . . .     108

United States v. Stuart-Caballero, 686 F.2d 890
     (11th Cir. 1982) . . . . . . . . . . . . .     102

Sumlin v. State, 617 S.W.2d 372 (Ark. 1981) . . .     81

Tolbert v. State, 260 Ga. 527, 397 S.E.2d 439
     (1990) . . . . . . . . . . . . . . . . . .     116

Turner v. Louisiana, 379 U.S. 466 (1965) . . . . .     23

Tuzman v. State, 145 Ga.App. 761, 244 S.E.2d 882
     cert. denied, 439 U.S. 929 (1978) . . . . . .     39

United States ex rel. Savini v. Jackson, 250 F.2d
     349 (2nd Cir. 1957) . . . . . . . . . . . .     87

Wainwright v. Greenfield, 474 U.S. 284 (1986) . .     102,103

Wainwright v. Witt, 469 U.S. 412 (1985) . . . . .   8, 10, 11,
                                                            21

Waller v. State, 102 Ga. 684 (1897) . . . . . . .     51

Waters v. State, 248 Ga. 355, 283 S.E.2d 238 (1981)     114

Watkins v. State, 207 Ga.App. 766, 430 S.E.2d 105
     (1993) . . . . . . . . . . . . . . . . . .     88

United States v. White, 444 F.2d 1274 (5th Cir.),
     cert. denied, 404 U.S. 949 (1971) . . . . . .     84, 99

xii

Wilcox v. State, 250 Ga. 745, 301 S.E.2d 251 (1983)      114,116

Williams v. State, 254 Ga. 508, 330 S.E.2d 353
     (1985) . . . . . . . . . . . . . . . . . .      94

Williams v. State, 261 Ga. 640, 409 S.E.2d 649
     (1991) . . . . . . . . . . . . . . . . . .      43

Willie v. State, 585 So.2d 660 (Miss. 1991) . . .      96

Wilson v. State, 250 Ga. 630, 300 S.E.2d 640 (1983)      95

Windsor v. State, 716 P.2d 1182 (Idaho 1985) . . .      81

In re Winship, 397 U.S. 358 (1970) . . . . . . . .      55

Witherspoon v. Illinois, 391 U.S. 510 (1968) . . .      8, 20, 21,
                                                         24, 28

Wong Sun v. United States, 371 U.S. 471 (1963) . .      72

Wood v. Woodham, 561 So.2d 224 (Ala. 1989) . . . .      19

Zant v. Moon, 264 Ga. 93 (1994) . . . . . . . . .      71

Zant v. Stephens, 462 U.S. 862 (1983) . . . . . .      94

MISCELLANEOUS

American Bar Association's Standards Relating to
     the Prosecution Function, §3-5.9 . . . . .      94

Paduano and Stafford Smith, *Deathly Errors:
     Juror Misperceptions Concerning Parole in the
     Imposition of the Death Penalty*, 18 Colum. Hum.
     Rts. L. Rev. 211 (1987) . . . . . . . . . . .      25

STATUTES

O.C.G.A. §15-12-133 . . . . . . . . . . . . . .      21

O.C.G.A. §16-5-1 . . . . . . . . . . . . . . . .      55


O.C.G.A. §17-10-6.1 . . . . . . . . . . . . . .      14

O.C.G.A. §17-10-30 . . . . . . . . . . . . . .      13, 23, 26

O.C.G.A. §17-10-35 . . . . . . . . . . . . . .      83,113

O.C.G.A. §23-3-52  . . . . . . . . . . . . . . .     36, 37, 38,
                                                    45, 52, 53,
                                                    61, 63, 73,
                                                    80, 87, 93,
                                                    98,110,113,
                                                           117

IN THE SUPREME COURT
STATE OF GEORGIA

TOMMY LEE WALDRIP,  )
    Appellant  )
           )
    v.  )    No. S96P1753
           )
           )
STATE OF GEORGIA,  )
    Appellee.  )
           )

## BRIEF OF APPELLANT

The appellant, Tommy Lee Waldrip, appeals his convictions for murder, and several other crimes and his sentence of death.

### STATEMENT OF THE CASE

Tommy Lee Waldrip was arrested on April 16, 1991, and subsequently charged with malice murder, two counts of felony murder, kidnapping with bodily injury, six counts of aggravated assault, theft by taking a motor vehicle, arson in the second degree, influencing a witness, concealing a death, being a convicted felon in possession of a firearm, and two counts of possession of a firearm in the commission of a felony. All of the crimes arose out of events connected with the death of Keith Evans which took

place on or about April 14, 1991. (T. 1694).[1] Prior to trial, counsel filed a special plea incompetency, and a jury trial on Mr. Waldrip's competency to proceed to trial was held in September 1994. The jury found Mr. Waldrip competent to stand trial. (C. 947). After a second jury trial in October 1994, Mr. Waldrip was convicted of malice murder, felony murder (the underlying felonies kidnapping with bodily injury, aggravated battery, aggravated assault, arson, theft by taking, and influencing a witness), kidnapping with bodily injury, five counts of aggravated assault, theft by taking motor vehicle, arson in the second degree, influencing a witness, concealing a death, felony murder (the underlying felony being a felon in possession of a firearm), being a convicted felon in possession of a firearm, and two counts of possession of a firearm during commission of a felony. (T. 3334-35). He was subsequently sentenced to death. (T. 3556). Mr. Waldrip filed a timely motion for a new trial which was denied on November 21, 1995. A timely notice of appeal was filed and this appeal follows.

---

1.   "T." refers to the transcript of the trial proceedings. Pre- and post-trial hearings are referred to by the date on which they were conducted followed by the applicable page numbers. "C." refers to the transcript of Mr. Waldrip's competency trial which was held the month before his trial. "R." refers to the pleadings and other documents in the Record on Appeal compiled by the clerk's office.

2

### STATEMENT OF FACTS

The appellant's son, John Mark Waldrip[2] was tried and convicted of armed robbery in October 1990. The complaining witness and the state's primary witness against John Mark in the armed robbery case was Keith Evans. (T. 1755-61). There was no evidence and there has been no allegation that Mr. Waldrip was in any way involved in this armed robbery. John Mark's armed robbery conviction was set aside on appeal and a retrial was scheduled for April 1991. (T. 1803-05). However, shortly before the scheduled retrial, Keith Evans disappeared. (T. 1821). Mr. Evans' truck was subsequently discovered burned in Dawson County, (T. 2032, 2047), and his body was located in Gilmer County. Tommy Lee Waldrip, the appellant herein, was charged along with his son, John Mark, with the murder of Keith Evans. A third codefendant was Howard Livingston, the brother-in-law of Tommy Lee Waldrip and the uncle of John Mark.

The state's evidence at trial consisted primarily of several conflicting statements obtained by law enforcement from Mr. Waldrip after his arrest. Mr. Waldrip variously took full responsibility for all the events leading to Mr. Evans' death, (State's Exhibit 99A), denied any involvement in the murder, and described a course of events in which he and Howard Livingston assisted John Mark in killing Mr. Evans in Dawson County and

---

2. To minimize confusion between the two Waldrips -- the appellant herein, Tommy Lee Waldrip and his codefendant/son, John Mark Waldrip -- Tommy Lee Waldrip will be referred to as Mr. Waldrip and his codefendant/son, John Mark Waldrip, will be referred to as John Mark.

3

disposing of his body in Gilmer County.  (State's Exhibit 100A).
See also (State's Exhibit 101A).

Shortly after his arrest, Mr. Waldrip started exhibiting
disturbing signs of mental illness which prompted his attorneys
to seek expert mental health assistance from the court.  (C. 476-
84, 488-92).  Mr. Waldrip constantly talked about how law en-
forcement interfered with his thoughts and actions through a
machine which could read his mind no matter where he was and
which could monitor his thoughts and actions.  He talked at
length with the mental health experts about this obsession, both
those hired by the defense and those hired by the state, and his
interactions with his attorneys were soon influenced and dominat-
ed by this obsession as well.  See, e.g., (C. 545-47, 750, 781).
Counsel consequently filed a special plea of incompetency and
sought to have the trial of the case delayed until Mr. Waldrip
could regain competency and become able to assist counsel in his
defense.  On a change of venue to Hall County a jury found Mr.
Waldrip competent in September 1994 and the case immediately
proceeded to trial in October 1994.

The state had originally sought the death penalty against
all three codefendants.  Mr. Waldrip, was tried first on a change
of venue in Gwinnett County.  The jury convicted him of murder
and sentenced him to death.  Subsequently, John Mark was convict-
ed at a jury trial and sentenced to life in prison.  The state
then agreed to drop its request for the death penalty against

4

Howard Livingston.  He was tried and convicted of murder and
sentenced to life in prison.

**ENUMERATION OF ERRORS**

I.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR
     WHEN IT FAILED TO EXCUSE THREE PROSPECTIVE
     JURORS, LARUE DAVIS, PERRY GANT AND MARGARET
     LYNCH, FOR CAUSE

II.  THE COURT UNDULY RESTRICTED COUNSEL'S VOIR
     DIRE ON THE ISSUE OF CAPITAL PUNISHMENT

III. MR. WALDRIP'S RIGHTS TO CONFRONTATION WERE
     VIOLATED BY ADMISSION INTO EVIDENCE OF STATE-
     MENTS MADE BY HIS CODEFENDANT

IV.  THE STATE WAS ALLOWED TO INTRODUCE IRRELEVANT
     AND PREJUDICIAL TESTIMONY ABOUT MR. WALDRIP'S
     PRIOR CRIMINAL HISTORY WHICH IMPROPERLY
     PLACED MR. WALDRIP'S CHARACTER IN ISSUE

V.   THE STATE IMPROPERLY READ INTO EVIDENCE TES-
     TIMONY PREVIOUSLY GIVEN BY THE NOW DECEASED
     VICTIM

VI.  THE STATE FAILED TO PROVE THAT VENUE FOR THE
     CRIME OF CONCEALING A DEATH WAS IN DAWSON
     COUNTY WHERE MR. WALDRIP WAS PROSECUTED

VII. THE TRIAL COURT'S JURY INSTRUCTION ON INTENT
     IMPROPERLY SHIFTED THE BURDEN OF PROOF

VIII.   THE STATE SHOULD NOT HAVE BEEN ALLOWED TO
        INTRODUCE PREJUDICIAL, INFLAMMATORY, AND
        GRUESOME PHOTOGRAPHS WHICH WERE NOT NECESSARY
        TO ASSIST THE TESTIMONY OF ANY WITNESS BUT
        WERE ONLY USED TO INFLAME THE JURY

IX.  THE COURT ERRED IN ALLOWING MR. WALDRIP'S
     FELONY MURDER CONVICTION, PREDICATED ON POS-
     SESSION OF A FIREARM, TO STAND

X.   THE TRIAL COURT ERRED IN DENYING MR. WAL-
     DRIP'S REQUEST FOR A NEW TRIAL BASED UPON A
     VIOLATION OF BRADY V. MARYLAND

5

XI.   THE COURT ERRONEOUSLY PERMITTED ADMISSION OF
      EVIDENCE WHICH HAD PREVIOUSLY BEEN SUPPRESSED
      BECAUSE IT WAS OBTAINED IN AN ILLEGAL SEARCH

XII.  THE TRIAL COURT ERRED IN DENYING MR. WAL-
      DRIP'S MOTION FOR A NEW TRIAL ON THE GENERAL
      GROUNDS THAT THE EVIDENCE WAS LEGALLY INSUF-
      FICIENT TO SUSTAIN THE VERDICT AND SENTENCE

XIII.     THE TRIAL COURT ERRED IN DENYING MR. WAL-
          DRIP'S REQUEST THAT DR. JOHN CURRIE, DEFENSE
          PSYCHOLOGIST, BE PAID IN FULL FOR HIS SERVIC-
          ES

XIV.  THE SENTENCE OF DEATH IS DISPROPORTIONATE IN
      THIS CASE IN LIGHT OF THE SENTENCES IMPOSED
      ON MR. WALDRIP'S CODEFENDANTS AND MR. WAL-
      DRIP'S PERSONAL CIRCUMSTANCES

XV.   THE TRIAL COURT IMPROPERLY COMMENTED ON MR.
      WALDRIP'S FAILURE TO TESTIFY DURING THE PEN-
      ALTY PHASE OF HIS TRIAL

XVI.  THE TRIAL COURT ERRED BY ALLOWING THE PROSE-
      CUTION TO USE EVIDENCE OF OTHER CRIMES IN
      AGGRAVATION WITHOUT PROPER NOTICE AND WITHOUT
      FIRST MEETING ITS BURDEN TO SHOW THAT PRIOR
      GUILTY PLEAS WERE THE RESULT OF KNOWING,
      VOLUNTARY AND INTELLIGENT WAIVERS

XVII.     THE PROSECUTOR ENGAGED IN IMPROPER CONDUCT
          WHEN HE ARGUED FACTS NOT IN EVIDENCE DURING
          HIS CLOSING ARGUMENT AT THE PENALTY PHASE

XVIII.    THE JURY WAS IMPROPERLY ALLOWED TO FIND TWO
          AGGRAVATING CIRCUMSTANCES BASED ON THE SAME
          CONDUCT

XIX.  THE COURT ERRED DURING THE COMPETENCY TRIAL
      BY ALLOWING THE PROSECUTOR TO MAKE IMPROPER
      REFERENCES TO THE DEFENDANT'S CONSTITUTIONAL-
      LY PROTECTED REFUSAL TO DISCUSS THE FACTS OF
      HIS CASE WITH THE STATE'S EXPERT WITNESSES
      AND HIS ALLEGED ATTEMPT TO CONTACT COUNSEL

XX.   THE CHANGE OF VENUE GRANTED FOR PURPOSES OF
      THE COMPETENCY TRIAL WAS INSUFFICIENT TO
      AVOID PERVASIVE PRETRIAL PUBLICITY AND OBTAIN
      A FAIR JURY

XXI. THE PROSECUTOR MISLEAD THE JURY BY ARGUING AND
IMPLYING THAT THE DEFENSE WAS REQUIRED TO TREAT
THE DEFENDANT'S MENTAL ILLNESS

XXII.    THE TRIAL COURT IMPROPERLY LIMITED DEFENSE
COUNSEL'S VOIR DIRE AT THE COMPETENCY TRIAL

XXIII.    IT WAS ERROR TO ALLOW THE STATE'S EXPERT
WITNESS TO REFER TO HIMSELF AS THE "JUDGE'S
WITNESS"

XXIV.    THE TRIAL COURT ERRED BY ALLOWING THE STATE
DURING THE COMPETENCY PROCEEDINGS REPEATEDLY
TO REFER TO AND ELICIT TESTIMONY ABOUT THE
PENDING CHARGES

<u>ARGUMENT</u>

**GUILT-INNOCENCE PHASE ISSUES**

I.   THE TRIAL COURT COMMITTED REVERSIBLE ERROR
     WHEN IT FAILED TO EXCUSE THREE PROSPECTIVE
     JURORS, LARUE DAVIS, PERRY GANT AND MARGARET
     LYNCH, FOR CAUSE

During voir dire, the court failed to grant the defense's
motion to remove from the venire three prospective jurors who
were not qualified and should have been excused for cause.  The
defense was thus forced to expend three of its peremptory strikes
to prevent these jurors' biases from tainting Mr. Waldrip's
trial.  (T. 1605, 1607, 1608).

"[I]t is well established in Georgia that peremptory strikes
are invaluable.  When a defendant in a felony trial has to ex-
haust his peremptory strikes to excuse a juror who should have
been excused for cause, the error is harmful."  <u>Bradham v. State</u>,
243 Ga. 638, 639, 256 S.E.2d 331, 332 (1979).  Because the
court's erroneous failure to excuse veniremembers Davis, Gant,
and Lynch for cause resulted in Mr. Waldrip being forced to
strike them peremptorily, Mr. Waldrip was denied his rights to a
fair and impartial jury, due process, equal protection, a fair
trial, and a reliable determination of punishment, pursuant to
the Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution, Article I, Section I, Paragraphs 1, 2, 11, 14, and
17 of the Georgia Constitution; <u>Witherspoon v. Illinois</u>, 391
U.S. 510 (1968); <u>Wainwright v. Witt</u>, 469 U.S. 412 (1985);  <u>Pope
v. State</u>, 256 Ga. 196, 345 S.E.2d 831 (1986), <u>cert. denied</u>, 484
U.S. 872 (1987); <u>Parisie v. State</u>, 178 Ga.App. 857, 344 S.E.2d

8

727 (1986); Logue v. State, 155 Ga.App. 476, 271 S.E.2d 42 (1980), and other applicable law.

A.   The Trial Court Should Have Excused Veniremember LaRue Davis for Cause

1.   Predisposition to Impose a Sentence of Death

LaRue Davis stated that she considered the death penalty appropriate for a defendant convicted of murder, unless he had a defense: she could think of no mitigating circumstances, once a defendant had been convicted, which would change her mind.  (T. 778-781).  Nevertheless, the trial court erroneously failed to excuse her for cause.  (T. 790).  Ms. Davis clearly and repeatedly expressed her belief that a person convicted of murder should be sentenced to death:

> if a person were without a shadow of a doubt be declared guilty, with no remorse, that he should not be allowed to live.  (T. 765).

> if a person is, has murdered someone in blood, cold blood, has no remorse for it and because of all the evidence that is presented he is determined to be guilty of it, that he should have the electric chair.  (T. 775).

> if he is just definitely a murderer, has no remorse for his crime, I think he should have the electric chair.  (T. 780).

Only if Mr. Waldrip could present a valid defense might she possibly be dissuaded from voting for a death sentence in such a case.  "I think that if he could convince the Court that he had a reason to commit this murder, maybe self-defense or something, that a life sentence would be appropriate."  (T. 779).  "Maybe if it was self-defense or, in order to protect a family member or a

9

child or, I don't know, that is all I can think of right now."
(T. 781).

Ms. Davis' firm commitment to imposing a death sentence
should have disqualified her from serving on a death penalty case
because her attitude towards capital punishment did, in fact,
"prevent or substantially impair the performance of [her] duties
as a juror in accordance with [her] instructions and [her] oath."
Wainwright v. Witt, 469 U.S. at 424-25 (quoting Adams v. Texas,
448 U.S. 38, 45 (1980)).  The law mandates that if, after suffi-
cient voir dire, the prospective juror's answers indicate that
his "views on capital punishment are such as to make him unable
to follow the law or obey his oath[]," Adams v. Texas, 448 U.S.
at 49, the court must excuse the juror for cause.  A trial court
commits reversible error if it denies a defense motion to excuse
a juror whose voir dire answers meet that standard.  See, e.g.,
Morgan v. Illinois, 504 U.S. 719 (1992);  Pope v. State, 256 Ga.
196, 345 S.E.2d 831 (1986).

"[A]n inability fairly to consider a life sentence is just
as disqualifying as an inability to consider a death sentence."
Childs v. State, 257 Ga. 243, 250, 357 S.E.2d 48, 56 (1987),
cert. denied, 484 U.S. 970 (1987).  See also Morgan v. Illinois,
504 U.S. 719 (1992);  Isaacs v. State, 259 Ga. 717, 730, 386
S.E.2d 316, 328 (1989), cert. denied, 497 U.S. 1032 (1990);
Skipper v. State, 257 Ga. 802, 364 S.E.2d 835 (1988);  Hance v.
Zant, 696 F.2d 940, 956 (11th Cir. 1983) ("the same standard
should apply to a veniremember in favor of the death penalty [as

10

to one opposed]"), cert. denied, 463 U.S. 1210 (1983), overruled on other grounds, 762 F.2d 1383 (11th Cir. 1985). Because the standard for determining a juror's death-qualification "does not require that a juror's bias be proved with 'unmistakable clarity' . . . [because] veniremen . . . may be unable to articulate, or may wish to hide their true feelings," Wainwright v. Witt, 469 U.S. at 424-425, neither may the standard for life-qualification demand unattainable certainty.

Rather, this Court has explained that, in ascertaining capital punishment attitudes where the veniremember makes incon-sistent or equivocal statements, the trial judge should consider the "final distillation" of his or her voir dire testimony. Spivey v. State, 253 Ga. 187, 197 n.3, 319 S.E.2d 420, 431 (1984), cert. denied, 469 U.S. 1132 (1985). See also Crowe v. State, 265 Ga. 582, 588, 458 S.E.2d 799, 807 (1994) (potential juror's testimony should be considered as a whole). Ms. Davis was quite articulate and emphatic about her strong preference for the death penalty. By contrast, her testimony as to her ability to follow the law was equivocal. She could not articulate any mitigating reasons "why [she] would not send somebody to the electric chair even if [she] voted for a guilty verdict in a case." (T. 781). The court's judgment that she would be able to follow the law appears to be based solely on her responses to questions requiring only yes or no answers. (T. 783-787). Yet "general questions of fairness and impartiality," such as these, may not be relied upon to discern a juror's true ability to

11

follow the law in a death penalty case. Morgan v. Illinois, 504 U.S. at 735. "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." Id. Looking at the "final distillation" of her testimony, Ms. Davis' "dogmatic beliefs" regarding the necessity for a death sentence upon conviction of murder were as strong as her answers to the judge's generic "follow-the-law" questions were weak. On balance, the inconsistency between Ms. Davis' declarations that she would impose the death sentence on anyone convicted of murder and her yes answers to the court's question about whether she would consider all evidence indicated an insurmountable predisposition for the death penalty. The court therefore erred in denying Mr. Waldrip's challenge for cause. In a comparable case, the Florida Supreme Court held that a prospective juror's statements that he was a strong supporter of the death penalty cast sufficient doubt on his assertions that he could follow the court's instructions. Bryant v. State, 656 So.2d 426 (Fla. 1995); see also Skipper, 257 Ga. 802 (prospective juror's negative response to statutory question of whether he opposed death penalty not sufficient to life-qualify him).

Ms. Davis' commitment to the death penalty was as automatic as that of the juror at issue in Pope, 256 Ga. at 201, in which this Court reversed a death sentence obtained after the trial court refused to excuse for cause a juror who was predisposed to return a death sentence. That juror's statement on voir dire

12

that "if the defendant was 'found guilty beyond a shadow of a doubt' and the trial court authorized [the juror] to consider the death penalty he would impose it," *Id.* at 201, was indistinguishable from Ms. Davis' statement that "if a person were without a shadow of a doubt be [sic] declared guilty, without remorse, that he should not be allowed to live." (T. 765). Neither juror could credibly give any weight to mitigating circumstances, as the law would require them to do.

Further, Ms. Davis' insistence on proof of a defense before imposing a life sentence is contrary to Georgia law: the burden is on the prosecution to establish aggravating circumstances and to show that the ultimate punishment should be imposed. Even when no mitigating circumstances are established, the jury is empowered to impose a life sentence. *O.G.C.A.* §17-10-30. To allow someone who would consider a life sentence only if and when the defense proved to him that a life sentence, rather than death, would be required, is completely contrary to the law and the court should have excluded Ms. Davis for being incapable of applying the proper burden of proof in this case.[3]

   2.   Misunderstanding of Mr. Waldrip's Parole Eligibility

Not only did Ms. Davis clearly express her predisposition towards a sentence of death upon conviction of murder, she also made clear her understanding that a person sentenced to life in

_____

   3.  In fact, Ms. Davis would have required the defense to prove not just that Mr. Waldrip deserved life but that he had a defense -- such as self-defense -- to the murder charge.

13

prison would be released on parole after seven to eight years and her intention to factor this information into her sentencing decision.  She testified that if convicted of murder, a person should be sentenced to death in order to protect the victim's family from worrying about him being released on parole:

> the family of the victim should not have to worry about him being up in jail and possibly out on parole after so many years and be out on the streets again.  (T. 765).

> I don't think the family, if, say if he is given a life sentence . . . with a parole in seven or eight years, that he should have to, the family should have to worry about it, about that person some day getting out of jail and being free and maybe coming back and doing something to the other members of the family. (T. 775-76).

In spite of the veniremember's misconceptions about the law and the reality of parole, see Argument II;  O.G.C.A. §17-10-6.1., the court denied the defense motion to excuse her for cause, (T. 789), and the defense was forced to use one of its peremptory strikes to eliminate this prejudiced and unqualified juror from the venire.  (T. 1605).

The trial court's denial of the defense's motion to strike Ms. Davis from the venire was error because leaving her on the jury would have allowed the "misunderstanding [of parole eligibility] [to] pervade[] the jur[or's] deliberations [and] ha[ve] the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration."  Simmons v. South Carolina, 114 S.Ct. 2187, 2192, 129

14

L.Ed.2d 133 (1994).  Failure to strike Ms. Davis thus violated Mr. Waldrip's due process rights.  See Argument II.

### B.  The Trial Court Erred in Failing to Excuse Juror Perry Gant for Cause

Mr. Gant testified that due to the large number of charges and the large number of witnesses expected to be called, he had already formed an opinion that Mr. Waldrip must be guilty:

> then you got up and you went over a list of witnesses, I think maybe the prosecution, three pages long, you know, and if he had done that before he had asked the question [whether the juror felt that he could serve], you know, I might not have been sitting in here now, I don't know.  (T. 1011).

> if the prosecution is going to call three pages of witnesses and you have to discredit three pages of witnesses, I would say, you know, the chances are slim to none you could do that.  So I'm not real sure, you know, I haven't already made my mind up.  (T. 1012).

> if I [had known the witness list was so long], I might have raised my hand the other day, you know, and said well, you know, that's a lot of witnesses . . . So, you know, probably had leanings, you know, toward guilty. (T. 1013).

When asked whether he still felt that Mr. Waldrip was guilty, Mr. Gant testified that Mr. Waldrip had a lot of work ahead of him to show that he was not guilty given how many witnesses the state was planning on calling.  (T. 1013).

Even after being admonished that he had to put aside his opinions, Mr. Gant's responses to the court's questions indicated strong partiality:

15

> I'm not real sure I would be a good juror, you know. I'm just not very comfortable with it. (T. 1019).

> I just want to make pretty clear that I don't think, you know, that I would be the best choice, I will just put it that way. (T. 1020).

> I have already had an opinion in my head that, you know, this man has got a lot of people and evidence going to be against him. (T. 1021).

During further questioning by the defense, Mr. Gant continued to insist that he had an opinion that Mr. Waldrip was guilty, and that therefore he would not make a good juror:

> if you have three pages of witnesses that you are going to be calling . . . you've got a hard row to hoe there.

> . . . . as of right this minute, yes [I still hold an opinion of defendant's guilt] . . . If you was my lawyer, I wouldn't want you taking that chance.

(T. 1020-23).

Nevertheless, the court refused to excuse the juror for cause, (T. 1028), and the defense had to use one of its peremptory strikes to eliminate this prejudiced juror from the venire. (T. 1607).

"[A]n impartial jury is the cornerstone of the fairness of trial by jury," Melson v. Dickson, 63 Ga. 682, 686 (1879), and

> [w]hen a defendant is required to use one of his most precious peremptory strikes to remove a juror tainted with cause for disqualification, the foundation of fairness and protection of fundamental rights is shaken.

McKee v. State, 168 Ga.App. 214, 308 S.E.2d 574 (1983). To preserve the fairness guaranteed by law, "[j]urors should come to

16

the consideration of a case . . . free from *even a suspicion* of
prejudgment" concerning "the issue to be tried . . . as to the
parties, the subject matter, or the credibility of witnesses."
Logue, 155 Ga.App. at 477 (citing Edwards v. Griner, 42 Ga.App.
281, 155 S.E. 789 (1930)) (emphasis supplied).

As the Supreme Court explained,

> the measure of a jury is taken by reference
> to the impartiality of each, individual juror
> . . . and each of these jurors must stand
> equally impartial in his or her ability to
> follow the law.

Morgan v. Illinois, 504 U.S. at 735 n.8.  See also Irvin v. Dowd,
366 U.S. 717, 722 (1961) (the constitutional "right to jury trial
guarantees to the criminally accused a fair trial by a panel of
impartial, indifferent jurors"); Rogers v. McMullen, 673 F.2d
1185, 1188 (11th Cir. 1982) ("[a]t a minimum, juries must be
comprised of competent and impartial persons"), cert. denied, 459
U.S. 1110 (1983).

The voir dire of Juror Gant clearly revealed that he would
not be able to be fair and impartial.  Indeed, he recognized this
himself and repeatedly stated that he would not make a good
juror.  In Parisie, 178 Ga.App. at 859, the Court of Appeals
reversed a conviction where the trial court failed to excuse for
cause a juror who stated that he could not be impartial and would
be influenced by previous events in his life.  See also Chapman
v. State, 593 So.2d 605 (Fla.App. 4 Dist. 1992) (though prospec-
tive juror did not think she would be affected by fact that her
mother had been killed during convenience store robbery years

17

before, there was possibility that it would affect her deliber-
ations;  trial court's failure to exclude juror for cause re-
versible error);  United States v. Martin, 749 F.2d 1514 (11th
Cir. 1985) (where attempted rehabilitation of juror established
only that she could put aside some of her bases of prejudice
while leaving others undisturbed, juror should have been excused
for cause).

In Logue, the Court of Appeals reversed a conviction because
of failure to strike a juror for cause where that juror's "in-
clination" towards the prosecution "remained or was at least in
doubt" even after efforts to rehabilitate her.  Logue, 155
Ga.App. at 478.

When a prospective juror has initially expressed bias or
prejudice it is not sufficient merely to solicit blanket disavow-
als later during voir dire.[4]  The juror's testimony must actual-
ly demonstrate that he is capable of being a fair and impartial
juror whose "mind [is] 'perfectly impartial' between the State
and the accused."  Bass v. State, 183 Ga.App. 349, 351, 358

---

4.  Irvin v. Dowd, 366 U.S. 717, 728 (1961) (jurors' state-
ments of their own impartiality to be given "little weight" due
to "unconscious mental processes");  Coleman v. Kemp, 778 F.2d
1487, 1543 (11th Cir. 1985) ("conclusory protestations of impar-
tiality in the voir dire" were not sufficient);  Jordan v. Lipp-
man, 763 F.2d 1265, 1274 (11th Cir. 1985) (quoting United States
v. Davis, 583 F.2d 190, 197 (5th Cir. 1978)) ("[t]he juror is
poorly placed to make a determination of his own impartiality";
"juror's conclusory statement of impartiality is insufficient");
United States v. Gerald, 624 F.2d 1291, 1297 (5th Cir. 1980)
(under certain circumstances "a trial court commits reversible
error by permitting the jurors to decide whether their ability to
render an impartial verdict is impaired"), cert. denied, 450 U.S.
920 (1981).

S.E.2d 837, 839 (1987).  The record fails to establish that this was the case with regard to Juror Gant.  It is not sufficient for the juror to indicate that in general he can follow the evidence and the court's instructions.  Id.  See also Knop v. McCain, 561 So.2d 229, 233 (Ala. 1989) (jurors' original statements of prejudice indicated "strong and deep impressions which [would] close the mind against the testimony" and jurors should have been excused for cause even though they subsequently affirmed that they could decide case based on evidence and law); Wood v. Woodham, 561 So.2d 224, 228 (Ala. 1989) ("the simple extraction of an affirmative response from a potential juror does not necessarily absolve that juror of probable prejudice").

C.   The Trial Court Erred in Failing to Excuse Prospective Juror Margaret H. Lynch for Cause

Ms. Lynch made it clear during voir dire that she had already made up her mind that a person who is involved in a murder committed with anger should be sentenced to death:

> I feel with hatred and anger and really, I mean, proven that they did it with lots of witnesses and evidence, then I feel like the death penalty is the best and not life imprisonment.  I don't feel like they should be able to live if they have taken someone's life. (T. 1163, T. 1173, T. 1176).

> I would listen to all the sides, but I feel like the death penalty should be, you know, a means to handle things like [a case involving anger, vindictiveness and a lot of witnesses]. (T. 1177).

Nevertheless, the court denied the defense motion to strike the juror for cause.  (T. 1184).

19

The strength of Ms. Lynch's predisposition toward the death penalty, is well within the range of certainty for which this Court has allowed exclusion of death-scrupled veniremembers. See, e.g., Hill v. State, 263 Ga. 37, 40, 427 S.E.2d 770, 774 (1993) (juror who "believed in" capital punishment could nevertheless be Witherspoon-excluded because he said he would have a hard time sleeping if personally involved), cert. denied, 114 S.Ct. 396 (1993). Impartiality requires a symmetrical standard for the reverse-Witherspoon inquiry and review of the trial court's decision should account for the fact that "an equal amount of attention has not been given to the need to assure that the jury is not composed only of death-prone jurors [as to guarding against jurors who would be too life-prone]." Lynd v. State, 262 Ga. 58, 65, 414 S.E.2d 5, 12 (1992) (Benham, C.J., concurring specially), cert. denied, 113 S.Ct. 420 (1992).

Though Ms. Lynch did assert that she would look at all the circumstances if chosen to serve on the case, her ability to fairly weigh them against her instinctual factors (anger, vindictiveness, and multiple witnesses) is questionable, just as the Pope juror's was. The trial court should have remembered the policy concerns behind the reverse-Witherspoon inquiry: "any juror to whom mitigating factors are . . . irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." Morgan v. Illinois, 504 U.S. at 739. As Chief Justice Benham observed, "it is not sufficient that the

20

juror be willing to 'consider' evidence in mitigation if he or she is committed to vote automatically for the death penalty after having 'considered' the mitigating circumstances." Bennett v. State, 262 Ga. 149, 155, 414 S.E.2d 218 (1992) (Benham, C.J., dissenting).  Examining the "final distillation," Spivey, 253 Ga. at 197 n.3, of her expressed opinions, the trial court should have excused Ms. Lynch for inability to consider a life sentence.

The trial court also failed to excuse Ms. Lynch for incapacity to apply the burden of proof correctly.  As Ms. Davis, Ms. Lynch would have required Mr. Waldrip to present a defense in order to even consider a sentence other than death:  "if it was self-defense or an accident, that is a different story, I feel . . . [otherwise] I feel like the death penalty is the best and not life imprisonment."  (T. 1163).  The burden of convincing a jury to impose the death sentence may not be so shifted from the prosecution to the defense.

II.   THE COURT UNDULY RESTRICTED COUNSEL'S VOIR
      DIRE ON THE ISSUE OF CAPITAL PUNISHMENT

Mr. Waldrip was denied his rights to assistance of counsel, a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of punishment, pursuant to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, Section I, Paragraphs 1, 2, 11, 14, and 17 of the Georgia Constitution;  O.C.G.A. §15-12-133;  Wither-spoon v. Illinois, 391 U.S. 510 (1968);  Wainwright v. Witt, 469 U.S. 412 (1985);  Morgan v. Illinois, 504 U.S. 719 (1992);

21

Legare v. State, 256 Ga. 302, 348 S.E.2d 881 (1986), and other applicable law, by the court's curtailment of and interference with defense counsel's voir dire of prospective jurors on the issue of their attitudes toward capital punishment.

The court consistently refused to allow counsel to question jurors about their understanding of what would happen to a person sentenced to life in prison.  (T. 122, 531-35).  As the testimony of one of the potential jurors showed, lay members of the public often believe that a person sentenced to life imprisonment will be eligible for parole after a short period of time, such as seven or eight years.  (T. 765, 776).  Additionally, during the penalty phase, the jurors returned with a question about the meaning of a life sentence and whether Mr. Waldrip would be released from prison if he received a life sentence thus making it clear that this was an issue about which the jurors were concerned.

Without the right to a voir dire adequate to identify unqualified jurors, the constitutional right to an impartial jury is meaningless.

> Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able to impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.

Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).  See also Ham v. South Carolina, 409 U.S. 524 (1973) (Fourteenth Amendment requires trial judge to interrogate veniremembers on

22

issue of racial bias); Turner v. Louisiana, 379 U.S. 466 (1965)
(Due Process Clause requires inquiry into jurors' impartiality).
In fact, the United States Supreme Court "[has] not hesitated,
particularly in capital cases, to find that certain inquiries
must be made to effectuate constitutional protections." Morgan
v. Illinois, 504 U.S. at 730.

Similarly, Georgia law requires that counsel be allowed to
ask veniremembers about "any matter or thing which would illus-
trate any interest of the juror in the case, including . . . any
fact or circumstance indicating any inclination, leaning, or bias
which the juror might have respecting the subject matter of the
action or the counsel or parties thereto." *O.G.C.A.* §15-12-133.
In Legare, 256 Ga. 302, this Court held that the trial court had
committed reversible error by refusing to allow defense counsel
to voir dire veniremembers on the question of possible racial
bias.  A juror's predisposition toward the death penalty in a
capital case is at least as serious a possible taint as racial
bias;  the remedy should also therefore be reversal of Mr. Wal-
drip's death sentence.

Therefore, under both the United States Constitution and
Georgia law, Mr. Waldrip had a right to thoroughly examine each
veniremember regarding his or her attitude toward the death
penalty, a right which the trial court violated by denying ques-
tioning on the veniremember's understanding of the implications
of life imprisonment.  "[A] trial court must require a thorough
and informative questioning of each juror." McCorquodale v.

23

State, 705 F.2d 1553, 1560 (11th Cir. 1983), cert. denied, 466 U.S. 954 (1984). This Court itself has advocated a full inquiry and that decisions on qualification of jurors be made only after a "final distillation, after substantial questioning by contending counsel and often by the judge, of theretofore unarticulated, amorphous, and casual thoughts upon capital punishment." Spivey v. State, 253 Ga. 187, 197 n.3, 319 S.E.2d 420, 431 (1984), cert. denied, 470 U.S. 1024 (1985). Because a juror's understanding of the allowable sentencing alternatives bears directly on her attitude toward the death penalty, this Court should extend to a criminal defendant in Mr. Waldrip's place the right to inquire into each juror's understanding of life imprisonment.[5] In discussing the interpretation of words used to voir dire about death penalty scruples, the Supreme Court wrote, "the critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood -- or misunderstood -- by prospective jurors." Witherspoon, 391 U.S. at 781 n.9. Determining how the phrase "life imprisonment" might be understood -- or misunderstood -- by prospective jurors, is likewise essential to the reverse-Witherspoon inquiry.

---

5. Such a right would, of course, soon become irrelevant as under the new life without parole amendment to the death penalty law, jurors will automatically be instructed on the difference between life with and life without parole. Thus, the remedy Mr. Waldrip seeks would apply only to cases such as his which arise under the old statute and in which the issue of parole has been raised by the jurors during voir dire.

24

The voir dire testimony of veniremember LaRue Davis illus-
trates the types of misunderstandings that might have been
uncovered, had voir dire been permitted.  See Argument I.  Ms.
Davis expressed repeatedly her understanding that a person sen-
tenced to life in prison would be released on parole after seven
to eight years and her intention to factor this information into
her sentencing decision.  (T. 765, 775-776).  Based on that
reasoning, she testified, a person convicted of murder should be
sentenced to death in order to protect the victim's family from
worrying about him being released on parole.  As Mr. Waldrip was
not allowed to inquire, he cannot now show how many other jurors
labored under similar or even more prejudicial misconceptions
about the law.  It is highly likely, however, that other jurors
likewise thought about and focused on the possibility of parole.
The late Chief Justice Charles L. Weltner, was quoted as saying
that his "review of death cases . . . convinced [him] that juries
often impose the death penalty not because they want the defen-
dant to be executed, but because they are convinced that other-
wise, he will be paroled."  The Atlanta Journal and Constitution,
October 12, 1986, "Death penalty foes girding for final Supreme
Court battle," 1A, 17A.  See also Paduano and Stafford Smith,
Deathly Errors: Juror Misperceptions Concerning Parole in the
Imposition of the Death Penalty, 18 Colum. Hum. Rts. L. Rev. 211
(1987) (discussing surveys reaching the same conclusion).

In reality, however, serious violent felonies in Georgia
carry a mandatory minimum term of imprisonment of ten years, no

portion of which may be paroled or reduced in any other way.
*O.G.C.A.* §17-10-6.1.  Additionally, for a first conviction of a
serious violent felony in which the defendant is sentenced to
life imprisonment, he will not be eligible for any form of parole
until he has served a mandatory minimum of 14 years.  *O.G.C.A.*
§17-10-6.1.  Further, any sentence imposed for a first conviction
of a serious violent crime other than life imprisonment or life
without parole or death must be served in its entirety, with no
exceptions.  *O.G.C.A.* §17-10-6.1.  Accordingly, if convicted of
his two charged serious violent felonies, murder and kidnapping
with bodily injury, as he was, Mr. Waldrip faced an absolute
minimum term of 20 years before he would even be eligible for
parole.  This reality bears no resemblance Ms. Davis's decisional
framework.

Yet "[the] Due Process Clause does not allow the execution
of a person on the basis of information which he had no opportu-
nity to deny or explain.'"  Simmons v. South Carolina, ___ U.S.
___, 114 S.Ct. 2187, 2192, 129 L.Ed.2d 133 (1994) (denial of
request for instruction on life imprisonment due process viola-
tion where defendant was in fact parole-ineligible).  The trial
court should have anticipated that retaining Ms. Davis without
opportunity for further voir dire would result in a "misunder-
standing [of parole eligibility] pervad[ing] the jury's delibera-
tions [and having] the effect of creating a false choice between
sentencing petitioner to death and sentencing him to a limited
period of incarceration."  Id.  In fact, the jury later returned

26

to the court with the very question that the court dismissed as irrelevant at voir dire: "Does life imprisonment mean no chance of parole?"[6] Allowing Ms. Davis's misconception in particular, and denying voir dire on this issue overall, the trial court violated Mr. Waldrip's due process rights.

The justice concerns evinced by <u>Simmons</u>'s due process analysis apply with equal force in Mr. Waldrip's case. His future dangerousness inevitably would be at issue in the sentencing phase of the trial, a fact that the trial court should have anticipated at the time of voir dire. As the United States Supreme Court noted, defendant's future dangerousness is likely to enter a jury's sentencing decision and the jury's evaluation of future dangerousness may very well depend on its understanding of parole eligibility. <u>See</u> <u>Simmons v. South Carolina</u>. "Public opinion and juror surveys support the commonsense understanding that there is a reasonable likelihood of juror confusion about the meaning of the term 'life imprisonment.'" <u>Simmons</u>, 114 S.Ct. at 2197 n.9.

This general observation was clearly borne out for Mr. Waldrip, as evidenced by Ms. Davis' misperceptions during voir dire and the jury request for instructions on life imprisonment during penalty phase deliberations. Mr. Waldrip's case is thus distinguishable from <u>Burgess v. State</u>, 264 Ga. 777, 450 S.E.2d 680 (1994), in which this Court refused to apply <u>Simmons</u>' rea-

---

6. This question is found on an unnumbered page at the end of the Trial Exhibits in Volume XX.

27

soning to a trial court's failure to charge the jury on parole
eligibility.  The Court's decision in that case was based on the
fact that how the jury's knowledge of parole availability affect-
ed its decision to impose the death penalty was too speculative
to consider.  Id. at 788.  Ms. Davis's statements during voir
dire in this case left no room for such speculation:  she clearly
expressed her belief that life imprisonment would entail parole,
her feeling that a convicted murderer should not be allowed that
parole regardless of the parole board's judgment, and her mis-
conception that the only other alternative was the death sen-
tence:

> I'm sure that if he was on parole, it would
> be the decision of a lot of judges and lawyers
> and so forth and they would consider whether
> he would deserve to be out on parole and so,
> but if he is just definitely a murderer, has
> no remorse for his crime, I think he should
> have the electric chair.

(T. 780).  Ms. Davis's unambiguous reliance on parole eligibility
as a reasoning for the death penalty is only one instance of the
juror misunderstandings that could very well have existed among
the chosen jurors, and that should have been explored and cor-
rected during voir dire.  By blocking the intended effect of a
reverse-Witherspoon inquiry, the trial court unconstitutionally
denied the defense an opportunity to explore the potential
jurors' understanding of life imprisonment.

The Court in Simmons also recognized an Eighth Amendment
rationale to require informing the jury of the implications of a

28

life sentence.  Though it did not resolve the issue, Justices

Souter's and Stevens' concurrence recognized that

> the Eighth Amendment imposes a heightened
> standard for reliability in the determination
> that death is the appropriate punishment in a
> specific case.  Thus, it requires provision of
> accurate sentencing information as an indis-
> pensable prerequisite to a reasoned determina-
> tion of whether a defendant shall live or die.
> . . . Thus, whenever there is a reasonable
> likelihood that a juror will misunderstand a
> sentencing term, a defendant may demand in-
> struction on its meaning.

Simmons v. South Carolina, 114 S.Ct. at 2198 (Souter, Stevens,

JJ, concurring).  See also Clark v. Tansy, 882 P.2d 527, 530

(N.M. 1994) (need for heightened reliability would mandate recog-

nition of defendant's right to require instruction on legal terms

so jury may make reasoned moral choice).  Accordingly, the trial

court should have recognized that the likelihood of misunder-

standing was demonstrably great in Mr. Waldrip's case and granted

his voir dire request.


        III. MR. WALDRIP'S RIGHTS TO CONFRONTATION WERE
             VIOLATED BY ADMISSION INTO EVIDENCE OF STATE-
             MENTS MADE BY HIS CODEFENDANT

        John Mark was not called as a witness by the state and did

not testify at Mr. Waldrip's trial.  Nevertheless, over defense

objection, the state was allowed to enter into evidence testimony

about several incriminating statements made by John Mark.  The

state failed to make an adequate showing to justify use of these

statements as co-conspirator statements, the statements were not

inherently reliable and Mr. Waldrip was prevented from confront-

ing and cross-examining John Mark, declarant of the statements, and they should therefore not have been admitted.

The first instance of this inadmissible hearsay evidence came during the testimony of Robert Garner. Mr. Garner was a prisoner who along with a later witness, Thomas Hitchcock, was incarcerated in the Forsyth County Jail on April 13, 1991, waiting to testify in the armed robbery case against John Mark, which had been scheduled to commence on April 15, 1991. While in jail, Thomas Hitchcock called over Mr. Garner to the telephone and put him on the phone with John Mark. (T. 1884). Mr. Garner testified that he then had a conversation with John Mark during which John Mark threatened Mr. Garner not to testify against him at the upcoming trial. (T. 1887-89). Mr. Garner testified that during this conversation he was told that John Mark called from his parents' home, Mr. Garner could hear unidentified voices in the background, (T. 1885), and at one point John Mark asked Mr. Garner to hold while he listened to something his father, i.e. Mr. Waldrip, was saying. (T. 1888). Mr. Garner testified at some length about being afraid of John Mark indicating that he thought he was at risk of being hurt by John Mark or somebody else at John Mark's request, and that as a result when he was taken to court to testify on April 15, 1991, he refused to testify. (T. 1890-96).

After objection by the defense, the trial court allowed these statements into evidence, because of the "evidence" of conspiracy between the defendant and his son. (T. 1866-77). The

30

court found evidence of a conspiracy because "John Mark, Howard K. Livingston, and Tommy Lee Waldrip participated together in the killing of Keith Evans." (T. 1874). This finding was, however, inadequate and in error.

> To use the co-conspirator exception, the prosecution must show a prima facie case that the declarant and the defendant were part of a conspiracy and the statement was made during the pendency of the criminal project. This may be shown by circumstantial evidence but the offered statement itself should not be considered.

Milich, *Georgia Rules of Evidence*, §18.11, p. 307 (West Publishing, 1995).

Mr. Waldrip's participation in the offense of killing Keith Evans might be evidence of *accomplice liability*, but provides no proof that Mr. Waldrip conspired with John Mark and Howard Livingston to plan and undertake the crime of murder. Because no evidence of a conspiracy existed, Mr. Garner's testimony about John Mark's threats were highly improper and prejudicial against Mr. Waldrip.[7]

Although the testimony provided by Mr. Garner could at best only be used against John Mark to prove that John Mark did something illegal, it was used against Mr. Waldrip and relied heavily on by the state in its closing argument. The prosecutor not only insinuated but affirmatively stated that there was proof that Mr. Waldrip conspired with John Mark to get rid of Keith Evans and

---

7. The court also wrongfully introduced the possibility of a conspiracy by instructing the jury about conspiracy absent any evidence of a conspiracy from the testimony. (T. 1889).

31

Mr. Garner and that the phone conversation between John Mark and Mr. Garner provided proof of that.  (T. 3235-37).

The entire testimony of witness Thomas Hitchcock was likewise inadmissible for all of the same reasons which apply to the testimony of Mr. Garner.  Mr. Hitchcock, who put Mr. Garner in touch with John Mark on the telephone while they were both in jail, testified at length about his own conversations with John Mark and about his conversations with Robert Garner.  Mr. Hitchcock testified that he on occasion called John Mark collect from the jail, (T. 2009), that these calls were made to John Mark's father's house, (T. 2016), and that John Mark also occasionally came to visit him in jail.  (T. 2021).  He acknowledged that he put Mr. Garner on the telephone with John Mark, (T. 2015), in response to a request by John Mark that he do so.  (T. 2020).  There was not even an allegation that Mr. Waldrip was present during any of these conversations.  Mr. Hitchcock was also improperly allowed to testify at length about his own motivations for testifying.  All of his testimony was inadmissible.

Even assuming the court correctly concluded that there was a conspiracy between John Mark, Howard Livingston and Mr. Waldrip to kill Keith Evans, there was certainly no evidence of a conspiracy among the codefendants relevant to the testimony of Robert Garner.  When testimony about statements made by codefendants is admitted under the co-conspirator exception to the hearsay rule, the testimony nevertheless still has to relate to the alleged conspiracy.  The mere fact that a co-conspirator excep-

32

tion has been established, does not enable the state to admit into evidence all of the codefendants' statements about anything he has ever talked about.  No evidence whatsoever was presented -- apart from the insinuations drawn from Robert Garner's testimony and John Mark's alleged statement that his "Daddy" was saying something while he was on the phone with Mr. Garner -- to show that even if there was a conspiracy to kill Keith Evans, there was any conspiracy or even any participation involving Mr. Waldrip in the crime of threatening Robert Garner.

Moreover, no evidence -- other than the inadmissible hearsay -- had been presented and no evidence was presented that *at the time* when this telephone conversation took place between Mr. Garner and John Mark, any conspiracy between John Mark, Howard Livingston and Mr. Waldrip had been initiated.  By the state's own evidence, the conversation in question took place five to six hours before the defendants encountered Keith Evans and even assuming *arguendo* that their joint participation in the killing proved a conspiracy, there was no evidence that such a conspiracy was initiated several hours before their encounter with Mr. Evans.

John Mark's threats against Mr. Garner were so far removed from and so unconnected to any criminal activity on the part of Mr. Waldrip that they should not have been admitted into evidence.  The prejudice resulting from their admission is of the kind warned against by the United States Supreme Court many years ago when conspiracy jurisprudence was in its infancy.  While

33

recognizing the necessity for being able to charge and prosecute
conspiracies, the Supreme Court warned against

> [t]he dangers for transference of guilt
> from one to another across the line separating
> conspiracies, subconsciously or otherwise, are
> so great that no one really can say prejudice
> to substantial right has not take place. . . .
> . The line must be drawn somewhere.

Kotteakos v. United States, 328 U.S. 750, 774 (1946).  Yet in
this case, the court failed to draw that line when it admitted
into evidence testimony about John Mark's conduct with respect to
Mr. Garner which was not connected to the conspiracy relating to
Keith Evans, assuming one existed, in which Mr. Waldrip was
allegedly involved.

The testimony of Robert Garner regarding John Mark's state-
ments should have been excluded because its admission violated
Mr. Waldrip's Sixth Amendment right to confront and cross-examine
the witnesses against him.  It is clear that "the Georgia co-
conspirator hearsay exception is much broader than the tradition-
al common law exception" and hearsay admitted under that excep-
tion must therefore "be judged for reliability under the stan-
dards elaborated in Dutton v. Evans, [400 U.S. 74 (1970)]" in
order to meet Sixth Amendment requirements.  Horton v. Zant, 941
F.2d 1449, 1465 (11th Cir. 1991).  The statements made by John
Mark to Mr. Garner and Mr. Hitchcock do not meet the Sixth Amend-
ment requirements of reliability.  They were all statements made
by one felon to other felons.  The reporters of the statements
were themselves incarcerated persons who all had incentives to
cooperate with the authorities and report whatever would be

34

helpful to the state as they themselves were awaiting criminal prosecutions.  The statements were made on the telephone under conditions when the reporters of the statements may have had less than ideal opportunities to hear, understand and challenge the statements.  And the statements were fairly vague and their meaning was elaborated on by the reporters.  There is absolutely no reason to think that these statements by John Mark made to fellow criminals a couple of days before his scheduled armed robbery trial were particularly reliable or likely to be true.

This evidence was not only inadmissible for the above rea-sons, it was also totally irrelevant.  Mr. Garner testified at some length about John Mark's successful attempt to persuade Mr. Garner -- by threatening him -- not to testify at the armed robbery trial.  While this was possibly a crime with which John Mark could have been charged, it was not a crime with which Mr. Waldrip was or could have been charged.  There was simply no evi-dence that Mr. Waldrip was in any way involved in or aware of John Mark's conversation with Mr. Garner.  Mr. Garner was clear during his testimony that he could not identify the voices of people talking in the room from where John Mark was calling and John Mark's alleged statements during one point in the conversa-tion that his father was saying something is by no means proof that his father was talking about John Mark's attempt to influ-ence Mr. Garner's testimony.  Even assuming John Mark's father really was saying something, he could have been telling John Mark to get off the phone, clean his room, take out the trash or any

35

number of other totally innocuous statements a father may make to
his son.  Mr. Waldrip had been given no notice of this evidence,
was not charged with any crime involving Robert Garner, and thus
had no opportunity to defend against or even challenge this evi-
dence.  Nevertheless, this evidence, because of the way it was
used by the prosecution, was very prejudicial to Mr. Waldrip as
it implied the existence of a pernicious and well-planned con-
spiracy to do harm to Keith Evans.  Such planning and premedita-
tion was not otherwise in evidence in this case.

The court also admitted into evidence, over defense objec-
tion, testimony by a law enforcement officer who overheard a
conversation between Mr. Waldrip and his son/codefendant John
Mark on or about April 18, 1991, several days after the death of
Keith Evans while both were in custody at the Dawson County Jail.
The law enforcement officer recounted statements made both by Mr.
Waldrip and by John Mark.  (T. 2335).  These statements took
place after Mr. Waldrip had given a confession to the authorities
and lead the authorities to the body of Keith Evans.  Without a
doubt, the conspiracy, if one ever existed, was certainly termi-
nated at this point.  Gunter v. State, 243 Ga. 651, 661, 256
S.E.2d 341 (1979);  O.C.G.A. §23-3-52.

Because Mr. Waldrip's rights to confront witnesses against
him, to due process, a fair trial, the assistance of counsel and
a reliable determination of punishment, pursuant to the Sixth,
Eighth, and Fourteenth Amendments to the United States Constitu-
tion, Article I, Section I, paragraphs 1, 2, 11, 12, 14, and 17

36

of the Georgia Constitution, <u>Dutton v. Evans</u>, 400 U.S. 74 (1970), and other applicable law, were violated by the introduction into evidence of statements made by Mr. Waldrip's codefendant, John Mark, Mr. Waldrip should be granted a new trial.

> IV.  THE STATE WAS ALLOWED TO INTRODUCE IRRELEVANT
> AND PREJUDICIAL TESTIMONY ABOUT MR. WALDRIP'S
> PRIOR CRIMINAL HISTORY WHICH IMPROPERLY
> PLACED MR. WALDRIP'S CHARACTER IN ISSUE

Mr. Waldrip's rights to assistance of counsel, due process, a fair trial, and a reliable determination of punishment, pursuant to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, Section I, paragraphs 1, 2, 14, and 17 of the Georgia Constitution, and other applicable law, were violated by the state's use of character evidence against him both during the competency trial and during the trial on the criminal charges.

"It is a fundamental principle in our system of jurisprudence, intended to protect the individual who is charged with a crime, and to insure him of a fair and impartial trial before an unbiased jury, that the general character of the defendant and his conduct in other transactions is irrelevant unless the defendant chooses to put his character in issue." <u>Bacon v. State</u>, 209 Ga. 261, 71 S.E.2d 615, 616–17 (1952). Until then, evidence of a defendant's bad character is inadmissible. *O.C.G.A.* §24-9-20(b) ("No evidence of general bad character or prior convictions shall be admissible unless and until the defendant shall have first put his character in issue."). For example, in <u>Hart v. State</u>, 174

37

Ga.App. 134, 329 S.E.2d 178 (1985), the defendant had not placed his character in issue when the state elicited testimony from an investigating officer that the officer had information that the defendant was selling cocaine out of his apartment.  The court held that the testimony had improperly introduced bad character evidence into the proceedings and that its admission constituted reversible error.[8]  Evidence of bad character or other crimes may be admitted only when there is "an absolute necessity" to do so and the exceptions to the general rule of exclusion must be "carefully limited and guarded by the courts." *Underhill's Criminal Evidence*, (5th. ed.) at 464.

Under Georgia law, "[t]he general character of the parties and especially their conduct in other transactions are irrelevant matter unless the nature of the action involves such character and renders necessary or proper the investigation of such conduct." *O.C.G.A.* §24-2-2.

The evidence introduced both at the competency trial and at the criminal trial was inflammatory and prejudicial evidence which served no purpose but to show that Mr. Waldrip was of bad

---

8.  Similarly, in <u>Boyd v. State</u>, 146 Ga.App. 359, 360, 246 S.E.2d 396 (1978), the court held that testimony from a prosecution witness that placed the defendant's character in issue was reversible error.  The testifying witness, a law enforcement officer, had testified on two different occasions to matters that placed defendant's character in issue.  The court commented that such testimony was "inherently harmful, for the jury will draw conclusions [about defendant's character] therefrom."  The court also stated that such testimony "deprived [defendant] of a fair and impartial trial, notwithstanding the instruction to the jury to disabuse their minds of such testimony." <u>Boyd v. State</u>, 146 Ga.App. at 360.

character.  Michelson v. United States, 335 U.S. 469, 475-476
(1948); Boyd v. State, 146 Ga.App. 359, 246 S.E.2d 396 (1978);
Robinson v. State, 7 S.E.2d 758, 759-60 (Ga.App. 1940).

"Evidence of independent criminal acts can have a strong
impact on the jury." French v. State, 237 Ga. 620, 229 S.E.2d
410, 411 (1976).  For that reason, other crimes evidence is not
admissible, if the danger of prejudice to the defendant by its
admission outweighs its probative value.  Tuzman v. State, 145
Ga.App. 761, 244 S.E.2d 882, 885, cert. denied, 439 U.S. 929
(1978).

A.   Improper Use of Character Evidence at Competency
     Trial

The prosecutor, under the pretense of expert witness testi-
mony at the competency trial, elicited testimony about several
previous criminal convictions and character evidence about Mr.
Waldrip.  (C. 607, 688).  On cross-examination of a defense
expert witness, the prosecutor first told the court that he
wanted to ask the witness about Mr. Waldrip having been incarcer-
ated in a number of different jurisdictions in connection with
this and previous charges because that would help explain Mr.
Waldrip's comments about the conspiracy of Dawson County reaching
into other counties.  (C. 597).

The court, over defense objection that this type of ques-
tioning improperly would allow admission of character evidence,
granted the state's request insofar as the state intended to
question the witness about what Mr. Waldrip had told him.  (C.

39

599-602).   When it turned out that Mr. Waldrip had not told the
expert anything about being incarcerated in other counties, the
prosecutor nevertheless insisted on getting into questions about
Mr. Waldrip's prior criminal history and asked the following
questions:

> Q:  . . . Did Mr. Waldrip reveal to you any
> prior criminal history, and if so, what did he
> tell you about that?
>
> A:  He talked about being arrested for a DUI
> and incarcerated, and as I said earlier that
> he talked about a revocation of probation or
> parole, but that was in the context of this
> broader conspiracy, so he did talk about that
> as well.
>
> Q:  So he told you about some prior experience
> with the courts that he has had.
>
> A:  Yes, sir.  His focus was mainly on his
> captors, the jailers, the sheriff, and so yes,
> the court too.
>
> Q:  Not asking you about this at this time,
> what I'm asking you about is simply this:  He
> has revealed to you some prior criminal histo-
> ry, that is some prior involvement with the
> criminal court system on his part.
>
> A:  Yes, sir, as I was just commenting.

(C. 607).  Subsequently in examination of the state's own wit-
ness, the prosecutor again was allowed, over defense objection,
(C. 668-86), to question the witness about Mr. Waldrip's prior
criminal conduct.

> Q:  And as part of your interview process with
> Tommy Waldrip can you state whether or not you
> sought to find out anything which you denomi-
> nated as identifying information in your re-
> port?

* * *

40

> A:   . . . He stated that in 1984 he was ar-
> rested for burglary and received probation for
> that.   He stated that he'd been arrested sev-
> eral times for DUI and spent twenty-two months
> in prison for DUI and possession of stolen
> goods.   He has -- he basically said he'd been
> in the Dawson County Jail since April 17th,
> 1991.

(C. 687-88).   This evidence was highly prejudicial and unrelated to the civil proceeding to determine Mr. Waldrip's competency to stand trial.

Lastly, the prosecutor elicited testimony from Mr. Waldrip, over strong objection by the defense, about three prior convictions, and introduced copies of those prior convictions into evidence.   (C. 869-75).

The prohibition against character evidence applies with equal force in the context of a competency trial and Georgia courts have indicated that it would be improper to admit evidence about specific prior instances of criminal conduct on the part of the petitioner in a competency trial.   See, e.g., Standbridge v. State, 158 Ga.App. 482, 280 S.E.2d 850 (1981) (general reference to past experiences and educational background not prejudicial where no reference to specific court appearance or specific crime); Brown v. State, 256 Ga. 387, 349 S.E.2d 452 (1986).   And the prosecutor's implicit argument that because Mr. Waldrip had previously been competent he was more likely to be competent now is also to no avail as the only issue at a competency trial is the defendant's present ability to understand the proceedings and assist in his own defense.   Brown v. State, supra;   Lightsey v. State, 188 Ga.App. 801, 374 S.E.2d 335 (1988).

41

B.    **Improper Use of Character Evidence at Criminal Trial**

The testimony of a prosecution witness at trial, who arrested Mr. Waldrip on charges unrelated to these proceedings, improperly introduced Mr. Waldrip's character into evidence.  (T. 2199-2201).  The prosecutor improperly elicited testimony from a former police investigator that pertained to a prior arrest of Mr. Waldrip.  (T. 2198-2201).  This prior arrest was completely unrelated to the arrest and criminal charges at issue in this case, as defense counsel pointed out in objection to the testimony.  (T. 2200).  Similarly, the prior arrest testified to by the prosecution witness had no relevance to the issues presented in the trial of the case.[9]  Over defense counsel's objection, the court allowed the prosecutor to inquire into Mr. Waldrip's prior criminal history and to ask questions such as the following:

> Q:  . . What were you going to do [with the defendant]?
>
> A:  . . . I received a telephone call that Mr. Waldrip was in the probation office and that there was a warrant for his arrest.  I . . . verified that [the] teletype was correct and it was still valid and then went to the probation office to execute that arrest.
>
> Q:  How physically did you place him under arrest at this point?
>
> A:  I asked him if he was carrying anything in his pockets, which is normal procedures, to

---

9.  The ultimate issue in determining the admissibility of evidence of other crimes is not mere similarity but relevance to the issues in the trial of the case.  The inquiry is whether proof of the extrinsic crimes tends to prove the crimes charged.  Stephens v. State, 261 Ga. 467, 405 S.E.2d 483 (1991) (citing Williams v. State, 251 Ga. 749, 784, 312 S.E.2d 40 (1983)).

42

clear his pockets, which he indicated he did-
n't have anything such as a knife or weapon in
his pockets.   I then placed him in handcuffs,
[and] placed him in the front seat of an un-
marked patrol vehicle.

(T. 2199-2201).   This testimony served only to interject Mr.

Waldrip's character, the fact that he was on probation, into the

proceedings and fundamentally prejudiced the jury against him.

In this case, Mr. Waldrip had not put his character in issue at

trial prior to the testimony of the prosecution witness.   There-

fore, the prosecution should not have been allowed to elicit

testimony from its witness that pertained to a prior and dis-

tinctly separate arrest from the one at issue in the case.

Introduction of evidence that Mr. Waldrip was on probation and

had previously been convicted of a felony improperly brought his

general character into issue because it was meant to reflect his

conduct in a separate and irrelevant transaction.   As stated in

Williams v. State, 261 Ga. 640, 409 S.E.2d 649, 651 (1991),

> evidence of an independent offense or act
> committed by the accused is highly and inher-
> ently prejudicial, raising, as it does, an
> inference that an accused who acted in a cer-
> tain manner on one occasion is likely to have
> acted in the same or in a similar manner on
> another occasion and thereby putting the ac-
> cused's character in issue.

Because of the improper use of character evidence Mr. Wal-

drip was denied a fair trial and his convictions must be set

aside.

43

**V.   THE STATE IMPROPERLY READ INTO EVIDENCE TES-
TIMONY PREVIOUSLY GIVEN BY THE NOW DECEASED
VICTIM**

Mr. Waldrip's rights to due process, a fair trial, and
confrontation of witnesses against him, pursuant to Article I,
Section I, Paragraphs 1, 2, 11, 14, and 17 of the Georgia Consti-
tution, the Fifth, Sixth, Eighth, and Fourteenth Amendments to
the United States Constitution, and other applicable law, were
violated when a prosecution witness read aloud verbatim testimony
given by the victim in an earlier unrelated proceeding.

Former Assistant District Attorney Russ McClellan, the
prosecution's first witness, "played the part" of the victim,
Keith Evans, in an exhaustive reading for the jury of Mr. Evans'
testimony at the armed robbery trial after which John Mark had
been convicted in 1990.  (T. 1763-1801).  This evidence was
inflammatory, irrelevant, and highly prejudicial for two reasons:
1) a reading by a former assistant district attorney added preju-
dicial authority to the victim's testimony; and  2) Mr. McClel-
lan's testimony could not have been given in the identical manner
of Mr. Evans' original testimony and thus misrepresented the
victim's actual statement.  This was particularly harmful as the
evidence was not even necessary or relevant to the instant case.

A.   The Reading of Keith Evans' Testimony Violated
     Georgia's Hearsay Statute Regarding the Admission
     of Testimony From a Former Trial, Because Tommy
     Lee Waldrip Was Not a Party in John Mark Waldrip's
     Armed Robbery Trial, and Thus Had No Opportunity
     To Cross-examine Evans, and the Issues in the Two
     Trials Were Different

Hearsay evidence is defined as "that which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons." *O.C.G.A.* §24-3-1. Such testimony is not admissible as evidence at trial, subject to some exceptions. One exception exists for the introduction of testimony given at a previous judicial proceeding. Georgia's "Testimony at Former Trial" exception reads:

> The testimony of a witness since deceased .
> . . which was given under oath on a former
> trial upon *substantially the same issue and
> between substantially the same parties* may be
> proved by anyone who heard it and who profess-
> es to remember the substance of the entire
> testimony as to the particular matter about
> which he testifies.

*O.C.G.A.* §24-3-10 (emphases added).

The federal courts[10] as well as the Georgia courts,[11]

---

10.   Reynolds v. United States, 98 U.S. 145, 160 (1878) (admitting testimony given at former trial due, in part, to full opportunity for defendant to cross-examine witness); Mattox v. United States, 156 U.S. 237 (1895) (admitting testimony at retrial because testimony given at trial, under oath, and subject to cross-examination); Pointer v. Texas, 380 U.S. 400, 407 (1965); United States v. Boulahanis, 677 F.2d 586, 589 (7th Cir. 1982) (upholding constitutionality of such testimony if "subject to cross-examination.").

11.   Craft v. State, 154 Ga.App. 682, 682, 269 S.E.2d 490, 491 (1980) (key factor in determining whether former testimony admissible is adequacy of opportunity for cross-examination); Cates v. State, 245 Ga. 30, 33, 262 S.E.2d 796, 799 (1980) (whether defendant had opportunity to cross-examine witness at

(continued...)

have emphasized the opportunity to cross-examine as the essential requirement for the admissibility of an inaccessible witness' testimony.

In the present case, the prosecuting attorney and a former assistant district attorney read, verbatim, Keith Evans' testimony from the armed robbery trial of John Mark, to which Mr. Waldrip was not a party.  Thus, Mr. Waldrip had never had any opportunity to cross-examine Evans.  Furthermore, the issues in the two cases were not substantially the same.  On these facts, the testimony was inadmissible as hearsay under Georgia law.

The Court of Appeals set out the necessary requirements for Georgia's Former Testimony exception in Prater v. State, 148 Ga.App. 831, 253 S.E.2d 223 (1979).  In Prater, the defendant was charged with burglary and armed robbery.  A witness, by the name of Weinthal, testified at Prater's commitment hearing and at an extradition proceeding implicated Prater in the crimes.  Both of these proceedings took place in Tennessee.  Weinthal died before Prater was tried in Georgia.  Prater appealed in part based upon the introduction of Weinthal's earlier testimony at his trial.

---

11.  (...continued)
previous trial is "the central issue in determining whether [the former testimony hearsay exception] applies"); Stidem v. State, 246 Ga. 637, 638, 272 S.E.2d 338, 339 (1980) (affirming admission of inaccessible witness' testimony due, in part, to fact that appellant was represented by counsel in first hearing and cross-examined witness); Prater v. State, 148 Ga.App. 831, 253 S.E.2d 223 (1979) ("the purpose for requiring that the former testimony had been received in a proceeding having substantially the same issues and parties is to insure that the party against whom the testimony is now offered had an opportunity adequately to cross examine the witness at the previous proceeding").

Prater argued that the prosecuting party in the Tennessee pro-
ceedings were not substantially the same as in his Georgia trial,
and that the issues differed as well.

The Court of Appeals held that "whether this evidence is
admissible as a matter of Georgia evidence law, and whether it is
admissible as a matter of federal constitutional law, are two
distinct questions." Id. at 834.  The court focused first on the
Former Testimony Exception to Georgia's hearsay rule, emphasizing
the importance of the availability of cross-examinations:

> the purpose for requiring that the former
> testimony had been received in a proceeding
> having substantially the same issues and par-
> ties is to insure that the party against whom
> the testimony is now offered had an opportuni-
> ty adequately to cross examine the witness at
> the previous proceeding.

Id. at 836.

Prater not only was a party in all proceedings being consid-
ered by the court, but he also "had ample opportunity to cross-
examine Weinthal in the Tennessee proceedings." Id. at 837.  In
contrast, Tommy Lee Waldrip was not a party in John Mark's armed
robbery case, and thus had no opportunity to cross-examine Keith
Evans.

Turning to the issue of substantially the same parties, the
Prater court ruled that "it is only the party against whom the
former testimony is now offered, whose presence as a party in the
previous suit is significant." Id. at 837 (quoting McCormick on
Evidence, p. 618).  Since Prater was a defendant in all the pro-
ceedings, the court held this prong of the test satisfied.

47

Noting that the "requirement of identity of issues, is like the rule about parties, merely a means of fulfilling the policy of securing an adequate opportunity of cross examination," the court held the specific issues for which Weinthal's testimony was admitted were all substantially the same, i.e. Prater's involvement in a specific robbery in Georgia.  Id. at 837, 838.

Evans' testimony in John Mark's armed robbery trial went to the issue of whether John Mark committed a certain armed robbery. Evans was the clerk who had been robbed, and thus testified as to the identity of his assailant.  The use of Evans' testimony in Mr. Waldrip's trial on the other hand was for the purpose of establishing that John Mark, and by inference Mr. Waldrip, had a motive to kill Keith Evans.  These two issues are not substantially the same.

This Court has held that under circumstances such as these, it is error to admit such hearsay testimony.  Cates v. State, 245 Ga. 30, 262 S.E.2d 796 (1980).  Cates was accused of murder and other crimes.  Id. at 30.  Cates allegedly committed the crimes with Robert Bellinger, who was tried separately.  Bellinger testified at his own trial that Cates was the one who committed the actual killing.  Id. at 31.  Bellinger was subsequently called by the prosecution at Cates' trial but refused to testify. Eventually, the court reporter from Bellinger's trial was called to testify that a transcript was unavailable and to recall what he could of Bellinger's testimony.  Cates argued that such testimony violated Georgia's hearsay rule and did not fall under the

Former Testimony exception because his trial did not involve substantially the same issues or parties.

This Court agreed that there was error in permitting the court reporter to testify. The Court held that the opportunity for Cates to cross-examine Bellinger was "the central issue in determining whether [the Former Testimony exception] applies." Id. at 34.

In Mr. Waldrip's case, testimony from a deceased witness was admitted. Mr. Waldrip did not have an opportunity to cross-examine the witness at the time the testimony was given. As this is the "central issue" in determining whether such testimony falls under one of the limited hearsay exceptions, its absence should preclude the admission of such testimony. The essential element of substantial similarity of parties did not exist in Mr. Waldrip's trial, and thus the court erred in permitting admission of Keith Evans' former testimony.

B.    Admission of Evans' Testimony Was Reversible Error
      Given the Prejudicial Manner of Its Introduction

Mr. Darragh, the prosecuting attorney in Mr. Waldrip's murder trial, and former assistant district attorney Russ McClellan, who prosecuted John Mark's armed robbery trial, introduced Keith Evans' testimony to the jury via dramatic dialogue, encompassing more than thirty-seven pages of trial transcript. After establishing to the jury that Mr. McClellan had been an assistant district attorney for more than nine years, the trial judge permitted Mr. Darragh and Mr. McClellan to perform Evans' testi-

49

mony through role-playing.  Mr. McClellan played the victim,
Keith Evans, while Mr. Darragh played the prosecuting attorney at
John Mark's trial, Mr. McClellan himself.

There are a number of problems with permitting such a pro-
duction in a court room to be had for the jury because it pres-
ents the jury with a necessarily inaccurate portrait of the
testimony.  Mr. McClellan, in his role as the deceased, was
permitted to portray the victim as he pleased, emotionally,
linguistically, and physically.  He was allowed to incorporate
into his role whatever tones, incantations, emphases, gestures,
or emotions he wished to convey to the jury.  Arguably, Mr.
McClellan could have testified to the manner in which Mr. Evans
had delivered his testimony, if this was relevant, since he was
there.  If Mr. Evans testified in a hesitant manner, exhibiting
fear for his life, this arguably could have been admissible.
However, Mr. McClellan was allowed to convey such sentiments to
the jury in his portrayal of Mr. Evans, regardless of whether
they were true.

The natural problem with such a production is that these
concerns cannot be properly addressed or circumscribed by the
court, and are not subject to review from the transcript alone.
More subtle abuses of such testimony are possible and equally
prejudicial.  This mode of introduction has the potential to
prejudice the jury to an incalculable degree.

It is true that there are a number of cases where due to the
inaccessibility of a witness, a trial transcript has been read

50

into evidence for the jury.[12]  However, no case seems to ad-
dress the problems associated with McClellan's and Darragh's
theatrical performance.  The potential for abuse in such a situa-
tion far exceeds the potential in the previously decided cases.

Despite the apparent non-existence of case law regarding
this area, there are some principles which this Court can use to
determine the proper course of conduct.  The first is the text of
Federal Rule of Evidence 804(b)(5).  The rule applies to the
admission of testimony which would otherwise be hearsay.  This
rule provides some guidance in that it requires

> . . . (B) the statement [be] *more probative*
> on the point for which it is offered *than any*
> *other evidence* which the proponent can procure
> through reasonable efforts;  and (C) the gen-
> eral purposes of these rules and the interests
> of justice will best be served by admission of
> the statement. . .

(emphasis added).  This suggests a balancing which must be under-
taken when determining the admissibility of testimony.  The
conflicting interests are the state's interest in an effective
prosecution and obtaining justice, while the defendant's interest
(especially in the hearsay context) is to obtain a fair trial,
without being unduly prejudiced.  To apply these principles to
the issue regarding the reading in of testimony, the proper
balance would seem to be to allow the prosecution to simply admit

---

12.  <u>Brown v. Matheson</u>, 142 Ga. 396 (1914) (privately hired
stenographer permitted to read testimony);  <u>McKenzie v. State</u>, 28
Ga.App. 33 (1921) (court stenographer permitted to testify as to
witness' testimony);  <u>Waller v. State</u>, 102 Ga. 684 (1897) (wit-
ness permitted to read statement of another from trial);  <u>Goodwin
v. Allen</u>, 89 Ga.App. 187, 78 S.E.2d 804 (1953).

51

the *transcript* into evidence for the jury to consider, have a
court reporter read it, or have a witness recount the substance
of the former testimony.  In this case, defense counsel suggested
that McClellan testify as to what he did at the trial, but the
court refused this suggestion even though that course of conduct
would have ensured the preservation of Evans' testimony and
fairness to Mr. Waldrip and the state was instead allowed to have
the testimony acted out before the jury.  Because this violated
Mr. Waldrip's rights to confront and cross-examine the witnesses
against him, he must be granted a new trial.

VI.   THE STATE FAILED TO PROVE THAT VENUE FOR THE
      CRIME OF CONCEALING A DEATH WAS IN DAWSON
      COUNTY WHERE MR. WALDRIP WAS PROSECUTED

Mr. Waldrip was charged with a number of crimes all arising
from the death of Keith Evans.  All these crimes were charged in
Dawson County where most of the activities leading to Mr. Evans'
death apparently took place.  One crime, however, "concealing a
death," O.C.G.A. §16-10-31, clearly took place in Gilmer County
and not in Dawson County.  Because Mr. Waldrip was thus wrongly
tried in Dawson County for a crime the venue of which was in
Gilmer County, Mr. Waldrip's rights to due process, a fair trial,
and trial in the district where the crime was committed, pursuant
to the Sixth, Eighth, and Fourteenth Amendments to the United
States Constitution, Article I, Section I, paragraphs 1, 2, 14,
and 17 of the Georgia Constitution, and other applicable law,
were violated.  The defense motion to direct a verdict of not

52

guilty because of the state's failure to prove venue was denied. (T. 2842-43).

Under Georgia law it is clear that "[c]riminal actions *shall* be tried in the county where the crime was committed." *O.C.G.A.* §17-2-2(a) (emphasis added). This is a mandatory requirement, as evidenced by the word "shall". Venue is an element of the criminal offense and "must be established beyond a reasonable doubt." Sawyer v. State, 217 Ga.App. 406, 409, 457 S.E.2d 685 (1995). While the state may meet its burden with slight evidence when there is no challenge to venue and no conflicting evidence, Jones v. State, 245 Ga. 592, 266 S.E.2d 201 (1980), nevertheless, the state may not completely fail to prove venue. In this case, according to the state's own evidence, it is clear that the body of Keith Evans was buried in Gilmer County. (T. 1709, 1826). Mr. Waldrip therefore should have been prosecuted in Gilmer County, if at all, on the charge of concealing a death and the state failed to meet its burden of proof with regard to that charge in Dawson County.

### VII. THE TRIAL COURT'S JURY INSTRUCTION ON INTENT IMPROPERLY SHIFTED THE BURDEN OF PROOF

Over defense objection, the court instructed the jury on voluntary intoxication. Mr. Waldrip had not raised any defense related to intoxication and had not made intoxication an issue at trial. Nevertheless, there was evidence that Mr. Waldrip had consumed some alcohol earlier in the evening before the crime.

53

The court gave the jury the following instruction about voluntary intoxication:

> if a person's mind when not affected by intoxicants is capable of distinguishing between right and wrong as well as reasoning and acting rationally, and the person voluntarily deprives himself of reason by consuming intoxicants, and while under the influence of such intoxicants the person commits a criminal act, the person is criminally responsible for such acts to the same extent as if the person were sober.

(T. 3298).

The instruction given by the court, unfairly instructed the jury that because Mr. Waldrip may have been intoxicated, it was not required to find that he actually at the time of the crime had the necessary mental state to be convicted of the various crimes.  This was particularly harmful in light of the fact that Mr. Waldrip was being tried as an accomplice and the state's evidence did not show whether Mr. Waldrip had been aware of his son's plan to kill or even actually participated in the killing at all.

The jury was instructed in a manner which could have given it the impression that if it found Mr. Waldrip to be voluntarily intoxicated, it had to find him to be responsible for his acts regardless of whether the state had met its burden of proof with regard to mental state.[13]  The instruction was incomplete, in-

---

13.  The fact that other, correct instructions on the burden of proof were also given is irrelevant.

> [A]n instruction relating to specific evidence which may be read to relieve the state
> (continued...)

54

accurate, and resulted in violation of Mr. Waldrip's rights to
due process as it relieved the state of its burden of proof on
the element of intent.

Intent to kill is a critical element of the offense of
malice murder under Georgia law. *O.C.G.A.* §16-5-1. <u>See also</u>,
<u>e.g.</u>, <u>Patterson v. State</u>, 239 Ga. 409, 238 S.E.2d 2, 8 (1977).
As such the state bears the burden of proving that element beyond
a reasonable doubt. <u>In re Winship</u>, 397 U.S. 358, 364 (1970).
Failure of the trial court to instruct the jury in a constitu-
tionally adequate fashion on a required element, or an instruc-
tion which relieves the state of its burden on a required ele-
ment, violates due process. <u>See</u>, <u>e.g.</u>, <u>Henderson v. Kibbe</u>, 431
U.S. 145 (1977); <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975);
<u>Patterson v. New York</u>, 432 U.S. 197 (1977); <u>Sandstrom v. Mon-
tana</u>, 442 U.S. 510 (1979). This is equally true when the element
in question is intent.

> [A]lthough intent is typically considered a
> fact peculiarly within the knowledge of the
> defendant, this does not . . . justify shift-
> ing the burden to him.

---

13. (...continued)
of its burden of proof as to mental state is
not cured by another general instruction plac-
ing he burden on the state. The two instruc-
tions are contradictory. A jury is as likely
as not to resolve the contradiction favorably
to the state. That likelihood requires the
court to grant relief.

<u>Erwin v. State</u>, 848 S.W.2d 476, 483 (Mo. 1993) (citing <u>Francis v.
Franklin</u>, 471 U.S. 307, 322 (1985)).

55

Mullaney v. Wilbur, 421 U.S. at 702 (declaring unconstitutional state rule which required defendant to prove "heat of passion" by a preponderance of the evidence in order to obtain a conviction of manslaughter).

In State v. Erwin, 848 S.W.2d 476 (Mo. 1993), the Supreme Court of Missouri found unconstitutional a jury instruction which in all relevant respects is indistinguishable from the one given in this case. In Erwin, the judge instructed the jury that "an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct." Id., 848 S.W.2d at 481 (defendant, charged with murder of his best friend, claimed to have been under influence of alcohol and could only vaguely remember what he had been doing). The Missouri Supreme Court reversed the defendant's conviction holding:

> The instruction here creates a reasonable likelihood that the jury would believe that if defendant was intoxicated, he was criminally responsible regardless of his state of mind. That reading has the effect of excusing the state from proving the defendant's mental state beyond a reasonable doubt and violates due process under Sandstrom [v. Montana, 442 U.S. 510 (1979)].

Id., 848 S.W.2d at 483.

The instruction given in this case suffers from exactly the same fatal flaw as the one rejected in Erwin.[14]  In this case like in Erwin, there is at least a "reasonable likelihood that

_____

14.  Appellant is aware of this Court's decision Bright v. State, 265 Ga. 265, 455 S.E.2d 37 (1995), which failed to adopt the reasoning of Erwin, but asks this Court to reconsider the premises of the Bright decision.

56

the jury [] misapplied the challenged instruction," <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990), relieving the state of its burden of proof. See also <u>Francis v. Franklin</u>, 471 U.S. 307, 316 (1985) (reversal required if reasonable juror could have understood the charge as shifting burden of proof). The Supreme Court, however, has made it abundantly clear that

> a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense.

<u>Patterson v. New York</u>, 432 U.S. at 215.

The instruction in this case created a mandatory presumption that if Mr. Waldrip, when not intoxicated, was "capable" of forming the necessary intent, he would be guilty of the crime of murder regardless of his state of mind at the time of the crime. Just as in another Georgia case involving burden shifting instructions, "[t]he jurors 'were not told that they had a choice, or that they *might* infer [intent]; they were told only that the law presumed it.'" <u>Francis v. Franklin</u>, 471 U.S. 307, 316 (1985) (quoting <u>Sandstrom v. Montana</u>, 442 U.S. 510, 515 (1979)). As in <u>Francis</u>, the jurors here could have thought that while intent must be proved, the state could meet its burden by showing that Mr. Waldrip was capable of intent when sober.

Indeed the language used by the trial court was more conclusive than that used in <u>Francis</u>. In <u>Francis</u> the jurors were told that the presumption could be rebutted. Here, like in <u>Sandstrom</u>, "a reasonable jury could well have interpreted the presumption as

57.

'conclusive,' that is, not technically as a presumption at all, but rather as an irrebuttable direction by the court to find intent once convinced of the facts [capability to form intent when sober] triggering the presumption." <u>Sandstrom v. Montana</u>, 442 U.S. at 517.  As such, it was clearly unconstitutional.

The prosecutor's closing argument emphasized the improper instruction:

> . . . voluntary intoxication in this case is no excuse, and the judge will tell you that, and it has nothing to do with his intent in this matter.  It's simply no excuse in this case.

(T. 3188).

Mr. Waldrip's rights to due process, equal protection, a fair trial, and reliable proceedings, pursuant to the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Article I, Section I, paragraphs 1, 2, 11, 12, 14, and 17 of the Georgia Constitution, <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979), <u>Francis v. Franklin</u>, 471 U.S. 307 (1985), and other applicable law, were violated by the court's incomplete and erroneous jury instruction on intent at the completion of the guilt-innocence phase.  Mr. Waldrip is therefore entitled to a new trial.

VIII.     THE STATE SHOULD NOT HAVE BEEN ALLOWED TO
          INTRODUCE PREJUDICIAL, INFLAMMATORY, AND
          GRUESOME PHOTOGRAPHS WHICH WERE NOT NECESSARY
          TO ASSIST THE TESTIMONY OF ANY WITNESS BUT
          WERE ONLY USED TO INFLAME THE JURY

The victim in this case died after being shot twice and

beaten.  At trial, the prosecution introduced into evidence

numerous highly prejudicial and inflammatory photographs.  These

photographs depicted the victim's body, see, e.g., (T. 2155,

2171), the site where the body was discovered, (T. 2247-48), and

images of the victim's body taken during autopsy procedures.  (T.

2542-44, 2550-90).  These photographs were gruesome, inflammato-

ry, prejudicial, and unnecessarily repetitive.  Admission of

these photographs resulted in violation of Mr. Waldrip's rights

to due process, a fair trial, the assistance of counsel and a

reliable determination of punishment, pursuant to the Sixth,

Eighth, and Fourteenth Amendments to the Constitution, Article I,

Section I, paragraphs 1, 2, 11, 12, 14, and 17 of the Georgia

Constitution, and other applicable law.

The admission of these photographs was totally unnecessary

overkill which served only to inflame and prejudice the jury.

The photographs were not relevant to any matter at issue at the

trial:  the cause of death was not at issue;  self-defense was

not alleged by the defense;  and the victim's identity was not

questioned by anybody.

The person through whom these photographs were introduced

was the prosecutor, Mr. Darragh.  While the prosecution's expert

witness, Dr. Hanzlick, did refer to the photographs in his testi-

mony, it was not imperative that he do so.  The photographs were simply not necessary to assist Dr. Hanzlick in his testimony. For example, at one point in direct examination, Dr. Hanzlick referred to the photographs to estimate irrelevant issues such as "causation of pain" and the degree of the victim's mobility after he was wounded.  See (T. 2597-2598).  Neither of these matters were at issue in the case.[15]  However, throughout his examination of Dr. Hanzlick, *the prosecutor* relied heavily on the photographs, constantly referring to them as he examined his witness. (T. 2591-2631).

The issue in this case is indistinguishable from that which arose in State v. Beers, 8 Ariz.App. 534, 448 P.2d 104 (1968). In that case, involving the death of a young child, the prosecution introduced two pictures of the victim.  Ultimately, the court found that the introduction of photographs had been unnecessary and that their introduction had unfairly prejudiced the defendant.  Reversing the conviction, the court held that "[i]n this case . . . we feel the trial court abused its discretion by permitting the photographs to be introduced in evidence as they were so highly inflammatory under the circumstances that their probative value did not outweigh their probable prejudicial effect."  State v. Beers, 8 Ariz.App. at 538.

---

15.  In addition, the prosecutor, Mr. Darragh, remarked that some of the photographs which depicted gruesome wounds "acknowledg[ed] that murder is basically a gruesome business."  (T. 2583-2584).  The "gruesomeness" of the crime of murder was certainly not an issue in this case.  This is one example of the fact that the photographs had no probative value in these proceedings.

The photographs introduced in this case were not at all probative of any factual question at issue, and their introduction was extremely prejudicial to the defense.  The photographs were of absolutely no assistance to the jury in performing its duty to resolve factual issues at trial.  "[E]vidence must relate to the questions being tried by the jury and bear upon them either directly or indirectly.  Irrelevant matter should be excluded."  *O.C.G.A* §24-2-1.  Since the admitted photographs in this case were simply not probative of any issue in the case, they should have been excluded.

Compounding the error in admitting irrelevant photographs is the fact that the pictures were particularly gruesome.  In Hol-comb v. State, 130 Ga.App. 154, 202 S.E.2d 529 (1973), although "not spectacularly gruesome" photographs were at issue, the court commented that

> a trial judge would often be well advised
> to sustain an objection to their admissibility
> on the ground that they add nothing of proba-
> tive value to the record.

Id., 130 Ga.App. at 155.  See also Hicks v. State, 256 Ga. 715, 720, 352 S.E.2d 762 (1987) ("relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").  Other states have balancing tests to deter-mine when highly prejudicial photographs should be admitted.  See, e.g., McNeal v. State, 551 So.2d 151, 159 (Miss. 1989) ("trial court must consider:  (1) whether the proof is absolute or in doubt as to identity of the guilty party, as well as, (2) whether the photographs are necessary evidence or simply a ploy

61

on the part of the prosecutor to arouse the passion and prejudice of the jury").

In this case, the defense's objections to introduction of the photographs should have been sustained.  The probative value of the photographs was far outweighed by their prejudicial impact.  The gruesome and inflammatory photographs of the victim, the site where the victim's body had been buried, and the autopsy procedure were completely irrelevant to the effective resolution of this case.[16]  Rather, these photographs were used solely to inflame the passions of the jury, and to unfairly prejudice the defendant.  The photographs were repetitive[17], and unnecessary, and their admission rendered Mr. Waldrip's trial fundamentally unfair.  Because these photographs were wrongfully admitted and their inflammatory nature could have affected the outcome of the trial, Mr. Waldrip's conviction should be reversed and the case remanded for a new trial.

---

16.  For instance, the post-autopsy photographs marked 85-P and 84-P were particularly gruesome and prejudicial.  Photograph 85-P depicted a "portion of skull that was broken and mashed in", and photograph 84-P depicted a fractured skull being held by Dr. Hanzlick.  (T. 2566-2567).  Certainly, there was a way to illustrate the location and other details of the victim's head injuries without referring to these particular photographs.

17.  For example, the photographs marked 70-P, 71-P, 78-P, 72-P, 108-P, and 74-P all showed different angles of the victim's scalp, (T. 2568), and the photographs marked 315-P and 319-P depicted the same neck and shoulder wounds.  (T. 2580).

IX.   THE COURT ERRED IN ALLOWING MR. WALDRIP'S
      FELONY MURDER CONVICTION, PREDICATED ON POS-
      SESSION OF A FIREARM, TO STAND

One of Mr. Waldrip's convictions was for felony murder where the predicate felony was "being a convicted felon in possession of a firearm."  This status offense cannot properly be the predicate for a felony murder conviction under Georgia law and that conviction therefore resulted in violation of Mr. Waldrip's rights to due process, a fair trial, and a reliable determination of punishment, pursuant to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, Section I, paragraphs 1, 2, 14, and other applicable law.

Felony murder is defined under Georgia law as occurring when "[a] person . . . in the commission of a felony . . . causes the death of another human being irrespective of malice."  O.C.G.A. §16-5-1(c).  In defining which felonies could constitute the predicate for a felony murder conviction, this Court originally held that "the Georgia legislature intended felony murder to encompass all felonies as 'felony' is defined in [the Georgia code] not just dangerous or forcible felonies."  Baker v. State, 236 Ga. 754, 758, 225 S.E.2d 269 (1976).

However, in 1992, two years before the trial in this case, the Court changed the definition of "felony" for purposes of the felony murder statute.  In Ford v. State, 262 Ga. 602, 423 S.E.2d 255 (1992), the Court reconsidered the issue of "whether danger-ousness is a prerequisite to the inclusion of a felony as an underlying felony under the felony murder statute" in Georgia.

63

The Court held that the statute was merely a codification of the felony murder doctrine at common law, and that the function of the statute was "not served by application of the rule to felonies not foreseeable dangerous." Id. 262 Ga. at 603.  The Court then adopted the rule previously adopted by the Kansas Supreme Court that "a felony means any felony that is dangerous per se, or 'which by the attendant circumstances, create[s] a foreseeable risk of death.'" Id.

Like Mr. Waldrip in this case, the defendant in Ford was convicted of felony murder, with the underlying felony being the possession of a firearm by a convicted felon.  Ford was in the process of unloading a semi-automatic pistol which inadvertently fired, sending a bullet through the floor killing the downstairs inhabitant.  In reversing his felony murder conviction, this Court held that "a status felony, including the possession of a firearm by a previously convicted felon, is not inherently dangerous." Id. at 603.

It is thus clear that the law in effect now and at the time of Mr. Waldrip's 1994 trial required that in order for a status offense such as possession of a firearm by a convicted felon to qualify as the predicate felony for a felony murder conviction under Georgia law, the state must show, at a minimum, that the possession was surrounded by such circumstances as would create a foreseeable risk of death.  In this case, the state did not make such a showing.  Likewise, the jury was not informed that such a showing would be required so there is no guarantee that the jury

64

did not convict Mr. Waldrip of felony murder purely by virtue of
the fact that a firearm evidently at some point was located in
Mr. Waldrip's trunk, thus in his possession.

X.   THE TRIAL COURT ERRED IN DENYING MR. WAL-
     DRIP'S REQUEST FOR A NEW TRIAL BASED UPON A
     VIOLATION OF BRADY V. MARYLAND

The court erred in the Order on Motion for New Trial in
denying Defendant Tommy Lee Waldrip's request for a new trial
based upon a violation of Brady v. Maryland, 373 U.S. 83 (1963).
Counsel for Mr. Waldrip filed a Motion For Discovery A/K/A "Bra-
dy" Motion on May 10, 1991, requesting certain information,
statements documents and reports from the state which would be
favorable to the defendant.   See *Motion for Discovery A/K/A
"Brady" Motion.*   (R. 55).   Further Mr. Waldrip prayed for an *in
camera* inspection of the state's file and all such documents to
be sealed for appellate review.   See *Motion for In Camera Inspec-
tion of State's File.*   Presiding Judge John E. Girardeau entered
an Order on October 31, 1991, granting the defendant's motion for
discovery and ordering the state to provide defense counsel any
such information within the knowledge of the prosecution team.
See *Order on Motion for Discovery A/K/A "Brady" Motion.*   (R.
837).   Judge Girardeau entered another order concerning the
"Brady" motion of Tommy Lee Waldrip on the 6th day of November,
1991, which further delineated with specificity the requirements
which were upon the state in providing the defendant with materi-
als requested.   Said order on "Brady" motions is a part of the

65

record herein.  _See_ _Order on "Brady" Motions_ November 6, 1991.
(R. 868).  The court in this matter entered still another order
on Mr. Waldrip's _Motion to Produce Statements of Witnesses_ re-
quiring the state to provide the defendant with all oral and
written statements made by codefendants and by all state witness-
es.  _See_ _Order on Motion to Produce Statements of Witnesses_ dated
January 16, 1992.

In spite of the above orders and the constitutional mandate
of _Brady_, certain information came to light during the jury trial
of codefendant Howard Kelly Livingston that should have been
provided to Mr. Waldrip and counsel prior to Mr. Waldrip's trial
in October 1994.  A hearing concerning alleged _Brady_ violations
was held during the October 1995 jury trial of Mr. Livingston and
a copy of the transcript of those proceedings has been made a
part of the record herein.  (Transcript of Motion for New
Trial).[18]

At the _Brady_ violation hearing in October of 1995, GBI Agent
Paul Loggins testified about administering a polygraph examina-
tion to Paul Waldrip.  Paul Waldrip is the youngest son of Mr.
Waldrip and was not a party to these proceedings.  _See_ Livingston
Volume 19 at 4475.  GBI Agent Loggins conceded that he had inter-
viewed and talked with Paul Waldrip both before and after ad-
ministering the actual polygraph examination and, most important-

_____

18.  Volumes 19 and 20 of the trial record in the Livingston
case have been made a part of this record as Defendant's Exhibit
1 to the Motion for a New Trial.  They will be referenced as
"Livingston Vol. 19 at p. ___."

ly, that the examination showed Paul Waldrip to be deceptive about his knowledge of the whereabouts of the body of Keith Evans and about his participation in the murder of Keith Evans.  Livingston Vol. 19 at 4475-87.  GBI Agent Loggins made it clear that Paul Waldrip was a suspect in this matter and was being investigated and that the polygraph was requested by investigator Maynard Waters of the Dawson County Sheriff's Department.  Therefore, a polygraph examination was administered to Paul Waldrip.  GBI Agent Loggins also testified that he discussed this matter with Maynard Waters both before and after the polygraph exam and also provided investigator Waters with a copy of the official report of the polygraph examination.  Livingston Vol. 19 at 4486-87.

Based upon the testimony of GBI Agent Loggins there is no question that the official report of this polygraph examination and the documents pertaining thereto were contained within the files of the Georgia Bureau of Investigation, a law enforcement agency assigned to work hand in hand with the Dawson County Sheriff's Department in this matter, and therefor the polygraph examination and documents pertaining thereto were within the control of the prosecution.  Brady v. Maryland requires "that the prosecution disclose evidence favorable to an accused . . . where the evidence is material to quilt or to punishment."  373 U.S. at 87.  Brady also requires disclosure of evidence that would be useful in impeaching government witnesses.  See United States v. Bagley, 473 U.S. 667 (1985);  Giglio v. United States, 405 U.S.

67

150 (1971). Even if the information withheld would not be admissible at trial, if said information might lead the defense to other admissible testimony or could be useful in constructing a defense, then the prosecution should provide it. Sellers v. Estelle, 657 F.2d 1075 (5th Cir. 1981).

The heart of the defense in the Tommy Lee Waldrip trial was that Mr. Waldrip was not at the scene of the murder, but rather was at home when the murder took place and was picked up by the assailants a very short time after the killing. The defense in this case was consistent with the physical evidence and the only evidence of Mr. Waldrip having been involved in the murder were portions of conflicting statements which Mr. Waldrip gave to law enforcement authorities.

Mr. Waldrip at all times when interviewed by law enforcement insisted that his son Paul Waldrip had nothing to do with this crime. Counsel emphasized during closing argument that none of the physical evidence a the scene of the murder at Hugh Stowers Road or the shooting at the Highway 9 Bridge could be attributed to Tommy Lee Waldrip. There is no blood evidence, hair evidence, shoe tread evidence, lime evidence or any other kind of physical evidence of any kind linking Mr. Waldrip to the scene of the killing of Keith Evans.

The state's case was that three people were involved in the killing of Keith Evans and that in addition to John Mark Waldrip and Howard Livingston, the person there was Tommy Lee Waldrip. However, it must be remembered that the firearm which the prose-

cution tendered at the trial of Mr. Waldrip as the murder weapon
was a gun which had belonged to Paul Waldrip and the evidence now
shows that Paul Waldrip was a suspect and that he did not fare
well on the polygraph examination.  This certainly raises the
distinct possibility that the third person at the scene of the
crime was Paul Waldrip, not Tommy Lee Waldrip.

At and before Mr. Waldrip's trial, the state insisted that
Paul Waldrip had an alibi and therefor was not pursued as a
suspect.  The only statement tendered to Mr. Waldrip as discovery
pursuant to the orders discussed above, concerning Paul Waldrip
was an interview with GBI Agent Billy Stone who went with Paul
Waldrip to the mini-storage area.  No other information or state-
ments concerning Paul Waldrip were provided to the defense.  The
defense knew from discussing the case with the state that the
state's position was that Paul Waldrip was at home on the evening
of the murder and that he therefore was not being investigated.
At no time did the state disclose that Paul Waldrip had indeed
been investigated with at least three statements having been
taken and a polygraph examination having been done by GBI Agent
Loggins.  The defense investigation provided no evidence to
contradict the Paul Waldrip alibi.  The defendant at trial was
unable to present any evidence to counteract the inference that
Paul Waldrip was not involved and indeed was at home on the night
of the killing.  Even without any credible evidence to present,
the defense still felt that there was a strong likelihood that
Paul Waldrip was the person at the scene of the killing, rather

than Tommy Lee Waldrip, and went forth with that defense and argument in front of the jury during the guilt-innocence phase.

As the Court can now assess, any information taken from Paul Waldrip which would lead one to believe that he was being deceptive as to his whereabouts on the evening of the death of Keith Evans becomes vitally important in the defense of Tommy Lee Waldrip.

The state of Georgia assumes that the polygraph test would be inadmissible and so therefor any arguments surrounding a <u>Brady</u> violation as to the polygraph test would be moot.  This is incorrect as evidence which might be inadmissible can still constitute a <u>Brady</u> violation in that it could lead to the discovery of admissible evidence.  <u>Sellers v. Estelle</u>, 657 F.2d 1075 (5th Cir. 1981).  More importantly, had defense counsel been provided this information prior to the trial of Mr. Waldrip in October 1994, certain questions would have been asked on cross-examination of certain law enforcement officers about whether or not Paul Waldrip had been investigated and whether he was actually a suspect or a target of their investigation.  If law enforcement officers had answered "yes," then the defense had made their point.  If law enforcement officers in this case had answered "no," and the defense had been in possession of the polygraph test results showing that Paul Waldrip had been deceptive or had lied, those witnesses could have been impeached.  Under those circumstances it is likely that the trial court would have ruled that the fact that a polygraph test had been administered would be admissible

70

for impeachment purposes.  Further, the fact that the answers showed deception might well have become admissible for impeachment purposes.  If the Brady violation would have potentially affected the outcome of this litigation, Mr. Waldrip is entitled to a new trial.  Zant v. Moon, 264 Ga. 93 (1994).  The testimony of Agent Loggins makes clear that Dawson County had these documents in their possession concerning Paul Waldrip and his deception in answering polygraph test questions.  Livingston Vol. 19 at 4478.  Further they had in their files at least two other interviews with Paul Waldrip.  The only comment which the state offers in this matter is they were unaware of the polygraph examination.  Livingston Vol. 19 at 4514.  The state claims to have no list of items tendered to the defense.  Defense counsel in this matter carefully prepared a file on every witness expected to testify at the October 1994 jury trial and maintained all interviews done by prosecution and defense for each such witness file.  Defense counsel looked harder at Paul Waldrip than at anyone else, but had no evidence to contradict the allegation that Paul Waldrip was at home on the evening of the death of Keith Evans.  The trial court noted that it was unable to sort out what the state had given defense and what had not been revealed.  Livingston Vol. 19 at 4471-73.  The state, of course, was unable to prove or verify that it had disclosed the documents in question.

Mr. Waldrip's rights to due process, assistance of counsel and a reliable determination of punishment pursuant to the Fifth,

71

Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution, Article I, Section I, paragraphs 1, 2, 14, and 17
of the Georgia Constitution, Brady v. Maryland, 373 U.S. 83
(1963), and other applicable law were violated by the state's
failure to disclose the above information and a new trial must be
granted in order for the Brady materials properly to be utilized
by defense counsel in defense of Mr. Waldrip.

XI.   THE COURT ERRONEOUSLY PERMITTED ADMISSION OF
EVIDENCE WHICH HAD PREVIOUSLY BEEN SUPPRESSED
BECAUSE IT WAS OBTAINED IN AN ILLEGAL SEARCH

Prior to trial, Mr. Waldrip's motion to suppress evidence
obtained in an illegal search of his car was granted by the trial
court.  Therefore, evidence gathered from that car during the
illegal search was ruled inadmissible at trial.  Nevertheless,
during trial the state was allowed to admit into evidence Mrs.
Linda Waldrip's expired insurance card, which had been recovered
by the police from the car during the illegal search.  This was
allowed because of a witness' knowledge of the document prior to
its seizure.  (T. 2063-69).  Admission of this piece of sup-
pressed evidence rendered the court's suppression ruling meaning-
less and grossly violated Mr. Waldrip's Fourth Amendment rights.

Mr. Waldrip's rights to due process, an impartial jury, and
freedom from unreasonable searches and seizures, pursuant to
Article I, Section I, Paragraphs 1, 2, 11, 13, and 17 of the
Georgia Constitution, the Fourth, Fifth, Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution, Wong Sun

72

v. United States, 371 U.S. 471 (1963); *O.C.G.A.* §17-5-30(a);
Mapp v. Ohio, 367 U.S. 643 (1961), and other applicable law, were
violated by the admission into evidence of this evidence which
had been suppressed previous to trial.

    XII. THE TRIAL COURT ERRED IN DENYING MR. WAL-
         DRIP'S MOTION FOR A NEW TRIAL ON THE GENERAL
         GROUNDS THAT THE EVIDENCE WAS LEGALLY INSUF-
         FICIENT TO SUSTAIN THE VERDICT AND SENTENCE

Not one piece of physical evidence, which was scientifically
tested by the Georgia State crime lab, linked Mr. Waldrip to the
original shooting at the Highway 9 Bridge in Dawson County or to
the alleged killing/death site of the deceased on Hugh Stowers
Road in Dawson County, Georgia.  Defense counsel argued at trial,
and continues to do so herein, that there was utterly no evidence
of Mr. Waldrip's physical presence at either of the two loca-
tions, apart from the conflicting statements given by Mr. Wal-
drip.  For those reasons, Mr. Waldrip's convictions were obtained
in violation of his rights pursuant to the Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution, Article
I, Section I, paragraphs 1, 2, 14, and 17 of the Georgia Consti-
tution, Jackson v. Virginia, 443 U.S. 307 (1979), and other
applicable law.

Exhibit #91, glass found at the Highway 9 Bridge where the
state contended that the original shot was fired,[19] cannot be
attributed to Mr. Waldrip or the vehicle in which the state

_____

    19.  This exhibit was never even tested by the crime lab.

contends Mr. Waldrip was riding on the evening of the death of Keith Evans. State's exhibit #65 is a 20 gauge shotgun shell hull -- the casing left after a shot shell is fired. On cross-examination of the state's firearms expert, it was made clear that this 20 gauge shot shell hull could not be linked to the alleged murder weapon as ever having been fired by that particular weapon. (T. 2528-29). The 20 gauge shotgun which was alleged to be the murder weapon in this matter, exhibit #66, belonged to Paul Waldrip, the son of Mr. Waldrip. State's exhibits #40 through #50, were plaster casts of foot prints found at the scene of the crime, none of which were tied in any way to Mr. Waldrip, and none of which therefore provided any evidence that Mr. Waldrip was ever at Hugh Stowers Road. Defendant's Exhibit #2 was Mr. Waldrip's shoes which were dissimilar in tread design to the shoe markings found at the Hugh Stowers Road site. (T. 3113-14).

State's exhibits #136, 285, 269, and 456 were cigarette butts which had apparently been smoked and dropped on the road at the crime scene. There is no evidence to attribute these cigarette butts to Mr. Waldrip. Saliva tests concerning these cigarettes were negative. (T. 2460). Lastly, there was no fingerprint evidence linking Mr. Waldrip to the death of Keith Evans. (T. 3103-06). And no eye witnesses testified to Mr. Waldrip's presence at or near the scene of the crime.

In the final analysis, there was only one way to link Mr. Waldrip to the death of Keith Evans and that was through Mr.

74

Waldrip's own contradictory statements.  These statements totally contradicted each other and show that Mr. Waldrip was attempting to protect his youngest son, Paul Waldrip, from prosecution rather than actually tell the authorities exactly what occurred.

All confessions are to be viewed cautiously and under Georgia law a conviction which rests solely on the uncorroborated confession of the defendant cannot stand.  Sands v. State, 262 Ga. 367 (1992).  This would be particularly true in this case where the contradictory confessions were given by a severely mentally ill person who had strong incentives to protect his child.  Because the scientific evidence failed to link Mr. Waldrip to the crime and no evidence other than his contradictory confessions provided evidence of his involvement in the death of Keith Evans, Mr. Waldrip's convictions should be set aside.

XIII.   THE TRIAL COURT ERRED IN DENYING MR. WAL-
        DRIP'S REQUEST THAT DR. JOHN CURRIE, DEFENSE
        PSYCHOLOGIST, BE PAID IN FULL FOR HIS SERVIC-
        ES

The trial court initially allowed Dr. John Currie to serve as a defense psychologist in preparation for and during Mr. Waldrip's competency and jury trials.  Dr. Currie testified during the competency trial and extensively during the guilt-innocence trial of Mr. Waldrip.  (T. 2985-3086).  Dr. Currie was cross-examined extensively by the prosecutor, Lee Darragh.  As a result of the lengthy cross-examination, Dr. Currie's fees exceeded the amount originally allocated by the trial court.  In spite of the fact that the extra expenses were incurred as a

75

result of the state's lengthy cross-examination, the trial court has refused to pay Dr. Currie beyond the $750 originally allocated. See *Defendant's Motion For Extension of Funds* (dated November 30, 1994); *Order on Motion for Extension of Funds* (dated November 30, 1994).

Counsel had, to the best of his ability, attempted to calculate the time for which Dr. Currie would be needed at the jury trial and had applied for funds sufficient to cover such time. Counsel could, of course, not calculate exactly how long cross-examination would be. Such cross-examination was extensive, requiring Dr. Currie to come back for an extra day, and ran Dr. Currie's billing time well beyond what the court previously had granted. Neither Mr. Waldrip nor his counsel had any control over the amount of time Dr. Currie had to remain due to objections by the state, conferences with the court concerning such objections, and cross-examination by the state. All of these matters, which were beyond the control of Mr. Waldrip, let to a final billing which extended beyond the amount pre-approved by the Court. Had Dr. Currie been able to testify and be cross-examined reasonably and leave after conclusion of his testimony, the pre-approved amount would have covered his testimony.

Dr Currie's final statement -- attached to the *Final Motion for Extension of Funds* (dated November 30, 1994), which is a part of the record herein -- shows that Dr. Currie spent one hour reviewing the file prior to coming to court. On October 20th, the first day Dr. Currie testified, which would have been the

76

only day as far as the defense was concerned, Dr. Currie's travel time was 2.5 hours.  Counsel could not exactly predict the amount of time Dr. Currie would need for travel and had calculated it at 2 hours.  On that same day, Dr. Currie appeared in court for three hours.  That this amount of time would be needed could not have been foreseen.  Dr. Currie's basic defense testimony was relatively brief, it was cross-examination, objections, arguments of law and bench conferences which made up the bulk of Dr. Currie's time.  As a result of these objections, bench conferences and legal arguments, Dr. Currie had to return on October 21, 1994, which required additional travel time and additional in-court time.  None of these matters were within control of or could have been predicted by the defense.  As a result of them, however, Dr. Currie ended up billing the defense $3,400, well beyond the $750 counsel had calculated would be necessary for Dr. Currie's travel and testimony during the jury trial.

It was estimated that the remaining funds approved for Dr. Currie would be adequate for him to testify and leave the court-room.  At that time there was $750 left of the court approved funds for Dr. Currie.  The defense had estimated one hour to review the file, two hours of travel and one hour of testimony. Billing at $200 per hour, that would have amounted to $800, just barely above the remaining $750.  However, as set out above, due to the state's extensive examination of Dr. Currie the time required well exceeded the four hours estimated.

Dr. Currie, of course, was not at fault and is entitled to be reimbursed for his services. Mr. Waldrip is indigent and does not have any funds with which to pay Dr. Currie. Unless the court authorizes public funds for Dr. Currie, the only source would be out of defense counsel's own pocket. This would be unwarranted and unfair in light of the fact that defense counsel was not in any way responsible for the extensive time Dr. Currie was required to spend in this case.

It is a violation of Mr. Waldrip's rights for the court to rule that these reasonable expert witness fees of Dr. Currie should not be paid. Mr. Waldrip filed motions for funds as required, and had been granted funds pursuant to Ake v. Oklahoma, 470 U.S. 68 (1985). The trial court's position apparently was that when the defense ran out of the money previously approved, the defendant should have stopped. This would have been impossible as the money ran out during the course of Dr. Currie's testimony.

Counsel, a sole practitioner, had to virtually shut down his law practice during the course of the competency trial and criminal trial in September and October of 1994 in order to concentrate on the defense of Mr. Waldrip. It cannot be required that counsel now also pay out of his own pocket for the expert services provided by Dr. Currie.

The balance of funds owed to Dr. Currie, $2,650, should be paid by Dawson County and failure to do so would result in violation of Mr. Waldrip's rights to assistance of counsel, a fair

78

trial, due process and a reliable determination of sentence pursuant to pursuant to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I, Section I, paragraphs 1, 2, 14, and 17 of the Georgia Constitution, Ake v. Oklahoma, 470 U.S. 68 (1985), and other applicable law.


**PENALTY PHASE ISSUES**

XIV. THE SENTENCE OF DEATH IS DISPROPORTIONATE IN THIS CASE IN LIGHT OF THE SENTENCES IMPOSED ON MR. WALDRIP'S CODEFENDANTS AND MR. WALDRIP'S PERSONAL CIRCUMSTANCES

The present crime involved three codefendants, Tommy Lee Waldrip, appellant herein, his son John Mark, and his brother-in-law Howard Kelly Livingston. According to the state's theory of the case, John Mark wanted to kill the victim because the victim had testified against John Mark at a previous armed robbery trial and was scheduled to testify again on the Monday following his death on Saturday night. Pursuant to the state's theory, John Mark had the motive and incentive to kill Keith Evans and Tommy Lee Waldrip and Howard Livingston, at the most, helped John Mark carry out this killing.

The state originally filed notices and sought the death penalty against all three defendants. Tommy Lee Waldrip was the first defendant to go to trial. He was convicted and sentenced to death. Subsequent to that trial, however, both of the two codefendants have been tried and both have received life sentences. John Mark was convicted after a jury trial but only sentenced to life in prison for his involvement. The state dropped

79

## CERTIFICATE OF SERVICE

I hereby certify that the above has been served by first

class mail on counsel for the state:

Lee Darragh
Office of the District Attorney
P.O. Box 1690
Gainesville, GA 30503-1690

Michael Bowers
Attorney General
132 State Judicial Building
40 Capitol Square, S.W.
Atlanta, GA 30334

this ___19th___ day of ___August___, 1996.

122

its request for the death penalty against Howard Livingston who was tried, convicted and sentenced to life in prison.

Mr. Waldrip is thus the only one of the three codefendants who is or will be under sentence of death due to the death of Keith Evans.  There is no supportable version of the facts, however, under which Mr. Waldrip is the most culpable person. The trial court found as a matter of fact that Mr. Waldrip was less culpable and that "the most culpable (the son) was given a life sentence."  (R. 755).  John Mark clearly was the person who had a motive to kill the victim.  Mr. Waldrip, however, had nothing to gain.  Mr. Waldrip further, cooperated fully with the authorities providing several statements about what had tran- spired.  It was only based on these statements that the state was even able to prosecute any of the defendants.

Pursuant to statute, this Court is required to review each sentence of death imposed in the state and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."  *O.C.G.A.* §17-10-35(c)(3).  As recognized by the United States Supreme Court, the proportionality review serves as a safeguard against "the random or arbitrary imposition of the death penalty."  Gregg v. Georgia, 428 U.S. 153, 206 (1976). This is exactly the type of situation for which the statutorily required proportionality review must have been designed.  While it may at times be difficult to determine what cases are "simi- lar" for proportionality review purposes, cases involving codefe-

80

ndants do not present such problems.  As this Court has previously held "because of the similarity of the crime," when conducting proportionality review, the Court "must give special consideration to the sentence received by the co-defendants in the same crime."  <u>Hall v. State</u>, 241 Ga. 252, 258, 244 S.E.2d 833 (1978).  Indeed, in <u>Hall</u> the Court set aside the death sentence imposed on Mr. Hall because it was disproportionate to the sentence of life imposed on Mr. Hall's codefendant and there was "no evidence . . . that Hall ordered the killing or was the 'prime mover' in the crime."  <u>Id.</u> 241 Ga. at 260.  <u>See also</u> <u>Slater v. State</u>, 316 So.2d 539 (Fla. 1975) (setting aside death sentence and imposing life sentence where codefendant, the 'triggerman,' had been allowed to enter plea of nolo contendre to murder charge and had been sentenced to life); <u>Windsor v. State</u>, 716 P.2d 1182 (Idaho 1985) (death sentence set aside as disproportionate and life sentence imposed where codefendant, whose participation in the crime was greater, also received death sentence;  defendant should not receive identical sentence to more culpable codefendant where defendant, <em>inter alia</em>, cooperated with police, had no history of violent criminal activity, accompanied the officers to the crime scene, was an ideal inmate and had an extremely troubled childhood); <u>State v. Stokes</u>, 352 S.E.2d 653 (N.C. 1987) (setting aside death sentence where codefendant, who was more deserving of death than defendant, had been sentenced to life during separate trial); <u>Sumlin v. State</u>, 617 S.W.2d 372 (Ark. 1981) (comparing death sentence to life sentence imposed on

81

wife/codefendant for the same crime and vacating death sentence
as disproportionate); State v. McIlvoy, 629 S.W.2d 333 (Mo.banc
1982) (finding sentence disproportionate and setting aside death
sentence of hired killer where hirer was sentenced to life for
her involvement in the crime).

To uphold the death sentence for only one of three codefend-
ants, when the defendant was not the most culpable and the other
defendants are not sentenced to death is patently disproportion-
ate.  But the Court is not limited to considering whether the
sentence is disproportionate based on the crime alone, it must
also consider "the defendant."  The sentence of death is partic-
ularly inappropriate in this case in light of Mr. Waldrip's clear
and pervasive mental illness, his history of alcohol addiction,
his history of living a law abiding life, his limited criminal
history none of which included any violent crimes, his coopera-
tion with the authorities, and his advanced age.  See, e.g.,
Clark v. State, 609 So.2d 513 (Fla. 1992) (setting aside death
sentence based in part on defendant's history of alcohol and drug
abuse and emotional disturbance);  DeAngelo v. State, 616 So.2d
440 (Fla. 1993) (setting aside death sentence due to the fact
that defendant had served in the army, confessed and was suffer-
ing from considerable mental disorders).  Mr. Waldrip, in addi-
tion to the sentence for murder, has already been sentenced to
one additional life sentence, and several terms of years.  He
will therefore not be eligible for parole until he has served at

least twenty years, or approximately at age 65.  No penological or other purpose will be served by executing this man.

Mr. Waldrip's sentence of death was imposed under the influence of prejudice and passion and is disproportionate to the crime and the defendant in the case.  It must, pursuant to Article I, Section I, Paragraphs 1, 2, 11, 12, 14, and 17 of the Georgia Constitution, the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *O.C.G.A.* §17-10-35, and other applicable law, therefore be set aside.

XV.   THE TRIAL COURT IMPROPERLY COMMENTED ON MR. WALDRIP'S FAILURE TO TESTIFY DURING THE PENALTY PHASE OF HIS TRIAL

During the penalty phase of Mr. Waldrip's trial, in response to a hearsay objection by the state, the court, in sustaining that objection commented in the presence of the jury that such testimony would be "self-serving in the sense of having the defendant testify without testifying." (T. 3404).  This gratuitous and improper comment on Mr. Waldrip's choice not to testify rendered his sentencing trial unfair.

A prosecutor's commenting to the jury on a defendant's failure to testify is an improper penalty imposed on the defendant for exercising his constitutional privilege against self-incrimination.  *Griffin v. California*, 380 U.S. 609, 614 (1965).  *Griffin* forbids not simply the direct reference to a defendant's failure to testify, but also the indirect reference. *See*, *e.g.*, *United States v. Norton*, 867 F.2d 1354, 1364 (11th

Cir.), cert. denied, 109 S.Ct. 3192 (1989); Marlow v. State, 152 Ga.App. 218, 262 S.E.2d 460, 462 (1979). It is clear that if such dire consequences flow from a prosecutor's comment on a defendant's failure to testify, the same comment made by the judge will have at least as deleterious an effect on the jury and the remedy for that error must be at least as far reaching.

In applying Griffin, most courts, see, e.g., D'Ambrosio v. Fay, 349 F.2d 957 (2nd Cir. 1965); Samuels v. United States, 398 F.2d 964, 968 (5th Cir. 1968); Lussier v. Gunter, 552 F.2d 385, 389 (1st Cir.), cert. denied, 434 U.S. 854 (1977); State v. Clark, 772 P.2d 322 (N.M. 1989); Hearn v. Mintzes, 708 F.2d 1072, 1076 (6th Cir. 1983); United States v. White, 444 F.2d 1274, 1278 (5th Cir.), cert. denied, 404 U.S. 949 (1971); Knowles v. United States, 224 F.2d 168, 170 (10th Cir. 1955); McCracken v. State, 431 P.2d 513, 517 (Alaska 1967); State v. Lincoln, 643 P.2d 807, 819 (Haw.App. 1982); State v. Hunter, 627 P.2d 1339, 1342 (Wash.App. 1981), have adopted a formula first announced in the pre-Griffin, non-constitutional case of Morrison v. United States, 6 F.2d 809, 811 (8th Cir. 1925):

> The test is: Was the language used *manifestly intended* to be, or was it of such a character that the jury would *naturally and necessarily* take it to be a comment on the failure of the accused to testify?

Id. (emphases added). This is the test employed by Georgia courts. See Ranger v. State, 249 Ga. 315, 319, 290 S.E.2d 63 (1982).

84

Although the concerns at the penalty phase of a capital prosecution are not perfectly congruent with those applicable to the determination of guilt, most courts which have considered the issue have held that the protection against comment on defendant's failure to testify applies at the penalty phase as well as at the guilt-innocence phase of a capital trial.  South Carolina has adopted a *per se* rule forbidding such prosecutorial comment, see State v. Sloan, 298 S.E.2d 92, 95 (S.C. 1982), and New Jersey has even forbidden comment upon the "wholly passive" demeanor of a non-testifying defendant.  State v. Rivera, 602 A.2d 775, 777-78 (N.J.App. 1992).  In habeas corpus review of a Pennsylvania death sentence, the United States Court of Appeals for the Third Circuit has held that under the Morrison test a prosecutor's reference to the defendant's failure to express remorse in limited testimony violated Griffin, and was not an error harmless beyond a reasonable doubt under the standard of Chapman v. California, 386 U.S. 18, 23 (1967).  Lesko v. Lehman, 925 F.2d 1527 (3rd Cir. 1991).

The United States Supreme Court, in Estelle v. Smith, 469 U.S. 454 (1981), held that

> We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned.  Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees. . . . Any effort by the State to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment.

85

Id. at 462-63 (footnotes and citations omitted).

Because the court's comment in this case clearly referred the jury to Mr. Waldrip's failure to testify in his own behalf, Mr. Waldrip's rights to a fair trial, due process, freedom from compulsory self-incrimination, and a reliable determination of punishment, pursuant to Article I, Section I, Paragraphs 1, 2, 11, 12, 14, 16, and 17 of the Georgia Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and other applicable law, were violated and he should be granted a new sentencing phase trial.

> XVI. THE TRIAL COURT ERRED BY ALLOWING THE PROSE-
> CUTION TO USE EVIDENCE OF OTHER CRIMES IN
> AGGRAVATION WITHOUT PROPER NOTICE AND WITHOUT
> FIRST MEETING ITS BURDEN TO SHOW THAT PRIOR
> GUILTY PLEAS WERE THE RESULT OF KNOWING,
> VOLUNTARY AND INTELLIGENT WAIVERS

During the penalty phase of Mr. Waldrip's trial, the state was allowed to use in aggravation several prior convictions of Mr. Waldrip's. However, as proper notice of the state's intent had not been given and as the state failed to meet its burden of showing that the prior convictions were validly obtained, use of these convictions resulted in denial of Mr. Waldrip's rights to due process, a fair and impartial jury, a fair trial, the assis-tance of counsel and a reliable determination of punishment pursuant to Article I, Section I, Paragraphs 1, 2, 11, 12, 14, and 17 of the Georgia Constitution, the Sixth, Eighth, and Four-teenth Amendments to the United States Constitution; Burgett v. Texas, 389 U.S. 109, 115 (1967); Pope v. State, 256 Ga. 195, 345

86

S.E.2d 831, 844 (1986); <u>Marshall v. Lonberger</u>, 459 U.S. 422, 436 (1983); <u>United States ex rel. Savini v. Jackson</u>, 250 F.2d 349, 355 (2nd Cir. 1957); <u>Carnley v. Cochran</u>, 369 U.S. 506, 514 (1962); *O.C.G.A.* §17-10-2(a), and other applicable law.

   A.   The Prosecution Failed to Give Timely Notice of
        the Evidence to Be Used in Aggravation

During the penalty phase of trial, the state introduced into evidence several prior felony convictions in aggravation. (State's Exhibits 137, 142, 1-S and 3-S). The prosecutor's required notice of intent to use these convictions was not mailed until the Friday before jury selection began on Monday. The envelope in which the notice was enclosed was postmarked September 30, 1994. (T. 3377). The record suggests the notice was delivered to defense counsel's office the following Monday while Mr. Waldrip and counsel were already in court taking part in jury selection. (T. 3363). Thus, trial had begun before Mr. Waldrip or his counsel received notice.

Georgia law allows the introduction of a defendant's prior convictions during the sentencing phase of a death penalty trial only where the state affirmatively notifies the defense before trial that such evidence in aggravation will be used. *O.C.G.A.* §17-10-2(a). Only such evidence as is made known to the defense before trial is admissible. <u>Id.</u> The purpose of the provision is to provide the defense an opportunity to "investigate the circumstances surrounding the prior conviction introduced in aggravation . . . to present mitigating matters surrounding this offense

87

at the sentencing hearing." <u>Watkins v. State</u>, 207 Ga.App. 766, 430 S.E.2d 105, 113 (1993).  The notice requirement also furthers fundamental fairness by recognizing "the difficulty of rebutting evidence of specific acts unless timely notice of the . . . intention to offer evidence is given." <u>Chandler v. State</u>, 261 Ga. 402, 407, 405 S.E.2d 669, 673 (1991).

As the court noted in <u>Bacon v. State</u>, 188 Ga.App. 782, 374 S.E.2d 351 (1993),

> we cannot approve of waiting until the day of trial to give notice to defense counsel that the State intends to put on evidence during the sentencing hearing of a prior conviction.  . . .  To permit the State, as a tactical maneuver, to erode a defendant's right to an opportunity to prepare for trial by withholding notice of its intent to submit evidence of prior convictions runs contrary to the stated purpose of the Code section.

<u>Id.</u> at 783.

In this case, Prosecutor Darragh did notify the defense that he would introduce prior convictions during the penalty phase of the trial.  However, the notice was not mailed until the Friday before jury selection began.  The notice was delivered to defense attorney Brannon's office on the following Monday while the parties were in court questioning the jury.  Because of this, counsel for Mr. Waldrip was denied the opportunity to investigate the validity of the prior convictions and the circumstances surrounding them.  Thus, the prior convictions should not have been admitted and Mr. Waldrip is entitled to a new sentencing phase trial.

88

**B.**   **The State Improperly Asserted That It Had No Burden of Showing That the Convictions Used in Aggravation Were Valid and Resulted from Knowing, Voluntary, and Intelligent Waivers of Mr. Waldrip's Rights**

With regard to the above referenced prior convictions used in aggravation at the penalty phase of the trial, even assuming *arguendo* sufficient notice had bene given, they should nevertheless still not have been admitted because the prosecutor improperly asserted that the defendant had the burden of demonstrating that his prior convictions were not the result of knowing, voluntary, and intelligent waivers of his rights. (T. 3372). Prosecutor Darragh incorrectly relied on Parke v. Raley, 113 S.Ct. 517 (1992), for this proposition. (T. 3380, 3386).

Mr. Darragh improperly interpreted the holding of Parke, 113 S.Ct. 525. There, the United States Supreme Court upheld a Kentucky statute that placed the burden with regard to the validity of prior convictions on the defendant, noting "we cannot say that it is fundamentally unfair to place at least a burden of production on the defendant." Id. However, the Court went on to discuss that the states have adopted varying positions relative to the burden in such instances. The Court noted that some jurisdictions place the burden on the state and others on the defendant. The Court clearly left this decision to the states. Id.

In Georgia, unlike Kentucky, the burden of proof with regard to validity of prior convictions rests on the state. Georgia has long followed the rule that "once the defendant raises the issue

of intelligent and voluntary waiver with respect to prior guilty pleas, the burden is on the state to establish a valid waiver." Pope v. State, 256 Ga. 195, 209, 345 S.E.2d 831 (1986).  In applying the rule, the Georgia courts promote the underlying policy that "courts indulge every reasonable presumption against waiver." Carnley, 369 U.S. at 514.  To permit a conviction obtained without counsel or without a valid waiver "to be used against a person either to support guilt or enhance punishment for another offense is to erode the principle" of Gideon v. Wainwright, 372 U.S. 335 (1963).  Burgett, 389 U.S. at 115.  A plea of guilty "cannot be voluntary in the sense that it constitutes an intelligent admission that the accused committed the offense unless the accused has received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" Marshall v. Lonberger, 459 U.S. at 436 (quoting Smith v. O'Grady, 312 U.S. 329, 334 (1941)).

Fully six months after the decision in Parke and more than fifteen months before Mr. Waldrip's trial, the Georgia Court of Appeals reaffirmed the rule in Pope.  See Dowdy v. State, 209 Ga.App. 95, 96, 432 S.E.2d 827, 829 (1993).

In Bright v. State, 265 Ga.App. 265, 455 S.E.2d 37 (1994), the Supreme Court again reaffirmed the rule in Pope, but denied the defendant's appeal because counsel did not raise a timely objection.  Bright, 265 Ga.App. at 286.  Unlike defense counsel in Bright, Mr. Waldrip's attorney did raise a timely objection to

90

the prosecutor's failure to meet his burden of demonstrating that the prior convictions resulted from a knowing, voluntary, and intelligent waiver.  (T. 3357).

Moreover, not only did the state fail affirmatively to prove waiver, the trial transcript itself raises serious doubts about Mr. Waldrip's waiver in at least two instances.  (1-S; 3-S). During a conference to discuss the pending sentencing phase of the trial, the defense objected to the use of State's Exhibit 1-S, Mr. Waldrip's guilty plea to a burglary charge in Rockdale County:

> MR. BRANNON:    Judge, as to State's Exhibit
> Number 1, I do interpose an objection as to
> based on the plea form entered the day that he
> tendered his plea.  The question was, "Did you
> in fact commit the offense of burglary and
> criminal trespass as explained in the indict-
> ment or accusation," the answer is, "No," ini-
> tialed by TLW, Tommy Lee Waldrip.  "Are you in
> fact guilty as charged in this indictment,"
> the answer is, "No," initialed by Mr. Waldrip.

(T. 3369-3370).  In overruling the defense objection, the court noted that the judge in the Rockdale County matter had certified the guilty plea:

> THE COURT:  So even if Mr. Waldrip had entered
> that plea, as some do, saying they are not
> guilty, the judge determines that in fact
> there is a factual basis for the entry of the
> plea, that it is freely and voluntarily en-
> tered after advice of rights, then it is a
> valid plea.  Based upon that I would not rule
> it out if on the grounds raised.

(T. 3371).

There are also serious doubts about Mr. Waldrip's waiver when entering a guilty plea to charges in Forsyth County.  (3-S).

91

Mr. Darragh tendered the document, arguing that Mr. Waldrip had legal counsel and properly waived his right to trial:

> MR. DARRAGH:   As to State's Exhibit Number 3, which is for sentencing purposes, this is 89-5674, Forsyth County, theft by receiving, DUI, reckless driving, leaving scene of an accident in the case.  The first page, the same one that has the State exhibit number shows representation at the time of the entry of plea of guilty by J. Russell Jackson on February 6th, 1989, and the document further has a petition to enter a plea of guilty in the case in which he states that he did commit the acts, supposedly did as opposed to did not in this particular matter, and the sentencing date is also the same date as the entry of the plea in the case, February 6th, 1989, again showing he was represented by counsel at the time in this case.

(T. 3375).  Following a break and a brief discussion of the notice requirement, defense counsel responded:

> MR. BRANNON:   Okay.   If I might perfect the rest of my argument.   This is based on the petition to enter a plea contained herein. There are some other areas which are not clear in here.  When asked about, "Have you received a copy of the indictment in the case," it has an NA by yes, and NA by no.  "Have you had it read to you," it has NA by yes and NA by no. When you turn over on the next page, "Has any plea agreement been made by you with anyone which causes you to plead guilty," "Yes," "And what is it," there is nothing written down to advise what that might be.
>
> Also, the one I just read to the Court would be number 30 on here about the plea agreement.   Back on the front, again, number 23, "You've been advised of maximum punishment by law for offense or offenses to which you want to plead guilty," they are not written in here.   The answer is, "yes," but where it says, "What is it," the client is supposed to be advised, there is no advice there that he actually knew what it was.

(T. 3377-3378).  The court admitted both guilty pleas for use in aggravation at sentencing.  (T. 3393).

The record reveals serious doubt about whether Mr. Waldrip understood the seriousness of the charges against him when entering the two guilty pleas discussed.  The prosecution has the burden of showing that the pleas were in fact knowing, voluntary, and intelligent.  Prosecutor Darragh failed to assume this burden.  His reliance on Parke was clearly erroneous and served to undermine the purposes of O.C.G.A. §17-10-2(a) as applied in Pope.  Therefore, the prior convictions should not have been admitted and Mr. Waldrip is entitled to a new sentencing phase trial.

XVII.    THE PROSECUTOR ENGAGED IN IMPROPER CONDUCT WHEN HE ARGUED FACTS NOT IN EVIDENCE DURING HIS CLOSING ARGUMENT AT THE PENALTY PHASE

During closing argument at the penalty phase, the prosecutor -- apparently in an effort to explain how an otherwise law-abiding former minister, Tommy Lee Waldrip, had ended up involved in the present case -- started reciting in some detail Mr. Waldrip's alleged involvement and actions in a prior burglary.  (T. 3514).  No evidence had been admitted about the details of this burglary, however, and the prosecutor's argument thus amounted to pure speculation at best and unsworn and improper testimony by the prosecutor at worst.

Closing argument is not "an opportunity for the prosecutor, in effect, to present additional testimony," Parks v. State, 254

93

Ga. 403, 416, 330 S.E.2d 686, 697 (1985), and it is "reprehensible for a lawyer in closing argument to misstate the testimony or facts in evidence." Barnes v. State, 244 Ga. 302, 308, 260 S.E.2d 40, 44 (1979). See also Williams v. State, 254 Ga. 508, 511, 330 S.E.2d 353, 356 (1985) ("A prosecutor may not . . . inject into his final argument 'matters which [have] not been proven in evidence'") (quoting Winget v. State, 138 Ga.App. 433, 437, 226 S.E.2d 608 (1976)); American Bar Association's Standards Relating to the Prosecution Function, §3-5.9 ("It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record").

Such conduct, when perpetrated during the penalty phase of a capital case, also clearly violates "the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.'" Skipper v. South Carolina, 476 U.S. 1, 7 n.1 (1986) (quoting Gardner v. Florida, 430 U.S. 349, 363 (1977)). See also Zant v. Stephens, 462 U.S. 862, 887 (1983) (denial of due process for consideration of the death sentence to be based upon factors that are not "fully subject to explanation by the defendant"); Williams v. State, 254 Ga. at 511, 330 S.E.2d at 356 (error occurred when prosecutor injected facts not proven at trial into his closing argument, because defendant "had no chance to rebut").

Because the prosecutor's improper argument resulted in denial Mr. Waldrip's rights to due process, a fair trial, and a

94

reliable determination of punishment, pursuant to the Fifth,
Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution, Article I, Section I, Paragraphs 1, 2, 11, 14, 16,
and 17 of the Georgia Constitution, and other applicable law, Mr.
Waldrip must be granted a new penalty phase trial.

### XVIII.    THE JURY WAS IMPROPERLY ALLOWED TO FIND TWO AGGRAVATING CIRCUMSTANCES BASED ON THE SAME CONDUCT

The state relied upon and the jury found two statutory
aggravating circumstances at the penalty phase.  However, both
statutory aggravating circumstances were based upon exactly the
same facts and conduct, an alleged aggravated battery of the
victim prior to death.  The state relied on the (b)(2) aggravat-
ing circumstance that the murder had been committed during anoth-
er felony, to wit, aggravated battery and the (b)(7) aggravating
circumstance that the murder was outrageously and wantonly vile,
horrible and inhuman, in that it had involved an aggravated
battery.

In effect, the jury was allowed to give double weight to one
act committed by Mr. Waldrip.  Such duplicative aggravation has
been rejected under Georgia law and the law of many other states.
In the context of double murders, for example, this Court has
held that "[t]he doctrine of 'mutually supporting aggravating
circumstances' precludes simultaneous use of the murder of [A] to
support the death penalty for [B] and use of the murder of [B] to
support the death penalty for [A]." Wilson v. State, 250 Ga.

95

630, 300 S.E.2d 640, 648 (1983).  See also Burden v. State, 250
Ga. 313, 297 S.E.2d 242, 245 (1982).

Both Alabama and Mississippi have clearly condemned exactly
the type of duplication of aggravation which was allowed in this
case.  See, e.g., Cook v. State, 369 So.2d 1251 (Ala. 1979)
(findings of robbery and pecuniary gain aggravating circumstances
based on single act of taking money from robbery victim was
duplicative and unconstitutional);  Jenkins v. State, 606 So.2d
604 (Miss. 1992) (error to instruct jury on both robbery and
pecuniary gain aggravators where evidence in support of factors
identical;  this amounts to impermissible double-counting);
Willie v. State, 585 So.2d 660 (Miss. 1991) (sentencing jury
cannot consider both robbery and pecuniary gain aggravators;
"When life is at stake, a jury cannot be allowed the opportunity
to doubly weigh the commission of the underlying felony and the
motive behind underlying felony as separate aggravators").

Mr. Waldrip's rights to due process, a fair and impartial
jury, a fair trial, the assistance of counsel and a reliable
determination of punishment, pursuant to Article I, Section I,
Paragraphs 1, 2, 11, 12, 14, and 17 of the Georgia Constitution,
the Sixth, Eighth, and Fourteenth Amendments to the United States
Constitution, and other applicable law, were violated by the
improper duplication of statutory aggravating circumstances and
his death sentence should therefore be set aside.

**COMPETENCY TRIAL**

> XIX. THE COURT ERRED DURING THE COMPETENCY TRIAL
> BY ALLOWING THE PROSECUTOR TO MAKE IMPROPER
> REFERENCES TO THE DEFENDANT'S CONSTITUTIONAL-
> LY PROTECTED REFUSAL TO DISCUSS THE FACTS OF
> HIS CASE WITH THE STATE'S EXPERT WITNESSES
> AND HIS ALLEGED ATTEMPT TO CONTACT COUNSEL

Both in opening statements and closing arguments at the competency trial, the prosecutor told the jury that because Mr. Waldrip exercised his constitutional right not to discuss his case with the state's expert witnesses, the jury should infer that Mr. Waldrip must be competent to stand trial. (C. 462-63, 914). The prosecution also questioned the expert witnesses about Mr. Waldrip's decision not to discuss his case with them. And in cross-examination of Mr. Waldrip asked whether he had "threatened" a jailer that he would call his lawyer. (C. 846, 849). The prosecutor disingenuously misled the jury to believe that if a defendant chooses to seek protection under the Fifth or Sixth Amendments, he automatically forfeits a claim of incompetence to stand trial. This was the focus of the state's case, (C. 703, 749, 786-90), and the state effectively used Mr. Waldrip's exercise of Fifth and Sixth Amendment protections as evidence against him. As a result, Mr. Waldrip's rights to due process, a fair trial, and not to incriminate himself, pursuant to Article I, Section I, Paragraphs 1, 2, 11, 16, and 17 of the Georgia Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, _Griffin v. California_, 380 U.S. 609 (1965), and other applicable law, were violated.

The trial of a criminal defendant while he is mentally incompetent violates due process.  Nathaniel v. Estelle, 493 F.2d 794, 796 (5th Cir. 1974).  Under Georgia law, whenever a defendant in a criminal case enters a plea of mental incompetency, it is the duty of the court to try the issue to a special jury.  O.C.G.A. §17-7-130 (1987).  The proceeding is civil in nature and under Georgia law, the defendant is required to show incompetency by a preponderance of the evidence.  Corn v. State, 240 Ga. 130, 240 S.E.2d 694 (1977).  The test for competency to stand trial is:  whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."  Dusky v. United States, 362 U.S. 402 (1960);  Crawford v. State, 240 Ga. 321, 326, 240 S.E.2d 824 (1977).

The Fifth Amendment, "in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  Griffin v. California, 380 U.S. 609, 615 (1965).  The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any proceeding, civil or criminal, formal or informal, where the answers might

98

incriminate him in future criminal proceedings." <u>Lefkowitz v.</u>
<u>Turley</u>, 414 U.S. 70, 77 (1973) (emphasis added).

It has long been the law that "remarks about the defendant's
failure to testify constitute reversible error.  Such statements
infringe on the defendant's presumption of innocence and violate
his Fifth Amendment right against self-incrimination by convert-
ing silence to evidence of guilt." <u>United States v. White</u>, 444
F.2d 1274, 1277 (5th Cir. 1971).

Use of a defendant's invocation of his right to silence is
especially insidious when it, as in this case, follows assurances
made to the defendant that he had a right not to speak.  "An
accused having the assurance of the court that his claim of
privilege would be granted might well be entrapped if his asser-
tion of the privilege could then be used against him . . . .
Elementary fairness requires that an accused should not be misled
on that score." <u>Johnson v. United States</u>, 318 U.S. 189, 197
(1943).

During the competency trial, Prosecutor Darragh purposely
and repeatedly made improper reference to Mr. Waldrip's use of
his Fifth Amendment protection.  In his opening statement to the
jury, the prosecutor said:

> You will also find that the psychiatrist at
> the mental health institute as well as the
> psychologist who is helping him sought to,
> pursuant of the order that they had received
> and the things that they were going to be
> looking at, sought to discuss his case with
> him.  And you will hear evidence that he de-
> clined to discuss his case, that he declined
> to discuss his case with these folks who are

the psychiatrists of Georgia Mental Health
Institute in the hospital.

(C. 462-463).  During his direct examination of state witness Dr.
Robert J. Storms, Prosecutor Darragh asked:

> Q.  In seeking to carry out that part of the
> order can you state whether or not you sought
> to ask Tommy Lee Waldrip about the facts of
> this case?
>
> A.  Yes, we did.
>
> Q.  And what did he respond?
>
> A.  He said he didn't -- well, his exact re-
> sponse was he wasn't there.
>
> Q.  Okay.  Did you ask him to go into any more
> detail with you?
>
> A.  No.
>
> Q.  In your report can you state whether or
> not you recounted Mr. Waldrip declined to
> discuss his case, as is his legal right?
>
> A.  Yes.
>
> Q.  And what did you mean by that?
>
> A.  I mean that when we wanted -- he basically
> requested that he not discuss the facts of his
> case, which is his legal right to do, his
> legal and constitutional right not to, and so
> we did not press it.
>
> Q.  And did he ask you not to discuss the
> facts of his case?
>
> A.  I really don't remember.  I just know that
> he indicated he didn't want to discuss the
> facts of his case, and our policy is that we
> don't press them.

(C. 702-703).  Prosecutor Darragh repeated the constitutional

violation with his second expert witness, Dr. Jerold Stephen

100

Lower.  (C. 748-749).  Prosecutor Darragh persisted along these
lines while questioning a third expert, Dr. Everett Clark Kugler:

> Q. . . . Did you ask him to discuss his case
> with you, that is, the facts of this case with
> you?
>
> A.   I think more than asking him, because
> first of all we read the individual his rights
> and tell them that they don't have to answer
> any questions about their case.  Certainly we
> give them this opportunity.  So the answer I
> think would be yes to the question that you
> are posing.
>
> Q.  Did he decline to or agree to discuss the
> facts of his case?
>
> A.  He refused to discuss anything related to
> this case and was very clear about that.

(C. 786).  Finally, Prosecutor Darragh repeated his error during
closing argument:

> And listen to what Dr. Storms testified to
> and what Dr. Kugler testified to when they
> wanted to ask him about the facts of the case,
> He refused to talk about the facts of the
> case.  What do those things indicate?  Those
> things indicate he knows what his attorney can
> do for him, they indicate he knows he ought
> not talk if his attorney says he can't talk.
> He knows he ought to talk when his attorney
> says to talk.  He knows what his attorney can
> do for him and he knows it's not in his best
> interest to talk about the facts of the case .
> . .

(C. 914).  Prosecutor Darragh's attack on Mr. Waldrip's claim of
mental incompetency was based almost entirely on these blatant,
repeated comments and questions about Mr. Waldrip's constitu-
tionally protected right to remain silent.

Prosecutorial comment is improper if the defense can demon-
strate either that "(1) the prosecutor manifestly intended to

101

comment on the defendant's silence, or (2) the character of the comment was such that a jury would naturally and necessarily construe it as a comment on the defendant's silence." <u>United States v. Stuart-Caballero</u>, 686 F.2d 890, 892 (11th Cir. 1982). In <u>Black v. State</u>, 261 Ga. 791, 793, 410 S.E.2d 740, 743 (1991), there was brief questioning and brief comment by the prosecutor both at the competency trial and at the criminal trial concerning the defendant's silence after he was read his <u>Miranda</u> rights. While denying relief because the issue had not been preserved, this Court held that "[i]f such had erroneously been allowed despite timely and proper objection, the case would have to be reversed unless the state could show that the error was harmless beyond a reasonable doubt." <u>Id.</u>

In <u>Estelle v. Smith</u>, 451 U.S. 454 (1981), the Court found that admission of a psychiatrist's testimony on the issue of a defendant's future dangerousness at the penalty phase of a capital case, where the testimony was the result of an in-custody court-ordered competency examination, infringed the defendant's Fifth Amendment constitutional guarantee against self-incrimination. In <u>Wainwright v. Greenfield</u>, 474 U.S. 284 (1986), the court held that

> [i]t is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity. In both situations, the State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights

102

will not be penalized.  In both situations,
the State then seeks to make use of the de-
fendant's exercise of those rights in obtain-
ing his conviction.  The implicit promise, the
breach, and the consequent penalty are identi-
cal in both situations.

Wainwright v. Greenfield, 474 U.S. at 286.

Prosecutor Darragh manifestly intended to comment on Mr.
Waldrip's silence.  He repeatedly questioned witnesses about and
made comments upon Mr. Waldrip's use of his Fifth Amendment
rights.  The record shows that these comments were far from harm-
less.  They were clearly intended to undermine Mr. Waldrip's
mental incompetency claim by using his constitutional rights
against him.

Like the defendants in Estelle and Greenfield, Mr. Waldrip
was advised of his Fifth Amendment right to remain silent and
when he did so, that silence was used against him in a court of
law.  Unlike the defendant in Black, Mr. Waldrip's counsel re-
served his right to appeal this issue by timely objection.

Likewise, the prosecutor improperly, when cross-examining
Mr. Waldrip, asked whether he had "threatened" a jailer that he
would call his lawyer.  (C. 846, 849).  Although Mr. Waldrip
denied any such statement, the prosecutor's "testimony" unfairly
prejudiced the jury by implying that Mr. Waldrip's exercise of
his Sixth Amendment right to counsel reflected poorly on his
character or implied guilt.  This implication of a criminal
defendant's right to counsel cannot be condoned.

As shown above, it is clear that a prosecutor is absolutely
prohibited from making any comment on or drawing any negative

103

inferences from a defendant's decision not to testify or other-
wise invoke his Fifth Amendment right to remain silent.  Griffin
v. California, 380 U.S. 609 (1963); Ranger v. State, 249 Ga.
315, 319, 290 S.E.2d 63, 67 (1982); United States v. Lequire,
943 F.2d 1554, 1565 (11th Cir. 1991).  The comment made by the
prosecutor in this case in an equally offensive manner encouraged
the jury to draw negative inferences from the alleged fact that
Mr. Waldrip had indicated that he wished to speak to his lawyer.

Indeed, comment on a defendant's invocation of his right to
counsel is even more egregious than comment on the right to
silence because the right to counsel is considered to be a much
more important and fundamental right.  And any interference with
that right must be strictly rebuffed.  See, e.g., Edwards v.
Arizona, 451 U.S. 477 (1981); Minnick v. Mississippi, 111 S.Ct.
486 (1990); Powell v. Alabama, 287 U.S. 45 (1964).

As the Supreme Court itself has articulated it:

> It bears emphasis that the right to be
> represented by counsel is among the most fun-
> damental of rights.  We have long recognized
> that "lawyers in criminal courts are necessi-
> ties, not luxuries."  As a general matter, it
> is through counsel that all other rights of
> the accused are protected:  "Of all the rights
> that an accused person has, the right to be
> represented by counsel is by far the most
> pervasive, for it affects his ability to as-
> sert any other rights he may have."

Penson v. Ohio, 488 U.S. 75, 84 (1988) (citing Gideon v. Wain-
wright, 372 U.S. 335, 344 (1963); Schaefer, Federalism and State
Criminal Procedure, 70 Harv. L. Rev. 1, 8 (1956)).

Because Mr. Waldrip's rights to due process, a fair trial, and the benefit of counsel, pursuant to Article I, Section I, Paragraphs 1, 2, 11, 14, and 17 of the Georgia Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963), and other applicable law, were violated by the prosecutor's comments during the competency trial on Mr. Waldrip's silence and that he had "threatened" to call his lawyers from jail, Mr. Waldrip must be granted a new trial.

Mr. Waldrip's mental competency trial was fundamentally unfair and the jury's determination that he was mentally competent is unreliable.   This chilling effect on the constitutional guarantees of due process and against self-incrimination cannot be condoned.   Mr. Waldrip's conviction must be reversed and the case remanded for a fair competency proceeding.

XX.   THE CHANGE OF VENUE GRANTED FOR PURPOSES OF
      THE COMPETENCY TRIAL WAS INSUFFICIENT TO
      AVOID PERVASIVE PRETRIAL PUBLICITY AND OBTAIN
      A FAIR JURY

Mr. Waldrip's rights to due process of law, equal protection, the assistance of counsel, trial by an impartial jury, and a reliable determination of the issues, pursuant to Article I, Section I, Paragraphs 1, 2, 11, and 17 of the Georgia Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and other applicable law, were violated because the change of venue for purposes of the competency

105

trial from Dawson to Hall County was not sufficient to avoid juror exposure to pre-trial publicity.

Dawson and Hall are adjoining counties and share several media sources. Indeed, when the original motion to change venue was heard, the state did not oppose it and agreed, in a stipulation, with defense counsel, that venue should be changed to a county outside the reach of the media which serves Dawson County. In the stipulation, the parties specifically provided that the prejudicial publicity had infected Hall County as well and that venue should be changed to a county other than Hall County. (August 29, 1991, at 5); see also (August 29, 1991, at 50-57, 70) (describing media coverage as including both Dawson and Hall Counties). Many of the prospective jurors at Mr. Waldrip's competency hearing were familiar with the case. (C. 122, 145, 170, 265, 293). In fact, two of the members of Mr. Waldrip's petit jury at the competency hearing, Juror Chapley, (C. 145), and Juror Isle, (C. 170), testified during voir dire examination that they had read newspaper articles concerning this case. Because the trial court correctly concluded that a change of venue was necessary in order for Mr. Waldrip to obtain a fair and impartial jury, it was imperative that the case was moved to a county which was not affected by the pervasive and prejudicial pretrial publicity which rendered a fair trial in Dawson County impossible. See, e.g., Jones v. State, 261 Ga. 665, 409 S.E.2d 642, 643 (1991).

XXI. THE PROSECUTOR MISLEAD THE JURY BY ARGUING
AND IMPLYING THAT THE DEFENSE WAS REQUIRED TO
TREAT THE DEFENDANT'S MENTAL ILLNESS

The Assistant District Attorney misled the jury at the
competency trial to believe that defense counsel had an obliga-
tion to treat the defendant's mental illness so that he would be
competent to stand trial.  (C. 509, 615).  Specifically, upon
cross-examination of the defense's expert witness and of Ms.
Watson, one of Mr. Waldrip's attorneys who testified about her
problems communicating with Mr. Waldrip, the prosecutor asked
questions which implied that it was the defense's duty to provide
curative psychiatric treatment for the defendant.  See, e.g., (C.
509-510;  C. 614-615).  As the prosecutor certainly knew, not
only is defense counsel under no obligation to ensure the defen-
dant is competent to stand trial, in fact, no funds exist for
such a procedure, even if an appropriate motion were to be made.

Due process requires that a defendant only be tried if he
can be a competent, meaningful participant in his own trial.[20]
Therefore, the purpose of a competency trial is to determine this
sole issue -- the mental ability of the defendant, at time of
trial, to intelligently participate in the proceedings.  See
Almond v. State, 180 Ga.App. 475, 349 S.E.2d 482, 484 (1986)
(citing Echols v. State, 149 Ga.App. 620, 255 S.E.2d 92 (1979)).
In this case, during a bench conference, Judge Girardeau had to
remind the prosecutor that the issue of Mr. Waldrip's competence

---

20.  The accused has a constitutional right not to be put on
trial while incompetent.  Drope v. Missouri, 420 U.S. 162 (1975);
Pate v. Robinson, 383 U.S. 375 (1966).

was the only issue of concern in the competency hearing.  Specifically, Judge Girardeau stated that in determining defendant's competency, "no part of [the] inquiry is whether the defendant or counsel of defendant have made legitimate efforts to get the defendant in the position to stand trial." (C. 617).  Yet, through his statements and questions, the prosecutor persisted in raising an issue that was absolutely irrelevant to an effective resolution of the defendant's competency to stand trial.  While, the subject of responsibility for defendant's psychiatric treatment simply should have never been part of the ultimate inquiry of competency, the prosecutor insisted that the defense's failure to secure treatment somehow proved that Mr. Waldrip was not in fact mentally ill and that the competency issue had been created by counsel to obtain a continuance.  In failing to adhere to the proper standard in the competency hearing, the prosecutor wrongly misled the jury.[21]

In fact, defense counsel in this case fulfilled the primary obligation that they had as representatives of a potentially incompetent defendant.[22]  Once they suspected that Mr. Waldrip was incompetent to stand trial, counsel filed a plea of insanity, which raised the subject of his mental competency as an issue to

_____

21.  It is the jury that must make the ultimate determination of competency to stand trial.  Stripling v. State, 261 Ga. 1, 401 S.E.2d 500 (1991).

22.  "If insanity of the defendant is known to his counsel, then counsel has a professional, moral, and legal duty to file a plea of insanity as provided by law." Huguley v. State, 120 Ga.App. 332, 170 S.E.2d 450 (1969), cert. denied, 400 U.S. 834 (1970).

be resolved solely by a special jury.  Under these circumstances,
it would have been entirely inappropriate for counsel to make a
motion for treatment before the jury had decided whether Mr.
Waldrip was competent.  As such, the prosecutor's questions
regarding defense counsel's failure to file a motion for treat-
ment were even more irrelevant.  Ultimately, defense counsel were
not obligated to ensure that Mr. Waldrip would be competent for
trial, and even if they had been, it would have been inappropri-
ate and premature for them to file a "motion for treatment"
before the jury had resolved the competency issue.  In this
instance, defense counsel had already fulfilled their legal
obligation to Mr. Waldrip with respect to his potential incompe-
tence to stand trial.  At the time of the competency hearing, the
prosecutor was certainly aware of this.  However, he continued to
challenge counsel on their failure to obtain treatment for Mr.
Waldrip, successfully misleading the jury in the process.  This
type of conduct is improper.  In Lyon v. State, 262 Ga. 247, 416
S.E.2d 523 (1992), the defendant appealed in part based on alle-
gations of prosecutorial misconduct.  While the Court affirmed
the conviction, it relied on the fact that the trial court's
instruction that the state's use of misleading questions that
"implied unethical conduct" on the part of defense counsel were
improper and that the jury should disregard them.  Id. at
524.[23]

---

23.  See also Caldwell v. Mississippi, 472 U.S. 320 (1985)
(prosecutor's remarks were impermissible because they were mis-
(continued...)

109

Finally, assuming *arguendo* that defense counsel had a duty to ensure that Mr. Waldrip was competent to stand trial, no funds would have been available for such a procedure, even if an appropriate motion had been made.[24]  Courts are strict about disbursing funds for purposes of psychiatric evaluation.[25]  Funds may be available for the purpose of preparing for trial and presenting a defense only if defense counsel makes a proper showing that the defendant's mental condition is likely to become

---

23.  (...continued)
leading in a manner that diminished the jury's sense of responsibility;  Fleming v. State, 240 Ga. 142, 240 S.E.2d 37 (1977) ("[a] prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence").

24.  *O.C.G.A.* §17-7-30 outlines the procedures to be followed after a criminal defendant is found mentally incompetent to stand trial.  Nowhere in the statute is there a mention of an obligation on the part of anyone to treat the defendant to attain competency.  Rather, the defendant is placed in state custody for an indefinite period of time, and is likely to be committed to a state mental institution, depending on his mental state.

> If the [defendant] does not meet the criteria for civil commitment or if the person after having been committed becomes mentally competent to stand trial, the committing court shall be notified and the person shall be returned to court as provided for in subsection (e) of this Code section.

*O.C.G.A.* §17-7-130(c).  While the provision contains regulations to be followed in the instance that a defendant "becomes" mentally competent, it contains no regulation mandating that defendant receive curative treatment.

25.  A trial court is not initially obligated *sua sponte* to appoint a psychiatrist to evaluate a defendant prior to trial.  See generally Jackson v. State, 180 Ga.App. 774, 350 S.E.2d 484 (1986).  The defense is first required to make a motion for examination to determine a defendant's competence to stand trial before its necessity is considered by the trial court.  Lindsey v. State, 254 Ga. 444, 330 S.E.2d 563 (1985).

110

a significant issue at trial.  See Ake v. Oklahoma, 470 U.S. 68 (1985).  Courts hold defense counsel to a high standard in making this showing.  For example, in Jackson v. State, 180 Ga.App. 774, 350 S.E.2d 484 (1986), although defense counsel showed that he was inhibited in the preparation of a defense and that defendant had given him three different versions of the alleged crime, the court held such evidence to be "insufficient to establish either bona fide doubt as to defendant's competence to stand trial or that incompetence of defendant was likely to be a significant factor [at trial]."  Jackson v. State, 180 Ga.App. at 776. Therefore, the trial court was not obligated to appoint a psychi-atrist to evaluate, let alone treat, defendant prior to trial. See also Jones v. State, 189 Ga.App. 232, 375 S.E.2d 648 (1988) (denying funds for additional expert assessment and assistance on whether defendant was competent to stand trial when defendant claimed that state-paid psychologist was biased).  Counsel has been unable to locate any cases which approved of or granted a right to funds for treatment purposes as opposed to funds to obtain an expert to assist in trial preparation.

The prosecutor in this case was, therefore, challenging defense counsel's failure to carry out an impossible task, and inviting the jury to draw improper inferences from this failure. Even if defense counsel had been obligated to make Mr. Waldrip competent to stand trial in this case, which they were not, a court would have never funded this procedure if such a motion had been made.  Therefore, the prosecutor's argument that the defense

111

had done nothing to treat Mr. Waldrip's mental illness was misleading, ascribed improper ulterior motives and lack of good faith to defense counsel and was harmful to Mr. Waldrip in that it allowed and encouraged the jury to base its competency determination on improper and inapplicable considerations.

Mr. Waldrip's rights to due process and a fair trial, pursuant to Article I, Section I, Paragraphs 1, 2, 11, and 17 of the Georgia Constitution, the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and other applicable law, were violated by the prosecutor's improper and misleading argument.

### XXII.   THE TRIAL COURT IMPROPERLY LIMITED DEFENSE COUNSEL'S VOIR DIRE AT THE COMPETENCY TRIAL

Prior to Mr. Waldrip's competency trial, the trial court improperly restricted counsel from asking questions that would have revealed bias and prejudice in venire persons.  Counsel was not allowed to ask potential jurors concerning the meaning of "preponderance of the evidence," (C. 73, 79), was barred from questioning jurors about their ability to defend their opinions during jury deliberation, (C. 140, 152), was not allowed to ask about the importance of a client being able to communicate with his attorney, (C. 172-73), or whether a mentally ill person can have trouble communicating.  (C. 183).  These rulings violated Mr. Waldrip's rights to due process, an impartial jury, and the benefit of counsel, pursuant to Article I, Section I, Paragraphs 1, 2, 11, 14, and 17 of the Georgia Constitution, the Fifth,

Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, *O.C.G.A.* §15-12-133, Henderson v. State, 251 Ga. 398, 306 S.E.2d 645 (1983), and other applicable law.

The right to individual examination of jurors is set forth in *O.C.G.A.* §15-12-133:

> In the examination, the counsel for either party shall have the right to inquire of the individual jurors examined touching any matter or thing which would illustrate any interest of the juror in the case, including any opinion as to which party ought to prevail, the relationship or acquaintance of the juror with the parties or counsel therefor, any fact or circumstance indicating any inclination, leaning or bias which the juror might have respecting the subject matter of the action or the counsel or parties thereto, and the religious, social, and fraternal connections of the juror.

The single most important purpose of voir dire is to ascertain the impartiality of jurors; their ability to treat the cause on the merits with objectivity, freedom from bias and prior inclination. Freeman v. State, 132 Ga.App. 615, 208 S.E.2d 625 (1974). A denial of the right is an error requiring reversal. Reid v. State, 129 Ga.App. 657, 200 S.E.2d 454 (1973). A party is given the right to inquire into any fact or circumstance indicating any inclination, leaning or bias which the juror might have respecting the subject matter of the suit. Falsetta v. State, 158 Ga.App. 392, 280 S.E.2d 411 (1981). Where a defendant in a criminal case has been deprived of his or her right, the burden is on the state to show that the error was harmless. Henderson v. State, 251 Ga. 398, 306 S.E.2d 645 (1983).

113

Henderson established that questioning should be allowed where it is related to the nature of the suit, and not limited by the "specific case." In Henderson it was found to be error not to allow the defendant to question whether members of the juror's immediate family had ever worked in law enforcement, as the question related to the nature of the suit -- a criminal case. Mr. Waldrip was prevented from questioning venire persons about their preconceptions about the communication skills of mentally ill persons and the importance of a client being able to communicate with his attorney. Not only are these questions intimately related to the general nature of the case -- a competency trial -- as approved in Henderson, but they were specifically relevant to the facts of Mr. Waldrip's case.

In Waters v. State, 248 Ga. 355, 283 S.E.2d 238 (1981), the defense wanted to ask the jurors hypothetical questions which were not allowed by the court. This Court upheld this restriction as the questions called for the jurors to prejudge the case. In Wilcox v. State, 250 Ga. 745, 301 S.E.2d 251 (1983), the Court again held proposed questioning by the defense to amount to calling for a prejudgment of the issues in the case. In that case the defense was properly prevented from asking a juror who had indicated a leaning in the case, which side she was leaning towards. The questions Mr. Waldrip sought to ask, however, are distinguishable from those previously found to be improper by this Court. The question concerning the jurors' ability to defend their opinions during jury deliberations in no way re-

114

quires a juror to decide one way or another any question relevant to the case.  It is merely a question posed at the juror to uncover any potential bias, or whether a juror's personal characteristics will hinder his/her participation in deliberations, and is not a prejudgment of the case.

Likewise, questions about a mentally ill person's ability to communicate and whether it is important for a client to be able to communicate with counsel only sought to uncover bias and not to have jurors prejudge the case.  These questions were sought to be asked to determine any hidden prejudices or predispositions the jurors may have had which would prevent them from impartially evaluating the evidence presented.  A juror who, as an example, did not think it important for a client to be able to communicate with counsel but thought all decisions should be made by counsel alone, would not be able to apply the standard for competency -- which does require consideration of the defendant's ability to assist counsel -- fairly and impartially.

In view of the foregoing, it appears that the trial court's limits on Mr. Waldrip's voir dire prior to the competency trial were unduly restrictive and that Mr. Waldrip is due to be granted a new trial.

XXIII.    IT WAS ERROR TO ALLOW THE STATE'S EXPERT
          WITNESS TO REFER TO HIMSELF AS THE "JUDGE'S
          WITNESS"

On direct examination at the competency trial, Dr. Robert Storms testified that he was "the Judge's witness" and a "friend

115

of the Court." (C. 651). In fact, Dr. Storms was an expert retained and used by the state. Not only was this testimony therefore patently false, it highly prejudiced the jury against the defendant. Because the trial court offered no curative instruction after this comment, the jury was left to give undue and prejudicial weight to the testimony of this state witness.

Similarly misleading and self-serving testimony was offered by Dr. Storms when he testified on behalf of the state in rebuttal during the guilt-innocence phase of Mr. Waldrip's trial. (T. 3087). Dr. Storms' testimony at that time that he was a "neutral friend of the Court," id., requires that Mr. Waldrip be granted a new trial.

When an expert is court-appointed, as opposed to hired by one of the parties, the credibility of the witness is automatically enhanced. There is a perception that when an expert testifies for the prosecution, the expert is biased since the witness is being paid by the prosecution. The very purpose of the court appointing an expert is to obtain an impartial opinion. See Tolbert v. State, 260 Ga. 527, 528, 397 S.E.2d 439 (1990). When Dr. Storms testified that he was the "Judge's witness," he immediately raised his credibility.

Dr. Storms' comments at both the competency hearing and the trial unfairly prejudiced the jury in favor of this state witness. Even while testifying for the state, Dr. Storms bestowed impartiality on himself with his outright false statements to the jury in which he, in effect, obtained the court's approval. Dr.

116

Storms' statements, being both false and highly prejudicial, were
clearly improper, thus demanding curative action by the trial
court.  Yet, while this self-serving testimony was offered in the
presence of the court without any correction by the court, the
court impliedly acquiesced.

When counsel makes an improper statement before the jury,
O.C.G.A. §17-8-75 requires rebuke of counsel and curative in-
structions to the jury, and sometimes even mistrial.  Richardson
v. State, 199 Ga.App. 10, 403 S.E.2d 877 (1991).  While there is
no statute concerning the improper statements of witnesses, such
cases are to be governed by analogizing the law embodied in
O.C.G.A. §17-8-75 and "by reference to the fundamental rules of
law guaranteeing fair and impartial trials."  Felton v. State, 93
Ga.App. 48, 49, 90 S.E.2d 607 (1955).

Applying the Felton standard, this Court held in Stanley v.
State, 250 Ga. 3, 4, 295 S.E.2d 315 (1982), that "[w]hen prejudi-
cial matter is placed before the jury in a criminal case, the
trial judge must decide whether a mistrial must be granted as the
only corrective measure or whether the prejudicial effect can be
corrected by withdrawing the testimony from the consideration of
the jury under proper instructions."  Because Dr. Storms' testi-
mony violated Mr. Waldrip's rights to due process, to confront
witnesses against him, and a fair trial, pursuant to Article I,
Section I, Paragraphs 1, 2, 11, 12, 14, and 17 of the Georgia
Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments

117

to the United States Constitution, and other applicable law, he must be granted a new trial.

> XXIV.    THE TRIAL COURT ERRED BY ALLOWING THE STATE DURING THE COMPETENCY PROCEEDINGS REPEATEDLY TO REFER TO AND ELICIT TESTIMONY ABOUT THE PENDING CHARGES

Prior to his trial on the substantive crimes with which he was charged, Mr. Waldrip had a competency trial to determine whether he was competent to proceed to trial.  As early as during voir dire for the competency trial, the prosecutor initiated comments about the severity of the underlying crime.  During voir dire questioning of the entire jury venire, the Assistant District Attorney asked whether the defendant potentially being tried for serious crimes would interfere with their decision in a competency verdict.  (C. 33).  This question unfairly prejudiced the venirepersons against Mr. Waldrip and insinuated that a verdict of incompetency might allow him to "go free."  This prejudice was compounded by the trial court's refusal of both a cautionary instruction that jurors should not be concerned about the result of the subsequent trial and an instruction that a verdict of incompetency would result in treatment at G.M.H.I. and not release from custody.  (C. 37-40).  Cf. Roberts v. State, 335 So.2d 285 (Fla. 1976) (when insanity defense raised, jurors should be instructed as to result of finding of insanity to avoid confusion and speculation); Lyles v. United States, 254 F.2d 725 (D.C. Cir. 1957) (same, because jury has right to understand meaning of its possible verdict).

The prosecutor's treatment of the competency hearing as a mere formality before the criminal trial continued throughout the proceedings. At closing argument, for instance, the prosecutor assumed the jury's verdict at the competency hearing by stating what the burden of proof will be for the "trial *that will be upcoming* on October 3rd." (C. 886) (emphasis added). Of course, if the jury had found Mr. Waldrip incompetent to proceed, a trial would not have been upcoming and only after Mr. Waldrip had been returned to competency would the state have been able to prosecute him.

The issues to be determined by the jury at a competency trial, of course, concern the defendant's ability to understand the proceedings against him and to cooperate with and assist counsel in his defense. These are general issues which do not in any way depend on what the pending charges are. A person who is competent to proceed to trial in a shoplifting case is competent to proceed to trial in a capital murder trial. The nature of the underlying charges is thus completely irrelevant to the competency proceedings.

In his opening statement during the competency trial the prosecutor told the jury that Mr. Waldrip was awaiting trial on a murder charge. (C. 448-50). The prosecutor continued to elicit testimony throughout the proceedings about the serious charges against Mr. Waldrip. (C. 513, 565-67, 577-82). As this Court has made clear,

> evidence is not inadmissible at a [competency trial] just because it might also be

119

> relevant to the issue of guilt. Evidence may
> be relevant to more than one issue, and so
> long as it is sufficiently relevant and mate-
> rial to the issue of mental incompetency, it
> is properly admitted at a competency trial.

Black v. State, 261 Ga. 791, 410 S.E.2d 740, 744 (1991). In so

holding, however, the Court clearly inferred that when evidence

which is relevant to the guilt determination is *not* relevant to

the competency determination it should not be admitted at the

competency trial. In Black, the Court declined to reverse be-

cause no objection to the allegedly improper statements and

evidence had been made at trial. In this case, of course, de-

fense counsel repeatedly objected to the prosecution's prejudi-

cial and irrelevant references and testimony about the underlying

charges.

The repeated references to Mr. Waldrip's capital murder

charge so prejudiced and inflamed the jury that Mr. Waldrip's

competency hearing was rendered fundamentally unfair. Mr. Wal-

drip's rights to due process and an impartial jury, pursuant to

Article I, Section I, Paragraphs 1, 2, 11, and 17 of the Georgia

Constitution, the Fifth, Sixth, Eighth, and Fourteenth Amendments

to the United State Constitution, and other applicable law, were

violated by the repeated references during the competency trial

to Mr. Waldrip's pending criminal charges.

## CONCLUSION

For all of the above reasons as well as any other reasons which may appear to the Court, Mr. Waldrip's convictions and sentence of death should be set aside.

Respectfully Submitted,

J. RICHARDSON BRANNON
Ga. Bar No. 077650
The Brannon Law Office
400 Jessie Jewell Parkway, SW
Gainesville, GA 30501
(770) 503-0140

CHARLOTTA NORBY
Ga. Bar No. 545645
83 Poplar Street, NW
Atlanta, GA 30303
(404) 688-1202

*Counsel for Tommy Lee Waldrip*

BY:

121