# 102-Doc. 9, R-54

IN THE SUPERIOR COURT FOR THE COUNTY OF DAWSON
STATE OF GEORGIA


STATE OF GEORGIA,              )
                              )
                              )
            vs.               )       FILE NO. 91-CR-300C
                              )
                              )
TOMMY LEE WALDRIP,            )
                              )
            Defendant.   )


----------------------------------------------------------

JURY TRIAL

HON. JOHN E. GIRARDEAU                    OCTOBER 13, 1994

----------------------------------------------------------

APPEARANCES OF COUNSEL:

                              ORIGINAL

        On Behalf of the State:

                LYDIA J. SARTAIN, District Attorney
                LEE DARRAGH
                LEONARD C. PARKS, JR.
                Assistant District Attorneys
                Gainesville, Georgia


        On Behalf of the Defendant:

                J. RICHARDSON BRANNON, III
                ANNE WATSON
                DONALD PULLIAM
                Attorneys at Law
                Gainesville, Georgia

                    - - - -

                              VOLUME IX

GEORGIA, DAWSON COUNTY
CLERK'S OFFICE, SUPERIOR COURT
FILED FOR RECORD
at 8:35 A.M. 12-9-94
Recorded in Book_____ Page_____
This_____ day of_____ 19____
            Beck, McCord
                  CLERK

1  incarcerated, his mind has been going a little nuts, he
2  has been hearing voices, he has heard voices of people
3  he can identify, jailers, prosecutors, newscasters.  He
4  has described a system of monitoring which he has felt
5  has been going into his brain without his permission,
6  and it rose to the level that Mr. Brannon and I were
7  quite concerned, in that we could not talk to him any
8  further without his fear of being overheard and
9  monitored.
10        That is when Dr. Currie, a clinical
11  psychologist from Atlanta, came into play and he
12  examined Mr. Waldrip.  The results of his examination,
13  and he will testify to you, are that Mr. Waldrip is a
14  man of borderline, below average intelligence.  He has
15  also exhibited episodes of psychotic behavior, and one
16  other feature that he has found through his testing --
17        MR. DARRAGH:  Excuse me, Ms. Watson, Your
18  Honor, may we approach at the bench?
19        (Recorded bench conference).
20        THE COURT:  How is this going to be used in
21  the trial?
22        MS. WATSON:  There are reasons, I told you
23  what our defense was, there are reasons for the
24  different statements.
25        THE COURT:  Is Dr. Currie going to testify

1741

1    THE COURT:  The evidence you shall give to
2  the Court and to the jury in the trial of this issue
3  between the State of Georgia and Tommy Lee Waldrip, who
4  is charged with murder and other crimes set forth in
5  Indictment Number 91-CR-300C shall be the truth, the
6  whole truth and nothing but the truth?
7    THE WITNESS:  I do.
8    THE COURT:  Very well.
9    RUSS McCLELLAN,
10  after being first duly sworn, testified as follows:
11    DIRECT EXAMINATION
12  BY MR. DARRAGH:
13    Q    Sir, would you state your full name and
14  present occupation, please?
15    A    My name is Russ McClellan, I'm presently an
16  attorney in private practice.
17    Q    And how long have you been in private
18  practice now?
19    A    Since November, 1992.
20    Q    And where do you practice, sir?
21    A    I have an office in Cumming and I also have
22  an office in Roswell.
23    Q    Prior to your present employment, what was
24  your immediately preceding employment?
25    A    I was the chief assistant district attorney

1    for the Blue Ridge Judicial Circuit.

2        Q      What counties does that --

3        A      Forsyth and Cherokee.

4        Q      Okay.  How long did you hold that position?

5        A      I was chief assistant for about three or

6    four years, I guess, and prior to that I was an

7    assistant district attorney.  I was, I began my

8    employment there in November, 1984.

9        Q      All right, sir.  Would you briefly describe

10   for, though I suppose we will get into some evidence of

11   that here, would you briefly describe for the jury what

12   your duties were as chief assistant district attorney

13   and assistant district attorney?

14       A      I was a trial assistant district attorney, I

15   prepared indictments, investigated cases, coordinated

16   law enforcement, interviewed witnesses and actually

17   tried cases in my two-county circuit.

18       Q      In the context of those duties, sir, can you

19   testify as to whether or not you had any involvement

20   with any trials against one named John Mark Waldrip?

21       A      Yes, I did.

22       Q      Do you know how John Mark Waldrip is

23   related, if he is, to the defendant Tommy Lee Waldrip?

24       A      John is his son.

25       Q      All right, sir.  Do you recall what John

1756

1    Q    All right, sir.  I'm going to show you that

2  which I have shown counsel, which is marked State's

3  Exhibit 106.  Can you tell me whether you can identify

4  that particular document?

5    A    Yes.

6    Q    And what is that particular document?

7    A    It appears to be the testimony of Keith

8  Evans in that trial.

9    Q    All right, sir.

10         MR. DARRAGH:  Your Honor, I'm going to

11  tender State's Exhibit 106 and ask that I be allowed

12  to --

13  BY MR. DARRAGH:

14    Q    First of all, were you the attorney asking

15  the questions of Keith Evans in that trial?

16    A    Yes, I was.

17         MR. DARRAGH:  That I be asked to be Russ

18  McClellan as far as reading questions and that Mr.

19  McClellan be able to testify further about the answers

20  of Keith Lloyd Evans in that particular trial, and I do

21  tender 106 for that purpose.

22         MR. BRANNON:  Your Honor, we would oppose

23  introduction of 106 for this reason.  We haven't been

24  provided, at least to our knowledge, with a copy of that

25  document and have not had occasion to read it.  I think

1761

1   the witness can refresh his memory and testify to what

2   he did at that particular proceeding, but other than

3   that, I think it wouldn't be admissible and we object to

4   it on those grounds.

5            MR. DARRAGH:  Your Honor, it would be

6   admissible for several reasons.  It goes to the

7   motivation of what happened in the death of Keith Lloyd

8   Evans, what the testimony was and the import of that

9   testimony and why it was that Keith Evans was killed and

10  the extent to which that testimony was offered and what

11  impact it had, therefore it would be admissible for

12  those reasons.

13           Further, Keith Lloyd Evans is unavailable,

14  he cannot, of course, be here to testify, and I can lay

15  a further foundation as to the certification of that

16  particular document, but I ask that we be able to

17  proceed in that fashion.  I'm not tendering it for the

18  purpose of going out with the jury, but to have his

19  testimony read here in court and then make it a part of

20  the record.

21           THE COURT:  May I see the exhibit?

22           MR. DARRAGH:  Further, it is directly

23  relevant to the testimony being offered by the witness.

24           THE COURT:  Okay.

25           MR. BRANNON:  Before the Court makes a

1  ruling, let me also add to it that the link has already

2  been established through this witness of the John Mark

3  Waldrip trial, in that case, so I -- and Mr. Evans was a

4  witness, I will object to the relevance of the entire

5  transcript, whatever the testimony was at that trial, I

6  don't think it is relevant to the issues in this trial

7  and so I object on those grounds also.

8          THE COURT:  Your intent, Mr. Darragh, is to

9  go through the entire testimony, the question and

10  answer?

11          MR. DARRAGH:  Yes, sir, for the particular

12  purpose of showing the import of that testimony and why,

13  Your Honor, it was important to influence this witness,

14  in the case of John Mark, Tommy Lee and Howard

15  Livingston.

16          THE COURT:  The objection is overruled.  You

17  may proceed as you have indicated you are, the statement

18  will be attached to the record but will not, or the

19  testimony will be attached to the record but will not go

20  out with the jury as an evidentiary exhibit.

21          MR. DARRAGH:  Your Honor, my additional copy

22  is on its way, until it gets here, I will approach the

23  witness, if I may.

24  BY MR. DARRAGH:

25      Q     I will be you, Mr. McClellan.

```
1      A      Okay.

2      Q      And ask the questions, if you will give the

3  answer that Keith Evans gave.

4             (Whereupon, the afore-mentioned testimony

5  was read).

6  BY MR. DARRAGH:

7      Q      "Tell us your name and age to start with,

8  Keith?

9      A      Keith Evans, 23.

10     Q      And where are you living now?

11     A      Decatur, Georgia.

12     Q      How long have you lived there?

13     A      Approximately five months.

14     Q      Okay.  And where did you live prior to that?

15     A      Dawsonville, Georgia.

16     Q      All right, are you working now?

17     A      Yes.

18     Q      Where are you working?

19     A      Kroger Company.

20     Q      And what is your position with Kroger?

21     A      Customer service.

22     Q      Could you tell us what that involves, just a

23  little bit, please?

24     A      Assisting the customers and assisting the

25  front end people.
```

1764

1     Q     Okay.  Prior to working for Kroger, where

2  did you work?

3     A     Foodcenter.

4     Q     And where is that located?

5     A     Highway 9.

6     Q     Here in Forsyth County?

7     A     Yes.

8     Q     How long had you worked there?

9     A     Approximately four and a half years.

10     Q     All right, how did you start out with

11  Foodcenter?

12     A     Cashier.

13     Q     Did you move up from cashier to some other

14  position?

15     A     Yes, I did.

16     Q     What position did you move up to?

17     A     Well, when I left, my position was closing

18  manager.

19     Q     All right.  And tell me what that involves.

20     A     I was responsible for the store, running the

21  store.

22     Q     Okay.  By closing manager, does that refer

23  to the shift that you worked, or what does that refer

24  to?

25     A     Yes, worked almost all nights.

1765

1      Q      Okay.  How long, what were the hours of the

2   store in the evenings?

3      A      We closed at 10:00.

4      Q      Okay.  And were you open seven days a week?

5      A      Yes.

6      Q      Okay.  Could you describe for me a little

7   bit what exactly you would do on a routine shift, what

8   your responsibilities were?

9      A      Making sure the store was running properly,

10  I worked in the office most of the time, counting tills

11  and cashing checks.

12     Q      Okay.

13     A      Customer service.

14     Q      If anybody that cashed a check, would they

15  have to come through you?

16     A      Most of the time, yes.

17     Q      What were the exceptions when they wouldn't

18  have to come through you?

19     A      A cashier could have me approve a check and

20  she could cash the check.

21     Q      So the cashier would still have to come to

22  you?

23     A      Yes, most of the time."

24             MR. DARRAGH:  I'm on page five, Counselor.

25             MR. BRANNON:  Thank you.

                           1766

```
1              MR. DARRAGH:  At line 20, 21.
2    BY MR. DARRAGH:
3        Q     "And you say you counted the money during
4    the shift an put it in the safe, things like that?
5        A     Yes.
6        Q     And when you were working at Foodcenter,
7    where were you living?
8        A     In Dawsonville.
9        Q     How long had you lived in Dawsonville?
10       A     23 years.
11       Q     Now let me refer you back to the 27th of
12   December of last year.  Were you working on that
13   evening?
14       A     Yes.
15       Q     What shift were you working?
16       A     The evening shift.
17       Q     What time did you come in to work on that
18   day?
19       A     2:00 o'clock.
20       Q     Is that the normal time you would go to
21   work?
22       A     Yes.
23       Q     And did anything happen, did anything happen
24   while you were on that particular shift that --
25       A     Yes, that evening, say 7:00, real close to
```

1  7:00, I was robbed.

2      Q      Okay.  Would you tell me about how that

3  happened, how that came about?

4      A      I had left the courtesy counter and one of

5  my cashiers said that there was someone waiting at the

6  window for customer service, so I went back to the

7  courtesy counter to wait on the customer.

8      Q      Uh-huh.

9      A      And once I got inside the courtesy counter,

10 I was, the person I was waiting on threw a bag to me.

11     Q      Uh-huh.

12     A      And told me to fill the bag, he had a gun

13 like inside his pants and he had on a jacket and pulled

14 his jacket back and showed me the gun.

15     Q      Okay.

16     A      So --

17     Q      What did you do after that?

18     A      I went to the safe and I opened the safe and

19 I filled the bag.

20     Q      And where was he while you were doing this?

21     A      He was still standing at the window.

22     Q      And where were his hands, could you tell

23 where his hands were?

24     A      I don't recall.

25     Q      Do you recall what he was wearing at all?

1768

1     A     He had on a brown jacket and jeans.

2     Q     And how much of the gun were you able to

3 see?

4     A     Just the handle of the gun.

5     Q     Okay, where was the gun on his, where did he

6 have the gun?

7     A     It was like to his side, like sticking in

8 his pants.

9     Q     Okay.  On what side of his body?

10     A     On his left side.

11     Q     Okay.  Now, did he come, if you could maybe

12 step down to the chalkboard here, I don't know how good

13 you are at drawing, just do like a floor plan of the

14 front of the store and show me where the registers are

15 and where the courtesy counter is.

16     A     The register is right here, seven registers.

17     Q     Okay.

18     A     The courtesy counter is here and the window

19 is right here.

20     Q     And where is the door that you would go in

21 and out of?

22     A     It was right here.

23     Q     Okay.

24     A     And the safe was right here, there was a

25 desk here.

1769

1    Q      Okay.  When you first saw the person, where

2    was he?

3    A      He was standing at the window right here.

4    Q      Okay.  And where did you go at that point?

5    A      Well, I went in beside the counter and came

6    around to the window to see what the customer needed and

7    you know, like I say, threw the bag through the window.

8    Q      How big of an opening is the window?

9    A      Like --"

10    MR. DARRAGH:  I'm sorry.

11    Q      "How big of an opening is the window?  Like

12    a standard money type window?

13    A      Standard money window.

14    Q      Okay.  Does it have a depression underneath

15    it?

16    A      No.

17    Q      It's just --

18    A      A flat surface.

19    Q      Okay.  You can go back to your seat now.

20    And the person that you saw that night, had you seen

21    that person before?

22    A      Yes, I have.

23    Q      How many times would you, would you say you

24    have seen that person?

25    A      Five or more.

1770

1    Q      Where have you seen him?

2    A      As a customer in the store.

3    Q      Okay.  And what was your contact with him as

4  a customer?

5    A      Just like I recall cashing his check and I

6  saw him like in the store purchasing things.

7    Q      Okay.  Did you ever know him by name?

8    A      No.

9    Q      Do you see that person in the courtroom

10  today?

11   A      Yes, I do.

12   Q      Would you point him out, please?

13   A      Yes.  He's the gentleman right here.

14   Q      Okay.  Would you describe what he is wearing

15  for the record?

16   A      He has on a brown suit and a white shirt.

17   Q      Let the record reflect he is identifying the

18  defendant."

19          MR. DARRAGH:  Your Honor, if I may pause

20  here at this moment and ask Mr. McClellan a question

21  before we continue.

22          THE COURT:  Very well.

23  BY MR. DARRAGH:

24   Q      Sir, you were in the courtroom at that time?

25   A      Yes.

1771

1     Q      Asking the questions, is that correct?

2     A      That's correct.

3     Q      Did you see who it was that Keith Lloyd

4  Evans pointed out that you identified as the defendant?

5     A      Yes, the defendant was John Mark Waldrip and

6  that is who we had on trial at that time.

7     Q      And you previously testified he is the son

8  of Tommy Lee Waldrip, the defendant here?

9     A      Correct.

10            MR. DARRAGH:   Continue.

11     Q      "Is there any doubt or any question in your

12  mind about who the person was that night?

13     A      No.

14     Q      Now, after he told you to fill up the bag,

15  tell me exactly what he did while you were filling up

16  the bag.

17     A      I didn't look up at him when I filled the

18  bag.  I filled the bag and the only things he said to me

19  when I was filling the bag was, "easy," so --

20     Q      At what time did the store have any --"

21            MR. DARRAGH:   Excuse me.

22     Q      "At that time did the store have any alarms

23  or anything like that?

24     A      No, it didn't.

25     Q      Did he ever make any statements to you about

1772

1   your hands or about an alarm or anything like that?

2       A    No.   Like I said, he said, "easy," you know,

3   like everything I did, you know, I assumed he was

4   watching my hands.

5       Q    Okay.  What is the angle of your view when

6   you are standing back here, is this a raised area?

7       A    Yes, it's raised.

8       Q    Would your eye level be about his eye level

9   or below or at the same height?

10      A    It is just, it's a little bit above.

11      Q    Okay.  You said that he had the gun in the

12  left side of his pants?

13      A    Right.

14      Q    And showed his jacket like this?

15      A    Uh-huh.

16      Q    Could anybody else that was working in the

17  cash area have seen that from the way he was standing?

18      A    No.

19      Q    How far is it from the window to the safe,

20  how far did you have to go to get to the safe?

21      A    It's about three or four feet.

22      Q    Okay.  And where is the safe as far as the

23  level, in other words, would you be able to stand and go

24  in the safe, or did you have to bend down?

25      A    Either way, it was at the level you could

1 | reach, either way.

2 |     Q    Okay.  From where the safe was and where he

3 | was, was he able, was his line of vision, did it include

4 | the inside of the safe?

5 |     A    Yes, he could see inside the safe.

6 |     Q    Okay.  At what point did he tell you to

7 | stop, or did he tell you to stop, as far as getting the

8 | money out and putting it in the bag?

9 |     A    Well, the money was laid out like laying

10 | this way.

11 |     Q    Uh-huh.

12 |     A    And there was, there was like one more pack

13 | of --

14 |     Q    If you want to use your hand, the jury can't

15 | see your hand.  The money was laying like this,

16 | indicating --

17 |     Q    Okay.

18 |     A    Like this, this was the safe, the money was

19 | laying this way.  I had picked up each stack of the

20 | money, there was one stack left, and I don't know, maybe

21 | he couldn't see my hand exactly where they were going

22 | and he said, "stop, that's enough."

23 |     Q    What denominations did you have in the safe

24 | and what denominations did you put into the bag?

25 |     A    It was bundles of ones, fives, and tens.

1    Q    Okay.  And was that how you normally bundled
2  the money?

3    A    Yes.

4    Q    And what quantity, I guess, bills do you
5  bundle together as a general rule?

6    A    Ones are bundled in fifties, and we bundle
7  packs of fifties in stacks of 500 and then ones bundled
8  in one hundreds, two fifties and five hundreds.

9    Q    Okay.  And tens?

10    A    And tens are bundled in 250 or 500.

11    Q    Okay.  And so the pack is a series of
12  bundles or a number of bundles, so there are 500 --"

13         MR. DARRAGH:  Excuse me.

14    Q    "500 one dollar bills would have been
15  bundled together?

16    A    Right.

17    Q    Did you put any of those bundles in the bag?

18    A    Yes, I did.

19    Q    Do you remember how many, roughly?

20    A    There was approximately two or three packs
21  of ones.

22    Q    Okay.

23    A    And about --"

24         THE WITNESS:  I think that is part of my
25  question.

1    Q    "How about the next denomination up, five,

2  you said they were bundled in five hundreds or two

3  fifties?

4    A    Yes, there were various amounts of fives and

5  tens, I couldn't be exact.

6    Q    Okay.  Do those get packed together in any

7  other denominations, or are they just --

8    A    They are just left.

9    Q    Okay.  And what was the one that was

10  closest, ones up this way, or were they just stuck in

11  there at random?

12    A    Just random.

13    Q    Okay, what happened after he told you to

14  stop?

15    A    I handed him the bag and he ran out of the

16  store.

17    Q    Okay.  Where, could you step down here and

18  show me where the doors are to the store?

19    A    Okay.  The big double door here, which is

20  usually always open.

21    Q    Uh-huh.

22    A    And there is double doors here, double doors

23  here and he ran out this door right here.

24    Q    I guess I was a little bit confused, I was

25  drawing this as the front of the store, I guess this is

1776

1   the back of the store, is that right?

2       A       Yes.

3       Q       So this is where all the merchandize is?

4       A       Yes, uh-huh.

5       Q       This is the front?

6       A       Yes.

7       Q       So if you walk in the front door, the

8   courtesy counter is to your left, or to your right?

9       A       Yes.

10      Q       Which way?

11      A       Well, if you come in the store, it would be

12  to your left.

13      Q       Okay.  He went out the door across from, I

14  guess diagonally across the store?

15      A       Right.

16      Q       What did you do after he left?

17      A       Once I saw he was out of sight I picked up

18  the phone and called the police.

19      Q       And did he make any other statement while he

20  was there, other than what you have testified?

21      A       No.

22      Q       Did he tell you anything about calling the

23  police before he left?

24      A       No, I don't recall him saying anything about

25  that.

1      Q      Did you have any particular reason for

2  waiting until he was out of sight?

3      A      I just, I wanted to make sure he was gone

4  because I didn't want him to turn around and see me on

5  the phone.

6      Q      Okay.  And how long did it take the police

7  to arrive?

8      A      I would say three to five minutes.

9      Q      And did you make any statements to the

10 police or give any kind of description of the person

11 that you saw?

12     A      Yes, the next morning I went and did a

13 composite drawing of him.

14     Q      Let me ask, in looking at the defendant

15 today, is there any marked difference in his appearance

16 today as far as his facial hair or length of his hair or

17 any other features you observed.  His hair is a little

18 bit shorter and he had a mustache at the time.

19     Q      Now, where did you say you were when you

20 first were drawn to his attention, somebody first drew

21 you to his attention?

22     A      I was back at the frozen food cases.

23     Q      Where are they in relation to the courtesy

24 counter?

25     A      To the front?

1778

1    Q     Or to the front, yes.

2    A     It was like three and a half aisles away.

3    Q     Okay, in what direction?

4    A     It would be, if you were facing the courtesy

5    counter, it would be to your right.

6    Q     Back this way?

7    A     Yes.

8    Q     Okay, so the store goes back this way some

9    more?

10   A     Yes.

11   Q     Let me get the right lines in there and who

12   was it that drew your attention to him?

13   A     It was the cashier, Becky Jennings.

14   Q     Did you go immediately to the counter?

15   A     Yes.

16   Q     Where he was waiting?

17   A     Uh-huh.

18   Q     And how would you have gotten to the counter

19   from where you were?

20   A     I had to walk by the courtesy counter and go

21   around and go in.

22   Q     So, you had walked behind him?

23   A     Yes.

24   Q     Okay.  And did you notice anything unusual

25   about him as you walked about?

1779

1    A       No, he was facing inside the courtesy
2  counter, I think.
3    Q       And what was the first thing that happened
4  that you knew that something was wrong, something bad
5  was about to happen?
6    A       Well, once I got in there and he threw me
7  the bag, now I knew I was being robbed.
8    Q       Okay, what exactly did he say when he threw
9  you the bag?
10   A       He said, "fill the bag."
11   Q       At what point did he show the gun?
12   A       After he said fill the bag.
13   Q       Did anybody else come over to see what you
14  all were doing?
15   A       No.
16   Q       Is there a glass or anywhere besides right
17  there at that window?
18   A       Yes, the upper part of the courtesy counter
19  is glass.
20   Q       And where was the nearest cashier, let me
21  ask you that?
22   A       She was on register five.
23   Q       And what is the sequence that they go, start
24  at one and go away from the counter?
25   A       Yes.

1780

1    Q      So, how far would she have been from the

2    counter?

3    A      She was about, I would say 30 feet.

4    Q      I believe you testified somebody coming to

5    the counter to get a check cashed or for some other

6    customer service, is that an unusual thing at that time

7    of the evenings?

8    A      No.

9    Q      Was there anything about that that would

10   have drawn anyone's attention to you or to him?

11   A      No.

12   Q      How long was he there, how long was the

13   defendant there in contact with you at the counter?

14   A      About five minutes.

15   Q      Now, at some later time were you called upon

16   to look at some pictures?

17   A      Yes.

18   Q      When was that?

19   A      Numerous times.

20   Q      Okay.  When was the first time you were

21   asked to look at some pictures, was it the next day, or

22   weeks, or so, months?

23   A      It was weeks, maybe.

24   Q      Where were you when you were asked to do

25   that?

1781

1    A    The first time I looked at pictures, I was
2  at the police department.

3    Q    Okay, what kind of pictures did you look at
4  there?

5    A    They were, it was a card like containing
6  photographs of different people.

7    Q    Okay.  Do you recall which officers were
8  there?

9    A    I don't remember which officer I talked to
10 that day.

11   Q    Okay.  Were you able to identify anybody out
12 of that particular picture spread?

13   A    No.

14   Q    Okay.  How about at a later time?

15   A    I saw, I would say there are four times I
16 looked at pictures of people.

17   Q    Okay.  Did you pick somebody out of any of
18 those pictures?  Did you pick the defendant out of any
19 of those pictures?

20   A    No.  It was the last ones I was shown, that
21 I picked someone out.

22   Q    Do you remember when that was?

23   A    It was one day just as I had come in to
24 work, an officer came up to the store and showed me some
25 pictures.

1    Q      Okay.  Who was there with you when you took,

2    when that took place, was anybody in the store there

3    with you?

4    A      Yes, there were other employees there, it

5    was at shift change time.

6    Q      Okay.  And did you identify out of that, and

7    who did you identify out of that picture spread?

8    A      The man I identified today in the court

9    room.

10   Q      And do you recall exactly when that was,

11   about how long after this incident?

12   A      How long after, it was a few months after

13   that.

14   Q      Now let me show you what has been marked as

15   State's Exhibit Number 1 and see if you can identify

16   first of all just the whole exhibit, not any particular,

17   but on the exhibit as a whole, the whole exhibit?

18   A      Yes.

19   Q      Okay.  What is that?

20   A      It's a photo, display folder.

21   Q      Have you seen that folder before?

22   A      Yes, I have.

23   Q      When did you see that folder?

24   A      This was the day I identified him.

25   Q      Okay, and where were you, at the Foodcenter?

1783

1    A      Yes.

2    Q      And which picture did you identify as the

3    defendant?

4    A      Number three.

5    Q      And is the person pictured in number three

6    the same person you identified today?

7    A      Yes.

8    Q      Mr. Evans, is there any question in your

9    mind as to, is there any question in your mind at all as

10   to the identification that you have made today and that

11   you made on that card or that lineup that John Mark

12   Waldrip is the person that came into your store and

13   robbed you on the 27th?

14   A      No.

15   Q      Thank you, sir."

16          MR. DARRAGH:  Your Honor, at this time the

17   cross-examination proceeded.  I would be glad to

18   continue in the fashion that I am if counsel would also

19   like the cross-examination.

20          MR. BRANNON:  It will be fine if they

21   proceed in the same manner, Your Honor.

22          MR. DARRAGH:  I will proceed.

23   Cross-examination by Mr. Rusty Jackson, and I will be

24   Mr. Jackson if you will continue to be Mr. Evans.

25   Q      "Now, when the person that robbed you left

1784

1  the store, did you get, did you see him get into any car

2  or anything of that nature?

3      A      No.

4      Q      Any car whatsoever that could be termed a

5  getaway car or whatever?

6      A      No.

7      Q      Now, from your description of the store area

8  here, would it be fair to say that when you walked into

9  the cashier's box, that was the first time, and turned

10 toward the person at the window, that's the first time

11 you were face to face with the person at the window, is

12 that right?

13     A      Yes.

14     Q      And what you were thinking is that you were

15 going to go up and cash someone's check, is that right?

16     A      Very possibly.

17     Q      Now, at, at what point did you first view

18 the person that was standing at the window?

19     A      Face to face, or just when I walked into the

20 courtesy counter?

21     Q      When you walked into the courtesy counter.

22     A      Yes.

23     Q      And then what is it, about five steps or so

24 from the entry to the courtesy counter, to the window?

25     A      Well, three.

1     Q      Three steps?

2     A      Uh-huh.

3     Q      Okay.  So you walked one, two, three steps

4  and you were there, and the first thing that happened is

5  a bag that is thrown on the --

6     A      Once I got in the courtesy counter, yes,

7  once I had stepped behind --

8     Q      Was the bag thrown on the counter as soon as

9  you stepped inside the courtesy counter?

10     A      Once I approached the window, yes.

11     Q      Okay.  As you were approaching the window,

12  the bag was thrown to the counter?

13     A      Right.

14     Q      And during those three steps you were

15  taking, the bag comes down on the counter?

16     A      I only took three steps to the counter,

17  walked around like a corner like this.

18     Q      Uh-huh.

19     A      And I walked around the corner and was

20  approaching the window when the bag was thrown in.

21     Q      Okay.  As you walked into the entrance to

22  the courtesy counter and you looked down and you saw

23  someone standing?

24     A      Uh-huh.

25     Q      At the window?

1786

1       A       Right.

2       Q       And you turned the corner, walked three

3   steps to the window, as you were walking down those

4   three steps the bag was placed down?

5       A       Right.

6       Q       Okay.  And would it be fair to say that once

7   the bag was placed down, your attention was focused on

8   the bag that had been placed down?

9       A       Right.

10      Q       Then when you got to the courtesy counter

11  the person said fill the bag up and pulled his coat

12  back?

13      A       Right.

14      Q       And you viewed the gun?

15      A       Right.

16      Q       All right.  Let me talk a second about the

17  gun.  Is the jacket that you, the jacket that the person

18  was wearing, was it, was it a sports jacket he was

19  wearing, a suit coat like I am wearing?

20      A       No.

21      Q       Just a regular corduroy jacket, not a sports

22  coat?

23      A       It had more of like a leather look to it.

24      Q       Was it cut similar to this, did it hang

25  straight down?

1787

1    A      It was a little shorter than that jacket
2  that you have on.

3    Q      Okay.  And the gun was not visible until the
4  coat was pulled back, is that correct?

5    A      Correct.

6    Q      So as far as where the gun was on the
7  person, on the left side, it had to be back in this area
8  somewhere where the coat concealed it, is that right?

9    A      It was a little further to the front.

10   Q      A little further to the front, okay,
11 somewhere right in front of the person's side?

12   A      Right.

13   Q      The front side of his body, would you say it
14 was just in front of the person's side?

15   A      Yes.

16   Q      Just in front of the person's side and the
17 front side of his body?

18   A      Right.

19   Q      Now, all you saw of the gun was that it was
20 a brown handled revolver, is that right?

21   A      Right.

22   Q      Tell me exactly what you saw of the gun.

23   A      I saw the top of the gun.

24   Q      Oh, the top of the gun, the top of the gun
25 meaning the handle that you hold it by?

1788

1    A    Right.

2    Q    And it had a brown color?

3    A    Yes.

4    Q    Could you tell what kind of material it was

5    that the handle was made out of?

6    A    No.

7    Q    You just saw the color brown?

8    A    Right.

9    Q    Could you see the barrel of the gun at all?

10   A    No.

11   Q    You couldn't see, could you see the cylinder

12   that the bullets went in at all?

13   A    Like the very top of it.

14   Q    Did you notice what color that was?

15   A    It was a dark brown color.

16   Q    The cylinder where the bullets go in was

17   also a dark brown color?

18   A    Yes.

19   Q    When the person pulled their coat back to

20   show you the gun, did they do it with their left hand?

21   A    Yes.

22   Q    Or right hand?

23   A    Left hand.

24   Q    Left hand.  Now, I believe you said on

25   questioning by Mr. McClellan that you think the entire

1789

1   time that this event was going on was five minutes?

2       A       Approximately.

3       Q       Okay.  Now, the safe that you were taking

4   the money out of is in the same box?

5       A       Right.

6       Q       That you were in up there, is that correct?

7       A       Correct.

8       Q       It was on this side of the entry door to the

9   box, on the window side, or on the other side?

10      A       The first block I have drawn there.

11      Q       The first block there?

12      A       That's the safe.

13      Q       Okay.  So you didn't have to move really

14  very far to get to the safe?

15      A       No.

16      Q       The safe, is it down on the floor?

17      A       No, it's about level with you, you know.

18      Q       You have to have a combination to get into

19  the safe, I suppose, is that right?

20      A       No, not necessarily.

21      Q       Okay.  So the safe was not necessarily

22  locked?

23      A       No.

24      Q       And this particular type was not locked, so

25  you just had to turn a handle and open it?

1790

1    A      Right.

2    Q      Okay, so you just turned the handle, opened

3 it and started putting money in the bag?

4    A      Right.

5    Q      And you said the bills were bundled in ones

6 and fives and tens?

7    A      Correct.

8    Q      And how would such a bundle of, say, ones,

9 how many ones would you put into a bundle to make a

10 bundle?

11    A      You bundle them in packs of 50 and then we

12 bundled ten packs of 50 to make 500.

13    Q      Okay.  I'm talking about ones, you have got

14 one big bundle and it has 500 ones in it?

15    A      Right.

16    Q      Okay.  So you just have to reach in and take

17 out one bundle, is that right?

18    A      Right.

19    Q      To get $500, how about the tens, what size

20 are they bundled in to?

21    A      We bundle those into 250 and 500.

22    Q      Okay.  So, is what you got out of the safe

23 basically, talking about $3,000, talking about six

24 bundles of $500 each?

25    A      Yes.

1791

1      Q       Okay.  So, that's what you did basically,

2  you took out six bundles or thereabouts?

3      A       Yes.

4      Q       And put it in the bag before you had to

5  stop?

6      A       Yes.

7      Q       Okay.  And then gave the bag back to the

8  person who ran out of the store, I think you said?

9      A       Yes.

10      Q       Okay.  Now, as you were putting the money in

11  the bag, your attention was focused on the fact you

12  were, what you were doing, taking the money out of the

13  safe and putting it into the bags, is that correct?

14      A       Correct.

15      Q       You were not looking at the person standing

16  at the window at that time, is that right?

17      A       Right.

18      Q       Now did you really have to move at all from

19  the safe to place the bag back on the counter where the

20  window is at or did you just kind of throw it up there?

21      A       Just like a step or two.

22      Q       A step, and did you place it up there or did

23  you toss it up there?

24      A       Placed it up there.

25      Q       And then the person immediately grabbed the

1792

1  bag and ran?

2      A      Right.

3      Q      Now that we have gone through the whole

4  process of doing that, do you think it actually took as

5  long as five minutes to go through all of that?

6      A      It may have been less.

7      Q      Now, you said that you saw these

8  photographic lineups.  You think you saw several of

9  them?

10     A      Yes.

11     Q      And by several, do you mean you at least saw

12  three or more?

13     A      Yes.

14     Q      And so the last one that has been identified

15  that you picked someone out of?

16     A      Yes.

17     Q      Okay.  Now, after you identified this

18  photograph, were you ever asked in State's Exhibit

19  Number 1 here, were you ever asked to go to the jail or

20  anywhere else and view a group of people in an in-person

21  lineup?

22     A      Yes, but that was before I saw that

23  particular --

24     Q      That is what I'm asking you, after you saw

25  this, were you ever asked to do that?

1793

1      A      No.

2      Q      And would it be fair to say that all these

3  pictures show basically the people depicted in them from

4  just below the shoulders up?

5      A      Yes.

6      Q      And you said Mr. Waldrip had been to the

7  Foodcenter before, is that correct?

8      A      Yes.

9      Q      And the business that you had had with him

10 there in the past was cashing his paychecks, is that

11 right?

12     A      Yes.

13     Q      That is one of the things that you do quite

14 often, is cash a lot of people's paychecks, say people

15 doing that particular thing, is that a fair statement?

16     A      Yes.

17     Q      Let me show you what I have marked as

18 Defendant's Exhibit Number 1.  Do you recognize that?

19     A      Yes.

20     Q      What is that?

21     A      That's the composite that I did.

22     Q      Okay.  How did you go about doing this

23 composite drawing?

24     A      I used, I guess you could call slides, small

25 slips of plastic, used the different ones.

1    Q      They give you different looks on persons,
2    different facial features?

3    A      Yes.

4    Q      Hairstyles?

5    A      Yes.

6    Q      Things of that nature?

7    A      Yes.

8    Q      By putting those together you come up with a
9    description of the person you think you saw, is that
10   right?

11   A      Yes.

12   Q      That is the composite you came up with.  Is
13   that correct?

14   A      Yes.

15   Q      I believe that's all the questions I have at
16   this time."  Mr. Jackson said, then Mr. McClellan said,
17   "Just a few more questions."  And then Mr. McClellan
18   continued with redirect examination.  And I will be you
19   now.

20   Q      "Now, when you, I believe you said earlier
21   about the cashing of checks, where did you usually cash
22   them, at the courtesy counter, where did you cash the
23   checks that you cashed for the defendant on prior
24   occasions, where were you when you cashed those checks?

25   A      Courtesy counter.

1795

1    Q      Is it possible for someone standing at the

2 courtesy counter to see the safe if you are standing

3 there cashing their check?

4    A      Yes.

5    Q      Can they see the safe?

6    A      Uh-huh, yes.

7    Q      Can that person see the condition the safe

8 is in, that is, that it is not normally closed or

9 locked?

10   A      If you looked at it the way the door, the

11 door is usually closed, you would assume it's locked.

12   Q      Okay.  But you can plainly see that it's a

13 safe, that it is a safe?

14   A      Yes.

15   Q      And did you say that you did not have to

16 have a combination to open it?

17   A      No.

18   Q      How did you open this safe?

19   A      You just lift the handle to open the door.

20   Q      What kind of safe is it, has it got any

21 combination?

22   A      Yes, it does.

23   Q      On the outside?

24   A      Yes.

25   Q      Does it have a handle?

1796

1    A    Yes.

2    Q    And describe the handle to me again.

3    A    It is just a lift handle, you lift it up on

4 the door and you pull it and --

5    Q    Is it like a lever?

6    A    Yes.

7    Q    Like a car door?

8    A    No.

9    Q    Now, have you ever cashed checks when you

10 have had the safe open for some reason, or do you have

11 to go to the safe to get the money to cash the checks?

12    A    There has been times I went to the safe to

13 get money.

14    Q    Is there any other cash drawer in the

15 courtesy counter area where you cash a check?

16    A    Just the register itself.

17    Q    Okay.  Where is that located?

18    A    It is beside the window, it's to the, if you

19 are facing the counter, it would be to your right.

20    Q    To your right, so if you are working, it

21 would be to your left?

22    A    Correct.

23    Q    When did you first realize you had seen the

24 defendant before that night, when did you first realize

25 you had seen him?

1797

1    A      When?  When I walked to the courtesy
2  counter.

3    Q      And did you tell anybody that was
4  investigating this case that you had seen him before?

5    A      Yes.

6    Q      Who did you tell?

7    A      I told all the officers that I talked to.

8    Q      And when you, going back to this lineup here
9  that you looked at, this photo display, all the
10  photographs you have seen, did you select any other
11  photographs other than the one that you showed me,
12  number three on this exhibit?

13    A      No, I did not.

14    Q      As the person that was there that night?  I
15  believe you said you went to an in-person lineup on
16  another --

17    A      Yes, I did.

18    Q      -- time, and was that before you were shown
19  this particular --

20    A      Yes.

21    Q      -- this particular photo?  Where was that
22  conducted?

23    A      At the jail.

24    Q      And did you identify anybody out of that
25  lineup?

1798

1      A      No.

2      Q      Before that lineup and before you were shown

3   any of these pictures, did the officers suggest anything

4   to you as to whether someone was or was not in a

5   particular lineup or photographs, as to who might be in

6   there?

7      A      They said they thought they had the person

8   but, you know --

9      Q      At which point was that?

10     A      Well, there was one or two times they said

11  they thought they had the person.

12     Q      Was one of those times with this lineup?

13     A      No.

14     Q      Did that influence your decision in any way?

15     A      No.

16     Q      Their statement that they thought they had

17  the person, now with regard to these pictures, was this

18  how they were shown to you, just like this?

19     A      Yes.

20     Q      Were you ever shown pictures of any of these

21  people individually before you were shown this?

22     A      Not that I recall, no.

23     Q      Okay.  Did any officers suggest to you which

24  pictures to select out of that lineup?

25     A      No.

1      Q      Have you had any occasion to see the
2 defendant since the robbery, before court this week?
3      A      Yes, I did.
4      Q      Where did you see him?
5      A      It was, I had come home one weekend, well,
6 it was during the week.
7      Q      Uh-huh.
8      A      To visit my family and I was in a
9 convenience store in Dawsonville and I saw him outside
10 the convenience store.
11      Q      That was in Dawsonville?
12      A      Yes.
13      Q      Your parents live in Dawsonville?
14      A      Yes, correct.
15      Q      And you were living up there at the time?
16      A      I was visiting.
17      Q      Visiting, okay.  And that was when?
18      A      I would say that was in June or July.
19      Q      Of this year?
20      A      Yes.
21      Q      Or last year?
22      A      Yes, this year.
23      Q      And was that after you had identified this
24 photograph?
25      A      Yes.

1      Q      Thank you.

2      A      Uh-huh."

3             MR. DARRAGH:  The Court said, "Anything

4    further?"  Mr. Jackson said, "No, sir."  Mr. McClellan

5    said, "No further questions."  The Court asked him to

6    step down.

7             Your Honor, that concludes the reading of

8    that testimony of Keith Lloyd Evans at the initial trial

9    of John Mark Waldrip.

10   BY MR. DARRAGH:

11     Q      Sir, you were familiar with and were

12   handling that case, is that correct?

13            THE COURT:  Mr. Darragh, I think we will

14   break at this point.  We're going to take our noon

15   recess.  Ladies and gentlemen, we're going to use the

16   clock inside the courtroom here as the official time, so

17   if you would, just coordinate your watches with the

18   clock that is here.  Remember your precautionary

19   instructions I gave you this morning.  We will be in

20   recess for one hour.

21            (Jury excused from the courtroom).

22            (Noon recess).

23

24

25

1801

1  car and John was fixing to get in it and he hollered and

2  we started talking, and he walked over, like we were

3  pulling out of the drive, you know, moving and --

4      Q      John walked over and talked to you at that

5  point?

6      A      Uh-huh.

7      Q      All right.  What car was Tommy in?

8      A      It was Linda's car.

9      Q      Okay.  Let me show you some -- excuse me,

10  this thing moves, I was going to lean on it, not a good

11  idea.

12          Ma'am, let me show you some exhibits that

13  are marked State's 21-P, 23-P and 28-P.  Are you

14  familiar with this particular vehicle?

15      A      Yes.

16      Q      And what vehicle is that?

17      A      Linda's car.

18      Q      Okay.  Is that the car that you saw Tommy

19  in?

20      A      Yes.

21      Q      Okay.  Is that the car that you saw John

22  Mark about to get in between 9:00 and 9:30 on that

23  evening?

24      A      Yes.

25      Q      You had known John some time before this as

1  well, is that correct?

2      A      Uh-huh.

3      Q      Just a yes or no to this question at this

4  time.  You still from time to time talk to John Mark

5  Waldrip on the telephone, is that correct?

6      A      I did but I haven't talked to him probably

7  in eight or ten months, you know, at least.

8      Q      Okay.  How frequently before then did you

9  talk with him?

10     A      I only talked to him a few times, I just

11  happened to be there, you know, when he had called.

12     Q      Okay.  Be where when he would call?

13     A      At Kim Odom's.

14     Q      Okay.  Was Kim also a resident of the

15  Gravitt Apartments?

16     A      Uh-huh.

17     Q      And you would get on the phone with John and

18  have conversation with him?

19     A      Yes, how you doing.

20     Q      Okay.  Now, the event following that

21  particular Saturday night, can you testify as to whether

22  or not you observed Tommy Waldrip around the apartments

23  prior to his being arrested?

24     A      Uh-huh.

25     Q      Did he come and talk to you?

1924

1     A     Right.

2     Q     And you turned the corner, walked three

3 steps to the window, as you were walking down those

4 three steps the bag was placed down?

5     A     Right.

6     Q     Okay.  And would it be fair to say that once

7 the bag was placed down, your attention was focused on

8 the bag that had been placed down?

9     A     Right.

10     Q     Then when you got to the courtesy counter

11 the person said fill the bag up and pulled his coat

12 back?

13     A     Right.

14     Q     And you viewed the gun?

15     A     Right.

16     Q     All right.  Let me talk a second about the

17 gun.  Is the jacket that you, the jacket that the person

18 was wearing, was it, was it a sports jacket he was

19 wearing, a suit coat like I am wearing?

20     A     No.

21     Q     Just a regular corduroy jacket, not a sports

22 coat?

23     A     It had more of like a leather look to it.

24     Q     Was it cut similar to this, did it hang

25 straight down?

1    A       It was a little shorter than that jacket
2  that you have on.
3    Q       Okay.  And the gun was not visible until the
4  coat was pulled back, is that correct?
5    A       Correct.
6    Q       So as far as where the gun was on the
7  person, on the left side, it had to be back in this area
8  somewhere where the coat concealed it, is that right?
9    A       It was a little further to the front.
10   Q       A little further to the front, okay,
11 somewhere right in front of the person's side?
12   A       Right.
13   Q       The front side of his body, would you say it
14 was just in front of the person's side?
15   A       Yes.
16   Q       Just in front of the person's side and the
17 front side of his body?
18   A       Right.
19   Q       Now, all you saw of the gun was that it was
20 a brown handled revolver, is that right?
21   A       Right.
22   Q       Tell me exactly what you saw of the gun.
23   A       I saw the top of the gun.
24   Q       Oh, the top of the gun, the top of the gun
25 meaning the handle that you hold it by?

1    A    Right.

2    Q    And it had a brown color?

3    A    Yes.

4    Q    Could you tell what kind of material it was

5    that the handle was made out of?

6    A    No.

7    Q    You just saw the color brown?

8    A    Right.

9    Q    Could you see the barrel of the gun at all?

10    A    No.

11    Q    You couldn't see, could you see the cylinder

12    that the bullets went in at all?

13    A    Like the very top of it.

14    Q    Did you notice what color that was?

15    A    It was a dark brown color.

16    Q    The cylinder where the bullets go in was

17    also a dark brown color?

18    A    Yes.

19    Q    When the person pulled their coat back to

20    show you the gun, did they do it with their left hand?

21    A    Yes.

22    Q    Or right hand?

23    A    Left hand.

24    Q    Left hand.  Now, I believe you said on

25    questioning by Mr. McClellan that you think the entire

1789

1  time that this event was going on was five minutes?

2      A      Approximately.

3      Q      Okay.  Now, the safe that you were taking

4  the money out of is in the same box?

5      A      Right.

6      Q      That you were in up there, is that correct?

7      A      Correct.

8      Q      It was on this side of the entry door to the

9  box, on the window side, or on the other side?

10     A      The first block I have drawn there.

11     Q      The first block there?

12     A      That's the safe.

13     Q      Okay.  So you didn't have to move really

14  very far to get to the safe?

15     A      No.

16     Q      The safe, is it down on the floor?

17     A      No, it's about level with you, you know.

18     Q      You have to have a combination to get into

19  the safe, I suppose, is that right?

20     A      No, not necessarily.

21     Q      Okay.  So the safe was not necessarily

22  locked?

23     A      No.

24     Q      And this particular type was not locked, so

25  you just had to turn a handle and open it?

1790

1    A      Right.

2    Q      Okay, so you just turned the handle, opened

3  it and started putting money in the bag?

4    A      Right.

5    Q      And you said the bills were bundled in ones

6  and fives and tens?

7    A      Correct.

8    Q      And how would such a bundle of, say, ones,

9  how many ones would you put into a bundle to make a

10 bundle?

11   A      You bundle them in packs of 50 and then we

12 bundled ten packs of 50 to make 500.

13   Q      Okay.  I'm talking about ones, you have got

14 one big bundle and it has 500 ones in it?

15   A      Right.

16   Q      Okay.  So you just have to reach in and take

17 out one bundle, is that right?

18   A      Right.

19   Q      To get $500, how about the tens, what size

20 are they bundled in to?

21   A      We bundle those into 250 and 500.

22   Q      Okay.  So, is what you got out of the safe

23 basically, talking about $3,000, talking about six

24 bundles of $500 each?

25   A      Yes.

1791

1       Q      Okay.  So, that's what you did basically,

2   you took out six bundles or thereabouts?

3       A      Yes.

4       Q      And put it in the bag before you had to

5   stop?

6       A      Yes.

7       Q      Okay.  And then gave the bag back to the

8   person who ran out of the store, I think you said?

9       A      Yes.

10      Q      Okay.  Now, as you were putting the money in

11  the bag, your attention was focused on the fact you

12  were, what you were doing, taking the money out of the

13  safe and putting it into the bags, is that correct?

14      A      Correct.

15      Q      You were not looking at the person standing

16  at the window at that time, is that right?

17      A      Right.

18      Q      Now did you really have to move at all from

19  the safe to place the bag back on the counter where the

20  window is at or did you just kind of throw it up there?

21      A      Just like a step or two.

22      Q      A step, and did you place it up there or did

23  you toss it up there?

24      A      Placed it up there.

25      Q      And then the person immediately grabbed the

1  bag and ran?

2      A       Right.

3      Q       Now that we have gone through the whole

4  process of doing that, do you think it actually took as

5  long as five minutes to go through all of that?

6      A       It may have been less.

7      Q       Now, you said that you saw these

8  photographic lineups.  You think you saw several of

9  them?

10      A       Yes.

11      Q       And by several, do you mean you at least saw

12  three or more?

13      A       Yes.

14      Q       And so the last one that has been identified

15  that you picked someone out of?

16      A       Yes.

17      Q       Okay.  Now, after you identified this

18  photograph, were you ever asked in State's Exhibit

19  Number 1 here, were you ever asked to go to the jail or

20  anywhere else and view a group of people in an in-person

21  lineup?

22      A       Yes, but that was before I saw that

23  particular --

24      Q       That is what I'm asking you, after you saw

25  this, were you ever asked to do that?

1793

1    A      No.

2    Q      And would it be fair to say that all these

3  pictures show basically the people depicted in them from

4  just below the shoulders up?

5    A      Yes.

6    Q      And you said Mr. Waldrip had been to the

7  Foodcenter before, is that correct?

8    A      Yes.

9    Q      And the business that you had had with him

10 there in the past was cashing his paychecks, is that

11 right?

12   A      Yes.

13   Q      That is one of the things that you do quite

14 often, is cash a lot of people's paychecks, say people

15 doing that particular thing, is that a fair statement?

16   A      Yes.

17   Q      Let me show you what I have marked as

18 Defendant's Exhibit Number 1.  Do you recognize that?

19   A      Yes.

20   Q      What is that?

21   A      That's the composite that I did.

22   Q      Okay.  How did you go about doing this

23 composite drawing?

24   A      I used, I guess you could call slides, small

25 slips of plastic, used the different ones.

1    Q      They give you different looks on persons,

2  different facial features?

3    A      Yes.

4    Q      Hairstyles?

5    A      Yes.

6    Q      Things of that nature?

7    A      Yes.

8    Q      By putting those together you come up with a

9  description of the person you think you saw, is that

10 right?

11   A      Yes.

12   Q      That is the composite you came up with.  Is

13 that correct?

14   A      Yes.

15   Q      I believe that's all the questions I have at

16 this time."  Mr. Jackson said, then Mr. McClellan said,

17 "Just a few more questions."  And then Mr. McClellan

18 continued with redirect examination.  And I will be you

19 now.

20   Q      "Now, when you, I believe you said earlier

21 about the cashing of checks, where did you usually cash

22 them, at the courtesy counter, where did you cash the

23 checks that you cashed for the defendant on prior

24 occasions, where were you when you cashed those checks?

25   A      Courtesy counter.

1795

1    Q    Is it possible for someone standing at the
2 courtesy counter to see the safe if you are standing
3 there cashing their check?

4    A    Yes.

5    Q    Can they see the safe?

6    A    Uh-huh, yes.

7    Q    Can that person see the condition the safe
8 is in, that is, that it is not normally closed or
9 locked?

10    A    If you looked at it the way the door, the
11 door is usually closed, you would assume it's locked.

12    Q    Okay.  But you can plainly see that it's a
13 safe, that it is a safe?

14    A    Yes.

15    Q    And did you say that you did not have to
16 have a combination to open it?

17    A    No.

18    Q    How did you open this safe?

19    A    You just lift the handle to open the door.

20    Q    What kind of safe is it, has it got any
21 combination?

22    A    Yes, it does.

23    Q    On the outside?

24    A    Yes.

25    Q    Does it have a handle?

1796

1      A      Yes.

2      Q      And describe the handle to me again.

3      A      It is just a lift handle, you lift it up on

4   the door and you pull it and --

5      Q      Is it like a lever?

6      A      Yes.

7      Q      Like a car door?

8      A      No.

9      Q      Now, have you ever cashed checks when you

10   have had the safe open for some reason, or do you have

11   to go to the safe to get the money to cash the checks?

12      A      There has been times I went to the safe to

13   get money.

14      Q      Is there any other cash drawer in the

15   courtesy counter area where you cash a check?

16      A      Just the register itself.

17      Q      Okay.  Where is that located?

18      A      It is beside the window, it's to the, if you

19   are facing the counter, it would be to your right.

20      Q      To your right, so if you are working, it

21   would be to your left?

22      A      Correct.

23      Q      When did you first realize you had seen the

24   defendant before that night, when did you first realize

25   you had seen him?

1797

1     A      When?   When I walked to the courtesy

2  counter.

3     Q      And did you tell anybody that was

4  investigating this case that you had seen him before?

5     A      Yes.

6     Q      Who did you tell?

7     A      I told all the officers that I talked to.

8     Q      And when you, going back to this lineup here

9  that you looked at, this photo display, all the

10  photographs you have seen, did you select any other

11  photographs other than the one that you showed me,

12  number three on this exhibit?

13     A      No, I did not.

14     Q      As the person that was there that night?   I

15  believe you said you went to an in-person lineup on

16  another --

17     A      Yes, I did.

18     Q      -- time, and was that before you were shown

19  this particular --

20     A      Yes.

21     Q      -- this particular photo?   Where was that

22  conducted?

23     A      At the jail.

24     Q      And did you identify anybody out of that

25  lineup?

1798

1      A      No.

2      Q      Before that lineup and before you were shown

3  any of these pictures, did the officers suggest anything

4  to you as to whether someone was or was not in a

5  particular lineup or photographs, as to who might be in

6  there?

7      A      They said they thought they had the person

8  but, you know --

9      Q      At which point was that?

10     A      Well, there was one or two times they said

11  they thought they had the person.

12     Q      Was one of those times with this lineup?

13     A      No.

14     Q      Did that influence your decision in any way?

15     A      No.

16     Q      Their statement that they thought they had

17  the person, now with regard to these pictures, was this

18  how they were shown to you, just like this?

19     A      Yes.

20     Q      Were you ever shown pictures of any of these

21  people individually before you were shown this?

22     A      Not that I recall, no.

23     Q      Okay.  Did any officers suggest to you which

24  pictures to select out of that lineup?

25     A      No.

1799

1    Q     Have you had any occasion to see the

2    defendant since the robbery, before court this week?

3    A     Yes, I did.

4    Q     Where did you see him?

5    A     It was, I had come home one weekend, well,

6    it was during the week.

7    Q     Uh-huh.

8    A     To visit my family and I was in a

9    convenience store in Dawsonville and I saw him outside

10   the convenience store.

11   Q     That was in Dawsonville?

12   A     Yes.

13   Q     Your parents live in Dawsonville?

14   A     Yes, correct.

15   Q     And you were living up there at the time?

16   A     I was visiting.

17   Q     Visiting, okay.  And that was when?

18   A     I would say that was in June or July.

19   Q     Of this year?

20   A     Yes.

21   Q     Or last year?

22   A     Yes, this year.

23   Q     And was that after you had identified this

24   photograph?

25   A     Yes.

1    Q    Thank you.

2    A    Uh-huh."

3    MR. DARRAGH:  The Court said, "Anything

4 further?"  Mr. Jackson said, "No, sir."  Mr. McClellan

5 said, "No further questions."  The Court asked him to

6 step down.

7    Your Honor, that concludes the reading of

8 that testimony of Keith Lloyd Evans at the initial trial

9 of John Mark Waldrip.

10 BY MR. DARRAGH:

11    Q    Sir, you were familiar with and were

12 handling that case, is that correct?

13    THE COURT:  Mr. Darragh, I think we will

14 break at this point.  We're going to take our noon

15 recess.  Ladies and gentlemen, we're going to use the

16 clock inside the courtroom here as the official time, so

17 if you would, just coordinate your watches with the

18 clock that is here.  Remember your precautionary

19 instructions I gave you this morning.  We will be in

20 recess for one hour.

21    (Jury excused from the courtroom).

22    (Noon recess).

23

24

25

1801

1  Waldrip.

2      Q    All right, sir.  Before we proceed with some

3  more documentation, can I ask you, please, do you have a

4  personal recall as to what Keith Evans' attitude was,

5  demeanor was in reference to coming to court or in

6  reference to any court actions prior to the first trial?

7      A    He was very cooperative.  He had no trouble,

8  as I recall, we had no trouble getting him to appear

9  when we needed him and that sort of things.

10     Q    Prior to the first trial did you notice in

11  him from your personal observations any apprehension

12  prior to the first trial?

13     A    None more than any, you know, witness in a

14  similar case would have about testifying at all and

15  about testifying in an armed robbery case where they

16  were the victim.

17     Q    As to the second time that the matter was to

18  come up for trial on April 15th, 1991, did you make any

19  personal observations or could you make any personal

20  observations, from your recall, about his demeanor in

21  reference to that?

22     A    Yes.  I think I would have to say he was a

23  little bit more reluctant this time around, apprehensive

24  about testifying.

25     Q    Okay.  Was he nonetheless cooperative?

1       A       Oh, yes, cooperative.  I don't know whether
2   it may have been frustration with the system, that sort
3   of thing.

4       Q       All right, let me ask you this, sir.  Can
5   you testify as to whether or not Rusty Jackson, who
6   represented John Mark Waldrip in the first trial, filed
7   any motions following John Mark Waldrip's conviction?

8       A       Yes, he did, he filed a motion for new
9   trial.

10      Q       Did that matter come on for hearing?

11      A       Yes.

12      Q       Was there a motion for new trial granted in
13  that case by the trial judge who had heard the case
14  previously?

15      A       Yes, I represented the State at that motion,
16  the motion was granted.

17      Q       Do you recall, then, from your own personal
18  knowledge as to the reasons the new trial was granted?

19      A       Yes, I do.

20      Q       And what was that reason?

21      A       The reason was there was improper
22  communication by one of the bailiffs to the jurors
23  concerning their deliberations, and that formed the
24  basis, although I don't think that was the original
25  ground of the motion for new trial, that came out during

1804

Cumming?

      MR. DARRAGH:  Your Honor, I object at this time without proper impeachment of the witness through appropriate methods, which have not been presented by counsel.

      THE COURT:  Sustained.

      MR. BRANNON:  If we might, I need to respond to that again, Judge.

      THE COURT:  If you are asking to ask that question, I don't think it is going to do any good, but if you want to try it, you can.

      MR. BRANNON:  For purposes of discovery, we were only handed it the end of last week.

      MR. DARRAGH:  Your Honor, if this is going to be a longer discussion, if we could have it at the bench.

      THE COURT:  Approach the bench, please.

      (Recorded bench conference).

      THE COURT:  Okay.

      MR. BRANNON:  My first response is, since he has testified that he was and where he was incarcerated, I should be allowed to ask anyway, because they have opened the door for bringing that in.  But if the objection is what I'm going to impeach him with, it was only given to us last Thursday afternoon and there is no

1897