**133-Doc. 9, R-56**

IN THE SUPERIOR COURT FOR THE COUNTY OF DAWSON
STATE OF GEORGIA

STATE OF GEORGIA,            )
                             )
                             )
            vs.              )      FILE NO. 91-CR-300C
                             )
                             )
TOMMY LEE WALDRIP,           )
                             )
              Defendant.     )

------------------------------------------------------------

JURY TRIAL

HON. JOHN E. GIRARDEAU              OCTOBER 17, 1994

------------------------------------------------------------

APPEARANCES OF COUNSEL:

**ORIGINAL**

        On Behalf of the State:

                LYDIA J. SARTAIN, District Attorney
                LEE DARRAGH
                LEONARD C. PARKS, JR.
                Assistant District Attorneys
                Gainesville, Georgia


        On Behalf of the Defendant:

                J. RICHARDSON BRANNON, III
                ANNE WATSON
                DONALD PULLIAM
                Attorneys at Law
                Gainesville, Georgia

                        - - - -

                        VOLUME XI

GEORGIA, DAWSON COUNTY
CLERK'S OFFICE, SUPERIOR COURT
FILED FOR RECORD
at _____ M 12-9-94
Recorded in _____ Book _____ Page _____
This _____ day of _____ 19 ___
_____ McCord
        CLERK

1    Q      And what cite did you proceed to and when

2  did you go there and why did you go there?

3    A      Excuse me, the following day, which was

4  April 18th, 1991, again I was at my office at that time

5  in Milledgeville and received a second call, or my

6  supervisor received a second call from Agent Frank Baker

7  advising, or requesting that I come up and help in

8  recovering the remains of a victim from a burial site.

9    Q      Approximately what time did you arrive at

10  that scene?

11    A      At about 2:30 p.m.

12    Q      All right, sir.  In what vehicle did you

13  travel?

14    A      In the van that I was driving at that time.

15    Q      Was there anyone else with you?

16    A      No, sir, I followed one of the other GBI

17  agents, I believe it was Danny Duncan, to the scene.

18    Q      When you got to the scene, what were your

19  observations and what did you begin to do first?

20    A      The scene was in a wooded area off of an

21  unnamed and unnumbered county road, the nearest road

22  that had any kind of number was called Southern Road,

23  the number on it was 113.  This appeared to be somewhat

24  like a cul-de-sac and off the downgrade of this road to

25  the right-hand side down the shoulder was a burial site.

1      Q       And what did you proceed to do?

2      A       There were some faint impressions, shoe

3   impressions or boot impressions in the earth.   I

4   attempted to photograph them, or did photograph them, I

5   photographed the general area around there and then we

6   began sifting the debris, which consisted of twigs,

7   leaves and dirt which covered the body.

8      Q       How was that sifting undertaken?

9      A       First the body, a portion of the body had

10  already been uncovered and in order to attempt to find

11  any evidence that may be not particularly or not exactly

12  over that grave site but in that general vicinity, we

13  raked all the debris to one pile and sifted through it

14  first.

15            In doing that, anything that may have been

16  in the general area would have been found through this

17  sifting process, and when I describe a sifting process,

18  I'm talking about using different grades of wire and

19  placing dirt and debris on the wire and rubbing it until

20  the debris falls through it, anything left on the

21  surface would be recovered.

22            We did the general area around the scene,

23  around the grave site first by doing that, and then went

24  to the grave site itself and started uncovering the

25  debris from it.

1          Once we got the outline of the grave site
2     identified, then I dug down a depth of about two feet
3     parallel to the grave site so that I could get down in
4     there and work forward through the dirt which covered
5     the body.
6          As I would do that, the earth I uncovered, I
7     would put that on the sifter and people that were there,
8     officers that were there helping us would sift that
9     material.
10          During that process a Pennington brand
11     plastic bag was recovered, one of the, I recovered that
12     by going down, but it was a large bag, excuse me.  This
13     bag was labeled lime and there was also a white
14     substance consistent with lime on the body itself.
15          Once we recovered the entire body and the
16     position of the body was lying north/south, on its back,
17     the legs were elevated a little bit at the knees, the
18     arms were crossed and covering the face.
19          After we got down to uncover the entire
20     body, placed a sheet down beside it and simply rolled
21     the body on to the sheet.  The purpose in doing that is
22     that anything that may have been on the body or with it
23     would at that time be captured in that sheet, and then
24     took the sheet along with the body, placed that in a
25     heavy duty body bag and then it was transported.

2244

1     Q      Okay.  Let me show you an item which is
2   marked number 21, State's Exhibit 21.  Have you seen
3   this item before?
4     A      Yes.
5     Q      What is that item?
6     A      This is the plastic bag, limestone bag that
7   was recovered from the burial site.
8     Q      And following your recovery of that item,
9   did you give it to any individuals there at the scene?
10    A      Yes, sir, I gave it to Agent Mefferd.
11    Q      So, Mefferd also went to the Gilmer County
12  scene?
13    A      Yes, sir.
14    Q      Where in relation to the body itself was
15  that Pennington lime bag as identified on the bag
16  itself, where in relation to that was it?
17    A      It was overlying a portion of the body in
18  the grave site itself.
19    Q      You described earlier seeing something that
20  you felt was consistent with lime.
21           First of all, have you seen lime before just
22  as a person?
23    A      Yes, sir, I have.
24    Q      And what led you to the conclusion, if
25  anything, that it was lime?  What observations did you

1  make about that material that led you to the conclusion

2  that it was consistent with lime?

3      A      The fact that, from my experience of people

4  that attempt to hasten the destruction of a body in

5  using lime, this bag was opened at one end, which would

6  indicate it had been used, or emptied there at that

7  scene, and then there was an accumulation of this white

8  material there.

9      Q      Okay.  Did you yourself recall whether you

10  collected any other -- just a moment.

11          MR. DARRAGH:  One moment, please, Your

12  Honor.

13  BY MR. DARRAGH:

14      Q      All right, sir, let me show you some

15  photographs at this time.  Photographs -- before I do

16  it, may I house clean here a moment?

17          I want to show you some photographs marked

18  State's photographs, and therefore also exhibit numbers,

19  127-P, 133-P, 134-P, 116-P, 119-P, 125-P, 113-P, 114-P

20  and 111-P.

21          Have you seen these areas photographed

22  before?

23      A      Yes, sir.

24      Q      Do these photographs accurately depict and

25  show the scenes that they purport to show?

2246

1    A    They, the spatters actually went, those

2  stands are shaped in somewhat of an upside down U as we

3  are looking at them, and the spatters, as well as the

4  larger accumulations, were all along the circumference

5  of that area.

6    Q    Okay.  The impressions that you got of any

7  shoes, but particularly the dress shoes, were the

8  farthest removed from the highest accumulation of blood

9  or blood spatters, isn't that correct?  You wouldn't

10 disagree with that, would you?

11   A    Well, I would have to look through all these

12 and compare.  It would take quite awhile to do that.  I

13 can't say at this point.

14         MR. DARRAGH:  Excuse me.  Your Honor, I will

15 object to the question because the question is in form

16 argumentative, in that there has already been testimony

17 from the officer about the location of the blood

18 spatters and the location of the photographs of the

19 dress shoes taken, and therefore the question itself is

20 an argumentative question and I will object to it.  That

21 testimony is before the jury and they can determine it

22 themselves.

23         THE COURT:  I'm going to allow it over

24 objection.

25 BY MR. BRANNON:

2260

1    Q      Well, stand number 15, you said it was a

2   dress shoe impression at that stand but you didn't

3   mention any soil samples of blood stains at 15.  15 is

4   the closest one north down the road, isn't it?

5    A      We had some stands that went as high as 20,

6   the best as I recall, and those numbered stands only go

7   to number 15.  From my own recollection and what I have

8   in my notes, I can't testify where anything from 16 to

9   20 were.  There is some following testimony that could.

10    Q      Okay.  So, stand 16, where you have a dress

11   shoe impression, and stand 18, where you had a faint

12   dress shoe impression, you don't know where those were?

13    A      To the best of my recollection, they would

14   have been, following the sequence of numbers, because in

15   looking at that, started with number one and went in a

16   counterclockwise manner, so the higher numbers in all

17   probability, the best I can say right now, would have

18   been northward.

19    Q      Coming this way?

20    A      Yes, sir.

21    Q      From 15, back this way?

22    A      That's correct.

23    Q      Okay.  Your signs, scuffling or struggling

24   in the dirt, those signs are down here near six and

25   eight and seven and eleven, correct?

1    A       Yes, sir, there were some drag marks in that
2  vicinity.

3    Q       All right.  The shoe impressions that were
4  taken at the scene, of your personal knowledge, you are
5  in no way attributing those shoe impressions to Tommy
6  Lee Waldrip at this time, are you?

7    A       No, sir.

8    Q       And the beer cans found at the scene, you
9  are not attributing those at this time to Mr. Waldrip,
10  are you?

11    A       No, sir.

12    Q       And the cigarette butts you found at the
13  scene, you are not attributing those to Mr. Waldrip, are
14  you?

15    A       No, sir.

16    Q       The hair sample found at the scene, you are
17  not attributing that to Mr. Waldrip, are you?

18    A       Of my own knowledge, no, sir.

19        MR. BRANNON:  Give me just a minute.  You
20  were up there a good while, let me look through my notes
21  here.

22  BY MR. BRANNON:

23    Q       The crime, as you understand it, was alleged
24  to have taken place, if indeed something happened here,
25  here at Hugh Stowers Road late on the evening of April

1  13th, is that how you understand it, 1991?

2       A      Yes.

3       Q      Okay.  When you got out there it was April

4  17th, four days later, is that correct?

5       A      Yes, sir.

6       Q      Did you ever personally talk to Mr. John

7  Hughes, the farmer who lives over in Forsyth County,

8  that owns some property right out here down Hugh Stowers

9  Road?

10      A      No, sir.

11      Q      South of this?

12      A      I didn't.

13      Q      All right, let me talk to you just a minute

14 about the Gilmer County site, if I could.  This

15 photograph that is marked 133-P, that's a photograph of

16 the kind of what I call the overall scene as you walk

17 down to where the grave site is located, would that be a

18 correct statement?

19      A      Yes, sir.

20      Q      All right.  Is there any crime scene tape

21 out when you walked on that site?

22      A      I don't recall there being any there.

23      Q      There is not any in the photograph when you

24 photographed it, is there?

25      A      No, sir.

1    Q      All right.  And when you got to this site,
2  what day is it?
3    A      April 18th, 1991.
4    Q      Okay.  So it's conceivably four to five days
5  later.  Now, when you got to this site on April 18th,
6  you don't know how many, not law enforcement officers,
7  but just people had driven by and been on that site and
8  got out and walked around, do you?
9    A      No, sir.  It was, seemed to me a fair, very
10 remote area but I have no idea how many people may have
11 been there, no.
12   Q      You don't have knowledge of anybody that
13 just walked down the road or picked up an insurance card
14 there or any drivers by?
15   A      No, sir.
16   Q      But when you showed up on the 18th there was
17 no crime scene tape there, correct?
18   A      Not that I recall.
19   Q      All right.  When you got to the Gilmer
20 County site on the 18th, how many people were there?
21   A      I don't have an exact accountings.  GBI
22 Agents Tommy Stone and Tommy Mefferd were there and
23 Danny, GBI Agent Danny Duncan, I believe I followed him
24 there, and a lady there from the Hall County Sheriff's
25 Office, Deputy Sheriff Kathy Sheffield was there.

2264

1     Q     When you are talking about from the side of

2 the roadway, all your measurements were made from this,

3 this would be the west side?

4     A     Right.

5     Q     Correct?

6     A     Right, this is the west here.  That's the

7 east, north, the south is up here.

8     Q     All right.

9     A     Agent Attaway would hold the tape measure,

10 stand over here and mark as best he could and I would

11 record the measurement on the other end of the tape, is

12 what we are doing.

13     Q     Okay.

14     A     8-B, which I'm going to put right here

15 beside 8-A is a second tire impression, okay?  It's 26

16 feet five inches from our line here and it is 14 feet

17 two inches from the west side of the roadway over here.

18 Six is a tire impression, 8-B is a similar tire

19 impression, in my opinion, okay?  From outside the wheel

20 here, to outside of the wheel here, if I may get into

21 this.

22     Q     What observation did you make about those

23 two tires?

24     A     To me they appeared to be similar tire

25 tread.

1      Q      So you determined then to make a measurement

2   between those?

3      A      It is my belief this was one vehicle here,

4   actuality driver's side tire here, the passenger side

5   front tire here.  From the outside of the tire to the

6   outside of the tire, the measurement was 63 and a

7   quarter inches.

8      Q      All right.

9      A      Okay?  Now, stand nine --

10     Q      All right, let me ask you this.  As to the

11  outside of those two tire areas, were these things going

12  straight on the road, or were they to an angle?

13     A      They were angled.  You can see the tire

14  impression here in my opinion was the most obvious

15  because you can see where it actually crosses over, not

16  really center line but I'm going to call it center line

17  and you can see where it is turning at an angle, that

18  pushed the dirt up.  This tire is behind this tire, the

19  vehicle is probably located something like that when it

20  came to a stop.

21     Q      All right.

22     A      And again that is very rough, okay?

23     Q      You went to what you call stand nine.

24     A      Right.  Okay, stand nine is located right

25  here, it is 22 feet from our line of center mass and it

2285

1  is 13 feet seven inches from the west side over here.

2  What we had here, we had blood splatters and we had

3  broken glass, glass fragments here.

4       Q      Okay.  Now, when you make an observation,

5  glass fragments and blood splatters, is that based on

6  what somebody has told you or what you personally

7  observed?

8       A      I observed in my opinion blood splatters and

9  I saw broken glass.

10      Q      All right.  You went on to another location,

11  is that correct?

12      A      Yes.  Stand ten, which is located right

13  here.  You can still see it over here in the photograph.

14  Stand ten, it was located 21 feet to center mass here

15  and 13 feet ten inches from the west side.  What we had

16  here was a single hair and a button was located in that

17  area right there.

18      Q      Did you observe the collection of those

19  items?

20      A      Yes, I later did, yes.

21      Q      Okay.  So, at the time you made the

22  notations, they were still there and had not been

23  collected yet?

24      A      That's correct, yes.

25      Q      And -- okay.  You went on from there to

2286

1   another location, is that correct?

2        A        Yes, stand 11.  Which is located right here

3   and again you can kind of see it over here at the side

4   right here.  Stand 11 was 19 feet to here, to center

5   from center mass to stand 11 and 17 feet six inches to

6   the left side of the roadway here.  This was an

7   accumulation of blood in a ditch, this is actually a dip

8   here, it is over in the ditch, it's an accumulation of

9   blood there on the dirt surface as well.

10        Q        And you went to stand 12?

11        A        Right.  Okay, stand 12, which I'm going to

12   put my 12 right here, again you can see 12 here in front

13   of ten.  Stand 12 was 16 feet six inches from our line

14   here and was 13 feet seven inches from the west side of

15   the roadway.  This was a portion of a shirt, I referred

16   to in my opinion as some type of dress shirt and there

17   was also in my opinion a tennis shoe impression here.

18   This is at 12.

19        Q        And was there another item also there at 12?

20        A        There was also hair at 12, like it was, like

21   a, it was a group of hair, more than one hair.

22        Q        And stand 13?

23        A        Okay.  Stand 13 is a little more, stand 13

24   is located here.  If you will notice here, it is very

25   difficult to see, but it's over here, you can see it is

1  kind of hidden there.  Stand 13 is 16 feet six inches

2  from our line here, 19 feet six inches from our west

3  side of the roadway and this again is just an

4  accumulation of blood over here on the ground surface.

5      Q       And I'm sorry, which number was that last

6  one?

7      A       13, our next one will be 14.

8      Q       Okay.

9      A       14 is located here, again you can see 14

10 here.  14 was 14 foot ten inches from our line here, it

11 was 13 feet four inches from the west side of the

12 roadway.  There were two cigarette butts located on the

13 ground there.

14     Q       What is your recall on how close they were

15 together or how far apart they were?

16     A       They were in close proximity, I don't recall

17 exact distance between them.

18     Q       But they were close enough you gave them the

19 same measurement?

20     A       Yes, they were very close to each other.  I

21 don't know the exact distance but they were fairly

22 close.

23     Q       All right.  You went to what you called

24 stand 14-A, is that correct?

25     A       The next one will be 14-B.

1    Q      I'm sorry.

2    A      We will call it 14-B, I will place it right

3    here.  14-B is 12 feet three inches from our line here,

4    17 feet six inches from the west side.  This was an

5    indention in the ground, okay?  Initially we didn't know

6    what it was, just an indention, where an object had been

7    mashed into the ground, okay?

8    Q      Would you describe the shape of that

9    indention?

10   A      It was, at the time it just looked like a

11   small, I didn't know what it was, I knew something had

12   been indented in the ground but it was just an indention

13   where something had gone long ways into the ground, it

14   was long, well, long and thin.

15   Q      All right.  Let me show you an item of

16   evidence that has been previously admitted as State's

17   Exhibit 73.  Would you observe that item for a minute?

18   A      Yes, I recognize this item.

19   Q      And how do you recognize that item?

20   A      This item was provided to me by Investigator

21   Doug Perry that morning when I initially arrived at this

22   scene.

23   Q      How does that item compare with the indent

24   that you just described?

25   A      Later in the day after I completed my

2289

1   there.   16 is located right here.   It is two feet nine

2   inches to the center mass and 14 feet one inch from the

3   west side, and this was in my opinion a tennis shoe

4   design on the surface of the dirt, it had like a diamond

5   design, in my opinion like a diamond design on the tread

6   of a tennis shoe.

7       Q       All right.

8       A       Okay.

9       Q       You went to another location?

10      A       Stand 17.   With 17 we get one foot north of

11  our line, we are back this side of the line, and this is

12  one foot north and it was 14 foot five inches from the

13  west side and this was a second what appeared to me to

14  be some type of tennis shoe impression.

15      Q       Then you proceeded to the next stand?

16      A       18.   Okay, 18 again we're north, 33 foot two

17  inches north of center, and three foot five inches --

18  wait a second --

19              I apologize.   I have lost that one in my

20  notes.

21      Q       Mr. Mefferd, are you looking for your

22  diagram?

23      A       I was looking for the legend to identify

24  what 18 is.

25      Q       Is that what you are looking for, sir?

2292

1    A      Yes, sir, thank you.  18, again, as I

2    described, I apologize, was a dress shoe impression,

3    dress shoe impression here.

4           Okay, 19, if you will, is going to be

5    located over in this direction.  It's eight feet north

6    of this line and it's four feet to the west side of the

7    roadway, it is like over here, and this was a Busch beer

8    can.

9    Q      All right.

10   A      Okay.

11   Q      Then you proceeded to where?

12   A      Okay.  My next one will be 20.  20 is

13   located right here, seven feet three inches from this

14   line, it is eight feet from the west side of the

15   roadway.

16          This was a shoe impression but it was like

17   someone was sliding, the shoe impression itself had a,

18   has like someone slid on the dirt.

19   Q      And which stand was that one, now?

20   A      20.

21   Q      Okay.

22   A      Right here.

23   Q      Then you went --

24   A      I went to stand 21, which is just above it

25   here.  This is 12 foot nine inches here to the center

1  mass, eight foot two inches, and this is a second shoe

2  impression, or another shoe impression on the dirt

3  surface.

4       Q       Then stands 22, 23 and 24, did they involve

5  similar items?

6       A       Yes.

7       Q       Where were they located?

8       A       Okay.  22 is located right here, which is 23

9  feet to center mass and two feet south of this location

10 here, and this was again a Busch beer can.

11      Q       And 23 and 24?

12      A       Okay.  23 was located right here, 15 feet

13 four inches from this center mass and seven feet west,

14 again another Busch beer can.

15      Q       Okay.

16      A       And my last is going to be 24, it is located

17 over here, and it again is a Busch beer can, it is 35

18 feet five inches and 27 feet from the west side.  Those

19 those last ones were all Busch beer cans, they were

20 empty.

21      Q       Please have a seat, sir.  Now, at the Hugh

22 Stowers Road scene you have just been describing, how,

23 did you observe a collection of the physical evidence

24 there at the scene?

25      A       Yes, I did.

1     Q        And who collected the physical evidence
2  there at the scene?
3     A        Agent Mitchell.
4     Q        And to whom did he give that physical
5  evidence?
6     A        As we, prior to departing from the scene, he
7  relinquished custody of all the evidence which was
8  collected there over to myself.
9     Q        All right, sir.  The evidence that you
10 received from Agent Mitchell at the scene, did you in
11 any way tamper with that evidence, seek to alter that
12 evidence, do anything to add to that evidence or take
13 away from that evidence or change it in any fashion?
14    A        No, sir, I did not.
15    Q        Did you allow anybody else to do the same
16 with that?
17    A        No, sir, I did not.
18    Q        What did you do with the evidence that you
19 took from there at the scene, from Mitchell?
20    A        I initiated my own evidence forms, the
21 evidence I took custody of, other than the items
22 provided to me by Investigator Perry, he already had an
23 evidence form initiated for the items he took.  I
24 maintained custody until I turned for example everything
25 over to Chief Deputy Henry George of the Dawson County

1   so.

2        Q       In maintaining custody, did you in any way

3   alter, change, add to, seek to take away from, fool with

4   it in any fashion?

5        A       No, sir, I did not.

6        Q       I need to, by way of necessity, go through

7   several items of physical evidence at this point.  I

8   will try to be brief with it.  Let me show you first

9   items 27-H and 27-J.  Well, let me do it in this face,

10  sir.  I'm going to show you items 27-G, 27-L, 27-B,

11  27-A, 27-C, 27-F, 27-E, 27-P, 27-O, 27-H, 27-J, 27-I,

12  27-M, 27-K, 49, 47, 46, 44, 42, 41, 51, 50.

13              All right, also I'm going to show you item

14  number 26 as originally contained in that paper bag.

15  Did you observe the collection of item 26 as well?

16       A       Yes, I did.

17       Q       And who actually collected that item?

18       A       I believe Agent Attaway collected this item.

19              THE COURT:  Has that been previously

20  identified?

21              MR. DARRAGH:  No, sir, I believe it has not

22  been.

23  BY MR. DARRAGH:

24       Q       Do you recognize the notation on number 26

25  at the top of the page?

2296