141-Doc. 51, P-2

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

STATE OF GEORGIA          )
                          )
   vs.                    )  No. 00-B-0700-7
                          )
WESLEY VANDALE HARRIS,    )
                          )
   Defendant.             )

COPY

- - -

Transcript of proceedings in the above-referenced case, heard before the Honorable John S. Langford, Senior Judge, reported by Jeanine M. Ritter, Certified Court Reporter, at the Gwinnett Justice and Administration Center, 75 Langley Drive, Lawrenceville, Georgia, on January 14, 2002.

- - -

APPEARANCES OF COUNSEL:

On behalf of the State:         Daniel J. Porter, D.A.
                                Donald P. Geary, Assistant D.A.
                                John S. Melvin, Assistant D.A.

On behalf of the Defendant:     Herbert Adams, Jr., Esq.
                                Walt M. Britt, Esq.
                                Christine A. Koehler, Esq.

On behalf of Gwinnett County
   Superior Court Judges:       Kathryn L. Allen
                                Senior Asst. Attorney General



Jeanine M. Ritter
Certified Court Reporter
Lawrenceville, Georgia  30043
(770) 277-6962

```
 1  Whereupon,
 2                        TOM LAWLER,
 3  was called as a witness herein and, having been first duly
 4  sworn, was examined and testified as follows:
 5                     DIRECT EXAMINATION
 6  BY MR. BRITT:
 7       Q     State your name for the record.
 8       A     Tom Lawler.
 9       Q     And Mr. Lawler, how are you employed?
10       A     I'm the elected Clerk of Superior Court in Gwinnett
11  County.
12       Q     And when were you elected the Clerk of the Superior
13  Court?
14       A     Six years ago.
15       Q     And prior to that time you were the elected
16  district attorney here in this district for two years -- I
17  mean two terms; is that correct?
18       A     Back from '85 to about '91.
19       Q     And prior to that time you had been the -- in
20  private practice and also the solicitor or prosecutor in
21  juvenile court for a number of years; is that correct?
22       A     Correct.
23       Q     And you are a member of the Bar of the State of
24  Georgia in good standing?
25       A     Yes.
```

1   Q   Have you, since becoming the elected Clerk of the
2   Gwinnett Superior Courts and State Courts, ever taken an oath
3   before the judge of the Probate Court pursuant to O.C.G.A.
4   Section 15-12-23 that you, as the Clerk of the Superior Court
5   and as the Clerk of the Gwinnett County Board of
6   Commissioners, swear that you will duly discharge faithfully
7   the duties of the Clerk of the Board of Jury Commissioners for
8   Gwinnett County as required by law and shall never divulge any
9   of the proceedings and deliberations of the jury commissioners
10  unless compelled to testify thereof in some court of this
11  state.  Have you ever taken that oath?
12  A   I've never taken such an oath.
13  Q   Have you ever served in the capacity as clerk to
14  the board of jury commissioners?
15  A   I have not.
16  Q   Would it be fair to say that after the jury list is
17  compiled, revised and signed off by the chairman of the board
18  of jury commissioners, you take it into your office as a file;
19  is that correct?
20  A   It is filed along with the certificate.
21  Q   And that is your total involvement to this date; is
22  that correct?
23  A   Well, it depends on what you mean by involvement.
24  I have duties as with -- with regard to --
25  Q   Drawing the --

1   A   -- technology.

2   Q   Right.

3   A   But I don't do anything personally. I have a staff
4   that actually does the electronic manipulations necessary to
5   pick the pool.

6   Q   Okay. You have never met with the board of jury
7   commissioners in your capacity as clerk of the Gwinnett
8   Superior Court or as clerk of the board of jury commissioners
9   in the revision and compilation of the jury list that is
10  reflected on State's Exhibit No. 1, have you?

11  A   I have not.

12  Q   And why is that?

13  A   Well, that's because we operate under an internal
14  operating procedure, which I have a copy of. It may already
15  be in evidence.

16  Q   Let me show you -- there's been a series of them
17  over this period of time we're talking about that are shown on
18  Defendant's Exhibits 2, 3 and 4?

19  A   Right. Under these -- and, of course, I have the
20  original of the first one also.

21  Q   Okay.

22  A   A certified copy of it, which is back in 1988 when
23  we moved to this building. Apparently we went to a jury plan
24  at that time. And in 1998 the original one was filed. And
25  from that point on, the court administrator took over the

1  duties of jury clerk.

2      Q    You have reviewed the statute in question in this
3  case and the population figures that are set forth in that; is
4  that correct?

5      A    Yes, I have.

6      Q    And would it be fair to say that the population
7  figures are 183,000 and not more than 216,000, according to
8  the United States census for 1990 or any future census; is
9  that correct?

10     A    That's correct.

11     Q    And in 1990 Gwinnett County did not fit within that
12 census figure, and in 2000 they did not fit within that census
13 figure; is that correct?

14     A    My investigation reveals that's true.

15     Q    So the jury plan as promulgated by the Gwinnett
16 Superior Court judges is violative of the statute; is that
17 correct?

18          MR. PORTER:  Objection.  Your Honor, that's what
19      the Court is here --

20          THE COURT:  Sustain the objection.

21          MR. BRITT:  Okay.

22 BY MR. BRITT:

23     Q    Defendant's Exhibit No. 5, is that an oath of your
24 predecessor in office, Mr. Yates, who was the clerk of the
25 superior court?

1  A     It appears to be an oath and it's got his
2  signature. I'm familiar with his signature.
3  Q     And you've never subscribed to a similar oath; is
4  that correct?
5  A     No. I absolutely have not done that.
6         MR. BRITT: That's all the questions I have. Oh,
7  I'm sorry. I do have something else.
8  BY MR. BRITT:
9  Q     Since these issues have been raised and I have
10 spoken to you about these various issues, have you attempted
11 to approach the superior court judges about curing the problem
12 of you taking the oath?
13 A     Well, when I discovered it -- and I actually
14 discovered the fact that we may be in conflict with the
15 statute. Prior to the -- the weekend prior to the testimony
16 was scheduled before -- I don't remember the date.
17 Q     Right, back in December.
18 A     December. And upon discovery, Your Honor, of the
19 fact that we didn't fit the population cap, I came in on that
20 Sunday and found through the census that we were in violation
21 since '90. I notified the district attorney because I wasn't
22 sure that he was aware, but he was already aware that that was
23 a possibility.
24        So the next morning I contacted our chief judge,
25 Dawson Jackson. And we had -- only by telephone. And we had

1  a discussion very briefly as to the situation, because it did
2  appear that the plan may be in jeopardy and that I was --
3  since it did appear that it was my duty, I'm more than willing
4  to take the oath and to meet with the jury commissioners and
5  to revise the pool and correct the problem, if that is
6  necessary.
7      Q    And in our discussions that you and I have had
8  about your testimony, what is the time frame that you feel is
9  reasonable for reconstituting the jury panel?
10     A    Well, not -- since all the groundwork is done --
11 and if it's done correctly, I don't know.  If everything is
12 done correctly, it wouldn't take very long at all, less than
13 30 days.
14     Q    Okay.
15     A    If you were -- if there are problems, of course,
16 you have to address them.  And, you know, I can't see the
17 future.
18     Q    And your proposal is, is that you would appear
19 before the probate judge, swear to your oath, begin your
20 duties and meet with the jury commissioners and not with the
21 judges of the superior court; is that a fair statement?
22     A    Well, I don't know if I'd say it that way.  I talk
23 with the judges on a daily basis, not all of them but some of
24 them.  And I'm sure I might discuss the jury situation with
25 them without any hesitation.  But as far as the constitution

1  of the jury, probably the jury commissioners, under the way I
2  read the law, would --
3      Q    It's you and the jury commissioners?
4      A    -- would try to determine the best way to do that
5  in accordance with the statutes.
6          MR. BRITT:  Thank you, Mr. Lawler.
7                      CROSS-EXAMINATION
8  BY MR. PORTER:
9      Q    Mr. Lawler, when you were first elected clerk, were
10 you approached by the court administrator regarding the
11 allocation of jury duties?
12     A    Yes.
13     Q    And did Mr. O'Neill offer to you that he would
14 continue to constitute and manage and handle the juries, as
15 had been done for some time prior under the administration of
16 Mr. Yates?
17     A    Well, when I came in, it was the beginning of the
18 year.  And these plans are often filed toward the beginning of
19 each year or toward the end of the last year.  And since I had
20 just been elected -- I think the way he put it, if my recall
21 is pretty good -- is:  Do you want the jury back?
22          And I said:  Not necessarily.
23          And he said:  Well, we have the jury plan.  Do you
24 want me to continue it?
25          And I said:  Certainly.

1  Q  And at that time did you essentially feel
2  comfortable in delegating the responsibility to the jury to
3  the court administrator?
4  A  Well, see, I didn't feel like I was delegating it.
5  My understanding -- I was here, as you know, as the district
6  attorney when the original statute was passed in the
7  legislature that had the population guidelines. And they were
8  designed in the legislature for Gwinnett County. So I had
9  never -- I knew we had a statute that allowed the jury plan.
10 I knew we fell within the statute. I had no idea that we were
11 no longer in the population cap.
12 Q  So in good faith you essentially continued a
13 practice that you at that time believed to be correct?
14 A  Well, yes. And plus, you know, I have an order
15 that operates that way. And I do tend to follow court orders.
16 So the order had been issued. And the way we were going to do
17 jury plan, I had no objection to it. And to be honest, it's
18 worked very well since 1988, which is the original order.
19 Q  And your understanding was, when you allowed Mr.
20 O'Neill to continue, you were operating that you were within
21 compliance with the law?
22 A  My feeling -- I had no idea that the population cap
23 was below our population, yes.
24     MR. PORTER: Thank you. That's all the questions I
25     have.

REDIRECT EXAMINATION

BY MR. BRITT:

Q    When you discussed this matter prior to the previous hearing in December with Judge Jackson and you related your fears and your thoughts on the matter, what did he say to you about remedying the situation?

A    He said that he was going to discuss it with the judges and Homer Stark, our former chief judge, who's a senior judge, and that he'd get back to me.

Q    And since that date, which I believe was in early December --

A    I've had no contact with anybody from the -- any judge concerning what I should or should not do.

MR. BRITT:   Thank you, Mr. Lawler.

MR. PORTER:  I have no recross.

THE COURT:   Okay. Do you want to go to another witness?

MR. BRITT:   Yes.

THE WITNESS: Thank you.

THE COURT:   Excuse him subject to recall?

MR. BRITT:   We're through. He can be released. He has to go out of town.

THE WITNESS: I have to go out of town tomorrow. Would that be all right if I'm released?

MR. PORTER:  Fine with the State.

# Profiles of General Demographic Characteristics | 2000

Issued May 2001

2000 Census of Population and Housing

**Georgia**



U.S. Department of Commerce
Donald L. Evans,
Secretary

Economics
and Statistics
Administration
J. Lee Price,
Acting Under Secretary for
Economic Affairs

U.S. CENSUS BUREAU
William G. Barron, Jr.,
Acting Director



DEFENDANT'S EXHIBIT 1

CONTENTS

State
County
Place
Consolidated City
Metropolitan Area – State Part
American Indian Area – State Part
Congressional District (106th Congress)
About the Profile

i

Table DP-1. Profile of General Demographic Characteristics: 2000
Geographic Area: Georgia

[For information on confidentiality protection, nonsampling error, and definitions, see text]

| Subject | Number | Percent | Subject | Number | Percent |
|---|---|---|---|---|---|
| Total population | 8,186,453 | 100.0 | **HISPANIC OR LATINO AND RACE** | | |
| **SEX AND AGE** | | | Total population | 8,186,453 | 100.0 |
| Male | 4,027,113 | 49.2 | Hispanic or Latino (of any race) | 435,227 | 5.3 |
| Female | 4,159,340 | 50.8 | Mexican | 275,288 | 3.4 |
| | | | Puerto Rican | 35,532 | 0.4 |
| Under 5 years | 595,150 | 7.3 | Cuban | 12,536 | 0.2 |
| 5 to 9 years | 615,584 | 7.5 | Other Hispanic or Latino | 111,871 | 1.4 |
| 10 to 14 years | 607,759 | 7.4 | Not Hispanic or Latino | 7,751,226 | 94.7 |
| 15 to 19 years | 596,277 | 7.3 | White alone | 5,128,661 | 62.6 |
| 20 to 24 years | 592,198 | 7.2 | **RELATIONSHIP** | | |
| 25 to 34 years | 1,299,256 | 15.9 | Total population | 8,186,453 | 100.0 |
| 35 to 44 years | 1,353,508 | 16.5 | In households | 7,952,631 | 97.1 |
| 45 to 54 years | 1,079,992 | 13.2 | Householder | 3,006,369 | 36.7 |
| 55 to 59 years | 375,651 | 4.6 | Spouse | 1,548,800 | 18.9 |
| 60 to 64 years | 285,805 | 3.5 | Child | 2,439,098 | 29.8 |
| 65 to 74 years | 435,695 | 5.3 | Own child under 18 years | 1,899,303 | 23.2 |
| 75 to 84 years | 261,723 | 3.2 | Other relatives | 522,651 | 6.4 |
| 85 years and over | 87,857 | 1.1 | Under 18 years | 218,208 | 2.7 |
| Median age (years) | 33.4 | (X) | Nonrelatives | 435,713 | 5.3 |
| | | | Unmarried partner | 145,743 | 1.8 |
| 18 years and over | 6,017,219 | 73.5 | In group quarters | 233,822 | 2.9 |
| Male | 2,915,524 | 35.6 | Institutionalized population | 126,023 | 1.5 |
| Female | 3,101,695 | 37.9 | Noninstitutionalized population | 107,799 | 1.3 |
| 21 years and over | 5,646,535 | 69.0 | | | |
| 62 years and over | 948,821 | 11.6 | **HOUSEHOLD BY TYPE** | | |
| 65 years and over | 785,275 | 9.6 | Total households | 3,006,369 | 100.0 |
| Male | 311,231 | 3.8 | Family households (families) | 2,111,647 | 70.2 |
| Female | 474,044 | 5.8 | With own children under 18 years | 1,051,302 | 35.0 |
| | | | Married-couple family | 1,548,800 | 51.5 |
| **RACE** | | | With own children under 18 years | 732,734 | 24.4 |
| One race | 8,072,265 | 98.6 | Female householder, no husband present | 435,410 | 14.5 |
| White | 5,327,281 | 65.1 | With own children under 18 years | 258,006 | 8.6 |
| Black or African American | 2,349,542 | 28.7 | Nonfamily households | 894,722 | 29.8 |
| American Indian and Alaska Native | 21,737 | 0.3 | Householder living alone | 710,523 | 23.6 |
| Asian | 173,170 | 2.1 | Householder 65 years and over | 210,409 | 7.0 |
| Asian Indian | 46,132 | 0.6 | | | |
| Chinese | 27,446 | 0.3 | Households with individuals under 18 years | 1,174,114 | 39.1 |
| Filipino | 11,036 | 0.1 | Households with individuals 65 years and over | 569,830 | 18.8 |
| Japanese | 7,242 | 0.1 | | | |
| Korean | 28,745 | 0.4 | Average household size | 2.65 | (X) |
| Vietnamese | 29,016 | 0.4 | Average family size | 3.14 | (X) |
| Other Asian [1] | 23,553 | 0.3 | | | |
| Native Hawaiian and Other Pacific Islander | 4,246 | 0.1 | **HOUSING OCCUPANCY** | | |
| Native Hawaiian | 866 | - | Total housing units | 3,281,737 | 100.0 |
| Guamanian or Chamorro | 1,568 | - | Occupied housing units | 3,006,369 | 91.6 |
| Samoan | 819 | - | Vacant housing units | 275,368 | 8.4 |
| Other Pacific Islander [2] | 995 | - | For seasonal, recreational, or occasional use | 50,064 | 1.5 |
| Some other race | 196,289 | 2.4 | | | |
| Two or more races | 114,188 | 1.4 | Homeowner vacancy rate (percent) | 1.9 | (X) |
| | | | Rental vacancy rate (percent) | 8.2 | (X) |
| Race alone or in combination with one or more other races: [3] | | | | | |
| White | 5,412,371 | 66.1 | **HOUSING TENURE** | | |
| Black or African American | 2,393,425 | 29.2 | Occupied housing units | 3,006,369 | 100.0 |
| American Indian and Alaska Native | 53,197 | 0.6 | Owner-occupied housing units | 2,029,154 | 67.5 |
| Asian | 199,812 | 2.4 | Renter-occupied housing units | 977,215 | 32.5 |
| Native Hawaiian and Other Pacific Islander | 9,689 | 0.1 | Average household size of owner-occupied units | 2.71 | (X) |
| Some other race | 241,298 | 2.9 | Average household size of renter-occupied units | 2.51 | (X) |

- Represents zero or rounds to zero.   (X) Not applicable.
[1] Other Asian alone, or two or more Asian categories.
[2] Other Pacific Islander alone, or two or more Native Hawaiian and Other Pacific Islander categories.
[3] In combination with one or more of the other races listed. The six numbers may add to more than the total population and the six percentages may add to more than 100 percent because individuals may report more than one race.

Source: U.S. Census Bureau, Census 2000.

U.S. Census Bureau

**Table DP-1. Profile of General Demographic Characteristics: 2000**
Geographic Area: Gwinnett County, Georgia

(For information on confidentiality protection, nonsampling error, and definitions, see text)

| Subject | Number | Percent | Subject | Number | Per. |
|---|---|---|---|---|---|
| Total population | 588,448 | 100.0 | **HISPANIC OR LATINO AND RACE** | | |
| **SEX AND AGE** | | | Total population | 588,448 | 100.0 |
| Male | 296,749 | 50.4 | Hispanic or Latino (of any race) | 64,137 | 10.9 |
| Female | 291,699 | 49.6 | Mexican | 36,016 | 6.1 |
| | | | Puerto Rican | 4,173 | 0.7 |
| Under 5 years | 47,075 | 8.0 | Cuban | 2,098 | 0.4 |
| 5 to 9 years | 47,216 | 8.0 | Other Hispanic or Latino | 21,850 | 3.7 |
| 10 to 14 years | 45,661 | 7.8 | Not Hispanic or Latino | 524,311 | 89.1 |
| 15 to 19 years | 40,435 | 6.9 | White alone | 394,164 | 67.0 |
| 20 to 24 years | 36,610 | 6.2 | **RELATIONSHIP** | | |
| 25 to 34 years | 104,688 | 17.8 | Total population | 588,448 | 100.0 |
| 35 to 44 years | 115,719 | 19.7 | In households | 582,063 | 98.9 |
| 45 to 54 years | 81,237 | 13.8 | Householder | 202,317 | 34.4 |
| 55 to 59 years | 23,591 | 4.0 | Spouse | 123,729 | 21.0 |
| 60 to 64 years | 14,617 | 2.5 | Child | 187,619 | 31.9 |
| 65 to 74 years | 18,947 | 3.2 | Own child under 18 years | 153,571 | 26.1 |
| 75 to 84 years | 9,804 | 1.7 | Other relatives | 35,952 | 6.1 |
| 85 years and over | 2,848 | 0.5 | Under 18 years | 9,477 | 1.6 |
| Median age (years) | 32.5 | (X) | Nonrelatives | 32,446 | 5.5 |
| | | | Unmarried partner | 8,978 | 1.5 |
| 18 years and over | 422,455 | 71.8 | In group quarters | 6,385 | 1.1 |
| Male | 211,284 | 35.9 | Institutionalized population | 3,913 | 0.7 |
| Female | 211,171 | 35.9 | Noninstitutionalized population | 2,472 | 0.4 |
| 21 years and over | 401,140 | 68.2 | | | |
| 62 years and over | 39,575 | 6.7 | **HOUSEHOLD BY TYPE** | | |
| 65 years and over | 31,599 | 5.4 | Total households | 202,317 | 100.0 |
| Male | 12,759 | 2.2 | Family households (families) | 152,296 | 75.3 |
| Female | 18,840 | 3.2 | With own children under 18 years | 85,498 | 42.3 |
| | | | Married-couple family | 123,729 | 61.2 |
| **RACE** | | | With own children under 18 years | 69,064 | 34.1 |
| One race | 575,775 | 97.8 | Female householder, no husband present | 20,319 | 10.0 |
| White | 427,883 | 72.7 | With own children under 18 years | 12,661 | 6.3 |
| Black or African American | 78,224 | 13.3 | Nonfamily households | 50,021 | 24.7 |
| American Indian and Alaska Native | 1,838 | 0.3 | Householder living alone | 37,230 | 18.4 |
| Asian | 42,360 | 7.2 | Householder 65 years and over | 6,171 | 3.1 |
| Asian Indian | 11,284 | 1.9 | | | |
| Chinese | 6,380 | 1.1 | Households with individuals under 18 years | 91,051 | 45.0 |
| Filipino | 1,186 | 0.2 | Households with individuals 65 years and over | 22,654 | 11.2 |
| Japanese | 1,048 | 0.2 | | | |
| Korean | 9,298 | 1.6 | Average household size | 2.88 | (X) |
| Vietnamese | 7,709 | 1.3 | Average family size | 3.28 | (X) |
| Other Asian [1] | 5,455 | 0.9 | **HOUSING OCCUPANCY** | | |
| Native Hawaiian and Other Pacific Islander | 263 | - | Total housing units | 209,682 | 100.0 |
| Native Hawaiian | 66 | - | Occupied housing units | 202,317 | 96.5 |
| Guamanian or Chamorro | 73 | - | Vacant housing units | 7,365 | 3.5 |
| Samoan | 31 | - | For seasonal, recreational, or | | |
| Other Pacific Islander [2] | 93 | - | occasional use | 354 | 0.2 |
| Some other race | 25,407 | 4.3 | | | |
| Two or more races | 12,673 | 2.2 | Homeowner vacancy rate (percent) | 1.2 | (X) |
| | | | Rental vacancy rate (percent) | 5.7 | (X) |
| *Race alone or in combination with one or more other races:* [3] | | | **HOUSING TENURE** | | |
| White | 437,452 | 74.3 | Occupied housing units | 202,317 | 100.0 |
| Black or African American | 81,804 | 13.9 | Owner-occupied housing units | 146,543 | 72.4 |
| American Indian and Alaska Native | 3,939 | 0.7 | Renter-occupied housing units | 55,774 | 27.6 |
| Asian | 45,993 | 7.8 | | | |
| Native Hawaiian and Other Pacific Islander | 742 | 0.1 | Average household size of owner-occupied units | 2.98 | (X) |
| Some other race | 31,945 | 5.4 | Average household size of renter-occupied units | 2.60 | (X) |

- Represents zero or rounds to zero.   (X) Not applicable.
[1] Other Asian alone, or two or more Asian categories.
[2] Other Pacific Islander alone, or two or more Native Hawaiian and Other Pacific Islander categories.
[3] In combination with one or more of the other races listed. The six numbers may add to more than the total population and the six percentages may add to more than 100 percent because individuals may report more than one race.

Source: U.S. Census Bureau, Census 2000.

68

## ISSUES CONCERNING A CROSS-SECTION OF THE COMMUNITY IN GWINNETT COUNTY'S JURY POOL BASED ON THE 2000 CENSUS

*The Numbers*
- 74.3% White
- 13.9% Black or African American
- 7.8% Asian
- 0.7% American Indian and Alaska Native
- 0.1% Native Hawaiian and other Pacific Islander
- 5.4% Other race
- 10.9% Hispanic (of any race)

*These numbers have been forwarded to the County by the U.S. Department of Commerce and the U.S. Census Bureau. Congress has not "certified" these numbers*

*The Law*
- A defendant has a Sixth Amendment right to a jury made up of a fair cross-section of the community. Taylor v. Louisiana, 419 U.S. 522 (1975).

- "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren v. Missouri, 439 U.S. 357, 364 (1979). The U.S. Supreme Court has not further defined what is a "distinctive group" under the Duren test, but several courts, both federal and state, have addressed this precise issue.

- Regarding whether Hispanics are a "distinctive group" for Sixth Amendment cross-section requirements, many jurisdictions have specifically held that they are such a group. See, e.g., Castaneda v. Partida, 430 U.S. 482, 495 (1977) (Mexican-Americans); U.S. v. Lara, 181 F.3d 183, 191 (1st Cir. 1999); U.S. v. Rioux, 97 F.3d 648, 654 (2d Cir. 1996); U.S. v. Cecil, 836 F.2d 1431 (7) (4th Cir. 1988); U.S. v. Garcia, 991 F.2d 489, 491 (8th Cir. 1993); U.S. v. Nelson, 137 F.3d 1094 (2) (9th Cir. 1998); U.S. v. Chanthadara, 230 F.3d 1237, 1256 (10th Cir. 2000); U.S. v. Coronell-Leon, 973 F. Supp. 1094, 1099 (Defendant. Neb. 1997); U.S. v. Haworth, 948 F. Supp. 981, 985 (D.N.M. 1996); U.S. v. Johnson, 21 F. Supp.2d 329, 334 (S.D.N.Y. 1998); State v. Atwood, 832 Plaintiff.2d 593, 638-39 (Ariz. 1992); People v. Ayala, 1 Plaintiff.3d 3 (19) (Cal. 2000); State v. Gibbs, 758 A.2d 327, 335 (Conn. 2000); State v. Paz, 798 Plaintiff.2d 1 (4) (Idaho 1990), *overruled on other grounds* State v. Card, 825 Plaintiff.2d 1081 (1991); People v. Broadnax, 532 N.E.2d 936, 942 (Ill. 1988); Commonwealth v. Prater, 725 N.E.2d 233, 239 (Mass. 2000); State v. Robles, 535 N.W.2d 729, 732 (N.D 1995); Aldrich v. State, 928 S.W.2d 558, 560 (Tex. 1996); State v. Young, 853 Plaintiff.2d 327(9) (Utah 1993); State v. Guerra-Reyna, 549 N.W.2d 779, 781 (Wis. 1996) (Mexican-Americans). *But see* U.S. v. Rodriguez, 588 F.2d 1003, 1007 (5th Cir. 1979) (Pre-Duren case finding that Hispanics were not a cognizable group under Sixth Amendment); U.S. v. Duran de Amesquita, 582 F. Supp. 1326, 1328 (S.D.FL 1984) (making same finding); U.S. v. Musto, 540 F. Supp. 346 (19) (D.C.N.J. 1982) (doubting whether Hispanics are a cognizable group under Sixth Amendment).


DEFENDANT'S EXHIBIT

- Regarding the second prong of the test, an absolute disparity between the percentage of a group in the population and its percentage in the jury pool of less than 5% is almost always constitutional; an absolute disparity between 5% and 10% is usually constitutional; and an absolute disparity of over 10% is probably unconstitutional. See Morrow v. State, 272 Ga. 691 (2000).

- A Sixth Amendment challenge was brought in Georgia and tested by the Supreme Court in Morrow, supra. There, Justice Carley did not specifically hold that Hispanics were a cognizable group but instead focused on the other two prongs of the Duren test, arguably recognizing and/or assuming that Hispanics are a group for Sixth Amendment purposes.

- O.C.G.A. § 15-12-40 (a) (1) states the following: "At least biennially, unless otherwise directed by the chief judge of the superior Court, the board of jury commissioners shall compile, maintain, and revise a trial jury list of upright and intelligent citizens of the county to serve as trial jurors and a grand jury list of the most experienced, intelligent, and upright citizens of the county to serve as grand jurors. In composing the trial jury list, the board of jury commissioners shall select a fairly representative cross section of the intelligent and upright citizens of the county. In composing the grand jury list, the board of jury commissioners shall select a fairly representative cross section of the most experienced, intelligent, and upright citizens of the county." "A violation of § 15-12-40 is proven by showing a wide absolute disparity between the percentage of the group in the population and its percentage in the jury pool." Morrow, supra at 693.

- "The Unified Appeal Procedure states that there should be no imbalances for cognizable groups greater than 5%, UAP § E, but [the Supreme] Court has stated that the 5% rule is a prophylactic rule designed to ensure to the extent possible that disparities would be kept well below the constitutional minimum." Morrow, supra at 693.

- In Georgia, "[t]here is no constitutional guarantee that grand or petit juries, impaneled in a particular case, will constitute a representative cross-section of the entire community. The proper inquiry concerns the procedures for compiling the jury lists and not the actual composition of the grand or traverse jury in a particular case. The Constitution requires only that the State not deliberately and systematically exclude identifiable and distinct groups from jury lists; hence, in order to prevail on a constitutional challenge to the composition of the grand and petit juries in his case, a criminal defendant must establish prima facie that a distinct and identifiable group in the community is substantially under-represented on the jury venire." Torres v. State, 272 Ga. 389 (2000).

- Under O.C.G.A. § 15-12-40.1, no person shall be qualified to serve as a juror unless that person is a citizen of the United States.

### The Time-Line

- Under § 15-12-40 (a) (1), the jury commissioners are to revise the trial and grand jury list at least biennially. Our last revision was September 28, 1999.

- § 15-12-40 (a) (1) gives specific instructions of how to revise the trial and grand jury lists after July 1, 2000 in that it list sources that the jury commissions must use in the revision.

## AN ANALYSIS OF GWINNETT COUNTY'S JURY POOL
## BASED ON THE 2000 CENSUS

*First Issue: Are Hispanics "Cognizable" for Sixth Amendment Jury Purposes?*

@ Willis v. Zant, 720 F.2d 1212, 1216 (11th Cir. 1983), *cert. denied*, 467 U.S. 1256, 104 S. Ct. 3548, 82 L. Ed. 2d 851 (1984) sets forth a test for determining if a group is distinctive enough to by cognizable for cross-section purposes:
> (1) that the group is defined and limited by some factor (i.e., that the group has a definite composition such as by race or sex);
> (2) that a common thread or basic similarity in attitude, ideas, or experience runs through the group;
> (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

@ Georgia appellate courts have applied the Willis test to college students and age groups and found that these are not cognizable. Henry v. State, 265 Ga. 732, 734-35 (3) (1995) (college students); Potts v. State, 259 Ga. 812, 813 (1) (1990) (18-24 age group); Hicks v. State, 256 Ga. 715, 718 (7) (1987) (age groups generally); Swanson v. State, 248 Ga. App. 551, 555 (3) (2001) (18-24 age group).

@ Specifically regarding Hispanics, the Florida Supreme Court has applied the Willis test and found that they are cognizable regarding a Batson challenge. State v. Alen, 616 So.2d 452 (Fl. 1993). *But see* U.S. v. Rodriguez, 588 F.2d 1003, 1007 (5th Cir. 1979) (Pre-Duren case finding that Hispanics were not a cognizable group under Sixth Amendment); U.S. v. Duran de Amesquita, 582 F. Supp. 1326, 1328 (S.D.Fl. 1984) (making same finding); U.S. v. Musto, 540 F. Supp. 346 (19) (D.C.N.J. 1982) (doubting whether Hispanics are a cognizable group under Sixth Amendment).

@ The Seventh Circuit has applied the Willis test to Native Americans on reservations and found that they are not cognizable. U.S. v. Raskiewicz, 169 F.3d 459 (7th Cir. 1999). This case is informative about how to apply the test, and it contains good overall analysis of the subject.

@ The cases relied on by the District Attorney that Hispanics are not cognizable: Wellons v. State, 266 Ga. 77, 90-91 (29) (1995); DeYoung v.


DEFENDANT'S EXHIBIT 12

State, 268 Ga. 780, 790-91 (14) (1997). The District Attorney takes the position that the law has held that Mexican-Americans constitute a cognizable class, not the broader group of Hispanics.

*Second Issue: How do our numbers stack up against the law?*

@ Applying the Unified Appeal traverse jury certificate formulas, if the jury pool is left as it stands, there is a 13.73% disparity; if the jury pool is reduced to 28,000, there is a 9.93% disparity.

@ Georgia law states that an absolute disparity between the percentage of a group in the population and its percentage in the jury pool of less than 5% is almost always constitutional; an absolute disparity between 5% and 10% is usually constitutional; and an absolute disparity of over 10% is probably unconstitutional. See Morrow v. State, 272 Ga. 691 (2000).

@ In Wells v. State, 243 Ga. App. 629, 630 (2000), the Court of Appeals found an absolute disparity of 9.9% satisfied constitutional requirements and then went on to address the third prong.

@ In Cochran v. State, 256 Ga. 113, 115-16 (8) (1986), the Georgia Supreme Court held that an absolute disparity of 7.1% regarding women on a jury panel was not a significant enough disparity to require reversal of a conviction. In West v. State, 252 Ga. 156, 157 (1) (1984), the Georgia Supreme Court found a constitutional violation where there was a 17% absolute disparity for women in a jury pool. In Devier v. State, 250 Ga. 652 (1) (1983), the Georgia Supreme Court found a constitutional violation where there was a 36% absolute disparity for women in a jury pool. In these last two cases, once a disparity above ten percent was found, the third prong of the Duren test, systematic exclusion, was not addressed.

@ "In order to show systematic exclusion, the defendant must demonstrate sufficiently to establish a prima facie case that (1) the sources from which the jury list was drawn are tainted in that they provide the opportunity for discrimination, and (2) that use of these sources resulted in a substantial disparity between the percentages of the separate class on the jury list and in the population as a whole." Orkin v. State, 236 Ga. 176, 191 (4) (1976) (citing Whitus v. Georgia, 385 U.S. 545, 550 (87 S. Ct. 643, 17 L. Ed. 2d 599) (1967); Foster v. Sparks, 506 F.2d 805(4) (5th Cir. 1975); Pass v. Caldwell, 231 Ga. 192 (1973)). Random selection negates unsubstantiated allegations of a deliberate and systematic exclusion of an identifiable and distinct group. Wells, *supra*, 243 Ga. at 630, n. 3.