# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

## GAINESVILLE DIVISION

| | | |
|---|---|---|
| TOMMY LEE WALDRIP, | : | |
| | : | CIVIL ACTION NO. |
| Petitioner, | : | 2:06-CV-00062 |
| | : | |
| v. | : | HABEAS CORPUS |
| | : | |
| WILLIAM TERRY, | : | |
| WARDEN, Georgia Diagnostic | : | |
| And Classification Center, | : | |
| | : | |
| Respondent. | : | |

## PETITIONER'S CORRECTED BRIEF
## IN SUPPORT OF HIS CLAIMS FOR HABEAS RELIEF

### VOLUME I

Jeffrey L. Ertel
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Atlanta, Georgia 30303

Lawrence J. Fox (PA I.D. 15261)
David J. Kessler (PA I.D. 81551)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA   19103-6993
(215) 988-2700

*Attorneys for*
Petitioner Tommy Lee Waldrip

# TABLE OF CONTENTS

**Page**

## VOLUME ONE

I.       FACTS ..................................................................................3

II.     PROCEDURAL HISTORY ...............................................3

III.   STANDARDS OF REVIEW ............................................3

    A.   AEDPA STANDARDS APPLICABLE TO THE MERITS OF MR. WALDRIP'S CLAIMS ................................................4

    B.   CAUSE AND PREJUDICE STANDARDS ...................................6

        1.   Cause and Prejudice is a Federal Question that This Court Must Decide *De Novo*...................................................6

        2.   The Thresholds for "Cause" and "Prejudice" Are Interrelated and a Strong Showing on One Reduces the Threshold for the Other ......................................................7

        3.   Standards for Cause ................................................................7

        4.   Prejudice from the Alleged Constitutional Violation that Works to Mr. Waldrip's Actual and Substantive Disadvantage Constitutes "Actual Prejudice" ....................8

        5.   For *Brady* Claims, the Federal "Cause" and "Prejudice" Standard is Co-Extensive with the Merits Analysis ...........9

    C.   STANDARDS FOR DISCOVERY OR AN EVIDENTIARY HEARING .............................................................................10

        1.   Standard for Discovery............................................................10

2.      Standard for an Evidentiary Hearing......................................11

IV.     THE COURT SHOULD GRANT MR. WALDRIP RELIEF
        BASED ON HIS THREE CLAIMS RELATING TO HIS
        UNCONSTITUTIONALLY ADMITTED CONFESSIONS
        [Claims 7-in part, 8, and 9]...............................................14

    A.  INTRODUCTION ..................................................................14

    B.  FACTUAL BACKGROUND ...........................................15

        1.  Pre-Arrest Contacts With Law Enforcement
            (Contacts 1 and 2) ....................................................16

        2.  Initial Post-Arrest Contact with Law Enforcement:  Mr.
            Waldrip's Request for Counsel (Contact 2A) ..................17

        3.  Subsequent Interrogation of Mr. Waldrip (Contacts 3
            through 9)..................................................................18

        4.  Motion to Suppress and Trial Court Rulings.....................20

            i.   Tommy Lee Waldrip's Motion to Suppress...............20

            ii.  Trial Court's Order on Tommy Lee Waldrip's
                 Motion to Suppress .........................................24

        5.  Interim Appeal, Trial and Direct Appeal ............................25

        6.  State Post-Conviction Proceedings...............................27

            i.   Discovery of the Summary Report............................27

            ii.  Evidentiary Hearing in State – Post Conviction........29

            iii. Judge James' Order Denying Relief...........................30

        7.  Appeal to Georgia Supreme Court...............................30

C.   **THE STATE VIOLATED MR. WALDRIP'S RIGHTS UNDER EDWARDS AND HIS CONFESSIONS SHOULD HAVE BEEN SUPPRESSED** ....................................................31

   1.   **Once a Defendant Unambiguously Requests Counsel All Interrogation Must Cease and Any Statements from Subsequent Interrogations are Inadmissible**......................31

   2.   **The State Violated Mr. Waldrip's Rights Under Edwards** ..................................................................32

        i.   **Mr. Waldrip Unambiguously Requested Counsel Immediately After Being Arrested**..............................32

        ii.   **Mr. Waldrip Did Not Subsequently Waive His Rights**

             a.   **Mr. Waldrip Never Initiated a Contact with the State in Which He Knowingly and Voluntarily Waived His Rights**........................34

             b.   **Further, the State's Interrogations of Mr. Waldrip on April 16 and 17 Precludes Any Contention of Initiation and Waiver** ...............37

        iii.   **Mr. Waldrip's Subsequent Inculpatory Statements Were Made in Response to Custodial Interrogation** ..................................................40

   3.   **The State's Suppression of the Summary Report is Cause to Excuse Mr. Waldrip's Procedural Default of Edwards Claim**.........................................................40

        i.   **The State's Failure to Disclose the Summary Report – and the Pivotal Facts It Contained – Establishes Cause to Excuse Mr. Waldrip's Procedural Default of his Request for Counsel Claims**.............................................41

           a.      **The State Cannot Excuse its Withholding of the Summary Report and its Contents as "Work Product"** ....................................................**43**

           b.      **The State Cannot Excuse its Withholding of the Summary Report and its Contents on the Theory that Mr. Waldrip Knew He Had Requested Counsel** ...............................................**45**

      4.    **Mr. Waldrip Has Suffered Actual Prejudice as a Consequence of The State's Violation of His Sixth and Fourteenth Amendment Rights under *Edwards*** .................**47**

  **D.**    **THE STATE VIOLATED MR. WALDRIP'S RIGHTS UNDER *NAPUE* BY KNOWINGLY MISLEADING THE COURT** ..........................................................................**49**

      1.    **The State Cannot Knowingly Mislead the Court and, Once It Learns It Has Misled the Court, It Is Bound to Correct the Misrepresentation** ...............................**50**

      2.    **The State Repeatedly Denied that Mr. Waldrip Requested Counsel and Hid Sheriff Chester's April 16, 1991 Interview Of Mr. Waldrip** ......................................**51**

      3.    **The State Knew Mr. Waldrip Requested Counsel After His Arrest** ...................................................................**53**

      4.    **The State Had a Duty to Correct the Misleading Evidence It Proffered** ..............................................................**55**

      5.    **Mr. Waldrip Has Suffered Actual Prejudice as a Consequence Of the State Knowingly Misleading the Court and, Thus, the Court Can Reach the Merits of Mr. Waldrip's *Napue* Claim** ...................................**58**

**E.    THE STATE VIOLATED MR. WALDRIP'S RIGHTS UNDER *BRADY* BY SUPPRESSING THE SUMMARY REPORT** ........................................................................ **58**

    **1.    Mr. Waldrip Was Prejudiced and the Summary Report Is Material under *Brady* if There Is a Reasonable Probability Its Suppression Altered the Outcome of Mr. Waldrip's Trial** ................................................ **60**

    **2.    The Inadmissibility of the Summary Report Is a Red Herring** ................................................................ **61**

    **3.    Mr. Waldrip's Unambiguous Request for Counsel is Material If for No Other Reason Because It Undermines the Credibility of His Custodial Statements** ........................ **65**

**F.    THE COURT CAN AND MUST CONSIDER THE SUMMARY REPORT IN THESE PROCEEDINGS IN ITS ANALYSIS OF MR. WALDRIP'S *EDWARDS*, *NAUPE*, AND *BRADY CLAIMS*** ........................................................ **68**

    **1.    Even if the Summary Report Were Inadmissible under State Law, the Summary Report Is Admissible Here Under the Federal Rules of Evidence** .......................... **70**

    **2.    Even If the State Law Admissibility of the Summary Report Were Relevant, the Georgia Supreme Court's Ruling Is Entitled to No Weight** ............................................. **73**

        **i.    Prior to the Georgia Supreme Court's Ruling, No Court Questioned the Admissibility of the Summary Report and Mr. Waldrip Had No Occasion to Lay a Foundation as to "Admissibility"** ............................................. **73**

        **ii.    Under Established Eleventh Circuit Precedent, No Deference Is Due to a State Evidentiary Ruling that Is Objectively Unreasonable, Is Designed to Frustrate the Assertion of Federal Rights, or Is So Extreme as to Deny a Fair Proceeding** ................. **77**

         iii.    **The Georgia Supreme Court's Ruling Rests on Clearly Erroneous Factual Findings and Speculation and Denies Petitioner any Fair Opportunity to Meet the Court's Concerns**...............78

         iv.    **Under Georgia Law, the Summary Report Would Have Been and Is Admissible** .......................82

     3.    **The Refusal to Consider the Summary Report Would Violate Mr. Waldrip's Constitutional Right to "Present A Complete Defense" and Fundamental Principles of Due Process**...........................................................86

 G.    **MR. WALDRIP IS ENTITLED TO AN EVIDENTIARY HEARING TO ESTABLISH THE ADMISSIBILITY OF THE SUMMARY REPORT BECAUSE HE DID NOT "FAIL TO DEVELOP" THIS POINT IN STATE COURT** ............................90

 H.    **CONCLUSION**………...................................................................91

V.    **FORMER COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO REASONABLY INVESTIGATE MITIGATION EVIDENCE, INCLUDING MENTAL HEALTH EVIDENCE** ........................................................................92

 A.    **COUNSEL HAS A HEIGHTENED DUTY TO INVESTIGATE IN A CAPITAL CASE** .........................................93

 B.    **THE STATE HABEAS COURT UNREASONABLY FOUND THAT TRIAL COUNSEL WERE NOT DEFICIENT**.....................................................................101

 C.    **THE PREJUDICE IS EVIDENT FROM THE CONTRAST BETWEEN THE PENALTY PHASE AS PRESENTED AND THE MITIGATION EVIDENCE THAT WAS AVAILABLE TO TRIAL COUNSEL TO USE IN THE PENALTY PHASE**.........................................................................112

**D.    A REASONABLE INVESTIGATION WOULD HAVE UNCOVERED A COMPELLING CASE IN MITIGATION ......115**

    **1.    Tommy Lee Waldrip Was Neglected as a Child ..................115**

    **2.    As a Young Adult, Tommy Experienced Several Family Tragedies and Began to Exhibit Signs of Mental Illness.........................................................................117**

    **3.    After the Sudden Deaths of His Daughter, Aunt, and Brother, Tommy Moved His Family to South Carolina Where He Built a Successful Church, But Then Lost All He Had Built After Suffering a Mental Breakdown.............121**

    **4.    After leaving Monck's Corner, Tommy's Paranoia and Disturbed Behavior Progressively Worsened ......................125**

    **5.    Based Upon the Foregoing Mitigation Evidence that Trial Counsel Failed to Investigate and Discover, Mental Health Experts Concluded that Tommy Lee Waldrip Had Long Suffered from Paranoid Schizophrenia ......................137**

**E.    THERE IS A REASONABLE PROBABILITY THAT A SINGLE JUROR WOULD HAVE VOTED FOR LIFE HAD THE FORMER COUNSEL UNDERTAKEN A REASONABLE INVESTIGATION AND PRESENTED THE MITIGATION EVIDENCE IN THE SENTENCING PHASE ................................140**

**VI.    FORMER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL TO MR. WALDRIP THROUGHOUT THE COMPETENCY HEARING ........................................................................145**

**A.    FORMER COUNSEL HAD A DUTY TO UNDERTAKE A REASONABLE INVESTIGATION INTO THE FACTS AND LAW RELEVANT TO THE COMPETENCY HEARING..........146**

    **1.    Evaluation by a Competent Mental Health Expert Reveals That Mr. Waldrip Suffers from Paranoid**

                Schizophrenia ......................................................................150

2.     *Ake v. Oklahoma* Required the State to Provide Mr. Waldrip With a Competent Expert(s) ....................................151

3.     Former Trial Counsel and Dr. Currie Rendered Ineffective Assistance to Mr. Waldrip by Failing To Conduct Proper Evaluations of Mr. Waldrip ................152

4.     The Trial Court's failure to provide sufficient funds to conduct a proper examination deprived Mr. Waldrip of competent expert assistance ...................................................156

B.     FORMER COUNSEL WERE INEFFECTIVE IN FAILING TO OBTAIN A CONTINUANCE TO REVIEW THE MMPI-II TESTING SHEET AND USE IT TO IMPEACH THE PROSECUTION'S MENTAL HEALTH EXPERTS ..........158

C.     FAILING TO OBJECT TO THE PROSECUTION'S REPEATED ASSERTIONS THAT MR. WALDRIP'S SILENCE AND REQUEST FOR COUNSEL DEMONSTRATED HIS COMPETENCY TO STAND TRIAL CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL ........................................................................161

1.     ADA Darragh Used Mr. Waldrip's Invocation of His Rights to Silence and to Counsel Against Him.....................163

2.     In *Doyle v. Ohio* and *Wainwright v. Greenfield*, the Supreme Court Held That a Prosecutor Cannot Comment Upon a Defendant's Invocation of His Post-Arrest Right to Silence .......................................................................166

3.     ADA Darragh Intentionally Ignored *Doyle* and *Greenfield* .................................................................*168*

4.     Former counsel were ineffective in failing to object to the constitutional error and allowing Mr. Waldrip to suffer the attendant prejudice...........................................................169

**D.**   **MR. WALDRIP IS ENTITLED TO DISCOVERY AND AN EVIDENTIARY HEARING ON THEY MYRIAD MENTAL HEALTH ISSUES** ...........................................................174

**VII.**   **KNOWING THEIR CLIENT WAS MENTALLY ILL, FORMER COUNSEL WERE INEFFECTIVE IN PROTECTING HIM** ..................................................177

**A.**   **FORMER COUNSEL WERE INEFFECTIVE IN FAILING TO ENSURE THAT THE COURT PROVIDED AN ADEQUATE COLLOQUY TO MR. WALDRIP WHEN HE INSISTED ON TESTIFYING AGAINST THEIR ADVICE** ...................................177

1.   **The Colloquy Conducted by the Trial Court Prior to Allowing Mr. Waldrip to Testify Was Woefully Inadequate** .............................................................178

2.   **Before Allowing a Defendant to Testify the Court Must Be Satisfied That the Defendant Is Knowingly and Intelligently Waiving His Constitutional Rights**.................178

3.   **The Trial Court Made No Inquiry into Mr. Waldrip's Understanding and Knowledge of the Waiver he Purported to Give**.................................................182

4.   **Counsel Were Ineffective For Failing to Object Adequately to the Trial Court's Colloquy**...........................184

i.   **Cause is established through Former Trial Counsel's ineffective assistance**...................................184

ii.   **Prejudice is established because Mr. Waldrip would have received a new trial if Former Counsel had raised this issue on appeal**............................................185

**B.**   **FORMER TRIAL COUNSEL WERE CONSTITUTIONALLY DEFICIENT IN FAILING TO PREPARE MR. WALDRIP TO TESTIFY AT THE COMPETENCY HEARING**.........................186

C.   IN LIGHT OF MR. WALDRIP'S MENTAL ILLNESSES, FORMER TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO HAVE A GUARDINA *AD LITEM* APPOINTED TO MAKE CRITICAL DECISIONS FOR HIM ........................................................................188

VIII.   MR. WALDRIP'S CUSTODIAL CONFESSIONS WERE INVOLUNTARY AND HIS FORMER COUNSEL WERE INEFFECTIVE IN ADVOCATING THIS POSITION ...............193

A.   PETITIONER'S STATEMENTS SHOULD HAVE BEEN EXCLUDED FROM THE UNDERLYING TRIAL BECAUSE THEY WERE NOT VOLUNTARILY MADE ..........198

1.   Law Enforcement's Tactics Were Coercive ........................200

2.   Mr. Waldrip Was Peculiarly Vulnerable to the Coercion Applied ..................................................................202

B.   THE STATE COURTS WERE CONSTRAINED BY FORMER COUNSEL'S INEFFECTIVENESS...............................................204

IX.   MR. WALDRIP WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY, A FUNDAMENTALLY FAIR TRIAL, AND A RELIABLE SENTENCING PROCEEDING WHEN THE JURY ENGAGED IN MISCONDUCT ................................................................210

A.   THE JURY'S CONDUCT HERE CONSTITUTED MISCONDUCT ......................................................................214

B.   CAUSE AND PREJUDICE.......................................................221

C.   PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING ..............................................................................226

1.   Overview of the Law.............................................................226

2.   Petitioner Has Exercised Due Diligence in State Court and Federal Court...............................................................227

X.       THE PENALTY PHASE AT THE UNDERLYING TRIAL WAS SO INFESTED WITH ERROR THAT PETITIONER' SENTENCE OF DEATH CANNOT STAND.........................................................................230

    A.   INTRODUCTION ..........................................................230

    B.   THE GUILT/INNOCENCE PHASE INSTRUCTIONS ALLOWED THE JURY TO CONVICT PETITIONER OF MALICE MURDER WITHOUT FINDING THAT HE HAD THE SPECIFIC INTENT TO KILL.................................231

    C.   GEORGIA'S DEATH PENALTY SCHEME ................................235

    D.   PLANE TWO:  THE COURT'S INSTRUCTIONS ALLOWED THE JURY TO UNCONSTITUTIONALLY FIND PETITIONER TO BE DEATH ELIGIBLE.................................236

        1.   The Court's Instructions on Aggravating Circumstances Unconstitutionally Allowed the Culpability of the Actual Killer to Be Imputed to Petitioner.........................................236

           i.   Court Erred in Allowing the Jury to Find Petitioner Eligible for the Death Penalty as a "Party to the Aggravating Circumstance".........................................238

               a.   The "Party to the Aggravating Circumstance" Instruction's Effect on the (b)(2) Agreement ..239

               b.   the "Party to the Aggravating Circumstance" Effect on the (b)(7) Aggravator.........................240

           ii.   The Guilt Phase Instructions Nullified the Court's *Enmund* Filter .............................................242

    E.   THE COURT'S INSTRUCTIONS ON AGGRAVATING CIRCUMSTANCES FAILED TO GENUINELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY  .....................................................................243

   1.   The (b)(2) Aggravator Failed to Narrow the Class of
        Persons Eligible for the Death Penalty ...................................244

   2.   The (b)(7) Aggravator Failed to Narrow the Class of
        persons Eligible for the Death Penalty...................................245

F.   PLANE THREE:  THE TRIAL COURT
     UNCONSTITUTIONALLY PROHIBITED THE
     JURORS FROM CONSIDERING RELEVANT
     MITIGATING EVIDENCE AT THE SELECTION
     STAGE ............................................................................247

G.   THE COURT IMPROPERLY INSTRUCTED THE JURY ON
     MITIGATING CIRCUMSTANCES IN GENENERAL...............248

H.   THE COURT IMPROPERLY LIMITED CONSIDERATION
     OF MITIGATING EVIDENCE TO THAT WHICH HAS A
     NEXUS ON THE CRIME ..............................................................250

**VOLUME TWO**

XI.     THE PROSECUTION VIOLATED MR. WALDRIP'S
        CONSTITUTIONAL RIGHTS BY ARGUING
        REPEATEDLY THAT HIS POST-ARREST SILENCE
        AND REQUEST FOR COUNSEL WHEN INTERVIEWED
        BY THE PROSECUTION'S MENTAL HEALTH
        EXPERTS DEMONSTRATED HIS COMPETENCY
        TO STAND TRIAL ........................................................254

   A.   THIS COURT SHOULD CONSIDER THE MERITS OF THIS
        CLAIM BECAUSE MR. WALDRIP CAN DEMONSTRATE
        CAUSE AND PREJUDICE TO OVERCOME PROCEDURAL
        DEFAULT .................................................................254

        1.   Cause is Established By Former Trial Counsel's
             Constitutionally Deficient Counsel ......................256

        2.   Mr. Waldrip Was Prejudiced Because A Timely
             Objection Would Have Excluded The Improper
             Testimony and Led to a Reasonable Probability
             Of a Different Result ............................................258

XII.    THE PROSECTUION SUPPRESSED FIVE CRUCIAL
        PIECES OF MENTAL HEALTH EVIDENCE THAT
        DEMONSTRATED THE EXTENT OF MR. WALDRIP'S
        MENTAL ILLNESS IN VIOLATION OF *BRADY V.*
        *MARYLAND* ...............................................................261

   A.   MR. WALDRIP SUFFERED FROM A LONGSTANDING
        DELUSIONAL DISORDER; HOWEVER, THE STATE'S
        EXPERTS OPINED THAT MR. WALDRIP WAS
        COMPETENT TO STAND TRIAL BASED UPON HIS
        MMPI SCORE AND LACK OF HISTORY OF MENTAL
        ILLNESS ...................................................................262

   B.   THE PROSECUTION SUPPRESSED FIVE CRUCIAL
        PIECES OF MENTAL HEALTH EVIDENCE ...........................265

C.   *BRADY* REQUIRES THE PROSECUTION TO PROVIDE
     THE DEFENDANT WITH EXCULPATORY EVIDENCE ........267

     1.   Evidence is material under *Brady* if it undermines
          confidence in the verdict..........................................267

D.   THE SUPPRESSED MENTAL HEALTH EVIDENCE
     UNDERMINES CONFIDENCE IN THE VERDICT,
     ENTITLING MR. WALDRIP TO RELIEF .................................269

     1.   The prosecution possessed the Suppressed Mental
          Health Evidence.....................................................269

     2.   Former Trial Counsel did not Possess the Suppressed
          Mental Health Evidence nor could they obtain it from
          Another source .......................................................270

     3.   The Suppressed Mental Health Evidence, Which Was
          Favorable To Mr. Waldrip, Is Material ...............................271

          a.   The MMPI-II Testing Sheet Is Material As Both
               Positive Evidence Of Mr. Waldrip's Incompetency
               And As Impeachment Evidence Against Dr. Storms
               And Dr. Kugler ..........................................................272

          b.   Dr. Lower's Notes Demonstrate That Mr. Waldrip's
               Mental Condition Was Significantly Worse Than
               Dr. Lower Testified.....................................................274

          c.   Dr. Storms' outpatient Interview With Mr. Waldrip
               Confirms That Mr. Waldrip Suffered Delusions ......274

          d.   The Dacus Report Is Powerful Evidence That Mr.
               Waldrip Was Not Malingering In The Presence Of
               The Former Mental Health Experts ..........................275

          e.   The Parole Report Negates The Prosecution's
               Claim That Mr. Waldrip's Condition Was
               Stress-Induced..............................................................276

4.      The Materiality Of The Suppressed Mental Health Evidence Is To Be Determined Cumulatively, Rather Than Individually........................................................277

F.      THE CUMULATIVE EFFECT OF THE PROSECUTION'S MISCONDUCT IN THE COMPETENCY HEARING UNDERMINES ANY CONFIDENCE IN THE OUTCOME.......278

G.      THE PROSECUTION SUPPRESSED OTHER MATERIAL EVIDENCE IN VIOLATION OF *BRADY* .....................................279

XIII.    CLAIM 2 – THE GUILT PHASE JURY INSTRUCTIONS VIOLATED MR. WALDRIP'S CONSTITUTIONAL RIGHTS........................................................282

A.      BURDEN OF PROOF .......................................................282

1.      Cause and Prejudice ...............................................282

2.      Argument .................................................................283

B.      UNANIMITY ...................................................................287

C.      CIRCUMSTANTIAL EVIDENCE ..................................288

D.      VOLUNTARY INTOXICATION ....................................289

E.      WEIGHT OF TOMMY WALDRIP'S STATEMENT.................290

XIV.    CLAIM 6:  PETITONER WAS DENIED DUE PROCESS OF LAW WHEN THE STATE FAILED TO PRODUCE EVIDENCE SUFFICIENT TO SUPPORT EACH ESSENTIAL ELEMENT OF THE CRIMES AND EACH OF THE AGGRAVATING CIRCUMSTANCES, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ..............................................................292

XV.        CLAIM 13. THE DISTRICT ATTORNEY TESTIFIED IN
           MR. WALDRIP'S TRIAL, WHICH GAVE UNDUE
           CREDIBILITY TO THE STATE'S CASE AND
           VIOLATED MR. WALDRIP'S RIGHT TO A FAIR
           TRIAL UNDER THE FIFTH, EIGHTH AND
           FOURTEENTH AMENDMENTS TO THE UNITED
           STATES CONSTITUTION ............................................................294

XVI.       CLAIM 14:  THE PROSECUTOR IMPROPERLY
           PRESENTED EVIDENCE AND ARGUMENT DEALING
           WITH THE WORTHAND VALUE OF THE VICTIM IN
           VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND
           FOURTEENTH AMENDMENTS TO THE
           UNITED STATES CONSTITUTION............................................300

XVII.      CLAIM 15:  PETITIONER'S RIGHTS UNDER THE
           FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
           AMENDMENTS TO THE UNITED STATES
           CONSTITUTION WERE VIOLATED BY BECKY
           McCORD'S EMPANELLING THE GRAND JURY EVEN
           THOUGH SHE WAS WORKING IN THE DISTRICT
           ATTORNEY'S OFFICE AND WAS A RELATIVE OF
           THE VICTIM ...................................................................................304

XVIII.     CLAIM 17:  MR. WALDRIP'S ABSENCE FROM
           CRITICAL STAGES OF THE PROCEEDINGS
           VIOLATED THE FIFTH, SIXTH, AND FOURTEENTH
           AMENDMENTS TO THE UNITED STATES
           CONSTITUTION AND PREJUDICED HIS RIGHT TO A
           FAIR TRIAL, AND TRIAL COUNSEL WAS
           INEFFECTIVE  FOR FAILING TO ENSURE MR.
           WALDRI'S PRESENCE ................................................................311

XIX.       CLAIM 18:  THE EVIDENCE PRESENTED DURING THE
           COMPETENCY HEARING DEMONSTRATED THATMR.
           WALDRIP WAS INCOMPETENT TO STAND TRIAL..........314

      A.   THE SIXTH AMENDMENT GUARANTEES THAT MR.
           WALDRIP CANNOT BE PUT ON TRIAL WHILE
           INCOMPETENT................................................................................314

**B.**   **MR. WALDRIP WAS INCOMPETENT TO STAND TRIAL FOR THE MURDER OF KEITH EVANS**......................................315

**XX.**   **CLAIM 23:  THE TRIAL JUDGE'S LIMITED CHANGE OF VENUE FOR THE COMPETENCY HEARING VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE PRE-TRIAL PUBLICITY INFECTED THE JURY**.....................................................317

**A.**   **THE TRIAL COURT EXPLICITLY FOUND THAT PREJUDICIAL PRETRIAL PUBLICITY WAS PERVASIVE IN HALL COUNTY**..........................................................318

**B.**   **VENUE IN HALL COUNTY FOR THE COMPETENCY HEARING WAS INHERENTLY PREJUDICIAL AND, THUS, REQUIRED A VENUE CHANGE FURTHER FROM DAWSON COUNTY**.............................................321

**XXI.**   **CLAIM 24:  THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY COMMITTING VARIOUS ERRORS AS TO THE *VOIR DIRE* FOR PETITIONER'S COMPETENCY HEARING**...........................................331

**A.**   **THE TRIAL COURT ERRED IN PROHIBITING PETITIONER FROM ASKING QUESTIONS DESIGNED TO PROPERLY ELICIT JUROR BIAS AND PREJUDICE ON *VOIR DIRE***...........................................................331

**B.**   **PETITIONER WAS IMPROPERLY RESTRICTED FROM ASKING QUESTIONS RELATED TO MENTAL ILLNESS, IN GENERAL, AND IN RELATION TO A PERSON'S RELATIONSHIP WITH OTHERS**.................................334

**C.**   **PETITIONER WAS RESTRICTED FROM ASKING QUESTIONS RELATED TO INDEPENDENCE OF JUROR**

    DECISIONS ........................................................................339

  D.  PETITIONER WAS RESTRICTED FROM ASKING
    QUESTIONS RELATED TO LEGAL TERMINOLOGY,
    WHERE THAT TERMINOLOGY NEITHER CONSTITUTED
    NOR RELATED TO ELEMENTS OF COMPETENCY .............340

XXII.  CLAIM 25:  MR. WALDRIP IS INCOMPETENT TO BE
    EXECUTED ........................................................................343

  A.  EXECUTING AN INCOMPETENT PERSON VIOLATES
    THE EIGHTH AMENDMENT'S PROHIBITION ON CRUEL
    AND UNUSUAL PUNISHMENT ......................................343

  B.  MR. WALDRIP'S EXECUTION IS NOT IMMINENT, BUT
    MR. WALDRIP BRINGS THIS CLAIM OUT OF
    CAUTION ........................................................................343

XXIII.  CLAIM 27:  PETITIONER WAS DEPRIVED OF A FAIR
    TRIALBY THE INTRODUCTION OF EVIDENCE OF
    OTHER CRIMES, IN VIOLATION OF THE FIFTH,
    SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
    TO THE UNITED STATES  CONSTITUTION ...........................344

XXIV.  CLAIM 28:  PETITIONER WAS DENIED HIS RIGHT
    TO A RELIABLE SENTENCING DETERMINATION BY
    A VERDICT FORM THAT VIOLATED HIS RIGHTS
    UNDER THE  FIFTH, SIXTH, EIGHTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED
    STATES CONSTITUTION ...........................................350

XXV.  CLAIM 29:  BECAUSE THE JURY FAILED TO FIND
    THE EXISTENCE OF ANY STATUTORY
    AGGRAVATING CIRCUMSTANCES, PETITIONER
    HAS BEEN SENTENCED TO DEATH IN VIOLATION
    OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
    AMENDMENTS TO THE UNITED STATES
    CONSTITUTION ...........................................................358

XXVI.       MR. WALDRIP'S SENTENCE OF DEATH IS
            DISPROPORTIONATE WHEN COMPARED TO
            OTHERS WHO HAVE COMMITTED SIMILAR
            CRIMES AND WHEN COMPARED TO THE
            SENTENCES OF HIS CO- DEFENDANTS, WHICH
            VIOLATES THE EIGHTH AND FOURTEENTH
            AMENDMENTS TO THE UNITED STATES
            CONSTITUTION AND THE CORRESPONDING
            PROVISIONS OF THE GEORGIA CONSTITUTION ...............362

XXVII.      CLAIM 32:  THE DEATH PENALTY IS CRUEL AND
            UNUSUAL PUNISHMENT AND VIOLATES MR.
            WALDRIP'S  RIGHTS UNDER THE FIFTH, SIXTH,
            EIGHTH AND  FOURTEENTH AMENDMENTS TO THE
            UNITED STATES  CONSTITUTION............................................373

XXVIII.     CLAIM 33:  EXECUTION BY LETHAL INJECTION IS
            CRUEL AND UNUSUAL PUNISHMENT, AND IT
            WOULD BE A VIOLATION OF THE FIFTH, SIXTH,
            EIGHTH AND  FOURTEENTH AMENDMENTS FOR
            MR. WALDRIP TO BE  EXECUTED BY SUCH MEANS .........376

XXIX.       CLAIM 35:  THE UNIFIED APPEAL PROCEDURE
            VIOLATED MR. WALDRIP'S RIGHTS UNDER THE
            FIFTH, SIXTH, EIGHTH AND FOURTEENTH
            AMENDMENTS TO THE UNITED STATES
            CONSTITUTION.................................................................393

XXX.        CLAIM 36:  MR. WALDRIP'S DUE PROCESS AND
            EQUAL PROTECTION RIGHTS WERE VIOLATED
            WHEN THE  SAME JURY THAT DECIDED HIS GUILT
            ALSO DECIDED THE SENTENCE IN HIS CASE, IN
            VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND
            FOURTEENTH AMENDMENTS OF THE UNITED
            STATES CONSTITUTION ...........................................396

XXXI.       CLAIM 37:  THE TRIAL COURT VIOLATED MR.
            WALDRIP'S RIGHTS UNDER THE FIFTH, SIXTH,
            EIGHTH AND FOURTEENTH AMENDMENTS TO THE
            UNITED STATES CONSTITUTION BY EXCUSING FOR

CAUSE JURORS WHOSE VIEWS ON THE DEATH PENALTY WERE NOT EXTREME ENOUGH TO WARRANT *WITHERSPOON* EXCLUSION ...............................399

A.    THE TRIAL COURT IMPROPERLY STRUCK JURORS UNDER *WITHERSPOON* ................................................399

B.    THE TRIAL COURT USED SELECTIVE INTERVENTION TO DISQUALIFY VENIREMEMBERS WHO HAD PERSONAL SCRUPLES AGAINST THE DEATH PENALTY .........................................................403

XXXII.    CLAIM 38:  THE TRIAL JUDGE UNDULY RESTRICTED MR. WALDRIP'S VOIR DIRE IN THE GUILT/INNOCENCE PHASE OF TRIAL, WHICH VIOLATED PETITIONER'S CONSTITUTIONALRIGHT TO A FAIR TRIAL AND SENTENCING UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ..............................................407

A.    THE TRIAL COURT UNCONSTITUTIONALLY RESTRICTED PETITIONER'S VOIR DIRE REGARDING POTENTIAL JUROR PREJUDICES AND BIASES ..................409

XXXIII.    CLAIM 39: MR. WALDRIP'S SENTENCE OF DEATH IS BEING EXACTED PURSUANT TO A PATTERN AND PRACTICE OF GEORGIA'S PROSECUTING AUTHORITIES, COURTS AND JURIES TO DISCRIMINATE ON GROUNDS OF RACE, GENDER, AND POVERTY IN THE ADMINISTRATION OF RIGHTS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION ...........................................415

A.    BECAUSE THE RIGHT TO LIFE IS A FUNDAMENTAL RIGHT WHICH MUST BE SUBJECT TO AT LEAST THE SAME CONSTITUTIONAL PROTECTIONS AS THE RIGHT TO VOTE, THE STATE CANNOT DEPRIVE ITS CITIZENS OF THEIR LIVES IN A DISPARATE

AND ARBITRARY MANNER .......................................................421

B.    THE LACK OF A UNIFORM STANDARD GUIDING
PROSECUTORS WHEN TO SEEK THE DEATH PENALTY
HAS LED TO THE ARBITRARY AND DISPARATE
TREATMENT OF SIMILARLY SITUATED DEFENDANTS,
PARTICULARLY IN CASES SUCH AS PETITIONER'S .........422

XXXIV.    CLAIM 40:  THE COURT'S LIMITED VENUE CHANGE
FOR THE GUILT/INNOCENCE AND SENTENCING
PHASES OF TRIAL VIOLATED MR. WALDRIP'S
RIGHT TO A FAIR TRIAL UNDER THE FIFTH, SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION...........................................426

A.    THE TRIAL COURT CHANGED THE VENUE TO
GWINNETT COUNTY, IGNORING THE VENUES
PROPOSED BY THE DEFENSE AND THE
PROSECUTION.............................................................................426

B.    THE TRIAL COURT ERRED IN NOT MOVING VENUE
FURTHER FROM DAWSON COUNTY THAN GWINNETT
COUNTY BECAUSE IT WAS INHERENTLY
PREJUDICIAL..............................................................................427

C.    THE TRIAL COURT ERRED IN NOT MOVING VENUE
FURTHER FROM DAWSON COUNTY THAN GWINNETT
COUNTY BECAUSE THE GWINNETT COUNTY VENIRE
WAS ACTUALLY PREJUDICIAL.................................................428

XXXV.    CLAIM 41:  BY NOT REMOVING CERTAIN JURORS
FOR CAUSE, THE TRIAL JUDGE VIOLATED MR.
WALDRIP'S RIGHT TO A FAIR TRIAL AND
SENTENCING UNDER THE FIFTH, SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION ............................................................434

A.    THE TRIAL COURT ERRED IN FAILING TO EXCUSE
FOR CAUSE VENIREPERSONS WHOSE VIEWS ABOUT

THE DEATH PENALTY WERE SO FIXED THAT THEY
WERE INCAPABLE OF CONSIDERING A SENTENCE
OTHER THAN DEATH................................................................435

    1.    Venireperson Larue Davis Stated that She Would
        Sentence to Death Any Individual Who Had Committed
        Murder, and Would Not Consider Any Mitigating
        Factors Other than Self-Defense and/or Accident...............435

    2.    Venireperson Margaret Lynch States that She Would
        Sentence to Death Any Individual who Had Committed
        Murder, and Would Not Consider Any Mitigating
        Factors Other than Self-Defense and/or Accident...............438

B.    THE TRIAL JUDGE ERRED IN NOT EXCUSING CERTAIN
    VENIREPERSONS FOR CAUSE, WHERE THEY EXHIBITED
    BIAS AGAINST DEFENDANT DURING *VOIR DIRE* ...............439

C.    THE TRIAL JUDGE ERRED IN NOT EXCUSING CERTAIN
    VENIREPERSONS FOR CAUSE, WHERE THEY EXHIBITED
    A MISUNDERSTANDING OF PAROLE ELIGIBILITY...........440

XXXVI.    CLAIM 42:  PETITIONER WAS DENIED A
    FUNDAMENTALLY FAIR COMPETENCY
    PROCEEDING AND TRIAL BY THE
    UNDERREPRESENATION OF HISPANIC PEOPLE IN
    THE GRAND AND TRAVERS JURY POOLS IN BOTH
    HALL COUNTY, GEORGIA AND GWINNETT
    COUNTY, GEORGIA, IN VIOLATION OF THE FIFTH,
    SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
    TO THE UNITED STATES CONSTITUTION ...........................443

XXXVII.    CLAIM 68:  THE TRIAL COURT'S IMPROPER
    RULINGS DURING MR. WALDRIP'S COMPETENCY
    AND CRIMINAL TRIALS DENIED PETITIONER HIS
    RIGHT TO A FAIR TRIAL AND DUE PROCESS IN
    VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED
    STATES CONSTITUTION ............................................................447

**A.**     **THE TRIAL COURT FAILED TO GIVE THE FORMER MENTAL HEALTH EXPERTS SUFFICIENT TIME AND MATERIALS TO PERFORM PROPER COURT-ORDERED PSYCHIATRIC/PSYCHOLOGICAL EVALUATIONS..............447**

**B.**     **THE TRIAL COURT FORCED PETITIONER TO ASSESS HIS LAWYERS' PERFORMANCE THROUGHOUT THE PROCEEDINGS IN VIOLATION OF HIS RIGHTS TO REMAIN SILENT AND TO EFFECTIVE ASSISTANCE OF COUNSEL ..................................................................448**

**C.**     **THE TRIAL COURT DENIED PETITIONER'S REQUEST TO HOLD THE SUPPRESSION HEARING *IN CAMERA*.........449**

**D.**     **THE TRIAL COURT IMPROPERLY ALLOWED THE PROSECUTION TO RECALL WITNESSES IN PRETRIAL HEARINGS........................................................................451**

**E.**     **THE TRIAL COURT PERMITTED IMPROPER REDACTIONS OF PETITIONER'S STATEMENTS ................452**

**F.**     **THE TRIAL COURT PERMITTED EMOTIONAL DISPLAYS BY MEMBERS OF VICTIM'S FAMILY IN THE COURTROOM................................................................453**

**G.**     **THE TRIAL COURT IMPROPERLY PERMITTED EVIDENCE OF A PROBATION WARRANT INTO EVIDENCE ....................................................................454**

**H.**     **THE TRIAL COURT PERMITTED PHYSICAL EVIDENCE TO REMAIN IN PLAIN VIEW ........................................455**

**I.**     **THE TRIAL COURT DENIED FORMER TRIAL COUNSEL AN OPPORTUNITY TO CONDUCT THOROUGH CROSS-EXAMINATIONS ............................................456**

**J.**     **THE TRIAL COURT PERMITTED PURELY SPECULATIVE TESTIMONY...............................................................457**

**K.**     **THE TRIAL COURT ALLOWED PROSECUTION EXPERTS**

TO TESTIFY OUTSIDE THEIR REALMS OF EXPERTISE ...459

    1.    The Trial Court Improperly Allowed Dr. Hanzlick To Testify Regarding The Pain Of Mr. Evans's Injuries .........459

    2.    The Trial Court Improperly Allowed Serologist Connie Pickens To Testify Regarding The Use Of Fire To Destroy Evidence....................................................................460

**L.**    THE TRIAL COURT FAILED TO ENFORCE THE RULE OF SEQUESTRATION ....................................................461

**M.**    THE TRIAL COURT PERMITTED PREJUDICIAL AND INACCURATE DEMONSTRATIVE EVIDENCE......................462

**N.**    THE TRIAL COURT PERMITTED A JUROR TO ASK A QUESTION DURING TRIAL IN OPEN COURT .......................463

**O.**    THE TRIAL COURT REFUSED TO GRANT MISTRIALS WHEN PROPERLY REQUESTED BY THE FORMER TRIAL COUNSEL ....................................................................464

**P.**    THE TRIAL COURT REQUIRED PROPOSED JURY INSTRUCTIONS PREMATURELY ...............................................465

**Q.**    THE TRIAL COURT REFUSED TO ISSUE LIMITING INSTRUCTIONS AT THE TIME EVIDENCE WAS ADMITTED FOR LIMITED PURPOSES....................................466

**R.**    THE TRIAL COURT DENIED A DIRECTED VERDICT .........467

**S.**    THE TRIAL COURT FAILED TO QUASH THE PROSECUTION'S APPLICATION TO SEEK THE DEATH PENALTY................................................................467

**T.**    THE TRIAL COURT LIMITED AREAS OF TESTIMONY OF DR. CURRIE, THE DEFENSE FORMER MENTAL HEALTH EXPERT........................................................469

**U.**    THE TRIAL COURT FAILED TO COMPEL THE

PROSECUTION TO OPT BETWEEN MUTUALLY
EXCLUSIVE THEORIES OF GUILT ...........................................470

V.    THE TRIAL COURT INSTRUCTED JURORS TO PREPARE
      FOR POSSIBILITYPENALTYPHASE .......................................472

W.    THE TRIAL COURT SUBMITTED THE INDICTMENT TO
      THE JURY WITH HANDWRITTEN EDITS AND
      REDACTIONS ...................................................................472

X.    THE TRIAL COURT IMPROPERLY RESPONDED TO
      JURY QUESTIONS ...........................................................473

      1.    The Trial Court Improperly Responded to the Four
            Questions asked by the Jury in the Guilt/Innocence
            Phase of the Underlying Trial.................................473

            i.    The Court Failed to Allow the Jury to Have
                  Copies of the Transcripts of the Trial or Tapes
                  of Petitioner's Uncounseled Statements ....................473

            ii.   The Trial Court's Response to the Jury that it Could
                  Find Petitioner "Guilty of Malice Murder as a 'Party'
                  to the Murder" was Improper and Highly
                  Prejudicial ..................................................475

      2.    The Trial Court Improperly Responded to Two Questions
            in the Penalty Phase of the Underlying Trial ......................476

            i.    The Trial Court Violated Petitioner's Rights to a
                  Full and Fair Sentencing Hearing When it
                  Improperly Responded to the Jury's Questions
                  Regarding Parole .........................................476

            ii.   The Trial Court Violated Petitioner's Right to a
                  Full and Fair Sentencing Hearing and His Right to
                  Remain Silent when it Improperly Responded to
                  The Jury's Question about His Failure to Testify .....477

Y.    The Trial Court Improperly Sustained The Prosecution's

Objections To Testimony Offered By Petitioner during Penalty
Phase .................................................................................................478

Z.    The Trial Court Overruled Proper Objections Made by Former
Trial Counsel.....................................................................................479

AA.  The Trial Court Admitted Irrelevant and Prejudicial Evidence..491

XXXVIII.  CLAIM 69:  MR. WALDRIP'S TRIAL WAS FRAUGHT
WITH PROCEDURAL AND SUBSTANTIVE ERRORS,
WHICH CANNOT BE HARMLESS WHEN VIEWED AS
A WHOLE, SINCE THE COMBINATION OF ERRORS
DEPRIVED HIM OF THE FUNDAMENTALLY FAIR
TRIAL GUARANTEED UNDER THE FIFTH, SIXTH,
EIGHTH, AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION AND THE
ANALOGOUS PROVISIONS OF THE GEORGIA
CONSTITUTION ..............................................................................500

# VOLUME III

**XXXIX.**  **MR. WALDRIP IS ACTUALLY INNOCENT OF THE CRIMES FOR WHICH HE IS SENTENCED TO DIE**...............506

**A.**  **INTRODUCTION** ...................................................506

**B.**  **THE MIX OF EVIDENCE DEMONSTRATING TOMMY'S INNOCENCE**......................................................508

    **1.**  **John Mark Waldrip Murdered Keith Evans** .........................508

    **2.**  **There Is No Evidence Linking Tommy Waldrip To The Murder** .........................................................511

    **3.**  **Tommy Waldrip Suffers from Severe Mental Illness**...........513

    **4.**  **Tommy Waldrip's Inconsistent Statements Regarding The Murder Make Plain That He Was Not Involved**...................517

**C.**  **ARGUMENT** .....................................................520

    **1.**  **Tommy's Actual Innocence Claim Provides A Gateway To Address Any And All Procedurally Defaulted Claims** ....521

        **i.**  **Tommy's Actual Innocence Provides A Gateway To All Claims**...............................................522

        **ii.**  **Tommy Is Innocent of the Death Penalty**....................524

    **2.**  **Tommy Is Actually Innocent of the Murder of Keith Evans And Imposition of the Death Penalty Violates the Eighth And Fourteenth Amendments**...................526

        **i.**  **It Is Unconstitutional To Execute An Innocent Person**........................................................527

**D.**     **CONCLUSION**.......................................................................**530**

**XL.**     **CONCLUSION TO THE BRIEF** ...................................................**531**

# TABLE OF AUTHORITIES

## CASES

*Adams v. Texas*,
448 U.S. 38 (1980).................................................................399

*Agan v. Dugger*,
835 F.2d 1337 (11th Cir. 1987) ....................................12, 227

*Ake v. Oklahoma*,
470 U.S. 68 (1985)...............................151, 152, 157, 448, 459

*Alcorta v. Texas*,
355 U.S. 28 (1957)..................................................................47

*Alderman v. Zant*,
22 F.3d 1541 (11th Cir. 1994) ..........................................6, 41

*Aldridge v. United States*,
283 U.S. 308 (1931)..............................................333, 408, 411

*Allen v. Thomas*,
161 F.3d 667 (11th Cir. 1998) ............................................345

*Amadeo v. Kemp*,
816 F.2d 1502 (11th Cir. 1987), *rev'd on other grounds sub nom.*
*Amadeo v. Zant*, 486 U.S. 214 (1988).........................................7

*Amadeo v. Zant*,
486 U.S. 214 (1988)..............................................8, 41, 221

*Apprendi v. New Jersey*,
530 U.S. 466 (2000)...............................................................368

*Arizona v. Roberson*,
486 U.S. 675 (1988)..................................................................39

*Arnett v. Kennedy*,
416 U.S. 134 (1974)...............................................................501

*Aron v. United States*,
291 F.3d 708 (11th Cir. 2002) ............................12, 226, 228

*Ashcraft v. Tennessee*,
322 U.S. 143 (1944)...............................................................199

*Ashley v. Texas*,
    319 F.2d 80 (5th Cir. 1963) ...................................................................268

*Atkins v. Singletary*,
    965 F.2d 952 (11th Cir. 1993) ...............................................................12

*Atkins v. Virginia*,
    536 U.S. 304 (2002)..............................................................................235

*Atlantic Coast Line R. Co. v. Daugherty*,
    141 S.E.2d 112 (Ga. App. 1965)..........................................................44

*Banks v. Dretke*,
    540 U.S. 668 (2004)...........................................8, 9, 41, 42, 60, 64, 222, 258, 261

*Banks v. Horn*,
    271 F.3d 527 (3d Cir. 2001), *rev'd and remanded by* 536 U.S. 266 (2002) .............288

*Barfield v. Orange County*,
    911 F.2d 644 (11th Cir. 1990) ...............................................................71

*Baty v. Balkcom*,
    661 F.2d 391 (5th Cir. 1981), *cert. denied sub nom, Balkcom v. Baty*,
    456 U.S. 1011  (1982)...........................................................................208

*Baze v. Rees*,
    ___ U.S.____, 128 S. Ct. 1520 (2008)...........................................380, 382

*Beck v. Alabama*,
    447 U.S. 625 (1980)..................................................................93, 210, 503

*Becker v. Giambruno*,
    No. 97-0313, 2003 U.S. Dist. LEXIS 25227 (W.D.N.Y. Aug. 13, 2003) ................260

*Beech Aircraft Corp. v. Rainey*,
    488 U.S. 153 (1988)...............................................................................71

*Bell v. Cone*,
    535 U.S. 685 (2002).................................................................................5

*Bell v. Maryland*,
    378 U.S. 226 (1964)............................................................................389

*Berger v. United States*,
    295 U.S. 78 (1935)..............................................47, 49, 173, 279, 299, 504

*Berry v. States,*
490 S.E.2d 389 (1997) ....................................................................................85

*Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.,*
713 F.2d 618 (11th Cir. 1983) ....................................................................81

*Blackburn v. Alabama,*
361 U.S. 199 (1960)............................................................198, 199, 202, 469

*Blackledge v. Allison,*
431 U.S. 63 (1977)...............................................................................11, 226

*Blake v. Kemp,*
758 F.2d 523 (11th Cir. 1985) ...............................................................151, 152

*Blakely v. Washington,*
542 U.S. 296 (2004)........................................................................................291

*Blystone v. Pennsylvania,*
494 U.S. 299 (1990)........................................................................................236

*Bonaparte v. Georgia,*
558 S.E.2d 383 (Ga. 2002)............................................................................87

*Booker v. Singletary,*
90 F.3d 440 (11th Cir. 1996), *cert. denied sub nom.,*
*Booker v. Florida,* 532 U.S. 1033 (2001) ..............................................202

*Booth v. Maryland,*
482 U.S. 496 (1987)........................................................................................355

*Boulden v. Holman,*
394 U.S. 478 (1969)........................................................................................407

*Boyde v. Brown,*
404 F.3d 1159 (9th Cir. 2005) ....................................................................516

*Boyde v. California,*
494 U.S. 370 (1990)........................................................142, 247, 250, 288

*Boykin v. Alabama,*
395 U.S. 238 (1969)........................................................180, 344, 345

*Boykins v. Wainwright,*
737 F.2d 1539 (11th Cir. 1984) ....................................................................77, 78

*Bracy v. Gramley,*
  520 U.S. 899, 117 S.Ct. 1793 (1997)........................................................................10

*Bradley v. United States,*
  410 U.S. 605 (1973)........................................................................389, 390

*Brady v. Maryland,*
  373 U.S. 83 (1963)........................................................................47, 61, 267

*Brecht v. Abrahamson,*
  507 U.S. 619 (1993)........................................................................9, 48, 185

*Breedlove v. Moore,*
  279 F.3d 952 (11th Cir. 2002) ........................................................................77, 83, 226, 228

*Brewer v. Quarterman,*
  550 U.S. 286 (2007)........................................................................211, 219

*Brewer v. Williams,*
  430 U.S. 387 (1977)........................................................................38, 201

*Bridges v. State,*
  613 S.E.2d 621 (2005) ........................................................................83

*Brown v. Ricketts,*
  233 Ga. 809, 213 S.E.2d 672 (1975)........................................................................207

*Brown v. State,*
  490 S.E.2d 75 (1997) ........................................................................401

*Brown v. State,*
  549 S.E.2d 107 (Ga. 2001)........................................................................85

*Buenoano v. Singletary,*
  963 F.2d 1433 (11th Cir. 1992) ........................................................................12, 227

*Bullock v. Lucas,*
  743 F.2d 244 (5th Cir. 1984) ........................................................................237

*Burton v. Johnson,*
  948 F.2d 1150 (10th Cir. 1991) ........................................................................220

*Bush v. Gore,*
  531 U.S. 98 (2000)........................................................................366, 419, 420, 421, 422

*Cafeteria Workers v. McElroy,*
    367 U.S. 886 (1961)..................................................................501

*Cage v. Louisiana,*
    498 U.S. 39 (1990).............................................282, 283, 284, 285

*Callahan v. Le Fevre,*
    605 F.2d 70 (2d Cir. 1979)........................................................179

*Cargle v. Mullin,*
    317 F.3d 1196 (10th Cir.2003) ................................................146

*Carnley v. Cochran,*
    369 U.S. 506 (1962)..................................................................345

*Castro v. Ward,*
    138 F.3d 810 (10th Cir. 1998) ..................................................157

*Chambers v. Florida,*
    309 U.S. 227 (1940)............................................................198, 199

*Chambers v. Mississippi,*
    410 U.S. 284 (1973)..........................................................66, 69, 78, 88

*Chancey v. State,*
    256 Ga. 415, 349 S.E.2d  717 (1986)......................................330

*Chandler v. Florida,*
    449 U.S. 560 (1981)............................................................317, 330

*Chandler v. United States,*
    218 F.3d 1305 (11th Cir. 2000) ................................................249

*Clarke v. Zant,*
    275 S.E.2d 49 (Ga. 1981).........................................................185

*Clay v. Director, Juvenile Div., Dep't of Corr.,*
    749 F.2d 427 (7th Cir. 1984) ........................................................7

*Cole v. Arkansas,*
    333 U.S. 196 (1948)............................................................75, 76

*Coleman v. Thompson,*
    501 U.S. 722 .........................6, 8, 41, 48, 184, 220, 224, 255, 256, 257, 288, 290, 291

*Collazo v. Estelle*,
940 F.2d 411 (9th Cir. 1991) ...................................................38

*Colorado v. Connelly*,
479 U.S. 157 (1986)..................................196, 198, 199, 200, 204

*Commonwealth v. Kerpani*,
508 Pa. 418, 498 A.2d 829 (1985) ..................................216, 217

*Cone v. Bell*,
129 S. Ct. 1769 (2009)................................4, 213, 294, 362

*Cooks v. United States*,
461 F.2d 530 (5th Cir. 1972) ..................................208

*Copertino v. State*,
726 So.2d 330 (Fla. Dist. Ct. App. 1999) ...........................326

*Costello v. United States*,
350 U.S. 359 (1956).................................307, 308

*Crane v. Kentucky*,
476 U.S. 683 (1986)................................57, 66, 78, 88, 89, 524

*Crawford v. Head*,
311 F.3d 1288 (11th Cir. 2002) ..................8, 41, 59, 60, 61, 67, 68

*Crawford v. Washington*,
541 U.S. 36 (2004)..................................498

*Crowe v. Head*,
356 F. Supp. 2d 1339 (N.D. Ga. 2005) ...................4, 7, 47, 294

*Curry v. State*,
255 Ga. 215, 336 S.E.2d 762 (1985)..................................414

*Darden v. Wainwright*, ,
477 U.S. 168 (1986)..................................400

*Darwin v. Connecticut*,
391 U.S. 346 (1968).................................66, 201

*Davis v. Georgia*,
429 U.S. 122 (1976)..................................401

*Davis v. Maynard*,
  869 F.2d 1401 (10th Cir. 1989) ............................................................402

*Davis v. North Carolina*,
  384 U.S. 737 (1966)...........................................................67, 199, 201

*Davis v. Terry*,
  465 F.3d 1249 (11th Cir. Ga. 2006).........................................................529

*Dawson v. State*,
  554 S.E.2d 137 (Ga. 2001).........................................................377, 385, 391

*Dobbert v. Florida*,
  432 U.S. 282 (1977)...............................................................................321

*Dobbs v. Zant*,
  506 U.S. 357 (1993)...................................................................................8

*Dobbs v. Zant*,
  720 F. Supp. 1566 (N.D. Ga. 1989), *aff'd* 946 F.2d 1519 (11th Cir. 1991)..............416

*Downs v. McNeil*,
  520 F.3d 1311 (11th Cir. 2008) ............................................................525

*Doyle v. Ohio*,
  426 U.S. 610 (1976)...........................................................166, 178, 260

*Drane v. State*,
  455 S.E.2d 27 (1995) ...............................................................................88

*Dretke v. Haley*,
  541 U.S. 386 (2004).........................................357, 360, 375, 406, 507, 521

*Drope v. Missouri*,
  420 U.S. 162 (1975).........................................................170, 183, 314, 316

*Duest v. Singletary*,
  997 F.2d 1336 (11th Cir. 1993) ............................................................144

*Dupart v. United States*,
  541 F.2d 1148 (5th Cir. 1976) ...............................................................50

*Duren v. Missouri*,
  439 U.S. 357 (1979)...............................................................................444

*Dusky v. United States,*
  362 U.S. 402 (1960).................................................................314, 316

*East v. Scott,*
  55 F.3d 996 (5th Cir. 1995) .................................................................10

*Eberheart v. State,*
  232 Ga. 247, 206 S.E.2d 12 (1974)........................................................197

*Eddings v. Oklahoma,*
  455 U.S. 104 (1982)..............................................93, 111, 250, 355, 397

*Edge v. State,*
  414 S.E.2d 463 (1992) ........................................................................234

*Edwards v. Arizona,*
  451 U.S. 477 (1981)..........................................................20, 31, 35, 36, 183

*Emerson v. Gramley,*
  91 F.3d 898 (7th Cir. 1996) ...............................................................111

*Enmund v. Florida,*
  458 U.S. 782 (1982).................................236, 239, 292, 293, 397, 470, 524

*Estelle v. Williams,*
  425 U.S. 501 (1976)..........................................................................333, 408

*Evitts v. Lucey,*
  469 U.S. 387 (1985)..............................................................................308

*Faretta v. California,*
  422 U.S. 806 (1975)..............................................................................180

*Felker v. Turpin,*
  101 F.3d 657 (11th Cir. 1996) .............................................................529

*Fikes v. Alabama,*
  352 U.S. 191 (1957)..............................................................................199

*Finney v. State,*
  250 S.E.2d 388 (1978) ........................................................................353

*Fischetti v. Johnson,*
  384 F.3d 140 (3d Cir. 2004).................................224, 255, 256, 261, 263

*Fleming v. Zant,*
   386 S.E.2d 339 (1989) ................................................................370, 376

*Ford Motor Co. v. Hanley,*
   196 S.E.2d 454 (Ga. App. 1973)..............................................................44

*Ford v. State,*
   423 S.E.2d 255 (1992) ...........................................................................355

*Ford v. Wainwright,*
   477 U.S. 399 (1986)............................................................93, 210, 308, 343

*Francis v. Franklin,*
   471 U.S. 307 (1985).................................................................................211

*Fugate v. Head,*
   261 F.3d 1206 (11th Cir. 2001) ..........................................170, 254, 257

*Fulton DeKalb Hosp. Authority v. Miller & Billips,*
   667 S.E.2d 455 (Ga. App. 2008)............................................................83

*Furman v. Georgia,*
   408 U.S. 238 (1972)................................362, 363, 364, 374, 422, 503

*Gardner v. Florida,*
   430 U.S. 349 (1977)................................333, 355, 367, 408, 502

*Gibbons v. State,*
   286 S.E.2d 717 (Ga. 1982).......................................................................85

*Giglio v. United States,*
   405 U.S. 150 (1972)....................................................51, 56, 59, 61, 64

*Glados, Inc. v. Reliance Ins. Co.,*
   888 F.2d 1309 (11th Cir. 1987) ...............................................................71

*Godfrey v. Georgia,*
   446 U.S. 420 (1980).....................................................................245, 359

*Godinez v. Moran,*
   509 U.S. 389 (1993)...........................................................179, 180. 181

*Goins v. Angelone,*
   52 F. Supp. 2d 638 (E.D. Va. 1999) ....................................................441

*Goldberg v. Kelly*,
397 U.S. 254 (1970)................................................................501

*Gravely v. Mills*,
87 F.3d 779 (6th Cir. 1996) ........................................170, 257, 259

*Gray v. Mississippi*,
481 U.S. 648 (1987)..........................................210. 219, 224, 400

*Green v. Georgia*,
442 U.S. 95 (1979)..............................64, 78, 369, 370, 479

*Green v. Georgia*,
519 U.S. 145 (1996)................................................................400

*Gregg v. Georgia*,
428 U.S. 153 (1976)............................352, 355, 363, 365, 396

*Griffin v. California*,
380 U.S. 609 (1965)................................................................162

*Guess v. State*,
422 S.E.2d 178 (1992) ........................................................85

*Hall v. Wainwright*,
733 F.2d 766 (11th Cir. 1984) ..............................................311

*Ham v. South Carolina*,
409 U.S. 524 (1973)................................................................332

*Hamblin v. Mitchell*,
354 F.3d 482 (6th Cir. 2003) ................................................99

*Hammond v. State*,
260 Ga. 591, 398 S.E.2d 168 (1990)..................................349

*Hampton v. State*,
527 S.E.2d 872 (Ga. 2000)....................................................75

*Hamric v. Bailey*,
386 F.2d 390 (4th Cir. 1967) ..............................................264

*Hardwick v. Crosby*,
320 F.3d 1127 (11th Cir. 2003) ..........................................289

*Harris v. Kuhlmann*,
   346 F.3d 330 (2d Cir. 2003)........................................................................183

*Harris v. Nelson*,
   394 U.S. 286 ...............................................................................10, 229

*Harris v. South Carolina*,
   338 U.S. 68 (1949)....................................................................................199

*Harris v. State*,
   237 Ga. 718, 230 S.E.2d 1 (1976), *cert. denied*, 431 U.S. 933..................197

*Hasan v. Ishee*,
   No. 1:03-288, 2006 U.S. Dist. LEXIS 83926 (S.D. Oh. Aug. 14, 2006)....................70

*Haynes v. Washington*,
   373 U.S. 503 (1963)....................................................................................33

*Head v. Ferrell*,
   554 S.E.2d 155 (2001) ...............................................................................243

*Head v. Thomason*,
   276 Ga. 434, 578 S.E.2d 426 (2003)............................................................94

*Heath v. Jones*,
   941 F.2d 1126 (11th Cir. 1991) ...................................................................501

*Height v. State*,
   604 S.E.2d 796 (Ga. 2004)..........................................................................280

*Herrera v. Collins*,
   506 U.S. 390 (1993)...............................................................527, 528, 530

*Herring v. New York*,
   422 U.S. 853 (1975)....................................................................................450

*Hill v. State*,
   295 S.E.2d 518 (Ga. 1982)..........................................................................144

*Hill v. Turpin*,
   135 F.3d 1411 (11th Cir. 1998) ...........................................................171, 505

*Hodge v. Seiler*,
   558 F.2d 284 (5th Cir. 1977) .......................................................................72

*Holmes v. South Carolina,*
547 U.S. 319 (2006) ........................................................................78

*Horton v. State,*
295 S.E.2d 281 (1982) ...................................................................365

*Horton v. State,*
371 S.E.2d 384 (Ga. 1988) ............................................................290

*House v. Bell,*
547 U.S. 518 (2006) ...............................................507, 508, 523, 528

*Huffman v. Wainwright,*
651 F.2d 347 (5th Cir. 1981) .............................................................7

*Hurtado v. People of California,*
110 U.S. 516 (1884) .......................................................................308

*Indiana v. Edwards,*
128 S. Ct. 2379 (2008) ...................................................................181

*Irvin v. Dowd,*
366 U.S. 717 (1961) ...............................................................325, 326

*J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.,*
534 U.S. 124 (2001) .......................................................................390

*Jackson v. Denno,*
378 U.S. 368 (1964) ..............................................47, 56, 211, 469

*Jackson v. Virginia,*
443 U.S. 307 (1979) ...............................................................293, 511

*Jenkins v. State,*
269 Ga. 282, 498 S.E.2d 502 (1998) ..............................................247

*Johns v. Department of Justice,*
624 F.2d 522 (5th Cir. 1980) .........................................................190

*Johnson v. Mississippi,*
486 U.S. 578 (1988) ................................................6, 41, 255, 258, 348

*Jones v. State,*
295 S.E.2d 71 (1982) .....................................................................233

*Jones v. State,*
    261 Ga. 665, 409 S.E.2d 642 (1991)...............................................330

*Jones v. United States,*
    526 U.S. 227 (1999)...........................................................368

*Jones v. Walker,*
    540 F.3d 1277 (11th Cir. 2008), *cert. denied*, 129 S. Ct. 1670 (2009)...............6, 180

*Jones v. Wood,*
    114 F.3d 1002 (9th Cir. 1997) .................................................11

*Julius v. Jones,*
    875 F.2d 1520 (11th Cir. 1989) .................................................8

*Jurek v. Estelle,*
    623 F.2d 929 (5th Cir. 1980) ................................................200

*Jurek  v. Texas,*
    428 U.S. 262 (1976)......................................................364, 396

*Kentucky v. Stincer,*
    482 U.S. 730 (1987).........................................................311

*Kimbell v. State,*
    252 Ga. 65 (1984) .........................................................204

*Kimmelman v. Morrison,*
    477 U.S. 365 (1986).........................................................207

*Knighton v. Maggio,*
    740 F.2d 1344 (5th Cir. 1984) ...............................................155

*Kotteakos v. United States,*
    328 U.S. 750 (1946)......................................................9, 48, 185

*Kyles v. Whitley,*
    5 F.3d 806 (5th Cir. 1993) ...................................................63

*Kyles v. Whitley,*
    514 U.S. 419 (1995)...........................61, 62, 63, 64, 267, 272, 273, 277, 504

*Lee v. State,*
    509 P.2d 1088 (Alaska 1973)................................................311

*Lefkowitz v. Turley,*
    414 U.S. 70 (1973)..................................................................................162

*Leyra v. Denno,*
    347 U.S. 556 (1954)................................................................................199

*Livingston v. State,*
    444 S.E.2d 748 (Ga. 1994).............................................25, 197, 206, 301

*Lockett v. Ohio,*
    438 U.S. 586 (1978)................................................247, 250, 355, 397, 478

*Lockhart v. McCree,*
    476 U.S. 162 (1986)........................................................................219, 220

*Lowenfield v. Phelps,*
    484 U.S. 231 (1988)................................................................................244

*Lundgren v. Mitchell,*
    440 F.3d 754 (6th Cir. 2006) ................................................................152

*Lynott v. Story,*
    929 F.2d 228 (6th Cir. 1991) ..................................................................10

*Magana v. Hofbauer,*
    263 F.3d 542 (6th Cir. 2001) ................................................................208

*Marshall v. Cathel,*
    428 F.3d 452 (3d Cir. 2005)  (emphasis supplied) ................................108

*Martinez-Macias v. Collins,*
    810 F. Supp. 782 (W.D. Tex. 1991), *aff'd,* 979 F.2d 1067 (5th Cir. 1992) .......195, 208

*Martinez v. State,*
    474 S.E.2d 708 (Ga. App. 1996)............................................................233

*Mason v. Mitchell,*
    293 F. Supp 2d 819 (N.D. Oh. 2003)........................................................70

*Mason v. State,*
    248 S.E.2d 302 (Ga. 1978)......................................................................86

*Mathews v. Eldridge,*
    424 U.S. 319 (1976)................................................................................501

*Maxwell v. Bishop,*
    398 U.S. 262 (1970)........................................................................................407

*Maynard v. Cartwright,*
    486 U.S. 356 (1988)...............................................................219, 245, 352

*Mayo v. Owen,*
    67 S.E.2d 709 (Ga. 1951).................................................................................84

*McCleskey v. Kemp,*
    481 U.S. 279 (1987)................................................416, 418, 422, 424

*McCleskey v. Zant,*
    499 U.S. 467 (1991)........................................................................................223

*McGahee v. Ala. Dep't of Corr.,*
    560 F.3d 1252 (11th Cir. 2009) ........................................................................5

*McKoy v. North Carolina,*
    494 U.S. 433 (1990)........................................................................................144

*In re Michael,*
    326 U.S. 224 (1945)........................................................................................217

*[Michael] Williams v. Taylor,*
    529 U.S. 420  (2000)..........................................................12, 90, 227, 228

*Michigan v. Harvey,*
    494 U.S. 344 (1990).........................................................................................33

*Michigan v. Mosley,*
    423 U.S. 96 (1975)..........................................................................................31

*Middleton v. Dugger,*
    849 F.2d 491 (11th Cir. 1988) ......................................................................111

*Miller-El v. Cockrell,*
    537 U.S. 322 (2003)...........................................................................................6

*Mills v. Maryland,*
    486 U.S. 367 (1988)................................................................144, 359, 478

*Mills v. Singletary,*
    63 F.3d 999 (11th Cir. 1995) .......................................................................326

*Minnick v. Mississippi*,
   498 U.S. 146 (1990)..................................................................31, 37, 39, 200

*Miranda v. Arizona*,
   384 U.S. 436 (1966)..............................................................................31, 200

*Mitchell v. U.S.*,
   526 U.S. 314 (1999)..............................................................................179

*Mize v. Hall*,
   532 F.3d 1184 (11th Cir. 2008) ...........................................................529

*Moody v. State*,
   224 Ga. 301 (Ga. 1968)..........................................................................87

*Mooney v. Holohan*,
   294 U.S. 103 (1935)............................................................................50, 56

*Moran v. Burbine*,
   475 U.S. 412 (1986)........................................................................180, 183

*Morford v. United States*,
   339 U.S. 258 (1950)........................................................................333, 411

*Morgan v. Illinois*,
   504 U.S. 719 (1992)........................................................................397, 437

*Morrissey v. Brewer*,
   408 U.S. 471 (1972)..............................................................................501

*Mosley v. Michigan*,
   423 U.S. 96 (1975)......................................................................24, 25, 31

*Mu'Min v. Virginia*,
   500 U.S. 415 (1991)........................................................................333, 411

*Mullaney v. Wilbur*,
   421 U.S. 684 (1975)................................................................................77

*Murphy v. Florida*,
   421 U.S. 794 (1975)........................................................................325, 326

*Murray v. Carrier*,
   477 U.S. 478 (1986)............................................................... *passim*

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958) ................................................................................76

*Napue v. Illinois*,
   360 U.S. 264 (1959) ........................................47, 50, 55, 56, 57, 59, 64, 67

*Newland v. Hall*,
   527 F.3d 1162 (2009) ..............................................................................95

*Norris v. Crocker*,
   54 U.S. 429 (1852) ................................................................................389

*Ohio v. Roberts*,
   448 U.S. 56 (1980) ..................................................................................85

*Olson v. North Dakota*,
   271 N.W.2d 574 (N.D. 1978) ........................................................322, 323

*Owen v. Sec'y Dep't of Corrections*,
   568 F.3d 894 (11th Cir. 2009) ..........................................................9, 224

*Panetti v. Quaterman*,
   551 U.S. 930 (2007) ..................................................................................6

*Panzavecchia v. Wainwright*,
   658 F.2d 337 (5th Cir. 1981) ..................................................................77

*Parke v. Raley*,
   506 U.S. 20 (1992) ................................................................................348

*Parker v. Dugger*,
   498 U.S. 308 (1991) ..............................................................................364

*Pate v. Robinson*,
   383 U.S. 375 (1966) ......................................................................170, 181

*Patton v. Yount*, ,
   467 U.S. 1025 (1984) ..................................................220, 325, 326

*Payne v. Bell*,
   89 F. Supp. 2d 967 (W.D. Tenn. 2000) ..................................................11

*Payne v. Tennessee*,
   501 U.S. 808 (1991) ......................................................................250, 300

*Penry v. Johnson,*
    532 U.S. 782 (2001) .................................................................................478

*Penry v. Lynaugh,*
    492 U.S. 302 (1989) ........................................................ 94, 248-49, 397

*People v. Tyburski,*
    494 N.W.2d 20 (Mich. Ct. App. 1992) ..................................................413

*Perez v. Irwin,*
    963 F.2d 499 (2d Cir. 1992).............................................................281, 285

*Philmore v. McNeil, ---,*
    -- F.3d --, 2009 WL 2181682 (11th Cir. July 23, 2009) ................... *passim*

*Pipefitters Local Union v. United States,*
    407 U.S. 385 (1972)........................................................................390, 391

*Pope v. State,*
    256 Ga. 195, 345 S.E.2d 831 (1986).......................................................348

*Porter v. Wainwright,*
    805 F.2d 903 (11th Cir. 1986) ..................................................................12

*Powell v. Collins,*
    332 F.3d 376 (6th Cir. 2003) ........................................................154, 156

*Proffitt v. Florida,*
    428 U.S. 242 (1976).......................................................................364, 396

*Pulley v. Harris,*
    465 U.S. 37 (1984)...................................................................................364

*Rankins v. Page,*
    No. 99-1515, 2000 U.S. App. LEXIS 8787 (7th Cir. May 7, 2000)...........70

*Ring v. Arizona,*
    536 U.S. 584 (2002)................................................................................368

*Roberts v. Louisiana,*
    428 U.S. 325 (1976).......................................................................364, 396

*Robinson v. Cain,*
    510 F. Supp. 2d 399 (E.D. La. 2007).......................................................63

*Robinson v. State,*
   256 Ga. 564, 350 S.E.2d 464 (1986)..................................................................390

*Roebuck v. State,*
   586 S.E.2d 651 (2003) ...................................................................................83

*Rogers v. Richmond,*
   365 U.S. 534 (1961)......................................................................................198

*Rompilla v. Beard,*
   545 U.S. 374 (2005)..............................................95, 96, 97, 103, 112, 113, 114, 140

*Roper v. Simmons,*
   543 U.S. 551 (2005)......................................................................................234

*Roper v. Simmons,*
   543 U.S. 557 (2005)..............................................................................230, 235

*Rosales-Lopez v. United States,*
   451 U.S. 182 (1981)..............................................................332, 333, 407, 408, 411

*Rose v. Clark,*
   478 U.S. 570 (1986)......................................................................................287

*Ross v. Kemp,*
   756 F.2d 1483 (11th Cir. 1985) .........................................................................239

*Ross v. State,*
   254 Ga. 22( 326 S.E.2d 194 (1985) ...................................................................349

*Ruffin v. Dugger,*
   848 F.2d 1512 (11th Cir. 1988) .........................................................................237

*Rupe v. Wood,*
   93 F.3d 1434 (9th Cir. 1996) ............................................................................280

*Sanders v. Sullivan,*
   863 F.2d 218 (2d Cir. 1988)........................................................................50, 51

*Sawyer v. Whitley,*
   505 U.S. 333 (1992)......................6, 244, 293,  357, 360, 375, 406, 521,522, 525, 526

*Schlup v. Delo,*
   513 U.S. 298 (1995)......................................6, 357, 360, 375, 406, 507, 522, 523, 529

*Schneckloth v. Bustamonte,*
   412 U.S. 218 (1973).................................................................198

*Schneider v. Estelle,*
   552 F.2d 593 (5th Cir. 1977) ....................................................50

*Sellers v. Estelle,*
   651 F.2d 1074 (5th Cir. 1981) ...................................................63

*Sheppard v. Maxwell,*
   384 U.S. 333 (1966)...............................................317, 323, 330

*Sibley v. Culliver,*
   377 F.3d 1196 (11th Cir. 2004) .......................................224, 256

*Siebert v. Allen,*
   455 F.3d 1269 (11th Cir.2006) ................................................309

*Silva v. Woodford,*
   279 F.3d 825 (9th Cir. 2002), *cert. denied*, No. 01-1779,
   2002 U.S. LEXIS 7365 (2002) ................................................155

*Simmons v. South Carolina,*
   512 U.S. 154 (1994)........................359, 407, 412, 414, 441, 476

*Singletary v. Fischer,*
   365 F. Supp. 2d 328 (E.D.N.Y. 2005) ....................................523

*Skipper v. South Carolina,*
   476 U.S. 1 (1986)...........................................................249, 251

*Smart v. Leeke,*
   873 F.2d 1558 (4th Cir. 1989) ................................................179

*Smith v. Illinois,*
   469 U.S. 91 (1984).....................................................................39

*Smith v. Singletary,*
   170 F.3d 1051 (11th Cir. 1999) ..............................................208

*Smith v. State,*
   571 S.E.2d 740 (Ga. 2002).....................................................444

*Smith v. United States,*
   348 U.S. 147 (1954).................................................................230

*Snowden v. Singletary,*
    135 F.3d 732 (11th Cir. 1998) .................................................................77, 78, 83

*Spano v. New York,*
    360 U.S. 315 (1959)..........................................................................................199, 200

*Spaziano v. Florida,*
    468 U.S. 447 (1984)...................................................................................................397

*Spaziano v. Singletary,*
    36 F.3d 1028 (11th Cir. 1994) ...........................................................................59, 63

*Spencer v. State,*
    260 Ga. 640, 398 S.E.2d 179 (1990).....................................................................414

*Spivey v. Head,*
    207 F.3d 1263 (11th Cir. 2000) ...................................................................144, 170

*Spivey v. State,*
    253 Ga. 187, 319 S.E.2d 420 (1984)......................................................................369

*Stano v. Dugger,*
    921 F.2d 1125 (11th Cir. 1991) ..............................................................................180

*Starr v. Lockhart,*
    23 F.3d 1280 (8th Cir. 1994) .......................................................................153. 156

State. *Pope v. State* at 209( 345 S.E.2d 831......................................................349

*State v. Biegenwald,*
    594 A.2d 172 (N.J. 1991)..........................................................................................404

*State v. Cage,*
    554 So.2d 39 (La. 1989) ...........................................................................................284

*State v. Gardner,*
    154 Ga. 264 (1985) ....................................................................................................204

*State v. Joyner,*
    289 S.C. 436, 346 S.E.2d 711 (S.C. 1986) ............................................................216

*State v. Middlebrooks,*
    840 S.W.2d 317 (Tenn. 1992).................................................................................356

*State v. Williams,*
    550 A.2d 1172 (N.J. 1988).......................................................................................405

*Staub v. Baxley,*
   355 U.S. 313 (1958)........................................................................................79

*Stephens v. Hall,*
   407 F.3d 1195 (11th Cir. 2005) ....................................................................51

*Stirone v. United States,*
   361 U.S. 212 (1960)......................................................................................307

*Strickland. See e.g. Whitney v. Horn,*
   280  F.3d 240 (3d Cir. 2002).........................................................................231

*Strickland v. Washington,*
   466 U.S. 668 (1984)................................................................................ *passim*

*Strickler v. Greene,*
   527 U.S. 263 (1999).............................................8, 58, 60, 222, 267, 309, 310

*Sullivan v. Louisiana,*
   508 U.S. 275 (1993).........................................................................283, 286, 287

*Taylor v. Louisiana,*
   419 U.S. 522 (1975)......................................................................................445

*Taylor v. Maddox,*
   366 F.3d 992 (9th Cir. 2004) ...........................................................................6

*Teague v. Lane,*
   489 U.S. 288 (1989)........................................................................................95

*Teague v. State,*
   314 S.E.2d 910 (Ga. 1984).............................................................................86

*Tennard v. Dretke,*
   542 U.S. 274 (2004)...............................................................................251, 252

*Terry v. Georgia,*
   377 S.E.2d 837 (Ga. 1989).............................................................................87

*[Terry] Williams v. Taylor,*
   529 U.S. 362 (2000)................................................................................ *passim*

*Thomas v. Varner,*
   428 F.3d 491 (3d Cir. 2005)............................................................169, 170 257

*Thornton v. State,*
    264 Ga. 563, 449 S.E.2d 98 (1994)..................................................................413, 414

*Timberlake v. State,*
    246 Ga. 488, 271 S.E.2d 792 (1980)........................................................................296

*Tison v. Arizona,*
    481 U.S. 137 (1987)....................................................239, 240, 397, 470, 524

*Torres v. Ercole,*
    No. 06-674, 2008 U.S. Dist. LEXIS 49172 (S.D.N.Y. June 25, 2008) .............196, 197

*Townsend v. Sain,*
    372 U.S. 293 (1963)..................................................12, 202, 226, 228

*Trop v. Dulles,*
    356 U.S. 86 (1958)........................................................................383

*Tuilaepa v. California,*
    512 U.S. 967 (1994)..................................................236, 367, 368

*Turner v. Duncan,*
    158 F.3d 449 (9th Cir. 1998) ................................................187, 188, 189

*Turner v. Louisiana,*
    379 U.S. 466 (1965)........................................................408, 414

*Turner v. Murray,*
    476 U.S. 28 (1986)........................................................333, 408

*Turner v. Pennsylvania,*
    338 U.S. 62 (1949)........................................................................199

*Turpin v. Christenson,*
    497 S.E.2d 216 (Ga. 1998)........................................................................111

*United States v. 30.64 Acres of Land,*
    795 F.2d 796 (9th Cir. 1986) ................................................190, 191

*United States v. Agurs,*
    427 U.S. 97 (1976)........................................................................50, 51

*United States v. Alzate,*
    47 F.3d 1103 (11th Cir. 1995) ................................................46, 51, 52, 57

*United States v. Anderson,*
   574 F.2d 1347 (5th Cir. 1978) ................................................................264

*United States v. Anton,*
   597 F.2d 371 (3d Cir. 1979) ....................................................................291

*United States v. Bagley,*
   473 U.S. 667 (1985) ..................................................48, 59, 60, 61, 267, 280

*United States v. Baker,*
   432 F.3d 1189 (11th Cir. 2005) ........................................................145, 171

*United States v. Biberfeld,*
   957 F.2d 98 (3d Cir. 1992) ........................................................................46

*United States v. Blount,*
   479 F.2d 650 (6th Cir. 1973) ............................................................332, 408

*United States v. Boigegrain,*
   155 F.3d 1181 (10th Cir. 1998) ...............................................................181

*United States v. Box,*
   50 F.3d 345 (5th Cir. 1995) .......................................................................71

*United States v. Brannan,*
   562 F.3d 1300 (11th Cir. 2009) .................................................................90

*United States v. Central Gulf Lines,*
   747 F.2d 315 (5th Cir. 1984) .....................................................................72

*United States v. Central Gulf Lines, Inc.,*
   974 F.2d 621 (5th Cir. 1992) .....................................................................72

*United States v. Chrisco,*
   493 F.2d 232 (8th Cir. 1974) ...................................................................311

*United States v. Clark,*
   308 F. App'x 411 (11th Cir. 2009) ...........................................................210

*United States v. Contreras-Castro,*
   825 F.2d 185 (9th Cir. 1987) ...................................................................335

*United States v. Cronic,*
   466 U.S. 648 (1984) .........................................................................145, 207

*United States v. Cuthel,*
    903 F.2d 1381 (11th Cir. 1990) ....................................................214

*United States v. Deutsch,*
    475  F.2d 55 (5th Cir. 1973), *overruled on other grounds, United States v.*
    *Henry,* 749 F.2d 203 (5th Cir. 1984) .......................................267

*United States v. Dominguez,*
    226 F.3d 1235 (11th Cir. 2000) ...........................................214, 215

*United States v. Fell,*
    217 F. Supp. 2d 469 (D. Vt. 2002)...........................367, 368, 369, 370

*United States v. Fessel,*
    531 F.2d 1275 (5th Cir. 1976) ...................................................152

*United States v. Gagnon,*
    470 U.S. 522 (1985)...................................................................311

*United States v. Garey,*
    540 F.3d 1253 (11th Cir. 2008) (citations omitted).............. 180-81, 183

*United States v. Garza,*
    608 F.2d 659 (5th Cir. 1979) ....................................................296

*United States v. Gomez,*
    927 F.2d 1530 (11th Cir. 1991) ..................................... 37, 39-40

*United States v. Gonzalez,*
    921 F.2d 1530 (11th Cir. 1991) ..................................................171

*United States v. Gutierrez,*
    No. 05-639, 2007 WL 3026609 (W.D. Tex. Oct. 16, 2007)......................63

*United States v. Ianniello,*
    866 F.2d 540 (2d Cir. 1989)......................................................214

*United States v. Jones,*
    193 F.3d 948 (8th Cir. 1999) ....................................................335

*United States v. Jones,*
    958 F.2d 520 (2d Cir. 1992)........................................................71

*United States v. Klee,*
    494 F.2d 394 (9th Cir. 1974) ....................................................217

*United States v. NYNEX,*
    781 F. Supp. 19 (D.D.C. Ga. 1991) ..............................................................45

*United States v. Purnett,*
    910 F.2d 51 (2d Cir. 1990)........................................................................182,

*United States v. Resko,*
    3 F.3d 684 (3d Cir. 1993).......................................................217, 218, 225

*United States v. Rivera Pedin,*
    861 F.2d 1522 (11th Cir. 1988) ..................................................50, 51, 56

*United States v. Roark,*
    753 F.2d 991 (11th Cir. 1985) .................................................................198

*United States v. Sarras,*
    No. 08-11757, 2009 WL 1661152 (11th Cir. June 16, 2009).....................90

*United States v. Scheffer,*
    523 U.S. 303 (1998)...........................................................................88, 89

*United States v. Sells Eng'g, Inc.,*
    463 U.S. 418 (1983)......................................................................306, 307

*United States v. Sipe,*
    388 F.3d 471 (5th Cir. 2004) ...................................................................63

*United States v. Smith,*
    521 F.2d 957 (D.C. Cir. 1975)...................................................................85

*United States v. Spagnoulo,*
    960 F.2d 990 (11th Cir. 1992) .................................................................268

*United States v. Span,*
    75 F.3d 1383 (9th Cir. 1996) .........................................................195, 208

*United States v. Stone,*
    139 F.3d 822 (11th Cir. 1998) ..................................................................91

*United States v. United States Gypsum Co.,*
    438 U.S. 422 (1978)................................................................................215

*United States v. Wood,*
    299 U.S. 123 (1936)........................................................................333, 408

*United States v. Yonn,*
  702 F.2d 1341 (11th Cir. 1983) .................................................................214

*United States v. Young,*
  470 U.S. 1 (1985).................................................................295, 296, 299

*Victor v. Nebraska,*
  511 U.S. 1 (1994).................................................................286

*Wainwright v. Greenfield,*
  474 U.S. 284 (1986).................................................................166, 167, 168

*Wainwright v. Sykes,*
  433 U.S. 72 (1977).................................................................6, 184, 255

*Wainwright v. Witt,*
  469 U.S. 412 (1985).................................................400, 405, 407, 434, 435, 439, 443

*Waldrip v. Head,*
  620 S.E.2d 829 (Ga. 2005).................................................31, 62, 79, 82, 171

*Waldrip v. State,*
  267 Ga. 739, 482 S.E.2d 299 (1997),
  *cert. denied,* 522 U.S. 917 (1997).................................................*passim*

*Ward v. Board of Commissioners of Love County,*
  253 U.S. 17 (1920).................................................................79, 80

*Wardius v. Oregon,*
  412 U.S. 470 (1973).................................................................88

*Washington v. Texas,*
  388 U.S. 14 (1967).................................................................88, 89

*Watkins v. Miller,*
  92 F. Supp. 2d 824 (S.D. Ind. 2000) .................................................63

*Watts v. Indiana,*
  338 U.S. 49 (1949).................................................................199

*Weems v. United States,*
  217 U.S. 349 (1910).................................................................391

*Wellons v. Hall,*
  554 F.3d 923 (2009).................................................358, 361, 376, 395, 399, 433

*White v. Lewis,*
  874 F.2d 599 (9th Cir. 1989) ...................................................................48

*Whitney v. Horn,*
  280 F.3d 240 (3d Cir. 2002).................................................................233

*Wiggins v. Smith,*
  539 U.S. 510 (2003)..........................4, 5, 92, 95, 96, 98, 102, 114, 140, 144

*Williams v. Stewart,*
  441 F.3d 1030 (9th Cir. 2006) .............................................................111

*Williams v. Taylor,*
  529 U.S. 389 (2000).............................................................102, 111, 140,

*Williams v. Turpin,*
  87 F.3d 1204 (11th Cir. 1996) ...................................................8, 223, 418

*Williams v. Washington,*
  59 F.3d 673 (7th Cir. 1995) .........................................................160, 271

*Willis v. Cockrell,*
  No. 01-20, 2004 U.S. Dist. LEXIS 15950 (W.D. Tex. Aug. 9, 2004).......................63

*Winebrenner v. United States,*
  147 F.2d 322 (8th Cir. 1945) ...............................................................225

*In re Winship,*
  397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)..............................246, 283, 285

*Witherspoon v. Illinois,*
  391 U.S. 510 (1968)...................211, 397, 399, 400, 405, 407, 410, 434

*Wood v. Bartholomew,*
  516 U.S. 1 (1995)...........................................................................64, 281

*Wood v. Georgia,*
  370 U.S. 375 (1962)............................................................................307

*Woodson v. North Carolina,*
  96 S.Ct. 2978 (1976)..........................................................................210

*Woodson v. North Carolina,*
  428 U.S. 280 (1976)............................... 93, 351, 355, 359, 364, 396, 502-03

*Woodward v. City of Council of Augusta,*
  162 S.E.2d 304 (Ga. 1968)........................................................................86

*Zant v. Campbell,*
  245 Ga. 368, 265 S.E.2d 22 (1980)..........................................................207

*Zant v. Stephens*,
  462 U.S. 862 (1983)..................225, 236, 243, 247, 292, 352, 353, 354, 359, 363, 503

## STATUTES, RULES AND CODES

U.S. Const. Amend. V ................................................................................421

U.S. const. Amend. VI ...............................................................................210

28 U.S.C. § 2254 ................................................................................. *passim*

Ga. Code Ann. § 16-5-1 .............................................................................234

Ga. Code Ann. § 17-10-30 ..........................................................................235

Ga. Code Ann. § 24-9-83 .............................................................................64

O.C.G.A. § 9-14-48 ...................................................................................212

O.C.G.A. § 15-12-164 ................................................................................397

O.C.G.A. § 17-10-1.2 .................................................................................300

O.C.G.A. § 17-10-30 ...............................................................240, 351, 352, 353

O.C.G.A. § 17-10-35 ..................................................................................365

O.C.G.A. § 17-10-38 .............................................................................375, 383

O.C.G.A. § 24-3-2 ......................................................................................86

O.C.G.A. § 24-9-83 .....................................................................................84

Fed. R. Evid. 801 ........................................................................................70

Fed. R. Evid. 803 ........................................................................................72

Fed. R. Evid. 1101 ......................................................................................70

Ga. R. Prof. Conduct 1.4 ............................................................................177

Ga. R. Prof. Conduct 3.3 ................................................................50

## OTHER AUTHORITIES

1 ABA Standards for Criminal Justice 4-4.1, commentary (2d ed. 1980) ........................95

3 Wayne LaFave et al., *Criminal Procedure* § 11.10 ....................................257

*American Heritage Dictionary of the English Language* 1173 ......................................285

*Black's Law Dictionary* (6 ed.) ..........................................................387

Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 ..........................................................153

John H Blume, et al., *Probing "Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1232 (2001) ......................................................397

R. Langdon, et al. *Disturbed Communication in Schizophrenia: The Role of Poor Pragmatics and Poor Mind-Reading*, 32 ..................................................203

Richard A. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death,* 31 B.C.L. Rev. 1103, 1129 (1990) ..................................................356

*United States Attorneys' Manual* § 9-10.010 ................................................420

*Webster's II New Riverside Dictionary* 769 ..................................................285

*Webster's Third New International Dictionary – Unabridged* (1986) ..........................285

The Fifth, Sixth, Eighth and Fourteenth Amendments provide safeguards that are essential to assure that the outcome of a prosecution is a just one.  To achieve a just result, all participants in the adversary process must play their assigned constitutional roles.  The prosecution must be a minister of justice.  Its role is not blindly to seek the accused's conviction, but to assure a just and fair result.  Thus, the prosecution cannot present false testimony or withhold exculpatory evidence from the defense.  Defense counsel, for their part, must bring a constitutionally mandated quantum of skill, knowledge and effort to defending the accused and to enforcing all of the accused's constitutional rights.  Finally, both judge and jury must fulfill their sworn duties to follow the law, to remain impartial, to consider all the evidence and to reach a just outcome.  Only then, under our law, can the adversarial process act as the constitutional crucible that burns away the excess, arrives at the truth and delivers justice.

Mr. Waldrip now comes before this Court to seek vindication of his rights, which were trampled throughout his prosecution.  In his case the constitutional system failed; his rights were violated; he has been sorely prejudiced.  A man who is actually innocent of the crimes for which he was convicted has been sentenced to death.

While every capital case is a maelstrom of details and events, from almost the beginning Mr. Waldrip's case turned upon three critical issues:  (1) his

incriminating custodial confessions; (2) his debilitating mental illness; and (3) his "case for life" – the penalty phase of the case.  Sadly, these are the three places where the Constitution's protections were ignored, circumvented or forgotten:

- The State knew Mr. Waldrip requested counsel when he was arrested, continued to interrogate him and then, once it had obtained his incriminating statements, denied that the requests ever took place;

- Defense counsel failed even to consider using Mr. Waldrip's mental illness in mitigation or adequately investigate mitigation evidence;

- Defense counsel failed to adequately investigate or present Mr. Waldrip's mental illness;

- The jury considered and voted on Mr. Waldrip's death sentence during the guilt/innocence phase of the case; and

- The penalty phase jury instructions failed to inform the jury of how to properly narrow and select Mr. Waldrip as a defendant eligible and worthy of the death penalty.

Taken individually and together, the various constitutional violations described in this brief demonstrate that Mr. Waldrip was not provided the safeguards the Constitution guaranteed him, that this Court cannot have any confidence in the outcome of Mr. Waldrip's trial, verdict, sentence or appeal, and that Mr. Waldrip's conviction and sentence cannot stand.[1]

---

[1]    A chart of the claims in Mr. Waldrip's petition is included as Exhibit A in the Appendix. The chart provides an index of where each claim is primarily argued in this brief. In a contemporaneously filed motion, Mr. Waldrip has requested to withdraw four claims (26, 30, 59, and 60) and, therefore, is not briefing them. Further, for the following claims, Mr.

(Continued)

## I.    FACTS

As the Court is aware, the record in this matter is voluminous and proceedings below complex, including four trips before the Georgia Supreme Court.  Instead of summarizing all of the relevant facts for all of Mr. Waldrip's claims in one section, the particulars pertinent to each claim are detailed within the particular argument.

## II.    PROCEDURAL HISTORY

The procedural history of this matter is attached herein at Appendix A.

## III.    STANDARDS OF REVIEW

In its March 31 Order setting the schedule for future briefs, the Court requested Mr. Waldrip brief, for each claim in his Petition, the following:

1.    Why he is entitled to relief;

2.    If the Court has determined the claim is procedurally defaulted, why the Court should excuse that default and consider the merits of the claim; and

3.    What discovery Mr. Waldrip needs and why he needs an evidentiary hearing.

(*See* Order Denying Motion for Discovery, Doc. 64, at 19-20 (filed 3/31/09) [hereinafter "March 31 Order"] [App. 1].)

---

(Continued)

Waldrip relies on the argument in his Petition and provides no further briefing here: 46, 47, 48, 50, 52, 53, 54, 58, and 57.

The applicable legal standards that apply to these three questions are explained below.

### A.   AEDPA STANDARDS APPLICABLE TO THE MERITS OF MR. WALDRIP'S CLAIMS

To the extent no state court has adjudicated the merits of any claim fairly presented to it, including failing to do so because the court concluded that the claim was procedurally defaulted, any review of the merits by this Court is *de novo*.  *Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009) (where the state court did not reach the merits of the underlying claim its review is not subject to deference and is reviewed *de novo*); *Crowe v. Head*, 356 F. Supp. 2d 1339, 1350 (N.D. Ga. 2005) ("Section 2254(d) applies only to *claims decided on their merits* by state courts."). Specifically, the standards imposed by 28 U.S.C. § 2254(d) are inapplicable; indeed, the statute, by its text, is limited to:  "any claim that was *adjudicated on the merits in State court proceedings . . .*".  *Id.* (emphasis supplied).

For claims that the state court did adjudicate on the merits, habeas relief is warranted under 28 U.S.C. § 2254 if a state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2); *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003).

The "contrary to" clause of Section 2254(d)(1) mandates relief "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *[Terry] Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, relief must be granted if "the state court identifies the correct governing legal principle from [the United States Supreme] Court's decisions but unreasonably applies that principle to the facts" of the petitioner's case. *Wiggins v. Smith*, 539 U.S. at 520 (citing *[Terry] Williams v. Taylor*, 529 U.S. 362, 413 (2000); *Bell v. Cone*, 535 U.S. 685, 694 (2002)). Where this Court determines that a state court's decision is an unreasonable application of federal law under § 2254(d)(1), the Court is unconstrained by the standards in § 2254(d) and must undertake a *de novo* review of the record. *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) (citing *(Terry) Williams v. Taylor*, 529 U.S. 326 (2000)).

Under § 2554(d)(2), habeas relief is warranted if a state court's decision is "based on an unreasonable determination of the facts presented." Federal courts must defer to state court factual findings unless a petitioner proves by clear and convincing evidence that the state court's findings were objectively unreasonable in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. §

2254(e), *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003).  Thus, no deference is

owed "to unreasonably-found facts or to the legal conclusions that flow from

them." *Jones v. Walker*, 540 F.3d 1277, 1288 (11th Cir. 2008), *cert. denied*, 129 S.

Ct. 1670 (2009) (*citing Panetti v. Quarterman*, 551 U.S. 930 (2007); *Taylor v.

Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004)).

## B.   CAUSE AND PREJUDICE STANDARDS

Where the Court has found that Mr. Waldrip has procedurally defaulted a

claim, Mr. Waldrip must establish "cause for the default and actual prejudice as a

result of the alleged violation of federal law" for this Court to review the claim on

the merits.[2]  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Wainwright

v. Sykes*, 433 U.S. 72 (1977); *Alderman v. Zant*, 22 F.3d 1541, 1551 (11th Cir.

1994).

### 1.   Cause and Prejudice is a Federal Question that This Court Must Decide *De Novo*.

"Cause and prejudice" is a federal question that this Court is bound to

consider *de novo*.  *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *Murray*, 477

U.S. at 489 ("cause" is "a question of federal law").  The standard under § 2254

does not apply to a state's determination of cause and prejudice because, as

---

[2]   Mr. Waldrip's procedural default may also be excused if failure to review the claim
would result in a "miscarriage of justice."  *See Coleman v. Thompson*, 501 U.S. 722, 750.
*See also Schlup v. Delo*, 513 U.S. 298, 314-15 (1995); *Sawyer v. Whitley*, 505 U.S. 333,
339 (1992).  Mr. Waldrip addresses this standard in his argument on his claim that he is
actually innocent. (*See* Vol. III, Section XXXIX.C.1., below.)

explained above, the application of the statute is limited to claims that have been

adjudicated on the merits in state court.  28 U.S.C. § 2254; *Crowe*, 356 F. Supp. 2d

at 1350.

> **2.     The Thresholds for "Cause" and "Prejudice" Are Interrelated and a Strong Showing on One Reduces the Threshold for the Other.**

While a habeas petitioner must show both cause and prejudice to excuse

default, a strong showing of one prong lowers the threshold for the other prong.

*Murray*, 477 U.S. at 488.  Thus, a strong demonstration that a state official

intentionally impeded the petitioner from raising a claim – such as by knowingly

withholding evidence – also suggests that the official felt the issue was outcome

determinative and, hence, prejudicial.  *See, e.g., Amadeo v. Kemp*, 816 F.2d 1502

(11th Cir. 1987), *rev'd on other grounds sub nom. Amadeo v. Zant*, 486 U.S. 214

(1988).  Likewise, "if prejudice is high, cause will be more easily found."  *Clay v.

Director, Juvenile Div., Dep't of Corr.*, 749 F.2d 427, 434 (7th Cir. 1984);

*Huffman v. Wainwright*, 651 F.2d 347, 351 (5th Cir. 1981).

> **3.     Standards for Cause.**

Cause exists if Mr. Waldrip can show that "some objective factor external to

the defense impeded counsel's efforts to comply with [Georgia's] procedural rule."

*Murray v. Carrier*, 477 U.S. at 488.  While the Supreme Court has not created an

exhaustive list of factors that constitute cause sufficient to excuse default, there are

some that are well established in the jurisprudence:

> 1.   The State's suppression of evidence of the claim.  *Banks v. Dretke*, 540 U.S. 668, 690-91 (2004) ("[A] petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence."); *Amadeo v. Zant*, 486 U.S. 214, 222 (1988); *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002) (finding cause for default where *Brady* material was first discovered in post-conviction proceedings through the Georgia Open Records Act);

> 2.   Former counsel's constitutionally ineffective representation caused the procedural default.  *Coleman*, 501 U.S. at 754; *Williams v. Turpin*, 87 F.3d 1204, 1210 (11th Cir. 1996);

> 3.   Counsel did not know and with reasonable diligence could not have discovered the factual predicate for the claim at the time of the alleged procedural default.  *Strickler v. Greene*, 527 U.S. 263, 283-90 (1999);

> 4.   Actions of the state, state courts, or other officials hindered compliance with the procedural rule or made compliance "impracticable."  *Dobbs v. Zant*, 506 U.S. 357, 359 (1993); *Julius v. Jones*, 875 F.2d 1520, 1525 (11th Cir. 1989).

> **4.    Prejudice from the Alleged Constitutional Violation that Works to Mr. Waldrip's Actual and Substantive Disadvantage Constitutes "Actual Prejudice."**

To establish actual prejudice, a habeas petitioner must show "prejudice as a

result of the *alleged violation of federal law*."  *Coleman*, 501 U.S. at 750

(emphasis supplied).  In question form, did the violation of Mr. Waldrip's

constitutional rights actually prejudice the proceeding that the conduct impacted?

In order to constitute "actual prejudice," the petitioner must persuade the Court that the alleged constitutional violation "had [a] substantial and injurious effect or influence in determining" the outcome of the proceeding.  *See Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  In other words, "the petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different had the constitutional violation not occurred."  *Owen v. Sec'y Dep't of Corrections*, 568 F.3d 894, 908 (11th Cir. 2009).

### 5.    For *Brady* Claims, the Federal "Cause" and "Prejudice" Standard is Co-Extensive with the Merits Analysis.

Because of the unique nature of *Brady* claims, the analysis under "cause" and "prejudice" is identical to the constitutional merits analysis.  *See Banks*, 540 U.S. at 691 ("Thus, if Banks succeeds in demonstrating "cause and prejudice," he will at the same time succeed in establishing the elements of his Farr Brady death penalty due process claim.").  This is because, as to *Brady* claims, the "cause" for excusing the procedural default mirrors the constitutional violation – the suppression of exculpatory evidence.  Further, the actual prejudice arising from the constitutional violation (the suppression) mirrors the materiality standard under *Brady*.  This construct is unique to *Brady* claims; for other constitutional violations, such as *Batson*, *Edwards* or *Caperton v. Massey*, the prejudice does not come from the evidence of the constitutional violation, but from the effect of the

violation on the trial itself (improper jury strikes, improperly admitted statements, or the biased tribunal).

## C.   STANDARDS FOR DISCOVERY OR AN EVIDENTIARY HEARING

### 1.   Standard for Discovery.

The rules governing federal habeas corpus proceedings permit a petitioner to utilize the discovery process of the Federal Rules of Civil Procedure "to the extent that the judge in the exercise of his discretion and for good cause shown grants leave to do so."  Rules Governing § 2255 Proceedings for the United States District Courts, Rule 6.  According to the commentary to Rule 6:

> where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.

*id*.; *accord East v. Scott*, 55 F.3d 996 (5th Cir. 1995); *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991) (quoting *Harris v. Nelson*, 394 U.S. 286, 300).  This rule recognizes that Mr. Waldrip need only demonstrate that the facts, if developed, *may* show that he is illegally confined.  *See Bracy v. Gramley*, 520 U.S. 899, 908-909, 117 S.Ct. 1793, 1799 (1997).  "Petitioner need not show that the additional discovery would definitely lead to relief.  Rather, he need only show good cause

that the evidence sought would lead to relevant evidence regarding his petition." *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000).[3]

In addition, in order to obtain discovery, Mr. Waldrip does not need to demonstrate that he would be entitled to an evidentiary hearing. *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997) (discovery is available "regardless of whether there is to be an evidentiary hearing"); *Payne*, 89 F. Supp. 2d at 970.[4]  "Indeed, the Supreme Court has noted with approval the Advisory Committee's suggestion that there may be instances in which discovery prior to an evidentiary hearing would be beneficial and might obviate the need for such a hearing." *Payne*, 89 F. Supp. 2d at 970 (citing *Blackledge v. Allison*, 431 U.S. 63, 81 (1977)).

### 2.    Standard for an Evidentiary Hearing.

A habeas petitioner is "entitled to careful consideration and plenary processing of (his claim), including full opportunity for presentation of the relevant facts." *Blackledge v. Allison*, 431 U.S. 63, 83-84 (1977).  An evidentiary hearing is required on all non-record based claims if the petition:  (1) alleges facts, which if true, would entitle the petitioner to relief; (2) a full and fair hearing was not held in the state court; and (3) there are no procedural obstacles to the federal court's

---

[3]    The resolution of the *merits* of the claim would follow the completion of the discovery being sought, as in any civil litigation.

[4]    The standard for obtaining discovery laid out in Rule 6 is substantially less onerous than the evidentiary hearing standard of § 2254(e).

review.  *Id.*; *Townsend v. Sain*, 372 U.S. 293 (1963); *Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002).

In determining whether a petitioner has raised cognizable claims that would entitle him to relief, "the court must accept petitioner's alleged facts as true and determine whether he or she has stated a valid claim."  *Buenoano v. Singletary*, 963 F.2d 1433, 1439 (11th Cir. 1992); *accord*, *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1993); *Agan v. Dugger*, 835 F.2d 1337, 1339 (11th Cir. 1987); *Porter v. Wainwright*, 805 F.2d 903, 933 (11th Cir. 1986).  If the Court finds that the claim is cognizable and facts are in dispute, the question of whether an evidentiary hearing is mandatory turns on whether a full and fair hearing on the issue was conducted in the state courts.  *Townsend*, 372 U.S. at 312-13; *Buenoano*, 963 F.3d at 1439; *Agan*, 835 F.2d at 1339.

The amendments to the federal habeas statute under the Anti-Terrorism & Effective Death Penalty Act of 1996 did not restrict the ability of the district courts to hold evidentiary hearings, except in cases where petitioners failed to develop facts in state court and cannot satisfy the statutory requirements for excusing the default.  In those instances, evidentiary hearings are precluded under 28 U.S.C. § 2254(e)(2).

The proper meaning of the "failed to develop" language in § 2254(e)(2) was explained by the Supreme Court in *[Michael] Williams v. Taylor*, 529 U.S. 420

(2000).  There, the Commonwealth of Virginia had argued for a strict liability

definition, *i.e.*, so long as the facts were not discovered and presented in state

court, there was necessarily a failure to develop the facts.  The Supreme Court

unanimously rejected this interpretation, instead ruling that "failed to develop"

imported a "threshold standard of diligence" such that provisions (A) and (B) of §

2254(e)(2) apply only if the petitioner was not reasonably diligent in trying to

develop the factual record in state court.  *Id*. at 433-34.  The Court explained that

"[d]iligence for purposes of the opening clause depends upon whether the prisoner

made a reasonable attempt, in light of the information available at the time, to

investigate and pursue claims in state court."  *Id*. at 435.

# SUMMARY REPORT

**IV.   THE COURT SHOULD GRANT MR. WALDRIP RELIEF BASED
ON HIS THREE CLAIMS RELATING TO HIS
UNCONSTITUTIONALLY ADMITTED CONFESSIONS [Claims 7-in
part, 8, and 9]**

**A.   INTRODUCTION**

Defendant is arrested for capital murder.  The defendant asserts that he asked

for counsel and that that request was ignored as law enforcement conducted

multiple unconstitutional and uncounseled interrogations of the accused.  The

prosecution denies the request ever took place and puts witnesses on the stand who

swear under oath that the request for counsel never occurred.  The confessions are

admitted into evidence, the defendant is convicted of murder, and the jury imposes

the death penalty.

It is only in state habeas discovery that petitioner's counsel learns that there

was documentary proof of petitioner's unambiguous request for counsel in the

prosecution's files, at counsel table during the trial, in a document used by the

prosecution to prepare for trial.

Confronted with this disclosure that the state's witnesses had misled the

Court at a suppression hearing, the Respondent has argued that the document that

proves that point is mere hearsay and should be ignored, notwithstanding its

extraordinary probative value, the Respondent's stipulation that it was admissible,

or the State's failure to produce it for six years.

Mr. Waldrip will demonstrate that any excuse for non-consideration is without merit.  But as those legal issues are addressed, Mr. Waldrip hopes that this Court will not lose sight of the fundamental violation here:  that by putting on witnesses who denied Mr. Waldrip asked for counsel and failing to disclose to Mr. Waldrip and the court that the State had documentary proof that he had requested counsel, confessions that should have been suppressed from the beginning (likely precluding the bringing of any charges against Mr. Waldrip), ended up forming the only foundation for his conviction and Mr. Waldrip's execution – unless Mr. Waldrip can persuade this Honorable Court to grant him relief from these multiple constitutional violations.

**B.     FACTUAL BACKGROUND**

Keith Evans was murdered around midnight on April 13, 1991.  The Georgia Bureau of Investigations ("GBI"), the Dawson County Sheriff's Office, and the District Attorney's Office for the Northeastern Judicial District ("DA's Office") immediately began a multi-agency investigation.  Assistant District Attorney Raymond George was placed in charge to coordinate the effort and ensure all evidence was collected in a constitutionally permissible manner.  (Deposition of Former D.A. Andrew Fuller, Doc. 9, R-156 (E.H. 11), at 3215-16 (filed 5/24/2006) [App. 2].)

**1.    Pre-Arrest Contacts With Law Enforcement (Contacts 1 and 2).**

Mr. Waldrip met with law enforcement twice before he was arrested on April 16, 1991.  Both contacts (termed Contacts 1 and 2)[5] took place on April 14, 1991.  The first was a 45-60 minute interview with law enforcement at Mr. Waldrip's home.  (Record on Interim Appeal ("ROIA"), Vol. 8, Order on Tommy Lee Waldrip's Motion to Suppress Statements, Doc. 68, Ex. P-30, at 1416 (filed 7/30/2009) [hereinafter "Suppression Order"] [App. 3].)  The second occurred at the Dawson County Courthouse and jail, where Mr. Waldrip spoke with Special Agent Jim Berry of the GBI, Officer Billy Carlisle of the Dawson County Sheriff's Office, and ADA Raymond George.  (*Id.*)  Mr. Waldrip was not under arrest or in custody at this time.  (*Id.* at 1416-17.)  During the second encounter, importantly, Mr. Waldrip told the interviewers, including Raymond George, that he wanted to speak to his lawyer.  (*Id.* at 1421, n.9.)

---

[5]    In its Suppression Order, the Trial Court identified two pre-arrest contacts (Contacts 1 and 2) and eight post-arrest contacts (Contacts 3, 3A, and 4 through 9) between Mr. Waldrip and law enforcement.  (Suppression Order, at 1415-48, P-30) [App. 3].)  The Summary Report identifies one additional post-arrest contact – the first post-arrest contact – which was termed Contact 2A in post-conviction briefing.  (Petitioner's Post-Hearing Brief, Vol. I, Doc. 9, Ex. R-260, at 25 (filed 5/24/2006) [App. 4]; Summary Report, at 22229-30, R-22 [App. 5].)

### 2. Initial Post-Arrest Contact with Law Enforcement: Mr. Waldrip's Request for Counsel (Contact 2A).

Mr. Waldrip was arrested on April 16, 1991 on an alleged probation violation. (*Id.* at 1420.) He was transported to the Dawson County jail and placed in "Maximum Security – Solitary Confinement." (Summary Report, Doc. 9, Ex. R-221 (E.H. 76), at 22243 (filed 5/24/06) [App. 5].)

During his first contact with law enforcement immediately after his arrest, Mr. Waldrip was interrogated by Sheriff Randy Chester of the Dawson County Sheriff's Office and asked for a lawyer. The State's Summary Report, prepared by ADA George, recounted:

> Around mid-afternoon [of April 16, 1991], Tommy entered the Dahlonega Probation Office. When advised of the warrant he began to get nervous, and walking, backed out of the Probation Office, mumbling to himself. As he walked out along the parking lot of the Probation Office, Chief Investigator Steve Hawk, Lumpkin County Sheriff's Office, arrived and placed Tommy Waldrip under arrest. The arrest was not resisted by Tommy. He was then transported to Dawson County jail.
>
> *Tommy was initially interviewed by Sheriff Chester. However, he asked for an attorney and the interview was terminated.*

(Summary Report, at 22230, R-221 (emphasis supplied) [App. 5].)

Eight years after his arrest and five years after his trial, conviction and sentence, Mr. Waldrip first learned in discovery in his state post-conviction proceedings that the State had this evidence corroborating his claim. (*See* Section IV.B.6.i, below.) As the Court recognizes, Mr. George has sworn in an affidavit

- 17 -

that he wrote the Summary Report and that it is accurate – Mr. Waldrip asked for a lawyer immediately after being arrested.  (*See* Affidavit of Raymond George, Docs. 70, P-35, at ¶¶ 2, 4,  (filed 7/31/09) [hereinafter "George Aff."] [App. 6].)

### 3.     Subsequent Interrogation of Mr. Waldrip (Contacts 3 through 9).

Despite Mr. Waldrip's request for counsel, no counsel was provided while the State kept him in complete isolation in a windowless cell[6] and continued to interrogate him for five days.  Mr. Waldrip's only contacts were with law enforcement personnel.  Those contacts were as follows:[7]

- •    <u>Contact 3</u> – April 16, 1991:  GBI Agent Berry initiated an interrogation of Mr. Waldrip, without providing counsel.  (Suppression Order, at 1420-21, P-30 [App. 3].)

- •    <u>Contact 3A</u> – April 17, 1991:  Sheriff Chester initiated an interrogation of Mr. Waldrip, without providing counsel and without *Miranda* warnings.  In this interrogation, Sheriff Chester undertook to intimidate Mr. Waldrip into waiving his rights and confessing by appealing to Mr. Waldrip's Christian beliefs.  (*E.g.*, Transcript of Pretrial Motions Hearing ("P.T.") (8/26/91) Vol. II, Doc. 9, Ex. R-19, at 147-48 (filed 5/24/2006) [App. 7].)  The Trial Court found Sheriff Chester committed multiple *Miranda* violations in this contact.  (Suppression Order, at 1425, P-30 [App. 3].)

- •    <u>Contact 4</u> – April 18, 1991, 7:00 a.m.:  After a sleepless night, Mr. Waldrip told his jailer, Ann Martin, that he had decided he wanted to

---

[6]    *See* P.T. (8/26/91) Vol. II, at 181-87, R-19 (testimony of Ann Martin, the jailer) [App. 7].)

[7]    A chart of all of Mr. Waldrip's contacts with law enforcement is included as Exhibit 142 in the Appendix.

talk to Sheriff Chester.  Ms. Martin did not provide *Miranda* warnings and did not question Mr. Waldrip.  (*Id.* at 1427-29.)

- • Contact 5 – April 18, 1991, 8:30 a.m.:  Sheriff Chester followed up with Mr. Waldrip, communicating again without providing any warnings or affording counsel.  (*Id.* at 1430-31.)  Sheriff Chester testified that Mr. Waldrip's communication was a continuation of the discussion the night before.  (P.T. (8/26/91) Vol. II, at 154, R-19 (emphasis supplied) [App. 7].)  The Trial Court found Sheriff Chester committed multiple *Miranda* violations in this contact.  (Suppression Order, at 1432-34, P-30 [App. 3].)

- • Contact 6 – April 18, 1991, 10:10 a.m.:  After Sheriff Chester left Mr. Waldrip, he called the District Attorney's office and instructed ADA Raymond George to have a GBI agent interrogate Mr. Waldrip.  (P.T. (8/26/91) Vol. II, at 155-56, R-19 [App. 7].)  The Trial Court found that GBI Agent Attaway and ADA George initiated this contact.  (Suppression Order, at 1436-37, P-30 (emphasis supplied) [App. 3].)  During this interrogation, Mr. Waldrip signed a *Miranda* waiver and made his first inculpatory statement.  Agent Attaway testified he was not aware that Mr. Waldrip had previously requested counsel when he began questioning.  (P.T. (8/26/91) Vol. II, at 196-7, R-19 [App. 7]; P.T. (8/27/91) Vol. I, Doc. 9, Ex. R-20, at 67-68 (filed 5/24/2006) [App. 8].)  ADA George, however, who authored the Summary Report, knew of the request.

- • Contact 7 – April 18, 1991, 9:45 p.m.:  At John Mark's request, Agent Attaway and ADA George drove him to the Dawson County jail, where he met with his father, Mr. Waldrip.  No interrogation took place. (Suppression Order, at 1444, P-30 [App. 3].)

- • Contact 8 – April 19, 1991, 1:15 p.m.:  Agent Attaway and Sheriff Chester interrogated Mr. Waldrip again.  Mr. Waldrip again signed a *Miranda* waiver and made the second of his inculpatory statements during this session.  (*Id.* at 1445.)

- • Contact 9 – April 22, 3:45 p.m.:  Agent Attaway and Sheriff Chester interrogated Mr. Waldrip for the final time.  Again, Mr. Waldrip signed a *Miranda* waiver and made the third of his inculpatory statements during this session.  (*Id.* at 1446.)

Immediately after this last contact, Mr. Waldrip was taken before a

magistrate for an appearance hearing, where Mr. Waldrip renewed his request for

counsel.  (Summary Report, at 22243, R-221 [App. 5]; ROIA, Vol. 3, State's

Response to Motion to Suppress, Doc. 9, Ex. R-1, at 454 (filed 5/24/2006)

[hereinafter "State's Response to Motion to Suppress"] [App. 9].)  Mr. Waldrip

was first provided with a lawyer on April 25, 1991, nine days after his arrest, nine

days after his request for one.  (ROIA, Vol. 1, Order Appointing Attorneys dated

April 25, 1991, Doc. 9, Ex. R-1, at 23 (filed 5/24/2006) [App. 10].)

### 4.    Motion to Suppress and Trial Court Rulings.

Mr. Waldrip's pre-trial proceedings were conducted jointly with his two co-

defendants:  his son John Mark Waldrip and his brother-in-law Howard Kelly

Livingston.

### i.    Tommy Lee Waldrip's Motion to Suppress

On May 10, 1991, Mr. Waldrip moved to suppress his post-arrest statements

for several reasons including that he was too mentally ill to waive his *Miranda*

rights and that he had requested counsel and had been interrogated in violation of

*Edwards v. Arizona*, 451 U.S. 477 (1981).  (ROIA, Vol. 1, Defendant's Motion to

Suppress Statements, Doc. 9, Ex. R-1, at 68-74 (filed 5/24/2006) ("Rather than

waiving his rights, Defendant requested to see an attorney.  The police officers

ignored this request.") [hereinafter "Motion to Suppress Statements"] [App. 11].)

On August 26, 1991, the day the Trial Court had scheduled an evidentiary

hearing on this motion, the Prosecution filed a response flatly denying that Mr.

Waldrip requested counsel after he was arrested.  (State's Response to Motion to

Suppress, at 450-493, R-1 [App. 9].)

The Trial Court held two days of hearings on the Motion to Suppress.[8]  At

the hearing, the Prosecution called as witnesses, among others, former ADA

Raymond George,[9] Sheriff Chester, and GBI Special Agent Tim Attaway.  The

State limited Mr. George's testimony to his pre-arrest interview with Mr. Waldrip

on April 14 (Contact 2), and did not ask Mr. George about the substance of any

subsequent contact even though Mr. George had participated in Contact 6.  (P.T.

(8/26/91) Vol. II, at 134-140, R-19 [App. 7].)

The State next called Sheriff Chester to testify about his contacts with Mr.

Waldrip.  (*Id.* at 141.)  Sheriff Chester testified to interviewing Mr. Waldrip at his

---

[8]     Near the start of the proceedings, Mr. Waldrip's counsel asked to postpone the hearing on
the voluntariness of Mr. Waldrip's inculpatory statements.  He was uncomfortable with
Mr. Waldrip's desire to testify and did not have an expert to evaluate Mr. Waldrip's
mental health.  P.T. (8/26/91) Vol. I, Doc. 9, Ex. R-18, at 12 (filed 5/24/06) [App. 12].)
On July 10, 1992, as agreed, the hearing resumed and Mr. Waldrip's former counsel
presented the testimony of an expert, Dr. Currie, concerning Mr. Waldrip's mental
condition.  (*See* P.T. (7/10/92), R-37 [App. 13]; Suppression Order, at 1419 n. 7, P-30
[App. 3].)

[9]     Between the investigation and the suppression hearing, Raymond George left the District
Attorney's Office and entered private practice.  (*See* Petitioner's Motion for
Reconsideration, Exhibit C (Testimony of Raymond George at H.K. Livingston Trial),
Doc. 9, Ex. R-290, at 4117 (filed 5/24/2006) [hereinafter Raymond George Testimony]
[App. 14].)

home on April 14, 1991 (Contact 1) and that his next contact with Mr. Waldrip was on April 17, 1991 (Contact 3a) when he appealed to Mr. Waldrip's Christian beliefs.  (*Id.* at 142-149.)  Sheriff Chester's testimony regarding Contact 3a was the first time that contact came to light; it had not been identified or discussed in the State's <u>Response to the Motion to Suppress</u>.  (*See* Suppression Order, at 1415 n.2, P-30 [App. 3]; State's Response to Motion to Suppress, at 450-493, R-1 [App. 9].).

Sheriff Chester then testified to his contact with Mr. Waldrip on April 18, 1991 (Contact 5).  (P.T. (8/26/91) Vol. II, at 149-158, R-19 [App. 7].)  Mr. Brannon next cross-examined Mr. Chester regarding Contacts 1, 3a and 5.  (*Id.* at 158-173.)  The State decided not to re-direct Sheriff Chester, he was excused and the State called Jailer Anne Martin to testify regarding Contact 4.  (*Id.* at 173-74.)  However, after Jailer Martin had finished being cross examined, the State recalled Sheriff Chester to the stand, but only after Sheriff Chester had a discussion with ADA Darragh at the prosecutor's table.  (*Id.* at 190-93.)  While the trial court sustained the State's objection and prevented Mr. Brannon from inquiring into the contents of that conversation (*id.* at 192), DA Fuller only asked two curious questions of Sheriff Chester:

> DA Fuller:  Did you have occasion to know the Defendant Tommy Lee Waldrip had, at any time, mentioned the word "lawyer," to any other investigator that was involved in this case?
>
> Sheriff Chester: No, I did not.

| | |
|---|---|
| DA Fuller: | On the occasion where you had the opportunity to see him on April 18th, 1991 at 8:30 a.m. or approximately that time, did you at that time have any knowledge that Defendant Tommy Lee Waldrip had used the word, "lawyer," in reference to any other law enforcement officer involved in the investigation of this case? |
| Sheriff Chester: | No.  I was not aware of that. |

(*Id.* at 191-92.)

Finally, Special Agent Attaway testified to his three interrogations of Mr.

Waldrip, Contacts 6, 8 and 9.  (*Id.* at 195-211; P.T. (8/27/91) Vol. I, at 15-18, 19-

24, R-20 [App. 8].)  As to whether Mr. Waldrip had asked for counsel, former DA

Fuller elicited this testimony:

| | |
|---|---|
| DA Fuller: | At this time period [April 18] were you aware, did you have any knowledge of any occasion within which Defendant Tommy Lee Waldrip had made a request for a lawyer or mentioned he had made a request for a lawyer? |
| SA Attaway: | No, sir, I hadn't. |
| DA Fuller: | Or even mentioned the word, "lawyer?" |
| SA Attaway: | No, sir, I had not. |
| DA Fuller: | Okay. |
| SA Attaway: | As far as my involvement with the investigation, I hadn't had much contact.... |

(P.T. (8/26/91) Vol. II, at 196-97, R-19 [App. 7].)

During the entire hearing, neither the witnesses nor the State confirmed Mr.

Waldrip's request for counsel and, in fact, Sheriff Chester denied the contact ever

took place.  (P.T. (8/26/91) Vol. II, at 145, R-19 (p. 145: Q:  [Can] you tell the

Court when was the next occasion you had . . . . the opportunity to have any

contact with Defendant Tommy Lee Waldrip?  A: It was on the 17th day of April.")

[App. 7].)[10]

### ii.    Trial Court's Order on Tommy Lee Waldrip's Motion to Suppress.

The Trial Court ruled on the Motion to Suppress on June 29, 1993.  The

Trial Court found that in his two identified interrogations, Contacts 3A and 5

(Contact 2A at the time remained concealed), Sheriff Chester had plainly violated

Mr. Waldrip's rights under *Miranda* and possibly under *Mosley v. Michigan*, 423

U.S. 96 (1975).  (Suppression Order, at 1425, 1432-34, P-30 [App. 3].)  The Trial

Court ruled, however, that these violations did not taint the State's three

subsequent interrogations, Contacts 6, 8 and 9.  (*Id.* at 1440-42, 1446, 1447-48.)

Based on Mr. Attaway's testimony regarding these three contracts and Mr.

Waldrip's executed *Miranda* waiver certificates, the trial court found that Mr.

Waldrip had waived his *Miranda* rights and Mr. Waldrip's inculpatory statements

---

[10]    Not only did this testimony directly contradict the Summary Report, but without knowledge that the contact took place, defense counsel was prevented from asking what happened during it or if Mr. Waldrip invoked his right to counsel.

during these sessions were therefore admissible at trial. (*Id.* at 1430 n.13.) In reaching this conclusion the Trial Court found, as the State had represented and its witnesses had sworn, that Mr. Waldrip did not request counsel after being arrested.[11] (*Id.* at 1420-48.)

### 5.     Interim Appeal, Trial and Direct Appeal.

On interim appeal to the Georgia Supreme Court, Mr. Waldrip challenged the Trial Court's ruling that his inculpatory statements were voluntarily made, arguing that he was too mentally ill to waive his *Miranda* rights. (*See* Brief of Appellant on Interim Appeal, Doc. 9, R-2, at Part Four Argument and Citations of Authority (filed 5/24/06) [App. 15].) The Georgia Supreme Court affirmed that the statements were voluntary. *Livingston v. State*, 444 S.E.2d 748, 753-754 (Ga. 1994) ("*Waldrip I*").

The three co-defendants returned to the Trial Court and Mr. Waldrip was tried first after his competency hearing. Without any physical evidence or eyewitnesses, the Prosecution hinged its case entirely on Mr. Waldrip's confessions. As ADA Darragh summed up in closing:

> [Y]ou will remember that [statement to GBI Special Agent Attaway] collectively better than I when it's all over and done with, and at the end, *that statement to Tim Attaway will come out more strongly than anything you've ever seen in connection with all of this case* . . .

---

[11]     The Trial Court also found that, notwithstanding Mr. Waldrip's mental condition, Mr. Waldrip's confessions were made voluntarily and had not been coerced. (*Id.*)

(Transcript of Trial Proceedings ("T.T.") Vol. XVII, Doc. 9, Ex. R-62, at 3284

(filed 5/24/2006) (emphasis supplied) [App. 17]; *see also id.* at 3173-3190, 3231-

3286 (relying almost entirely on confessions) [App. 17].)

At trial, ADA George testified that he was in charge of the investigation and

described its scope and breadth as well as his contacts with Mr. Waldrip.  (T.T.

Vol. XII, Doc. 9, Ex. R-57, at 2380-81, 2388-89 (filed 5/24/2006) [App. 18].)  Mr.

Waldrip's statements, including the "*Miranda* Forms" he signed during the

uncounseled interrogations, were admitted at trial through Special Agent Attaway.

(T.T. Vol. XIII, Doc. 9, Ex. R-58, at 2713-15 (filed 5/24/2006) [App. 19].)  Special

Agent Attaway sat at the prosecution table assisting ADA Darragh throughout the

trial.  (Deposition of Tim Attaway, Doc. 9, Ex. R-157 (E.H. 12), at 3449-53

(internal pp. 193-196) (filed 5/24/2006) [hereinafter "Attaway Dep."] [App. 20].)

The defense argued that the jury should not believe Mr. Waldrip's

statements because (1) Mr. Waldrip was mentally ill, as evidenced by the

inconsistency and unreliability of what he reportedly said, and (2) by making these

suspect confessions, Mr. Waldrip was taking the blame for his son.  (T.T. Vol.

XVII, at 3190-3213, R-62 [App. 17].)  Thus, in the guilt stage of the trial, the

primary defense focused on attacking the credibility of the custodial statements.

(*Id.*)

On October 26, 1994, the jury convicted Mr. Waldrip.  (*Id.* at 3334-42.)  At the sentencing stage, the only additional evidence the State introduced was proof of a prior non-violent conviction.  (T.T. Vol. XVIII, Doc. 9, R-63, at 3493-3508 (filed 5/24/06) [App. 16].)  Thus, the primary evidence the State relied upon in asking the jury to sentence Mr. Waldrip to death were his custodial statements.  (*Id.*)  The jury sentenced Mr. Waldrip to death two days later.  (*Id.* at 3556.)  The Georgia Supreme Court affirmed Mr. Waldrip's conviction and the United States Supreme Court denied his petition for certiorari.  *Waldrip v. State*, 482 S.E.2d 299 (Ga. 1997), *cert. denied*, 522 U.S. 917 (1997).

### 6.    State Post-Conviction Proceedings

### i.    Discovery of the Summary Report

After timely filing his initial Petition for Writ of Habeas Corpus in state court on March 17, 1998, Mr. Waldrip began to undertake discovery (State Application and Petition for Writ of Habeas Corpus, Doc. 9, Ex. R-77 (filed 5/24/2006) [App. 21].)  Pursuant to Open Records and discovery requests, the Prosecution produced the Summary Report drafted by ADA George, which disclosed for the first time confirmation that Mr. Waldrip had asked for counsel moments after he was arrested – and that the State knew this even as it presented witnesses who testified to the contrary.  (*See* Section IV.B.2, above (quoting Summary Report, at 22230, R-221.)

Multiple consistent copies of the Summary Report, both handwritten and typed on the District Attorney's Office's official stationery, were located in both in the DA's Office's files and at other law enforcement agencies. (Summary Report, at 22596-639 (handwritten copy) [App. 145], 22222-43 (copy on official stationery), R-221 [App. 5]; Evidentiary Hearing ("E.H."), Vol. 21, Doc. 9, Ex. R-166, at 5836-68 (filed 5/24/2006) (copy provided to Forsyth County Sheriff Department) [App. 22]; E.H., Vol. 29, Doc. 9, Ex. R-174, at 8533 (filed 5/24/2006) (copy in Special Agent Attaway's Trial Binder) [App. 23].)  In the state post-conviction proceedings, ADA Darragh testified that he had read the Summary Report and used it to prepare for trial.  (Deposition of Lee Darragh, Doc. 9, Ex. R-152 (E.H. 7), at 2107 (filed 5/24/2006) [hereinafter "Darragh Dep."] [App. 25].) Likewise, Special Agent Attaway testified that he used an annotated copy of the Summary Report as a reference at trial.  (Attaway Dep., at 3285-86, 3458-59 (internal pp. 28-29, 201-02), R-157 [App. 20]; E.H. Vol. 29, Doc. 9, R-174, at 8533 (filed 5/24/06) (Special Agent Attaway's Trial Binder) [App. 23].)

ADA Darragh testified that he withheld the Summary Report from Mr. Waldrip's counsel as work product (Darragh Dep., at 2107, R-152 [App. 25]), and Mr. Waldrip's former counsel, Mr. Brannon, gave a sworn statement that he never saw the Summary Report before it was produced during the state post-conviction

proceedings.  (Affidavit of J. Richardson Brannon, Doc. 9, Ex. R-147, at 140-41, 145-46 (filed 5/24/2006) [hereinafter "Brannon Aff."] [App. 26].)

**ii.   Evidentiary Hearing in State-Post Conviction.**

On April 29, 2002, Judge James held an evidentiary hearing on Mr. Waldrip's state habeas petition.  Prior to the evidentiary hearing, Mr. Waldrip and Respondent entered into a stipulation for the admission of the Summary Report along with all other Documents from the District Attorney's Office's files.  The Stipulation read:

> Both Petitioner and Respondent wish to streamline the Evidentiary Hearing and not waste the Court's time and resources by arguing unnecessarily over the admissibility of evidence, including documents.
>
> *   *   *
>
> The Parties agree that the entire record (the "Underlying Record") in the underlying criminal case captioned *State v. Tommy Lee Waldrip*, Criminal Action No. 91-CR- 300-C (the "Underlying Trial"), is admissible in the Evidentiary Hearing including, but not limited to, any and all sealed portions and the entire file of the District Attorney's Office of the Northeastern Judicial Circuit in the Underlying Trial that was filed with the Dawson County Court pursuant to Judge Girardeau's orders on April 25, 2001 and July 12, 2001 (the "DA Case File").

(Stipulation and Order Between Petitioner and Respondent Regarding the Admissibility of Documents at the Evidentiary Hearing filed April 16, 2002, Doc. 51, Ex. P-3, at 1-2 (filed 8/28/2008) [hereinafter "Stipulation Order on Admissibility (4/16/02)"] [App. 27].)  Judge James approved the Stipulation.  (*Id.*

at 8.)  Following the evidentiary hearing, Mr. Waldrip and Respondent filed post-hearing briefs,[12] and Judge James took the petition under advisement.

### iii.    Judge James' Order Denying Relief.

On June 8, 2004, Judge James issued his ruling.  While Judge James found that Mr. Waldrip had requested counsel immediately after his arrest, he noted that "Petitioner, himself, was aware that he had told law enforcement that he wanted to speak to an attorney."  As a result, he gave no weight to the Summary Report or the fact that it had been withheld from Mr. Waldrip, his former counsel and the Trial Court, and accordingly denied Mr. Waldrip relief on all claims.  (State Order Denying Petition for Writ of Habeas Corpus, Doc. 9, Ex. R-267, at 7 (filed 5/24/2006) [hereinafter "Order Denying Relief"] [App. 28].)

### 7.    Appeal to Georgia Supreme Court.

Mr. Waldrip timely moved for a Certificate of Probable Cause to Appeal to the Georgia Supreme Court.  The Georgia Supreme Court granted an appeal on two questions, one of which was "whether the habeas court erred in denying Waldrip's evidence suppression claims."  (State Order Granting Application for

---

[12]     These briefs consist of:   (1) Mr. Waldrip's Post-Hearing Brief in Support of Amended Petition for Writ of Habeas Corpus (Doc. 9, R-260 - R-262) (2) Respondent's Post-Hearing Brief (Doc. 9, R-263) (3)  Mr. Waldrip's Post-Hearing Reply Brief in Support of Amended Petition for Writ of Habeas Corpus (R-264 to R-265); and (4) Respondent's Supplemental Brief (Doc. 9, R-266)All of these briefs were filed on the Federal Docket on May 24, 2006 as Docket Entry Number Nine.

Certificate for Probable Cause to Appeal, May 9, 2005, Doc. 9, Ex. R-280 (filed

5/24/2006) [hereinafter "May 9, 2005 Order"] [App. 29].)  On October 12, 2005,

the Georgia Supreme Court affirmed the trial court's denial of relief.  *Waldrip v.*

*Head*, 620 S.E.2d 829, 833 (Ga. 2005).

###### C.   THE STATE VIOLATED MR. WALDRIP'S RIGHTS UNDER *EDWARDS* AND HIS CONFESSIONS SHOULD HAVE BEEN SUPPRESSED.

####### 1.   Once a Defendant Unambiguously Requests Counsel All Interrogation Must Cease and Any Statements from Subsequent Interrogations Are Inadmissible.

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), a defendant in custody

must be informed of his right to remain silent and his right to have a lawyer.  Law

enforcement officials must "scrupulously honor" a suspect's assertion of the right

to stand silent and must refrain from questioning him further concerning the crime

for which he invoked the right.  *Michigan v. Mosley*, 423 U.S. 96, 103 (1975);

*Miranda*, 384 U.S. at 473-74.  Likewise, if a suspect asserts his right to counsel,

law enforcement officials must cease *all* questioning until he is provided a lawyer.

*Edwards*, 451 U.S. at 484-85; *Miranda*, 384 U.S. at 474-75.  Any subsequent

statements are inadmissible unless the suspect simultaneously initiates the contact

with law enforcement and knowingly and intelligently waives his right to counsel.

*Edwards*, 451 U.S. at 486 n.9; *see also Minnick v. Mississippi*, 498 U.S. 146, 150-

51 (1990).

## 2.   The State Violated Mr. Waldrip's Rights Under *Edwards*.

To make out an *Edwards* violation, Mr. Waldrip must show that:  (1) he requested counsel; (2) he did not subsequently waive that right; and (3) his subsequent incriminating statements were made in the course of custodial interrogation.  Mr. Waldrip can readily meet these requirements.

### i.   Mr. Waldrip Unambiguously Requested Counsel Immediately After Being Arrested.

From the outset, Mr. Waldrip contended that following his arrest he had asked for a lawyer and the State had ignored him.  (Motion to Suppress Statements, at 68-74, R-1 [App. 11].)  The Summary Report[13] that the State withheld confirms Mr. Waldrip's assertion.  (*See* Section IV.B.2, above (citing Summary Report, at 22230, R-221.)

This post-arrest request was fully consistent with Mr. Waldrip's expressed desire prior to his arrest to speak with a lawyer.  (*See* Suppression Order, at 1421 n. 9, P-30 [App. 3].)  Mr. Waldrip told law enforcement officials on April 14, 1991, that he did not want to speak with them further without a lawyer.  (*See* Section IV.B.1, above (Contact 2).)  While Mr. Waldrip was not then in custody, as Chief

---

[13]   The Court has raised the question whether it can consider the Summary Report in this proceeding.  (*See* March 31 Order, Doc. 40 [App. 1].)  It can and it must.  The report is not only admissible under the Federal Rules of Evidence that apply in these proceedings, *see* FRE 1101(e), but the Georgia Supreme Court's ruling was without substantial support and objectively unreasonable.  Mr. Waldrip addresses these points in detail at Section IV.F.1-2, below.

Justice Rehnquist noted in *Michigan v. Harvey*, 494 U.S. 344, 350 (1990),

"suspects who assert their right to counsel are unlikely to waive that right

voluntarily in subsequent interrogations."  The Summary Report affirms that Mr.

Waldrip did exactly what one would expect after he was arrested:  he repeated his

request for a lawyer.

       Since disclosure of the Summary Report, the Respondent has not come

forward with any evidence to contradict Mr. Waldrip's request for counsel.

Indeed, *the Respondent has not denied that Mr. Waldrip requested counsel post-*

*arrest.*[14]  *See Haynes v. Washington*, 373 U.S. 503, 510 (1963) ("We cannot but

attribute significance to the failure of the State, after listening to the petitioner's

direct and explicit testimony, to attempt to contradict that crucial evidence; this

testimonial void is the more meaningful in light of the availability and willing

cooperation of the policemen who, if honestly able to do so, could have readily

---

[14]    Having now produced the Summary Report, the Respondent is careful not to deny that Mr. Waldrip asked for a lawyer after his arrest.  Respondent instead argues that Mr. Waldrip did not assert this request at the suppression hearing.  (*See* Respondent's Post-Hearing Brief, Doc. 9, Ex. R-263, at 150 n.42 (filed 5/24/2006) [App. 31]; *see also* Brief of Appellee/Respondent in Opposition to Certificate of Probable Cause, Doc. 9, Ex. R-284, at 13 n.13 (filed 5/24/2006) ("Prior to the habeas hearing, Petitioner never asserted that he requested counsel during a contact with Sheriff Chester as he now claims. Instead, Petitioner asserted that he invoked his right to counsel during his pre-arrest conversation with Agent Berry.  As previously argued on appeal, the only time Petitioner invoked his right to counsel was during the April 14, 1991 noncustodial interview with Agent Berry and Sheriff Chester.") [App. 32].)  But, this, too, is incorrect. (*See* ROIA, Vol. I, Defendant's Motion to Suppress Statements, Doc. 9, Ex. R-1, at 68-74 (filed 5/24/2006) [App. 11].)

denied the defendant's claims.").  Moreover, ADA George has sworn that the

Summary Report he prepared is accurate, and that he has always believed it to be

so.  (George Aff., at ¶¶ 4, 6, P-35 [App. 6].)  There can be no doubt, then, that

Tommy Lee Waldrip duly invoked his right to counsel immediately after his arrest.

> ii.  **Mr. Waldrip Did Not Subsequently Waive His Rights.**
>
> a.  **Mr. Waldrip Never Initiated a Contact with the State in Which He Knowingly and Voluntarily Waived His Rights.**

The Trial Court identified eight contacts between the State and Mr. Waldrip

that occurred after his arrest and his request for counsel.  (*See* Section IV.B.1-3,

above (citing Suppression Order, at 1420-48, P-30 [App. 3]).)  In the state post-

conviction proceedings and in these proceedings, neither Mr. Waldrip nor

Respondent has proffered any additional evidence concerning Mr. Waldrip's post-

arrest dealings with the State.  Accordingly, the Trial Court's findings in its

Suppression Order are the starting point for analyzing whether Mr. Waldrip

subsequently waived his right to counsel within the meaning of *Edwards*.[15]

Of the eight contacts identified by the Trial Court, only six were determined

to be interrogations and to implicate Mr. Waldrip's Fifth, Sixth and Fourteenth

---

[15]  Mr. Waldrip has proffered additional evidence of his severe mental illness in connection with the question regarding whether any waiver he may have made was knowing and voluntary.  This particular voluntariness issue is addressed in Volume I of this Brief, at IX.

Amendment due process rights.  (Suppression Order, at 1420-27, 1430-45, 1446-48, P-30 (discussing Contacts 3, 3A, 5, 6, 7 and 9) [App. 3].)  The State initiated five of these six, specifically, Contacts 3, 3A, 6, 7, and 9.  Since *Edwards* holds that once an accused invokes his right to counsel, he cannot waive it unless *he* initiates the interrogation, 451 U.S. at 484-85 ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."), none of these five State-initiated interrogations could give rise to a waiver under *Edwards*.

The Trial Court found that Mr. Waldrip initiated Contact 5 on April 18, 1991:  Mr. Waldrip had asked to see Sheriff Chester and Contact 5 occurred when Sheriff Chester came in response.  (*See* Section IV.C, above (citing Suppression Order, at 1425, 1432-34, P-30 [App. 3]).)  But the Trial Court also specifically found that Mr. Waldrip did not knowingly and voluntarily waive his rights during Contact 5:  Sheriff Chester failed to provide any *Miranda* warnings and the Trial Court ruled that virtually the entire contact was inadmissible.  (*Id.*)  *Edwards* holds that without both initiation *and* a knowing waiver, an accused who has requested a lawyer does not forfeit his right to one.  451 U.S. at 486 n.9.

During his next contact with the State (Contact 6), an interrogation by Special Agent Attaway and ADA George beginning at 10:10 a.m. the same day,

Mr. Waldrip *was* advised of his rights and signed a *Miranda* Waiver Form.
(Suppression Order, at 1436-37, P-30 (emphasis supplied) [App. 3].)  However, the
Trial Court explicitly found that this was a separate interrogation that was initiated
by the State.[16]  (Suppression Order, at 1436-37, P-30 ("*[t]his contact was initiated
by Agent Attaway*, who went to the Dawson County jail to interview [Mr.
Waldrip]. … Agent Attaway introduced himself to [Mr. Waldrip] and asked [Mr.
Waldrip] if he wanted to talk to him and Mr. George; [Mr. Waldrip] stated that he
did.") [App. 3].)

Because Mr. Waldrip did not initiate the "further communication,
exchanges, or conversations with the police" that comprise Contact 6, that
interrogation violated his rights under *Edwards*.  451 U.S. at 484-485.  While the
State might attempt to pair Mr. Waldrip's initiation of Contact 5 with his signing of
a waiver form in Contact 6, such an argument would be unavailing.  Sheriff
Chester's response to the initiation was improper and unconstitutional questioning.
In short, Mr. Waldrip at no time initiated a conversation with the State where he
knowingly and voluntarily waived his rights – and thus at no time forfeited his
right to counsel.

---

[16]     After Sheriff Chester left Mr. Waldrip, he testified that he radioed the District Attorney's
Office and instructed ADA George to have a GBI agent conduct an interrogation.  (P.T.
(8/26/91) Vol. II, at 155-56, R-19 [App. 7].)

       **b.     Further, the State's Interrogations of Mr.**
               **Waldrip on April 16 and 17 Precludes Any**
               **Contention of Initiation and Waiver.**

Mr. Waldrip did ask to speak to Sheriff Chester on the morning of April 18, 1991; Contact 4 led directly to Contact 5.  But any characterization of this as a constitutionally effective "initiation" must fail because it was the by-product of a constitutionally impermissible course of interrogation.  *See Minnick v. Mississippi*, 498 U.S. 146, 150-51 (1990) (stating that a core purpose of the *Edwards* rule is to prevent law enforcement from pressing defendants and ensuring that statements obtained are not the result of coercive pressures); *United States v. Gomez*, 927 F.2d 1530, 1539 n.9 (11th Cir. 1991) (holding that "because the officers did violate *Edwards* by continuing the interrogation, an *Edwards* type of initiation was not possible.").

The State interrogated Mr. Waldrip twice between his request for counsel and when he asked to see Sheriff Chester.  After Mr. Waldrip requested counsel, Agent Berry of the GBI initiated an interrogation on April 16, 1991, at which Mr. Waldrip invoked his right to silence (Contact 3).  The next day, Sheriff Chester emotionally appealed to Mr. Waldrip, in a confrontation the Trial Court found involved multiple *Miranda* violations (Contact 3A).  (*See* Section IV.B.3, above (citing Suppression Order,  at 1425, 1432-34, P-30 [App. 3]).)

In Contact 3A, Sheriff Chester pressured Mr. Waldrip to speak to him. Sheriff Chester knew Mr. Waldrip, knew he was a religious man, and appealed to this characteristic. Thus, without reminding Mr. Waldrip of his rights, Sheriff Chester testified that he played the following card:

> Tommy, I am a Christian man, and I said, You claim to be a Christian, too. Please help me find out where Keith Evans is at because if he is somewhere, he may be starving to death. *We have got to know. I have got to relieve – help this family relieve some of their grief.*[17]

(P.T. (8/26/91) Vol. II, at 147, R-19 (emphasis supplied) [App. 7].) Sheriff Chester admitted that in foregoing warnings and taking this tack "I wasn't thinking about law enforcement, I wasn't thinking about the laws of this land. I was thinking about Keith Lloyd Evans." (*Id.* at 173.) The Sheriff's words were deliberately "calculated to pressure [Mr. Waldrip] into changing his mind about remaining silent, and into talking without counsel to his interrogators." *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (*en banc*).

The following morning, after a sleepless night, Mr. Waldrip asked to speak again with Sheriff Chester (Contact 4). When Sheriff Chester came to see him, Sheriff Chester gave no *Miranda* warnings and resumed their discussion:

---

[17]   The power of this type of speech was recognized by the United States Supreme Court in *Brewer v. Williams*, 430 U.S. 387, 407-08 (1977), where, speaking of a similar Christian Burial Speech, the Court observed "There can be no serious doubt, either, that Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as – and perhaps more effectively than – if he had formally interrogated him."

> I think I said "You need to talk to me, Tommy?"  And he said, "Yes, I
> do."  He said, "I've got to talk to you.  I've got to talk to somebody."
> I said, "Well, go ahead and talk."
>
> And he said to the fact that – his very words were, *"I can't help what
> my son has done,"* he said, *"<u>but I've got to relieve the grief of this
> family."</u>*

(P.T. (8/26/91) Vol. II, at 154, R-19 (emphasis supplied) [App. 7].)  Mr. Waldrip's

request to speak to Sheriff Chester thus stemmed directly from Sheriff Chester's

improper interrogation in Contact 3A.  Indeed, Mr. Waldrip's remarks substantially

mimicked Sheriff Chester's coercive language from the night before.

Because the Trial Court was unaware of Mr. Waldrip's unambiguous initial

request for counsel, the Trial Court had no reason to analyze whether Mr.

Waldrip's conversation with Sheriff Chester on April 18 was a constitutionally

effective initiation or the result of constitutionally impermissible police conduct.

Yet, clearly under any analysis, it was the latter.  *Minnick*, 498 U.S. at 150-151;

*Arizona v. Roberson*, 486 U.S. 675, 683, 687-88; *Harvey*, 494 U.S. at 350; *Smith v.

Illinois*, 469 U.S. 91, 98 (1984).  As the Eleventh Circuit concluded in *Gomez*:

> Although *Edwards* permits further interrogation if the accused
> initiates the conversation, the validity of this waiver logically depends
> on the accused being free from further interrogation.  In other words,
> the "initiation" must come prior to the further interrogation; initiation
> only becomes an issue if the agents follow *Edwards* and cease
> interrogation upon a request for counsel. *Once the agents have, as
> here, violated* Edwards*, no claim that the accused "initiated" more
> conversation will be heard.*

927 F.2d at 1538-39 (internal citations omitted) (emphasis supplied).  Because

Sheriff Chester and Jim Berry failed to follow the dictates of *Edwards* and *Minnick*

and stop interrogating Mr. Waldrip after he requested counsel, Mr. Waldrip's

request to see Sheriff Chester cannot be a valid and constitutionally effective

initiation.

> iii.    **Mr. Waldrip's Subsequent Inculpatory Statements Were Made in Response to Custodial Interrogation.**

The final element of Mr. Waldrip's *Edwards* claim is undisputed.  All of Mr.

Waldrip's inculpatory statements were obtained in response to custodial

interrogation.  (*See* Section IV.B.3, above (discussing Contacts 6, 8 and 9).)

Because these statements were obtained in violation of *Edwards* and its progeny,

they should not have been admitted.  Mr. Waldrip's conviction and sentence thus

violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution.

> 3.    **The State's Suppression of the Summary Report Is Cause To Excuse Mr. Waldrip's Procedural Default of *Edwards* Claim.**

This Court has ruled that Mr. Waldrip's three Request for Counsel Claims

have been procedurally defaulted and, in particular, Mr. Waldrip failed to raise his

*Edwards* claim on appeal.  (Order on Procedural Default, Doc. 40, at 10-12, 20-22

(filed 7/2/2008) (addressing Claims 7, 8 and 9) [App. 33].)  Therefore, to secure

relief Mr. Waldrip must establish "cause for the default and actual prejudice as a

result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S.

722, 750 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72 (1977); *Alderman v.*

*Zant*, 22 F.3d 1541, 1551 (11th Cir. 1994).[18]  This Court considers Mr. Waldrip's

"cause and prejudice" argument *de novo*.  *Johnson v. Mississippi*, 486 U.S. at 587

(1988); *Murray*, 477 U.S. at 489.

> i.    **The State's Failure to Disclose the Summary Report –**
> **and the Pivotal Facts It Contained – Establishes**
> **Cause to Excuse Mr. Waldrip's Procedural Default of**
> **his Request for Counsel Claims.**

It is well-established under federal law that prosecutorial suppression of

evidence is cause for failing to raise a claim in state court.  *Amadeo v. Zant*, 486

U.S. 214, 218-24 (1988) (finding cause where state suppressed memorandum

regarding jury composition); *see also Banks v. Dretke*, 540 U.S. 668, 690-91

(2004) ("[A] petitioner shows 'cause' when the reason for his failure to develop

facts in state-court proceedings was the State's suppression of the relevant

evidence."); *Crawford v. Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002) (finding

cause for default where *Brady* material first discovered in post-conviction

proceedings through the Georgia Open Records Act).

---

[18]    Mr. Waldrip continues to assert that these claims have not been procedurally defaulted
and are properly before this Court on their merits.  However, for purposes of this stage of
these proceedings, this Honorable Court's Procedural Default Order is binding.

Citing its opinion in *Strickler*, the Supreme Court in *Banks* found three factors that accounted for a determination of cause: "(a) the prosecution withheld exculpatory evidence; (b) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (c) the [State] confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received everything known to the government." 540 U.S. at 692-93. The same three factors apply here.

The Summary Report is exculpatory and was withheld. Not only did the State declare it had an Open File Policy (*see* P.T. (8/13/91), Doc. 9, Ex. R-16, at 139, 151-52, 157, 166 (filed 5/24/06) [App. 34]) but Mr. Waldrip filed numerous *Brady* motions. (*See generally*, P.T., conducted between July 12, 1991 and February 11, 1993, Doc. 9, R-14 to R-39 (filed 5/24/06).) And, the State confirmed petitioner's reliance on the Open File Policy and its compliance with Mr. Waldrip's *Brady* requests by explicitly denying that Mr. Waldrip ever asked for counsel. (*See* Brief of Appellee District Attorney on Interim Appeal, Doc. 9, Ex. R-3, at 3 (filed 5/24/2006) [App. 79].) Moreover, like the prosecution in *Banks*, the State here allowed its witnesses to mislead the trial court at the Suppression Hearing and failed to correct the record. *Banks*, 540 U.S. at 694 ("If it was reasonable for Banks to rely on the prosecution's full disclosure representation, it was also appropriate for Banks to assume that his prosecutors

would not stoop to improper litigation conduct to advance prospects for gaining a conviction.").

Given the State's obfuscation and its failure to disclose the Summary Report, it is not surprising that Mr. Waldrip failed to raise his *Edwards* claim to the Georgia Supreme Court in the face of the trial court's finding that he had not asked for counsel. Without the Summary Report or the admission of the State to the truth, Mr. Waldrip had no basis to appeal a trial court's factual finding. Yet, with it he would have taken affirmative action at the trial level, impeached the State's witnesses and shown that the State's own records confirmed his account, reflecting an early and unambiguous request for counsel, prior to his giving any inculpatory statements. The suppression of the Report and its proof of this critical fact "caused" the failure to appeal the claim and the procedural default.

> **a.   The State Cannot Excuse its Withholding of the Summary Report and its Contents as "Work Product."**

After the Summary Report was discovered in post-conviction proceedings, Mr. Waldrip's prosecutors asserted that it constituted "work product" and therefore was appropriately withheld. (Darragh Dep., at 2107, R-152 ("[I]t appears…that these documents were prepared by Raymond George. They are also attorney work product documents….") (referring to the Summary Report) [App. 25].) While portions of the report may have been work product, the State was obligated to

admit the facts it contained regarding Mr. Waldrip's request for a lawyer and the

suppression of the report still was the cause of Mr. Waldrip's procedural default.

First, statements evidencing that (a) Mr. Waldrip requested counsel and (b)

law enforcement officials understood he had done so clearly and unambiguously

are not "attorney work product." They are *facts*. And just as a client cannot

shroud facts pertinent to the case by writing them down and sending them to the

client's lawyer, the Prosecution cannot avoid producing exculpatory information

by having someone write it down, put it in the case file and then claim that the

facts are work product. *See Ford Motor Co. v. Hanley*, 196 S.E.2d 454, 457 (Ga.

App. 1973) (citing *Atlantic Coast Line R. Co. v. Daugherty*, 141 S.E.2d 112, 119

(Ga. App. 1965)). Moreover, the State could easily have fulfilled its obligation to

disclose this information without disclosing legitimate work product. The State

could have simply told the Court and the defense that Mr. Waldrip asked for

counsel or stated that it possessed a document that stated that he had. Or, the State

could have produced the report in a heavily redacted form.

Second, even if these pivotal facts could somehow be labeled "work

product," the State would still be constitutionally obligated to disclose them. The

pertinent question is whether the request for counsel was exculpatory under *Brady*.

If it were, it must be produced because a statutory privilege cannot trump a

prosecutor's constitutional duty under the Fifth and Fourteenth Amendments.

*United States v. NYNEX*, 781 F. Supp. 19, 25-26 (D.D.C. Ga. 1991).  In fact, in this case the Trial Court specifically ordered the Prosecution to produce all *Brady* information regardless of whether the information was found in the Prosecution's work product documents.[19]

> **b.     The State Cannot Excuse its Withholding of the Summary Report and its Contents on the Theory that Mr. Waldrip Knew He Had Requested Counsel.**

Respondent may also argue, as it did in state post-conviction proceedings, that the State was under no obligation to tell the Trial Court or the defense that Mr. Waldrip had invoked his right to counsel before he made any incriminating statements because Mr. Waldrip already knew that fact.

The relevant question, of course, is not what Mr. Waldrip knew.  Of course *he* knew that he had asked for a lawyer immediately after his arrest (assuming a man as mentally ill as Mr. Waldrip can be trusted to know anything).  It was on that basis that his lawyer moved to suppress the statements.  But Mr. Waldrip – a mentally ill man accused of capital murder – had virtually no credibility in

---

[19]     (*See* ROIA, Order on Motion to Require the Prosecution to Disclose Evidence Favorable to the Defendant under *Brady* and *Giglio*, dated January 16, 1992, Doc. 9, Ex. R-1 (filed 5/24/06) (ordering State to disclose any statements made by Mr. Waldrip that are known to or in the possession of the prosecution team) [App. 35]; Order on Defendant's Motion for Access to Sealed Documents dated August 1, 2001, Doc. 9, Ex. R-137 (filed 5/24/2006) (stating that the defense "correctly asserts that any *Brady* material contained in the work product documents [of the district attorney's office] should have already been provided") [App. 36].)

comparison to law enforcement officials and the prosecutors, who insisted – and swore – to the contrary.  And their false assertion that he did not ask for counsel was credited, even though the prosecutors had a document in their possession that confirmed that in fact he did ask the sheriff for a lawyer upon his arrest.  That corroborating evidence was not only clearly *Brady* material, it was dispositive of a fact of constitutional dimension.  *See United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir. 1995) (prosecution's knowledge of corroborating evidence, which confirmed defendant's own statements of what occurred during an interview, is *Brady* evidence and must be disclosed); *United States v. Biberfeld*, 957 F.2d 98, 99, 104 (3d Cir. 1992).[20]

Moreover, even if the State could excuse its conduct prior to the Suppression Hearing with the excuse that Mr. Waldrip knew he requested counsel, that pretext vanished the moment the prosecution asserted that he had not requested counsel and Sheriff Chester testified and stated that Mr. Waldrip never used the word "lawyer."  At that point the Summary Report, and the evidence it contained, gained and added dimension:  impeachment evidence of Sheriff Chester's misleading

---

[20]    To recognize the importance of this point, imagine a criminal prosecution in which the defendant asserts an alibi defense that he was in Atlanta at the time the crime took place in Valdosta.  The Respondent's position is that any evidence it collects that confirms the defendant's alibi can be withheld because, after all, the defendant knew he was in Atlanta.  The Respondent's position ignores the realities of the adversarial process and makes a mockery of both *Brady* and basic concepts of due process.

testimony. *See Napue v. Illinois*, 360 U.S. 264 (1959); *Alcorta v. Texas*, 355 U.S. 28 (1957). It provided a vital tool for cross-examining and discrediting Sheriff Chester that is different in kind from anything that Mr. Waldrip could have known, remembered or included in his testimony.

Likewise, the Prosecution failed to disclose Sheriff Chester's decision to terminate the initial interrogation, an acknowledgement that the Prosecution and he understood Mr. Waldrip's request for counsel was clear and unambiguous. This acknowledgment is critical, because it obviates any possible contention that Mr. Waldrip had not made a constitutionally effective request for counsel and destroys any assertion about the lawfulness and voluntariness of all of Mr. Waldrip's subsequent statements. Without knowing this key fact, the court could not conduct the thorough analysis of a proffered confession that *Jackson v. Denno*, 378 U.S. 368 (1964), mandates. A prosecutor's duty is to do justice, not to conceal critical, determinative facts from the defense or the courts. *Berger v. United States*, 295 U.S. 78, 88 (1935); *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963).

> **4. Mr. Waldrip Has Suffered Actual Prejudice as a Consequence of the State's Violation of His Sixth and Fourteenth Amendment Rights under *Edwards*.**

As with "cause," whether a habeas petitioner has sustained "actual prejudice" is a federal question that this Court must independently determine. *See Crowe*, 356 F. Supp. 2d at 1350. To establish actual prejudice, a habeas petitioner

must show "prejudice as a result of the *alleged violation of federal law.*"  *Coleman*, 501 U.S. at 750 (emphasis supplied).  In other words, did the violation of Mr. Waldrip's *Edwards* rights actually prejudice his trial?  To secure an affirmative answer to that question, Mr. Waldrip must persuade this Court that the alleged constitutional violation "had [a] substantial and injurious effect or influence in determining" the outcome of the proceeding.  *See Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

Here there can be no dispute that Mr. Waldrip suffered actual prejudice as a result of the State's *Edwards* violations.  The State's *Edwards* violations led to securing (and subsequent admission) of Mr. Waldrip's three confessions that were the heart of the State's case.  If these statements were inadmissible, the State could not have even tried, let alone convicted, Mr. Waldrip.  There is, consequently, far more than "a reasonable probability that if the evidence had been disclosed to the defense, the result of the proceedings would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see, e.g., White v. Lewis*, 874 F.2d 599, 603-604 (9th Cir. 1989) (finding no actual prejudice because, even if there were a violation of *Edwards*, the *admission of the statement* did not effect the outcome of the trial).

### D.  THE STATE VIOLATED MR. WALDRIP'S RIGHTS UNDER *NAPUE* BY KNOWINGLY MISLEADING THE COURT.

The State did not simply fail to provide Mr. Waldrip information that would have confirmed his request for counsel; the State affirmatively denied that he asked for a lawyer.  (State's Response to Motion to Suppress, at 450-493, R-1 [App. 9].) When the State does not just fail to disclose exculpatory evidence, but affirmatively misleads the Court and defense and deliberately misrepresents the truth, the State violates the defendant's constitutional rights.  As the United States Supreme Court said in *Berger*:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

1.    **The State Cannot Knowingly Mislead the Court and, Once It Learns It Has Misled the Court, It Is Bound to Correct the Misrepresentation.**

The State may not knowingly present false testimony and has a duty to correct testimony that it knows is false or highly misleading.  *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *United States v. Rivera Pedin*, 861 F.2d 1522, 1529-30 (11th Cir. 1988) (prosecutor's failure to correct government witness's statements known to be false constitutes reversible error); *Dupart v. United States*, 541 F.2d 1148, 1150 (5th Cir. 1976) (prosecutor has duty to correct testimony which "even though technically not perjurious, would surely be highly misleading"); *see also Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977) (stating that the duty extends to all members of the prosecution team, including law enforcement).  This prohibition applies to all lawyers in all proceedings before a tribunal.  *See* Ga. R. Prof. Conduct 3.3.  In the context of a prosecution for a capital offense, the requirement takes on a profound constitutional dimension.  The knowing presentation of false evidence in any stage of the trial violates a defendant's constitutional rights.  *Sanders v. Sullivan*, 863 F.2d 218, 221 (2d Cir. 1988).

If the Prosecution fails to obey its duty and there is any reasonable likelihood that the outcome could have been different absent the false testimony,

Mr. Waldrip is entitled to relief.  *See Agurs*, 427 U.S. at 103 ("[A] conviction

obtained by the knowing use of perjured testimony is fundamentally unfair, and

must be set aside if there is any reasonable likelihood that the false testimony could

have affected the judgment of the jury."); *Giglio*, 405 U.S. at 154; *see also Rivera*

*Pedin*, 861 F.2d at 1530; *Sanders*, 863 F.2d 218, 221.[21]

### 2.     The State Repeatedly Denied that Mr. Waldrip Requested Counsel and Hid Sheriff Chester's April 16, 1991 Interview of Mr. Waldrip.

The State never confirmed Mr. Waldrip's assertion that he requested

counsel.  Instead, the State denied it, and misled the court during the entire course

of Mr. Waldrip's pre-trial and trial proceedings on this important fact:

> 1.     The State's response to Mr. Waldrip's <u>Motion to Suppress</u> denied Mr. Waldrip requested counsel:
>
>> In paragraph number six of the Motion to Suppress Statements  filed by Defendant Tommy Lee Waldrip, the Defendant contends that there was not a valid waiver by Defendant Tommy Lee Waldrip of his constitutional rights.  Based on a review of the evidence, it is obvious that this legal position argued by Defendant Tommy Lee Waldrip must be rejected given that *the State of Georgia has submitted as evidence Waiver of Rights forms which have been executed by Defendant Tommy Lee Waldrip*

---

[21]    This is a less demanding standard than under *Brady*.  *See Stephens v. Hall*, 407 F.3d 1195, 1206 (11th Cir. 2005) ("This reasonable likelihood standard imposes a 'considerably less onerous' burden on [the petitioner] than the Brady standard."); *United States v. Alzate*, 47 F.3d 1103**,** 1110 n.7 (11th Cir. 1995) (noting that "the 'reasonable probability of a different result' standard .. is substantially more difficult for a defendant to meet than the 'could have affected' standard we apply").

> ***for each and every interview conducted by law
> enforcement*** *with Defendant Tommy Lee Waldrip which
> would qualify as a custodial statement or confession.*

(State's Response to Motion to Suppress, at 450-493, R-1 (emphasis
supplied) [App. 9].)  The response, obviously, does not mention that
Sheriff Chester's April 16, 1991 interview took place even though it
asserts that it lists every contact between Mr. Waldrip and the State.
(*Id.* at 454-56.)

2.     During the pre-trial hearing on the Motion to Suppress, Sheriff
Chester misled the court and denied that Mr. Waldrip asked for
counsel.  (*See* P.T. (8/26/91) Vol. II, at 144-45, 191-92, R-19 [App.
7].); (*see also* Section IV.B.4., above.))

3.     Sheriff Chester also stated earlier that he had had *no* contact with Mr.
Waldrip between Sunday, April 14, 1991 (Contact 1) and Wednesday,
April, 17, 1991 (Contact 3(A)).  (*Id.* at 145.)

4.     At the same hearing, Special Agent Tim Attaway made several
misleading statements to the Court.  During his direct by former DA
Fuller, Attaway represented that he was unaware of Mr. Waldrip's
asking for a lawyer when he interrogated him at 10:10 a.m. on April
18, 1991 (Contact 6).  (*See id.* at 196-97.)  Attaway repeated this
assertion during the hearing the next day, August 27, 1991. (*See* P.T.
(8/27/91) Vol. I, Doc. 9, Ex. R-20, at 16-17 (filed 5/24/06) [App. 8]).
Moreover, Attaway said that he did not know of any request for a
lawyer before the contact at 9:45 p.m. on April 18 (Contact 7), or the
interrogations at 1:15 p.m. on April 19 (Contact 8), or 3:15 p.m. on
April 22 (Contact 9).  (*See* P.T. (8/26/91) Vol. II, at 196-97, 209-10,
R-19 [App. 7]; P.T. (8/27/91) Vol. III, at 2-24, R-20 [App. 8].)

5.     During cross, Special Agent Attaway testified that Mr. Waldrip did
not "say anything about a lawyer" in response to his *Miranda*
warnings on April 18, 1991, and then testified as follows:

Mr. Brannon:          After he has done all these things he still
                      hasn't said the word, "lawyer," or "am I
                      going to benefit from anything," Mr.
                      Attaway?

| SA Attaway: | Not to me. |
|---|---|
| Mr. Brannon: | All right. Did he say that to Sheriff Chester? |
| SA Attaway: | Not that I remember. |

(P.T. (8/27/91) Vol. I, at 67-68, R-20 [App. 8].)

6. At trial, GBI Agent Jim Berry testified that he provided Mr. Waldrip with *Miranda* warnings, but he never mentioned that Mr. Waldrip had requested counsel. (T.T. Vol. X, Doc. 9, R-55, at 2075 (filed 5/24/2006) [App. 37].)

7. At trial, ADA Raymond George testified regarding Mr. Waldrip's statement on April 18th (Contact 5), but never mentioned that he had requested a lawyer. (T.T. Vol. XIII, Doc. 9, R-58, at 2641-2738 (filed 5/24/06) [App. 19].)

8. At trial, Special Agent Attaway testified about each of Mr. Waldrip's long statements and that Mr. Waldrip had voluntarily waived his right to remain silent and have a lawyer present. Special Agent Attaway testified to this even though his Trial Binder – with the Summary Report that states that Mr. Waldrip requested counsel – was at that moment in the courtroom at the Prosecution table. (*Id.* at 2682-2740; T.T. Vol. XIV, Doc. 9, R-59, at 2746-2828 [App. 132].)

9. On interim appeal, the State explicitly stated: "[Mr. Waldrip] did not invoke his fifth amendment [sic] right to counsel. . . . The pre-custodial statement did not serve as an invocation of the defendant's fifth amendment [sic] right to have counsel present during questioning." (Interim Appeal Brief of Appellee, Doc. 9, Ex. R-3, at 3 (filed 5/24/06) (emphasis in original) [App. 79].)

### 3. The State Knew Mr. Waldrip Requested Counsel After His Arrest.

Mr. Waldrip requested counsel after his arrest and at least Sheriff Randy

Chester, the person who conducted the interview, and Raymond George, the author

of the Summary Report, knew of that request immediately.  Further, both ADA

Darragh, who was the lead prosecutor during the competency hearing and the

underlying trial, and Special Agent Attaway knew of Mr. Waldrip's request for

counsel because both used the Summary Report to prepare for and during trial.

(*See* Darragh Dep., at 2107, R-152 [App. 25]; E.H. Vol. 29, at 8533, R-174

(Special Agent Attaway's Trial Binder) (annotating the very paragraph in question)

[App. 23].)

      In fact, the questions and answers provided during the Suppression Hearing

are a little too contrived to be accidental.  The most obvious examples are the two

questions posed by former DA Fuller to Sheriff Chester.  (*See* P.T. (8/26/91) Vol.

II, at 191-92, R-19 [App. 7].)  Instead of simply asking Sheriff Chester if Mr.

Waldrip ever asked for a lawyer, former DA Fuller asks if Mr. Waldrip ever

mentioned the word "lawyer" "to any *other investigator*" and if Mr. Waldrip

"use[d] the word lawyer" to "any *other* law enforcement officer."  (*Id.*)  When

compared to the evidence in the Summary Report, these questions appear

calculated to protect Sheriff Chester from having to disclose Mr. Waldrip's request

for counsel.  These questions are particularly disquieting in light of the fact that

they were posed to Sheriff Chester after he was called back to the stand and *after*

he had a secret discussion with ADA Darragh.  (*Id.* at 190-93.)

However, this is not the only anomaly in the Suppression Hearing that becomes apparent once the Summary Report surfaces and is examined.  Former DA Fuller restricts his questioning of Mr. George to only one pre-arrest contact even though Mr. George was the ADA Mr. Fuller placed in charge of the investigation to ensure that all of the evidence was collected in a constitutional manner (*see id.* at 134), and Mr. George was present for one of the most important interrogations with Mr. Waldrip:  Contact 6.  (*See id.* at 204.)  Moreover, former DA Fuller avoids the simple question with Special Agent Attaway (did Mr. Waldrip ask for counsel) and, instead, asks him if he *knew at the time of the interrogation* whether Mr. Waldrip asked for counsel.  (*See* P.T. (8/27/91) Vol. I, at 16-17, R-20 [App. 8].)  Again, in light of the now disclosed Summary Report, these questions appear couched carefully to avoid disclosure of Mr. Waldrip's request for counsel.

Of course without the benefit of the Summary Report, it is not surprising that neither the trial court nor the defense picked up on the too-clever-by-half questions posed by the State to dance around a hidden truth.

### 4.    The State Had a Duty to Correct the Misleading Evidence It Proffered.

The State had a duty to correct this false or highly misleading testimony. *See Napue*, 360 U.S. at 269-70 ("[T]he district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth").  Because the State

both presented and failed to correct untrue and highly misleading testimony, Mr.

Waldrip's due process rights were violated. "[A] deliberate deception of a court

and jurors by the presentation of known false evidence is incompatible with

rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153

(1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). This same

principle applies when the State, although not soliciting false testimony, allows

false or highly misleading testimony to go uncorrected. *Id.* (citing *Napue*, 360

U.S. at 269); *Rivera Pedin*, 861 F.2d at 1530 n.14 (citing *Dupart*, 541 F.2d at

1150).

Importantly, even if this Court does not grant Mr. Waldrip relief under

*Edwards*, it is nevertheless compelled to grant relief under *Napue* because the

perjury could have reasonably affected the outcome of the trial. It is a question for

the jury whether to believe a defendant's testimony and statements. Furthermore,

whether a defendant's statements are voluntary is also a question for the jury. *See*

*Jackson v. Denno*, 378 U.S. 368, 380-82 (1964) (finding that a jury must determine

whether the defendant's statements were voluntary). Thus, even if a court allows

custodial statements to be admitted, as the Trial Court improperly did here, the jury

can still ignore or dismiss those statements if it feels they are not credible or not

voluntary. *See id.* at 391 ("[w]hen there is a conflict of evidence as to whether a

confession is or is not voluntary, if the court decides that it is admissible, the

question may be left to the jury with the direction that they should reject the confession if upon the whole evidence they are satisfied it was not the voluntary act of the defendant").

If the jury had known that Mr. Waldrip had requested counsel and the State had failed to provide him with a lawyer, then the jury could have realized that his statements were not credible or voluntary and could not have convicted him. *See Crane*, 476 U.S. 689 (stating that the circumstances attendant to a confession are implicitly germane because they inform two separate inquires: (1) the legal issue of voluntariness; and (2) the "ultimate factual issue of the defendant's guilt or innocence"). Therefore, the Prosecution's proffer of perjured testimony is material. *Alzate*, 47 F.3d at 1110 (stating that false testimony is deemed material "if there is any reasonable likelihood that the false testimony *could have* affected the judgment of the [fact finder]") (emphasis in original).

The Court should also grant relief because Mr. Waldrip was entitled to highlight the misleading testimony so that the jury could properly assess the credibility of the witnesses. *Napue*, 360 U.S. at 269 ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.").

**5.**   **Mr. Waldrip Has Suffered Actual Prejudice as a Consequence of the State Knowingly Misleading the Court and, Thus, the Court Can Reach the Merits of Mr. Waldrip's *Napue* Claim.**

The State's suppression of the Summary Report acts as cause for Mr. Waldrip's procedural default of his *Napue* claim.  (*See* Section IV.C.3 above.)  In fact, it is through the belatedly produced Summary Report that Mr. Waldrip learned that the State *knew* it was presenting false and misleading testimony.

That Mr. Waldrip suffered actual prejudice by the State's knowing use of false and misleading testimony is obvious.  The State's misrepresentations and knowing and uncorrected use of false and misleading testimony went to the heart of the case:  the admissibility and credibility of Mr. Waldrip's confessions.  Thus, the State's misconduct "had [a] substantial and injurious effect or influence in determining" the outcome of Mr. Waldrip's suppression hearing and his trial.  His conviction and sentence, accordingly, cannot stand.

**E.    THE STATE VIOLATED MR. WALDRIP'S RIGHTS UNDER *BRADY* BY SUPPRESSING THE SUMMARY REPORT.**

"There are three components of a true *Brady* violation:  [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  *Strickler v.*

*Greene*, 527 U.S. 263, 281-282 (1999).[22]  The first two elements are not seriously

disputed by Respondent.  Only the third is in question:  Was the suppression of the

Summary Report prejudicial, that is, material?

Using the work product doctrine as cover, the State chose not to produce the

Summary Report.  (*See* Darragh Dep., at 2107, R-152 [App. 25].)  The State thus

successfully concealed Mr. Waldrip's request for counsel and was able to get his

custodial statements admitted and bolster their credibility.  As a result, can there be

any doubt that if the State had honored Mr. Waldrip's requests for this evidence,

there is more than a reasonable probability that Mr. Waldrip's trial would have

ended differently, because his statements would have been excluded or because the

jury would not have given them credence?  Mr. Waldrip either would not have

been convicted or would not have been sentenced to death.

---

[22]    The definition of "evidence favorable to an accused" under *Brady* is not limited to
evidence that proves the defendant did not commit the crime, nor is it limited to evidence
that would have been admissible at trial.  *United States v. Bagley*, 473 U.S. 673, 676
(1985); *Spaziano v. Singletary*, 36 F.3d 1028, 1044 (11th Cir. 1994).  Evidence that could
have been used to impeach prosecution witnesses by showing bias, interest, or prior bad
acts is also "*Brady* evidence."   *Bagley*, 473 U.S. at 676 (holding that impeachment
evidence is "evidence favorable to the accused, . . . so that, if disclosed and used
effectively, it may make the difference between conviction and acquittal."); *see also
Giglio*, 405 U.S. at 154; *Agurs*, 427 U.S. 97; *Napue v. Illinois*, 360 U.S. 264, 269 (1959)
("The jury's estimate of the truthfulness and reliability of a given witness may well be
determinative of guilt or innocence, and it is upon such subtle factors . . . that a
defendant's life or liberty may depend.") (internal citations omitted); *Crawford*, 311 F.3d
at 1325.

Thus, the suppression of the Summary Report violated Mr. Waldrip's constitutional rights under the Fifth and Fourteenth Amendments under *Brady* and its progeny. And, this is correct regardless of whether this Court believes (1) there was an *Edwards* or a *Napue* violation; (2) the Summary Report establishes that Mr. Waldrip requested counsel; or (3) the Summary Report was admissible under Georgia law.

 1.  **Mr. Waldrip Was Prejudiced and the Summary Report Is Material under *Brady* if There Is a Reasonable Probability Its Suppression Altered the Outcome of Mr. Waldrip's Trial.**

Prejudice in the procedural default context is coextensive with "materiality" in the *Brady* context. Accordingly, the petitioner is deemed prejudiced if material evidence was not disclosed as mandated by *Brady*. *See Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 289; *Crawford*, 311 F.3d at 1327; *see also above* Section IV.C.4.

Further, materiality in the *Brady* context – or prejudice where a *Brady* claim is procedurally defaulted in the habeas context, *see Banks*, 540 U.S. at 691 – is not measured by whether disclosure of the suppressed evidence would have resulted in the defendant's ultimate acquittal, *Crawford*, 311 F.3d at 1325, nor is it measured by whether there would have been insufficient evidence to convict the defendant absent the undisclosed evidence. *Id.* at 1325-26 (citing *Bagley*, 473 U.S. at 667). Rather, evidence is material if there is "a reasonable probability that had the

evidence had been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.  And, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*  As the Eleventh Circuit observed in *Crawford*, "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence, he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[23]  311 F.3d at 1325.

### 2.   The Inadmissibility of the Summary Report Is a Red Herring.

In Section IV.F of this Argument, Mr. Waldrip explains why this Court can and must consider the Summary Report for all purposes in this proceeding.  (*See* Section IV.F, below.)  However, for the purposes of analyzing Mr. Waldrip's *Brady* claim, it is self-evident that the Summary Report is not inadmissible hearsay to establish that the report exists and that it was in possession of the State, because with respect to these two points, the Summary Report is not being admitted to

---

[23]   In *Brady*, the United States Supreme Court found that suppression by the prosecution of evidence favorable to an accused violates due process "where the evidence is *material* either to guilt or to punishment."  373 U.S. at 87 (emphasis supplied).  *Brady* applies regardless of whether the prosecutor suppressed the evidence willfully or inadvertently, and regardless of whether the defendant made any request for the information during discovery.  *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (finding that the *Brady* standard is the same regardless of whether the defendant made a specific, general, or no request for *Brady* information); *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor.").

prove the truth of its contents.  The Respondent has never contested these points

and the Georgia Supreme Court's opinion does not contradict them.  Rather, by

analyzing "cause" under state law, the Georgia Supreme Court implicitly finds the

Summary Report admissible for that purpose.  *Waldrip v. Head*, 620 S.E.2d 829,

833-34 (Ga. 2005). The Georgia Supreme Court's hearsay holding is limited to

using the Summary Report to establish affirmatively that Mr. Waldrip requested

counsel.  *Id.* at 832-33.

Further, the Supreme Court's decision in *Kyles v. Whitley* teaches that this

Court should focus not on whether the Summary Report was admissible,[24] but

whether the information contained therein – the request and Sheriff Chester's

acknowledgement – could have been presented to the trial court and jury in any

form and whether, upon presentation, that information would have had reasonable

probability of changing the outcome.  514 U.S. 419, 434 (1995).  In reversing the

Fifth Circuit's opinion in *Kyles* had concluded that the potential *Brady* material –

undisclosed statements by Beanie Wells, the police informant who set up Kyles –

was immaterial because the statements could not have been used at trial to impeach

Beanie since he was not called as a witness by either the prosecution or the

---

[24]    For all the reasons discussed above, this Court is not bound by the Georgia Supreme
Court's summary ruling that the Summary Report is "inadmissible,"  Indeed, it is clear
that Mr. Waldrip could have introduced the Document during both the suppression
hearing and at trial.  (*See* IV. F.below.)

defense, *Kyles v. Whitley*, 5 F.3d 806, 815 n.10 (5th Cir. 1993) ("Beanie did not

testify and impeachment material did not affect the trial.").  The Supreme Court,

however, rejected the Fifth Circuit's narrow reasoning, concluding that:

> If the defense had called Beanie as an adverse witness, he could not
> have said anything of any significance without being trapped by his
> inconsistencies. . . .  Even if Kyles's lawyer had followed the more
> conservative course of leaving Beanie off the stand, though, the
> defense could have examined the police to good effect on their
> knowledge of Beanie's statements and so have attacked the reliability
> of the investigation . . . .

*Kyles*, 514 U.S. at 445-46 (internal citations omitted).[25]

Thus, within the four corners of *Kyles*, the information contained in the

Summary Report is clearly material.  Just as the Supreme Court considered Benie's

pre-trial statements, this Court can consider Raymond George's.  Armed with the

---

[25]   The Eleventh Circuit has narrowed the *Kyles* materiality analysis to either admissible
evidence or *inadmissible evidence that would lead to admissible evidence.  Spaziano*, 36
F.3d at 1044.  In fact, several courts have found inadmissible evidence to be material
under *Brady.  See, e.g., United States v. Sipe*, 388 F.3d 471, 483-486 (5th Cir. 2004)
(finding that inadmissible bad act evidence could have led to admissible impeachment
evidence that added to other evidence was material); *Sellers v. Estelle*, 651 F.2d 1074,
1077 & n.6 (5th Cir. 1981) (inadmissible evidence is material under Brady where it could
lead to admissible evidence); *U.S. v. Gutierrez*, No. 05-639, 2007 WL 3026609, at *5
n.13 (W.D. Tex. Oct. 16, 2007) (same); *Robinson v. Cain*, 510 F. Supp. 2d 399, 412
(E.D. La. 2007) ("[T]he inadmissibility of evidence under state law is not dispositive on
the issues of materiality."); *Willis v. Cockrell*, No. 01-20, 2004 U.S. Dist. LEXIS 15950,
at *88-89 (W.D. Tex. Aug. 9, 2004) (holding where an otherwise inadmissible doctor's
report was not turned over to the defense, *Brady* had been violated because that report
would have "led to favorable testimony."); *Watkins v. Miller*, 92 F. Supp. 2d 824, 844
(S.D. Ind. 2000) (holding that unsworn statements that would not have been admissible at
trial would have led the defense counsel to interview those witnesses and possibly
subpoena them for trial; thus, their statements and identities were material for *Brady*
purposes).

report, Mr. Brannon could have asked Mr. George on cross-examination: "Yes or no, did Mr. Waldrip request counsel shortly after being arrested?" We know from his affidavit that Mr. George would have said "Yes." (George Aff., ¶ 5, P-35 [App. 6].) And, this answer would have been material admissible evidence of Mr. Waldrip's request for counsel, changing the course of the trial.

Alternatively, if Mr. George answered "No," Mr. Waldrip's former counsel would have introduced the Summary Report to impeach Mr. George with his prior inconsistent statement. *See* Ga. Code Ann. § 24-9-83; *see also Kyles*, 514 U.S. at 445-46; *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 269); *Banks*, 540 U.S. at 700-03; *Bagley*, 473 U.S. at 676 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule."); *Wood v. Bartholomew*, 516 U.S. 1 (1995) (*per curiam*). And, under Georgia law the prior inconsistent statement in the Summary Report would be admitted, not only for impeachment, but as substantive evidence of the request. (*See* Section IV.C.1, above.)

Finally, even if it were inadmissible in the guilt phase of Mr. Waldrip's trial, the Summary Report would have been material evidence relevant to sentencing under *Green v. Georgia*, 442 U.S. 95 (1979). In *Green*, the United States Supreme Court held that irrespective of hearsay rules, reliable and highly relevant evidence that is critical to an issue in the sentencing is properly admissible in that proceeding. *See Green*, 442 U.S. at 97.

Here, the Summary Report was material to sentencing because it would have undermined the credibility of Mr. Waldrip's confessions.  Further, the report had all the indications of reliability, namely its creation by the prosecutor who served as coordinator of the investigation and its duplication for use by members of the prosecution team in preparation for and during the underlying trial.  (*See* Darragh Dep., at 2107, R-152 (ADA Darragh reviewed the Summary Report in preparation for trial) [App. 25]; Attaway Dep., at 3285-86, 3458-59, R-157 [App. 20]; E.H. Vol. 29, at 8533, R-174 (Special Agent Attaway's Trial Binder) (Special Agent Attaway used an annotated copy as a reference at trial) [App. 23].)  Thus, regardless of its admissibility, the report is material for purposes of sentencing.

> **3.    Mr. Waldrip's Unambiguous Request for Counsel Is Material If for No Other Reason Because It Undermines the Credibility of His Custodial Statements.**

If the Court agrees that the Summary Report establishes an *Edwards* violation, then the fact that it was wrongly suppressed serves simply as an alternative ground of relief.  Similarly, if the Court agrees that the Summary Report establishes a *Napue* violation, the fact that its suppression was also a *Brady* violation is but another reason to issue the writ.

However, Mr. Waldrip's *Brady* claim is broader than either his *Edwards* claim or his *Napue* claim, and entitles Mr. Waldrip to relief even if *Edwards* and *Napue* do not.

Mr. Waldrip's *Brady* claim is meritorious even if the Court finds that Mr. Waldrip somehow waived his *Edwards* rights after invoking them.  Mr. Waldrip's *Brady* claim is meritorious even if this Court finds that the Summary Report does not establish that the State knowingly misled the Georgia courts. Mr. Waldrip's *Brady* claim is meritorious even if the Court is not sure that the Summary Report establishes that Mr. Waldrip requested counsel.

Mr. Waldrip's *Brady* claim is meritorious because the Summary Report would have provided Mr. Waldrip with an effective challenge to the circumstances surrounding Mr. Waldrip's confessions, *Crane v. Kentucky*, 476 U.S. 683, 688 (1986), and thereby would have allowed him to present a complete and meaningful defense.  *See Chambers*, 410 U.S. at 302.  Quite simply, an ignored request for counsel is a factor in determining the voluntariness of a suspect's subsequent statements.[26]  *See Darwin v. Connecticut*, 391 U.S. 346, 349 (1968) (holding that

---

[26]    The Trial Court instructed the jury on this exact point:

> The rights which must be explained and which must be understood and given the defendant before any statement is taken by the police are as follows:  One, the defendant has the right to remain silent; two, if the defendant chose not to remain silent anything that the he said, wrote, signed, could be used as evidence against him in court; three, **the defendant had a right to consult with a lawyer before questioning and to have a lawyer present with him at all times during any questions**; four, if the defendant did not have the money for a lawyer, a lawyer would be provided for him to represent him before any questioning and to be present with him during any questioning.
>
> . . .

(Continued)

denial of counsel is to be considered in voluntariness inquiry); *Davis v. North Carolina*, 384 U.S. 737, 745-46 (1966).

The Summary Report would have led to proof that law enforcement interrogated Mr. Waldrip after his post-arrest request for counsel, and would have brought into question the voluntariness of Mr. Waldrip's purported confessions.  It would have also been powerful evidence with which to impeach Sheriff Chester, Former ADA George, and Special Agent Attaway.  In the event that one or all denied Mr. Waldrip's post-arrest request for counsel, Mr. Waldrip would have been equipped to undermine the credibility of each witnesses' testimony.  *See Bagley*, 473 U.S. at 676; *see also Napue*, 360 U.S. at 269 ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors . . . that a defendant's life or liberty may depend.") (internal citations omitted); *Crawford*, 311 F.3d at 1325.

At the end of the day, the *Brady* question is simple:  Given that the State chose to hide the Summary Report, does this Court believe that Mr. Waldrip "received a fair trial, understood as a trial resulting in a verdict worthy of

---

(Continued)

**If the police initiate or continue conversations with the defendant after the defendant exercises such right, then <u>any statement made to the police by the defendant after he exercises such right would not be voluntary,</u> and you must disregard it entirely and completely in reaching your verdict in this case.**

(T.T. Vol. XVII, at 3299-3300, R-62 (emphasis supplied) [App. 17].)

confidence." *See Crawford*, 311 F.3d at 1325. In view of the importance of Mr.
Waldrip's statements, the lack of any other evidence tying Mr. Waldrip to Keith
Evans' murder, and the explicit statement in the Summary Report that Mr. Waldrip
unambiguously requested counsel, this Court cannot have confidence that the
outcome of the proceedings would have been the same. There is at least a
reasonable probability that the trial court, confronted with evidence that Mr.
Waldrip requested counsel, would not have found that the State had carried its
burden in demonstrating that Mr. Waldrip had waived his *Edwards* rights. And,
even if the trial court had found them admissible, there is more than a reasonable
probability that at least one person on the jury, at a fair trial or sentencing with
counsel armed with the Summary Report, would have disregarded Mr. Waldrip's
confessions (as the trial court instructed they should) and found Mr. Waldrip not
guilty or sentenced him to life. Mr. Waldrip was actually prejudiced by the
suppression of the Summary Report, which not only excuses Mr. Waldrip's
procedural default, but mandates full habeas relief.

> **F.    THE COURT CAN AND MUST CONSIDER THE SUMMARY
> REPORT IN THESE PROCEEDINGS IN ITS ANALYSIS OF
> MR. WALDRIP'S *EDWARDS*, *NAPUE*, AND *BRADY* CLAIMS.**

Mr. Waldrip is mindful of the Georgia Supreme Court's ruling that the
Summary Report is inadmissible. As this Court stated in its March 31 Order:

> Moreover, the problem that petitioner will have in getting this court to
> consider the Summary Report in reference to his *Edwards* and *Brady*

claims in this action will not be resolved by anything that George or former Sheriff Chester might have to say. The problem is that it is obvious during the discovery period in his state habeas corpus proceeding, petitioner was well aware of the Summary Report, the fact that it was authored by George, and the fact that it indicates that petitioner told Sheriff Chester that he wanted to confer with counsel. Nonetheless, according to the Georgia Supreme Court, petitioner failed to demonstrate in the state habeas corpus proceeding that the Summary Report was admissible, and in resolving the question of whether the state court was correct and whether that ruling binds this court, this court will be limited to reviewing the evidence presented in the state court which should (or can) be a part of the record.

(March 31 Order, at 6 [App. 1].)

This Court, however, is obligated to consider the Summary Report. First, under the Federal Rules of Evidence, the Summary Report is clearly admissible before this Court to prove a federal constitutional violation. Second, even if this state rule were somehow pertinent to Mr. Waldrip's *Edwards* claim, it cannot control because its application to these facts is objectively unreasonable. Third, even if the Georgia Supreme Court's ruling was not objectively unreasonable, the Summary Report cannot be "inadmissible" either in post-conviction or at Mr. Waldrip's original trial because that would constitute an unconstitutional interference with his ability to mount a "complete defense." *Chambers*, 410 U.S. 284, 302 (1973).

### 1. Even if the Summary Report Were Inadmissible under State Law, the Summary Report Is Admissible Here Under the Federal Rules of Evidence.

The Federal Rules of Evidence apply to cases arising under 28 U.S.C. § 2254. Fed. R. Evid. 1101(e).  Where evidence has been presented in state court and deemed not admissible, the question becomes whether it is admissible under the Federal Rules of Evidence.  *Rankins v. Page*, No. 99-1515, 2000 U.S. App. LEXIS 8787, at *5-7 (7th Cir. May 7, 2000); *Hasan v. Ishee*, No. 1:03-288, 2006 U.S. Dist. LEXIS 83926, at *71-72 (S.D. Oh. Aug. 14, 2006); *Mason v. Mitchell*, 293 F. Supp 2d 819, 826 (N.D. Oh. 2003).  And, the federal rules clearly provide that the Summary Report is admissible to prove the State's *Edwards* and *Napue* violations.

The Summary Report is admissible here to prove the State's *Edwards* and *Napue* violations, because while the Summary Report could be considered hearsay, it is at the very least admissible hearsay.[27]  Federal Rule of Evidence 803(8)(C) provides that civil litigants may present "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."  The United

---

[27]   The Summary Report is *not* hearsay as against the State.  It is properly regarded as an admission of a party opponent under Rule 801(d)(2).  ADA George, who was led the early investigation, acted for the State in compiling the report under authority extended to him by the District Attorney, Mr. Fuller.  (Raymond George Testimony, at 4117-18, 4127-28, R-290 [App. 14].)  His Summary Report thus is a statement of the State, which the State adopted, made by an agent authorized and acting within his authority; it thus fits squarely within each of first four subparagraphs of the rule.  *See* FED. R. EVID. 801(d)(2)(A)-(D).

States Supreme Court has held that this rule is to be broadly interpreted: a statement in an investigative report is admissible so long as it is "based on a factual investigation and satisfies the Rule's trustworthiness requirement." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). Likewise, the Eleventh Circuit has held that factual statements of law enforcement officials[28] are presumed admissible under Rule 803(8)(C) "unless the sources of information for the report, or other circumstances, indicate a lack of trustworthiness." *Glados, Inc. v. Reliance Ins. Co.*, 888 F.2d 1309, 1312 (11th Cir. 1987) (*citing Beech Aircraft Corp.*, 488 U.S. at 166-67) (allowing admission of a detective's conclusion in police report as to who set a fire).[29]

The Summary Report, like all reports of official investigations, is presumed to be trustworthy and reliable. *Barfield v. Orange County*, 911 F.2d 644, 649-51 (11th Cir. 1990) (admitting report documenting results of EEOC investigation); *United States v. Box*, 50 F.3d 345, 357 (5th Cir. 1995) (where statement in investigative report offered against the State it is "more akin to an 'admission' than

---

[28]   Even without the benefit of his Affidavit, this Court found it "obvious" that ADA George authored the Summary Report. (March 31 Order, at 6 [App. 1].) After all, a stamp bearing the name and contact information of then-Dawson County District Attorney Andrew Fuller appears on each page of the typed version of the report. In addition, during the state habeas proceedings, the State attempted to assert that the document was work product. That assertion alone establishes that the Report is authentic.

[29]   Under Rule 803(8), there is no requirement that a custodian qualify the public record or reports for admission so long as the document is authenticated. *See United States v. Jones*, 958 F.2d 520, 521 (2d Cir. 1992).

unreliable hearsay").  ADA George, an experienced attorney in the DA's Office, compiled the Summary Report from his own personal knowledge, oral reports from law enforcement officials, and written reports and files from the investigation.  (Attaway Dep., at 3440-41, R-157 (App. 20); George Aff., ¶ 3, P-35 [App. 6].) [30]  And the State can hardly question its trustworthiness when the ADA who tried Mr. Waldrip's case and the lead GBI agent who testified against him relied upon the Report to prepare for the trial and had it with them at counsel table. [31]  Accordingly, the Summary Report is admissible under Rule 803(8)(C).

---

[30]    *See United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 626 (5th Cir. 1992) ("To satisfy the first element of Rule 803(8)(C), 'the record sought to be admitted must be made from matters within the personal knowledge of the public official making the record *or* his agent *or* someone with a duty to report the matter to a public official,'" (quoting *United States v. Central Gulf Lines*, 747 F.2d 315, 319 (5th Cir. 1984)) (emphasis supplied)).  Thus, the Summary Report and Mr. Waldrip's request for counsel is admissible whether or not the request was from Mr. George's own personal knowledge.  *See, e.g., Hodge v. Seiler*, 558 F.2d 284, 288 (5th Cir. 1977) (admitting under Rule 803(8)(C) investigation report prepared by HUD investigator based on testimony from third parties).

[31]    Thus, all four factors the rulemakers note – (1) the timeliness of the investigation; (2) the skill or experience of the officials who prepared the report; (3) whether a hearing was held; and (4) whether any motivational problems are presented, *see* FED. R. EVID. 803(8), Advisory Committee Note to Paragraph (8) – support the trustworthiness of the report.  These factors are non-exclusive and courts do not insist that all must be satisfied to allow admission.  *Id.*

2.      **Even If the State Law Admissibility of the Summary Report Were Relevant, the Georgia Supreme Court's Ruling Is Entitled to No Weight.**

   i.      **Prior to the Georgia Supreme Court's Ruling, No Court Questioned the Admissibility of the Summary Report and Mr. Waldrip Had No Occasion to Lay a Foundation as to "Admissibility."**

The Respondent stipulated to the admissibility of the Summary Report in the state post-conviction trial proceedings and the state habeas court approved the stipulation. Mr. Waldrip thus had no reason – and no notice – that there was any challenge that would require further foundation as to the admissibility of the Summary Report. (*See* Stipulation Order on Admissibility (4/16/02), at 7, 8, P-3 ("Because the Parties agree that the entire DA's Case File is Admissible …") [App. 27].)

And, it was only because of this Stipulation with Respondent that Mr. Waldrip released his subpoena over Mr. George and agreed not to call ADA Darragh, Mr. George, or Sheriff Chester at the Evidentiary Hearing. (*See* Letters from Mr. Kessler to Ms. Attaway dated April 8, Doc. 70, P-39 (filed 7/31/09) [App. 38]) April 10, April 22, and April 23, 2002, Doc. 51, Ex. P-3, P-8, P-10 (filed 8/28/2008) [App. 38]; *see also* Stipulation and Order Between Petitioner and Respondent Regarding the Admissibility of Transcripts and Introduction of Personnel Files, Doc. 51, Ex. P-4 (filed 8/28/2008) [App. 39].) If Respondent had not stipulated to the admissibility of the Summary Report in all of its versions, Mr.

- 73 -

Waldrip would never have released Mr. George from the subpoena and would have elicited the testimony (contained in Mr. George's Affidavit) at the Evidentiary Hearing.

It was only after the evidentiary hearing – and after Mr. Waldrip's opportunity to lay a foundation had passed – that Respondent raised any questions of hearsay with respect to the Summary Report.  (*See*, *e.g.*, Respondent's Post-Hearing Brief, Doc. 9, Ex. R-263, at 24 n.9. (filed 5/24/2006) [App. 31].)  The post-conviction trial court ignored these objections and found the Summary Report admissible.  (*See* Order Denying Relief, at 6-7, R-267 [App. 28].)

Under state procedure, Mr. Waldrip submitted an Application to the Georgia Supreme Court for a Certificate of Probable Cause to Appeal.  The Georgia Supreme Court granted that application, but directed the briefing as follows:

> The Court is particularly concerned with, and requests that you address in your briefs, the following:
>
>> Whether the habeas court erred in denying Waldrip's evidence suppression claims.
>>
>> Whether the habeas court erred in denying Waldrip's claim regarding the State's use, during his competency trial, of his silence and request for counsel.

(May 9, 2005 Order, Doc. 9, Ex. R-280 (filed 5/24/06) [App. 29].)  Moreover, the Georgia Supreme Court did not raise even one question regarding hearsay during

oral argument.  (*See* Petitioner's Motion for Reconsideration, Doc. 9, Ex. R-290, at

1 (filed 5/24/2006) [App. 14].)

Thus, when the Georgia Supreme Court held that the Summary Report was

"inadmissible," Mr. Waldrip was taken by complete surprise.[32]  When the question

originally arose at the state habeas trial court level – whether the request for

counsel vitiated the original order not suppressing the statements – the state habeas

trial court defined the parameters of the inquiry with respect to the confession.

And these were the matters Mr. Waldrip (and the State) briefed both below and in

the Georgia Supreme Court.

But this switching of topics is a lot more than an interesting footnote to the

history of this case.  Mr. Waldrip had a due process right to have the Georgia

Supreme Court review the determination that the state habeas court actually made,

a constitutional right that finds its expression in *Cole v. Arkansas*, 333 U.S. 196,

202 (1948).  In *Cole*, the trial court had answered the question as to whether the

evidence was sufficient to convict a defendant for a violation of 1943 Ark. Acts

§ 2.  Upon review, the Arkansas Supreme Court could not answer that question in

the affirmative.  So the Arkansas Supreme Court changed the question – asking

---

[32]    If it questioned the admissibility of the Report, the Georgia Supreme Court should have
requested briefing and/or argument on the subject – or, at the least remanded the action
back to the state habeas trial court.  The Georgia Supreme Court does not sit as a finder
of fact.  *Hampton v. State*, 527 S.E.2d 872, 874 (Ga. 2000).

instead whether the evidence was sufficient to convict the defendant under 1943 Ark. Acts § 1.

The United States Supreme Court in *Cole* recognized that by ignoring the question before it, the Arkansas Supreme Court violated the defendant's due press review rights. And it is in exactly the same way that the Georgia Supreme Court has violated due process here by "changing the question" rather than reviewing the state habeas court's determination. *Id.* at 202.

The ramifications of this violation for this case are clear: "Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457-58 (1958). Accordingly, this Court should ignore the surprise evidentiary ruling on a question never presented for adjudication and, instead, review the question that was tried in the state habeas court and in the Georgia Supreme Court, determine whether the fact that Mr. Waldrip knew he asked for counsel immunizes the State's misconduct, and reverse Mr. Waldrip's conviction because it does not.

ii.   **Deference Is Due to a State Evidentiary Ruling that Is Objectively Unreasonable, Is Designed to Frustrate the Assertion of Federal Rights, or Is so Extreme as to Deny a Fair Proceeding.**

A federal habeas court in this Circuit is not bound by a state court evidentiary ruling that "was objectively unreasonable in holding that the evidence that the state allegedly suppressed was inadmissible." *Breedlove v. Moore*, 279 F.3d 952, 964 & n.8 (11th Cir. 2002) (citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 n.11 (1975)). Mr. Waldrip meets that standard as the Georgia Supreme Court's ruling is based on clearly erroneous findings of fact (e.g. that Mr. Waldrip did not attempt to show that the Summary Report was admissible) and the ruling is radically inconsistent with Georgia's black-letter laws on evidence. [33]

Further, a federal habeas court may review the state evidentiary rulings where they are "so extreme as to result in the denial of a constitutionally fair proceeding." *See Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998); *Boykins v. Wainwright*, 737 F.2d 1539, 1543-44 (11th Cir. 1984); *Panzavecchia v. Wainwright*, 658 F.2d 337, 340 (5th Cir. 1981). A denial of fundamental fairness occurs when a state evidentiary ruling admits or excludes evidence that "is material in the sense of [being] a crucial, critical, highly significant factor" in the

---

[33]   Mr. Waldrip's claims can be proven true at an evidentiary hearing, which would demonstrate that the Georgia Supreme Court's evidentiary ruling was "objectively unreasonable." Mr. Waldrip respectfully renews his request for such a hearing if the Court has doubt that the Georgia court's ruling was and is objectively unreasonable.

proceedings. *Snowden*, 135 F.3d at 737; *Boykins*, 737 F.2d at 1544; *Panzavecchia*, 658 F.2d at 340; *accord Green v. Georgia*, 442 U.S. 95, 97 (1979) (regardless of Georgia's hearsay rule, a due process violation occurs when highly relevant evidence critical to an issue in the proceeding is excluded despite significant indications of the reliability of the evidence).

One cannot overstate how crucial, critical, and highly significant is the Summary Report and the case determinative facts it contains. The Georgia Supreme Court's simple declaration that the Report is "inadmissible" denied Mr. Waldrip the ability to present a complete defense and therefore denied him due process of law. *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006) (recognizing constitutional right to present a complete defense); *Crane v. Ky.*, 476 U.S. 683, 689 (1986) (same); *Chambers v. Miss.*, 410 U.S. 284, 302 (1973) (same); *see also Snowden*, 135 F.3d at 737 (when a state court's evidentiary ruling denies a federal habeas petitioner fundamental constitutional protections, the federal court must grant the petition).

        **iii.**    **The Georgia Supreme Court's Ruling Rests on Clearly Erroneous Factual Findings and Speculation and Denies Petitioner any Fair Opportunity to Meet the Court's Concerns.**

In declaring the Summary Report "inadmissible," the Georgia Supreme Court stated:

The statement at issue in the "Summary Report" is the written hearsay statement of its author. Although one prosecutor, Lee Darragh, testified in a deposition that "it appear[ed]" that the "Summary Report" was prepared by another prosecutor, Raymond George, and although the "Summary Report" itself bears Raymond George's name, <u>there is nothing in the record to indicate that Waldrip ever even attempted to call Raymond George as a witness</u>. Furthermore, Waldrip did not even question Lee Darragh specifically about the portion of the "Summary Report" at issue here. <u>Given Waldrip's failure to show the relevant statement in the "Summary Report" to be anything other than hearsay and quite possibly double hearsay, his failure to attempt any showing of why the general exclusion of hearsay should not apply in this case, and his failure to show any specific lawful use of the statement,</u> the statement in the "Summary Report" must be regarded as completely inadmissible and without probative value.

*Waldrip v. Head*, 620 S.E.2d 829, 832-33 (Ga. 2005) (emphasis supplied).

The factual premises for this reasoning are "'without any fair or substantial support'" and therefore cannot bar this Court's consideration of the Summary Report. *Staub v. Baxley*, 355 U.S. 313, 319-320 (1958) (quoting *Ward v. Board of Commissioners of Love County*, 253 U.S. 17, 22 (1920)).

**Incorrect Premise # 1: no attempts to show admissibility and lawful use of the Report:** The record in the state habeas proceedings is replete with arguments for the admissibility of the Summary Report and its lawful use, all in response to the Respondent's belated cries of "hearsay." Mr. Waldrip urged:

- "The Summary Report was clearly admissible in the Underlying Trial as an admission by the Prosecution."(*See, e.g.*, Petitioner's Post-Hearing Brief, Vol. II, Doc. 9, Ex. R-261, at 33 n.16 (Claim II) (filed 5/24/2006) [App. 41].)

- "[T]he disclosure of the Summary Report clearly would have allowed Former Trial Counsel to impeach Sheriff Chester during motions hearings and ADA Raymond George during both the motions hearing and the guilt/innocence phase of the Underlying Trial when each testified that Petitioner never requested counsel and that he voluntarily confessed." (*Id.* at 34.)

- "The Summary Report is not hearsay either.  In the Underlying Trial, and specifically during the pre-trial proceedings and the guilt/innocence phase of trial, the Summary Report would have been an admission by the Prosecution and admissible under O.C.G.A. §§ 24-3-31 (Admissions by parties to record); 24-3-33 (Admissions by agents)." (Petitioner's Post-Hearing Reply Brief, Doc. 9, Ex. R-264, at 11 n.5 (filed 5/24/2006) [App. 42].)

- "Petitioner argues that the summary report would have served to impeach witnesses at motion hearings and during the trial phase." (Order Denying Relief, at 7, R-267 [App. 28].)

- "The Prosecution hid the best evidence of Mr. Waldrip's request – contemporaneous documentary admissions." (Application for Certificate of Probable Cause, Doc. 9, Ex. R-269, at 24-25 n.18 [App 43].)

- "The State also repeatedly mischaracterizes the Summary Report as hearsay evidence; it is actually an admission against interest by a party opponent and as such, is inherently reliable." (Tommy Lee Waldrip's Reply Brief on the Merits, Doc 9, Ex. R-285, at 5 n.5. (citing O.C.G.A. § 24-9-83) (filed May 24, 2006) [App. 44].)[34]

***Incorrect Premise #2:  no efforts to call ADA George***:  As discussed above,

Mr. Waldrip *did* call Raymond George as a witness to be present in the state

habeas proceedings.  Mr. George was placed on the witness list and subpoenaed to

---

[34]    Petitioner also discussed these issues at length after the Georgia Supreme Court issued its Opinion in its <u>Motion for Reconsideration</u>, at 8-16, R-290 [App. 14].)

attend.  (Petitioner's List of Witnesses, Doc. 51, Ex. P-5 (filed 8/28/2008)

[App. 140]; Subpoena of Raymond George, Doc. 51, P-2 (filed 8/28/2008)

[App. 141].)  It was only Respondent's agreement that the Summary Report was

admissible prior to the evidentiary hearing, an agreement designed for the

convenience of Mr. George and the court, that stopped Mr. Waldrip from calling

him.[35]

   ***Incorrect Premise #3:  the implication that the timing of Mr. Waldrip's***

***request for counsel might be unclear:***  The Georgia Supreme Court also

incorrectly implied that the timing of Mr. Waldrip's request for counsel could not

_____

[35]        Further, Respondent admitted that Mr. George authored the report:

> Petitioner alleges that the State violated the mandates of *Brady* by not
> providing defense counsel with copies of *its work product* **in which**
> **Assistant District Attorney, Raymond George, wrote** that Sheriff Randy
> Chester initially spoke with Petitioner upon Petitioner's arrest and that
> Petitioner invoked his right to counsel.  (Vol. 76, Pet. Ex. 97, HT 22,230).
> Even assuming, *arguendo*, that **Raymond George's notes** were not
> provided to defense counsel prior to Petitioner's trial, counsel were not
> deficient as the notes were not discoverable by trial counsel as they were
> not *Brady* material ....

(Respondent's Post-Hearing Brief, at 22, R-263 (emphasis supplied) [App. 31].)  This
unequivocal statement is a judicial admission and is binding on the State.  *See Best
Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir.
1983) (stating that a party is bound by the admissions in his pleadings); O.C.G.A. § 24-3-
30 ("Without offering the same in evidence, either party may avail himself of allegations
or admissions made in the pleadings of the other.").  Because that admission establishes
that Mr. George wrote the Summary Report and did so as an agent for the State, Mr.
Waldrip was not required to produce any further additional evidence on those subjects.
*See Ploof*, 713 F.2d at 621.

be discerned from the Summary Report.  The court stated "Our review of the record indicates, for example, that Waldrip made a request for counsel prior to his arrest, which, if one were to speculate, conceivably could have been the source of the statement in the Summary Report." *Waldrip*, 620 S.E.2d at 834 n.1 (emphasis in original).

But this surmise is unfounded.  The Summary Report could not be more explicit:  Mr. Waldrip requested counsel in his contact with Sheriff Chester *after* his arrest (Contact 2A).  (*See* Summary Report, at 22230, R-221 [App. 5].) Raymond George, the author of the Summary Report, was present at the pre-arrest request for counsel, to which he testified at the Suppression Hearing (Contact 2). He therefore could not have been confused about the timing of the subsequent, separate post-arrest request or the fact that it was made to Sheriff Chester.  Nothing in the Summary Report supports the Georgia Supreme Court's musings which lack any fair or substantial support in the record.

### iv.   Under Georgia Law, the Summary Report Would Have Been and Is Admissible.

Based on the false premises that Mr. Waldrip had not sought to have the Summary Report admitted (when he had a Stipulation from Respondent that had that effect) and had not urged admission or a lawful use of the Report (when he repeatedly had), the Georgia Supreme Court did not analyze further whether

Georgia law would allow the Report into evidence.[36]  In fact, under Georgia law,

the Report *was* admissible, the Court's decision is inconsistent with its own prior

rulings, and the Court's failure to even undertake the analysis establishes that its

conclusion was objectively unreasonable.  *See Snowden*, 135 F.3d at 737 (citing

Florida law and finding that evidentiary ruling was improper); *Breedlove*, 279 F.3d

at 964 (citing Florida law to find that state supreme court's ruling was consistent

with Florida's evidentiary law.).

     First, the Summary Report was admissible as a party-opponent admission

under O.C.G.A. § 24-3-31 (admissions of parties to record admissible generally;

exceptions) and O.C.G.A. § 34-3-33 (admissions of agents).  It is undisputed that

ADA George, in leading the investigation, represented the interests of the State in

its trial against Mr. Waldrip.  In fact, Mr. Darragh and Respondent maintained

throughout that the Summary Report was work product, which means that it was

created by an agent of the State in anticipation of litigation.  *See Fulton DeKalb*

*Hosp. Authority v. Miller & Billips*, 667 S.E.2d 455, 457 (Ga. App. 2008).

Moreover, it is irrelevant whether Mr. George had personal knowledge of Mr.

---

[36]     The Georgia Supreme Court's reliance on *Bridges v. State*, 613 S.E.2d 621, 625-26, 626 n.12 (2005), and *Roebuck v. State,* 586 S.E.2d 651, 656 (2003), was misplaced.  Unlike in *Bridges*, Mr. Waldrip does not seek to introduce an oral statement from a third party; instead, Mr. Waldrip seeks to introduce a non-hearsay party-opponent admission memorialized in writing.  Also, this is not a case where opposing counsel simply failed to object to evidence, as in *Roebuck*; rather, here, the State agreed that the Documents were admissible at the time it controlled the persons who would have established (or disputed) their admissibility.  Moreover, the state habeas court approved the stipulation.

Waldrip's request; party-opponent admissions are admissible regardless of that fact. *See Mayo v. Owen*, 67 S.E.2d 709, 711 (Ga. 1951) ("Admissions do not come in, on the ground that the party making them is speaking from his personal knowledge, but upon the ground that a party will not make admissions against himself unless they are *true*.") (emphasis in original). [37]

Second, the Summary Report would have been admissible as impeachment evidence against Mr. George and Sheriff Chester, whose testimony was introduced at the suppression hearing and the trial. "A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case." O.C.G.A. § 24-9-83. With the Summary Report in their possession, former counsel would have been armed no matter how Mr. George and Sheriff Chester approached their testimony. If Sheriff Chester and Mr. George conceded that Mr. Waldrip asked for counsel, the Summary Report would be cumulative evidence, and the merits of Mr. Waldrip's claims would have been conceded. On the other hand, if either continued to assert that Mr. Waldrip did not ask for counsel after his arrest, the Summary Report would not only impeach him, but come in as substantive evidence. *Gibbons v. State*, 286 S.E.2d 717, 721 (Ga. 1982) (prior inconsistent statements used to impeach admissible as evidence);

---

[37]     Moreover, to the extent Sheriff Chester told Raymond George about Mr. Waldrip's request, that statement is also a party-opponent admission since Sheriff Chester was also an agent for the State.

*accord Berry v. States*, 490 S.E.2d 389, 391 (1997); *Guess v. State*, 422 S.E.2d 178, 179 (1992).  Given Mr. George's affidavit, there is no reason to believe he would not have testified truthfully and stated that Mr. Waldrip requested counsel. (*See* George Aff., P-35 [App. 6].)

Third, the Summary Report was admissible as a non-narrative business record under O.C.G.A. § 24-3-14.[38]  The State has conceded that Raymond George's notation in the Summary Report was made in the regular course of business within a reasonable time after Sheriff Chester's interrogation of Mr. Waldrip on April 16, 1991.  (Respondent's Post-Hearing Brief, at 22, R-263 (stating that the Summary Report was Raymond George's work product) [App. 31].)  In fact, Special Agent Attaway, who used the Summary Report at the underlying trial, testified in his deposition that Raymond George created the report as a synopsis of daily activity of the law enforcement officials involved in the case. (Attaway Dep., at 3440-41, R-157 [App. 20].)  In addition, each day of the handwritten version of the Summary Report starts on a separate piece of paper with

---

[38]     Because Mr. Waldrip's conviction was final before the Georgia Supreme Court decided in *Brown v. State*, 549 S.E.2d 107, 109 (Ga. 2001), that narrative police reports would no longer be considered business records, Mr. Waldrip need not rely on the fact that the statement at issue is non-narrative.  Moreover, the reasoning behind the *Brown* decision to limit the admissibility of police records as business reports – to protect a defendant's right to confrontation – does not apply here.  *See Brown*, 549 S.E.2d at 111 (citing *Ohio v. Roberts*, 448 U.S. 56 (1980)); *see also United States v. Smith*, 521 F.2d 957, 965 (D.C. Cir. 1975) (finding that police reports are admissible as business records "when offered by a criminal defendant to support his defense").

the day and date written on top.  (Summary Report, R-221 [App. 5].)  Thus, the

Summary Report qualified as a non-narrative business record under O.C.G.A. §

24-3-14.[39]

> ### 3. The Refusal to Consider the Summary Report Would Violate Mr. Waldrip's Constitutional Right to "Present a Complete Defense" and Fundamental Principles of Due Process.

The Summary Report is admissible under the Georgia Rules of Evidence and

the Georgia Supreme Court's holding to the contrary is objectively unreasonable.

That this is so is to be expected; any other result would not only be patently unfair

to Mr. Waldrip, but also represent an unconstitutional interference with his rights

to challenge the constitutionality, voluntariness or credibility of confessions.

What makes the Georgia Supreme Court's ruling unfair is the fact that,

under Georgia law, *a defendant's* written statement that he was told, understood

and waived his constitutional rights – a/k/a the "Waiver Certificate" – *is*

---

[39]   The Summary Report also qualified as non-hearsay as evidence of Sheriff Chester's state of mind and as a document used to refresh a witness' recollection.  Reports by law enforcement are not hearsay in the rare instances – such as this – where "the motive, intent, or state of mind of such an officer are matters concerning which the truth must be found."  *Teague v. State*, 314 S.E.2d 910, 912 (Ga. 1984) (quotations omitted); *accord* O.C.G.A. § 24-3-2.  The Summary Report demonstrated Sheriff Chester's knowledge of Mr. Waldrip's post-arrest request for counsel, and thus his state of mind during his unconstitutional interrogation of Mr. Waldrip in Contact 5.  In addition, any document that is used to refresh the memory of a witness can be admitted as evidence by the opposing party.  *Mason v. State*, 248 S.E.2d 302 (Ga. 1978); *Woodward v. City of Council of Augusta*, 162 S.E.2d 304 (Ga. 1968).  Special Agent Attaway used the Summary Report to refresh his recollection at deposition and the underlying trial.

admissible.  *See*, *e.g.*, *Bonaparte v. Georgia*, 558 S.E.2d 383, 385 (Ga. 2002);

*Terry v. Georgia*, 377 S.E.2d 837, 838 (Ga. 1989); *Moody v. State*, 224 Ga. 301,

301 (Ga. 1968).  In fact, the State admitted three of them against Mr. Waldrip at

the Suppression Hearing and at trial. (P.T. Vol. II (8/27/91), Doc. 9, R-21 at Exs. 3,

4, 5 (filed 5/24/2006) [App. 45].)  Thus, the Georgia Supreme Court allows written

reports to be admitted against defendants as evidence of the conditions of the

confession and waiver, *but has ruled that similar evidence cannot be admitted*

*against the State to establish a defense.*

      The unfairness of the ruling is obvious, yet the Georgia Supreme Court does

not even nod at, let alone explain, its disparate treatment of Mr. Waldrip.  Imagine

if the State were required to take the word of an accused whether he was provided

*Miranda* warnings or had waived them.  No Court would bind the State in such a

fashion and waiver certificates are the common sense result.  The Georgia Supreme

Court's inadmissibility ruling, however, effectively denies defendants the

opportunity to rely on the State's writings and forces them to rely on the State's

word – crippling, if not destroying, their defense.  Such unfairness is not

constitutional; the Georgia Supreme Court cannot use a mere rule of evidence to

undercut so severely Mr. Waldrip's access to the assertion of his constitutional

rights or to prevent him from mounting a complete defense.

While it is true that the accused's right to present certain evidence "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process," *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973), a defendant must be provided "'a meaningful opportunity to present a complete defense.'"[40] *Crane v. Kentucky*, 476 U.S. 683, 689 (1986); *Washington v. Texas*, 388 U.S. 14, 23 (1967).

There can be no legitimate interest served where the evidentiary rules are arbitrarily skewed against the defense. *United States v. Scheffer*, 523 U.S. 303, 316 n.12 (1998); *Washington v. Texas*, 388 U.S. at 22-23; *Wardius v. Oregon*, 412 U.S. 470 (1973).[41]  A ruling on the inadmissibility of the Summary Report forecloses Mr. Waldrip from introducing evidence identical to that which

---

[40]   The Georgia Supreme Court's summary holding violates its own rules and evidentiary principles as it has held that when Georgia courts exclude critical "hearsay" evidence, they must "adequately consider[] the elements of reliability and necessity which would require admission of that evidence under *Chambers* [*v. Miss.*, 410 U.S. 284 (1973)]." *Drane v. State*, 455 S.E.2d 27, 30 (1995).  Thus, the Georgia Supreme Court was required to conduct *sua sponte* the very analysis Mr. Waldrip is asking this Court to conduct, but did not.

[41]   In *Washington v. Texas*, 388 U.S. 14 (1967), state procedural statutes prevented co-defendants in a crime from testifying for one another and thus precluded an accused from introducing his co-defendant's testimony that the co-defendant had in fact committed the crime.  *Washington*, 388 U.S. at 16-17.  A co-defendant could, however, testify as a witness for the state.  *Id*. at 17.  The United States Supreme Court found the state statutes unconstitutional, because they did not deter perjury or otherwise serve a rational purpose, and unfairly burdened only the defense in presenting testimony.  *See id.* at 22-23.  The inadmissibility of the Summary Report is analogous; out-of-court statements by a party to an interrogation can be used to establish that a defendant waived his *Miranda* rights (e.g., Waiver Forms), but they cannot be used to establish that a defendant invoked his *Miranda* rights (e.g., police reports).

prosecution is permitted to introduce, thereby systematically providing the prosecution an opportunity to present more compelling evidence to the judge and jury regarding the circumstances of an accused's confessions. *See United States v. Scheffer*, 523 U.S. 303, 316 n.12 (1998); *Washington v. Texas*, 388 U.S. 14, 19, 22-23 (1967) ("This right is a fundamental element of due process of law.").

Moreover, the Georgia Supreme Court's inadmissibility ruling denies Mr. Waldrip the ability to attack the credibility of his confessions before the jury. *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) ("Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered:  If the defendant is innocent, why did he previously admit his guilt?"). How can a defendant meaningfully establish his rights or undermine the credibility of his confessions when he is prohibited from using evidence that is nearly identical to that which the prosecution is freely able to use to bolster the credibility of those same confessions?

## G. MR. WALDRIP IS ENTITLED TO AN EVIDENTIARY HEARING TO ESTABLISH THE ADMISSIBILITY OF THE SUMMARY REPORT BECAUSE HE DID NOT "FAIL TO DEVELOP" THIS POINT IN STATE COURT.

Mr. Waldrip is entitled to an evidentiary hearing on cause and prejudice and on his claims unless he "failed to develop the factual claim in State court proceedings." *See* 28 U.S.C. § 2254(e)(2).  A petitioner has not "failed to develop"

a claim unless "there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *[Michael] Williams*, 529 U.S. at 432. "Diligence …depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court…." *Id.* at 435.

Here, should the Court believe that it needs additional facts to determine the admissibility of the Summary Report, the Court should provide Mr. Waldrip an evidentiary hearing to establish these facts through the testimony of Sheriff Chester or Mr. George – either through affidavits or in live testimony. Mr. Waldrip did not fail to develop these facts below, but instead relied in good faith on Respondent's stipulation that the Summary Report was admissible. No fault can be laid at the feet of Mr. Waldrip or his counsel.

Nor can Respondent be heard to complain, as it invited the error at issue. *See United States v. Sarras*, No. 08-11757, 2009 WL 1661152, at *19 (11th Cir. June 16, 2009); *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009); *U.S. v. Stone*, 139 F.3d 822, 838 (11th Cir. 1998). If not for Respondent's stipulation as to the admissibility of the Summary Report, Mr. Waldrip would have had Mr. George testify at the evidentiary hearing in state court. (*See* Section IV.F.2, above.) It was only after the hearing – and Mr. Waldrip's chance to lay the

foundation had passed – that Respondent attacked the Summary Report as hearsay. (*Id.*)

## H.    CONCLUSION.

The State of Georgia extracted uncounseled confessions from Tommy Lee Waldrip despite his immediate post-arrest request for a lawyer.  It compounded this constitutional error by suppressing evidence of Mr. Waldrip's invocation of his right to counsel and then presenting false testimony at trial.  When the truth came out in state habeas proceedings, the George Supreme Court – recognizing that the Summary Report compelled post-conviction relief – swept it aside, branding it "hearsay" even though its admissibility had been stipulated and was clear.

For all the reasons set forth above, this Court is bound by the U.S. Constitution to vindicate the truth.  It is bound to do justice and grant Mr. Waldrip relief under *Edwards*, *Napue*, and *Brady*.

# MITIGATION
# INEFFECTIVENESS

## V.   FORMER COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO REASONABLY INVESTIGATE MITIGATION EVIDENCE, INCLUDING MENTAL HEALTH EVIDENCE.

A criminal defendant is entitled to the effective assistance of counsel under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. Counsel's performance will not withstand constitutional scrutiny if it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

In order to prevail on a claim of ineffective assistance of counsel, Petitioner must establish counsel's performance was deficient and that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 686. With respect to the first prong, Petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness," which has been defined as "reasonableness under prevailing professional norms." *Id.* at 688; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

With respect to the second prong, prejudice to the outcome of the proceeding – in this case, Petitioner's sentencing – the test is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also*

*[Terry] Williams v. Taylor*, 529 U.S. 362, 391 (2000).  For a state such as Georgia

– in which only one vote against death results in a life sentence – the measure of

prejudice is whether there is "a reasonable probability that at least one juror would

have struck a different balance."  *Wiggins*, 539 U.S. at 537.

### A.   COUNSEL HAS A HEIGHTENED DUTY TO INVESTIGATE IN A CAPITAL CASE

The death penalty has long been deemed a qualitatively different punishment

from a sentence of imprisonment.  For this reason our justice system demands a

heightened "need for reliability in the determination that death is the appropriate

punishment in a specific case."  *Woodson v. North Carolina*, 428 U.S. 280, 305

(1976); *see also Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *Beck v. Alabama*,

447 U.S. 625, 638 (1980).  As a result, "extraordinary measures" are required to

ensure the reliability of a death determination.  *Eddings v. Oklahoma*, 455 U.S.

104, 108 (1982) (O'Connor, J., concurring).

The sentencing process in a capital case focuses on the extent of the

defendant's personal culpability.  To achieve this, a capital sentencing jury must be

afforded a meaningful opportunity to assess "the character and record of the

individual offender," as well as "the circumstances of the particular offense."

*Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (internal quotation marks and

citation omitted).

> If the sentencer is to make an individualized assessment of the
> appropriateness of the death penalty, evidence about the defendant's
> background and character is relevant because of the belief, long held
> by this society, that defendants who commit criminal acts that are
> attributable to a disadvantaged background, or to emotional and
> mental problems, may be less culpable than defendants who have no
> such excuse.

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation

omitted); *Eddings*, 455 U.S. at 112 (consideration of offender's life history is a

"constitutionally indispensable part of the process of inflicting the penalty of

death").  Therefore, mitigating evidence – which includes *anything* that might

persuade the jury to impose a sentence other than death – is pivotal in a Georgia

capital case, because in Georgia "the jury may withhold imposition of the death

penalty for any reason, or without any reason."  *Head v. Thomason*, 276 Ga. 434,

578 S.E.2d 426, 429 (2003) (citations omitted) (emphasis in original).

As a trilogy of recent United States Supreme Court decisions reaffirms,

counsel has an added obligation in a capital case that flows from these principles:

they must conduct a thorough and diligent investigation into the client's

*background and life history* for potential mitigating evidence – an investigation

that is sensitive to the information that comes to light and what it signals as to

whether further investigation is required.  *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003);  *[Terry]  Williams v. Taylor*, 529 U.S. 362 (2000).[42]

In *[Terry]  Williams v. Taylor*, 529 U.S. 362, the Supreme Court found that trial counsel's decision to forego presentation of background evidence and to focus instead on the defendant's voluntary confessions could not be justified as a reasonable trial strategy.  This was because counsel had not first "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background."  *Id.* at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)).  Similarly, in *Wiggins v. Smith*, 539 U.S. 510, trial counsel was found ineffective where he made the decision not to present background evidence without having first conducted a diligent investigation into his client's life history. As the Court observed in *Wiggins*, the American Bar Association ("ABA") Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  539

---

[42]    These decisions represent applications of the clearly-established law set forth in *Strickland* and its progeny under the analyses set forth both in *Teague v. Lane*, 489 U.S. 288 (1989) and AEDPA, 28 U.S.C. § 2254(d)(1).  *Newland v. Hall*, 527 F.3d 1162, 1195-1201 (2009).

U.S. at 524 (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis supplied). Yet counsel in *Wiggins* violated this guideline and "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at p. 524. Just as in *[Terry] Williams* and *Wiggins*, Petitioner's trial counsel failed to conduct an adequate investigation into Petitioner's background, thereby making unsupported tactical decisions. Moreover, the lack of a diligent investigation precluded trial counsel from presenting powerful evidence that would have altered and strengthened materially the sentencing phase strategies they did employ.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), counsel had conducted *some* investigation, but had not uncovered significant potential mitigation evidence. They also had not looked at the publicly available file on the defendant's prior convictions – and they did not pull that file even when placed on notice that the Commonwealth intended to make use of it in the sentencing phase. The Third Circuit Court of Appeals – as the state habeas court did here – looked at the investigation and concluded, in essence, that "some is enough." The United States Supreme Court, however, strongly disagreed and rejected that standard because – given that counsel knew there was an issue critical to the sentencing phase (there,

Rompilla's prior convictions) – counsel had an obligation to pursue that issue.  *Id*.

at 389-390.  This was because it turned out that in that file was evidence that was

unlike what was hinted at in the reporting from the few witnesses that had been

interviewed earlier, evidence that would have put counsel on notice of additional

mitigation evidence they should have uncovered much to Rompilla's benefit.  *Id*.

As the United States Supreme Court explained, "once counsel had an

obligation to examine the file, counsel had to make reasonable efforts to learn its

contents; and once having done so, they could not reasonably have ignored

mitigation evidence or red flags simply because they were unexpected."  *Id*. at 391

n.8.  Ultimately, the Court recognized that the results that would have flowed from

that proper investigation would have:

> [A]dd[ed] up to a mitigation case that bears no relation to the few
> naked pleas for mercy actually put before the jury, and although we
> suppose it is possible that a jury could have heard it all and still have
> decided on the death penalty, that is not the test.  It goes without
> saying that the undiscovered "mitigating evidence" taken as a whole,
> "might well have influenced the jury's appraisal of [Rompilla's]
> culpability."

*Id*. at 393.[43]

---

[43]    Here, as in *Rompilla*, the state habeas court conducted an analysis that was focused on
whether counsel was deficient – *Strickland*'s first prong.  In *Rompilla*, it was clear,
therefore, that the prejudice analysis was conducted by the Court *de novo*.  *Id*. at 390.
Here, there is a conclusory and superficial statement at the close of the entire
ineffectiveness analysis (including claims of ineffectiveness at the guilt/innocence

(Continued)

It is this particularized duty to investigate mitigating evidence that guides this Court's assessment of the "reasonableness of counsel's conduct in light of prevailing professional norms," as dictated by the first prong of the *Strickland* analysis. *Strickland*, 466 U.S. at 688; *Wiggins*, 539 U.S. at 521.

One benchmark in informing this inquiry is the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. The Supreme Court has described the Guidelines as "standards to which we long have referred as 'guides to determining what is reasonable.'" *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688 and citing *[Terry] Williams*, 529 U.S. at 397).

The 1989 revision of the ABA's Guidelines – the guidelines in effect at the time of Petitioner's trial and throughout all stages of the pre-trial and post-trial proceedings in his case[44] – set forth clear standards as to the scope and depth of

_____

(Continued)

> phase) that announces: "It cannot be said that counsel's performance was deficient or that counsel's performance prejudiced Petitioner's defense." (State Order Denying Petition for Writ of Habeas Corpus, Doc. 9, Ex. R-267, at 42 (filed 5/24/06) [hereinafter "Order Denying Relief"] [App. 28].) Given the dearth of analysis directed toward any question about the penalty phase except whether counsel's representation was adequate, the *de novo* standard should apply here as well.

[44] The Guidelines were next revised in 2003. However, the "new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence. The 2003 ABA Guidelines do not depart in principle or concept from *Strickland*, *Wiggins*, or our court's previous cases concerning

(Continued)

representation that counsel should have provided.  These Guidelines "enumerate

the *minimal* resources and practices necessary to provide effective assistance of

counsel" in capital cases.  ABA Guidelines introduction, (emphasis supplied)

[App. 91].

The Guidelines repeatedly emphasize the all-encompassing nature of an

appropriate penalty phase mitigation investigation.  *See* ABA Guidelines 11.4.1;

11.8.2; 11.8.3; 11.8.6.  [App. 91].  Sentencing phase information to be investigated

and considered for presentation includes, but is not limited to: medical/mental

health history; education and special needs; military history; employment and

training history; family and social history (including physical, sexual or emotional

abuse); prior criminal history and experience in correctional institutions; and

rehabilitative potential of the defendant.  Guideline 11.4.1(D)(2)(C); 11.8.6(B).

"Counsel should present to the [sentencer] all reasonably available evidence

in mitigation unless there are strong strategic reasons to forego some portion of

such evidence."  Guideline 11.8.6(A).  Moreover, "[c]ounsel should consider all

_____

(Continued)

counsel's obligation to investigate mitigation circumstances."  *Hamblin v. Mitchell*, 354
F.3d 482 (6th Cir. 2003).

99

potential methods for offering mitigating evidence to the [sentencer], including witnesses, affidavits, reports. . .letters and public records." Guideline 11.8.6(C).[45]

Because of the enormity of the task of preparing for the penalty phase of a capital trial, the Guidelines stress two other points: *first*, counsel must begin early to look for mitigating evidence and counsel must pursue the search diligently; and, *second*, counsel needs to secure significant assistance from specialized professionals: The investigation "should begin *immediately upon counsel's entry into the case and should be pursued expeditiously*." *See* Guideline 11.4.1(A) (emphasis supplied); *see also* Guideline 11.8.3(A) (emphasizing that sentencing phase investigation should begin immediately upon the lawyer's entry into the case). "Counsel in a capital case is obligated to conduct a thorough investigation of the defendant's life history and background .... [and] *cannot adequately perform these and other crucial penalty phase tasks without the assistance of investigators and other assistance*." *See* Guideline 8.1, commentary (emphasis supplied). Resources such as investigators and experts "that counsel needs to pursue a proper

---

[45]    The 2003 revision of the Guidelines further clarifies that such penalty phase witnesses and evidence should relate information about the client's life "*from conception to the time of sentencing*, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death." (emphasis supplied). Guideline 10.11 [App. 92].

investigation should be sought early in the case." *See* Guideline 11.4.1,

commentary.  The role of such experts and investigators is to help prepare the

defense, provide an adequate understanding of the prosecution's case, provide

rebuttal to the prosecution's case at both guilt and sentencing, and "present

mitigating testimony about the impact on the defendant's life or events in any of

the areas described above." *See* Guideline 11.4.1(D)(7); 11.8.6(B).

### B.     THE STATE HABEAS COURT UNREASONABLY FOUND THAT TRIAL COUNSEL WERE NOT DEFICIENT.

The state habeas court reached two critical conclusions:  "counsel began

pursuing mitigation evidence from the time of their initial appointment to represent

Petitioner" (Order Denying Relief, at 42, R-267 [App. 28]), and  "counsel

adequately investigated Petitioner's background."  In reaching those conclusions,

the state habeas court relied primarily on certain "facts" that are not supported –

and in some cases are flatly contradicted – by the parts of the record on which the

court relied.  To that extent, the findings are unreasonable determinations of fact.

The state habeas court also relied, however, on certain aspirational

generalizations that trial counsel articulated about his *practice and philosophy* in

approaching capital cases.  The reliance on those statements and the resultant

"findings" that flowed from those statements to conclude there was an "adequate

investigation" are unreasonable applications of clearly established legal principles.

*See* 28 U.S.C. § 2254(d).  Moreover, in this instance, the state court

unambiguously identified the correct governing legal principle but "unreasonably

applie[d] that principle to the facts of petitioner's case."  *Wiggins v. Smith*, 539

U.S. 510, 520 (2003) (quoting *Williams v. Taylor*, 529 U.S. 389, 413 (2000)).

The state habeas court reached the following conclusions – and made the

following generalization – about counsel's strategy:

- Mr. Brannon soon realized that petitioner's childhood would become important as potential mitigation evidence.  (Order Denying Relief, at 32, R-267 [App. 28].)[46]

- Counsel began collecting mitigation evidence early on in their representation of Petitioner, as Mr. Brannon realizes that the penalty phase of a death penalty trial is as important as the guilt/innocence phase.  (*Id*. at 35.)[47]

---

[46]    For this proposition, the state habeas court relied on testimony at the evidentiary hearing in which Mr. Brannon acknowledged that he understood that Mr. Waldrip didn't have a perfect childhood by "the fact he said he did."  He thus instructed an assistant that he believed Mr. Waldrip "was probably mistreated" and that he should be aware of that because it would be significant for mitigation if he were convicted.  E.H., Testimony of J. Richardson Brannon, Doc. 9, Ex. R-146, at 73-4 (emphasis supplied) [hereinafter "Brannon Testimony"] [App. 46].)

[47]    Critically, however, the evidence on which the state habeas court relies shows Mr. Brannon's understanding of the critical nature of the penalty phase, *not* that Mr. Brannon's conduct put that understanding into practice.  He testified that "[pretty] early is my *recollection* because my *general approach* is that it is as important as the guilt-innocence phase."  (Brannon Dep., Doc. 9, Ex. R-233 (E.H. 2), at 25518 (emphasis supplied) [App. 47].[47])  And in the very next sentence he qualified his statement:  "I am trying to ready for trial with 148 witnesses and I am focused on that but also the other."  (*Id.*)  As a result, he incorrectly and with no justification assumed that the sentencing phase would come together because "anything that assisted the defense would be

(Continued)

- Early on in his representation of Petitioner, Mr. Brannon began anticipating that Petitioner's mental health would be an issue at trial – and he investigated the mental health issue for use at a competency hearing and at the guilt phase of trial.  (*Id*. at 39.)

In other words, the state habeas court recognized that former counsel were on notice (a) that the penalty phase is critical; (b) that Petitioner's mental health was a serious and pervasive issue; and (c) that Mr. Waldrip was likely not a reliable reporter about the availability of mitigation evidence.  Those facts in and of themselves signaled to counsel that an investigation into his childhood was likely to elicit significant mitigation evidence.  As the Supreme Court framed the lawyer's responsibility in *Rompilla*, these then were the "red flags" that triggered an obligation to investigate until counsel understood what evidence was available and how it could serve as mitigation, for only then could counsel make a reasonable and strategic decision as to whether and how to put on that evidence in the penalty phase.  545 U.S. at 391 n.8.

---

(Continued)

mitigation," (*see id.*) and "mitigating factors" would "pop up" during the first phase of trial.  (*Id.* at 25740 Handwritten Note.)  Instructively, this is the only record citation that the state habeas court relies upon to support its conclusion that "counsel began pursuing mitigation evidence from the time of their initial appointment to represent Petitioner." (Order Denying Relief, at 42, R-267 [App. 28].)  Adequately investigating mitigation evidence is a completely different activity from waiting for it to pop up while you are doing something else.

The state habeas court found that counsel did the following to prepare for the

penalty phase – and that these things were an "adequate" investigation into

Petitioner's background:

- A contract attorney – Don Pulliam – was appointed to "conduct witness interviews" and "review the State's file" and "one of his main duties was to investigate Petitioner's background, including his childhood." (Order Denying Relief, at 32, 35, R-267 [App. 28].)[48]

- Prior to being appointed to represent Petitioner, Mr. Brannon had served as counsel on five death penalty cases. (*Id.*)[49]

---

[48] This is an unreasonable finding of fact, because Mr. Pulliam was not even engaged as a contract attorney until the "eve of trial" and his "role was administrative rather than substantive." (Affidavit of Donald Pulliam, Vol. 2, Doc. 9, Ex. R-147 (E.H. 2), at 375, ¶¶ 3, 4 (filed 5/24/2006) [hereinafter "Pulliam Aff."] [App. 48].) Moreover, he stopped working prior to the time trial began, and thus was not available to assist Ms. Watson in her sentencing phase preparation during trial. (Pulliam Aff., ¶¶ 3-5, R-147 [App. 48].) Mr. Pulliam had no contact with "Mr. Waldrip's family or any other witness in the case." (*Id.*) To the extent that the Court credits Mr. Brannon's testimony that Mr. Pulliam was "*assigned* the task of looking into [Mr. Waldrip's background] specifically for [the] sentencing phase," (Brannon Testimony, at 73, R-146 (emphasis supplied) [App. 46]) there is no evidence in the record Mr. Pulliam actually spoke to any witnesses during the brief period immediately before trial, but for a lone letter Mr. Pulliam wrote to Mr. Brannon on *August 23, 1994* in which he discusses, apparently for the first time, Mr. Waldrip's background. (Pulliam Letter (8/23/94), Doc. 9, Ex. R-186 (E.H. 41), at 12345-47 (filed 5/24/06) [App. 49].) The investigation to be undertaken – if it was actually undertaken – related to people who were "law enforcement or ex-inmates at Dawson County." (*Id.* at 12346.) Given that trial counsel never considered presenting mental health evidence in mitigation (*see* Section V.C-D below) this letter just before trial cannot support the adequacy of an investigation *for the penalty phase*.

[49] While the state habeas court found that at the time of Petitioner's trial, Mr. Brannon had "served as counsel on five death penalty cases," he was actually only involved in four cases, including Petitioner's – and only three prior to Petitioner's. (Order Denying Relief, at 32, R-267 [App. 28]; Brannon Dep., at 25499-500, R-233 [App. 47].) The state habeas court's finding of fact in this regard is clearly erroneous. The state habeas court also found that Mr. Brannon had been lead counsel in at least two death penalty

(Continued)

- Prior to this case, Ms. Watson had assisted with one death penalty case.  (*Id.* at 33.) [50]

- While Mr. Allen, who had a law enforcement background, assisted with interviewing witnesses, counsel followed up with additional interviews of some of the witnesses.  (*Id.* at 34.) [51]

---

(Continued)

cases and co-counsel in one other death penalty case.  But Mr. Brannon was counsel (either lead or co-counsel) in only *one* death penalty case that actually went to trial – and even then – when Mr. Brannon represented Chris Horner – it is not clear whether the life sentence was imposed after trial or as the result of a negotiated plea.  (*Id.*)  In reality, Mr. Brannon had little, if any, experience in investigating mitigation or formulating a sentencing phase strategy.

[50]  The state habeas court's finding that Ms. Watson had "assisted with one death penalty case," while factually accurate, is misleading.   An examination of Ms. Watson's testimony cited by the state habeas court reveals, however, that Ms. Watson's involvement in that single death penalty case was *as a prosecutor* (Q: How many murder trials, if any, had you tried in the D.A.'s office?   A: I assisted in one death penalty case). (Deposition of Anne Watson, Doc. 9, Ex. R-231 (E.H. 86), at 24823 (filed 5/24/06) [hereinafter "Watson Dep."] [App. 50].)   Accordingly, she had absolutely no experience in developing mitigation evidence – the critical hire she needed to fulfill for Petitioner here, and it was an unreasonable application of law to facts to find that her prosecutorial experience ensured competent mitigation preparation.   Further, her prior criminal experience was devoid of any exposure to mental health or other forensic experts. (Watson Aff., at 164, R-147 [App. 51].)

[51]  The state habeas court makes no finding as to when Mr. Allen conducted these interviews, and it does not find that any of them were related to mitigation.  (*Id.* at 34.) Mr. Allen's own testimony establishes that his role was minor: "I did not do much work on the case.  I did not even keep a file on the case.  I was only hired to do what Mr. Brannon and his co-counsel, Anne Watson, asked me to do, which was fairly limited. They never discussed a theory of the case with me, and I never asked about it.  I just did the random things I was asked to do and reported the results back to Mr. Brannon, usually over the phone."  (Affidavit of David Allen, Doc. 9, Ex. R-146 (E.H. 2), at ¶3 (filed 5/24/06) [hereinafter "Allen Affidavit"] [App. 52].)  Mr. Brannon's description of Mr. Allen's work does not delineate any mitigation investigation by him.  (Testimony of Brannon, Doc. 9, Ex. R-146, at 65-67 [App. 46]; Brannon Dep., at 25507-9, R-233

(Continued)

- Ms. Watson conducted most of the investigation to gather mitigation evidence, but Mr. Brannon assisted.  (*Id*. at 35.)[52]

_____

(Continued)

[App. 47].)   As such, it was an unreasonable determination of fact to find that Mr. Allen's work was penalty phase preparation.

[52]   This fact cannot support the reasonableness of counsel's investigation, because Anne Watson did not know that she was responsible for the sentencing phase and its predicate – a comprehensive mitigation investigation – until trial.  (Affidavit of Anne Watson, Doc. 9, Ex. R-147, (E.H. 2), at 163 [hereinafter "Watson Aff."] [App. 51].) She testified to the same at her deposition:

Q:     Where there any other aspects of trial, either [in] the competency phase, guilt-innocence phase, or sentencing portion where Rich [Brannon] told you, you were going to do that portion?

A:     Well, yeah, the sentencing.

Q:     So he told you, you would be in charge of doing the sentencing [phase]?

A:     Yeah, lining up the witnesses and doing the direct.

Q:     When did he tell you to do that?

A:     Gosh,  I think it was – well, *it was during trial*.

Q:     Okay.  Is that when you started to prepare for the sentencing?

A:     Um-hmm – well, you know, lining them up and poring through the file to see who we would do.

(Watson Dep., at 24933-34, R-231 (emphasis supplied) [App. 50].)  And, while there is little evidence of any mitigation investigation in counsel's files, what exists is in Ms. Watson's trial binder, (*See* Anne Watson Binder, Doc. 9, Ex. R-197 (E.H. 52), at 15332-428 (filed 5/24/05) [hereinafter "Anne Watson Binder"] [App. 144].), and the only interview notes relating to mitigation are those of Rev. Ferguson from *September 29, 1994* – less than a month before trial. (*Id.* at 15423.).  To the extent that Ms. Watson was "preparing for the mitigation phase" before that time, it was not by conducting an investigation.   Not only are there no prior interview notes, but also she moved to Bozeman, Montana in August 1992 – a full 18 months prior to trial.  Although she came

(Continued)

- In preparing "the case" – with no differentiation between guilt and penalty phase preparations – Mr. Brannon became very familiar with Petitioner's background, including Petitioner's Pardons and Parole file.  (*Id.*)  Counsel also spoke to family members and former parishioners and collected some pictures and other materials.  (*Id.* at 35-36.)

- Mr. Brannon knew that it would be difficult to get the family to prepare for the mitigation stage of the trial, and they were reluctant to "say anything negative" about the Petitioner and only his wife indicated that Petitioner had suffered from prior mental problems.  (*Id.* at 36.)[53]

- Ms. Watson had primary responsibility for preparing Dr. Currie for the guilt/innocence and penalty phases of trial; counsel provided him with everything in the file.  (*Id.* at 36-37.)[54]

---

(Continued)

    back to Georgia to attend court hearings, the extent of her investigative involvement in Petitioner's case was meeting with him at the Hall County Jail.  (Watson Aff., at 153-54, R-147 [App. 51].)

[53]    Given that the state habeas court recognized that Mrs. Waldrip had provided additional "red flag" evidence that Mr. Waldrip had *prior* mental health problems, and given that the state habeas court relied on Mr. Brannon's testimony that he had told Mr. Pulliam (just prior to trial) that he had concluded that there was mistreatment of Mr. Waldrip in his background, these findings are demonstrations of the inadequacy of counsel's investigation, and it was an unreasonable finding of fact to conclude the opposite.

[54]    As stated in n.52 above, Ms. Watson began to strategize for the penalty phase during trial.  She testified unequivocally that she did not discuss mitigation with Dr. Currie.  (Watson Affidavit, at 165, R-147 [App. 51].  Indeed, the testimony supports the fact that Dr. Currie was asked to perform two tasks:  a competency evaluation and an inquiry into Petitioner's "predilection to protect his family members at all costs to himself."  (Affidavit of J. Richardson Brannon, Doc. 9, Ex. R-147 (E.H. 2), at 144 (filed 5/24/06) [hereinafter "Brannon Aff."] [App. 26]); Watson Affidavit, at 156-57, R-147 [App. 51].)  Moreover, she explained that she provided Dr. Currie only with the indictment (which was 20 or 30 pages long) and the statute on competency.  (Watson Dep., at 24847, R-231 [App. 50].)  Dr. Currie confirmed that those two items were the only information provided to him by trial counsel.  (Affidavit of John Stuart Currie, Doc. 9, Ex. R-147 (E.H. 2), at 200, ¶ 2 (filed 5/24/06) [hereinafter "Currie Affidavit"] [App. 54].)  To the extent the state habeas court's finding that "counsel provided [Dr.

(Continued)

The "red flags" in this case are related, because the unreliability of Mr. Waldrip's self-reporting went hand-in-hand with the vital importance of understanding his mental health issues; thus, consulting with Dr. Currie about the penalty phase and how to look for, develop and, most important, understand evidence that was specifically mitigating, as distinct from its relevance to the competency hearing or at the guilt phase of the trial, was *and was recognized to be* vital.  The "prompt investigation" referenced by the cases and the ABA Standards must include an examination of facts relative to "penalty in the event of conviction."  Standard for Criminal Justice, 4-4.1 (2d ed. 1982 Supp.)  The Third Circuit Court of Appeals looked to this provision and to *Strickland* to find that "a *separate* penalty phase investigation was the very foundation of reasonable representation in 1986."  *Marshall v. Cathel*, 428 F.3d 452, 467 (3d Cir. 2005)

_____

(Continued)

> Currie] with everything they had in their file pertaining to Petitioner, including Petitioner's background history, along with information from the state's file," (Order Denying Relief, at 36, R-267 [App. 28]), implies that he received more, it is an unreasonable determination of fact, because the two exhibits from the state court evidentiary hearing on which the state habeas court relied – Anne Watson's Deposition (then Respondent's Exhibit 42, at 40-41) and Brannon's Deposition (then Respondent's Exhibit 41, at 35) –demonstrated that Mr. Brannon could not recall what was sent to Dr. Currie (and he was not the one interacting with him), but speculated that Dr. Currie "was given whatever . . . we could put together."  (Brannon Dep., at 25532, R-233 [App. 47].)  The state habeas court's citation to Resp. Ex. 41, pg. 35, is to the section of Ms. Watson's deposition cited above.  (Watson Dep., at 24847, R-231 [App. 50].)

(emphasis supplied).  That duty was even clearer and more well-established by the time Mr. Waldrip was tried, almost a decade later.

Given that the state habeas court itself recognized that counsel's priorities properly included the development of mitigation evidence for a defendant who was not an accurate reporter of his history and whose mental illness was impeding the formulation of a defense, it was an unreasonable application of fact to law for the state habeas court to make no findings whatsoever that there was ever any penalty phase related to the consultation with Dr. Currie and yet somehow conclude that counsel "adequately investigated Petitioner's background."  (Order Denying Relief, at 42, R-267 [App. 28].)

What is not cited in the state habeas court's opinion is the uncontradicted testimony that the penalty phase was *never* discussed when Ms. Watson met with Dr. Currie.  Moreover, the uncontradicted reason for that was that Ms. Watson never considered using Dr. Currie or Mr. Waldrip's mental illness during the penalty phase.  As Ms. Watson testified at the state evidentiary hearing:

> I did not discuss mitigation with Dr. Currie.  I was unaware the[sic] Tommy's condition was serious enough to justify such due to the inadequate state evaluations and the background information not given to Dr. Currie.  I had no strategy reason for failing to investigate these issues with Dr. Currie nor for failing to present him as a witness during the penalty phase.

(Watson Aff., at 165, R-147 [App. 51]; *see also* Currie Aff., at 198-99, ¶ 8, R-147 ("Although I had not been asked to evaluate Mr. Waldrip for penalty phase issues, I also felt much of the information that I had learned in my evaluations would be mitigating and thus relevant in the penalty phase of trial.") [App. 54].)  Equally important, the only information provided by trial counsel to Dr. Currie were the Georgia standards on competency and the indictment – neither of which could assist Dr. Currie in the development of mitigating evidence.  (Currie Aff., at 200, ¶ 2, R-147 [App. 54]; Watson Aff., at 164, R-147 ("I recall providing Dr. Currie with a copy of the indictment and of the legal standards for competency. . . . I *did not provide any background information concerning Tommy's mental health or any information from the witnesses we interviewed*.") [App. 51].)

The lack of any inquiry into a key strategic "red flag" simply cannot be reconciled with a finding of *effective* assistance of counsel.  Moreover, had counsel consulted with Dr. Currie, they would have been placed on notice of the steps they needed to undertake to develop even further mitigating evidence.

Even by itself, however, mitigation evidence regarding a defendant's mental health "has the potential to totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior. 'Thus, psychiatric mitigating evidence not only can act in mitigation, it also could

110

significantly weaken the aggravating factors.'" *Middleton v. Dugger*, 849 F.2d

491, 495 (11th Cir. 1988) (citations omitted); *see also Turpin v. Christenson*, 497

S.E.2d 216, 229 (Ga. 1998) ("psychiatric evidence, if properly investigated and

presented, [can] totally change the evidentiary picture.").  In a penalty phase

analysis, mental health evidence can serve to "reduce [his] moral responsibility . . .

to a level at which capital punishment would strike [a] juror as excessive."

*Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996).

Beyond the state habeas court's findings of fact that are clearly erroneous

and its unreasonable application in finding that former counsel's mitigation

investigation was "adequate" based on said facts, the state habeas court's analysis

suffers from even a greater fatal flaw:  it based its entire decision on the evidence

introduced by the Respondent, without even considering the evidence introduced

by Mr. Waldrip.  This error requires relief for two reasons.

First, the failure to consider competent, admissible – and, in fact, *admitted* –

evidence which was presented to it is by definition an unreasonable determination

of the facts based on the evidence presented.  The state habeas court cannot simply

ignore, without comment, analysis or justification, competent evidence. *See*

*Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982) (finding that courts may not, as a

matter of law, ignore mitigating evidence); *Williams v. Stewart*, 441 F.3d 1030,

111

1057 (9th Cir. 2006) (stating that there is a difference between finding evidence insufficient and failing to consider it altogether).

Second, by only examining Respondent's evidence and looking at what former counsel did without any reference or analysis of the omissions complained of by Mr. Waldrip necessarily results in a conclusion of effectiveness that was an unreasonable application of *Strickland* and its progeny.  Indeed, it suffers from the same error that infected the Third Circuit's analysis in *Rompilla* – that "some is enough," no matter what notice the former counsel had, or what "red flags" were presented, or how easy it would have been to conduct the required investigation, or how valuable the results of the required investigation would have been.

## C. THE PREJUDICE IS EVIDENT FROM THE CONTRAST BETWEEN THE PENALTY PHASE AS PRESENTED AND THE MITIGATION EVIDENCE THAT WAS AVAILABLE TO TRIAL COUNSEL TO USE IN THE PENALTY PHASE.

Given that the state habeas court's analysis was directed at *Strickland*'s first prong, this Court should evaluate prejudice *de novo*, despite the state habeas court's non-specific conclusion that "It cannot be said that counsel's performance was deficient or that counsel's performance prejudiced Petitioner's defense." (Order Denying Relief, at 42, R-267 [App. 28]); *Rompilla*, 545 U.S. at 390.  As discussed above at *supra* n.4, the prejudice to Mr. Waldrip under the applicable

112

standard – whether "the undiscovered 'mitigating evidence' taken as a whole, 'might well have influenced the jury's appraisal of [Petitioner's] culpability,'" *id.* at 393 (quoting *Wiggins*, 539 U.S. at 538) – is readily apparent when the penalty phase testimony as actually presented is contrasted with the mitigation evidence that would have been uncovered, considered and presented had counsel pursued the "red flags" in a timely and diligent investigation targeted to the penalty phase.

An accurate summary of the approximately 100 pages of testimony (including cross examination) from Mr. Waldrip's penalty phase follows:

> Reverend Ferguson expressed shock over Petitioner's arrest and testified that Petitioner had been a pastor and done "dynamic work" with his congregation in South Carolina.  He also testified that Petitioner desired to continue his religious practices in jail.

(T.T. Vol. XVIII, at 3402, 3404, R-63 [App. 16].)

> Petitioner's sister testified that Petitioner had become an alcoholic and started having troubles with the law.  She also testified that, before 1983, Petitioner had done good things for people including her own daughter.

(*Id.* at 3408.)

> Petitioner's brother replicated the testimony of his sister.

(*Id.* at 3412-15.)

> Darlene Stover testified that she knew Petitioner while they were growing up and that he had helped her then because she was poor.

113

She was originally unaware of Petitioner's previous convictions, but she still thought he could be rehabilitated.

(*Id.* at 3417-18.)

Ben Stover, Darlene's husband, testified that he was a pastor, and that he had seen Petitioner do good work at his church in Monck's Corner.

(*Id.* at 3420-21.)

Carson Lightley testified that Petitioner was a good man who could be rehabilitated.

(*Id.* at 3425-26.)

J.M. Steedley testified that Petitioner had done good work in South Carolina and that he believed he could do work in prison, even if it was for the rest of his life.

(*Id.* at 3467, 3471.)

This testimony was wholly unpersuasive and provided little if any insight into Petitioner's traumatic and tragic life history. Had trial counsel not artificially truncated its investigation, they would have learned of a compelling case in mitigation. Had counsel conducted a reasonable investigation and presented the compelling evidence adduced, there is a reasonable probability that at least one juror would have struck a different balance. *See Rompilla*, 545 U.S. 374 (2005); *Wiggins*, 539 U.S. 510 (2003); *[Terry] Williams*, 529 U.S. 362 (2000).

### D.   A REASONABLE INVESTIGATION WOULD HAVE UNCOVERED A COMPELLING CASE IN MITIGATION.

A wealth of information was within easy reach.  Former counsel did not need to go to the ends of the earth to discover this information, but only needed to make a diligent inquiry by questioning witnesses that were known (or should have been known) to them.  This is especially so considering that Ms. Watson believed as early as August of 1992 that the "jury [would] probably convict on [the] evidence."  (Anne Watson Binder, Doc. 9, Ex. R-197 (E.H. 52), at 15332 (filed 5/24/06) [hereinafter "Anne Watson Binder"] [App. 144].)

The mitigation story below was reasonably available to Ms. Watson from Pamela Rowe, Lillian Lipscomb, Ronald Lipscomb, Sheilds Hunter, Jeanne Jordan, Jimmy Pinion, Barbara Bozeman, Martha Justice, Lowry Justice, Gerald Wilkerson, Elsie Corine Livingston, Michael Waldrip, Paulette Livingston and Joyann Hughes.  She simply did not seek them out or ask them the appropriate questions to acquire the information.

### 1.   Tommy Lee Waldrip Was Neglected as a Child.

Mr. Waldrip had a very difficult childhood.  (Affidavit of Joyce Nix, Doc. 9, R-147, (E.H. 2) at 355-56 (filed 5/24/2006) [hereinafter Nix Aff.] [App. 55].) Tommy did not receive support from his parents, emotionally or financially.

(Affidavit of Linda Waldrip, Doc. 9, R-147 (E.H. 2), at 392 (filed 5/24/2006) [hereinafter Linda Waldrip Aff.] [App. 56].)  His father, in particular, did not show him any care or affection.  (Nix Aff., at 355-56, R-147 [App. 55].)  Even as a child, Tommy had to pay his own way, so he worked nights while attending school during the day.  (Linda Waldrip Aff., at 392, R-147 [App. 56].)  His own wife, who has known Tommy since childhood, never heard Tommy's parents tell him they loved him or otherwise show him any affection.  (*Id.* at 391.)

Indeed, Tommy's parents failed to meet his most basic needs.  When Tommy had very serious health problems as a small child, such as scarlet fever and a potentially serious head trauma, his father refused to take him to the hospital because he thought the hospital would charge him too much money.  (*Id.* at 392; Nix Aff., at 355, R-147 [App. 55].)  For her part, Tommy's mother was mentally ill and often could not distinguish what was real from what was not real, much less provide appropriate care and attention to her children.  (Nix Aff., at 358-60, R-147 [App. 55].)  In fact, the only adult who ever cared for Tommy was his Aunt Evelyn, an alcoholic herself, who allowed Tommy to live with her when Tommy's father kicked him out of the house at age 16.  (Linda Waldrip Aff., at 392-94, R-147 [App. 56]; Nix Aff., at 355, R-147 [App. 55].)

116

2.    **As a Young Adult, Tommy Experienced Several Family Tragedies and Began to Exhibit Signs of Mental Illness.**

To find the affection and support he had always lacked from his parents, Tommy looked to Linda Waldrip.  (Nix Aff., at 356, R-147 [App. 55].)  Tommy married Linda when he was 17 and she was only 15.  (Linda Waldrip Aff., at 394, R-147 [App. 56]).  They moved into an apartment together in Atlanta.  (*Id.*)  Tommy worked, attended night school, and watched over his younger brother, Randy.  (*Id.*)  Linda introduced Tommy to the church, and Tommy became very involved and very religious.  (*Id.*)  The church seemed to fill a void in Tommy and make him feel whole.  (*Id.*)

It was not long after, however, that Tommy experienced several tragic and profound losses.  In 1964, Linda gave birth to their first child, but the baby, Michelle, was born with only one kidney, which was polycystic and not properly functioning.  (*Id.* at 396.)  At the same time, Tommy's Aunt Evelyn was in the hospital fighting cirrhosis of the liver.  (*Id.*)  Tommy spent his days visiting Evelyn, Michelle, and Linda, trying to shield each from the bad news about the other.  (*Id.*)  After a number of days, Evelyn passed away.  (*Id.*)  The day after her funeral, Michelle died too.  (*Id.*)  The deaths of his daughter and aunt within days

of each other took a devastating toll on Tommy, who "was like a zombie during the whole thing" and "just sat there on a chair and stared straight ahead." (*Id.*)

To cope, Tommy threw himself into the church and was ordained as a deacon in 1965. But by that point, he had already begun to show signs of mental illness. For instance, one night early in their marriage, Tommy and Linda attended a family dinner at the home of Linda's mother. In the middle of dinner, and without any warning, Tommy picked up a bowl of coleslaw and threw it at Linda's younger sister, Paulette, causing it to spill all over her hair and dress. (Affidavit of Elsie Corine Livingston, Doc. 9, R-147 (E.H. 2), at 285 (filed 5/24/2006) [hereinafter Elsie Livingston Aff.] [App. 57].) Linda's mother explained that "the weirdest part was that it wasn't that Tommy was angry or that he was just kidding around. He had been acting totally normal and then, out of nowhere, he hurled the salad across the table. No one knew what to say. . . . Tommy looked just like his regular self, as if nothing had happened." (*Id.* at 285.)

Similarly, when Linda was eight months pregnant with Michelle, Tommy came home to their apartment, declared that it was too hot, and, without warning, grabbed the bed sheets that Linda was sitting on and ripped them out from under her. (Linda Waldrip Aff., at 395, R-147 [App. 56].) Tommy had not hurt Linda and showed no signs of anger. But Linda remembered the incident not only

because it was so bizarre, but also because afterward Tommy stood there as if he did not know exactly what had just happened.  (*Id.*)

The strange behavior continued a year later, in 1965, when Linda gave birth to a healthy baby boy, Michael Lee, and Tommy impulsively uprooted and moved the family to Buford, Georgia, only to move the family back to Atlanta just as abruptly, all because he said he heard God speaking to him and telling him to do so.  (*Id.* at 397).

Despite his strange behavior and out-of-character episodes, Tommy enrolled in Immanuel College and was determined to become a preacher.  (*Id.*)  While he attended college, he also worked at a GM plant to support his family.  (*Id.*)  But after his father hurt himself and had to stop working, Tommy took over his father's barber shop so that his father would not lose the business, even though he earned less from the barber shop than he was paid in the GM position.  (*Id.*)  Tommy made this sacrifice without any thanks from his neglectful father, at the same time he was going to school and struggling to support his own wife and child.  (*Id.*)  Linda reported that Tommy always felt responsible for family, regardless of how badly his family members had acted.  (*Id.*)

Things then became even more difficult in 1967, when Linda's mother was diagnosed with ovarian cancer and scheduled for surgery.  (*Id.* at 398.)  While

119

Linda's mother was ill, Linda and Tommy took in and cared for Linda's four young siblings, in addition to their own baby, even though they were still teenagers themselves with very limited financial means.  (*Id.*)

To make matters worse, at about the same time, Tommy received a phone call from his father with devastating news.  (*Id.*)  Tommy's older brother, Freddie, had been killed "by some dirty cops who had tricked Freddie into helping them rob an armored truck and then shot him in the back."  (*Id.*)  Tommy was devastated. (*Id.*)  Freddie was the one person in his family that Tommy truly liked; he admired him for having survived his father's cold ways and having moved on with his life. (*Id.* at 388-99.)  Tommy always spoke of Freddie's death as "something that had been taken away from him, and he talked about the police as the ones who had taken it from him.  He was furious at them.  He never forgave them."  (*Id.*)  Like the tragic deaths of Tommy's infant daughter, Michelle, and his beloved Aunt Evelyn, Freddie's death traumatized Tommy, and the utter lack of emotion from his parents left the entire family unable to express their grief.  (Nix Aff., at 356, R-147 [App. 55].)

3.   **After the Sudden Deaths of His Daughter, Aunt, and
Brother, Tommy Moved His Family to South Carolina
Where He Built a Successful Church, But Then Lost All He
Had Built After Suffering a Mental Breakdown.**

When Linda's mother recovered, Tommy moved the family back to Buford,
Georgia.  He continued his studies and had two more children with Linda:  John
Mark in 1968 and Paul Thomas in 1970.  (Linda Waldrip Aff., at 399, R-147
[App. 56].)  He once again threw himself into church, work and family and, in
1971, he was ordained as a preacher.  (*Id.*)

Shortly thereafter, Tommy reported to Linda that God was sending him
messages, telling him that he had to go to South Carolina to start a church.  (*Id.*)
So, in the early 1970s the family moved to Monck's Corner, South Carolina, where
Tommy developed a quickly expanding church following and then built the
Maranatha Baptist Church from the ground up.  (*Id.* at 400.)  The church was so
successful that it added a Christian school for the parishioners' children, where
Tommy served as principal and pastor.  (*Id.*)  Tommy poured himself into his
work, as if keeping busy would block out all of the grief he had suffered.  (*Id.* at
400-01.)

Although he worked hard in Monck's Corner to build a successful church
and to be a loving and energetic father, Tommy still had episodes of paranoia and

121

disturbing behavior.  For instance, one day when a neighbor's dog accidentally got

loose and started charging after Tommy's young son, Mike, Tommy got very

upset, but not about whether Mike was hurt. (Affidavit of Michael Waldrip, Doc.

9, R-147 (E.H. 2), at 419 (filed 5/24/2006) [hereinafter Michael Waldrip Aff.]

[App. 58].)  Rather, he was upset because he irrationally thought that the dog's

owner had intentionally tried to get his dog to attack Mike simply because Mike

was Tommy's son.  (*Id.*)  Mike remembered the incident because Tommy's

reaction under the circumstances was so bizarre.

    Like his son, Tommy's parishioners began noticing Tommy's episodes of

irrational and paranoid behavior.  As one of his parishioners, Jeanne Jordan was

very close to Tommy, and considered him a father figure.  (Affidavit of Jeanne

Jordan, Doc. 9, R-147 (E.H. 2), at 250-51 (filed 5/24/2006) [hereinafter Jordan

Aff.] [App. 59].)  When she went through some very troubling times as a young

adult, she described Mr. Waldrip as the "rock during that period in her life" and

that "without him, I honestly believe I would not have made it."  (*Id.* at 252.)

    But thereafter she noticed a change.  One night when she was physically

threatened by a violent intruder in her home, she called Tommy for help.  (*Id.* at

253-54.)  Tommy came over to assist, but he insisted that she not call the police

because he said "you couldn't trust whatever they did do, and that all they would

ultimately do was get everyone in the world agitating you, showing up on your doorstep and watching you." (*Id.* at 254.)  Likewise, when Ms. Jordan got in trouble at school for refusing to read a book due to her religious beliefs, Tommy came to her aid, but bizarrely warned the principal that he "could not turn or take [Ms. Jordan] away from him." (*Id.* at 254-255.)

A few years later, in the late 1970s, all of these small signs of mental illness came to a head for Tommy when a small number of parishioners at the Maranatha Church approached him about making some changes in how the church was run. (Linda Waldrip Aff., at 401, R-147 [App. 56].)  Tommy's reaction was "completely out of proportion, and out of character for him." (*Id.*)  It reminded Linda of the time when Tommy had pulled the bed sheets out from under her years before.  He was suddenly a completely different person, except this time the reaction was much more intense and severe.  (*Id.*)  Tommy responded to his parishioners' request by giving a long, loud, and incoherent speech to the congregation about "persecution and betrayal, about schemes and plots." (*Id.*)  In his mind, the congregation was conspiring to manufacture claims against him to destroy what he had built.  (*Id.*)  He claimed that he "would not stand for a church that was infiltrated by detractors." (*Id.* at 402.)  He told Linda that he wanted to see the church through the "rebellion." (*Id.*)

At this point, both his family and his parishioners recognized that Tommy had experienced a mental breakdown.  (*Id.* at 401.)  Ms. Jordan explained that Tommy was "broken in front of [her]" and had "started breaking down in the pulpit when he tried to preach.  He would cry and mumble and not be able to finish." (Jordan Aff., at 255, R-147 [App. 59].)  Shields Hunter, the Assistant Principal at the Maranatha Baptist School, explained that Tommy became unduly distrustful of everyone and that he "had been operating under some severe debilitations.  His behavior had been remarkably paranoid, and far from normal." (Affidavit of Shields Hunter, Doc. 9, R-147, (E.H. 2), at 246-247 (filed 5/24/2006) [App. 60].)  Likewise, Lowry Justice, a board member at the Maranatha Church, noted that Tommy "seemed to really go off the deep end" and acted "like he was at war, like he had to protect his congregation – his family – against a great force trying to bring them down."  (Affidavit of Lowry Justice, Doc. 9, R-147 (E.H. 2), at 261 (filed 5/24/2006) [App. 61].)  Mr. Lowry's wife, Martha, similarly saw that Tommy, who was once a compassionate leader, suddenly "blew his top" and "seemed out of control" as he began "shouting from the pulpit" that his once beloved parishioners were now "traitors" who were "working against him." (Affidavit of Martha Justice, Doc. 9, R-147 (E.H. 2), at 266-67 (filed 5/24/2006) [App. 62].)

124

For her part, Linda recognized that Tommy was so troubled that he did not seem aware of his own behavior.  For instance, the night after Tommy gave his incoherent speech to the congregation about "surviving the rebellion," he seemed surprised by what had happened and did not seem to remember what he had done. (Linda Waldrip Aff., at 402, R-147 [App. 56].)  In fact, a few days after resolving to see the church through the imaginary "rebellion," Tommy made a complete turn-around, telling Linda that they could not stay in South Carolina anymore because "things were over" and "they had won."  (*Id.*)  Tommy had lost a part of himself when he lost that church.  (*Id.*)  According to his family, a part of Tommy "seemed to die" when they left Monck's Corner in the late 1970s and "he was never the same again."  (Michael Waldrip Aff., at 419, R-147 [App. 58].)

### 4.    After leaving Monck's Corner, Tommy's Paranoia and Disturbed Behavior Progressively Worsened.

After leaving Monck's Corner, Tommy packed the family up and moved back to Buford, Georgia again.  (Linda Waldrip Aff., at 402, R-147 [App. 56].)  He started working two jobs to try to keep things together, but he quickly became a totally different person.  (*Id.*)  He stopped doing things he had previously enjoyed; he stopped going to church; he missed time with his family that he previously cherished; he began drinking; he began moving his family around abruptly and

125

without reason; he began spouting "irrational talk" of being "run out of everywhere"; he began forgetting even the simplest things; he began seeing another woman; and he ultimately walked out on his family suddenly and without warning on Christmas Day.  (*Id.* at 402-05; Nix Aff., at 357, R-147 [App. 55].)  To make matters worse, at roughly the same time, the Waldrips' house burned down, and although no one determined its cause, Tommy was convinced that someone had started it on purpose.  (Linda Waldrip Aff., at 404, R-147 [App. 56].)

By this point, Tommy had developed mental problems similar to those exhibited by his mother, whom Tommy's sister described as having a "split personality."  (Nix Aff., at 359, R-147 [App. 55].)  Tommy's mother would act wildly and bizarrely, and then would completely forget what she had done.  (*Id.*)  Medication did not ease her outbursts and fits, and eventually her family members sought to commit her to a mental health facility.  (Linda Waldrip Aff., at 411, R-147 [App. 56].)  She refused and, instead, developed a drinking problem, much like Tommy, and ultimately wound up living in a nursing home without any functional memory or sense of reality.  (*Id.*)  After the incident at the Maranatha church, Tommy's family recognized that Tommy, like his mother before him, had "problems with knowing exactly what had happened, what was real and what was not."  (Nix Aff., at 360, R-147 [App. 55].)

126

Although Linda was hurt by Tommy's behavior, she was also concerned for Tommy because she was "convinced that something was seriously wrong with him mentally" and she "urged him to get professional help." (Linda Waldrip Aff., at 405, R-147 [App. 56].)  Much like his mother, however, he refused.  Instead, he uprooted and moved Linda and the family to St. Marys, Georgia, which – unbeknownst to Linda – was just across the Florida border from where Tommy had begun living a double life with a woman named Lynn Lipscomb.  (*Id.* at 404-07.)  When he was in St. Marys, Tommy eventually got a job as a security guard at a state park, but it just seemed to feed his distracted nature.  (*Id.* at 406.)  He would see law enforcement officers drinking and fooling around with women in the park while off-duty, and he would talk incessantly about how they were "just as bad as the ones who had killed Freddie."  (*Id.*)  To most people such behavior was perhaps dishonorable, but to Tommy, those officers were "the evil incarnate."  (*Id.* at 406-07.)

At around the same time, Linda and Tommy learned that the Maranatha school Tommy started in Monck's Corner had closed down.  (*Id.* at 407.)  Tommy's reaction was bizarre.  Instead of being sad about the closing, he told Linda that it was proof that evil people were out to ruin everything he did.  (*Id.*)

127

He was obsessed with such conspiratorial ideas, and even when he was completely sober, he was convinced that people were plotting against him. (*Id.*)

When Linda eventually discovered that Tommy had moved Lynn nearby, she told Tommy he was not welcome at her house as long as he continued seeing Lynn. (*Id.*) But Tommy would come back to Linda a few days later as if nothing had ever happened. (*Id.*) Tommy clearly did not remember that Linda had asked him to stay away. (*Id.*) Linda was hurt but remained very worried for Tommy. (*Id.*) He was drinking, confused and acting strangely. But he was rarely all three at the same time, so she knew that the confusion and strange behavior were not coming from the drinking alone. (*Id.* at 407-08.)

Tommy subsequently sought a divorce from Linda but, throughout the divorce hearing, he could not stop crying and, even afterward, he seemed utterly confused. (*Id.* at 408.) For instance, after the divorce was granted, Tommy kept returning to Linda's home. Sometimes he would return to say that he was worried and felt guilty about how his odd behavior affected his family, but other times he would do very bizarre things. (*Id.*) One time he threw a pig into Linda's house and then sped away. (*Id.*) Another time, he threw a rabbit in the house and did the same thing. (*Id.*) And another time, when Linda permitted him to stay at her house, she awoke at night to find that a minor cut she had received earlier that day

128

had started to bleed.  (*Id.* at 408-09.)  When she woke Tommy up to help her clean

the cut, Tommy jumped out of bed, ran out the front door and around the outside of

the house, and only then returned upstairs to help Linda. (*Id.* at 409.)  He said

nothing to explain what he was doing.   Linda wrote it off to Tommy's "acting

crazy again."  (*Id.*)

In this post-divorce period, Tommy moved back to Atlanta with Lynn.  (*Id.*)

He would call to tell his boys that "the old man" was "coming home from the

mountains."  (*Id.*)  He would then show up temporarily only to leave again.  This

unpredictable rollercoaster continued for some time.  (*Id.*)  All the while, Tommy

became increasingly paranoid and obsessed about what he considered to be a

police conspiracy to destroy his family.  (Affidavit of Lillian Lipscomb, Doc. 9, R-

147 (E.H. 2), at 269-77 (filed 5/24/2006) [hereinafter Lillian Lipscomb Aff.]

[App. 63].)  His initial distrust appeared to stem from his childhood when his older

brother whom he looked up to was shot and killed by the police during a botched

robbery.  (*Id.* at 270-72.)  But his initial distrust evolved into something much

deeper and more irrational, thoughts that became so intense that he started sleeping

with a pistol under his pillow.  (*Id.* at 274.)

Around the same time, in 1983, Tommy's bizarre behavior caused him legal

problems for the first time when he, his son Mike, and Lynn were arrested for a

burglary.  (Linda Waldrip Aff., at 409, R-147 [App. 56].)  Mike had developed a

cocaine problem and devised a plan to feed his drug addiction by robbing a drug

dealer in Georgia in 1983.  (Michael Waldrip Aff., at 420, R-147 [App.58].)  While

on his way to commit the robbery, Mike happened to run into Tommy and Lynn

Lipscomb.  (*Id.*)  When Tommy could not dissuade Mike from pursuing the

robbery, Tommy oddly insisted that he come along to protect Mike from law

enforcement because "he didn't trust them."  (*Id.* at 421; Lillian Lipscomb Aff., at

275, R-147 [App. 63].)  Mike, Tommy, and Lynn were then caught by the police.

Mike testified that he told the police that the robbery had been all his fault, but

Tommy nevertheless remained irrationally convinced that Bobby Clark of the

sheriff's department had set the whole thing up.  (Michael Waldrip Aff., at 421, R-

147 [App. 58].)

When Linda visited Tommy in jail, he went on and on about how the local

police had "gotten" his son.  (Linda Waldrip Aff., at 409, R-147 [App. 56].)  He

explained that "Mike was in real trouble while in police custody because law

enforcement had it in for the Waldrip family."  (*Id.* at 409-10.)  Tommy seemed to

have no understanding that Mike was in trouble because he had broken the law, not

because the police had some vendetta against Waldrips.  (*Id.* at 410.)  He could not

see the danger of Mike trying to rob a drug dealer; he genuinely saw only the

"danger" of the imaginary police conspiracy to persecute his family.  (Lillian

Lipscomb Aff., at 275, R-147 [App. 63].)

Even his lawyer, Gerald Wilkerson, recognized that Tommy had

demonstrable mental problems.  Mr. Wilkerson represented Mr. Waldrip in the

early 1980s in his divorce case and on his 1984 burglary charge.  (Affidavit of

Gerald Wilkerson, Doc. 9, R-147, (E.H. 2), at 425 (filed 5/24/2006) [hereinafter

Wilkerson Aff.] [App. 64].)  During the course of those representations, Tommy

could not effectively focus, understand or communicate.  (*Id.* at 426-27.)  He was

constantly and severely paranoid about a non-existent government conspiracy

against him and his family, a conspiracy which made it almost impossible to

communicate with him and which led him to make irrational decisions against his

own interests when offered a generous plea on the burglary charge.  (*Id.* at 425-

429.)

Much like Mr. Wilkerson, Lynn recognized Tommy's mental illness and

disturbed behavior, which led her to end her relationship with Tommy.  She

explained that "Tommy's paranoia about the police, and the lengths he was going

to in order to protect his family from what he claimed was police persecution,

became too much for me."  (Lillian Lipscomb Aff., at 275, R-147 [App. 63].)  She

131

knew that "Tommy was stuck in some mindset that didn't seem like it would ever change." (*Id.* at 274.)

After Lynn left him, Tommy returned to Linda and they eventually remarried. (Linda Waldrip Aff., at 410, R-147 [App. 56].) Linda hoped that the arrest might scare Tommy to go straight, but deep down she knew that there was "something seriously and deeply wrong with him" that could not be "scared away." (*Id.* at 410.) He got a job in the Cumming area and then sent for Linda, John and Paul. By that point, Mike was out on his own. (*Id.*)

Following the arrests in 1983, whenever any of his children got in trouble, Tommy saw it as more evidence of a conspiracy against him. (*Id.* at 412.) When his son, Paul, was later arrested for possession of marijuana, Tommy thought the whole charge was a set-up by Randy Chester, at the time a detective in the police department. (*Id.*) When Mike was arrested for drunk driving, Tommy said it happened simply because Mike was related to Tommy and the sheriff's department had a vendetta against him. (*Id.*) When Mike's wife, Pamela Rowe, was raped by a man who frequented the store at which she worked, Tommy was convinced that law enforcement was not acting to protect Pam and that the man who raped her was a drug runner for the sheriff. (*Id.* at 414.) And when a robbery conviction against his son, John, was quickly reversed and set for a re-trial, Tommy thought

132

that "the system" and law enforcement officials were "still out to get him." (*Id.* at 414-15.) None of his suspicions had any basis in fact.

Tommy's paranoia even extended to persons he had never met. For instance, when Tommy found out that his daughter-in-law, Pam, had a father who was a police chief, Tommy "went out of his head talking about how he didn't like the man and how he had some conspiracy against the Waldrips." (Michael Waldrip Aff., at 422, R-147 [App. 58].) Mike explained that even though Tommy had never met Pam's father, he "kept going on about how the man would destroy us all." (*Id.*) Not surprisingly then, Tommy "always seemed kind of off" to Pam. (Affidavit of Pamela Rowe, Doc. 9, R-147 (E.H. 2), at 378 (filed 5/24/2006) [App. 65].) In her presence, Tommy constantly talked about how the police chief, Bobby Clark "was trying to set Tommy or his sons up just so that he could arrest them and put them away." (*Id.*) Indeed, the fixation got so intense that Tommy relocated his family to Dawsonville, Georgia, because he was convinced that Mr. Clark "had turned the rest of Camden County against him and his family." (*Id.* at 379.) But, once there, Tommy just shifted his paranoid fixation from Bobby Clark to Randy Chester, then the Dawson County Sheriff, "saying he was out to set up the Waldrips." (*Id.* at 379-80.)

Despite, or perhaps because of, his paranoia, Tommy got into more trouble with the law when he befriended Lynn's brother, Ronnie Lipscomb.  (Affidavit of Ronald Lipscomb, Doc. 9, R-147 (E.H. 2), at 279 (filed 5/24/2006) [hereinafter Ronald Lipscomb Aff.] [App. 66].)  Tommy began hanging out with Ronnie in the late 1980s, after he stopped seeing Lynn.  (Linda Waldrip Aff., at 413, R-147 [App. 56].)  Both Tommy and Ronnie had alcohol abuse problems and drank together daily.  (Ronald Lipscomb Aff., at 279, R-147 [App. 66].)  They worked as house painters together and would work drunk, unless they could get high off the paint fumes.  (*Id.* at 279-80.)  At times, Tommy was so "out of it" that he had to quit painting and leave (*id.* at 280), but he was never violent or angry.  (Ronald Lipscomb Aff., at 280, 282, R-147 [App. 66].)

It was during this time that Tommy agreed to help Ronnie in an attempted robbery of a barber shop to feed Ronnie's drug habit.  But the pair were caught because Tommy kept losing his balance and falling.  (*Id.* at 281.)  When the two men were arrested and put in jail in 1988, Tommy became detached as if "nothing that was going on around him seemed to mean anything to him; he didn't even notice any of it."  (*Id.* at 281.)  Then, all of the sudden Tommy demanded a jury trial on the burglary charge—even though he had been caught at the scene of the

134

crime—because he insisted that "they were not going to get away with this." (*Id.*)
His paranoid delusions about some fantasy police conspiracy persisted.

After serving time for the botched burglary attempt with Ronnie, Tommy
returned to Linda in Dawsonville in 1989. (Linda Waldrip Aff., at 413, R-147
[App. 56].) At that point, Tommy said he wanted to turn his life around. (*Id.*) He
re-joined a Baptist Church and got a few painting jobs. (*Id.* at 414.) However,
when his trailer home burned down again, Tommy talked about the County having
something to do with it, leaving Linda to worry that he was "slipping back into his
obsessions." (*Id.*)

Shortly thereafter, Keith Evans – a man who had testified against Tommy's
son John in a robbery case – went missing and the police came to Linda's house to
ask questions. (*Id.* at 415.) When the police left, all Tommy could talk about was
how worried he was for John and that he knew the police were out to get John for
this. (*Id.*) He was inconsolable. The next thing Linda knew, her son, husband,
and brother were all in jail for the murder of Keith Evans. At that point, Tommy
was "a complete wreck" who had "completely lost it." (*Id.*) His fixation on police
conspiracies was worse than ever. He began talking about a "monitor" that knew
everything that he was thinking, and how Dawson County officials spoke to him
through this monitor, telling him that his family was in danger. (*Id.*) He also said

that the monitor told him that John and Linda had been killed, and he acted as if everything he had suspected all along had come true—namely, that law enforcement had finally "gotten" his family.  (*Id.*)

In fact, even the law enforcement officials who came in contact with Tommy during his incarceration pending his capital trial recognized Tommy's mental illness.  Joyann Hughes, a deputy in the Dawson County Sheriff's Department, frequently observed and interacted with Tommy during that time.  (Affidavit of Joyann Hughes, Doc. 9, R-147 (E.H. 2), at 242 (filed 5/24/2006) [hereinafter Hughes Aff.] [App. 67].)  She described him as "a gentle older man," (*id.* at 240), but recognized that mentally "Tommy definitely had problems" (*id.* at 242).  He was usually in a zombie-like state, such that he would not realize when someone was standing right in front of his face.  (*Id.*)  He would constantly write incoherent notes to some imaginary or unidentified person and place them all around his cell. (Hughes Aff., at 242-43, R-147 [App. 67].)  She explained that "[i]t was like reality wasn't registering with Tommy."  (*Id.* at 242.)  She confirmed that the same tenuous grasp on reality that his family saw Tommy struggle with for years before was now worse and readily apparent to all those around him.

136

5. **Based Upon the Foregoing Mitigation Evidence that Trial Counsel Failed to Investigate and Discover, Mental Health Experts Concluded that Tommy Lee Waldrip Had Long Suffered from Paranoid Schizophrenia.**

Once the foregoing evidence came to light after Tommy's capital trial was over, Dr. James Ray Merikangas, M.D. conducted a full examination of Tommy's mental health status. (Affidavit of James Ray Merikangas, M.D., Doc. 9, R-147 (E.H. 2), at 293-326 (filed 5/24/2006) [hereinafter Merikangas Aff.] [App. 68].) Dr. Merikangas received his M.D. from Johns Hopkins in 1969 and completed residencies in psychiatry and neurology at Yale-New Haven Hospital under the auspices of the Yale University School of Medicine. (*Id.* at 293.) He is board certified in psychiatry and neurology and has had a long and accomplished career as a practicing psychiatrist and professor of psychiatry. (*See id.* at Appendix A (Dr. Merikangas's curriculum vitae).)

Based on his review of the foregoing social history information and his own evaluation of Tommy, Dr. Merikangas concluded that Tommy has long suffered from paranoid schizophrenia, documented by a long history of persecutory delusions, auditory hallucinations, bizarre behavior, poor judgment, lack of insight into his illness, and prolific writing. (*Id.* at 306-14.) Dr. Merikangas explained how Tommy's alcoholism likely exacerbated his condition. (*Id.* at 324.) He also

explained how the mental illness itself is typically marked by active and passive phases, which explains Tommy's contrasting periods of relatively normal functioning and periods of complete paranoia and disturbed behavior. (*Id.* at 316.) In addition, Dr. Merikangas' evaluation revealed that Tommy suffers from and has suffered from neurological deficiencies, which could have been caused by any number of factors from his past, including the untreated frontal lobe injury from childhood and/or his significant exposure to harmful chemicals such as paint solvents. (*Id.* at 320-26.)

Dr. Merikangas also explained that Tommy's misdiagnoses by Dr. Currie and the State's doctors was due, in large part, to the failure to inform the diagnosing doctors of Mr. Waldrip's symptoms and social history. (*Id.* at 314-20.) And the doctors who had previously misdiagnosed Mr. Waldrip agreed. Dr. Currie explained that had he been provided with the full social history that Habeas Counsel collected and provided to Dr. Merikangas, he too would have diagnosed Mr. Waldrip as a paranoid schizophrenic. (Currie Affidavit, at 200-1, R-147 ("Dr. Merikangas' diagnosis is simply more accurate because it is based on a *complete* social history. Had trial counsel provided me with as complete a social history as was made available to Dr. Merikangas, I can say with a reasonable amount of

certainty that I too would have diagnosed Mr. Waldrip as suffering from paranoid schizophrenia.") [App. 54].)

The same holds true for Dr. Storms, the court-appointed psychiatrist who initially opined that Tommy was competent to stand trial.  After reading Dr. Merikangas's affidavit and the underlying social history information developed by Habeas Counsel, Dr. Storms testified that his prior failure to diagnosis Mr. Waldrip as a paranoid schizophrenic was due to a test scoring error on his part and the fact that he "had not had enough time or enough information to make a diagnosis." (Affidavit of Robert J. Storms, Ph.D., J.D., Doc. 9, R-147 (E.H. 2), at 385 (filed 5/24/2006) [App. 69].)  He explained that the full social history information developed by Habeas Counsel after Tommy's trial "is worthy of clinical consideration because it is from different sources across different time periods and points to a noticeable change in Mr. Waldrip's personality and behavior prior to the incident leading to his arrest."  (*Id.* at 386.)  Former trial counsel, of course, had never provided him with this critical social history data, which showed that "Mr. Waldrip [may have] suffered some type of illness, possibly a thought disorder, for several years pre-dating the incident for which he is on death row." (*Id.* at 387-88.)  Dr. Storms testified that a new, more thorough evaluation would have to be performed, taking into consideration the social history evidence related

to Tommy's "history of bizarre, possibly paranoid schizophrenic behavior." (*Id.* at 387.)  Dr. Merikangas performed that comprehensive evaluation and concluded unequivocally that Tommy had long been suffering from paranoid schizophrenia and that his mental illness significantly reduced his moral culpability for any criminal act.

> **E.  THERE IS A REASONABLE PROBABILITY THAT A SINGLE JUROR WOULD HAVE VOTED FOR LIFE HAD THE FORMER COUNSEL UNDERTAKEN A REASONABLE INVESTIGATION AND PRESENTED THE MITIGATION EVIDENCE IN THE SENTENCING PHASE.**

Given the above, there is no doubt that the evidentiary picture in the penalty phase would have been vastly different had counsel consulted with Dr. Currie and pursued a timely investigation into the factors it knew to be vital to the "case for life," as the sentencing phase is sometimes called.  Counsel's conduct in presenting the penalty phase as they did, devoid of these facts that would have been critical to a juror's reasoned consideration, and without any knowledge of the facts to inform a strategic decision to include or exclude them, was prejudicial under the standards set forth in the Supreme Court's precedent announced in *Strickland v. Washington*, 466 U.S. 668 (1984) and further illustrated by *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005).

If the former counsel had not been deficient, the jury would have gotten a picture of Mr. Waldrip's entire life, most notable for his marked mental decline and series of tragedies. With the help of the appropriate mental health expert, the jury would have seen the tapestry of Mr. Waldrip's life and how he had struggled valiantly against severe mental health impairments that caused paranoia, impulse control problems, alcoholism and depression. Against this formidable mitigation evidence, the Prosecution's case for aggravation was weak. Other than the evidence of the underlying crime, the Prosecution submitted evidence only of a few prior non-violent crimes, burglaries and DUIs.

The prejudice caused by former counsel here is as least as great as the prejudice found by the United States Supreme Court in *[Terry] Williams*. There, the Supreme Court applied *Strickland*'s standard for assessing prejudice – petitioner must prove that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," 466 U.S. at 694 – and held that the Virginia Supreme Court had unreasonably concluded that Williams suffered no prejudice from his counsel's failure to prepare and present a case in mitigation. 529 U.S. at 391, 396-97.

Trial counsel in *Williams* had failed to discover and present to the jury important mitigating evidence, including that Williams had an impoverished

141

childhood, that he was "borderline mentally retarded," and that prison records contained "commendations" Williams had received in prison. *Id.* at 395-96. Although the mitigation evidence left undiscovered in *[Terry] Williams* was substantial, so too was the prosecution's evidence supporting a death sentence. Williams, prior to the murder for which he had been sentenced to death, "savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to the city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw." *Id.* at 418 (Rehnquist, C.J., dissenting) (quotation marks and citations omitted). Moreover, even the evidence trial counsel had failed to discover was not uniformly helpful, because it included Williams' substantial juvenile criminal record. *See id.* at 396.

Yet despite Williams' acknowledged history of serious criminal violence, and despite the fact that some of the evidence omitted by counsel would have been damaging to Williams, the Supreme Court held that the mitigation evidence that counsel failed to investigate, discover and present to the jury "might well have influenced the jury's appraisal of his moral culpability," *id.* at 398 (citing *Boyde v. California*, 494 U.S. 370, 387 (1990)). Accordingly, the United States Supreme Court held that counsel's deficient performance had prejudiced Williams.

The conclusion that Mr. Waldrip was prejudiced by his former counsel's failures at the penalty phase follows inevitably from the learning of *[Terry] Williams* and the other cases discussed above. The mitigation evidence that competent trial counsel would have discovered is at least as compelling as the evidence in *[Terry] Williams*. The jury that sentenced Mr. Waldrip to death never understood his life, his story or his mental illness. In short, like Williams, Mr. Waldrip suffered a harrowing life and suffered from debilitating mental impairments.

Moreover, the Prosecution's case against Mr. Waldrip in aggravation was indisputably weaker than the case in *[Terry] Williams*. In *[Terry] Williams*, the state demonstrated that Williams had engaged in a life-long "crime spree," and it presented "strong evidence that [Williams] would continue to be a danger to society, both in and out of prison." 529 U.S. at 418-19 (Rehnquist, C.J., dissenting). In stark contrast, during Mr. Waldrip's sentencing hearing, the Prosecution introduced little evidence (apart from the underlying facts of the crime) to support the death sentence. Mr. Waldrip had no previous convictions or other history of violence that would have supported the prosecution's argument for death.

143

The unconstitutional consequences of the former counsel's failure to present either Petitioner's compelling social history or any evidence of his diminished capacity cannot be overstated. Under Georgia law, if only one juror believes that mitigating evidence outweighs aggravating evidence, the death penalty cannot be imposed. *See* O.C.G.A. §17-10-31; *see also Hill v. State*, 295 S.E.2d 518, 526 (Ga. 1982); *Wiggins*, 539 U.S. at 513; *Duest v. Singletary*, 997 F.2d 1336, 1339 (11th Cir. 1993); *Spivey v. Head*, 207 F.3d 1263, 1288 n.2 (11th Cir. 2000).

Moreover, it is well established that jurors need not agree unanimously on particular mitigation evidence to give it effect. *See Mills v. Maryland*, 486 U.S. 367, 384 (1988); *McKoy v. North Carolina*, 494 U.S. 433, 442-43 (1990).

This Court must grant the writ.

144

# COMPETENCY HEARING
# INEFFECTIVENESS

## VI.   FORMER TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL TO MR. WALDRIP THROUGHOUT THE COMPETENCY HEARING.

As demonstrated in Section V, above, former trial counsel were ineffective in investigating Mr. Waldrip's personal history, mental illness and other potential mitigation.  Because of their lack of knowledge, they could not make reasonable, informed, strategic decisions as to what to present at the penalty phase of his trial.  These same failures had a significant impact during the competency hearing.  A constitutionally adequate investigation would have provided counsel with the tools necessary to make informed strategic decisions that would have shaped Dr. Currie's testimony and the cross-examination of the State's experts – and that would have caused them to exercise greater diligence to object to the Prosecution's misuse of Mr. Waldrip's silence and to Mr. Waldrip's testifying.  As a result of these failures former counsel failed to subject the Prosecution's case for competency to "the crucible of meaningful adversarial testing." *U.S. v. Cronic*, 466 U.S. 648, 656 (1984).

Even if this Court finds the errors set forth below to be harmless in isolation, the Court must consider their cumulative effect upon the Competency Hearing – and in almost all instances, there were ramifications upon the guilt and penalty phases of the trial as well. *See U.S. v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005)

("The cumulative error doctrine provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal") (citation omitted); *see also Cargle v. Mullin*, 317 F.3d 1196, 1220-21 (10th Cir.2003) (granting a writ of habeas corpus based on cumulative error analysis because "these were not isolated, insular errors scattered randomly throughout the proceedings. On the contrary, these errors had an inherent synergistic effect . . . .") Accordingly, Mr. Waldrip requests that all of the ineffectiveness arguments in Sections V, VI, VII, and VIII be considered together.

### A.   FORMER COUNSEL HAD A DUTY TO UNDERTAKE A REASONABLE INVESTIGATION INTO THE FACTS AND LAW RELEVANT TO THE COMPETENCY HEARING.

As with the penalty phase, former counsel had an obligation to undertake a reasonable investigation to uncover facts and law relevant to the competency hearing in order to make an informed decision as to how to proceed. *Strickland*, *Wiggins*, (Section V., above). Counsel were having significant problems communicating with their client, and it was impeding their defense. (Watson Aff., R-147 [App. 51].) Given that they were on notice of both Mr. Waldrip's mental illness and that historical evidence existed. (*See* Order Denying Relief, R-267 (Linda Waldrip mentioned that Mr. Waldrip had such a history) [App. 28].)

146

Moreover, given that much of the investigation would uncover facts helpful to both phases of trial as well as the competency hearing, and since the marginal benefit of an investigation was substantially increased, a reasonable lawyer would have invested significant effort into what counsel recognized was a critical area, and not abandon such a fruitful endeavor.

An adequate investigation into Mr. Waldrip's background would have uncovered the sad tale that Mr. Waldrip lays out in Section V.D., above. Significantly, this evidence – all of which was at former counsel's fingertips – would have not only defeated one of the Prosecution's primary arguments – that Mr. Waldrip was malingering to avoid prison – but also would have provided substantial help to Dr. Currie in his testimony.  As Dr. Currie testified:

> Having reviewed these materials [the evidence a reasonable investigation would have uncovered].  I have become aware of a number of important events in Mr. Waldrip's history of which I was not aware of when I was evaluating Mr. Waldrip prior to trial.  Of primary importance is the fact that Mr. Waldrip has suffered from a history of delusions and hallucinations throughout much of his adult life.

(Currie Aff., at 199-200, R-147 [App. 54].)

Further, Dr. Storms testified in state post conviction:

> Contrary to what I understood at the time I evaluated Mr. Waldrip, the information contained in [the background information] indicate that *Mr. Waldrip has a **lengthy history of bizarre behavior** that could clinically indicate mental illness and delusions that pre-date the*

147

*incarceration during which I evaluated him. . . .* The data recently made available to me is worthy of clinical consideration because it is from different sources across different time periods and points to a noticeable change in Mr. Waldrip's personality and behavior prior to the incident leading to his arrest.

. . .

The type of historical data recently presented to me indicated significant psychological symptoms that this individual may have experienced prior to his incarceration. This information, *which in this context should have been provided by defense counsel*, indicates the necessity of more extensive interviewing and possibly more testing with a variety of instruments.

. . .

In Mr. Waldrip's case, had *I been given information related to his history of bizarre, possibly paranoid schizophrenic behavior,* I would consider [sic] performing additional psychological testing on Mr. Waldrip and certainly would have attempted to conduct more extensive interviews both with Mr. Waldrip and with those who knew him best, including friends and family.

. . .

Having reviewed the [background data not uncovered by former counsel], it appears that there is the possibility that Mr. Waldrip suffered some type of mental illness, possibly a thought disorder, for several years pre-dating the incident for which he is on death row. . . . *Thus, I believe that despite the testing and evaluation that I performed with Dr. Kuglar, Mr. Waldrip's mental health has not been as thoroughly evaluated as would have been the case had this information been available and I believe that Mr. Waldrip should be evaluated again by both a forensic psychiatrist and forensic psychologist.*

(Storms Aff., at ¶¶ 6, 7, 8 & 10, R-147 (emphasis supplied) [App. 69].)

An adequate investigation would have provided context to Mr. Waldrip's

behavior in prison and with his lawyers. It would have transformed the story from

"now that Mr. Waldrip has been arrested for murder, he conveniently appears to be mentally ill" to "Mr. Waldrip has had a long and difficult struggle with mental illness that is making it nearly impossible for him to relate to counsel and participate in his defense."

The state habeas court made only two findings as to former counsel's effectiveness with respect to the competency hearing that have any bearing on this issue (outside of the adequacy of the investigation which has already been discussed). First, as discussed above in Section V.B, the state habeas court found that "counsel provided [Dr. Currie] with everything they had in their file pertaining to Petitioner...." (Order Denying Relief, at 36, R-267 [App. 28].)  Second, without citation to the record, the state habeas court finds that "Counsel's files well document their efforts to prepare the case for the competency trial . . . ." (Order Denying Relief, at 42, R-267 [App. 28].)  Based on the evidence presented to the state habeas court, this finding is clearly erroneous and thus an unreasonable determination of fact.  § 2254(d).  Former counsel's files contain only copies of the various evaluations of the experts and the legal standards of competency.  (*See* Former Counsel's Files, D-9, R-178 thru R-199, *passim* (filed 5/24/06).  In other words, what Dr. Currie received was a practically empty file that was the result of counsel's inadequate preparation.  Therefore, the finding is at best misleading,

first, because former counsel's files contain very little – and much of what was gathered was gathered right before and during trial, too late to benefit Dr. Currie or counsel as they prepared for the competency proceeding. (*Id.*)

1.    **Evaluation by a Competent Mental Health Expert Reveals That Mr. Waldrip Suffers from Paranoid Schizophrenia.**

A thorough evaluation by Dr. James Ray Merikangas, M.D., including a complete social history, now shows that Mr. Waldrip has suffered from paranoid schizophrenia since at least 1964. (Affidavit of James R. Merikangas, M.D., Doc. 9, Ex. R-147 (E.H. 2), at 306, 308 (filed 5/24/06) [hereinafter "Merikangas Aff."] [App. 68]; *see also* Vol. I, Section IV, above (discussing Mr. Waldrip's paranoid schizophrenia, including persecutory delusions, auditory hallucinations and bizarre behavior.).) The mental health experts who examined Mr. Waldrip prior to trial failed to reach this diagnosis because paranoid schizophrenia is easily mistaken for other mental illnesses, such as delusional disorder, persecutory/paranoid type, especially "when the expert making the diagnosis has little or no context or history in which to place the diagnosis." (Merikangas Aff., at 307, R-147 [App. 68].)

Dr. Merikangas also detected in Mr. Waldrip symptoms of neurological impairment, including "physical characteristics indicating neurological damage" to his frontal lobe, which can lead to impulsive reactions. (*Id*. at 323; IAC Penalty Phase Argument.) This damage may have resulted from a number of events

150

including his mother's abuse of alcohol while Mr. Waldrip was *in utero*, high and untreated childhood fevers, childhood head injuries, and prolonged exposure to chemicals as a painter.  (Merikangas Aff., at 320-25, R-147 [App. 68].)

### 2. *Ake v. Oklahoma* Required the State to Provide Mr. Waldrip with a Competent Expert(s).

In *Ake*, the Supreme Court recognized that indigent defendants are entitled to independent mental health experts when their assistance "may well be crucial to the defendant's ability to marshal [a] defense."  470 U.S. at 80.  Under *Ake*, "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense."  *Id*. at 83.  The Court reached this conclusion because jurors listen to, are influenced by, and rely upon the testimony of experts, raising the possibility that the trial is fundamentally unfair when a party is left without expert assistance.  *Id*. at 80; *see also Blake v. Kemp*, 758 F.2d 523, 531 (11th Cir. 1985) (stating that expert assistance is necessary to help laymen, lawyers and judges identify and understand the presence and effects of mental illness.).

An appointed mental health expert must provide "an adequate psychiatric evaluation of [the defendant's] state of mind," *Blake*, 758 F.2d at 529, and enable defense counsel to provide the "minimally effective assistance" of counsel required by the Sixth Amendment.  *Id*. at 531. This evaluation and education of counsel

151

"enable[s] the jury to make its most accurate determination of the truth." *Ake*, 470 U.S. at 81; *see also U.S. v. Fessel*, 531 F.2d 1275, 1279 (5th Cir. 1976). Failure of an appointed mental health expert to conduct an appropriate examination is a violation of due process. *Blake*, 758 F.2d, at 530-3. Accordingly, Mr. Waldrip must also be provided the opportunity to undertake appropriate and adequate testing and present the results to this Court. (*See* Evidentiary Hearing Section, VI.D, below.)

### 3.   Former Trial Counsel and Dr. Currie Rendered Ineffective Assistance to Mr. Waldrip by Failing to Conduct Proper Evaluations of Mr. Waldrip.

The key to the *Ake* analysis lies in the finding that due process requires an *appropriate* examination *and* the expert's availability to "assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. The mere appointment of *an* expert is not enough by itself to ascertain whether these requirements are satisfied.[55] Thus, for example, the Eighth Circuit Court of

---

[55]   In its Order Denying Discovery on Cause and Prejudice, this Court cited *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006), for the proposition that competence in this context generally means a licensed practitioner. (Doc. 64, at 16 n.4 (filed 3/31/09) [App. 30].) This is case is distinguishable because the experts retained in *Lundgren* were licensed to perform the evaluation and give opinions that were necessary and appropriate. Here, Dr. Currie was not a licensed psychiatrist or a neurologist, and was not competent to evaluate Mr. Waldrip's brain damage or the other effects of his in utero and later toxic exposure.

Appeals reversed a sentencing proceeding because the critical issue was the extent

to which a defendant's capacity was diminished – and the appointed psychologist

admitted he could not assist the court in making that determination.  *See Starr v.*

*Lockhart*, 23 F.3d 1280, 1290 (8th Cir. 1994) (finding a psychologist inadequate

for the examination needed).[56]

Similarly, the Sixth Circuit Court of Appeals reversed a sentencing phase

where the appointed psychiatrist was incapable of conducting "the type of testing

and evaluation that was required to diagnose Petitioner with organic brain damage

for the purpose of showing the effect of that factor at mitigation.  Dr.

Schmidtgoessling indicated that such testing would require a referral to a

comprehensive medical facility and specialists in the appropriate fields – precisely

the type of assistance Petitioner sought but was denied."  *Powell v. Collins*, 332

F.3d 376, 395 (6th Cir. 2003).

---

[56]   "The psychologist testified that Starr was mildly retarded, but was unable to explain to the jury the level of Starr's social and intellectual functioning because his tests had not dealt with that. Nor was he able to interpret or explain the results of previous mental health tests, which assigned Starr the mental age of a six or seven year old, because he was not familiar with the methodology of those tests, Nor could he explain what it meant, in either psychological or lay terms, for an adult male to have the mental age of seven. The state psychologist apologized, on the record, for his inability to meet the defense's needs. At best, he could explain that Starr was in the lower one percent of the population in intelligence and was obviously not a genius.  Thus we find that Starr was denied the appropriate examination to which due process entitled him."  *Id.*

Here we have a situation where the "appropriateness" of the examination broke down, in part because the expert who was appointed could not assist in the "evaluation, preparation, and presentation of the defense" but was not as candid as the experts above.  Former trial counsel, for their part, did not probe to determine what an "appropriate" examination would look like.  Indeed, Ms. Watson never asked Dr. Currie if further assistance was necessary, but rather "assumed that he was evaluating [Mr. Waldrip] for all possible mental problems."  (Watson Aff., at 164, R-147 [App. 51].)  Thus, former trial counsel were constitutionally deficient in failing to obtain a qualified expert who could conduct an appropriate examination and fully assist the defense in establishing Mr. Waldrip's incompetency.  Moreover, as discussed above, former trial counsel did not even provide the expert they had with the necessary information to perform his duties.

Dr. Currie, in turn, was governed by the standards of his profession – which independently obligated him to refer Mr. Waldrip to the proper experts.  *See* Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 Am. J. Forensic Psychiatry, 43-64 (1994).  He knew, for example, about Mr. Waldrip's asymmetrical appearance and his long chemical exposure as a painter, but failed to follow up or to recommend the retention of a psychiatrist or neurologist.

154

The prejudice Mr. Waldrip suffered as a result of former counsel's constitutionally deficient performance is manifest.  Their failures allowed the prosecution to argue that Mr. Waldrip was feigning mental illness or had developed his disorders as a result of incarceration-related stress – arguments that the prosecution used effectively, but that were demonstrably false.  Additionally, they prevented former counsel from providing complete and responsible advice to Mr. Waldrip about the merits of his alternatives.  As a result, former counsel were hamstrung in their ability to counsel Mr. Waldrip and to advocate properly for him. *See*, *e.g.*, *Silva v. Woodford*, 279 F.3d 825, 838-39 (9th Cir. 2002), *cert. denied*, No. 01-1779, 2002 U.S. LEXIS 7365 (2002); *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984) (petitioner entitled to relief if record shows that "[counsel] could not make a valid strategic choice because he had made no investigation.").

These failures persisted through trial – particularly in the penalty phase – and on direct appeal where Dr. Currie's performance remained unmentioned.[57]  As a result of the great prejudice suffered by Mr. Waldrip and the very different requirements for preparing for a competency hearing, for a trial, and for a case in

---

[57]   Counsel did, however, continue to seek the payments Dr. Currie should have received but never did, and, as discussed below, they complained about that resultant deprivation. (Petitioner's Direct Appeal Brief, Doc. 9, R-67 (filed 5/25/06) at Claim XIII)  That claim has been renewed here.

mitigation, this Court should consider separately whether there was an examination appropriate to the requirements of the competency hearing, the guilt phase, and the penalty phase. *See Starr v. Lockhart*, 23 F.3d 1280, 1290 (8th Cir. 1994); *Powell v. Collins*, 332 F.3d 376, 395 (6th Cir. 2003).

### 4. The Trial Court's failure to provide sufficient funds to conduct a proper examination deprived Mr. Waldrip of competent expert assistance.

Finally, the Trial Court's failure to adequately compensate Dr. Currie exacerbated the inadequate examination and preparation of a defense for Mr. Waldrip, and further deprived Mr. Waldrip of his constitutional right to a mental health expert to advocate his position. Counsel sought the funds from the court, but it refused. To the extent that this failure was former trial counsel's responsibility, they were ineffective.

Mr. Brannon found Dr. Currie's testimony during the guilt/innocence stage to be lackluster compared with his testimony at the competency hearing because Dr. Currie knew that the Trial Court would not compensate him for the time necessary to prepare.

> We had requested additional funds for Dr. Currie both through letters and through motions, but I had been unable to convince the court that these funds were necessary . . . I believe that Dr. Currie's testimony was negatively impacted by the knowledge that he would not be compensated for the time that he spent in court during the trial.

(Brannon Aff., at 150, R-147 [App. 26].)  Dr. Currie corroborated Mr. Brannon's views:

> Mr. Waldrip's mental health evaluation was constrained by the lack of adequate funding.  From the outset of my work on this case, I was consistently made aware by trial counsel that the judge was going to make it difficult to obtain the necessary funding for evaluations and testing.  In fact, as early as 1992, I indicated to trial counsel that I would not be able to provide the necessary mental health work for the original cost estimate.  From that point on, my bills continued to be an issue of some contention.  I have yet to be paid in full for my services.

(Affidavit of John S. Currie, Ph.D., Doc. 9, Ex. R-147 (E.H. 2), at 201 (filed 5/24/06) [hereinafter "Currie Aff."] [App. 54].)

Simply allowing indigent defendants to engage mental health experts does not fulfill an accused's right to competent expert assistance.  *Ake*, 470 U.S. at 83; *see also Castro v. Ward*, 138 F.3d 810, 826 (10th Cir. 1998).  The court must provide adequate funding to implement that right.  *See id.*  Once the Trial Court found that Mr. Waldrip was entitled to Dr. Currie's assistance, it was obligated to fund his evaluation, his consultations with the defense, and his testimony.  With full information concerning Mr. Waldrip's myriad mental health issues, former counsel would have been better able to explain his incompetency, formulate a defense, and develop evidence in mitigation of punishment.  The Trial Court's decision to limit Dr. Currie's compensation precluded explanation of this most important aspect of his defense at trial.

157

**B.   FORMER COUNSEL WERE INEFFECTIVE IN FAILING TO OBTAIN A CONTINUANCE TO REVIEW THE MMPI-II TESTING SHEET AND USE IT TO IMPEACH THE PROSECUTION'S MENTAL HEALTH EXPERTS**.

Former counsel failed to avail themselves of a crucial piece of mental health evidence, by failing to review, comprehend and utilize the mis-scored MMPI-II Testing Sheet.  In doing so, they were ineffective.  The MMPI-II is material because it demonstrates that Mr. Waldrip actually attained an underlined elevated score on the schizophrenia scale, while two of the prosecution's experts explicitly relied upon an incorrect normal score to conclude that Mr. Waldrip was not mentally ill.  (Doc. 9, Ex. R-177, at 9557-59 (filed 5/24/06) [hereinafter MMPII Testing Sheet] [App. 53].)  Dr. Storms, who administered the MMPI-II, testified that Mr. Waldrip's "MMPI results give no indication of psychosis" (C.T. Vol. V, at 736, R-44 [App. 70]) and that "based on this data" Mr. Waldrip's condition was "basically stress-induced stuff."  (*Id.* at 726.)  Similarly, Dr. Kugler relied on the MMPI-II results in concluding that "we could find no evidence for [Mr. Waldrip] being psychotic." (*Id.* at 785.)  Dr. Kugler noted that delusional individuals "usually have a pretty significantly elevated score on one of the psychological tests, *i.e.* the MMPI-II, which is the one that we gave."  (*Id.* at 782.)  Dr. Kugler also told the jury that additional testing was unnecessary because the MMPI-II was "one of the most standard, most widely used personality tests."  (*Id.* at 801.)

158

But the raw data reveals that Dr. Storms had mis-scored the "Schizophrenia" scale of the MMPI-II test.  (Affidavit of Eric Y. Drogin, J.D., PhD., ABPP, Doc. 9, Ex. R-147 (E.H. 2), at 220-21 (filed 5/24/06) [hereinafter "Drogin Aff."] [App. 71].)  "Dr. Storms added 16 and 24 to obtain a total of '30' raw score points for the 'Schizophrenia' scale."  (*Id.* at 220.)  As a result, Dr. Storms ascribed a normal scaled score to Mr. Waldrip when an accurately scored test would have placed Mr. Waldrip "within the abnormally elevated range for the "Schizophrenia" scale." (*Id.* at 221.)

Despite the fact that former counsel offered the mis-scored MMPI-II Testing Sheet into evidence (*see* C.T. Vol. V, at 732, R-44 [App. 70]), it is unclear whether they ever actually had it in their possession (or realized what it was).  The transcript indicates that Ms. Watson requested that ADA Darragh produce the raw data, a request that ADA Darragh said he was *attempting* to comply with.  (*Id.* at 646.)  The next mention of the MMPI-II Testing Sheet comes when Mr. Brannon "offered" it into evidence some 80 transcript pages later without any mention that Mr. Brannon now possessed a copy of those dates or had even seen it.  (*Id.* at 732.)

Whether or not former counsel had the evidence at this critical juncture, they certainly had a duty to ensure that they had received it well before the competency hearing, reviewed it with Dr. Currie, and prepared to question the prosecution's experts with it. *See Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995) ("An attorney rather clearly has a duty to familiarize himself with the discovery materials provided by the state. Because counsel failed in this regard here, his behavior was not objectively reasonable under *Strickland*.") (citations omitted). For counsel to offer the newly-received data into evidence without review – or follow-up was ineffective.[58] Their failure to review this crucial evidence with Dr. Currie resulted in their failure to discover the scoring error that misled Dr. Storms

---

[58]    Citing page 89 of the evidentiary hearing transcript, the state habeas court finds: "To prepare for the cross-examinations, Mr. Brannon familiarized himself with the tests [the State's] experts performed as part of their psychological assessment of Petitioner. Mr. Brannon also reviewed these tests with Dr. Currie to obtain his input." (Order Denying Relief, at 39, R-267 [App. 28].) To the extent this holding can be read to say Mr. Brannon had access to the mis-scored MMPI-II and reviewed or analyzed it in anyway, Mr. Brannon's testimony at the evidentiary hearing provides no support for that finding, and it is clearly erroneous. All Mr. Brannon states is: "As I recall, we took, *whatever materials* we had on the three States's experts *and probably, I don't remember specifically doing this, but probably* I had Dr. Currie look that over and give me his thoughts." (Brannon Testimony, at 89, R-146 [App. 46].)

and Dr. Kugler into pronouncing Mr. Waldrip mentally fit.  This failure represents

constitutionally deficient performance.

Mr. Waldrip suffered great prejudice as a result of former counsel's deficient

performance: the MMPI-II Testing Sheet would have been powerful affirmative

evidence of Mr. Waldrip's mental illness, as well as powerful impeachment

evidence against the prosecution's mental health experts.  Therefore, former

counsel's failure to ensure that they received this critical evidence with enough

time to familiarize themselves with it and review it with their expert constitutes

ineffective assistance of counsel.

### C.   FAILING TO OBJECT TO THE PROSECUTION'S REPEATED ASSERTIONS THAT MR. WALDRIP'S SILENCE AND REQUEST FOR COUNSEL DEMONSTRATED HIS COMPETENCY TO STAND TRIAL CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

During the competency hearing, the prosecution's most-repeated argument

was that Mr. Waldrip was competent to stand trial because he was able to

cooperate with his counsel and follow instructions.  To demonstrate this, the

prosecution commented again and again on Mr. Waldrip's refusal to discuss the

facts of his case with the prosecution's mental health experts and on his request to

speak with his attorney.  In doing so, the prosecution knowingly violated Mr.

Waldrip's rights to post-arrest silence and counsel.  During the course of the

competency hearing, there was only one ambiguous point in the transcript that could have been construed as an objection – and the basis for the objection was never set forth.  (C.T. Vol. V, at 789-90, R-44 [App. 70]).  On direct appeal, however, the same counsel argued to the Georgia Supreme Court that the repeated comments on Mr. Waldrip's silence and request for counsel violated his Fifth Amendment rights – as made applicable to the states through the Fourteenth Amendment.  Counsel relied on United States Supreme Court precedent, including *Griffin v. California*, 380 U.S. 609, 615 (1965) and *Lefkowitz v. Turley*, 414 U.S. 70 (1973) – as well as precedents from the federal Courts of Appeals to argue that Mr. Waldrip's rights had been infringed by the Prosecution's repeated comments. (*See* Appellant's Brief on Direct Appeal, 8/19/96, Doc. 9, Ex. R-67, at 98-99 (filed 5/24/06) [App. 72].)

Counsel was correct that the United States Constitution offered Mr. Waldrip that protection – although he did not discuss the controlling law (set forth below) – but, as the Georgia Supreme Court found, it was counsel's failure to object at the right times and in the right way at the competency hearing that cost Mr. Waldrip the relief to which he was entitled.  Former counsel were substantively ineffective in failing to object to ADA Darragh's repeated use of Mr. Waldrip's rights to silence and counsel against him – and in their improper argument of the then-

162

unpreserved error on appeal. Moreover, to the extent that the Georgia Supreme Court determined that this error did not give rise to a reasonable probability of a different outcome in the competency hearing, the Georgia Supreme Court unreasonably applied clearly established federal law as found by the United States Supreme Court. 28 U.S.C. § 2254(d).

> **1.    ADA Darragh Used Mr. Waldrip's Invocation of His Rights to Silence and to Counsel Against Him.**

Mr. Waldrip had been advised by each of the experts with whom he met that he had a right to be silent and to consult with counsel. Nonetheless, in the competency hearing, the prosecution launched an unconstitutional attack on Mr. Waldrip's rights to silence and to counsel in his opening statement: "you will hear evidence that [Mr. Waldrip] declined to discuss his case, that he declined to discuss his case with these folks who are psychiatrists of Georgia Mental Health Institute in the hospital." (C.T. Vol. III, Doc. 9, Ex. R-42, at 462-3 (filed 5/24/06) [App. 73].) And this assault became a theme that persisted through his closing oration.

Thus, when cross-examining Dr. Currie, the defense expert, the prosecution repeatedly asked about the potential import of a psychotic person's invocation of his right to silence. (C.T. Vol. IV, Doc. 9, Ex. R-43, at 638-40 (filed 5/24/06) (Q: "Okay. And if a person chooses not to talk about the alleged facts or details of his

case . . . that is a product of that person's free will, isn't it, sir . . . ?) [App. 74].)

When Dr. Currie failed to give a satisfactory answer, ADA Darragh posed similar

questions to his own witnesses, inviting them to comment on Mr. Waldrip's

silence.  First, he asked Dr. Storms:

> Q.    And did he ask you not to discuss the facts of his case?
>
> A.    I really don't remember.  I just know that he indicated he didn't
> want to discuss the facts of his case, and our policy is that we
> don't press them.
>
> Q:    All right.   How, if you can, can you relate that to his
> understanding of his legal situation?
>
> A.    Well, it certainly indicates that he is able to cooperate with his
> attorney and that he -- that many -- he also, in my opinion,
> realizes that anything that he could have said, as we explained
> in his rights, could be brought out in court . . . he realized the
> ramifications of anything that he could tell us about the facts of
> the case, and he chose not to tell us.

(C.T. Vol. V, at 703, R-44 [App. 70].)

He next asked Dr. Lower to opine on Mr. Waldrip's request to speak with

his lawyer before agreeing to be examined:

> Q.    Okay . . . can you relate his refusal to talk with you about the
> facts of the offense, his getting up to call his attorney when he
> wasn't sure whether he should cooperate . . . and after having
> talked with his attorney coming back and agreeing to cooperate,
> can you relate those things to any of the issues that you were
> seeking to find out about as just discussed?
>
> A.    Well, certainly considering the seriousness of the charges that
> he's facing and the fact that I came unannounced . . . I think
> that was a rational thing for him to do, and it showed

164

comprehension of the role of his attorney and the need for his attorney's assistance . . . and so in general it would tend to show that he was thinking rationally about his own self-interest there.

(*Id*. at 748-49.)  The third prosecution witness, Dr. Kugler, initially failed to give

ADA Darragh the answer he sought:

Q.      . . . Just a yes or no on this . . . Did you ask him to discuss his case with you, that is, the facts of this case with you?

* * *

Q.    Did he decline to or agree to discuss the facts of his case?

A.    He refused to discuss anything related to this case and was very clear about that.

Q.    How can you, if you can, relate that refusal to talk about the facts of the alleged crime to any issues that this jury will be concerned with about competency to stand trial?

A.    *I don't think I would like to equate the two.  I think they're two separate issues.*

(*Id*. at 786-87 (emphasis supplied).)  But, ADA Darragh persisted until he obtained

the improper testimony he wanted:

Q.    All right.  And I guess my question may have been misunderstood . . . how does his refusal to talk with you about that relate to his understanding of the nature and objects of the proceedings against him, relate to whether he's capable of rendering counsel assistance and providing a proper defense, et cetera?

A.    It can have a great deal to do with his understanding of the proceedings and the ramifications of being found guilty in this kinds of thing, if that's sort of what you're asking.

165

* * *

Q.    [I]f, for example, he has on some occasions or at least one occasion, taking a hypothetical here, been advised not to talk about the facts of his case with other individuals, how would his refusal to talk about the facts of this case to you relate to his capability of rendering effective assistance to his counsel?

A.    *Well, it would generally tell me he's following the advice of his counsel . . . But to me, I think to answer your question, certainly it's one good indicator that he can cooperate with his counsel and follow instructions.*

(*Id*. at 788-89 (emphasis supplied).)

And, finally, in closing, to ensure the jury did not miss his central argument,

ADA Darragh told the jury:

And listen to what Dr. Storms testified to and what Dr. Kugler testified to when they wanted to ask him about the facts of the case, "He refused to talk about the facts of the case."  "What do those things indicate?"  Those things indicate he knows what his attorney can do for him, they indicate he knows he ought not talk if his attorney says he can't talk . . .  He knows what his attorney can do for him and he knows it's not in his best interest to talk about the facts of the case . . .

(C.T. Vol. VI, Doc. 9, Ex. R-45, at 914 (filed 5/24/06) [App. 75].)

> ### 2.    In *Doyle v. Ohio* and *Wainwright v. Greenfield*, the Supreme Court Held That a Prosecutor Cannot Comment Upon a Defendant's Invocation of His Post-Arrest Right to Silence.

In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court held that

impeaching a defendant with his post-arrest, post-*Miranda* silence violates the Due

Process Clause of the Fourteenth Amendment.  *Id*. at 619-20.  In *Wainwright v.*

*Greenfield*, 474 U.S. 284 (1986), the Court expanded *Doyle* to defendants who invoke their right to silence and counsel and later plead insanity.  In *Greenfield*, the defendant was arrested and given *Miranda* warnings; he responded by stating his desire to speak with a lawyer.  A second officer again read the defendant his *Miranda* warnings and the defendant repeated his request for counsel.  The defendant pleaded not guilty by reason of insanity.  At trial, the arresting officers testified regarding the defendant's requests for counsel.  *Id*. at 286.  During closing argument, the prosecutor argued that the defendant's silence and requests for counsel demonstrated that the defendant was not insane.  The defendant was found guilty.  *Id*. at 287.  The Eleventh Circuit reversed and ordered a new trial, citing *Doyle*.  *Id*. at 289.

The United States Supreme Court affirmed, rejecting the argument that *Greenfield* was distinguishable from *Doyle* because the silence was used as proof of sanity rather than proof of the offense:

> The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter breach that promise . . . It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity.

*Id*.  The Court rejected the argument that post-arrest silence and requests for counsel were more probative of sanity than of guilt:

[the] ambiguities attendant to post-*Miranda* silence do not suddenly disappear when an arrestee's mental condition is brought into issue . . . For example, one could reasonably conclude that custodial interrogation might intimidate a mentally unstable person to silence. Likewise, an emotionally disturbed person could be reasonably thought to rely on the assurances given during a *Miranda* warning and thereafter choose to remain silent.  In sum, just what induces post-arrest, post-*Miranda* silence remains as much a mystery today as it [ever was] . . . <u>Silence in the face of accusation is an enigma and should not be determinative of one's mental condition just as it is not determinative of one's guilt.</u>

*Id*. at 294, n.11 (emphasis supplied).

### 3.   ADA Darrah Intentionally Ignored *Doyle* and *Greenfield*.

*Doyle* and *Greenfield* control this case – and the prosecution repeatedly ignored their holdings; indeed, these constitutionally impermissible topics became a central argument for a finding of competency.  This strategy was invidious, and not only because it used Mr. Waldrip's invocation of his constitutional rights against him in a way the Fifth and Sixth Amendments squarely prohibit.  The strategy allowed the competency jury to construe the time that Mr. Waldrip sat silently at counsel table as self-incriminating evidence that his mental health permitted him to stand trial – and, potentially, to deserve death.  The twisting of Mr. Waldrip's silence into proof of his competency cannot be countenanced.

**4.    Former Counsel Were Ineffective in Failing to Object to the Constitutional Error and Allowing Mr. Waldrip to Suffer the Attendant Prejudice.**

Counsel who fail to make critical objections are constitutionally deficient. "Courts have routinely declared assistance ineffective when 'the record reveals that counsel failed to make a crucial objection or to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles.'" *Thomas*, 428 F.3d at 501 (citation omitted) (upholding the district court's grant of a writ of habeas corpus where trial counsel was objectively unreasonable in failing to move to suppress an unreliable witness identification); *see also Hofbauer*, 228 F.3d 689 (6th Cir. 2000) (reversing the district court's denial of a writ of habeas corpus where defense counsel failed to object to:  (1) the prosecution's use of improper character evidence while examining the petitioner; (2) the prosecution's "egregious character attacks during closing argument" and (3) the prosecution's mischaracterizations of a witness's testimony.).  This is especially true in the *Doyle* context:  a defendant receives ineffective assistance when "defense counsel fails to object to the prosecutor's 'very serious instances of prosecutorial misconduct' which include 'the initial introduction of the defendant's silence,' 'cross-examination of the defendant about his post-arrest silence,' and argument which

invited the jury to consider constitutionally protected silence as evidence of the defendant's guilt."[59]  *Fugate*, 261 F.3d at 1223 (quoting *Gravley*, 87 F.3d at 785 ).

As *Fugate* makes clear, former counsel were ineffective in failing to raise this objection properly.[60]  Such an objection would have been sustained and, given the emphasis the prosecution placed on this point, the competency hearing likely would have come to a different end.   The prejudice to Mr. Waldrip, then, is obvious:  the jury concluded that Mr. Waldrip was competent to stand trial on the

---

[59]  Former counsel were also ineffective for not objecting to the State's repeated implication that Mr. Waldrip and his counsel should (or even could) treat his mental illness.  *See Thomas*, 428 F.3d at 501.   The Constitution prohibits trying a defendant while he is incompetent.  *See Drope v. Missouri*, 420 U.S. 162, 173 (1975);  *see also Pate v. Robinson*, 383 U.S. 375, 385-86 (1966).   Due Process guarantees that a defendant whose competence is at issue is entitled to a court-appointed and court-funded expert to assist him in determining whether he is competent to stand trial.  *See Ake*, *supra*.

The Trial Court reminded ADA Darragh that the sole issue for the competency hearing was whether Mr. Waldrip was competent to stand trial and that "no part of [the] inquiry is whether the defendant or counsel of defendant have made legitimate efforts to get the defendant in the position to stand trial."  (C.T. Vol. IV, at 617, R-43 [App. 74].)   Despite this admonition, ADA Darragh asked questions of witnesses implying that former counsel had a duty to provide curative psychiatric treatment for Mr. Waldrip.  (*See, e.g.* C.T. Vol. III, at 509-10, R-42 [App. 73]; C.T. Vol. IV, at 614-15, R-43 [App. 74].)   For ADA Darragh to mislead the jury about the existence or implications of a duty to obtain treatment for Mr. Waldrip's mental illness is improper.  *See Spivey v. Head*, 207 F.3d 1263, 1277 (11th Cir. 2000) ("Of course, it is improper for the prosecutor to mislead or misrepresent the law to the jury . . .").   Former counsel lodged one objection during this questioning but without stating the basis for the objection (C.T. Vol. III, at 506-07, R-42 [App. 73]) and without following up with any further objections or move for a mistrial.

[60]  As mentioned above, counsel argued on direct appeal that they *had* objected with no citation to the record.  The State countered  with a citation to a single point in the record that contained an objection – but no clarification as to what was objected to.  Thus, at least constructively, there was no objection.

basis of his exercise of his constitutionally protected rights to silence and to request counsel. The prejudice arising from such repeated and intentional references by the prosecution on a defendant's invocation of his *Miranda* rights is not harmless. *See*, *e.g.*, *Hill v. Turpin*, 135 F.3d 1411, 1418 (11th Cir. 1998); *see also U.S. v. Gonzalez*, 921 F.2d 1530, 1549-50 (11th Cir. 1991). The Georgia Supreme Court unreasonably applied settled federal law when it concluded, without the benefit of a complete record, that Mr. Waldrip suffered no prejudice as a result of former trial counsel's failure to object to the prosecution's repeated *Doyle* violations.

On appeal from the state habeas court's denial of habeas corpus, the Georgia Supreme Court determined that "if trial counsel had made such an assumedly-meritorious objection" to the prosecution's repeated *Doyle* violations "there would have been no reasonable probability of a different outcome in Waldrip's competency trial." *Waldrip v. Head*, S05A1402 at 14 (October 11, 2005). This is an unreasonable application of *Strickland*; the prejudice caused by the prosecution's pervasive use of Mr. Waldrip's rights against him is obvious.[61] Mr. Waldrip's silence and request for counsel were the centerpiece of the argument for

---

[61] Moreover, given counsel's ineffectiveness in not undermining the state's experts in their testimony that Mr. Waldrip showed a "normal" score on the MMPI-II, the *two* most significant arguments in favor of Mr. Waldrip's competency would have been removed by effective counsel. *See Baker*, 432 F.3d at 1223.

competency, referenced in the prosecution's opening, examination of each of the mental health experts, and in closing argument.  (*See* Section VI.C.2, above.) Without this crucial theme, the prosecution's case for competency would have rested on the testimony of the state's mental health experts, which should have been undermined by the information not timely provided. *See* Vol. II Section XII, below.  Therefore, concluding that a timely and proper objection to the repeated theme would not have resulted in a reasonable probability of a different outcome in the competency hearing is unreasonable.

The Georgia Supreme Court's conclusion is further undermined by the incomplete record before it.  Mr. Waldrip's Certificate for Probable Cause on September 10, 2004 sought review of many issues.  The Georgia Supreme Court granted review only of Mr. Waldrip's evidence suppression claims and the *Doyle* violations.  (*See* May 9, 2005 Order, R-280 [App. 29].)  Thus, the Georgia Supreme Court did not have before it all of the evidence now before this Court regarding Mr. Waldrip's mental health and former counsel's constitutionally deficient performance in investigating, locating, understanding and using it.  These failures together represent constitutionally deficient assistance of counsel and Mr. Waldrip was prejudiced by them – indeed, as set forth above, by each alone – and certainly by them all taken together. Without a complete record containing all of

172

this crucial evidence, the Georgia Supreme Court had improperly limited its review of the proceeding, precluding any reasonable conclusion that the evidence of Mr. Waldrip's competency was "overwhelming."  The Georgia Supreme Court should have evaluated the effect of counsel's performance on the proceeding – not merely isolated instances of that performance.  Indeed, this Court should consider all of the prejudice that arose during the competency hearing when determining whether Mr. Waldrip has demonstrated the requisite prejudice under *Strickland*.

This principle comes from the Supreme Court's counsel in *Strickland* that an ineffectiveness claim must be weighed by considering "the totality of the evidence before the judge or jury."  466 U.S. at 695.  Because some errors affect discrete facts and others "alter [] the entire evidentiary picture," a reviewing court is to "take" the unaffected finding as a given, and taking due effect of the errors on the remaining findings, determine prejudice by looking at what decision would "reasonably likely have been" reached "about the errors."  *Id.* at 695-96.  It does not make sense to view an "altered evidentiary picture" without removing the product of the prosecutorial misconduct errors, which themselves are accumulated – see *Berger*, 295 U.S. at 89 – and the ineffectiveness errors.  The Georgia Supreme Court had evidence of both before it but considered only each in isolation and erred even in assessing the individual impact of the errors.  Thus, the Georgia

173

Supreme Court in finding in this regard was contrary to or an unreasonable

application of law in violation of 28 U.S.C. § 2254(d).

### D. MR. WALDRIP IS ENTITLED TO DISCOVERY AND AN EVIDENTIARY HEARING ON THE MYRIAD MENTAL HEALTH ISSUES.

In light of the myriad issues surrounding Mr. Waldrip's mental health, from

the gross prosecutorial misconduct (*e.g.* suppression of *Brady* evidence and

troubling *Doyle* violations), to former trial counsel's constitutionally ineffective

assistance with regard Mr. Waldrip's mental health, as well as the lingering

question of the extent of Mr. Waldrip's organic brain injury, Mr. Waldrip requests

leave of court to conduct an MRI and other testing to determine if Mr. Waldrip has

brain damage or other organic etiology for his mental illness.

This Court previously denied Mr. Waldrip this discovery because he had not

demonstrated "that the mental health professionals that examined him in

connection with his competency hearing were not qualified to evaluate petitioner."

(March 31 Order, at 17 [App. 1].)  Mr. Waldrip has now demonstrated that Dr.

Currie was both unqualified to properly diagnose his mental illnesses and that,

even if he were competent, Dr. Currie lacked the necessary information to

diagnose Mr. Waldrip due to the failures of Dr. Currie and former counsel to

complete a social history of Mr. Waldrip.  Mr. Waldrip has also demonstrated that

the prosecution's mental health experts failed to gather any social history from anyone other than Mr. Waldrip. Such an "investigation" is clearly insufficient to diagnose Mr. Waldrip's myriad mental illnesses. (*See* Section VII, below.)

Mr. Waldrip is not at fault for the failure to develop the facts surrounding his organic brain injury. Pursuant to *[Terry] Williams v. Taylor*, 529 U.S. 420, 431-32 (2000), a petitioner fails to develop the factual basis of a claim only if "there is lack of diligence or some greater fault, attributable to the prisoner or the prisoner's counsel." No such failure exists here. Mr. Waldrip's initial failure to have these tests performed is a result of the gross ineffectiveness of former trial counsel recounted above. (*See* Section V, above.) Once current habeas counsel was appointed, Mr. Waldrip sought leave of the state habeas court to obtain this testing; this request was denied. Mr. Waldrip renewed this request before this Court and was again denied on March 31, 2009. Thus, there is no delay attributable to Mr. Waldrip or current counsel, if by their deficient conduct, Mr. Waldrip was wrongly deprived of the appropriate examination the United States Constitution guarantees him. (*See* Section VI.A, above; *see also* Section V, above.) Mr. Waldrip should not be forced to bear the burden of former counsel's ineffectiveness.

Accordingly, Mr. Waldrip requests leave of Court to conduct organic brain testing to determine the nature and extent of the frontal lobe damage detected by

Dr. Merikangas but never completely diagnosed.  It is anticipated that the testing

will establish cause and prejudice and/or a miscarriage of justice sufficient to

excuse any procedural default as to all claims associated with mental health.

# MENTAL ILLNESS
# INEFFECTIVENESS

## VII.   KNOWING THEIR CLIENT WAS MENTALLY ILL, FORMER COUNSEL WERE INEFFECTIVE IN PROTECTING HIM.

Representing a mentally ill client, as former counsel knew they were, encompasses particular duties. *See* GEORGIA RULES OF PROF'L CONDUCT R. 1.4. To represent Mr. Waldrip effectively, counsel had to account for his mental illness and take precautions to protect him. In ways beyond their failures in mitigation (Section V, above) and in preparing the competency phase (Section VI, above), former counsel failed Mr. Waldrip and he was prejudiced. As discussed above, these errors alter the evidentiary picture – most at the competency hearing – but one was a distinct pretrial failure. Under *Strickland* then, to the extent the prejudice from any one appears inadequate, the Court should add to the assessment at counsel's overall performance. 466 U.S. at 695-96.

### A.   FORMER COUNSEL WERE INEFFECTIVE IN FAILING TO ENSURE THAT THE COURT PROVIDED AN ADEQUATE COLLOQUY TO MR. WALDRIP WHEN HE INSISTED ON TESTIFYING AGAINST THEIR ADVICE.

The jury in the competency hearing heard not only from Ms. Watson and four mental health experts, but also from Mr. Waldrip himself – over objections by the prosecution and former counsel. Despite the objections and the questions surrounding Mr. Waldrip's mental health, the Trial Court allowed Mr. Waldrip to

testify without a colloquy of any consequence and without adequate objections by former counsel.

### 1.      The Colloquy Conducted by the Trial Court Prior to Allowing Mr. Waldrip to Testify Was Woefully Inadequate.

Before it allowed him to take the stand, the Trial Court failed to ask a single question of Mr. Waldrip concerning his understanding of the proceedings against him or the consequences of testifying.   The entire exchange between the Trial Court and Mr. Waldrip was:

> Court:      Mr. Waldrip, you can testify in this matter if you choose to do so. If you do testify it will be under oath and you'll be subject to being questioned by the district attorney or by Mr. Darragh, the chief assistant district attorney. Anything that you say in that testimony could be used against you and would be used against you if it helped the State's case.
>
> Mr. Brannon has informed the Court that he and Mrs. Watson have advised you as your lawyers not to testify in this proceeding, and that's advice that you can either choose to accept or not accept.  Do you wish to testify in rebuttal?
>
> Waldrip:    Yes.
>
> Court:      Very well.  Mr. Pittman, you may bring in the jury.

(C.T. Vol. V, at 815, R-44 [App. 70].)[62]

---

[62]     If this Court holds that the Trial Court's colloquy was sufficient to determine whether Mr. Waldrip's purported waiver of his rights was knowing and intelligent, then it must

(Continued)

**2.    Before Allowing a Defendant to Testify, the Court Must Be Satisfied that the Defendant Is Knowingly and Intelligently Waiving His Constitutional Rights.**

By testifying, a defendant waives the privilege against self-incrimination on all issues about which he speaks.  *Mitchell v. U.S.*, 526 U.S. 314, 321 (1999).

---

(Continued)

find that the competency hearing was a nullity.  By finding Mr. Waldrip competent to waive his core constitutional rights, the Trial Court implicitly found him competent to stand trial.  This determination effectively usurped the function of the jury in the competency hearing. As noted previously, the test for the competence necessary to waive constitutional rights is equal to the test for the competence necessary to stand trial. *Godinez*, 509 U.S. at 398-400.  It follows that in allowing Mr. Waldrip to testify the Trial Court *necessarily* determined that he was competent to stand trial.  Allowing Mr. Waldrip to take the stand effectively told the jury to return a verdict of competence and deprived him of a fundamentally fair proceeding.  *See, e.g., Callahan v. Le Fevre*, 605 F.2d 70, 74-5 (2d Cir. 1979) (finding that defendant was denied due process where the trial court's instruction usurped the jury's function to determine guilt or innocence); *see also Smart v. Leeke*, 873 F.2d 1558, 1577 n.25 (4th Cir. 1989) (noting that a court's role is not to usurp the jury's function "but to achieve fairness in criminal trials to the greatest possible extent").  At a minimum, the Trial Court's determination that Mr. Waldrip was competent to testify colored the jury's decision-making process.  Yet, the Trial Court gave no limiting instruction regarding its decision to allow Mr. Waldrip to testify.  It simply put him on the stand.

Ineffective assistance of counsel constitutes cause to overcome procedural default.  *See* Sections III.B.3, above.  In this case, Former Trial Counsel strongly objected to Mr. Waldrip testifying at the Competency Stage but failed to object to the usurpation of the jury's function.  Further, counsel on Mr. Waldrip's direct appeal failed to raise this claim. In doing so they were ineffective and the cause of Mr. Waldrip's procedural default. *Strickland*, 426 U.S. at 687.  By implicitly telling the jury to return a verdict of competence, the Trial Court removed the issue from the jury and deprived Mr. Waldrip of a fundamentally fair proceeding.  *See, e.g., Callahan*, 605 F.2d at 74-5; *see also Leeke*, 873 F.2d at 1577 n.25.  This was clearly prejudicial and excuses the procedural default. This Court should accordingly determine this claim on the merits.

179

Further, if acting against the advice of counsel, the defendant also commits a partial waiver of his right to counsel. *Stano v. Dugger*, 921 F.2d 1125, 1151 (11th Cir. 1991) ("[A] defendant may partially waive right to counsel by insisting on a course of conduct contrary to advice by his counsel."). But only a knowing and voluntary waiver of constitutional rights is effective. "When a defendant seeks to waive his right to counsel, a determination that he is competent to stand trial is not enough; the waiver must be intelligent and voluntary before it can be accepted." *Godinez v. Moran*, 509 U.S. 389, 402 (1993). A trial court, therefore, must conduct a proper colloquy before it finds a valid waiver of Fifth and Sixth Amendment rights. *Id.*; *Faretta v. California*, 422 U.S. 806, 835 (1975); *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969).

A proper colloquy requires an inquiry into the defendant's understanding of the constitutional rights he seeks to abandon and the consequences of the abandonment. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Jones v. Walker*, 540 F.3d 1277, 1293 (11th Cir. 2008) (*en banc*). Thus, for example, when the accused seeks to waive his right to counsel, the trial court has a "duty to engage the defendant in a colloquy to elicit information regarding the defendant's background, understanding of the charges against him . . . ***and we have warned that the closer to trial an accused's waiver of right to counsel is, the more rigorous, searching***

*and formal the questioning of the trial judge should be*." *U.S. v. Garey*, 540 F.3d 1253, 1266-67 (11th Cir. 2008) (*en banc*) (emphasis supplied) (citations omitted). The failure to engage in a colloquy deprives a defendant of his right to a fair proceeding. *Pate*, 383 U.S. at 385-86.

When a defendant's competency is in question, the colloquy assumes greater importance. The United States Supreme Court has concluded that the constitutional standard for competency to stand trial and competency to waive the right to counsel are identical. *Godinez*, 509 U.S. at 398-99. A trial court that has reason to doubt a defendant's competence to stand trial must also have a reason to doubt a defendant's ability to waive his right to counsel. Therefore, a court cannot determine if a defendant is competent to waive counsel until it is resolved that he is competent to stand trial. "[I]t was impossible for the [Trial Court] to allow the defendant to waive counsel before determining whether he was competent to stand trial. Before resolving the first question, the court had to resolve the second." *U.S. v. Boigegrain*, 155 F.3d 1181, 1186 (10th Cir. 1998).[63]

---

[63]    Highlighting the importance of the right to the assistance of counsel, the Supreme Court in *Indiana v. Edwards*, 128 S. Ct. 2379 (2008), determined that the state may refuse to allow a defendant who has been determined to be competent to stand trial to proceed without the assistance of counsel.

**3.    The Trial Court Made No Inquiry into Mr. Waldrip's Understanding and Knowledge of the Waiver He Purported to Give.**

The Trial Court's colloquy was wholly inadequate under *Godinez*, *Dusky* and *Edwards*.   The Trial Court had ample reason to doubt Mr. Waldrip's competency to waive his rights:   The Trial Court had ordered a competency hearing to determine whether Mr. Waldrip could stand trial.   The Trial Court therefore could not, especially without a colloquy, find Mr. Waldrip competent to waive constitutional rights.   "Logically, the trial court cannot simultaneously question a defendant's mental competence to stand trial and at one and the same time be convinced that the defendant has knowingly and intelligently waived his right to counsel."   *U.S. v. Purnett*, 910 F.2d 51, 55 (2d Cir. 1990).   Moreover, during the competency hearing, the Trial Court heard testimony from *four* mental health experts that Mr. Waldrip suffered from delusions, (*see* C.T. Vol. IV, at 551-52, R-43; C.T. Vol. V. [App. 70], at 728, 764, and 806, R-44), and extended argument from former trial counsel about their inability to communicate their instruction that Mr. Waldrip should not testify.   (C.T. Vol. V, at 811-15, R-44 [App. 70].)   Even the ***prosecution*** objected to Mr. Waldrip's testimony.   (*Id*. at 814.)

But, despite all this, the Trial Court's colloquy amounted to a recitation of *Miranda*, *informing* Mr. Waldrip of his constitutional rights to counsel and against self-incrimination.   Precedent demanded much more – specifically, that the Trial Court *inquire* into Mr. Waldrip's understanding of the rights he purported to waive to ensure that the waiver was knowing and intelligent.   *See Faretta*, 304 U.S. at 464; *Moran*, 475 U.S. at 421.   The timing of Mr. Waldrip's waiver – *during* the competency hearing, heightened the Trial Court's duty to inquire.   *Garey*, 540 F.3d at 1266.   Yet the Trial Court did nothing to investigate Mr. Waldrip's understanding of his rights or the potential consequences of waiving them.   This was fundamental error.[64]

---

[64]   At the very least, before allowing Mr. Waldrip to testify, the Trial Court should have ordered that Mr. Waldrip be reevaluated with supplemental reports to follow.   This obligation arises from the caution in *Drope v. Missouri*, 420 U.S. 162, 181 (1975) that "a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standard of competence to stand trial."   *Id*.; *see also Harris v. Kuhlmann*, 346 F.3d 330, 351 (2d Cir. 2003).   The opinions of Dr. Storms, Dr. Lower and Dr. Kugler that Mr. Waldrip was competent to stand trial were based on evaluations that took place months before and were only valid as to the day(s) he was evaluated.   Mr. Waldrip's competence could have changed in the interim because mental illness "varies in degree.   It can vary over time.   It interferes with an individual's functioning at different times in different ways."   *Edwards*, 128 S. Ct. at 2386; *see also* Merikangas Aff., at 316, R-147 ("Paranoid schizophrenia, like many other types of mental health disorders, is characterized by both active and inactive phases.") [App. 68].)

183

### 4.   Counsel Were Ineffective for Failing to Object Adequately to the Trial Court's Colloquy.

This Court has determined that this claim was procedurally defaulted. (Procedural Default Order, at 25-6 [App. 33].)  As noted above, however, procedural default must be excused if Mr. Waldrip demonstrates that there was external cause for the procedural default and that the default prejudiced him. *Wainwright*, 433 U.S. at 87-88.

### i.   Cause is established through Former Trial Counsel's ineffective assistance.

Constitutionally deficient performance by counsel can satisfy the cause standard if the default took place at a stage of the proceedings at which petitioner was entitled to effective assistance of counsel and counsel's performance was constitutionally ineffective under the *Strickland* standard.  *Murray,* 477 U.S. at 488; *accord Coleman*, 501 U.S. at 752.  Former trial counsel strongly objected at the competency hearing.  But Mr. Brannon and Charlotta Norby failed to raise this claim on direct appeal, a stage at which Mr. Waldrip was also entitled to competent assistance of counsel.[65]  Counsel on the direct appeal did not make a strategic choice not to pursue this claim.  They simply failed to raise it.  (Deposition of

---

[65]   Former Counsel were also ineffective to the extent that their objections to this glaring constitutional error at the competency hearing were not sufficiently clear to preserve the error for appeal.

Charlotta Norby, Doc. 9, Ex. R-209 (E.H. 63), at 18506 (internal p. 18) (filed

5/24/06) (on direct appeal, former counsel "included all the claims [they] could

possibly think of" and "did not strategically exclude any claims") [hereinafter

"Norby Dep."] [App. 81].)  In carelessly neglecting to challenge the Trial Court's

colloquy, they were ineffective.  *Strickland v. Washington*, 466 U.S. 668 (1984).

> ii.   **Prejudice is established because Mr. Waldrip would
> have received a new trial if Former Counsel had
> raised this issue on appeal.**

Prejudice here is easily established:  Had Mr. Waldrip's former counsel

raised this claim on direct appeal, the Trial Court's woefully deficient colloquy

would have compelled the Georgia Supreme Court to overturn Mr. Waldrip's

conviction pending a new competency hearing.  *See Clarke v. Zant*, 275 S.E.2d 49

(Ga. 1981) (instructing Georgia courts on their responsibility to conduct a

constitutionally adequate colloquy); *Brecht v. Abrahamson*, 507 U.S. 619, 638

(1993) (stating that actual prejudice results where the alleged constitutional

violation "had substantial and injurious effect or influence in determining" the

outcome of the proceeding, citing *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946)).

Respondent has argued previously that the deficient colloquy is not grounds

for relief because the prosecution could have called Mr. Waldrip as an adverse

witness.  This argument is specious.  Mr. Waldrip testified in rebuttal; the

185

prosecution had forfeited its opportunity to call Mr. Waldrip as a witness by resting its case. That the prosecution hypothetically might have called Mr. Waldrip to testify cannot excuse this actual, glaring constitutional error during rebuttal. Accordingly, Mr. Waldrip has established cause and prejudice and this Court must reach the merits of the Colloquy claim.

### B.   FORMER TRIAL COUNSEL WERE CONSTITUTIONALLY DEFICIENT IN FAILING TO PREPARE MR. WALDRIP TO TESTIFY AT THE COMPETENCY HEARING.

As recounted in Section VII.A, above, Mr. Waldrip insisted upon testifying in rebuttal during his competency hearing against the wishes of his counsel. (*See* C.T. Vol. V, at 811-15, R-44 [App. 70].) Whether or not he sought to testify, however, Mr. Waldrip could have been called to testify by the prosecution. In light of this possibility and Mr. Waldrip's mental illness, former counsel should have addressed with the Trial Court the issue of Mr. Waldrip's possible testimony.

A lawyer who fails to prepare his client to testify renders constitutionally deficient assistance of counsel.

> [Defense Counsel's] failure to adequately consult with and prepare his client to testify did not meet the standard of competent representation. Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant. Counsel's admission that he spent at most forty-five minutes with Turner prior to trial demonstrates deficient performance. Much longer periods of consultation have previously been found ineffective in this circuit.

186

*Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998) (citations omitted).

As in *Turner*, former counsel unreasonably failed to adequately prepare their client to testify. This failure to prepare Mr. Waldrip to testify is plainly evident in the record. Mr. Brannon stated before Mr. Waldrip took the stand, that "I don't have an [sic] idea whatsoever as what [Mr. Waldrip] may or may not say when he gets to the witness stand," (C.T. Vol. V, at 812, R-44 [App. 70]), and "I am not aware of what the substance of the testimony will end up being . . . ." (*Id*. at 814.) As a result of failing to properly prepare Mr. Waldrip for the possibility that the prosecution may call him to testify, former counsel were also caught off-guard by Mr. Waldrip's insistence upon testifying and the Trial Court's allowing him to do so. Moreover, once the Trial Court ruled that Mr. Waldrip could testify, former counsel were deficient for not requesting a continuance to allow them to prepare Mr. Waldrip to take the stand.

The prejudice of former counsel's deficiencies is obvious: Mr. Waldrip was completely unprepared to answer the myriad questions about his mental state, prior crimes, and other issues, posed by ADA Darragh. These are issues that any reasonably competent counsel would have prepared Mr. Waldrip to answer in order to give the jury the true picture of Mr. Waldrip's mental illness. Instead,

former trial counsel left these crucial areas to the addled mind of a paranoid schizophrenic.  Had former counsel properly performed their duties, at a minimum, they would have had at least some idea of what Mr. Waldrip would testify to if called – and could, perhaps, have sought to limit the scope of examination accordingly.  Instead, Mr. Waldrip testified without any preparation and was vulnerable to questions about numerous damaging topics, including his prior criminal history.  By failing to take these basic steps, former counsel rendered ineffective assistance of counsel.

### C.  IN LIGHT OF MR. WALDRIP'S MENTAL ILLNESSES, FORMER TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO HAVE A GUARDIAN *AD LITEM* APPOINTED TO MAKE CRITICAL DECISIONS FOR HIM.

Mr. Waldrip's mental illness and the communication problems it caused with former trial counsel are well-documented.  Despite this knowledge, former counsel never moved for the appointment of a guardian *ad litem*.  This was not a strategic choice; former counsel did not hide Mr. Waldrip's mental illness.  Rather, former counsel were objectively unreasonable in failing to seek the appointment of a guardian *ad litem* despite their own belief that Mr. Waldrip was not making decisions in his own best interest.

Crucially, former counsel went on to state in the Special Plea that Mr. Waldrip had met with them to consider a plea agreement offered by the DA's

188

Office for life imprisonment, but that former counsel believes that he did "**not have the requisite mental capabilities and understanding to be able to rationally decide on a plea agreement**." (ROIA, at 1312, P-30 (Special Plea) (emphasis supplied).)[66]  Moreover, former trial counsel noted that they had told the Prosecution and the Trial Court of their difficulties conveying the plea agreement to their client and his inability to understand it and that they were dealing with "a client with severe psychological disorders." (*Id.*)   Accordingly, former counsel filed the Special Plea based on their belief that Petitioner "is insane to such an extent he is unable to understand the charges against him clearly and the repercussions thereof and is incapable of assisting his undersigned appointed attorneys in the defense of the charges against him." (Id. at 1313 (Special Plea).) Thus, the Trial Court was on notice, and former counsel believed, long before the competency hearing, that Mr. Waldrip was incapable of making decisions in his own best interest.  In fact, the trial court and former counsel were specifically

---

[66]    (*See also* Letter from Rich Brannon to the Honorable Judge Giradeau dated June 1, 1993, Doc. 9, R-161 (E.H. 16), at 14093-94 (filed 5/24/06) [App. 82].)    In the letter, Mr. Brannon requests that new counsel be appointed for Petitioner.  Mr. Brannon specifically notes the importance of receiving an offer for a plea agreement from the DA's Office, stating that "I feel that Anne and I have done a more than adequate job on this case since we are the only attorneys who have succeeded in receiving a plea agreement for a life sentence on behalf of our client.  This plea agreement came about due to creative motion work and therefore I feel we have rendered more than adequate services." (*Id.*)

aware that Mr. Waldrip may not have been making decisions in his own best interests at the Competency Hearing.

Former trial counsel detailed the extent of their belief that Mr. Waldrip was unable to make decisions in his best interest in their Special Plea of Incompetence to Stand Trial. (*See* ROIA, at 1310-13, P-30 [App. 83].)  In the Special Plea, former trial counsel stated that Mr. Waldrip lacked the mental capacity to "rationally decide on a plea agreement" (of life in prison), (*id*. at 1312), that he had "severe psychological disorders" (*id*.), and that he "is incapable of assisting his undersigned appointed attorneys in the defense of the charges against him." (*Id*. at 1313.)  Thus, former counsel recognized what Dr. Merikangas has subsequently confirmed:  that Mr. Waldrip suffered from severe mental disorders that rendered him incompetent to stand trial. (*See* Section VI, above.)

Courts have consistently noted the importance of appointing a guardian *ad litem* to represent the interests of minors and incompetents in specific cases, with some courts specifically holding that failing to appoint a guardian *ad litem* is a violation of due process. *See Johns v. Department of Justice*, 624 F.2d 522, 524 (5th Cir. 1980) (holding that "it was a denial of due process to hold proceedings to deport" a child who was not appointed a guardian *ad litem*); *U.S. v. 30.64 Acres of Land*, 795 F.2d 796, 805 (9th Cir. 1986) (stating that "[t]he absence of a guardian

190

*ad litem* (to represent the mentally ill plaintiff) in this case . . . puts the due process rights of (the plaintiff) in jeopardy in any trial that proceeds absent such representation.")

The failure to request a guardian *ad litem* was objectively unreasonable because counsel simultaneously believed that (1) the prosecution's plea offer was a good one; and (2) Mr. Waldrip was incapable of thoughtfully considering the offer because of his mental illness. But they did nothing about their dilemma; instead counsel fruitlessly argued with Mr. Waldrip – and then conveyed his rejection of the offer. It was constitutionally ineffective for counsel to recognize that Mr. Waldrip could not rationally assist in his defense and at the same time to rely on nothing other than his decision-making ability in rejecting a plea offer that would have allowed him to serve a life sentence. (*See, e.g.*, Currie Aff. at 198 ("I was a bit surprised by . . . the failure of defense counsel to understand the depths of their own client's mental problems and the effects of such problems on his ability to make rational, reasoned decisions both in and out of court.") [App. 54].)

This deficient performance severely prejudiced Mr. Waldrip. Because he could not make informed and reasoned decisions on his own behalf, he had a right to the assistance of someone dedicated to his interests – which is precisely what a guardian *ad litem* is intended to do. Had that occurred, the guardian might well

191

have determined that Mr. Waldrip, though innocent of the charges against him, was better off serving a life sentence than risking trial and the sentence of death that he now is fighting.

The state habeas court's legal conclusion that "the record is clear that trial counsel pursued every avenue with respect to Petitioner's mental health" is an unreasonable application of *Strickland* because the record cited by the Court does not address several issues – including the guardian *ad litem* issue – at all.  (Order Denying Relief, at 12, R-267 [App. 28].)  Rather, the Court cites the suppression hearings, Dr. Currie's trial testimony and excerpts of the competency hearing. (*Id*.)  None of this answers the question of what counsel is to do when their client irrationally refuses a plea bargain at a time when counsel believe him to be incompetent to make such a grave decision.[67]

---

[67] Former Trial Counsel's Ineffectiveness With Regard to Other Aspects of the Competency Hearing and Mental Health Issues Also Compel Relief.

The following deficiencies of counsel likewise impacted the evidentiary picture of the competency hearing and should be evaluated in determining whether that performance was prejudiced under *Strickland*.

- Former counsel failed to adequately craft voir dire questions for the competency hearing;

- Former counsel failed adequately to challenge the expertise and competence of the Prosecution's experts at the Competency Hearing;

(Continued)

## VIII.  MR. WALDRIP'S CUSTODIAL CONFESSIONS WERE INVOLUNTARY AND HIS FORMER COUNSEL WERE INEFFECTIVE IN ADVOCATING THIS POSITION

This argument will address the Claims raised as Claim 10, Claim 16 (in-part) and Claim 43.  In the Court's <u>Procedural Default Order</u>, the Court found that each was not procedurally defaulted and, therefore, all are before the Court on their merits.  (Order Denying as Moot Petitioner's Motion for Oral Argument Re: Procedural Default, Doc. 40, at 25-27 (filed 7/2/2008) [hereinafter Procedural Default Order] [App. 33].)

As discussed in Section IV.B.1-3, above, Mr. Waldrip was interrogated without counsel.  He also was maintained in solitary confinement, in a very small cell, without any contact with outside people.  The Sheriff knew Mr. Waldrip well,

---

(Continued)

- Former counsel failed properly to challenge the use by the Prosecutor during the Competency Hearing of the charges alleged against Mr. Waldrip;

- Former counsel failed to argue that the Competency venue decision was inadequate under the proper standard;

- Former counsel challenged the admission of evidence of other crimes at the Competency Hearing on appeal but mischaracterized binding precedent;

- Former counsel failed to request proper charges at the Competency Hearing and the Underlying Trial; and

- Former Counsel objected to charges at the Competency Hearing and the Underlying Trial that they failed to challenge on appeal.

and his questioning and the conditions in which law enforcement maintained Mr.

Waldrip were expressly designed to manipulate Mr. Waldrip into giving them the

answers they wished to hear.  (*See* P.T. (8/28/91) Vol. II, Doc. 9, Ex. R-23, at 210

(filed 5/24/06) (testimony of Sheriff Chester:  "Q: You certainly knew Tommy

Waldrip.  A:  Oh, Yeah.") [App. 76]; *see also* Evidentiary Hearing, Vol. 25, Report

of Special Agent Berry, Doc. 9, Ex. R-270, at 7382-83 (filed 5/24/06) (noting

Sheriff Chester's familiarity with the Waldrips) [App. 77].)  Under clearly-

established constitutional law, these conditions were coercive and the resultant

statements were involuntary and were required to be suppressed.

The statements were not suppressed, however, because former counsel never

set before the court the coercive conditions that rendered the statements

involuntary.  Counsel knew – and affirmed – that whether the uncounseled

custodial statements could be admitted was critical.  (*See*, *e.g.*, Watson Aff., at

154-57, R-147 ("Rich and I discussed possible strategies and based upon

everything we knew prior to the trial, we determined that the best strategy was to

attack Tommy's statements . . . .") [App. 51]; Brannon Aff., at 141, 145, R-147

("One of the key issues in the trial was the admission of Tommy Waldrip's various

statements to the police prior to my appointment in the case.") [App. 26].)

194

Thus, based upon counsel's own assessment, the Motion to Suppress and resultant appeal were critical.  The decision to make suppression a priority was a reasonable strategic decision – but once having made that reasonable strategic decision, counsel were obligated to argue in accordance with the governing law – or to make a good faith argument to overturn that law.  *See United States v. Span*, 75 F.3d 1383, 1390 (9th Cir. 1996) (stating that a lawyer's performance is not immunized from a constitutional challenge simply by attaching to it the label of "trial strategy," and holding that counsel was ineffective in intending but failing to present potentially meritorious defense because the failure stemmed from counsel's misunderstanding of the governing law); *cf. Martinez-Macias v. Collins*, 810 F. Supp. 782, 786 (W.D. Tex. 1991), *aff'd*, 979 F.2d 1067 (5th Cir. 1992) (finding trial counsel's strategy unreasonable, and thus grounds for ineffective assistance of counsel, where counsel failed to adequately research the governing law).

Here, however, they did neither.  Instead, they ignored binding precedent, and their decision was prejudicial; it cost their client what they recognized to be a critical pretrial motion that would otherwise have been likely to be meritorious. *See Strickland*, 466 U.S. at 693 (stating that to prove prejudice, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"; rather, a defendant need only show that "the result of the particular

proceeding [at issue was made] unreliable because of a breakdown in the adversarial process"); *e.g.*, *Torres v. Ercole*, No. 06-674, 2008 U.S. Dist. LEXIS 49172, *54-57 (S.D.N.Y. June 25, 2008) (noting that for prejudice resulting from counsel's deficient performance with respect to suppression of inculpatory statements, a petitioner need only establish a reasonable probability that the statements would have been deemed involuntary).

Indeed, what former counsel did here was worse.  The trial court understood that a statement had to be suppressed if it was involuntary, and that in order to be "involuntary" the law required evidence of coercion.  This is the clear holding of *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  The trial court told counsel that the Supreme Court required coercion.  (P.T. (July 10, 1992), Doc. 9, Ex. R-37, at 22-25 (filed 5/24/06) [App. 13].)  But counsel disregarded the trial court's comment.  Indeed, even when the State briefed *Connelly*, counsel still ignored it.

Given the utter absence of the necessary argument, it is not surprising that the trial court, and subsequently the Georgia Supreme Court, found "no evidence" of coercion.[68]  It is not that the evidence was not there; it was.  It was not that

---

[68]    Both the Trial Court, and the Georgia Supreme Court on interim appeal, found Petitioner's statements voluntary because there was no evidence of police coercion.  (*See* Order on Tommy Lee Waldrip's Motion to Suppress Statements, Doc.. 62, Ex. P-30, at 1416-19 (filed 7/30/09) ("There is no evidence of 'coercive police misconduct.'" (citing

(Continued)

196

counsel were unaware of what they needed to set forth; they were.  But they failed

to present the argument.  The state supreme court reviewed the findings of the trial

court, and the trial court ruled on the arguments raised by counsel . . .and when the

argument was not there, those courts could not afford relief. [69]

In the state habeas court, however, the issue was different.  There, the

question before the Court was a discrete application of *Strickland v. Washington*,

466 U.S. 668, 686 (1984) and *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986).

The state habeas court, however, found that former counsel were not ineffective

simply because they had argued for suppression of Petitioner's statements at pre-

---

(Continued)

> *Connelly*)) [hereinafter "Suppression Order"] [App. 3]); *Livingston v. State*, 264 Ga. 402, 408, 444 S.E.2d 748, 754 (1994) (stating that petitioner's statements were admissible because there was no evidence of coercive police activity).  In fact, former counsel failed to cite *Connelly* in its Appellant Brief and its Supplemental Appellant Brief to the Georgia Supreme Court during the interim appeal, even though the Prosecution cited *Connelly* in its Appellee Brief.  *Compare* Brief of Appellant and Enumeration of Errors on interim appeal to the Georgia Supreme Court, Doc. 9, Ex. R-2 (filed 5/24/06) [App. 15] *and* Supplemental Brief of Appellant on interim appeal to the Georgia Supreme Court, Doc. 9, Ex. R-4 (filed 5/24/06) [App. 78], *with* Brief of Appellee by the District Attorney on interim appeal to the Georgia Supreme Court, Doc. 9, Ex. R-3 (filed 5/24/06) [App. 79].

[69]  While there could have been an opportunity for the Georgia Supreme Court to find the error during its state-mandated review of the record and enumerated errors on direct appeal, the statute does not create an obligation for the Georgia Supreme Court to find and correct the errors of counsel.  *See* O.C.G.A. § 17-10-35(b) and (f); *Harris v. State*, 237 Ga. 718, 726, 230 S.E.2d 1, 7 (1976), *cert. denied*, 431 U.S. 933, *rehearing denied* 434 U.S. 882 (stating that the Georgia Supreme Court's statutory duty to review the record "in no way relieves [defense] counsel of diligence in behalf of his client") (citing *Eberheart v. State*, 232 Ga. 247, 251, 206 S.E.2d 12 (1974)).

trial motion hearings, and had prepared briefs for the interim appeal.  (Order

Denying Relief, at 11, 40, R-267 [App. 28].)  This was at least an unreasonable

application of clearly established Supreme Court law that warrants full habeas

relief under Section 2254(d)(1).  *[Terry] Williams v. Taylor*, 529 U.S. 362, 412-

413 (2000).

### A. PETITIONER'S STATEMENTS SHOULD HAVE BEEN EXCLUDED FROM THE UNDERLYING TRIAL BECAUSE THEY WERE NOT VOLUNTARILY MADE.

The standard for ascertaining the voluntariness of a confession was clearly

established by the United States Supreme Court at the time Mr. Waldrip's

conviction became final.  While the question of voluntariness is answered by

reference to the totality of the circumstances, *Schneckloth v. Bustamonte*, 412 U.S.

218, 226 (1973) (listing potential factors); *United States v. Roark*, 753 F.2d 991,

993 (11th Cir. 1985), "coercive police activity is a necessary predicate to the

finding that a confession is not 'voluntary' within the meaning of the Due Process

Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167

(1986).

Unconstitutional coercion does not require physical torture or brutality.  *See*

*Rogers v. Richmond*, 365 U.S. 534, 540-41 (1961); *Blackburn v. Alabama*, 361

U.S. 199, 206 (1960) (citing *Chambers v. Florida*, 309 U.S. 227 (1940)).

Psychological and emotional manipulation can be coercion. *See*, *e.g.*, *Davis v. North Carolina*, 384 U.S. 737, 750-751 (1966) (describing coercive tactics employed by police officers, including religious manipulation); *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) ("A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of 'persuasion.'"); *Spano v. New York*, 360 U.S. 315 (1959); *Fikes v. Alabama*, 352 U.S. 191 (1957); *Leyra v. Denno*, 347 U.S. 556 (1954); *Watts v. Indiana*, 338 U.S. 49 (1949); *Turner v. Pennsylvania*, 338 U.S. 62 (1949); *Harris v. South Carolina*, 338 U.S. 68 (1949); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944); *Chambers v. Florida*, 309 U.S. 227 (1940).

Of course, when law enforcement resorts to psychological coercion, the vulnerability of the defendant takes on added significance in weighing the totality of the circumstances. *See Connelly*, 479 U.S. at 164 (recognizing that when interrogators employ "more subtle forms of psychological persuasion," the defendant's mental condition "is a more significant factor"). Characteristics that render a defendant particularly vulnerable include mental illness, *see*, *e.g.*, *Spano v. New York*, 360 U.S. 315, 322 (1959) and low intelligence, *see*, *e.g.*, *Fikes v. Alabama*, 352 U.S. 191 (1957). These may indicate a reduced ability to respond to

powers of suggestion or pressure from authority, or they may indicate an inability

to understand the situation.  *See Connelly*, 479 U.S. at 165 (stating that "mental

condition is surely relevant to an individual's susceptibility to police coercion …");

*Spano v. New York*, 360 U.S. 315, 322 (1959); *Jurek v. Estelle*, 623 F.2d 929, 937

(5th Cir. 1980).

##### 1.     Law Enforcement's Tactics Were Coercive.

The conditions in which Mr. Waldrip were maintained were coercive.  He

was deprived of access to counsel.  (Summary Report, at 22230, R-221 [App. 5].)

This is coercive.  *See Minnick v. Mississippi*, 498 U.S. 146 (1990).  From the

moment he was arrested on a probation revocation warrant, Petitioner was placed

in solitary confinement, and from just after noon on April 16 until the morning of

April 18, he was locked in a jail cell without windows that was "completely

enclosed, kind of like being in an elevator."  (P.T. (8/26/91) Vol. II, at 186-87, R-

19 (testimony of Jailer, Ms. Martin) [App. 7]; *See* Summary Report, at 22243, R-

221 [App. 5].)  The only items in the cell were a bed, a sink, a toilet, a shower and

a table.  (*See* P.T. (8/26/91) Vol. II, at 185-87, R-19 [App. 7].)  Petitioner was

separated from all other inmates and met with no one except law enforcement

personnel.[70]  (*See id.* at 181-84).  Such conditions alone render statements

involuntary.  *See, e.g., Darwin v. Connecticut*, 391 U.S. 346, 349 (1968)

("Considering the 'totality of the circumstances,' we conclude that the court erred

in holding that the confession and the partial re-enactment were voluntary.  **The**

**denial of access to counsel** and the outside world continued throughout . . .")

(citations omitted) (emphasis supplied); *Davis*, 384 U.S. at 733, 745-46 ("The cell

in which Davis was placed measures 6 by 10 feet and contains a solid steel bunk

with mattress, a drinking fountain, and a commode.  It is located on the inside of

the building with no view of daylight. . . . Moreover, the uncontested fact that *no*

*one* other than the police spoke to Davis during the 16 days of detention and

interrogation that preceded his confessions is significant in the determination of

voluntariness." (emphasis in original)).  Moreover, Sherriff Chester's emotional

appeal to Mr. Waldrip's Christian beliefs in Contact 3a – without any Miranda

warnings – is clearly coercive. *See* Section IV.B.3, above; *Brewer v. Williams*, 430

U.S. 399.

---

[70]    In fact, save for a brief, supervised meeting with his son, John Mark Waldrip on April 18th, Mr. Waldrip was isolated from everyone except law enforcement personnel from the time of his arrest until he was brought before the court in his first appearance on April 22nd, a total of eight days.  (*See* Suppression Order, at 1444, P-30 (noting that at the onset of the April 18th meeting, Mr. Waldrip and his son were Mirandized and advised that GBI Agent Billy Stone would sit in on their meeting) [App. 3].)

## 2.   Mr. Waldrip Was Peculiarly Vulnerable to the Coercion Applied.

The Sheriff and others in law enforcement knew that Mr. Waldrip was deeply religious.  They also knew that he was mentally ill and, in fact, actually suffering from active delusions when he was interrogated.  Indeed, when Ms. Martin spoke with Mr. Waldrip, he expressed clear paranoid thoughts that had no basis in reality.  (P.T. (8/26/91) Vol. II, at 177, R-19 (stating that Mr. Waldrip thought that one of the female guards was going to jump him, even though Ms. Martin was the only female jailer) [App. 7].)

When law enforcement knows that a suspect is mentally ill and preys on his mental illness, that demonstrates extreme coercive behavior.  *See Blackburn v. Alabama*, 361 U.S. 199, 207-08 (1960) (finding petitioner's confession involuntary and admonishing the police where they knew of petitioner's mental problems but still interrogated him); *Townsend v. Sain*, 372 U.S. 293, 298-99 (1963) (police knew that the petitioner was under the influence of mind-altering drugs); *Booker v. Singletary*, 90 F.3d 440, 443 (11th Cir. 1996), *cert. denied sub. nom.*, *Booker v. Florida*, 532 U.S. 1033 (2001) (affirming the decision to set aside defendant's death sentence, based, in part, on the fact that petitioner's confession was

202

involuntary because he was a paranoid schizophrenic whose symptoms had been apparent).

As a matter of public policy, preying upon schizophrenics is of particular concern, because schizophrenia is a brain disorder that affects a person's ability to process and respond to information.  Where most people are capable of placing information in context, schizophrenics cannot; they interpret information literally and without any context.  *See* R. Langdon, et al. *Disturbed Communication in Schizophrenia:  The Role of Poor Pragmatics and Poor Mind-Reading*, 32 Psychological Medicine 1273, 1281 (2002).  This deficit is accompanied by decreased inferential reasoning and inhibitory suppression.[71]  *Id*. at 1276, 1281.  In other words, Sheriff Chester's plea – which the man on the street would have understood as coercive and manipulative – would have been received by him as a literal instruction that demanded the response Mr. Waldrip gave.  Thus, at the time of the suppression hearing and interim appeal, there was evidence of constitutionally significant coercion by law enforcement – both in the conditions in which they kept Mr. Waldrip and in their manipulative interrogation.  Given the

---

[71]    As the authors explain, when a person has a reduced ability to control inhibitions, he is "captured by the 'prepotent' objective facts and [] misinterpret[s] non-literal speech because [he is] captured by strictly literal word meanings." *Id*. at 128 n.1.

totality of circumstances, then, the confession was involuntary under clearly

established Supreme Court law.

### B.   THE STATE COURTS WERE CONSTRAINED BY FORMER COUNSEL'S INEFFECTIVENESS.

Former counsel refused to argue under the standard set forth in *Colorado v.

Connelly*, 479 U.S. 157, 164 (1986) – the case on point from the United States

Supreme Court – which held that "absent police conduct casually related to the

confession, there is simply no basis for concluding that any state actor has deprived

a criminal defendant of due process of law."  Thus, even though evidence of police

coercion existed, and was known to former counsel, (*see* P.T. (7/10/92), at 32-40,

R-37 [App. 13].), former counsel did not present evidence of coercion in the

motion to suppress or any supplements thereto.

Moreover, even though the Trial Court asked both sides to research and

address the issues in briefs after the hearing, (*id.* at 25), former counsel still failed

to research *Connelly*.  In the Defense's <u>Brief in Response to the State's Request for

the Defendant's Psychological Evaluation to be Provided in Written Form</u>, (Record

on Interim Appeal ("ROIA"), Doc. 9, Ex. R-1, at 1173-1181 (filed 5/24/06 [App.

80]), former counsel made the following argument:

## **ISSUE THREE**

If a defendant is insane at the time of a confession and/or admission, is such confession and/or admission voluntary and therefore admissible?

Answer no.  If a defendant was insane at the time of his confession and/or admission, such a confession and/or admission, is to be considered involuntary and therefore inadmissible for the following reasons:

If a defendant is insane at the time of a confession or admission, it is not considered to be voluntarily made and thus is not admissible.  In *State v. Gardner*, 154 Ga. 264 (1985), the defendant's confession was held to be inadmissible because it was obtained while the defendant was insane.  The *Gardner* court followed the United States Supreme Court case of *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960), which held a confession made by the defendant who is insane is not the product of "a rational intellect and a free will," and is therefore not voluntarily made.  The *Blackburn* court [sic] found that "in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane . . ."  *Blackburn* at 207.

Additionally, the public policy of this state dictates that "persons who do not have the use of reason . . . shall be incompetent witnesses."  O.C.G.A. Section 24-9-5.  *See also Kimbell v. State*, 252 Ga. 65, 66 (1984).  Thus the case law of this state specifically says that if a defendant is insane at the time of a confession it is not considered to be voluntarily made and thus is not admissible.

(*Id.* at 1177-79.)

By failing to cite *Connelly* and argue coercion, former counsel could not,

and did not, prevail on the Motion to Suppress.  On interim appeal, the Georgia

Supreme Court affirmed the Trial Court's decision, holding that "both [Mr.

Waldrip's] statement to the sheriff and his statement to the GBI were voluntarily

made" because, while the trial court considered the evidence of Mr. Waldrip's

mental illness, there was "no evidence of coercive police activity." *Livingston v.

State*, 444 S.E.2d 748, 753-54 (Ga. 1994). It followed from that finding that the

court held the statements and the information uncovered admissible at trial. *Id.* at

753.

Thus, the two prongs of ineffectiveness – objective unreasonableness and

prejudice – should have been readily apparent to the state habeas court. Instead,

the court analyzed the issue as though "raising the point" were enough:

> Petitioner has further failed to show ineffective assistance of counsel
> in failing to raise such claims [regarding suppression of his
> inculpatory statements], as the record is clear that trial counsel
> thoroughly explored this avenue at pre-trial motions hearings.
> (8/26/91 Motion Hearing, pp. 142-211; 8/27/91 Motion Hearing, pp.
> 1-96.)
> …
> Counsel filed several motions to suppress to exclude the nine
> statements Petitioner had given to law enforcement. (H. 95-96.) Of
> the nine, counsel were successful in getting two of the statements
> excluded. (H. 95.) Counsel also sought and received approval for an
> interim appeal to challenge the trial court's rulings regarding the
> suppression of evidence. (H. 90.) Counsel prepared briefs for the
> interim appeal which involved all three co-defendants, including
> Petitioner. (H. 90.)

(Order Denying Relief, at 11, 40, R-267 [App. 28].)[72]

The state habeas court's determination was, at a minimum, an unreasonable application of clearly established federal law.[73]  Under *United States v. Cronic*, 466 U.S. 648, 656 (1984), effective assistance of counsel encompasses "meaningful adversarial testing" and under *Strickland*, 466 U.S. at 688, counsel has a duty to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  In order to execute that duty, counsel must be adequately prepared to meet the prosecution's case.  *See Kimmelman*, 477 U.S. at 385.  By not identifying and applying the correct legal standard for involuntary confessions, after being given repeated opportunities to do so, former counsel's

---

[72]  The state habeas court also concluded that Petitioner's claims relating to admission of his statements to law enforcement were barred by *res judicata* because the Georgia Supreme Court had previously considered these claims on interim appeal. (Order Denying Relief, at 11, R-267 [App. 28].)  This was error because the Summary Report had not been disclosed until the state habeas proceedings.  That report was a "new fact" that impacted the determination of voluntariness.  Under Georgia's principles of *res judicata* the new fact allowed the court to revisit the question of involuntariness independently of the ineffectiveness of counsel.  *See Zant v. Campbell*, 245 Ga. 368, 369, 265 S.E.2d 22, 24 (1980) (stating that "state habeas corpus trial courts will not adjudicate issues already decided by an appellate court on direct appeal unless either the facts or the law has changed") (citing *Brown v. Ricketts*, 233 Ga. 809, 81, 213 S.E.2d 672, 674 (1975)).

[73]  Under Section 2254(d)(1), this Court must determine whether the state habeas court applied its ineffectiveness analysis in a way that was "contrary to" or an "unreasonable application" of clearly established Supreme Court law.  [*Terry*] *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).

conduct was both objectively unreasonable and prejudicial.  *See id.* (failure to

conduct pre-trial discovery because of mistaken belief that the prosecution was

obliged to produce all inculpatory evidence); *Martinez-Macias*, 810 F. Supp. at

786, *aff'd*, 979 F.2d 1067 (5th Cir. 1992) (failure to adequately research the

governing law which would have permitted counsel to elicit alibi witness

testimony without opening the door to extraneous arrest).

     In fact, courts have regularly condemned counsel who do not seek out and

apply the *proper* law to their arguments and advice.  *See*, *e.g.*,  *Smith v. Singletary*,

170 F.3d 1051, 1054 (11th Cir. 1999) ("Ignorance of well-defined legal principles

is nearly inexcusable."); *Cooks v. United States*, 461 F.2d 530, 532 (5th Cir. 1972)

(holding that counsel was ineffective because the controlling United States

Supreme Court precedents, decided more than a decade before counsel rendered

his advice, demonstrated unequivocally that counsel's advice was erroneous);

*Magana v. Hofbauer*, 263 F.3d 542, 549 (6th Cir. 2001) (holding that counsel's

ignorance of client's maximum possible sentence was objectively unreasonable);

*United States v. Span*, 75 F.3d 1383, 1390 (9th Cir. 1996) (holding that trial

counsel was ineffective where counsel failed to present potentially meritorious

defense due to counsel's misunderstanding of the law); *Baty v. Balkcom*, 661 F.2d

391, 394 (5th Cir. 1981), *cert. denied sub nom*, *Balkcom v. Baty*, 456 U.S. 1011

(1982) ("Inadequate preparation of counsel is one ground for finding a violation of the Sixth Amendment right to effective counsel.").  The state habeas court applied this precedent unreasonably when it held that it was enough for counsel to make *some* argument.

# JURY MISCONDUCT

**IX.   MR. WALDRIP WAS DENIED HIS RIGHT TO A FAIR AND
IMPARTIAL JURY, A FUNDAMENTALLY FAIR TRIAL, AND A
RELIABLE SENTENCING PROCEEDING WHEN THE JURY
ENGAGED IN MISCONDUCT.**

There are two constitutional principles at stake here.  The first is the
constitutional guarantee that "[e]very defendant in a serious criminal prosecution
has the right to trial by "an impartial jury." *United States v. Clark*, 308 F. App'x
411, 412 (11th Cir. 2009) (citing U.S. Const. amend. VI).  The corollary to that
right was articulated in *Gray v. Mississippi*, 481 U.S. 648, 668 (1987):  "a capital
defendant's constitutional right not to be sentenced by a 'tribunal organized to
return a verdict of death' surely equates with a criminal defendant's right not to
have his culpability determined by a 'tribunal organized to convict.'"  *Id*. (citation
omitted).  By its unguided and uninstructed voting on both guilt and penalty, the
jury in this case became a "tribunal organized to return a verdict of death" – a
constitutionally intolerable result.

The death penalty has long been deemed qualitatively different from
imprisonment, and it thus requires greater "reliability in the determination that
death is the appropriate punishment in a specific case." *Woodson v. North
Carolina*, 96 S.Ct. 2978, 2991 (1976); *see also Ford v. Wainwright*, 477 U.S. 399,
411 (1986); *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  This principle has
governed the limitations the United States Supreme Court has placed upon jury

selection (the questions at issue in *Gray* and in *Witherspoon v. Illinois*, 391 U.S. 510 (1968) and others of its progeny); the evidence that can be placed before juries (*e.g.*, *Jackson v. Denno*, 378 U.S. 368, 384-85 & nn.11-12 (1964)); and the conclusion that the Eighth Amendment forecloses "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action" (*e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988)).  In these and other instances, the presumption that "juries for the most part understand and faithfully follow instructions," *see Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985), has given way in face of the risk that jurors' frailties and human nature may lead to a verdict – or, even more particularly, a death sentence – that cannot withstand constitutional scrutiny.  Without equivocation, the Supreme Court has held that a federal court must be assured that a sentencing jury was able to "give a 'reasoned moral response' to a defendant's mitigating evidence – particularly that evidence which tends to diminish his culpability – when deciding whether to sentence him to death."  *Brewer v. Quarterman*, 550 U.S. 286, 289 (2007) (citations omitted).  In this case, this Court cannot have that assurance because the state habeas court did not have that assurance.

Here, the state habeas court weighed the evidence and found that Mr. Waldrip had a jury on which "some of the jurors may have participated in secret voting prior to the conclusion of the evidence." (Order Denying Relief, at 18, R-267 [App. 28].) Nonetheless, it observed that "the evidence reflects that the jury did not deliberate or discuss the case prior to the close of the evidence." *Id*. Given the affidavits and counter-affidavits[74] upon which the state habeas court relied, it is clear that what appears somewhat contradictory is the state habeas court's attempt to reconcile the affidavits and counter-affidavits.

Three jurors testified by affidavit that before the close of evidence *at the guilt phase of the trial*, the jury began to take votes on what they believed the appropriate punishment should be. In her first affidavit, one of the jurors, Clara Booher, recalled:

> ***Through both parts of the trial, we periodically took votes to see where everyone stood on the issue of punishment. We took the very first vote after we elected our foreman at the beginning of the trial.*** I don't remember the exact numbers of the vote, but it was not unanimous at that point. As we continued to take votes, the numbers would slightly change, ***but still by the end of the first part we were***

---

[74] Georgia law provides that habeas petitioners may present substantive evidence via live testimony, deposition or affidavit. *See* O.C.G.A. § 9-14-48 ("The court may receive proof by depositions, oral testimony, sworn affidavits, or other evidence. No other forms of discovery shall be allowed except upon leave of court and a showing of exceptional circumstances.").

> ***not unanimous on the punishment***, even though we <u>were</u> unanimous
> on the conviction.

(Affidavit of Clara Booher, August 18, 1991, Doc. 9, Ex. R-147 (E.H. 2) at 186-87,

¶ 7 (filed 5/24/06) (emphasis supplied) [hereinafter "First Booher Aff."] [App.

84].)  The State asked her to submit a second affidavit, which she did.  In that

affidavit, she affirmed that:

> ***We did take votes throughout the deliberations on whether we felt***
> ***the death penalty was appropriate.***  We probably took three to four
> votes, but I am not sure.  To the best of my memory, all of the votes
> were taken by secret ballot.  ***Although the votes were taken prior to***
> ***the evidence being tendered, we did not discuss or deliberate any***
> ***part of the case, facts or evidence until everything had been***
> ***tendered.***

(Affidavit of Clara Booher, August 11, 1999, Doc. 9, Ex. R-229 (E.H. 84) at

24578, ¶ 5 (filed 5/24/06) (emphasis supplied) [hereinafter "Second Booher Aff."]

[App. 85].)  Clearly, the state habeas court credited *both* of her affidavits in

concluding that the jury did not conduct its fact-finding as to the charges

underlying the conviction until the evidence had been received – but that it voted

as to sentence prematurely.

Notably, Ms. Booher does *not* say that the jury waited until after it was

instructed to vote.  Yet the jury could not have arrived at a constitutionally

defensible verdict without having been properly instructed.  At least as important,

it could not have imposed a constitutionally defensible sentence unless each element of Georgia's capital sentencing scheme was followed.

## A.   THE JURY'S CONDUCT HERE CONSTITUTED MISCONDUCT.

Whether a jury violates its duty based on outside influences or internal actions, the result is jury misconduct.  *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000).  To establish a claim of internal jury misconduct, a petitioner "must do more than speculate; he must show clear, strong, substantial and incontrovertible evidence ... that a specific, nonspeculative impropriety has occurred." *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) (quoting *United States v. Ianniello,* 866 F.2d 540, 543 (2d Cir. 1989)) (internal quotation marks omitted).  Where there is evidence of internal misconduct, this Court's "discretion is broadest."  *United States v. Clarke*, 308 Fed. Appx. 411, 412 (11th Cir.) *cert denied*, 129 S.Ct. 2412 (2009).

Internal misconduct may arise from bias against a defendant or premature deliberations.  *Id.*  When uninstructed jurors conduct a colloquy among themselves, there is a danger that "such conversations may lead jurors to form an opinion as to the defendant's guilt or innocence before they have heard all of the evidence, the arguments of counsel, and the court's instructions."  *United States v. Yonn*, 702 F.2d 1341, 1345 n.1 (11th Cir. 1983).  That is why juries are typically

214

instructed at the beginning of the trial and periodically throughout it not to discuss the case among themselves until permitted to do so after the evidence has been completed and they have received closing instructions.  *United States v. Dominguez*, 226 F.3d 1235, 1243 (11th Cir. 2000).  It is also why a judge's instructions are given to the jury as a whole, with counsel present; in any criminal case, allowing one person to "interpret" the law presents an unacceptable risk that the law will be miscommunicated to the remainder of the jury.  *See United States v. United States Gypsum Co*., 438 U.S. 422, 461-62 (1978) (finding reversible error where the foreman met with the judge to clarify an *Allen* charge and then reported back to the jury).

Accordingly, it is nothing short of remarkable that the foreman on Mr. Waldrip's jury, Richard Baca, testified:

> Another one of my duties as foreman was making sure that everyone on the jury got to vote.  I was in charge of each vote we took.  I don't remember there being too many different votes for the conviction part of the trial, and the real differences entered when we started into the second part of the trial, the punishment part.  Since it was clear that there were all sorts of folks on the jury, including many who felt very strongly about their religion, ***I had us take a vote before the punishment evidence was even started***, just to give us a sense of where everyone stood.  I believe this initial vote was by ballot.  At the point there ***were more votes for death than there were for life***, ***but there were a fair number of people who said that there was no way they were going to vote for the death penalty.***  I remember in particular that a woman and a well-known business man, who was quite religious, both made statements of this sort.

215

\* \* \*

Other jurors changed their votes as the punishment part of the trial went on.  ***We kept taking votes each time we went back to the jury room on a break, to see where we stood at that particular juncture***.  Anyone could call for a vote.  Pretty soon we switched from ballot votes to a vote by a show of hands.  I believe that we switched because ***we wanted to know who it was that was not being convinced by the evidence*** as we went along . . .  Once I had made my own final decision and confirmed it with the evidence ***I took it upon myself to explain to those jurors exactly why they should vote for death at the next vote***.

(Affidavit of Richard Baca, August 11, 1991, Doc. 9, Ex. R-147 (E.H. 2) at

¶¶ 6-7 (filed 5/24/06) (emphasis supplied) [hereinafter "First Baca Aff."]

[App. 86].)[75]

---

[75]    Mr. Baca submitted a second affidavit obtained by Respondent.  In that affidavit he did not deny that the jury took votes on punishment before the beginning of the penalty phase of Mr. Waldrip's trial.  In fact, the affidavit obtained by Respondent corroborates Mr. Baca's initial affidavit, because he testified that "we took approximately four to six votes during each phase of the trial.  Most all of the votes were taken by secret ballot, until the end when we started to deliberate.  After the close of evidence we took votes by secret ballot and by show of hands."  (Second Affidavit of Richard Baca, August 11, 1999, Doc. 9, Ex. R-229 at 24575, ¶ 4 (filed 5/24/06) [App. 87].)  Theresa Phillips likewise testified that the jury was "able to come to our penalty verdict so quickly because we had been taking votes as the sentencing phase went on."  (First Affidavit of Theresa Phillips, August 5, 1998, Doc. 9, Ex. R-147 (E.H. 2) at 367 (filed 5/24/06) [App. 88].)  And in her second affidavit, she confirmed:  "[w]e took votes, by secret ballot, following the guilt/innocence part of the trial to determine who felt the death penalty was appropriate."  (Second Affidavit of Theresa Phillips, August 10, 1999, Doc. 9, Ex. R-229 (E.H. 84) at 24580, ¶ 4 (filed 5/24/06) [App. 89].)

216

Regardless of the nature of the criminal case, "each juror [must] keep an open mind until the case has been submitted to the jury." *United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974). Jurors must not discuss a case among themselves until all the evidence has been presented, counsel have made final arguments, and the case has been submitted to them after final instructions by the trial court. *See, e.g.*, *United States v. Resko*, 3 F.3d 684, 688-89 (3d Cir. 1993). Indeed, "[i]t is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudged the case." *In re Michael*, 326 U.S. 224, 228 (1945). In the guilt-innocence phase, premature deliberation undermines confidence in all of the safeguards of a fair proceeding:

> First, since the prosecution presents its evidence first, any premature discussions are likely to occur before the defendant has a chance to present all of his or her evidence, and it is likely that any initial opinions formed by the jurors, which will likely influence other jurors, will be unfavorable to the defendant for this reason. *See Commonwealth v. Kerpani* 508 Pa. 418, 498 A.2d 829 (1985). Second, once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion. Consequently, the mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint. *See Winebrenner v. United States*, 147 F.2d 322, 328 (8th Cir. 1945); *State v. Joyner*, 289 S.C. 436, 346 S.E.2d 711, 712 (S.C. 1986).

> Third, the jury system is meant to involve decision-making as a collective, deliberative process and premature discussions among

217

individual jurors may thwart that goal. *See Winebrenner*, 147 F.2d at 329; *Kerpan*, 498 A.2d at 831. Fourth, because the court provides the jury with legal instructions only after all the evidence has been presented, jurors who engage in premature deliberations do so without the benefit of the court's instructions on the reasonable doubt standard. *See Winebrenner*, 147 F.2d at 327. Fifth, if premature deliberations occur before the defendant has had an opportunity to present all of his or her evidence (as occurred here) and jurors form premature conclusions about the case, the burden of proof will have been, in effect, shifted from the government to the defendant, who has "the burden of changing by evidence the opinion thus formed." *Id.* at 328.

Finally, requiring the jury to refrain from prematurely discussing the case with fellow jurors in a criminal case helps protect a defendant's Sixth Amendment right to a fair trial as well as his or her due process right to place the burden on the government to prove its case beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970).

*Resko*, 3 F.3d at 689-90. Of course, all of these serious concerns are implicated here, where the state habeas court found nothing more than that the jury waited until it had "the evidence" before it decided to vote.

At the same time, the searching inquiry that the Third Circuit mandated in *Resko* – and for lack of which it reversed the district court – pales in comparison to the situation here. In *Resko*, the defendants were convicted of drug conspiracy and firearm charges. Here, some of the charges were for capital offenses, and the end result was a death sentence by jurors who unabashedly had made their determination and argued to others *that they should change their minds before* instructions and before the "channeling and limiting of the sentencer's discretion,"

218

*see Maynard v. Cartwright*, 486 U.S. at 362, a process that is critical to a constitutional sentencing proceeding.

The effect of the voting was thus to deprive Mr. Waldrip of the right to have a jury consider and "giv[e] meaningful effect to mitigating evidence that may justify the imposition of a life sentence rather than a death sentence." *Brewer*, 550 U.S. at 289. As Richard Baca's affidavit, quoted in full, *supra*, explained, before the penalty phase started, "there were more votes for death than there were for life, ***but there were a fair number of people who said that there was no way they were going to vote for the death penalty***." (First Baca Aff. at ¶ 6, R-147 [App. 86] (emphasis supplied).) In other contexts, the Supreme Court has made it clear that even those who "firmly believe that the death penalty is unjust" have a right to sit on a capital jury. *Gray*, 481 U.S at 658 (*quoting Lockhart v. McCree*, 476 U.S. 162, 176 (1986)). It follows that the foreman erred in seeking to silence those views – by, among other means, making people vote by open shows of hands – *before* the jurors ever had the opportunity to express instructed and fully informed views on the question before them. His behavior *constructively* excluded those jurors from constitutionally proper deliberations. In comparison, if even a single juror is excluded *physically* from a jury because of his or her views on the death penalty, the importance of the constitutional requisite of a fair and impartial jury

that is not biased against a capital defendant precludes an application of harmless error. *Id.* at 668. Such solicitude simply cannot be reconciled with what amounted to a judicial shrug of the shoulders by the state habeas court when it refused to find cause and prejudice sufficient to reach the merits of the claim.

Previously, this Court has determined that Mr. Waldrip's Jury Misconduct Claim (Claim 4) was procedurally defaulted and that Georgia's procedural rule was "adequate" and "independent." (July 2 Order at 24-25.) As such, this Court may only reach the merits of this claim if there is "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 725 (1991).[76] The state court's holdings of no cause or prejudice are irrelevant as this Court considers them *de novo*. (*See* Standards, Cause and Prejudice, and Fact Sections at Sections I and III.B.)

Moreover, even though a state court could have made factual findings of bias or lack of bias that would have been entitled to deference, the "constitutional standard of jury impartiality is a question of law." *See Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) (comparing 28 U.S.C. § 2254(d) with *Patton v. Yount*,

---

[76] A procedural default can also be excused if the Court was to find that failure to review the merits of the claim would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 725.

467 U.S. 1025, 1037 n.12 (1984).)[77]  Accordingly, it is for this Court to determine

as a question of federal constitutional law whether a jury may pronounce an

uninstructed and unguided sentence of death.  In answering that question, the Court

will review *de novo* whether the jury needed only to wait until "the close of

evidence" to vote – as the state habeas court found – or whether a jury cannot vote

before it has been instructed.

### B.    CAUSE AND PREJUDICE.

Cause has been defined as "some objective factor external to the defense

[that] impeded counsel's efforts."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

In other words, because of the circumstances of the misconduct, "the

factual…basis for a claim was not reasonably available to counsel" at the direct

appeal stage.  *Murray*, 477 U.S. at 488; *accord Amadeo v. Zant*, 486 U.S. 214, 222

(1988) (concealment of underlying facts provided cause for petitioner's failure to

discover grounds at an earlier time).

Here, the jury was external to the defense, and Mr. Waldrip was clearly not

privy to the conversations that took place in the privacy of the jury room.  The

jurors certainly did not ask for permission to "expedite" the sentencing process.

---

[77]    Here, because the state habeas court did not look beyond the cause and prejudice
analysis, it did not make the requisite findings.

*See* (First Baca Aff. at 175, ¶ 10, R-147 ("I recall thinking that we had been smart to take votes all along, rather than waiting until the end of the trial to start voting. That way, we didn't have to go back through all of the evidence before taking a vote.  Rather, we only had to take a last vote based on the evidence we heard since our last vote.  ***That saved us a lot of time and allowed us to get the emotional part of the trial over with quickly***.") (emphasis supplied) [App. 86].)  Neither the judge, nor the prosecution, nor the defense had objective facts before them to suggest the jurors' misconduct.  As the Supreme Court recently reaffirmed in *Banks v. Dretke*, 540 U.S. 668 (2004) – there in the context of prosecutorial misconduct – when there is a presumption of propriety on the part of one who is obligated to discharge a duty faithfully, defense counsel does not have a "procedural obligation to assert constitutional error on the basis of mere suspicion."  *Id*. at 695-96.  Certainly, the same principle – that no obligation to assert error arises unless there is more than mere suspicion – should apply to wrongdoing by a jury which, if anything, has a more hallowed and "special role" "in the search for truth in criminal trials." *Id*. at 696 (*quoting Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

If the state procedural rule at the time of Mr. Waldrip's motion for new trial and direct appeal required his counsel to uncover issues no reasonable person had a basis even to suspect, then counsel on the motion for new trial and appellate

222

counsel on direct appeal were ineffective for failing to interview the jurors who served on Mr. Waldrip's jury *sua sponte* and thereby uncover evidence of the misconduct. Where there is a duty to investigate, the failure to investigate and then present the misconduct in a timely manner falls below the requisite standard of care in a capital case. *See* 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.8 [Duty to Assert Legal Claims]; 1989 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 11.7.3 [Objection to Error and Preservation of Issues for Post Judgment Review]. In Georgia, capital defendants have a right to effective assistance of counsel in a motion for new trial, *Williams v. Turpin*, 87 F.3d 1204 (11th Cir. 1996), and ineffective assistance of counsel also provides "cause" to overcome a procedural default. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (constitutionally ineffective assistance by trial counsel provides "cause" to overcome procedural default); *Murray v. Carrier*, 477 U.S. 478 (1986) (same where ineffectiveness occurs on appeal).[78] Whether the "cause" external to the

---

[78] In order for ineffective assistance of counsel to provide cause to overcome a procedural default, a petitioner must have raised such ineffectiveness as an independent claim in state proceedings. Petitioner clearly did so. (*See* State Order Denying Habeas Relief (6/8/04) at 18, R-267 ("Therefore, it cannot be said that Petitioner's counsel were

(Continued)

defense is the jurors' misconduct in the first instance or counsel's ineffectiveness

in not uncovering the misconduct is a question this Court assesses *de novo* rather

than under § 2254(d), because "cause" is not a "claim" and § 2254(d) is

inapplicable.  *See Fischetti v. Johnson*, 384 F.3d 140, 154-55 (3d Cir. 2004) (citing

*Coleman*, 501 U.S. at 755); *see also Sibley v. Culliver*, 377 F.3d 1196 (11th Cir.

2004); (Section Vol. II, Claim XII below.)  Here, "cause" clearly exists.

Mr. Waldrip has also suffered "prejudice as a result of the alleged violation

of federal law."  *Coleman*, 501 U.S. at 750.  "Prejudice" to overcome default is

found when there is at least a "reasonable probability" that the result of that

proceeding "would have been different had the constitutional violation not

occurred."  *Owen v. Sec'y Dep't of Corrections*, 568 F.3d 894, 908 (11th Cir.

2009) (quotation marks and citations omitted).  Here, the default impacted the

motion for new trial and direct appeal.  Given the strong holdings of the United

States Supreme Court in a line of cases beginning before *Denno*, and extending

through *Witherspoon* and *Gray* to *Brewer* – which affirm that without confidence

---

(Continued)

       ineffective in failing to address [the Jury Misconduct] issues on appeal.") [App. 28];
(Petitioner's Post-Hearing Reply Brief, at 184 n. 74, R-264 ("[C]ounsel would be
ineffective for failing to raise such an egregious claim of structural error [—that is, the
jury misconduct claim].") [App. 42].)

that a fair and unbiased tribunal imposed a death penalty through consideration of constitutionally mandated mitigation under the guidance of proper instruction, a court must reverse. *E.g.*, 481 U.S. at 668 (no harmless error analysis was warranted where even a single death-qualified juror was excluded from a jury wrongfully).

And, of course, all of the concerns identified by the *Resko* court add to the prejudice here. For example, in *Zant v. Stephens*, 462 U.S. 862 (1983), the Supreme Court affirmed that Georgia requires the state to establish a capital defendant's eligibility to be sentenced to death. Because the jury was voting on the sentence without requiring the state to meet its burden, "the burden of proof will have been, in effect, shifted from the government to the defendant, who has 'the burden of changing by evidence the opinion thus formed.'" *Resko*, 3 F.3d at 689-90 (*quoting Winebrenner v. United States*, 147 F.2d 322, 328 (8th Cir. 1995)).

Had the evidence of this misconduct been developed and this issue raised on direct appeal, there is a reasonable probability that the outcome of the direct appeal would have been different.[79]

---

[79]   To the extent this Court has questions that remain unanswered as to whether Petitioner has established cause and prejudice, he also requests an evidentiary hearing on this threshold issue.

**C.   PETITIONER IS ENTITLED TO AN EVIDENTIARY
HEARING.**

Given the state habeas court's reliance on the affidavits without further
inquiry, Mr. Waldrip respectfully requests that this Court hold an evidentiary
hearing so that it can have the jurors testify under oath to resolve any questions that
remain unanswered.  Mr. Waldrip is entitled to this hearing because it cannot be
said that he failed to develop these facts in the record below.  To the contrary, Mr.
Waldrip sought to depose the jurors on numerous occasions to learn how many
jurors were convinced to alter their votes by impermissible pre-instruction
persuasion, but all previous attempts were denied by the courts.

**1.   Overview of the Law**

A habeas petitioner is "entitled to careful consideration and plenary
processing of (his claim), including full opportunity for presentation of the relevant
facts." *Blackledge v. Allison*, 431 U.S. 63, 83-84 (1977) (quotation marks and
citation omitted).  An evidentiary hearing is required on all non-record based
claims if the petitioner:  (1) alleges facts, which if true, would entitle the petitioner
to relief; (2) a full and fair hearing was not held in the state court; and (3) there are
no procedural obstacles to the federal court's review.  *Id.*; *Townsend v. Sain*, 372
U.S. 293 (1963), *overruled sub nom on other grounds*, 504 U.S. 1 (1992); *Aron
v. United States*, 291 F.3d 708, 715 (11th Cir. 2002); *Breedlove v. Moore*, 269 F.3d

226

952, 960 (11th Cir. 2002); *Buenoano v. State*, 963 F.2d 1433, 1439 (11th Cir.

1992); *Agan v. Dugger*, 835 F.2d 1337, 1338 (11th Cir. 1987).

### 2.   Petitioner Has Exercised Due Diligence in State Court and Federal Court

As outlined above, the facts set forth in the juror affidavits demonstrate

constitutional error of the most serious kind – entitling Mr. Waldrip to relief in

the form of a new trial or, at the very least, a new sentencing hearing.  There has

not yet been a full and fair hearing on the facts Mr. Waldrip seeks to introduce

now.  This is through no fault of his own.[80]  In fact, once Mr. Waldrip learned

the facts detailing the pervasive jury misconduct during the state habeas

proceeding, he submitted affidavits from those jurors and sought to depose the

jurors both during the state habeas proceeding and in support of his cause and

prejudice motion in this Court.  *See* Petitioner's Motion for Leave of Court to

Depose Jurors, Doc. 46, Ex. R-310 [App. 90]; Affidavits Submitted by

---

[80]   The proper meaning of the "failed to develop" language in § 2254(e)(2) was explained by the Supreme Court in *[Michael] Williams v. Taylor*, 529 U.S. 420 (2000).  The Supreme Court unanimously clarified that "failed to develop" imported a "threshold standard of diligence," such that the provisions (A) and (B) of § 2254(e)(2) only apply if the petitioner was not reasonably diligent in trying to develop the factual record while in state court. *Id.* at 433-34.  The Court explained that "[d]iligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court."  *Id.* at 435.  Because Petitioner did not fail to develop the facts in state court, as shown below, § 2254(e)(2) has no application here.

Petitioner Tommy Lee Waldrip, Doc. 9, Ex. R-147 (E.H. 2); Petitioner's

Motion for Leave to Conduct Discovery Related to His Arguments for Cause and

Prejudice to Excuse Procedural Default, Doc. 45 (filed 7/21/08).)  In each

instance, his requests were denied.

     Petitioner was diligent and was not at fault for any lack of complete factual

development in state court.  Section 2254(e)(2) provides no impediment to this

Court's conducting an evidentiary hearing.  Moreover, because this Court must

accept Petitioner's alleged facts as true, and because Petitioner was diligent in

attempting to prove his evidence but was denied a full and fair hearing in the state

court, an evidentiary hearing in this Court is mandatory.[81]  *Townsend v. Sain*, 372

U.S. 293 (1963); *Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002);

*Breedlove v. Moore*, 269 F.3d 952, 960 (11th Cir. 2002).  Under *[Michael]*

*Williams v. Taylor*, 529 U.S. 420 (2000), this Court must grant an evidentiary

hearing on this issue.  As in the instant case, "where specific allegations before the

court show reason to believe that the petitioner may, if the facts are fully

developed, be able to demonstrate that he is confined illegally and is therefore

---

[81]    Even if this Court denies this request, Petitioner seeks to subpoena those jurors so it can proffer testimony about when it began deliberating for appellate purposes.

entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Harris v. Nelson*, 394 U.S. 286, 300 (1969).

Petitioner has presented the affidavits of several jurors demonstrating that *ex parte communications* occurred and that the jury began to vote before instructed, depriving Mr. Waldrip of any constitutionally meaningful deliberation of his verdict and sentence. The State responded by obtaining "clarifying affidavits" from several jurors. Although the state habeas court construed the affidavits and counter-affidavits as though the facts set forth in both were accurate, there are discrepancies that are troubling that must be resolved. Only if the jurors are questioned under oath, subject to cross-examination, can the Court determine the full extent of the misconduct and the extent to which it cost Mr. Waldrip the fair and impartial jury he deserved – in both the guilt/innocence and sentencing phases. Accordingly, Petitioner respectfully requests that this Court hold an evidentiary hearing on this claim.

229

# PENALTY PHASE
# JURY INSTRUCTIONS

X.   **THE PENALTY PHASE AT THE UNDERLYING TRIAL WAS SO INFESTED WITH ERROR THAT PETITIONER'S SENTENCE OF DEATH CANNOT STAND**

A.   **INTRODUCTION**

A well-liked young man had been brutally killed.  The details of the killing were clear; he was shot and beaten, and his truck was set on fire.  Multiple assailants appeared to have been involved.  Moreover, this young man was scheduled to testify in a criminal trial – and it soon became apparent that another scheduled witness had been frightened away from testifying.  Those facts were easy to put before a jury, readily invoking anger and resentment toward whoever did such a thing.  There was only one problem.  The evidence did not show that it was Petitioner who killed the Witness.  (See Vol. III, Section XXXIX.B (Actual Innocence), below)  Moreover, the most critical evidence offered by the Prosecution against Petitioner was his own uncounseled, internally inconsistent, and unconstitutionally obtained statements.  (*See* Section IV, above.)  It is well established that "[an] accused may not be convicted on his own uncorroborated confession."  *Smith* v. *United* States, 348 U.S. 147, 156 (1954).  In short, the evidence simply did not establish that Petitioner committed "a narrow category of the most serious crimes" or that his "extreme culpability makes [him] the most deserving of execution."  *Roper v. Simmons*, 543 U.S. 557, 568 (2005).  The jury

230

charges enabled the jurors to impose a sentence of death without making the findings necessary to a constitutional sentence.  Accordingly, this Court should grant the writ.  The challenge to the penalty phase jury instructions (with the exception of a challenge to one of the two aggravators – discussed at greater length below) was not found procedurally defaulted below and is not procedurally defaulted here.

**B.  THE GUILT/INNOCENCE PHASE INSTRUCTIONS ALLOWED THE JURY TO CONVICT PETITIONER OF MALICE MURDER WITHOUT FINDING THAT HE HAD THE SPECIFIC INTENT TO KILL**

The court's instructions on "party to a crime", "intent", and "malice" given at the guilt/innocence phase - the only time the court ever explained these concepts[82] – allowed the jury to convict Petitioner of malice murder without ever finding that he had the specific intent to kill. It did so by expressly allowing the jury to impute the intent to kill of the actual murderer onto Petitioner.  Considering the lack of any physical evidence tying Petitioner to the crime scene, it is probable that this is exactly what the jury did.  (*See* Vol. III Actual Innocence, below.)

---

[82]   The court repeated a *portion* of the guilt phase charge on party to a crime verbatim at the sentencing phase (T.T. Vol. XVIII, at 3538-39, R-63 [App. 16].)

Specifically, the court charged that intent "may be inferred from the proven circumstances or by acts and conduct, or it may in your discretion be inferred when it is the natural and necessary consequences of an act." (T.T. Vol. XVII, at 3295, R-62 [App. 17].)  Similarly, the trial court instructed the jury that "Malice may, but need not, be implied from all of the circumstances of the killing .... Malice aforethought may, be inferred from the reckless disregard for human life." (*Id.* at 3303-04.)  Because the charges are stated in the passive voice and focus on the *circumstances of the crime* and not the *actions of the Petitioner*, they allowed for intent and malice to be generalized rather than finding that the Petitioner intended or that the Petitioner had malice.  In other words, the jurors were instructed that they could "infer" that Petitioner "intended" to kill as long as the circumstances of the murder suggested that the actual killer intended to kill.

The guilt phase instructions were found by this Court to be procedurally defaulted.  (Order Denying as Moot Petitioner's Motion for Oral Argument Re: Procedural Default, Doc. 40, at 24-5 (filed 7/2/2008) [hereinafter Procedural Default Order] [App. 33].)  Trial counsel knew this was a capital case and that these definitions were critical to both the guilt and penalty phases.  Accordingly, they had an obligation to object and to preserve the error, and their failure to do so was infective within the meaning of *Strickland.  See e.g. Whitney v. Horn,* 280

F.3d 240, 256-257 (3d Cir. 2002) (observing where counsel failed to object to an erroneous charge on a capital defense that the court could not imagine a justification for such a choice.)  The prejudice from allowing such attenuated charges at trial and uncommented on at sentencing is manifest.  Accordingly, it should excuse the default as to these charges.

Moreover, the court instructed the jury that Petitioner could be found guilty as a party if he "committed the alleged crime, helped in the actual perpetration of the crime *or participated in the criminal endeavor*."  (T.T. Vol. XVII, at 3296, R-62 [App. 17].) (emphasis supplied).  Although the structure of this instruction makes clear that a "criminal endeavor" is something larger than the crime itself, the trial court failed to define the term or limit its scope.  A reasonable juror could have concluded incorrectly that the "criminal endeavor" included acting as an accessory after the fact in helping to conceal the murder.  That would be error under Georgia law.  *See Martinez v. State*, 474 S.E.2d 708, 711 (Ga. App. 1996) (holding that an accessory after the fact is not a party to the crime) (citing *Jones v. State*, 295 S.E.2d 71, 73 (1982)).  Based on the instructions, then, the jurors could find that Petitioner "intended that death be used by another to accomplish the criminal enterprise" if the actual murder had specific intent to kill and Petitioner

was only an accessory after the fact.[83]  In fact, the Prosecutor argued to the jury that Petitioner and his son " were both *equally culpable of everything that happened, everything that happened that night*, the death *and burial* of Keith Lloyd Evans.  (T.T. Vol. XVIII, at 3516, R-63 (emphasis supplied) [App. 16].)

The overall effect of these instructions was to allow the jury to convict Petitioner as a party to malice murder based on the imputed intent of the actual killer, requiring only that Petitioner played some peripheral role, no matter how limited, in the "crimes."  This is not a hypothetical inference.  When deliberating during the guilt/innocence phase, the jury expressly inquired of the court whether a person could be found guilty of malice murder as a party.  (T.T. Vol. XVII, at 3332-33, R-62 [App. 17].)[84]  It is clear that the jurors were concerned with whether they could convict the Petitioner on the basis of attenuated participation.

---

[83]   At the guilt phase, the effect of these instructions was to allow Petitioner to be convicted of malice murder based on the imputed intent of the actual killer as long as Petitioner played some peripheral role in the crime.  This was a problem with the felony murder charge as well, because instead of imputing malice from the *mens rea* of the underlying felony – *see Edge v. State*, 414 S.E.2d 463 (1992) – it allowed the jury to impute the *mens rea* of the *actual killer* onto Petitioner.  It is for this reason that the guilty verdict on malice murder does not establish the necessary level of intent to satisfy *Enmund* in this case.

[84]   The trial court only magnified the problem when it responded that the jurors "may find a defendant guilty of malice murder as a party…'to the *murder*.'" (T.T. Vol. XVII, at 3332, R-62 [App. 17]), incorrectly informing the jury that Petitioner can be found guilty of malice murder as a party to whatever murder – which, in this case, would include felony murder.

There is a separate reason that the above charges are discussed here – in what is primarily a challenge to penalty phase jury instructions: at the penalty phase the court did nothing to distinguish between the findings needed to convict and those needed to sentence to death.  As such, the jury had no different instructions to keep it from carrying forward the understanding of attenuated guilt set forth above forward to establish "attenuated death-worthiness" – a construct that renders meaningless the precautions necessary to ensure the constitutionality of the death penalty.

## C.    GEORGIA'S DEATH PENALTY SCHEME

Georgia's capital sentencing scheme has three "planes" – each of which designed to filter out those individuals who may not be sentenced to death constitutionally, leaving only "those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'"  *Roper v. Simmons*, 543 U.S. 551, 568, (2005) (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).

To pass through the first plane – the guilt/innocence stage – jurors must find the defendant guilty of murder – either malice murder or felony murder.  Ga. Code Ann. § 16-5-1.  For the second plane – the eligibility stage – the jurors must find the existence of at least one valid, statutory aggravating circumstance beyond a

reasonable doubt so that a defendant convicted of murder can be considered death eligible.  Ga. Code Ann. § 17-10-30; *Zant v. Stephens*, 462 U.S. 862, 878 (1983). Lastly, at the third plane – the selection stage – jurors must make an individualized determination that death is the appropriate sentence on the basis of the character of the individual and the circumstances of the crime.  A breakdown at any one of these planes renders a death sentence unconstitutional.  *See Tuilaepa v. California*, 512 U.S. 967, 971-972 (1994) ("To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase."); *Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990) ("[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence").

### D.   PLANE TWO:  THE COURT'S INSTRUCTIONS ALLOWED THE JURY TO UNCONSTITUTIONALLY FIND PETITIONER TO BE DEATH ELIGIBLE

#### 1.   The Court's Instructions on Aggravating Circumstances Unconstitutionally Allowed the Culpability of the Actual Killer to Be Imputed to Petitioner

The Supreme Court has held that a sentencing jury's focus in sentencing an individual to death must be on the culpability of that individual, not his accomplices.  *Enmund v. Florida*, 458 U.S. 782, 798 (1982).  And, "while the trier

236

of fact may impute intent to an aider and abettor for the purpose of determining

guilt, that imputation may not be done for the purpose of imposing the death

penalty." *Bullock v. Lucas*, 743 F.2d 244, 247 (5th Cir. 1984).

The jury should have been instructed to focus on Petitioner's role in the

murder, and to determine whether his individual culpability for his own actions

was sufficient to warrant the death penalty.  The United States Constitution

demands no less.  Instead, the jury was allowed to focus only on the nature of the

*crime*, and to determine the sentence based on its characteristics, in the process

crafting a new "party to the death penalty" sentence.  If that concept sounds like a

non sequitur, it is.  The death penalty can be imposed only for the narrow category

of the most reprehensible murders, and only on those persons who are culpable for

their personal role in the commission of those murders.  Without that finding here,

Mr. Waldrip's sentence of death is void.  It cannot stand.[85]

---

[85]    Due to the guilt phase instructions that allowed Petitioner to be convicted of malice murder without determining that he had the specific intent, the guilty verdict on malice murder does not establish the necessary level of intent to satisfy *Enmund* in this case. These facts differ from those *Ruffin v. Dugger*, for example, where the court held that the malice murder conviction established the required level of individual culpability under *Enmund* in large part because of the court's instructions that "*for one person to be guilty of a crime physically committed by another, it is necessary that he have a conscious intent that the criminal act shall be done*"  848 F.2d 1512, 1516 (11th Cir. 1988) (emphasis supplied).

In the face of Petitioner's argument that the defendant was found death eligible in the absence of the culpability required under *Enmund* or *Tison*, the state habeas court merely stated that the court's instruction on *Enmund* was consistent with the model jury instructions and thus proper.  (Order Denying Relief, at 24-25 [App. 28].)  The state habeas court's merits adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by [this] Court," 28 U.S.C. § 2254(d)(1), and thereby warrants federal habeas relief.

> **i.    Court Erred in Allowing the Jury to Find Petitioner Eligible for the Death Penalty as a "Party to the Aggravating Circumstance"**

The trial court erroneously instructed the jury that Petitioner could be found death eligible if he were merely "*party to the aggravating circumstance*."  (T.T. Vol. XVIII, at 3538, R-63 (emphasis-supplied)[App. 16].) In other words, if the jury found that the aggravating circumstances - *i.e.*, the characteristics of what happened, regardless of who caused it - existed beyond a reasonable doubt, they could find that he was a party to them and still sentence him to death, regardless of individual responsibility for the existence of the aggravators.  As discussed above, the jury had been instructed as to a "party to a crime" and had asked – and been

238

instructed – whether that meant he could be "party" to the murder. The exact same attenuation was expressly introduced into the penalty phase.

The problem with the instruction is more serious than its lack of basis in statute or case law and its deviation from the model jury instructions: it told the jury it could find Petitioner eligible for the death penalty *even if* he lacked the culpability necessary to justify the death penalty under *Enmund* and *Tison*. *See Enmund v. Florida,* 458 U.S. 782, 797 (1982) (In order to constitutionally impose a death sentence, the State must prove that the petitioner himself killed or attempted to kill the victim, intended that a killing take place, or that lethal force be employed.); *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987) (In order to constitutionally impose a death sentence petitioner must have been a "major participant" in the felony underlying a felony murder conviction and acted with reckless indifference to human life.), *see also Ross v. Kemp*, 756 F.2d 1483, 1497 (11th Cir. 1985) (Clark, J., concurring in part and dissenting in part) (stating that the Supreme Court forbids the death penalty being based on the imputation of an intent to kill from the actual killer onto an accomplice).

### a.    The "Party to the Aggravating Circumstance" Instruction's Effect on the (b)(2) Aggravator

The court instructed on the (b)(2) aggravating circumstance as follows:

> Where the offense of murder was committed while the defendant was
> engaged in the commission of certain felonies considered to be
> especially serious.  I charge you that the offense of kidnapping with
> bodily injury and aggravated battery are such felonies.

(T.T. Vol. XVIII, at 3539, R-63 [App. 16].)   This instruction on its own requires at

least a measure of individual culpability – tracking the statute – by containing the

words "while the defendant was engaged in the commission…"  O.C.G.A. § 17-

10-30(b).  The "party" instruction, however, obliterated that requirement,

authorizing the jury to find the aggravating circumstances by finding that the

defendant was merely a party to the aggravating circumstances.  Therefore, the

"party" instruction's effect on the (b)(2) aggravator was to authorize the jury to

deem Petitioner death eligible even if he played no role in the murder and only a

minor role in any of the underlying felonies – circumstances explicitly forbidden

by the Supreme Court in *Enmund* and *Tison*.  *See Tison v. Arizona*, 481 U.S. at

157-58 (holding an individual to be death worthy only if a "major participant" in

the underlying felony).

<blockquote>

**b.**     **The "Party to the Aggravating Circumstance"
Effect on the (b)(7) Aggravator**

</blockquote>

The Court instructed:

> The State must prove to your satisfaction and beyond a reasonable
> doubt that the torture, depravity of mind or aggravated battery to the

victim was of such a nature that the murder was outrageously or wantonly vile, horrible or inhuman....

In order to find that the offense of murder involved depravity of mind, you must find that the defendant, as the result of utter corruption, perversion or immorality, committed aggravated battery or torture upon a living person himself or *as a party.*

(T.T. Vol. XVIII, at 3541-42, R-63 [App. 16].)  Although the (b)(7) aggravator is written in the passive voice - thus seemingly not requiring individual culpability - the model instructions have been written to require that "the *defendant...committed* aggravated battery or torture upon a living person" or that "*defendant intentionally, unnecessarily, and wantonly inflicted* severe physical or mental pain, agony, or anguish upon a living victim."[86]  The "party" instruction improperly permitted the Petitioner to be held vicariously responsible for the manner in which Mr. Evans was murdered – regardless of *who* committed the battery, torture, or pain, agony,

---

[86]  In relevant part, the 1991 Model Jury Instructions state:

In order to find that the offense of murder involved torture, you must find *that the defendant intentionally, unnecessarily, and wantonly inflicted* severe physical or mental pain, agony, or anguish upon a living victim....

In order to find that the offense of murder involved depravity of mind, you must find *that the defendant*, as the result of utter corruption, perversion, or immorality, *committed aggravated battery or torture upon a living person*, or subjected the body of a deceased victim to mutilation or serious disfigurement or sexual abuse....

or anguish.  The Court's party instruction removed the essence of the aggravator's requirement and allowed the Petitioner to be sentenced to death without any consideration of his own culpability for this aggravating factor.

### ii.    The Guilt Phase Instructions Nullified the Court's *Enmund* Filter

Only later did the Trial Court introduce a *modified* form of an *Enmund* limitation – stating only that the sentence of death cannot be imposed "unless…the defendant either, one, committed the murder himself or, two, himself attempted to kill the victim or, three, intended that deadly force be used by another to accomplish the criminal *enterprise*."  (T.T. Vol. XVIII, at 3543-44, R-63 [App. 16].)  The Court will recall that the Trial Court had previously instructed the jury about a criminal endeavor and had informed the jury that intent "may be inferred from the proven circumstances or by acts and conduct, or it may in your discretion be inferred when it is the natural and necessary consequence of an act." (T.T. Vol. XVII, at 3295, R-62 [App. 17].)  In the modified *Enmund* instruction, the Trial Court did nothing to clarify or correct those instructions, allowing the jury to infer intent from the actions of others.  As a result of these instructions, the instructions on the aggravators did not satisfy the constitutionally-required function of ensuring

that Mr. Waldrip's *behavior* placed him in the narrow category of death-eligible persons.

### E.   THE COURT'S INSTRUCTIONS ON AGGRAVATING CIRCUMSTANCES FAILED TO GENUINELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY.

Additionally, the aggravating factors themselves failed to narrow the class of death eligible individuals.  To pass constitutional muster, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  Aggravating factors must "adequately differentiate [a] case in an objective, evenhanded, and substantively rational way from the many Georgia murder cases in which the death penalty may not be imposed.  *Id.*  Here, the (b)(2) or (b)(7) instructions, especially when considered in conjunction with the "party to the aggravating circumstance" instruction, fail to genuinely narrow the class of persons eligible for the death penalty.

As more fully explained below, because there is a reasonable likelihood that the state trial court's instructions allowed the jurors to find Petitioner death eligible in the absence of a valid aggravating circumstance, the state habeas court's merits

adjudication "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by

[this] Court," 28 U.S.C. § 2254(d)(1), and thereby warrants federal habeas relief.

### 1.   The (b)(2) Aggravator Failed to Narrow the Class of Persons Eligible for the Death Penalty.

Even in the absence of a "party to the aggravating circumstance" instruction,

the (b)(2) aggravator instruction merely duplicates the jury's finding that

Petitioner was guilty of felony murder, failing to narrow the class.[87,88] (*See* Section

---

[87]   In *Lowenfield v. Phelps*, 484 U.S. 231 (1988), it was held that an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself.  This case, therefore, is not governed by the holding in *Lowenfield* because Georgia's definitional stage does not sufficiently narrow the class of death-eligible defendants.  The Louisiana scheme at issue in that case differs from Georgia's.  *Id.* at 244-45 (juxtaposing the Texas and Louisiana schemes, which narrow at the sentencing phase, with that of Georgia, which narrows by use of aggravating factors).

[88]   The state habeas court and this Court found that Petitioner's argument that the "charge on the (b)(2) aggravating circumstance was constitutionally deficient in that the (b)(2) aggravator of aggravated battery and kidnapping with bodily injury cannot be both the aggravators and the felonies supporting the felony murder charge" was procedurally defaulted.  (Order Denying Relief, at 26, R-267 [App. 28].)  The state habeas court reasoned that "[e]ven though Petitioner has couched his argument as a challenge to the trial court's Jury charge, Petitioner is, in essence, making a substantive argument as to the law with respect to the (b)(2) aggravating circumstances."  *Id.*  It is not clear why this is not a challenge to a penalty    phase instruction that cannot be procedurally defaulted, see *Head v. Ferrell*, 554 S.E.2d 155, 160 (2001), but to the extent counsel should have understood their    obligation to preserve these challenges, counsel's ineffectiveness in failing to object to this erroneous instruction demonstrates cause and prejudice to overcome the procedural default.  *Murray v. Carrier*, 477 U.S. 478, 489 (1986).  Alternatively Petitioner's actual innocence of the death penalty excuses the default.  *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992).

(above section on (b)(2)), *supra*.)  The "party" instruction allows for an even greater level of attenuation.

### 2.    The (b)(7) Aggravator Failed to Narrow the Class of Persons Eligible for the Death Penalty

Similarly the (b)(7) aggravator – which was not found to be defaulted – failed to narrow the class of death-eligible individuals. Like the (b)(2) instruction, the jury's finding of the (b)(7) aggravator is at best duplicative of, and at worst more expansive than, the jury's finding at the guilt phase.  Indeed, this aggravating circumstance would apply in any case of felony murder predicated on aggravated battery.

Moreover, the trial court's instruction failed to provide the jury with proper guidance as to the construction and application of the (b)(7) aggravating circumstance, and this rendered it unconstitutionally vague.  *See Godfrey v. Georgia*, 446 U.S. 420 (1980) (holding that the broad language of the (b)(7) aggravating circumstance must be construed in a sufficiently narrow manner to provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not); *Maynard v. Cartwright*, 486 U.S. 356 (1988) (invalidating aggravating circumstances that had been applied too broadly to perform their constitutionally required function of reserving the death penalty for the most deserving defendants).

245

The trial court only exacerbated the problem because it failed to adequately define the element of malice as it related to aggravated battery.  (T.T. Vol. XVIII, at 3540, R-63 [App. 16].)  The Court stated:

> A person commits the offense of aggravated battery when he maliciously causes bodily harm to another by depriving him of a member of his body, by rendering a member of his body useless, not necessarily completely or permanently, or by seriously disfiguring his body or a member thereof.

(*Id.*)  In *Wade v. State*, the Georgia Supreme Court found that a charge that defined aggravated battery as when one "maliciously, that is to say with intent, causes bodily harm to another ...." improperly relieved the State from the burden of proving the essential element of malice. 368 S.E.2d 482, 488 (1988); *see also In re Winship*, 397 U.S. 358 (1970).  As a result of this, there is a reasonable likelihood that the jurors did not understand what was required in order to apply the (b)(7) aggravator constitutionally.

In its ruling, the state habeas court held that the trial court then defined aggravating circumstances and explained the possible sentences to be returned by the jury.  (T.T. Vol. XVIII, at 3537-38, 3544-45, R-63 [App. 16].)  It further held that "[w]ith respect to the charge on the (b)(7) aggravating circumstance, the trial court charged the jury consistently with the Suggested Pattern: Jury Instructions." (Order Denying Relief, at 25, R-267 [App. 28].).  However, as explained above,

246

the court's instructions were demonstrably not consistent with the model

instructions because of the addition of the "party" instruction.  Accordingly, this

finding of fact was an unreasonable determination within the meaning of §

2254(d), and it rendered the resultant application of fact to law unreasonable as

well.

> **F.    PLANE THREE:  THE TRIAL COURT
> UNCONSTITUTIONALLY PROHIBITED THE JURORS
> FROM CONSIDERING RELEVANT MITIGATING
> EVIDENCE AT THE SELECTION STAGE**

At the third plane – the selection stage – the jury must decide whether the

defendant deserves the death penalty based on "an *individualized* determination on

the basis of the character of the individual and the circumstances of the crime."

*Zant v. Stephens*, 462 U.S. 862, 879 (1983).  In making this determination, "the

Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest

kind of capital case, not be precluded from considering, *as a mitigating factor*, any

aspect of a defendant's character … that the defendant proffers as a basis for a

sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604-605 (1978); *see also*

*Boyde*, U.S. at 380 (holding a jury instruction is unconstitutional if  "there is a

reasonable likelihood that the jury has applied the challenged instruction in a way

that prevents the consideration of constitutionally relevant evidence").  Here, there

is a reasonable likelihood that the state trial court's instructions prevented jurors

247

from giving meaningful consideration to constitutionally relevant mitigating

evidence, including good character evidence and evidence without a nexus to the

offense.

The state habeas court's ruling on mitigating circumstances ignored most of

Petitioner's arguments, stating only that:

> The trial court defined "mitigating circumstance" and explained to the
> jury that residual doubt could, in fact, be a mitigating circumstance.
> (T. 3537.) …Moreover, Georgia law does not require the trial court to
> identify in its charge to the jury mitigating circumstances offered by
> the defendant. *Jenkins v. State*, 269 Ga. 282, 296, 498 S.E.2d 502, 515
> (1998).

(Order Denying Relief, at 24, R-267 [App. 28].)

Thus, as explained more fully below, the state habeas court's merits

adjudication "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by

[this] Court," 28 U.S.C. § 2254(d)(1), and warrants federal habeas relief.

## G.   THE COURT IMPROPERLY INSTRUCTED THE JURY ON MITIGATING CIRCUMSTANCES IN GENERAL

The trial court's instructions improperly restricted the evidence jurors were

permitted to consider as mitigating.  *See Penry v. Lynaugh*, 492 U.S. 302 (1989).

The trial court instructed:

> Mitigating or extenuating facts or circumstances are those
> which you, the jury, find do not constitute a justification or excuse for

248

the offense in question but which in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability or blame, so as to justify a sentence of life imprisonment, rather than a sentence of death.

A mitigating circumstance may stem from any of the diverse *frailties* of humankind. It may relate to the defendant's age, character, education, environment, background or mental and/or emotional disorders, if any. In addition, a mitigating circumstance may relate to some aspects of the crime itself which in your opinion may be considered to reduce the defendant's moral culpability or make him less deserving of a sentence of death.

(T.T. Vol. XVIII, at 3536-37, R-63 (emphasis supplied) [App. 16].)

This instruction explicitly limits mitigating evidence to evidence of Petitioner's "frailties" which precludes consideration of good character evidence. *See Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (holding that good character evidence may not be excluded from the sentencer's consideration). As discussed in Section V, above, the only evidence counsel proffered was to suggest that Mr. Waldrip was – or could be – a good man, not evidence to demonstrate his mental illness or other frailties.[89] The prejudice from this instruction is thus particularly significant here.

---

[89] Additionally, the trial court provided constitutionally inadequate instructions on residual doubt as a mitigating circumstance, creating a reasonable likelihood the jury was prevented from properly considering one of the most powerful forms of mitigating evidence. See *Chandler v. United States*, 218 F.3d 1305, 1320 n.28 (11th Cir. 2000) (recognizing that residual doubt is perhaps the most effective strategy to employ at sentencing). Despite the significance of the residual doubt charge, the sum total of the

(Continued)

### H. THE COURT IMPROPERLY LIMITED CONSIDERATION OF MITIGATING EVIDENCE TO THAT WHICH HAS A NEXUS TO THE CRIME

Moreover, the trial court's instruction further restricted consideration of mitigating evidence to that which has a connection to the crime. *See Boyde v. California*, 494 U.S. 370, 377-378 (holding that the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence) (citing *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Penry I v. Lynaugh*, 492 U.S. 302 (1989); *see also Payne v. Tennessee*, 501 U.S. 808, 822 (1991)).

The court linked mitigating evidence to the offense itself by instructing: "[m]itigating or extenuating facts or circumstances are those which you, the jury, find do not constitute a justification or *excuse for the offense in question* but which in fairness or mercy may be considered as extenuating or *reducing the degree of moral culpability or blame*, so as to justify a sentence of life imprisonment rather

---

(Continued)

Court's charge on residual doubt was: "Although you found the defendant guilty of murder beyond a reasonable doubt you may still have some residual or lingering doubt as to his guilt of that offense. Any such residual doubts may be considered by you as a mitigating circumstance." (T.T. Vol. XVIII, at 3537, R-63 [App. 16].) The trial court failed to indicate how residual doubt might serve as a mitigating circumstance or what role it might play in a juror's decision between a life sentence and a sentence of death.

than a sentence of death." (T.T. Vol. XVIII, at 3536-37, R-63 (emphasis

supplied)[App. 16].) It then emphasized that link by creating a parallel to

aggravation stating: "Aggravating circumstances are those which you, the jury,

find increase the guilt or enormity *of the offense*, or add to its injurious

consequences." (*Id.* at 3537 (emphasis supplied).)

 The court thus instructed the jury that only those things that are related to the

crime and thus reduce "moral culpability or blame" *for the crime* can constitute a

mitigating circumstance. The Supreme Court, however, has held that some types

of relevant mitigating evidence do not relate to defendant's "culpability" but

nonetheless serve as a basis for a sentence less than death. *See Skipper*, 476 U.S.

at 4-5 ("Although it is true that any such inferences would not relate specifically to

petitioner's culpability for the crime he committed, there is no question but that

such inferences would be 'mitigating' in the sense that they might 'serve as a basis

for a sentence less than death.'" (citations omitted)). And that is precisely the type

of mitigating evidence that had been placed before this jury. (*See e.g.* T.T. Vol.

XVIII, at 3408-09, R-63 [App. 16].)

 This nexus requirement effectively prohibits two types of relevant mitigating

evidence. First, it prohibits consideration of good character evidence, which does

not relate to culpability or the offense but unquestionably can serve as a basis for a

sentence of less than death.  *See Tennard v. Dretke*, 542 U.S. 274, 285-286 (2004) (noting that requiring a nexus unconstitutionally screens out "any positive aspect of a defendant's character, because good character traits are neither 'handicap[s]' nor typically traits to which criminal activity is 'attributable.'").  Second, it prevents the jury from considering Petitioner's "frailties" that are unrelated to the offense – even if they legitimately serve as a basis for a sentence less than death.  *See Tennard*, 542 U.S. at 285 (2004) (holding that impaired intellectual functioning is inherently mitigating regardless of whether defendant has established a nexus between mental capacity and the crime).  So, for example, this instruction would prohibit the jurors from considering Petitioner's mental health problems unless they believed that those problems were directly connected to the crime itself.  In this case, the mitigating evidence did not go to the crime but to Mr. Waldrip's character and other contributions to society.  Accordingly, Thus, given the court's instructions limiting consideration mitigating evidence to "frailties" that have a nexus to the crime, there is a reasonable likelihood that the court's instructions restricted the jury from giving proper consideration to the  relevant mitigating evidence before it.  The state habeas court's ruling that the court "defined" mitigating instructions fails to address these constitutional errors.  Because – as set forth above – the law requiring jurors to be instructed to give full consideration to

252

*all* relevant mitigation evidence is clearly established, the ruling otherwise was either contrary to or an unreasonable application of that law. *See* 28 U.S.C. § 2254(d).

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

## GAINESVILLE DIVISION

|  |  |  |
|---|---|---|
| TOMMY LEE WALDRIP, | : | |
| | : | CIVIL ACTION NO. |
| Petitioner, | : | 2:06-CV-00062 |
| | : | |
| v. | : | HABEAS CORPUS |
| | : | |
| WILLIAM TERRY, | : | |
| WARDEN, Georgia Diagnostic | : | |
| And Classification Center, | : | |
| | : | |
| Respondent. | : | |

## PETITIONER'S <u>CORRECTED</u> BRIEF
## IN SUPPORT OF HIS CLAIMS FOR HABEAS RELIEF

## VOLUME II

Jeffrey L. Ertel
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Atlanta, Georgia 30303

Lawrence J. Fox (PA I.D. 15261)
David J. Kessler (PA I.D. 81551)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA   19103-6993
(215) 988-2700

*Attorneys for*
Petitioner Tommy Lee Waldrip

# OTHER CLAIMS

XI.  **THE PROSECUTION VIOLATED MR. WALDRIP'S
CONSTITUTIONAL RIGHTS BY ARGUING REPEATEDLY THAT
HIS POST-ARREST SILENCE AND REQUEST FOR COUNSEL
WHEN INTERVIEWED BY THE PROSECUTION'S MENTAL
HEALTH EXPERTS DEMONSTRATED HIS COMPETENCY TO
STAND TRIAL.**

As discussed in Mr. Waldrip's argument related to his former counsel's

ineffectiveness during the competency hearing (*See* Volume I, Section VI.), the

Prosecution repeatedly commented on Mr. Waldrip's invocation of his right to

counsel and silence with the State's experts.  Because counsel's ineffectiveness

thus serves as cause – and because, as set forth below, the failure to object

prejudiced Mr. Waldrip – this Court should excuse the default and reach Mr.

Waldrip's substantive *Doyle* and *Greenfield* claim on its merits – even if it does

not grant relief on the merits on Mr. Waldrip's *Strickland* claim.  *See Fugate v.

Head*, 261 F.3d 1206, 1223 (11th Cir. 2001) (finding a similar failure ineffective).

A.  **THIS COURT SHOULD CONSIDER THE MERITS OF THIS
CLAIM BECAUSE MR. WALDRIP CAN DEMONSTRATE
CAUSE AND PREJUDICE TO OVERCOME PROCEDURAL
DEFAULT.**

This Court has determined that Mr. Waldrip's *Doyle* claim was procedurally

defaulted. (*See* Order on Procedural Default, Doc. 40, at 14-15, 25-26 (filed

7/2/08) [hereinafter "Procedural Default Order"] [App. 33].)  As noted previously,

however, procedural default must be excused when the petitioner shows there was

cause for the default that "cannot fairly be attributed to [the petitioner]" and that

the default prejudiced him.  *Coleman v. Thompson*, 501 U.S. 722, 753 (1991);

*Wainwright v. Sykes*, 433 U.S. 72, 87-88.  This Court must make its own *de novo*

determination of whether Mr. Waldrip has established cause and prejudice.  *See*

*Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *see also* 28 U.S.C. § 2254(d).

In order to establish that Former Trial Counsel's ineffective assistance

caused his procedural default, Mr. Waldrip need not satisfy the "unreasonable

application" test provided for in AEDPA, because former trial counsel's ineffective

assistance is not a separate claim for habeas corpus relief.  The Third Circuit

addressed this issue directly in *Fischetti v. Johnson*, 384 F.3d 140, 154-55 (3d Cir.

2004).  After determining that the trial court erred by forcing Fischetti to proceed

to trial either *pro se* or with his second court-appointed attorney – the first having

withdrawn citing irreconcilable differences – the Third Circuit declined relief

because denying Fischetti counsel in this manner did not "warrant vacating the

conviction on our habeas review."  *Id.* at 145.  However, the Third Circuit did find

that this same action constituted cause for overcoming procedural default of other

claimed errors.  The Third Circuit addressed the "obvious question":

> How can the denial of counsel suffice to establish cause to overcome a
> procedural default when we have already ruled that it is not sufficient
> as a stand-alone claim to warrant reversal of the underlying
> convictions?  The answer lies in the differing standard for evaluating
> constitutional error as a substantive basis of relief and as a cause to
> avoid default of other claims . . . AEDPA authorizes the writ of
> habeas corpus to be granted only for clearly erroneous applications of

Supreme Court case decisions. The constitutional error here does not meet this threshold. But AEDPA does not establish a statutory high hurdle for the issue of cause. And the Supreme Court's pronouncement in *Coleman* applied no AEDPA-style "unreasonable application" test in determining the existence of cause. Rather, it made its determination of cause, or lack of cause, based on a straightforward analysis whether the denial of counsel was 'an independent constitutional violation.'

*Fischetti*, 384 F.3d at 154-55 (citing *Coleman*, 501 U.S. at 755).

Furthermore, this Court has decided a closely analogous issue in the context of discovery. In its October 1, 2008 "Preliminary Order," this Court recognized the fundamental distinction between establishing a substantive "claim" and the cause and prejudice "gateway" through which a petitioner may obtain review of a substantive claim. (*See* Preliminary Order, Doc. 53, at 4-5 (filed 10/1/08).); *see also Sibley v. Culliver*, 377 F.3d 1196 (11th Cir. 2004). Accordingly, this Court need only determine that the counsel afforded Mr. Waldrip was constitutionally deficient in order to find that he has established sufficient cause to overcome procedural default.

### 1.    Cause Is Established By Former Trial Counsel's Constitutionally Deficient Counsel.

In this instance, the cause of the procedural default was Former Trial Counsel's failure to preserve properly an objection to the prosecution's unconstitutional argument regarding Mr. Waldrip's invocation of his rights to silence and counsel. A lawyer's failure to object to a violation of an accused's

fundamental constitutional rights amounts to ineffective assistance of counsel and constitutes "cause" to excuse the default. *Coleman*, 501 U.S. at 753-54; *see also Gravely v. Mills*, 87 F.3d 779, 785-86 (6th Cir. 1996) (holding that counsel was ineffective for not objecting to improper comments regarding defendant's post-arrest silence and request for attorney).

The Eleventh Circuit has expressly held failure to object to *Doyle-Greenfield* violations to be constitutionally deficient representation. A defendant receives constitutionally deficient representation when "defense counsel fails to object to the prosecutor's 'very serious instances of prosecutorial misconduct' which include 'the initial introduction of the defendant's silence,' 'cross-examination of the defendant about his post-arrest silence,' and argument which invited the jury to consider constitutionally protected silence as evidence of the defendant's guilt." *Fugate v. Head*, 261 F.3d 1206, 1223 (11th Cir. 2001) (quoting *Gravely*, 87 F.3d at 785).

Other circuits have similarly found counsel to be constitutionally deficient when counsel fails to lodge proper objections. *See Thomas v. Varner*, 428 F.3d 491, 501 (3d Cir. 2005) ("Courts have routinely declared assistance ineffective when 'the record reveals that counsel failed to make a crucial objection or to present a strong defense solely because counsel was unfamiliar with clearly settled legal principles.'" (quoting 3 Wayne LaFave et al., Criminal Procedure § 11.10(c),

at 721 (2d ed. 1999)); *see also Washington v. Hofbauer*, 228 F.3d 689 (6th Cir.

2000) (reversing the district court's denial of a writ of habeas corpus where trial

counsel failed to object to: (1) the prosecution's use of improper character

evidence while examining the petitioner; (2) the prosecution's "egregious character

attacks during closing argument," and (3) the prosecution's mischaracterizations of

a witness's testimony.).  Here, where counsel certainly knew and understood that

the law protected Mr. Waldrip, they had a duty to object in a timely fashion – to

secure relief either at that moment or, if not, on direct appeal.  Mr. Waldrip,

therefore, has established cause to overcome procedural default.

Indeed, the Georgia Supreme Court agreed that use of a defendant's silence

at a competency hearing would give rise to an "assumedly meritorious objection,"

finding procedural default instead under the "prejudice" prong – which this Court

assesses *de novo*.  *Waldrip v.* Head, 620 S.E.2d, 829, 836-37 (Ga. 2005); as to the

*de novo* review, *see Johnson*, 486 U.S. at 587; *see also* 28 U.S.C. § 2254(d).

> **2.    Mr. Waldrip Was Prejudiced Because A Timely Objection
> Would Have Excluded The Improper Testimony and Led to
> a Reasonable Probability of a Different Result.**

To establish prejudice, Mr. Waldrip must demonstrate a reasonable

probability of a different result.  *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  Here,

counsel raised the issue on direct appeal, but the Georgia Supreme Court

incorrectly concluded that it was precluded from reaching it because of the failure

to preserve the error properly at the competency hearing. The prosecution presented a consistent theme in its case for competency that Mr. Waldrip's silence with regard to the facts of his case and his request for counsel during interviews with the prosecution's mental health experts demonstrated that he was competent. ADA Darragh laid the foundation for this theme during his opening, constructed it during his examinations of the former mental health experts, and topped it off with his closing. Indeed this theme was the only one that was emphasized so repeatedly. (*See* Transcript of the Competency Trial Proceedings ("C.T.") Vol. III, Doc. 9, Ex. R-42 at 448, 450 (filed 5/24/06) (D.A. Darragh's opening statement outlining his intentions of pursuing this theme) [App. 73].)

The *Doyle* violations are weighed against the prosecution's little remaining evidence for competency – based largely on a mis-scored psychological test (*see* Sections VI.B, above, and XII.D.3.a, below) and a failure to present a comprehensive history of his mental illness caused by Mr. Waldrip's counsel's ineffectiveness (*see* Section VI.A, below). Based on that weighing, a reasonable probability exists that the jury would have reached a different result. As the Court stated in *Gravely*, the "influence that such improper assertions could have had on the jury are immense. We simply cannot be certain that [the] jury was not adversely affected from the prejudicial comments it was allowed to hear over and over again." 87 F.3d at 786 (citations omitted). Moreover, as the former counsel

did not object repeatedly and never asked for a curative instruction, the jury was free to accept the prosecution's argument in its entirety. *See Becker v. Giambruno*, No. 97-0313, 2003 U.S. Dist. LEXIS 25227, at 62 (W.D.N.Y. Aug. 13, 2003).

By exploiting Mr. Waldrip's silence and his request for counsel to impeach his incompetency, the prosecution's tactics amounted to prejudicial misconduct. Had the issue been properly joined either at the competency hearing or – if preserved and argued properly – on direct appeal, it would have been subject to a harmless error analysis. *See Doyle*, 426 U.S. at 620. Given the pervasive nature of the error and the invidious message it conveyed, the error would not have been harmless. Accordingly, had counsel objected and sought a new competency hearing – or had counsel properly preserved the error on appeal – a comment-free competency hearing would have been required. At such a hearing it is reasonably probable that – by removing the impermissible "theme" of the prosecution – Mr. Waldrip would have been found competent.

Furthermore, ADA Darragh's repeated and flagrant *Doyle* violations compound the adverse effects of withholding the Suppressed Mental Health Evidence (*see* Section II.E.2, above), which would have both demonstrated the true

extent of Mr. Waldrip's mental illness and destroyed the credibility of the

prosecution's mental health experts.[1]

## XII. THE PROSECUTION SUPPRESSED FIVE CRUCIAL PIECES OF MENTAL HEALTH EVIDENCE THAT DEMONSTRATED THE EXTENT OF MR. WALDRIP'S MENTAL ILLNESS IN VIOLATION OF *BRADY V. MARYLAND.*

Both Former Trial Counsel and the Trial Court had serious questions about

Mr. Waldrip's competency.   But the prosecution wanted Mr. Waldrip tried,

convicted and executed, and to these ends it suppressed vital evidence showing the

length and depth of Mr. Waldrip's mental illness.  This *Brady* violation entitles Mr.

Waldrip to a new competency hearing.[2]

---

[1]  *See also* Initial Petition for Writ of Habeas Corpus, Brief of Petitioner Tommy Lee Waldrip in Support of Claim Sixteen, Doc. 1, at 137-54 (filed 5/1/06) (discussing additional available evidence of mental illness which Former Trial Counsel failed to gather and present) [App. 93].)

[2]  This Court has determined that Mr. Waldrip's *Brady* claims were procedurally defaulted and that the State Court did not reach the merits of this claim.  (*See* Procedural Default Order, at 18-20 [App. 33].)  Because the U.S. Supreme Court has determined that the *Brady* analysis and the "cause" and "prejudice" standard are identical, *see Banks v. Dreke*, 540 U.S. 668 (2004), and Vol. I, Section III.B.5, Mr. Waldrip collapses the arguments into one in this section.  Because the state court did not reach the merits of this claim and cause and prejudice is a question of federal law, this Court reviews these arguments *de novo*.  *See Fischetti v. Johnson*, 384 F.3d 140 (3d Cir. 2004).

A.   **MR. WALDRIP SUFFERED FROM A LONGSTANDING DELUSIONAL DISORDER; HOWEVER, THE STATE'S EXPERTS OPINED THAT MR. WALDRIP WAS COMPETENT TO STAND TRIAL BASED UPON HIS MMPI SCORE AND LACK OF HISTORY OF MENTAL ILLNESS.**

As discussed in Volume I of this brief, Mr. Waldrip's mental illness was immediately apparent to Former Trial Counsel, who first interviewed Mr. Waldrip in April 1991.  (C.T. Vol. III, at 470-71, 474, Ex. R-42 [App. 73]; *see also* Order Denying Relief, Doc. 9, Ex. R-267, at 12 (filed 5/24/2006) [App. 28]); See above Vol. I, Section V.

Former counsel first informed the Trial Court of the possibility that Mr. Waldrip was mentally infirm with their Motion for Funds to Conduct a Psychiatric Examination and Special Pleas of Incompetency to Stand Trial and Incompetency at the Time of the Act in July 1991.  (Record on Interim Appeal ("ROIA"), Doc. 9, Ex. R-1, at 148-153 (filed 5/24/06) [App. 94].)  The Trial Court granted a jury trial on the issue of competency on April 28, 1993.  (ROIA, Doc. 62, Ex. P-30, at 1339-40 (filed 7/31/09) [App. 95].)  The Trial Court appointed four experts to examine Mr. Waldrip:  Dr. Currie for the defense and Dr. Storms, Dr. Lower and Dr. Kugler for the prosecution.  The competency hearing was held from September 12-16, 1994.  Each of the former mental health experts testified during the competency hearing that Mr. Waldrip was delusional.

The defense expert, Dr. Currie, evaluated Mr. Waldrip on two occasions. (C.T. Vol. IV, Doc. 9, Ex. R-43, at 543-47 (filed 5/24/06) [App. 74].)  He opined that Mr. Waldrip "respond[ed] in a straightforward way, not trying to exaggerate any impairment." (*Id*. at 539.)  Dr. Currie heard Mr. Waldrip describe the Monitor as "operated by the authorities, by the jailers and the Sheriff, with some sort of involvement by the prosecution" and "driven by radioactive power, nuclear power, and that somehow it picks up one's thoughts before one speaks them and it picks up his thoughts." (*Id*. at 545-46.)  Dr. Currie concluded that Mr. Waldrip is "mentally ill," and "psychotic" and that he suffers from "a delusional disorder or a paranoid disorder." (*Id*. at 551-52.)  Based on his observations, he opined that Mr. Waldrip had a "superficial understanding" of the proceedings against him, but his obsession with the Monitor prohibited Mr. Waldrip from applying this superficial knowledge to his own situation. (*Id*. at 552-54.)  Dr. Currie testified that Mr. Waldrip was incompetent to stand trial. (*Id.* at 553-54; *See also* Order Denying Relief, at 37, R-267 [App. 28].)

Dr. Storms testified first for the prosecution.[3] (C.T. Vol. V, Doc. 9, Ex. R-44, at 646 (filed 5/24/06) [App. 70].)   He had interviewed Mr. Waldrip for approximately three hours.  (*Id*. at 716.)   Dr. Storms testified that Mr. Waldrip suffered from "mild paranoia" and a  "delusional disorder of some type."  (*Id*. at 694, 728.)  However, Dr. Storms concluded that Mr. Waldrip was not psychotic for two reasons: (1) Mr. Waldrip's results on a standardized test known as the Minnesota Multiphasic Personality Inventory-II test ("MMPI") "give no indication of psychosis" (*id*. at 736); and (2) Mr. Waldrip "doesn't have a history of, for instance, schizophrenia or any type of psychiatric hospitalization or outpatient treatment."  (*Id*. at 726.)

Dr. Lower interviewed Mr. Waldrip for approximately an hour and a half on June 24, 1993.  (*Id*. at 745.)   Dr. Lower  testified  that  Mr.  Waldrip  "voiced  a

---

[3]      During the competency hearing Dr. Storms testified that he was "the judge's witness" and a "friend of the Court."  (C.T. Vol. V, at 650-51, R-44 [App. 70].)  All three experts were ordered by the court at the request of the Prosecution.  ROIA, at 1387-88, P30.

 By testifying that he was the "Judge's witness" Dr. Storms immediately enhanced his credibility.  Allowing Dr. Storms to mislead the jury by characterizing himself as "the judge's witness" and thus entirely neutral unfairly prejudiced the jury in favor of his testimony by creating the false impression of heightened impartiality.   Former Trial Counsel's failure to object and the Trial Court's resulting failure to issue curative instructions denied Mr. Waldrip his rights to due process, a fair trial, and to confront the witnesses against him.  *See United States v. Anderson*, 574 F.2d 1347, 1355 (5th Cir. 1978); *Hamric v. Bailey*, 386 F.2d 390, 395 (4th Cir. 1967) (concluding that the prosecutor had a duty to correct misrepresentations by experts).

number of rather florid delusions" and that there was a Monitor that read his thoughts, but that Mr. Waldrip was still "in good touch with reality." (*Id*. at 764.) Dr. Lower testified that he had not reached any diagnosis as to Mr. Waldrip (*Id*. at 726-29.)

The last prosecution expert, Dr. Kugler also testified that Mr. Waldrip had a delusional disorder of some type. (*Id*. at 791, 806.) He concluded, however, based on Dr. Storms' testing (including the incorrectly graded MMPI), a lack of historical mental health issues and his own evaluation, that Mr. Waldrip was not psychotic. (*Id*. at 784.)

### B.   THE PROSECUTION SUPPRESSED FIVE CRUCIAL PIECES OF MENTAL HEALTH EVIDENCE.

Despite *Brady's* mandate, a Trial Court order enforcing that mandate, and Former Trial Counsel's specific request for all "test data and reports surrounding the state evaluations" of Mr. Waldrip (Affidavit of J. Richardson Brannon, Doc. 9, Ex. R-147, at 142 (filed 5/24/2006) [hereinafter "Brannon Aff."] [App. 26]), the prosecution withheld five crucial pieces of mental health information from Former Trial Counsel, each of which showed Mr. Waldrip to be mentally infirm. The five pieces of suppressed evidence (collectively the "Suppressed Mental Health Evidence") were:

1. An MMPI-II Testing Sheet. (Doc. 9, Ex. R-177, at 9557-59 (filed 5/24/06) [hereinafter MMPII Testing Sheet] [App. 53].) This sheet

shows the scores for the MMPI-II administered to Mr. Waldrip by Dr. Storms and Dr. Kugler, the test each relied upon in his testimony for the prosecution. The sheet discloses a material miscalculation on the schizophrenia scale that dramatically alters the results and wholly undermines the experts' conclusions. A summary of the scores was provided to the Trial Court and appended as part of Exhibit A to the Competency Hearing Transcript, but the actual filled-in test sheet was not provided until years later in the Habeas Proceeding.

2. Dr. Lower's Notes." (Dr. Lower's Notes, Doc. 9, Ex. R-177 (E.H. 32), at 9626-28 (filed 5/24/06) [App. 96].) These are notes from Dr. Lower's examination of Mr. Waldrip that appear to have been filled out by hand at or near the time of the actual examination. In these notes, Dr. Lower provides actual Axis I and Axis II diagnoses and indicates that Mr. Waldrip suffered from a moderate degree of psychiatric illness, findings not reflected in his official report to the Court or his testimony for the prosecution.

3. "Dr. Storms' Outpatient Interview." (Dr. Storms' Outpatient Interview, Doc. 9, Ex. R-177 (E.H. 32), at 9504-9512 (filed 5/24/06) [hereinafter Dr. Storms' Outpatient Interview] [App. 97].) This, too, is a document that is filled out by hand apparently contemporaneously with Dr. Storms' and Dr. Kugler's examination of Mr. Waldrip. Unlike Dr. Storms' subsequent report to the Trial Court and contrary to the testimony he gave at the competency hearing, this document indicates that Mr. Waldrip had had prior mental health treatment and had been medicated in conjunction with the treatment.

4. The Dacus Report. (Appendix of Certificate of Probable Cause, Dacus Report, Doc. 9, Ex. R-274, at DA-1470 (Exhibit M) (filed 5/24/06) [hereinafter "Dacus Report"] [App. 98].) Mr. Dacus, a fellow inmate, became concerned about Mr. Waldrip's delusions and asked to speak with an officer. That officer, Sgt. Ann Martin, quoted Mr. Dacus' account of Mr. Waldrip's statement in her Report: "the FBI was watching him and knows what he thinks."

5. Mr. Waldrip's Parole Report. (Tommy Lee Waldrip Parole Reports, Doc. 9, Ex. R-166 (E.H. 21), at 5971-6018 (filed 5/24/06) [App. 99].) This suppressed report indicates that Mr. Waldrip was mentally unstable at least as early as 1984.

### C.   *BRADY* REQUIRES THE PROSECUTION TO PROVIDE THE DEFENDANT WITH ANY EXCULPATORY EVIDENCE.

"[T]he suppression by the prosecution of evidence favorable to an accused" violates due process.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  This is so whether the defendant has requested such materials from the prosecution.  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  As discussed in relation to Mr. Waldrip's Summary Report *Brady* claim (*see* Section IV.E, above), "[t]here are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  *Strickler v. Green*, 527 U.S. 263, 281-282 (1999).

### 1.   Evidence is material under *Brady* if it undermines confidence in the verdict.

Suppressed evidence is "material" if a petitioner demonstrates that the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435; *United States v. Bagley*, 473 U.S. 667, 678 (1985).  The materiality of the suppressed evidence is to be assessed *cumulatively* and not item by item.  *Kyles*, 514 U.S. at 436.

Further, a prosecutor has a duty to search for and produce impeachment evidence regarding its principal witnesses.  *See, e.g.*, *United States v. Deutsch*, 475

F.2d 55, 57 (5th Cir. 1973) (holding that the prosecution was deemed to possess information in the files of the United States Postal Service because postal workers were its principal witnesses), *overruled on other grounds*, *United States v. Henry*, 749 F.2d 203 (5th Cir. 1984).

The suppression of evidence that tends to show a petitioner is mentally ill or potentially incompetent is an especially egregious violation of due process.  Such information is of "vital significance to the accused persons in planning and conducting their defense."  *Ashley v. Texas*, 319 F.2d 80, 85 (5th Cir. 1963) (finding that failure to disclose the results of a mental examination was a material violation of *Brady*).  The Eleventh Circuit reiterated this in *United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992), holding that the prosecution's failure to turn over the results of a psychiatric evaluation that found the defendant suffered from paranoid delusional thinking violated *Brady* because the suppressed report "could have fundamentally altered the defense's strategy and made an insanity defense a viable option . . . Additionally, the report raised serious questions concerning Mr. Spagnoulo's competence to stand trial . . .".  *Id*. at 995.

The mental health evidence would have had the most direct impact in the Competency Hearing, where it could have been used to show that Mr. Waldrip was, indeed, incompetent – as well as to impeach the State's experts.  The value of the documents for impeachment would have been as great at trial, however,

because they would have served to undermine the credibility of the State's experts. Moreover, as discussed in Vol. I, Section V, counsel did not consider the effect of mental health evidence on the penalty phase presentation of mitigating evidence. Had they understood how much the prosecution's position could be undermined, the evidentiary picture throughout the trial proceedings (if Mr. Waldrip were nonetheless found to be competent, which is highly doubtful) would have been significantly altered.  Accordingly, the new evidence undermines any confidence in any of the proceedings.

> D.     **THE SUPPRESSED MENTAL HEALTH EVIDENCE UNDERMINES CONFIDENCE IN THE VERDICT, ENTITLING MR. WALDRIP TO RELIEF.**

Mr. Waldrip did not possess, nor could he obtain, the Suppressed Mental Health Evidence.  Each individual piece of that evidence was material to Mr. Waldrip's defense.  Alone and together, these violations compel relief.

> 1.     **The prosecution possessed the Suppressed Mental Health Evidence.**

Respondent cannot dispute that the Suppressed Mental Health Evidence was in the possession of the prosecution.  Prosecution witnesses generated the mis-scored MMPI-II Testing Sheet, Dr. Lower's Notes and Dr. Storms' Outpatient Interview.  The Dacus Report was found in the prosecution's files during post-trial proceedings. (Dacus Report, at DA-1470, R-274 [App. 98])  The Parole Report was written by Wesley Baker, Mr. Waldrip's state parole officer.

2.     **Former Trial Counsel did not possess the Suppressed Mental Health Evidence nor could they obtain it from another source.**

Both Mr. Brannon and Ms. Watson testified that they had not seen any of the Suppressed Mental Health Evidence until after Mr. Waldrip's trial had concluded. (Brannon Aff., at 142-45, R-147 [App. 26]; Watson Aff., at 158-60, R-147 [App. 51].)   Furthermore, none of this evidence was found in their files.   (*See* Anne Watson and Rich Brannon Files, E.H. Vols. 33-54, Doc. 9, Exs. R-178 –R-199, *passim* (filed 5/24/06).)[4]

---
[4]

Thus, Former Trial Counsel did not possess the Suppressed Mental Health Evidence and could not obtain it from another source because the prosecution controlled and suppressed it.[5]

### 3. The Suppressed Mental Health Evidence, Which Was Favorable To Mr. Waldrip, Is Material.

By withholding the Suppressed Mental Health Evidence, the prosecution ensured that the jury would not see a complete picture of Mr. Waldrip's mental illness, but only hand-picked evidence favorable to the prosecution's case. Had these key pieces of evidence been produced, Mr. Waldrip would have impeached the credibility of the prosecution's experts and demonstrated using the work product of the prosecution's experts that he was incompetent to stand trial. Therefore, each piece of Suppressed Mental Health Evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

---

[5] The Respondent pointed out that one document, the score summary for the MMPI-II, was appended as an Exhibit to the Competency Transcript. (C.T. Vol. VI, Doc. 9, Ex. R-45, at 94-101 (filed 5/24/06) [App. 75].) From the testimony, however, it is clear that Dr. Currie and Dr. Storms had testified before this exhibit was offered to the Court – which was comprised only of multiple tests that Dr. Storms and Dr. Kugler administered, and, in the case of the MMPI-II, the score summary alone was offered to the Court. (*See* C.T. Vol. V, at 645, 732-33, R-44 [App. 70].) As referenced above, this document was not in counsel's files, and there is no evidence that counsel was given a copy to review. To the extent the State's claim is that former counsel should have known that documents not previously produced were attached and examined those documents and used them to argue for the remaining test materials, the State is either abjuring *Brady* or highlighting an instance in which former counsel were clearly ineffective at trial. *See Williams v. Washington*, 59 F.3d 673, 680 (7th Cir. 1995). (*See also*, SectionVI.B.)

a.  **The MMPI-II Testing Sheet Is Material As Both Positive Evidence Of Mr. Waldrip's Incompetency And As Impeachment Evidence Against Dr. Storms And Dr. Kugler.**

The mis-scored MMPI-II Testing Sheet formed the basis for Dr. Storms and Dr. Kugler to conclude that "we could find no evidence for [Mr. Waldrip] being psychotic." (C.T. Vol. V, at 785, R-44 [App. 70].)  However, Dr. Storms, who administered the MMPI-II, had made a scoring error with regard to the "Schizophrenia" scale.  (*See* Drogin Aff., at 220, R-147 [App. 71].)  As a result, Dr. Storms ascribed a normal scaled score to Mr. Waldrip when an accurately scored test would have placed Mr. Waldrip "within the abnormally elevated range for the "Schizophrenia" scale." (*Id.* at 221.)

This evidence would have been pivotal to Former Trial Counsel both as positive evidence of Mr. Waldrip's incompetency and as a strong basis for impeachment:

> Had I been provided this information in a timely fashion, I could have used it in my cross-examination of the state experts, provided it to our expert Dr. Currie and presented this evidence both to the competency jury and to the trial jury.  This information would also have been consistent with our strategy at the penalty phase of Mr. Waldrip's trial.

(*See* Brannon Aff., at 142-143, R-147 [App. 26].)  This scoring error transmorphs evidence that the State used to argue Mr. Waldrip was competent into substantive and powerful evidence that he was paranoid and psychotic.  It simultaneously

undercuts all of the State's witnesses at the Competency Hearing – because all of their opinions were based, at least in part, on the MMPI-II – and provides trustworthy (it was conducted by the State's expert witness[6]), empirical evidence of Mr. Waldrip's mental illness.   At a minimum, Former Trial Counsel would have shown to the jury that "one of the most standard, most widely used personality tests" (C.T. Vol. V, at 801, R-44 [App. 70].) demonstrated that Mr. Waldrip was psychotic, contrary to the conclusions reached by the State's experts.

And, even if Mr. Waldrip would still have been found competent to stand trial, this evidence would have echoed through the trial and then, presumably, to the penalty stage where it would have impeached the trial testimony of the State's experts before *that* jury and served as strong evidence of mitigation such that former counsel would have been able to change one mind in favor of a life sentence.  *See Kyles*, 514 U.S. at 453.

---

[6]      The power of this fact should not be overlooked in the testimony that unfolded before the competency jury.  The State spent quite a bit of time cross-examining Dr. Currie on how he performed his testing in an effort to demonstrate that his results were unreliable.  (C.T. Vol. IV, Doc. 9, Ex. R-43, at 559-597 (filed 5/24/06) [App. 74].)  The MMPI would have destroyed any effectiveness of that cross as it showed that the State's own testing supported Dr. Currie.

b.  **Dr. Lower's Notes Demonstrate That Mr. Waldrip's Mental Condition Was Significantly Worse Than Dr. Lower Testified.**

Dr. Lower testified that Mr. Waldrip was perfectly oriented as to time, place, person and situation.  (C.T. Vol. V, at 749, R-44 [App. 70].)  Dr. Lower also testified that Mr. Waldrip was in good touch with reality, could understand the charges against him, and could properly communicate with counsel.  (*Id.* at 750; 755-57.)  Finally, Dr. Lower testified that he had not diagnosed Mr. Waldrip with any mental illness.  (*Id.* at 728-29.)  Dr. Lower's Notes, however, tell an entirely different story.  They state that Mr. Waldrip suffers from (1) retarded psychomotor activity; (2) a moderate degree of psychiatric illness; and (3) an Axis I and Axis II diagnosis of a persecutory delusional disorder and a personality disorder.  (Dr. Lower's Notes, at 9623-28, R-177 [App. 96].)  Former counsel could have used these notes to impeach Dr. Lower's testimony and support Dr. Currie's conclusion that Mr. Waldrip suffered from psychosis.

c.  **Dr. Storms' Outpatient Interview With Mr. Waldrip Confirms That Mr. Waldrip Suffered Delusions.**

Dr. Storms' Outpatient Interview states that Mr. Waldrip reported a mistrust of law enforcement, and that he heard voices through the Television, VCR and the Monitor.  (Dr. Storms' Outpatient Interview, Doc. 9, Ex. R-177 (E.H. 32), at 9507, 9509 (filed 5/24/06) [App. 97].) (Dr. Storms' Outpatient Interview, at Ex. N, R-274).  This runs completely counter to Dr. Storms' testimony that Mr. Waldrip was

- 274 -

"too well oriented to reality" and "showed no indication of psychosis." (C.T. Vol. V, at 736, Ex. R-44 [App. 70].)  Moreover, Dr. Storms' notes belie his testimony that Mr. Waldrip had "no history of mental illness" (*Id.* at 693.)  Dr. Storms wrote that Mr. Waldrip had *some* outpatient psychiatric treatment and that he was "put on some drug – didn't take drugs. 'not schizophrenia.'"   (Dr. Storms' Outpatient Interview at 9506, Ex. R-177 [App. 97].)

With this evidence, former counsel could have impeached Dr. Storms; Dr. Kugler, who was present during Dr. Storms' interview and testified that Mr. Waldrip showed "no evidence for his being psychotic" (C.T. Vol. V, at 785, R-44 [App. 70]); and Dr. Lower, who testified that Mr. Waldrip was in touch with reality.  (*Id.* at 750.)  Further, this evidence would have helped rebut one of the State's primary themes: that Mr. Waldrip was "malingering."   Instead, Dr. Storms' notes establish that Mr. Waldrip had a history of mental health problems.

d.    **The Dacus Report Is Powerful Evidence That Mr. Waldrip Was Not Malingering In The Presence Of The Former Mental Health Experts.**

Mr. Dacus, an inmate who was housed with Mr. Waldrip before the Underlying Trial, told state officials that Mr. Waldrip feared that the FBI was watching him and "knows what he thinks."   He also related that Mr. Waldrip believed that his wife and son were speaking with him over the prison speakers. The Dacus Report thus corroborates Mr. Waldrip's self-reporting of the Monitor

and is evidence that Mr. Waldrip was not feigning his symptoms.  It would have been material throughout the competency hearing, as well as during the guilt/innocence and penalty phases of the trial.

> e.     **The Parole Report Negates The Prosecution's Claim That Mr. Waldrip's Condition Was Stress-Induced.**

The Parole Report was written in 1984, seven years before the Evans murder.  It states that Mr. Waldrip was unstable during his incarceration.  It further recounts Mr. Waldrip stating repeatedly that he needed to be released to help take care of his family.  These statements would have been of enormous utility at his 1991 trial.

Both Dr. Storms and Dr. Kugler testified that they discounted Mr. Waldrip's delusions due to an assumed lack of a history of mental illness.  (*See* C.T. Vol. V, at 725-26, 784, R-44 [App. 70].)  The Parole Report, however, demonstrates a history of mental illness at least as far back as 1984.  The Parole Report would also have rebutted the key prosecution argument that Mr. Waldrip's symptoms stemmed from his incarceration for the Evans killing.  (*See* C.T. Vol. III, at 460, Ex. R-42 (prosecution's opening argument that Mr. Waldrip is under "some stress associated with that incarceration") [App. 73]; (Transcript of Trial Proceedings ("T.T."), Vol. II, Doc. 9, Ex. R-62, at 3270 (filed 5/24/2006) (prosecution's closing argument stating that "I respectfully suggest to you that it was due to the stress of

incarceration" that Mr. Waldrip suffers psychological problems.).)   Further, the

Parole Report undermines the prosecution's claim that Mr. Waldrip was feigning

mental illness by showing that the State of Georgia recognized 10 years prior to the

guilt/innocence stage that Mr. Waldrip was mentally unstable.   Finally, the Parole

Report corroborated that Mr. Waldrip was hyper-protective of his family,

supporting the defense argument that he went to extreme measures (including false

confessions) to protect them.

### 4.   The Materiality Of The Suppressed Mental Health Evidence Is To Be Determined Cumulatively, Rather Than Individually.

As noted above, the materiality of the suppressed evidence is to be assessed

*cumulatively* and not item by item.   *Kyles*, 514 U.S. at 436.   Thus, this Court must

look at the Suppressed Mental Health Evidence as a whole and determine if it

"could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict."   *Kyles*, 514 U.S. at 435; *Bagley*, 473 U.S. at

678.

Each individual piece of Suppressed Mental Health Evidence undermines

confidence in the verdict.   Its cumulative impact is overwhelming.   These are not

five unrelated pieces of evidence whose impact is isolated each from the others.

The pieces of Suppressed Mental Health Evidence are closely related because each

bears upon the central question of whether Mr. Waldrip was competent to stand

trial. Their cumulative impact demonstrates that Mr. Waldrip's mental health was dramatically worse than the prosecution argued or their experts indicated. The suppressed evidence casts grave doubt on the jury's verdict that he was competent to stand trial.

This Suppressed Mental Health Evidence also casts serious doubt on the legitimacy of the death sentence imposed upon Mr. Waldrip. This Court cannot be confident that the withheld evidence of Mr. Waldrip's mental illness and its potential mitigating effects would not have changed the mind of a single juror. If it is reasonable probable to have swayed even one juror, this Court must grant Mr. Waldrip relief.

**F.    THE CUMULATIVE EFFECT OF THE PROSECUTION'S MISCONDUCT IN THE COMPETENCY HEARING UNDERMINES ANY CONFIDENCE IN THE OUTCOME.**

The twin engines of the State's case that Mr. Waldrip was competent were both powered by prosecutorial misconduct that this Court must consider together. First, the prosecution repeatedly referenced Mr. Waldrip's invocation of his right to silence as the primary reason that jury should determine that he was competent to stand trial. Second, the State withheld several key documents created by its three expert witnesses that contradict significant portions of their testimony. The prosecution's case for competency would have been decimated if: (1) the prosecution had been stopped from repeatedly invoking Mr. Waldrip's silence; and

(2) former counsel had been able to cross-examine the prosecution's experts with the Suppressed Mental Health Evidence to expose both their false claims that Mr. Waldrip was not psychotic and the true extent of Mr. Waldrip's mental illness. These were not scattered isolated examples of misconduct; instead these errors reinforced each other to give validity and credibility to a theory and witnesses that should have been given neither.

As the Supreme Court stated in *Berger v. United States*, "we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." 295 U.S. 78, 89 (1935). The *Berger* court aggregated the prejudice suffered by the defendant in awarding a new trial. *Id*. This Court should do the same.

### G. THE PROSECUTION SUPPRESSED OTHER MATERIAL EVIDENCE IN VIOLATION OF BRADY.

The Trial Court erred in denying Mr. Waldrip's request for a new trial based on additional *Brady* violations. In addition to the suppressed evidence of *Edwards* violations and the Suppressed Mental Health Evidence, the prosecution suppressed five other crucial pieces of material evidence. These items are:

- **Paul Waldrip Polygraph – During the Keith Evans Investigation Paul Waldrip, Mr. Waldrip's son, took and failed a polygraph regarding his**

involvement in the Keith Evans murder.  The prosecution failed to disclose the existence of this polygraph examination until after his trial, but Former Trial Counsel did discover it during Mr. Waldrip's direct appeal.  Mr. Waldrip's motion for a new trial and request for a mistrial were denied.  Suppressing this evidence is a classic *Brady* violation: the Paul Waldrip Polygraph would have been admissible – and material – during the penalty stage of Mr. Waldrip's trial.  *See Height v. State*, 604 S.E.2d 796, 798 (Ga. 2004) (holding that the unstipulated polygraph results are admissible as mitigation evidence in the penalty stage of a trial); *see also Rupe v. Wood*, 93 F.3d 1434, 1439-41 (9th Cir. 1996) (petitioner's due process rights were violated by the refusal to admit evidence at the sentencing phase that a primary prosecution witness had failed a polygraph examination.)

- The DA Letter – The DA's Office sent a letter to the Sentence Review Panel on April 16, 1993  in support of the two life sentences imposed upon John Mark Waldrip.  This letter addressed several unadjudicated matters involving John Mark Waldrip and Robert Garner, and reveals that Mr. Garner's criminal history had not been fully disclosed to Former Trial Counsel.  (Brannon Aff., at 139-40, R-147 [App. 26].) These incidents would have been powerful impeachment evidence tending to show that Mr. Garner testified against Mr. Waldrip as a *quid pro quo* to avoid additional prosecution.  Failure to disclose impeachment evidence is a trademark *Brady* violation.  *Bagley*, 473 U.S. at 671-72.  Furthermore, the DA Letter demonstrates that the DA's Office believed John Mark Waldrip was the most culpable person in the death of Keith Evans.

- Misconduct Information – Despite a Trial Court order to produce any prior misconduct or bad acts of any witnesses (ROIA, Order on Motions for Disclosure of Impeaching Information, at 1021, R-1 [App. 100]), the prosecution withheld key information regarding misconduct by then-Sheriff Deputy Steven Hawk, of Lumpkin County, and Special Agent Tommy Mefferd of the Georgia Bureau of Investigation.  Both of these officers were involved in the falsification of DUI Evidence.  (Deposition of Tim Attaway, Doc. 9, Ex. R-157 (E.H. 12), at 3402-04 (filed 5/24/2006) [hereinafter "Attaway Dep."] [App. 20].)  These officers testified about Mr. Waldrip's arrest and the collection and seizure of physical evidence.  Failure to disclose this powerful impeachment evidence is a trademark Brady violation.  *Bagley*, 473 U.S. at 671-72.

- **The John Mark Letter** – **In a letter to his parents, Mr. Waldrip's son, John Mark Waldrip, told his parents to "please make sure that they don't charge me with any of this special murder."  (John Mark Letter, Doc. 9, Ex. R-165 (E.H. 20), at 5697-98 (filed 5/24/06) [App. 101].)  This letter would have buttressed Former Trial Counsel's argument, and Dr. Currie's testimony, that Mr. Waldrip would have confessed involuntarily in order to protect his son.**

- **To Do List** – **The DA's Office's file contained a handwritten "to do" list that concludes with "#10 – Probation warrant for Tommy Lee Waldrip."  (To Do List, Doc. 9, R-165 (EH 20), at 5686-87 (filed 5/24/06) [App. 138].)  Whether Mr. Waldrip's arrest on the probation revocation warrant was contrived was a key issue in Mr. Waldrip's motion to suppress.   This list demonstrates that Mr. Waldrip's arrest on a probation revocation warrant was an integral part of the Keith Evans investigation and not for a parole violation, as Former Trial Counsel argued. (ROIA, Vol. 1, Defendant's Motion to Suppress Statements, Doc. 9, Ex. R-1, at 68-74 (filed 5/24/2006) [App. 11].)**

As noted in Section XI.F, above, the materiality of suppressed *Brady* evidence is to be assessed cumulatively, rather than individually.  *Kyles*, 514 U.S. at 436.   Combined with other suppressed evidence Suppressed Mental Health Evidence, these five undisclosed items further undermine confidence in the verdicts of competency to stand trial, guilt, and death.[7]

---

[7]      Even if this Court determines that any or all of this *Brady* evidence is inadmissible, the evidence can still be material if there exists a reasonable probability that its disclosure would have affected the outcome of the proceedings.   *Wood v. Bartholomew*, 516 U.S. 1 (1995) (per curiam); *see also* Vol. I, Section IV.F, above.

## XIII. CLAIM 2:  THE GUILT PHASE JURY INSTRUCTIONS VIOLATED MR. WALDRIP'S CONSTITUTIONAL RIGHTS.

This court has found that the following claims are procedurally defaulted. Assuming without conceding that the claims are defaulted, Petitioner can show cause and prejudice to excuse the default.  In addition, the claims are meritorious and warrant the granting of habeas relief and a new trial.

### A.     BURDEN OF PROOF

The burden of proof instruction was improper because it contained a reference to moral certainty, allowing for juror confusion and the consideration of feelings and not the evidence proven at trial beyond a reasonable doubt.  *See Perez v. Irwin*, 963 F.2d 499 (2d Cir. 1992).  Trial counsel rendered ineffective assistance of counsel at trial by failing to object to this instruction.  Appellate counsel rendered ineffective assistance by failing to raise the claim on direct appeal.

### 1.     Cause and Prejudice

The procedural default on this claim was caused by and should be excused by the ineffective assistance rendered by trial and appellate counsel.   The instruction violated the Supreme Court's opinion in *Cage v. Louisiana*, 498 U.S. 39 (1990).  Thus, the inclusion of moral certainty language was deemed improper by the Supreme Court for almost six years before Petitioner's trial commenced.

The failure of trial counsel to object to such an instruction when the law was clearly established was ineffective. Likewise, the failure of appellate counsel to object to the instruction on direct appeal was also ineffective. Because trial and appellate counsel were ineffective, Petitioner can show cause to overcome the procedural default. He was also prejudiced by the ineffective assistance and the faulty instruction because such an error can never be harmless.

*Cage* error cannot be harmless. In *Sullivan v. Louisiana*, 508 U.S. 275 (1993), the U.S. Supreme Court, applying *Cage*, noted that the interrelationship between the reasonable doubt standard and the Sixth Amendment right to trial by jury is "self-evident." *Sullivan*, 508 U.S. at 278. In a unanimous opinion, the Court ruled that a constitutionally invalid "reasonable doubt" instruction could never be harmless error. Even though most constitutional errors "have been held amenable to harmless-error analysis" (*id.* at 279), this analysis could not logically be applied when "no jury verdict within the meaning of the Sixth Amendment" had been returned. *Id.* at 280.

## 2. Argument.

The Constitution prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). The "reasonable doubt" standard applies in Georgia to the sentencing phase findings of aggravating circumstance and the appropriate sentence, as well

283

as the guilt-innocence phase findings.  The phrasing of the instruction at the guilt

phase of the trial undermined the evidentiary certainty required by the Constitution

by stating:

> No person shall be convicted of any crime unless and until each
> element of the crime is proven beyond a reasonable doubt and to a
> moral and reasonable certainty…. [T]he State is not required to prove
> the guilt of the accused beyond all doubt or to a mathematical
> certainty.
>
> A reasonable doubt means just what it says.  It is the doubt of a fair-
> minded, impartial juror honestly seeking the truth.  It doesn't mean a
> vague or arbitrary notion but is a doubt for which a reason can be
> given arising from a consideration of the evidence, a lack of evidence,
> a conflict in the evidence or a combination of these.  If after giving
> careful consideration to all the facts and circumstances of this case
> your minds are wavering, or unsettled, or unsatisfied then that is a
> doubt of the law and you should acquit the defendant of those counts
> to which a doubt relates.
>
> But if that doubt does not exist in your minds as to the guilt of the
> defendant, then you would be authorized to convict the defendant on
> those counts you find proven beyond a reasonable doubt.  If the state
> fails to prove the defendant's guilt beyond a reasonable doubt, it
> would be your duty to acquit the defendant on that count, even if you
> believe he is, in fact, guilty of that count.

(T.T. Vol. XVII, at 3290-91, R-62 [App. 17].)

This instruction violated the Supreme Court's opinion in *Cage v. Louisiana*,

498 U.S. 39 (1990).

The reasonable doubt instruction condemned by the Supreme Court in *Cage*

is in material respects identical to the charge given in Petitioner's case.[8]  The jury

instructions clearly expressed the notion, condemned by the Supreme Court in

*Cage*, that the beyond-a-reasonable-doubt standard is synonymous with "proof to a

moral certainty," that any doubt must be more weighty than "vague,"  and that

moral certainty is "all that can be expected" or required.  Given the circumstances

of this case–the killing of a young man who was a witness in a trial against

Petitioner's son-there is a reasonable likelihood that juror's morals

unconstitutionally entered into the reasonable doubt equation.[9]

---

[8]     In *Cage*, the United States Supreme Court found that the Louisiana state trial court had violated the due process principles established in *In re Winship*, 397 U.S. 358 (1970), when it defined reasonable doubt as "such doubt as would give rise to a grave uncertainty," "an actual substantial doubt," and requiring "not an absolute or mathematical certainty, but a moral certainty."  *Cage*, 498 U.S. at 40 (quoting *State v. Cage*, 554 So.2d 39, 41 (La. 1989)).  The *Cage* Court noted that its previous decisions had repeatedly emphasized the constitutional underpinnings of the beyond-a-reasonable-doubt standard in criminal trials.

[9]     Besides diluting the state's burden of proof, the inclusion of "moral certainty" in a reasonable doubt instruction invites the jury to base their decision on feelings rather than facts, on emotion rather than on evidence.  *See Perez v. Irwin*, 963 F.2d 499, 502 (2d Cir. 1992) ("the concern is that the use of these words [moral certainty] might lead a jury to reach a verdict based on feelings rather than on the facts of the case").  This occurs because the phrase "moral certainty" has acquired an additional meaning, apart from the mere "probability" definition noted above.  A cluster of current dictionary definitions define "moral certainty" as a strong personal belief in a particular fact or idea in the *absence* of or *regardless* of objective evidence.  For example, *Webster's Third New International Dictionary - Unabridged* (1986) defines "moral certainty" as "based on an inner conviction"; and "virtual rather than actual, immediate, or completely demonstrable."  *Id.* at 1468, col. 3; *see also The American Heritage Dictionary of the English Language* 1173, col. 2 (3d ed. 1993) (defining moral certainty as "[b]ased on a firm conviction, rather than upon the actual evidence: *a moral certainty*") (emphasis added); *Webster's II New Riverside Dictionary* 769, col. 1 (1984, 1988) (moral certainty defined as "[b]ased on strong likelihood of conviction rather than on solid evidence").

(Continued)

Although the Supreme Court has found that inclusion of the phrase "moral certainty" in a reasonable doubt instruction does not per se violate due process (*Victor v. Nebraska*, 511 U.S. 1 (1994).), the instructions as a whole must be examined to determine whether *Cage* error occurred.  In *Victor*, the Supreme Court concluded that the use of "moral certainty" in a California pattern instruction did not improperly lessen the burden of proof in light of other language tethering "reasonable doubt" to an "abiding conviction."  Similarly, language in a Nebraska instruction ensured that the jurors understood they were required to have an "abiding conviction" of the defendant's guilt before they could return a guilty verdict.  The instructions in Petitioner's case, in contrast, failed to cure the inclusion of the "moral certainty" language.

As noted above, *Cage* error cannot be harmless.  *See Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993).  Part and parcel of this holding was the recognition that a *Cage* error in the definition of reasonable doubt is a "'structural defect[] in the constitution of the trial mechanism'" because the jury guarantee that it violates is a "'basic protectio[n]' whose precise effects are immeasurable, but without which a

---

(Continued)

286

criminal trial cannot reliably serve its function."  *Id.* at 281 (*quoting Rose v. Clark*, 478 U.S. 570, 577 (1986).  The *Sullivan* Court concluded:

> The right to jury trial reflects, as we have said, "a profound judgment about the way in which law should be enforced and justice administered."  *Duncan v. Louisiana*, 391 U.S. [145], 155.  The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error."

508 U.S. at 281-282.

Because there is a reasonable likelihood that the jury interpreted the court's instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause and jury trial clauses, the verdict violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution and must be set aside.

### B.   UNANIMITY

The trial court erroneously instructed that the verdict must be unanimous, "[w]hatever your verdict is." (T.T. Vol. XVII, Ex. R-62, at 3315.)  In other words, the instructed the jury that a not guilty verdict must be unanimous, instilling pressure for unanimity, instead of informing the jury that if any juror sincerely believed Petitioner was not guilty, that would be sufficient to prevent a guilty verdict from being entered.

Only a finding of guilt requires unanimity.  *Banks v. Horn*, 271 F.3d 527, 547 (3d Cir. 2001), *rev'd and remanded by* 536 U.S. 266 (2002), *reaff'd*, 316 F.3d 288 (3d Cir. 2003).

If one juror sincerely believes that the defendant is not guilty, that is sufficient to insure that a verdict of guilty will not be returned and for a mistrial to be de3clared as to that count.  The trial court's instruction may have coerced a finding of unanimity where one or juror sought to hold out for acquittal but relinquished their sincere belief in the face of the court's instructions.  *See Boyde v. California*, 494 U.S. 370, 384 (1990) ("instructions from the court . . . are viewed as definitive and binding statements of the law.")

Any failure by trial and appellate counsel to object to and appeal this instruction are excused by their deficient performance which resulted in ineffective assistance of counsel at the guilt phase.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Coleman v. Thompson*, 501 U.S. 722, 754 (1991).

## C.    CIRCUMSTANTIAL EVIDENCE

The circumstantial evidence charge was erroneous.  If trial counsel failed to object to it and appellate counsel failed to raise an objection on appeal, such ineffective assistance of counsel excused any procedural default.  *Murray*, 477 U.S. at 488.; *Coleman*, 501 U.S. at 754.

288

The jury charge on circumstantial evidence was confusing and served to mislead the jury.  (*See* T.T. Vol. XVII, at 3289-90, Ex. R-62 [App. 17].) .  Trial counsel requested that only a short instruction be given that "[t]o warrant a conviction on circumstantial evidence alone the proven facts must not only be consistent with the theory of guilt but must exclude every other reasonable theory other than the guilt of the accused."  (T.T. Vol. XVII, at 3289-90, R-62 [App. 17].)

The inclusion of this portion of the charge inside a lengthier discussion of the difference between direct and circumstantial evidence was confusing and improper in violation of the Due Process Clause and jury trial clauses.  Therefore, the verdict violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution and must be set aside.

### D.    VOLUNTARY INTOXICATION

The jury instructions on voluntary intoxication and on the relationship between voluntary intoxication and the element of intent was improper and incorrect.  The court instructed that voluntary intoxication is not an excuse for a criminal act.  (*Id.* at 3298.)

Voluntary intoxication is relevant when it can negate the element of intent for the offenses with which Petitioner was charged.  *See Hardwick v. Crosby*, 320 F.3d 1127, 1161 (11th Cir. 2003) (finding that when voluntary intoxication to the point of inability to form intent is shown, the instruction should be given to the

jury); *Horton v. State*, 371 S.E.2d 384 (Ga. 1988) (regarding availability of defense in Georgia).

Voluntary intoxication as a negation of intent has been clear law since at least 1988.  *See Horton*, 371 S.E.2d 384.  There could be no rational or strategic basis for failing to object to an erroneous jury instruction that removed a defense to intent from the jury's consideration. Any failure by trial and appellate counsel to object to the contrary jury instruction had no basis in law and constituted ineffective assistance of counsel.  *Murray*, 477 U.S. at 488.; *Coleman*, 501 U.S. at 754.

### E.    WEIGHT OF TOMMY WALDRIP'S STATEMENT

The trial court gave conflicting instructions on credibility that served to confuse the jury regarding the weight that should be given to statements by Petitioner.  The court gave the general instruction that:

> You must determine the credibility - - and another word for that is
> believability - - of the witnesses. It is for you to determine what
> witness or witnesses you believe, which witness or witnesses you will
> not believe, if there are some you do not believe.  In passing on their
> credibility you may consider all the facts and circumstances of the
> case, the witnesses' manner of testifying, their intelligence, their
> interest or lack of interest in the outcome of the case, their means and
> opportunity of knowing the facts that they testify about, the nature of
> the facts to which they testify, the probability or improbability of their
> testimony and of the occurrences to which they testify.  You may also
> consider their personal credibility insofar as it may legitimately
> appear from the trial of the case.

(T.T. Vol. XVII, at 3291-92, R-62.)

In a subsequent instruction, the court noted that the jury "should consider with great care and caution the evidence of any statement made by the defendant." (*Id.* at 3301-02.)

The conflict in these instructions may have led jurors to give different weight to Petitioner's alleged statements than to those made by other witnesses, compromising the jury's role as the exclusive fact-finder. *See Blakely v. Washington*, 542 U.S. 296, 306 (2004); *United States v. Anton*, 597 F.2d 371 (3d Cir. 1979).

Furthermore, by focusing the credibility instruction on those witnesses with an "interest... in the outcome of the case," (T.T. Vol. XVII, at 3292, R-62 [App. 17]), the instruction improperly focused the credibility determination on defense witnesses.

These instructions interfered with the jury's fact-finding role under the Sixth Amendment and deprived Petitioner of Due Process under the Fifth and Fourteenth Amendments. Any failure by trial counsel and appellate counsel to object was ineffective, thereby excusing any procedural default. *Murray*, 477 U.S. at 488.; *Coleman*, 501 U.S. at 754. Petitioner has demonstrated prejudice by noting the merits of his constitutional claim that the erroneous charges interfered with his Fifth, Sixth and Fourteenth Amendment rights.

291

**XIV.  CLAIM 6**:  **PETITIONER WAS DENIED DUE PROCESS OF LAW WHEN THE STATE FAILED TO PRODUCE EVIDENCE SUFFICIENT TO SUPPORT EACH ESSENTIAL ELEMENT OF THE CRIMES AND EACH OF THE AGGRAVATING CIRCUMSTANCES, IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

As noted above, the state failed to produce sufficient evidence on each of the essential elements of the crimes charged.  *See* Claim Five, *supra*.  In addition, the state failed to produce sufficient evidence to support the finding, beyond a reasonable doubt, of the existence of at least one aggravating circumstance.  *See e.g., Zant v. Stephens*, 462 U.S. 862 (1983).  The evidence produced fell far short of demonstrating the higher standard of Mr. Waldrip's death-eligibility and thus, his death sentence was unconstitutionally imposed.  *See Enmund v. Florida*, 458 U.S. 782 (1982).

The state was obligated to adduce evidence that proved beyond a reasonable doubt that Mr. Waldrip was guilty of at least one aggravating circumstance as a precondition to the imposition of a death sentence.  The state failed to do so.  In addition, the Prosecution exacerbated the error by obtaining a jury instruction that Mr. Waldrip could be sentenced to death whether he was directly involved in or simply a "party" to any aggravating circumstance.  *See* Claim Two, *supra*. Because there is no reliable, direct evidence to link Mr. Waldrip to the kidnapping or the murder itself, and because the inconsistent statements that were used to

292

secure his conviction should not have been admitted, *see* Claim Eight, *infra*, there was insufficient evidence to determine, beyond a reasonable doubt, that Mr. Waldrip was even present during, let alone a participant in, either aggravating circumstance. *Enmund v. Florida,* 458 U.S. 782 (1982); *Sawyer v. Whitley*, 505 U.S. 333, 336, 349 (1992); *Jackson v. Virginia*, 443 U.S. 307 (1979). The failure to present sufficient grounds to justify imposing a death sentence upon Mr. Waldrip renders the death sentence cruel and unusual under the Eighth Amendment.

> The Georgia Supreme Court, on direct appeal resolved the issue by holding:

> The evidence supports the jury's finding that the murder was committed while the appellant was engaged in the commission of kidnapping with bodily injury or aggravated battery, OCGA § 17-10-30(b)(2); and that the murder was outrageously wanton, vile, horrible, and inhuman in that it involved aggravated battery to the victim, OCGA § 17-10-30(b)(7). OCGA § 17-10-35(c) (2).

*Waldrip v. State*, 267 Ga. 739, 752 (1997). The court did not address the *Enmund* aspect of the claim and therefore is contrary to Supreme Court precedent *i.e., Enmund v. Florida, supra*. To the extent the Georgia Supreme Court's holding does address the question of eligibility, the court's adjudication of the issue is an unreasonable application of *Enmund*. 28 U.S.C. § 2254(d) (1).

## XV.   CLAIM 13: THE DISTRICT ATTORNEY TESTIFIED IN MR. WALDRIP'S TRIAL, WHICH GAVE UNDUE CREDIBILITY TO THE STATE'S CASE AND VIOLATED MR. WALDRIP'S RIGHT TO A FAIR TRIAL UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

This Court did not find Claim 13 procedurally defaulted.  (*See* Procedural

Default Order, at 25-27 [App. 33].)  As such, it is before this Court on the merits.

As the Georgia Supreme Court did not reach the issues addressed in this claim on

the merits and the state habeas court incorrectly determined it to be procedurally

barred (not defaulted), this Court reviews this claim *de novo*.  *Cone v. Bell*, 129 S.

Ct. 1769, 1784 (2009) (where the state court did not reach the merits of the

underlying claim its review is not subject to deference and is reviewed *de novo*);

*Crowe v. Head*, 356 F. Supp. 2d 1339, 1350 (N.D. Ga. 2005) ("Section 2254(d)

applies only to *claims decided on their merits* by state courts.").

In John Mark's first armed robbery trial, ADA Russ McClellan of the

Forsyth DA's Office prosecuted John Mark.  Thus, in the first armed robbery trial,

ADA McClellan asked questions of Keith Evans regarding John Mark's robbery of

the Cumming Food Store.

At the guilt/innocence phase of Mr. Waldrip's criminal trial, Mr. McClellan,

who had left the Forsyth DA's office, was the Prosecution's first witness.  (T.T. Vol.

IX, Doc. 9, Ex. R-54, at 1755-6 (filed 5/24/06) [App. 102].)  Mr. McClellan was

294

introduced to the jury as a former Assistant District Attorney who had prosecuted cases for nine years. (*Id.* at 1755-6.) As part of his testimony, ADA Darragh had Mr. McClellan play act Keith Evans's testimony – Mr. Darragh played the part of Mr. McClellan at the first armed robbery trial and Mr. McClellan played the part of Keith Evans. (*Id.* at 1761-1801.) Essentially, ADA Darragh testified as to what Mr. McClellan said and Mr. McClellan testified as to what Keith Evans said.

This violated Mr. Waldrip's constitutional rights under the Fifth, Eighth and Fourteenth Amendments by presenting the testimony as a theatrical dialogue, the Prosecution improperly bolstered the credibility of Keith Evans's testimony. This was aggravated by the fact that not only did ADA Darragh's presentation of testimony bolster the credibility of the prior testimony, but instead of having a court reporter or other neutral person read the testimony, former ADA Russ McClellan read the testimony, which further enhanced its credibility.[10] With two prosecutors reading testimony, the jury was led to the conclusion that Keith Evans's testimony was true without doing their own credibility assessment, one of the main dangers of letting a prosecutor vouch for a witness. *United States v. Young*, 470 U.S. 1, 18 (1985).

---

[10]   It was not a practical necessity for Russ McClellan to read the testimony. The admission of the testimony was not based on his presence when the original testimony was given.

Moreover, it was highly improper for ADA Darragh to testify as to what Russ McClellan asked Keith Evans at the first armed robbery trial.  According to Georgia's Code of Professional Conduct in effect at the time of the Underlying Trial, ADA Darragh "should [have avoided] testifying in court in behalf of his client (the State)."  *See* MODEL CODE OF PROF'L RESPONSIBILITY DR 5-102 (1980) (Appearance of Lawyer as Witness for His Client); *see also Timberlake v. State*, 246 Ga. 488, 500-01, 271 S.E.2d 792, 802 (1980).  "This rule is clearly applicable when a lawyer is preparing for trial, including the preparation of anticipated rebuttal and impeaching testimony."  *Id*.  Given that Russ McClellan was the Prosecution's first witness and that the testimony was elicited on direct, ADA Darragh's testimony was planned and deliberate.  Therefore, it was a violation of his ethical duties and reflects prosecutorial misconduct that rendered Petitioner's trial unfair and his verdict unreliable.

In general, it is improper for a  prosecutor to personally vouch for the veracity of a witness.  *See e.g. United States v. Young*, 470 U.S. 1 (1985).  By testifying during the performance, ADA Darragh improperly bolstered the credibility of the transcript and the prior trial because juries or jurors inherently believe prosecutors.  As the Court of Appeals for the Fifth Circuit observed in *United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979), "[t]he power and force of the government tend to impart an implicit stamp of believability to what the

296

prosecutor says."    Moreover, ADA Darragh made additional comments to enhance the prior testimony.  For example, during his closing argument at the guilt/innocence phase of the Underlying Trial, ADA Darragh reminded the jury that they had heard the testimony of Keith Evans, stated that Evans did not deserve what had happened to him, and then said, "Courageous young man got up there and looked John Mark Waldrip in the face and said, 'You did this armed robbery.' And the jury convicted based on that evidence that was there…".  (T.T. Vol. XVII, at 3235, R-62 [App. 17].)  By describing Evans as courageous and saying that he looked John Mark in the face, ADA Darragh sought to provide the jury with an image of Evans consistent with his telling the truth.  That image was strengthened by the references to the jury's convicting John Mark, "…based on that evidence that was there…" (*Id.*)  Without providing any evidence of the effect the testimony of Evans had in John Mark's trial, ADA Darragh nonetheless implied that it was the basis of John Mark's conviction.  The clear message seems to be that the earlier jury was convinced that Evans was telling the truth, and that the current jury should also believe the testimony to be the truth.

A more egregious example of improper bolstering is found in the closing arguments given by the Prosecution at the penalty phase of the Underlying Trial. During the argument, ADA Darragh referred to Evans's murder as a punishment, saying:

> That was his punishment for standing up in court and saying, 'John Mark Waldrip robbed me and robbed the Foodcenter in December of 1989.' That was his punishment for doing his civic duty, for being willing to stand up in front of a judge and raise up his hand and say, "Yes, Your Honor, in the State of Georgia versus John Mark Waldrip in the Superior court of Forsyth County where he is charged with the offense of armed robbery, I do promise to tell the truth." So his punishment was to die.

(T.T. Vol. XVIII, Doc. 9, Ex. R-63, at 3505-06 (filed 5/24/06) [App. 16].)  There can be little doubt that this statement was intended to vouch for the credibility of Evans as a witness.  Nearly every word seems to be calculated to show that the testimony given by Evans was the truth and should be believed by the jury.  The bolstering effect of these statements is heightened by the inherent credibility of ADA Darragh as the prosecutor.

While Mr. McClellan did not explicitly vouch for Evans's credibility,[11] his reading of the testimony of Evans was constructively the same thing.  Because Mr. McClellan was a former prosecutor, which was well known to the jury, the credibility of Keith Evans's prior testimony was implicitly elevated by the Prosecution.  As the United States Supreme Court stated in *United States v. Young*, that type of conclusion is one of the main dangers of allowing a prosecutor to

---

[11]  McClellan did, however, testify that Mr. Evans was a cooperative witness and that he seemed no more nervous than any other witness about to testify in an armed robbery case. (T.T. Vol. IX, Doc. 9, Ex. R-54, at 1803 (filed 5/24/06) [App. 102].)

vouch for a witness.  470 U.S. 1, 18 (1985).  According to the Court, "…the

prosecutor's opinion carries with it the imprimatur of the Government and may

induce the jury to trust the Government's judgment rather than its own view of the

evidence."  *Id.* at 18-19.  This language echoes the sentiments of the Court in

*Berger v. United States*, 295 U.S. 78, 88 (1935), in which the Court noted that the

average jury has confidence in the prosecutor to faithfully uphold his duty to

protect the innocent and punish the guilty, and, "[c]onsequently, improper

suggestions, insinuations and, especially, assertions of personal knowledge are apt

to carry much weight against the accused when they should properly carry none."

The possibility that the jury would accept the opinion of McClellan regarding the

credibility of Evans's testimony seems especially great since the jury had no

opportunity to judge Evans's demeanor themselves.

## XVI.  CLAIM 14:  THE PROSECUTOR IMPROPERLY PRESENTED EVIDENCE AND ARGUMENT DEALING WITH THE WORTH AND VALUE OF THE VICTIM IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court concluded that there was no *per se* bar to victim impact evidence under the Eighth Amendment at a capital sentencing hearing.  Nonetheless, victim impact testimony is clearly barred by the Due Process Clause of the Fourteenth Amendment to the extent that it is unduly prejudicial to the defendant.  *Id.* at 825. In Georgia, under OCGA Section 17-10-1.2(a)(1), the trial court may allow evidence from the family of the victim, or such other witnesses having personal knowledge of the victim's personal characteristics and the emotional impact of the crime on the victim, the victim's family or the community.  This evidence will be permitted only "in such a manner and to such a degree as not to inflame or unduly prejudice the jury."  OCGA §17-10-1.2(a)(2).

However, not all victim impact evidence will be admissible.  For victim impact evidence to be admissible, the prosecution must comply with state procedural safeguards intended to insure that the evidence does not result in the arbitrary imposition of the death penalty.  At the time of Petitioner's trial, the Prosecution was required, prior to the introduction of victim impact evidence or testimony, to present to the trial court the evidence it intended to present to the

300

jury.  The trial court was required to hear and rule on its admissibility.  *Livingston v. State*, 444 S.E.2d 748, 752 (Ga. 1994).  The Prosecution was required to notify Petitioner, at least ten days prior to trial, of the victim impact evidence it intended to offer.  *Id.*

Victim impact evidence should not be permitted to violate the rule against hearsay, i.e. testimony about the impact of the crime on another person.  Such testimony not only violates the rule against hearsay, but denies the defendant his right of confrontation.  The testimony of Keith Evans from John Mark Waldrip's first armed robbery trial was rank hearsay and thus should not have been admitted for any purpose, including victim impact evidence.

Also, when victim impact evidence is admitted, the trial court should instruct the jury regarding the purpose of the evidence. Said charge should emphasize that victim impact evidence is not the same as evidence of a statutory aggravating circumstance and that the introduction of such evidence does not relieve the state of its burden to prove beyond a reasonable doubt the existence of a statutory aggravating factor.

In Petitioner's case, his constitutional rights were violated by the Prosecution's introduction of impermissible victim impact evidence.  The victim impact evidence and testimony presented by the Prosecution in Petitioner's trial came from a variety of sources, including words by way of testimony from the

301

victim himself, prior to his death, detailing his successful employment history, his significant responsibilities, his family, and his long-standing ties to the community. (T.T. Vol. IX, Doc. 9, Ex. R-54, at 1764-1801 (filed 5/24/06) [App. 102].)  The Prosecution also presented the testimony of Russ McClelland, a district attorney who knew Mr. Evans from John Mark Waldrip's trial and who personally vouched for both his cooperative nature and courage in testifying against John Mark Waldrip. (*Id.* at 1803-04.)

Finally, when victim impact evidence is admitted, as it was in the underlying trial, the trial court should instruct the jury regarding the purpose of the evidence. Said charge should emphasize that victim impact evidence is not the same as evidence of a statutory aggravating circumstance and that the introduction of such evidence does not relieve the state of its burden to prove beyond a reasonable doubt the existence of a statutory aggravating factor.  No such charge occurred in Petitioner's case.

The State habeas court found this claim to be procedurally defaulted because it was not pursued on direct appeal.  (Order Denying Relief, at 44, R-267 [App. 28].)  Consequently, the state courts did not address the merits of the claim.  (*Id.*) This court found the state procedural rule was adequate and independent and held

it would not address the merits but upon a showing of cause and prejudice.[12]

Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly pursue the issue on appeal (either interim or direct). *See, e.g.*, *Murray v. Carrier*, 477 U.S. 478 (1986).  Had appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's death sentence.  *Philmore v. McNeil*, --- F.3d ----, No. 07-1367, 2009 WL 2181682, at * 12 (11th Cir. July 23, 2009).

---

[12]     Mr. Waldrip objects to this finding.

XVII.    CLAIM 15:  PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED BY BECKY McCORD'S EMPANELLING THE GRAND JURY EVEN THOUGH SHE WAS WORKING IN THE DISTRICT ATTORNEY'S OFFICE AND WAS A RELATIVE OF THE VICTIM.

From April 26 through April 29, 1991, the Grand Jury was reconvened for the sole purpose of hearing the case against Petitioner and his co-defendants.  (*See* Transcript of Pretrial Motions Hearing ("P.T.") (12/2/91), Doc. 9, Ex. R-35, at 62-63 (filed 5/24/06) (Becky McCord testimony at pre-trial hearing) [App. 103]; (Summary Report, Doc. 9, Ex. R-221 (E.H. 76), at 22244 (filed 5/24/06) [App. 5].) The Grand Jury returned a True Bill on all 20 counts of the indictment. (*See id.*)

Becky McCord, who is currently the Clerk of the Dawson County Court, was a secretary of the DA's Office from February 14, 1990 through, at least, December 2, 1991.  (*See* P.T. (12/2/91), at 8-9, Ex. R-35 (Becky McCord testimony at pre-trial hearing) [App. 103].)  As the secretary for the DA's Office, Ms. McCord worked in Dawson, Lumpkin, and White counties assisting the different district attorneys in various ways including by preparing indictments. (*See id.*)

Moreover, Ms. McCord was also related to Mr. Evans; he was her first cousin's son, and she was Mr. Evans's next-door neighbor at the time of his death.

304

(*See id.* at  25.)  In fact, Ms. McCord's father, brother, and husband had searched for Mr. Evans after he disappeared.  (*See id.* at 26.)

Ms. McCord, however, was not only a secretary in the DA's Office and a relative of the victim.  Judge Smith appointed her as a jury commissioner in 1987.  (Id. at 11.)  Ms. McCord continued in that position until April 26, 1991, when she resigned by letter to the Jury Commissioners.[13]  (*See id.* at 59.)  On September 20, 1990, Ms. McCord attended her first of two meetings of Jury Commissioners **after** accepting her job with the DA's Office.  (*Id.* at 19-21.)  At the meeting of September 20th, the Grand Jury Commissioners added and deleted names on the Grand Jury list from which the February 1991 Grand Jury term was chosen.  (*Id.*)  On November 20, 1990, Becky McCord joined the other Grand Jury Commissioners in certifying the Grand Jury list for the February 1991 Grand Jury term.  (*Id.* at 22-23.)  Ms. McCord did not officially resign her position as Jury Commissioner until the day that the grand jury reconvened to indict Petitioner and his co-defendants.

According to the pre-trial testimony of Curtis Leonard Chappell, Clerk of the Superior Court in Dawson County, Ms. McCord recommended that a number

---

[13]   Ms. McCord states in her testimony that she resigned orally on September 20, 1990 during the first Jury Commissioner meeting, (*see* P.T. (12/2/91), at 31-33, Ex. R-35 [App. 103]), but even she admits that was meaningless.  (*See id.* at 67 (testifying: "I verbally resigned but that doesn't mean anything.").)

of names be deleted from the Grand Jury list, of whom several may have died. (*Id.* at 85-86.)  Several names were deleted for other undisclosed reasons. Moreover, it is clear from the record that Becky McCord knew the people she recommended as additions to the list.  (*Id.* at 19-21, 26-28. )

Thus, while an employee of the DA's Office, whose sole purpose is to prosecute defendants, Ms. McCord was a Jury Commissioner, an office that requires neutrality; and, in fact, she helped select people for the Grand Jury, whose sole obligation is to act as a check on the DA's Office's possibly overly aggressive prosecution.

Georgia's provision for indictment by a grand jury clearly engenders an expectation, given the storied history of grand juries in English and American history, that the grand jury will be selected impartially and without prejudice to those accused of crimes by the prosecution.  Given that expectation, the operations of a grand jury in Georgia must conform to federal due process standards.  It is clearly improper to have an employee of the DA's Office selecting the grand jury members given the fact that it is their role to provide a check on the DA's Office and protect the accused from any excesses of that office.

The grand jury serves the "dual function of determining if there is probable cause to believe that a crime has been committed and **of protecting citizens against unfounded criminal prosecutions.**"  *United States v. Sells Eng'g, Inc.*

306

463 U.S. 418, 423 (1983) (internal quotations omitted) (emphasis supplied). The

purpose behind grand juries is to limit a citizen's "jeopardy to [only those] offenses

charged by a group of his **fellow citizens acting independently of either**

**prosecuting attorney or judge.**" *Stirone v. United States*, 361 U.S. 212, 218

(1960) (emphasis supplied). In *Wood v. Georgia*, 370 U.S. 375 (1962), the United

States Supreme Court said of a Georgia grand jury that was investigating political

corruption charges in a racially heated atmosphere that "[h]istorically, this body

has been regarded as a primary security to the innocent against hasty, malicious

and oppressive persecution; it serves the invaluable function in our society of

standing between the accuser and the accused . . . to determine whether a charge is

founded upon reason or was dictated by an intimidating power or by malice and

personal ill will." *Id*. at 390.

If a grand jury is going to fulfill its historical purpose, then it must be a

neutral body not beholden to the court or, most importantly, the prosecutors who

come before them. Here, however, the grand jury members were selected, at least

in part, by an agent of the Prosecution. Because Ms. McCord helped select the

grand jury that issued Petitioner's indictment, that indictment is rendered

unreliable because the grand jury's neutrality between the citizens it is sworn to

protect and the Prosecution it is supposed to check is thereby called into question.

In *Costello v. United State*s, 350 U.S. 359 (1956), the United States Supreme Court

307

stated, "[t]here is every reason to believe that [the Fifth Amendment] grand jury was [intended] to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes." *Id*. at 362. How can the grand jury be a "fair method for instituting criminal proceedings" when it is not even impartial?

There is no constitutional right to an indictment by a grand jury prior to being tried on state, as opposed to federal, criminal charges. *See Hurtado v. People of California*, 110 U.S. 516 (1884). Nonetheless, because Georgia requires and uses a grand jury in capital cases, the Fourteenth Amendment requires it to conduct such a procedure according to federal due process standards. *See Evitts v. Lucey*, 469 U.S. 387 (1985) (where the United States Supreme Court held that due process required a state, once having created a right of first appeal, not to deprive criminal defendants of the effective assistance of counsel on the first appeal of right); *Ford v. Wainwright*, 477 U.S. 399 (1986) (where the United States Supreme Court held that Florida's procedures for determining whether a death row inmate was insane were inadequate under federal due process standards, given the inmate's entitlement to avoid execution while mentally incompetent).

The grand jury that indicted Petitioner cannot be considered fair or impartial because it was selected by a commissioner who worked for, and was an agent of,

the Prosecution.  Justice requires that those that administer the adversarial system, those that sit in judgment and those that check the awesome power of the state, must be impartial and not even appear to be biased for the prosecution.  If the Honorable Judge John E. Girardeau had been selected by the DA's Office to handle the underlying trial, the appearance of bias would require relief.  If the jury that heard the underlying trial had been hand selected by an employee in the DA's Office, then that too would require relief.  Here, the grand jury pool was selected with the help of an employee of the DA's Office; the taint cannot be wiped clean.

The state courts found this claim to have been procedurally defaulted because it was not pursued on appeal.  This Court found that the state procedural rule invoked was adequate and independent.  The Court further indicated it would not address the merits of the claim absent a showing of cause and prejudice.  The state's withholding of this information (Ms. McCord being a member of the district attorney's office thus a *de facto* member of the prosecution team) by the state is a factor external to the defense that would establish "cause".  *Murray v. Carrier*, 477 U.S. 478, 488 (1986), *Strickler v. Greene*, 527 U.S. 263 (1999), *Siebert v. Allen,* 455 F.3d 1269, 1272 (11th Cir.2006) (*cert denied*, 549 U.S. 1286 (2007).  Further, assuming trial counsel had the duty to ferret out information that would otherwise be undetectable, trial and appellate counsel's failure to independently discovery Ms. McCord's relationship was deficient performance that would establish cause.

309

*Murray v. Carrier*, 477 U.S. at 488.  That Petitioner was prejudiced is patent.  Had the relationship been raised during trial there is a reasonable probability that the trial court would have dismissed the indictment.  If, however, the trial court did not and the issue pursued on direct appeal, there is a reasonable probability the result of the direct appeal would have been different.  *Philmore v. McNeil*, --- F.3d ----, No. 07-13637, 2009 WL 2181682, at * 12 (11th Cir. July 23, 2009).

310

**XVIII.**     **CLAIM 17:  MR. WALDRIP'S ABSENCE FROM CRITICAL STAGES OF THE PROCEEDINGS VIOLATED THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND PREJUDICED HIS RIGHT TO A FAIR TRIAL, AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO ENSURE MR. WALDRIP'S PRESENCE.**

A defendant's constitutional right to be present at his criminal trial is a cornerstone of the American judicial system.  This right grows out of the Confrontation Clause of the Sixth Amendment, but has been expanded by the Due Process Clause to cover many situations where the defendant is not confronting witnesses or evidence.  *United States v. Gagnon*, 470 U.S. 522 (1985); *see United States v. Chrisco*, 493 F.2d 232 (8th Cir. 1974) (voir dire); *Hall v. Wainwright*, 733 F.2d 766 (11th Cir. 1984) (communications between judge and jury); *Lee v. State*, 509 P.2d 1088 (Alaska 1973) (rendering of the verdict).

In *Kentucky v. Stincer*, 482 U.S. 730 (1987), the Supreme Court held that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."  482 U.S. at 745.

Petitioner was denied both his Sixth Amendment right to confront witnesses against him and his right to be present at critical stages of his trial under the Fourteenth Amendment and the Georgia Constitution when the Trial Court held numerous bench conferences without him present.  Specifically, during the

Competency Hearing, the Trial Court conducted bench conferences without taking the necessary steps to ensure that Petitioner was present for the conversations. (*See, e.g.*, C.T. Vol. IV, at 534-36, 597-606, Ex. R-43 [App. 74]; C.T. Vol. V, at 668-76, 676-86, 820, Ex. R-44 [App. 70].)  During both phases of the Underlying Trial, the Trial Court continued to conduct substantive bench conferences without ensuring Petitioner's presence, including conversations about potential jurors and about the testimony of Robert Garner, whose hearsay testimony was admitted over objection by the Defense.  (T.T. Vol. I, Doc. 9, Ex. R-46, at 20, 28, 93, 150, (filed 5/24/06) [App. 104]; T.T. Vol. III, Doc. 9, Ex. R-48, at 772 (filed 5/24/06) [App. 105]; T.T. Vol. IX, Doc. 9, Ex. R-54, at 1741, 1897 [App. 102]; T.T. Vol. XII, Doc. 9, Ex. R-57, at 2490, 2512 (filed 5/24/06) [App. 18]; T.T. Vol. XVII, Doc. 9, Ex. R-62, at 3339 [App. 17]; T.T. Vol. XVIII, R-63 at 3478, 3568, [App. 16].)[14]

---

[14]     When Petitioner was privy to said bench conferences, the record and transcripts make his presence clear.  (*See* T.T. Vol. XVIII, at 3478, R-63 [App. 16].)

The Trial Court's failure to ensure that Petitioner was present for and privy to bench conferences concerning his capital trial violated his Fifth, Sixth, and Fourteenth Amendment rights.  The state habeas court found this claim to be procedurally defaulted because it was not pursued on direct appeal.  This Court found the state court's finding of default to rest on an adequate and independent state rule and further ruled it would not address the merits but upon a showing of cause and prejudice.[15]  Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly pursue the issue on appeal (either interim or direct).  *See e.g., Murray v. Carrier*, 477 U.S. 478 (1986).  Had appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's death sentence.  *Philmore v. McNeil*, --- F.3d ----, No. 07-13637, 2009 WL 2181682, at * 12 (11th Cir. July 23, 2009).

---

[15]     Mr. Waldrip objects to this finding.

313

## XIX.  THE EVIDENCE PRESENTED DURING THE COMPETENCY HEARING DEMONSTRATED THAT MR. WALDRIP WAS INCOMPETENT TO STAND TRIAL.

The evidence adduced at the competency hearing and since clarified -- demonstrates that at the time of trial, Mr. Waldrip was incompetent to stand trial. (Initial Federal Petition for Writ of Habeas Corpus, Doc. 1, at 157-59 (filed 5/1/06) (Claim 18) [App. 93].)  Forcing him to stand trial for his alleged crimes despite this incompetency is a violation of Mr. Waldrip's Sixth Amendment rights. Accordingly, Mr. Waldrip is entitled to a new competency hearing.

### A.  THE SIXTH AMENDMENT GUARANTEES THAT MR. WALDRIP CANNOT BE PUT ON TRIAL WHILE INCOMPETENT.

Part of the right to a fair trial is an absolute "right not to be tried while legally incompetent."  *Drope*, 420 U.S. 162, 173 (1975).  In order to be found competent to stand trial, a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him.  *Dusky v. United States*, 362 U.S. 402, 402 (1960).  "[I]t is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is 'rational as well as factual.'"  *U.S. v. Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990) (quoting *Dusky*, 362 U.S. 402 (1960)).

314

**B.     MR. WALDRIP WAS INCOMPETENT TO STAND TRIAL
FOR THE MURDER OF KEITH EVANS.**

The delusions that we now know are a result of Mr. Waldrip's paranoid
schizophrenia and organic brain damage rendered Mr. Waldrip incompetent to
stand trial.  Ms. Watson testified during the competency hearing about the Monitor
and the resulting impossibility she and Mr. Brannon faced in trying to
communicate with Mr. Waldrip.  (C.T. Vol. III, at 474-76, 481, 483, R-42 [App.
73].)  Each of the Former Mental Health Experts concluded that Mr. Waldrip
suffered from paranoid delusions.  (*See* C.T. Vol. IV, at 545-46, 551-52, R-43
[App. 74]; C.T. Vol. V, at 694, 728, 791, 806, R-44 [App. 70].)   When Mr.
Waldrip sought to take the stand in rebuttal during the competency hearing, the
Trial Court heard extended argument regarding Mr. Waldrip's inability to
rationally discuss this decision with Former Trial Counsel and agree upon whether
Mr. Waldrip should testify.  When the Trial Court allowed Mr. Waldrip to testify,
he demonstrated firsthand for the jury that he suffered from a debilitating mental
illness.  He testified that the Monitor read his thoughts, making him unable to
communicate with Former Trial Counsel about the case because he thought it
would destroy his ability to receive a fair trial.  (C.T Vol. V, at 819, R-44 [App.
70]):  the Monitor "monitors my thoughts and my actions at all times, twenty-four
hours a day, seven days a week there's someone on the monitor."); (*Id.* at 819:

"I've tried to have a private session with you, I can't do it because I'm monitored right when we're talking . . ..")

It is obvious from this testimony that Mr. Waldrip was incompetent to stand trial.  Mr. Waldrip did not have "sufficient present ability to consult with his lawyer" as a result of his mental illness.  *Dusky*, 362 U.S. at 402.  Furthermore, while he understood what a trial was, Mr. Waldrip was so obsessed with the Monitor and the perceived law enforcement conspiracy against him that he could not apply this rudimentary understanding to his own situation.  Therefore, he did not have a *rational* understanding of the proceedings against him.  *Id.* (emphasis supplied).  Because Mr. Waldrip could not assist in his own defense and could not understand the proceedings against him, he was incompetent to stand trial.  Therefore, allowing him to stand trial violated Mr. Waldrip's Sixth Amendment "right not to be tried while legally incompetent."  *Drope*, 420 U.S. at 173.

## XX. CLAIM 23: THE TRIAL JUDGE'S LIMITED CHANGE OF VENUE FOR THE COMPETENCY HEARING VIOLATED PETITIONER'S RIGHT TO A FAIR TRIAL UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE PRE-TRIAL PUBLICITY INFECTED THE JURY.

Despite the Trial court's factual conclusion that Petitioner could not have a fair trial in a county abutting Dawson County, the trial court changed the venue of Petitioner's competency hearing to Hall County, Dawson County's next door neighbor. This deprived Petitioner of a fair and full competency hearing by an impartial jury of his peers. By its own admission, the trial court's moving of the competency hearing from Dawson County to Hall County did not ameliorate the detrimental effects of pretrial publicity on Petitioner's character and defenses, because the ubiquitous publicity that required the move from Dawson County in the first place had the same effect in Hall County. In fact, several venire members stated that they were familiar with the Keith Evans Investigation and the underlying trial, as well as the Dawson County area and its residents. It is indisputable that the transfer to Hall County did not, and could not, remove doubt about the fairness of the competency hearing, which is the entire reason behind changing venue in the first place.

A defendant's right to a fair trial may be prejudiced by publicity during or before his trial. *See Chandler v. Florida*, 449 U.S. 560, 574 (1981); *Sheppard v.*

*Maxwell*, 384 U.S. 333, 351 (1966).  The basic rule for change of venue is that if

the trial setting was inherently prejudicial as a result of pretrial publicity, or if there

was actual bias on the part of the individual jurors, then venue should be changed.

> **A.    THE TRIAL COURT EXPLICITLY FOUND THAT
> PREJUDICIAL PRETRIAL PUBLICITY WAS
> PERVASIVE IN HALL COUNTY.**

Before the trial court considered the issue of changing venue for the

Competency hearing, the trial court was compelled to address the exact same issue

for the guilt/innocence phase and penalty phase of the underlying trial.  The

Defense filed a Motion for Change of Venue on July 10, 1991 (the "Original

Motion to Transfer Venue"), which was unopposed by the Prosecution. (*See*

ROIA, at 211-15, R-1 [App. 106].)   The Trial court heard the motion on August

28 and August 29, 1991.

On August 29th, the Prosecution and Defense entered into an oral stipulation

(the "Venue Stipulation"), which was the following:

> Comes now the defendants by and through their attorneys of record
> and the District Attorney, Mr. Andrew Fuller, on behalf of the State
> and here enter into agreements and stipulation as to the following
> facts: One, the parties agree that there has been significant media
> coverage of this matter in the Dawson County, Georgia area.
>
> The parties to this stipulation further agree that this significant media
> coverage includes newspaper, radio and television coverage; two, the
> parties hereto agree that this significant media coverage as defined
> herein has been of such a pervasive nature to create a possible public
> bias among the potential jurors of the Dawson County area which bias

318

is of such significance that a fair trial of these defendants is impossible in Dawson County and in the counties are geographically adjacent to Dawson County, to wit, Lumpkin County, Pickens County, Forsyth County, Hall County, Gilmer County and Fannin County.

Although Cherokee County is geographically adjacent to Dawson County that county is purposefully omitted from this written stipulation,

Three, the parties hereby stipulate that because of the extent of media coverage in all of the above-named counties an unbiased pool of jurors would be extremely difficult to find, and for that reason should there be a change of venue those counties named herein excluding Cherokee County should not be considered as an appropriate site for any trial of this case.

(*See* P.T. (8/29/91) Vol. I, Doc. 9, Ex. R-24, at 4-5 (filed 5/24/06) [App. 107].)

Despite the stipulation, Judge Girardeau noted that he felt he had an "independent obligation to make a determination on that issue [him]self and not be driven by a stipulation." (*Id.* at 34.) Nonetheless, all of the facts that were presented to the trial court supported the Venue Stipulation. On December 6, 1991, the Court issued its Order Granting Change of Venue, in which the trial court stated:

All defendants in criminal trials are guaranteed the right to due process, not only by the Constitution of the United States, but by the Constitution and laws of this State. This right, given to all defendants, cannot be guaranteed for these Defendants in this case unless venue is changed.

(ROIA, at 921, R-1 [App. 108].)

319

On January 21, 1993, the Defense filed its Special Plea and the court ordered a competency hearing on Order on Special Plea of Incompetency to Stand Trial. (*See* ROIA, at 1310-13, 1339-40, P-30 [App. 109]).  On May 6, 1993, the Defense filed a Motion for Change of Venue for Jury Trial on Special Pleas of Incompetency to Stand Trial (the "Competency Hearing Motion to Transfer Venue").  (*See* ROIA, at 1346-50, P-30 [App. 110].).  On May 10, 1993, with the approval of the prosecution and the defense, the trial court adopted the Venue Stipulation as its findings of fact for the Competency Hearing Motion to Transfer Venue.   The trial court requested a list of potential venue sites from the parties, but they were unable to agree.

On August 16, 1994, the trial court transferred the Competency hearing to Hall County.  (Record on Appeal ("ROA"), Doc. 9, Ex. R-6, at 71-72 (filed 5/24/06) (Change of Venue for Competency Trial) [App. 111].)  The trial judge's change of venue to one of the very counties where, as both parties stipulated and the trial court itself agreed, it was "impossible" to give Petitioner a fair trial was manifest error and this Court must grant full habeas relief to Petitioner.

320

**B.   VENUE IN HALL COUNTY FOR THE COMPETENCY HEARING WAS INHERENTLY PREJUDICIAL AND, THUS, REQUIRED A VENUE CHANGE FURTHER FROM DAWSON COUNTY.**

To meet the inherently prejudicial standard for a venue change, the pretrial publicity must have been so extensive and corrupting that a reviewing court must "presume unfairness of constitutional magnitude." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (footnote omitted). Such publicity must have created a trial atmosphere that was "utterly corrupted" by the media coverage. *Id*. Because the Trial court concluded that it was **impossible** for Petitioner to have a fair trial in Hall County, this Court must presume that Petitioner's trial was constitutionally corrupted.

The purpose of changing venue is to escape pretrial publicity. If the change in venue is not sufficiently distant, then the court has not cured the problem and failed to ensure the defendant's right to a fair trial by an impartial jury. As the Supreme Court of North Dakota concisely stated the issue:

> When, as in this case, there exists doubt as to the ability of a defendant to receive a fair and impartial trial in the community because of pretrial publicity, a motion for a change of venue should be granted to eliminate that doubt. A change of venue from one community to another that has received virtually the same pretrial publicity does not accomplish that objective. Rather, the venue change should be made to a community that has escaped as near as practical the influences of the pretrial publicity.

*Olson v. North Dakota*, 271 N.W.2d 574, 582 (N.D. 1978) (footnote omitted).

Given the impossibility of receiving a fair trial in Hall County, there remains more than a doubt about the fairness of the competency hearing

      In its <u>Order Granting Change of Venue</u> for the Underlying trial, which the Trial court adopted for the Competency hearing, the court found that there was a great deal of publicity surrounding the case, that Mr. Evans was well-known in Dawson County, and that Dawson County's population is "small and relatively cohesive." (Record on Interim Appeal ("ROIA"), Doc. 9, Ex. R-1, at 921 (filed 5/24/06) [App. 108].) He also notes that "[h]ardly any prospective juror will not have formed some impression or opinion about the case." (*Id.*)

      During the hearing on the <u>Original Motion for Transfer of Venue</u>, the Trial court heard testimony from representatives of several media sources. A representative for the Gainesville Times testified that the Times was delivered to the following counties: **Hall**, Lumpkin, White, Habersham, Banks, part of Jackson, Forsyth, Dawson and part of Gwinnett. (P.T. (8/29/91) Vol. I., at 49-50, R-24 (emphasis supplied) [App. 107].) He also noted that the Times had an approximate circulation of 700. (*Id.* at 54.)

      In addition, a representative of radio station WDUN in Gainesville testified that the station's primary coverage included "**all of Hall County**, Lumpkin, Dawson, Forsyth, Gwinnett." (P.T. (8/29/91), at 70, R-22 [App. 112] (emphasis

supplied).)  The representative further testified that not all of the station's news

information came from law enforcement agents or agencies, and they did not check

sources of information.  (*Id.* at 72-73.)  Mr. Evans's murder took place in WDUN's

primary coverage area, so they focused more attention on it than it would have if it

had occurred elsewhere in the state.  (*Id.* at 75.)  In addition, it was a capital crime,

so it received even more coverage.  (*Id.*)  They referred to the case as

"noteworthy."  (*Id.* at 76.)

As the *Sheppard* court noted, "Due process requires that the accused receive

a trial by an impartial jury free from outside influences. Given the pervasiveness of

modern communications and the difficulty of effacing prejudicial publicity from

the minds of the jurors, the trial courts must take strong measures to ensure that the

balance is never weighed against the accused."  *Sheppard v. Maxwell*, 384 U.S. at

362 (footnote omitted).

Several courts have recognized the futility of changes of venue where the

locations in question have the same media sources.  *See e.g., Olson*, 271 N.W.2d

at 583 (ordering trial court to grant a second change of venue to a county

geographically farther away from the community in which the crime was

committed, noting that without a second change, the "jurors would still be obtained

from a community under the sphere of influence and possible prejudice generated

by the concentrated pretrial publicity of the Fargo news media.").

323

When the trial court decided to change venue for the Competency hearing, it decided that the coverage created by these media sources created an unacceptable risk of a biased jury.  But, the trial court did not solve this problem because these very same media sources saturated both Dawson County and Hall County.  The limited change in venue was, therefore, no more than a meaningless gesture.

The Keith Evans Investigation and his murder was one of the biggest events in the history of Dawson County.  (P.T. (8/28/91) Vol. II, at 198, R-23 (Sheriff Chester testifying that the search for Mr. Evans was the largest community activity since he became sheriff) [App. 76].)  Mr. Evans was a member of one of Dawson County's most respected and prominent families.  (*See* ROIA, at 921, R-1 (<u>Order Granting Change of Venue</u>: "The victim and his family are well-known and respected.") [App. 108]; P.T. (8/28/91) Vol. II, at 215, 219, R-23 [App. 76].)  In fact, Dawson County renamed a road "Keith Evans Road."  (P.T. (8/28/91), at 206, R-23  (testimony of Sheriff Chester) [App. 76].)  Mr. Walker testified that he was unaware of any other roads that have been named for people who had passed away recently.  (P.T. (8/28/91) Vol. I, Doc. 9, Ex. R-22, at 64 (filed 5/24/06) [App. 112].)

The murder of Mr. Evans was extremely emotional for the people of Dawson County.  (P.T. (8/28/91) Vol. II, at 203, R-23 (testimony of Sheriff Chester) [App. 76].)  Sheriff Chester testified that the community was hostile to

Petitioner and his co-defendants.  (*Id.*)  Moreover, the reaction to Mr. Evans's murder was so extreme that an **unrelated** murder case had to have its venue changed because of the hostility prevalent in the community.  (*See* P.T. (8/29/91) Exhibits, at Def. Ex. 89, R-25 [App. 113].)

Even if this Court were to determine, in the face of the trial court's conclusion to the contrary, that the venue in Hall County was not inherently prejudicial, the *voir dire* indicates that the Hall County venire was actually prejudicial.  Many venire members indicated a familiarity with the case, and two members of the jury that was seated testified that they had read articles about the case.

In order to show actual prejudice, one has to look at the totality of circumstances, with a view toward determining whether any juror partiality rendered the trial fundamentally unfair.  *Murphy v. Florida*, 421 U.S. 794 (1975).  In doing so, the court must evaluate the *voir dire* testimony of those jurors who were impaneled.  Specifically, the court should consider whether the impaneled jurors had "such fixed opinions that they could not judge impartially the guilt of the defendant."  *Patton v. Yount*, 467 U.S. 1025, 1035 (1984).  This Court should also ask whether the jurors could "lay aside [their] impression[s] … and render a verdict based on the evidence presented in court."  *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

If there is a possibility that jurors might have been exposed to pretrial publicity, as was the case in the competency hearing, the trial court was obligated

325

to make a thorough inquiry into whether actual prejudice exists.  *See Copertino v. State*, 726 So.2d 330 (Fla. Dist. Ct. App. 1999).  In determining whether the jurors exhibited actual prejudice, the court had to consider whether the media coverage created such fixed opinions in venire members that they are unable to impartially judge the defendant's guilt or innocence.  *See Patton*, 467 U.S. at 1035.  If a juror is capable of putting aside any impressions gleaned through exposure to pretrial media sources, and able to render a verdict based only on evidence presented at trial, there is no actual prejudice.  *See Murphy*, 421 U.S. at 800 (citing *Irvin*, 366 U.S. at 723); *Mills v. Singletary*, 63 F.3d 999, 1009 (11th Cir. 1995) (finding no actual prejudice because defendant was unable to demonstrate that any juror had formed an opinion of the defendant's guilt prior to hearing trial evidence).

Examples of this kind of prejudicial familiarity abound in this case. Specifically, on *voir dire* by the Petitioner, venire person Seabolt (63) testified, "I read some in the paper about the case," (C.T. Vol. I, Doc. 9, Ex. R-40, at 122 (filed 5/24/06) [App. 114].) adding, "I think there was an article Sunday in the paper." (*Id.* at 123.)  Upon further questioning, Seabolt explained, "There was just, the paper Sunday mentioned he was going to be put on trial for to see if he was mentally competent to stand trial." (*Id.*)  Additionally, Seabolt stated, "I faintly remember reading about it when it first happened, or several months back, something about it in the paper is all.  As far as all the aspects of it, I don't

remember anything." (*Id.* at 123-24.)  He recalled, "something about a, somebody else was standing trial and he disappeared or something.  I really can't even recall all that was about it, but it was in that neighborhood." (*Id.* at 124.)  Seabolt added, "I remember there was an Evans.  That's about it.  As far as first name I couldn't say." (*Id.* at 125.)

Several jurors had read about the case in the papers, and were familiar with it on some level.  For example, venireperson Chapley (67) revealed, "I have seen brief newspaper articles [in the last couple of weeks] but I really haven't read them or gotten involved in them." (*Id.* at 144-45.)  Further, Chapley stated, "I am aware of what I saw, I think it was in yesterday's paper that talked about this case today, and in retrospect I am surprised I didn't read the article in more depth knowing I was going to be here today, but as I recall all I was familiar with is that this case would be, I think there was a trial or a meeting about six months ago and at that time it was decided to see if he could be with some psychiatrist to determine if he was capable of participation in the trial.  That's the extent of what I had read." (*Id.* at 145-46.)  Chapley summarized, "I recall it [the underlying case] being in the paper but I don't recall anything about it." (*Id.* at 146.)

Similarly, venirepersons Isle (70) and Pointer (88) recalled information relating to the case.  Isle testified, "I remember seeing things in the papers but I don't remember exactly what it was.  It's been awhile." (*Id.* at 170.)  She added

327

that it was "several months ago" that she had read about it in the papers, and that she "probably read it in the paper" several years prior to being questioned on *voir dire*. (*Id*.) Finally, Isle mentioned that she "recognize[d] the name [Keith Evans], again just from the papers." (*Id*.) Similarly, Pointer testified, "I remember the name [Waldrip] in the paper [a couple of years back] but I have no idea what it was about." (C.T. Vol. II, Doc. 9, Ex. R-41, at 322 (filed 5/24/06) [App. 115].)

Like Seabolt, Chapley, Isle, and Pointer, venirepersons Norwood (80) and Little (no number) had prior knowledge of the case and the individuals involved. Specifically, Norwood admitted, "I am not really certain [that I know anything about the other case involving Mr. Waldrip]," and "I think I may have some vague idea" and "in the back of my mind it seems like I remember a murder case that was involved in Dawson county where there were several individuals involved in the murder, and that's all I can remember." (*Id*. at 265 [App. 115].) Norwood explained that he had learned of these facts from the Gainesville Times a couple of years ago. (*Id*. at 266.)

Little knew even more about the murder and underlying robbery than Norwood. Specifically, Little testified, "I do remember reading about it [a case involving the name Waldrip] in the newspaper last year." (*Id*. at 293.) When asked to expound upon what she remembered having read about the case, Little testified, "Well, it seems like there was a robbery involved at a store. And a son was involved or maybe Mr. Waldrip's son. That's just the sketchy details about it.

328

I don't remember anything precise, I just do remember vaguely reading about it. I try to look over the newspaper, and it was, I think it was like you said it was in Dawsonville and it was just, I just briefly remember that maybe there was a murder. I don't remember exactly, I am not sure." (*Id.* at 294.) She added, "Just when you [counsel for Petitioner] said that, the names of the, I guess it's the plaintiff, I am not sure, or whoever that name jogged a memory in me, the Evans name, uh-huh" and "just that I don't know him but just I remember reading about it. Seems like those names were familiar." (*Id.* at 295.) She explained, "I don't really recall [what the charge was in the other case]. I just think there was a murder. It was a year ago, wasn't it? I am not sure. I don't remember what the charge was, I didn't remember if he was arrested or what." (*Id.* at 295.)

Therefore, the above venirepersons clearly knew information about Petitioner, the underlying robbery case against John Mark Waldrip, and the murder of Mr. Evans. They were inherently and actually prejudiced against Petitioner. The actual prejudice of the venire as expressed on *voir dire* buttresses Petitioner's assertion that Hall County venirepersons were inherently prejudiced. Therefore, the two types of prejudice are inextricably linked in this case, and it is clear from the evidence that both types were present, rendering Petitioner's trial unfair. Because the Hall County jurors had been infected by pretrial publicity which

329

rendered the venue inherently prejudicial and the venire in that venue was actually

prejudicial, Petitioner's right to a fair trial and impartial jurors was violated.

The Georgia Supreme Court, in resolving this issue on direct appeal found:

The trial court did not abuse its discretion in denying appellant's second motion for change of venue in the competency trial, based on appellant's contention that the change of venue from Dawson County to Hall County was insufficient to avoid excessive pretrial publicity. Appellant has not attempted to show there is a substantial likelihood the competency trial was rendered unfair due to pretrial publicity, nor has he established prejudice by individual jurors. *Jones v. State,* 261 Ga. 665, 409 S.E.2d 642 (1991).  As support for this ground, appellant states only that two jurors on the trial jury had read newspaper articles about the trial, and cites to five on the  jury panel who were familiar with the case without any further explanation.  Our review of the record reveals that neither of the jurors on the trial jury had any clear recollection of what they had read, and both jurors stated they did not have any fixed opinion regarding appellant's competency, and appellant has failed to show a high excusal rate in general as a result of publicity. See e.g. *Chancey v. State,* 256 Ga. 415, 429, 349 S.E.2d 717 (1986).  The fact that the parties originally stipulated to venue in a county other than Hall does not relieve appellant from showing he was prejudiced by the trial court's denial of his motion. This claim is without merit.

*Waldrip v. State*, 267 Ga. 739, 741-42 (1997) (footnote omitted).  As the argument

outlined above indicates, the Georgia Supreme Court's resolution of this was an

unreasonable application of clearly established Supreme Court precedent.  *See*

*Chandler v. Florida*, 449 U.S. 560, 574 (1981); *Sheppard v. Maxwell*, 384 U.S.

333, 351 (1966).

330

## XXI. CLAIM 24:  THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY COMMITTING VARIOUS ERRORS AS TO THE *VOIR DIRE* FOR PETITIONER'S COMPETENCY HEARING.

The trial court unconstitutionally restricted Petitioner's voir dire by sustaining improper objections by the prosecution to Petitioner's questions. Specifically, the trial court limited the scope of questioning in violation of Petitioner's rights to due process and to trial by an impartial jury, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Petitioner was unable to properly question venire members as to bias or prejudice.  Petitioner was prevented from asking jurors about the meaning of "preponderance of the evidence," about their ability to hold to their own opinions during jury deliberation, about the importance of attorney-client communication, and about whether mentally ill clients might have trouble communicating.

These restrictions prevented trial counsel from ascertaining bias or inability to follow instructions in the venire members, and as such deprived him of his rights under both the Georgia and the United States Constitutions.   Because Petitioner was unable to adequately *voir dire* certain jurors, the jury's finding of competency lacks the required level of confidence.

331

### A.   THE TRIAL COURT ERRED IN PROHIBITING PETITIONER FROM ASKING QUESTIONS DESIGNED TO PROPERLY ELICIT JUROR BIAS AND PREJUDICE ON *VOIR DIRE*.

The principal purpose of *voir dire* is to determine the impartiality of jurors, their ability to treat the evidence objectively, and whether they are unbiased or have prejudged aspects of the case.  The role of v*oir dire* in ensuring a defendant's Sixth Amendment right to an impartial jury is critical.  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.").  *See also Ham v. South Carolina*, 409 U.S. 524 (1973) (holding that trial judge is constitutionally required to interrogate venire members  on issue of racial bias); *Turner v. Louisiana*, 379 U.S. 466 (1965) (holding that the Due Process clause requires inquiry into jurors' impartiality).  As such, the inquiry must provide the defense with sufficient information to exercise its challenges.  *See Rosales-Lopez*, 451 U.S. at 188; *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) (requiring that *voir dire* include "questions that permit the intelligent exercise of challenges by counsel").

The defendant in any criminal trial is constitutionally entitled to a jury composed of individuals with a "mental attitude of appropriate indifference."

332

*United States v. Wood*, 299 U.S. 123, 145-46 (1936).  *See also Gardner v. Florida*, 430 U.S. 349 (1977); *Turner v. Murray*, 476 U.S. 28 (1986).  In addition to **being** unbiased, the jurors need to **appear** unbiased as well.  *See Aldridge v. United States*, 283 U.S. 308, 315 (1931); *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976). The Supreme Court has reversed convictions where general *voir dire* was unduly restricted.  *See Morford v. United States*, 339 U.S. 258 (1950).  Thus, it is clear that *voir dire* of prospective jurors must be sufficient to reveal potential bias.  *See Mu'Min v. Virginia*, 500 U.S. 415, 413 (1991).

Within those bounds, the court has broad discretion as to the manner and content of the questions to be asked.  *See id.*; *Rosales-Lopez v. United States*, 451 U.S. 182 (1981).  This discretion is not infinite, however, but is "subject to the essential demands of fairness, " *Aldridge*, 283 U.S. at 310, and at a minimum, when requested by counsel, inquiry must be made into matters where the likelihood of prejudice is so great that not to inquire would risk failure in assembling an impartial jury.

The trial court erred in prohibiting Petitioner from asking proper questions related to the three substantive areas that these questions covered:  discussion of mental illness, discussion of the independence of a juror's decisions, and discussion of legal terminology that neither constituted nor related to elements or

333

defenses of the crimes involved.  Specific examples from the Competency hearing

Transcript are detailed below.

### B.    PETITIONER WAS IMPROPERLY RESTRICTED FROM ASKING QUESTIONS RELATED TO MENTAL ILLNESS, IN GENERAL, AND IN RELATION TO A PERSON'S RELATIONSHIP WITH OTHERS.

In violation of Petitioner's constitutional rights, the trial court prohibited

Petitioner from questioning potential jurors on mental illness.  These questions

went directly to the issue of juror biases toward the mentally ill[16] and toward

professional experts who work with the mentally ill, such a psychiatrists and

psychologists.  Thus, these questions were entirely appropriate and, in fact,

necessary to elicit juror bias with respect to a crucial defense theory of the case,

especially at the competency hearing.

For example, trial counsel asked "[I]n determining those issues [relating to

whether some people actually do have a real disease – mental illness] would you

accept the testimony of experts regarding mental illness and whether or not a

person has mental illness?", to which the juror replied, "I suppose."  The

---

[16]    The mentally ill are a protected class. Petitioner's right to question jurors on biases and prejudice against the class of mentally ill persons is paramount and undeniable.  By precluding Petitioner from determining if any potential juror had a bias against the mentally ill; the trial court violated Petitioner's rights under the Due Process under the Equal Protection Clauses of the Fifteenth and Fourteenth Amendments to the United States Constitution.

334

prosecution objected on the grounds that it was prejudgment of the particular witness's testimony, and that jurors are free to accept or reject any witness's testimony.  The trial court sustained the objection.  (C.T. Vol. II, Doc. 9, R-41, at 226 (filed 5/24/06) [App. 115].)

The trial court's treatment of this issue is contrary to the way courts have treated similar issues, such as, the propriety of *voir dire* questions related to jurors' opinions about the credibility of law enforcement officers, such as police officers. *See United States v. Jones*, 193 F.3d 948, 951 (8th Cir. 1999) (finding that defendant "was entitled to jurors who were not 'predisposed to believe [that] the testimony of the officers [was] inherently more credible than that of other witnesses'") (quoting *United States v. Amerson*, 938 F.2d 116, 118 (8th Cir. 1991)); *United States v. Contreras-Castro*, 825 F.2d 185 (9th Cir. 1987) (holding that trial court's failure to ask the venire members if they would be unduly influenced by the testimony of law enforcement officers constituted reversible error).  Jurors must independently weigh the credibility of all witnesses presented and Petitioner has the right to investigate whether a venireperson is prejudiced for or against witnesses because of their profession.  If potential jurors were going to discount the testimony of mental health professionals, simply because they were mental health professionals, Petitioner had a right to know about this bias.

Similarly, the trial court sustained the Prosecution's objection to Trial counsel's questions related to various characteristics of mental illness. (*See, e.g.*, C.T. Vol. II, Doc. 9, Ex. R-41, at 286 (filed 5/24/06) [App. 115] (relevance objection sustained to the question, "So you agree or disagree that a person with the symptoms of mental illness can improve at a later date?"); *id.* at 270, R-41 (sustaining objection to Trial counsel's questions, "So you know of any safeguards to distinguish those people [those who might have a tendency to fake or slide under a mental illness classification] from the people who may have a real mental illness?" and ("Do you agree that the symptoms of mental illness can subside), *id.* at 271.)

In addition, the trial court unduly restricted trial counsel from asking questions related to the effect of mental illness on a person's relationship with others. The most basic incarnation of this question was trial counsel's question, "Would you also agree that a person with a mental illness may have a difficulty in communication with other people?" (C.T. Vol. I, at 182-83, R-40 [App. 114].) The prosecution objected to this question on grounds of prejudgment, and the trial court sustained the objection. (*Id.* at 183.) The judge, indeed, improperly sustained objections to this question, in its various forms, throughout *voir dire*. For example, trial counsel's counsel asked, "Do you believe that a person can be

336

mentally ill where they cannot stand trial because they are unable to communicate with their lawyers or don't understand the nature of the charges against them or the charges as they relate to them or all of those?" (*Id.* at 57.)  The prosecution objected on the grounds that the question sought prejudgment of a legal issue, and the trial court agreed.  (*Id.* at 57-58.)  On another occasion, trial counsel's counsel asked, "Do you agree, then, that if a person is suffering from a mental illness that hurts their ability to communicate to their attorney that that could produce an ineffective relationship?" to which the juror responded in the affirmative.  (*Id.*. at 160.)  Following up, trial counsel asked, "Based on the fact that you may not have had personal experience or opportunity to see people who have a mental illness, could you rely on and respect the testimony of the experts regarding their findings?" (*Id.*)  The prosecution objected on the ground that the question asked for prejudgment of witnesses and evidence, and the judge sustained the objection. (*Id.*)

Trial counsel's other questions relating to mental illness were similarly barred.  (*See, e.g.*, C.T. Vol. II, at 255, R-41 (sustaining objection of prosecution to trial counsel's questions, "If you heard testimony regarding that subject matter [mental illness being treated or lessened by the use of therapy or drugs] of whether or not –" and "Would you be able to respect the opinion of a psychologist or

337

psychiatrist [regarding mental illness]?" [App. 115]); C.T. Vol. II, at  274, R-41 (sustaining prosecution's objection to trial counsel's question, "Would you have any difficulty in reaching a decision like that [if evidence proved you that he is incompetent] if the evidence proved it?") [App. 115].)  Similarly, the trial court even sustained objections to the most basic, innocuous questions on the attorney-client relationship or basic human communication.  (*See, e.g.*, C.T. Vol. I, at 172-73, R-40 (sustaining prosecution's objection to trial counsel's question, "Would you agree that a lawyer needs to be able to communicate with a client?" and calling the question "inappropriate" [App. 114]); C.T. Vol. II, at 375, R-41 (determining that in asking, "In working with them [people who might have had a mental illness or were hard to communicate with them in that way] did you find communication a necessary tool to achieve the goal?" trial counsel was "going too far") [App. 115].)

　　If a potential juror had a bias against the mentally ill or, in fact, had a fixed opinion that mental illness did not exist, this prejudice would interfere with a juror's ability to follow the trial court's instructions and perform his/her duty as a juror.  Moreover, if a potential juror had a fixed bias for or against the credibility or opinions of mental health professionals, this prejudice would also interfere with a juror's ability to perform his/her duty to weigh each witness as an individual. Because the trial court improperly restricted *voir dire* on the most important issue

in selecting a jury -- whether or not they had an inherent prejudice against the mentally ill -- the trial court thwarted its entire purpose and rendered the competency hearing fundamentally unfair.

### C.   PETITIONER WAS RESTRICTED FROM ASKING QUESTIONS RELATED TO INDEPENDENCE OF JUROR DECISIONS.

The trial court violated Petitioner's constitutional rights by preventing trial counsel from asking questions designed to elicit information relating to the strength of jurors' convictions and the independence of their decision making.  For example, trial counsel asked, "If somebody disagreed with you in the jury room do you feel like you could stand up to them and tell them why you disagree?", to which the juror answered, "Uh-huh." (C.T. Vol. I, at 140, R-40 [App. 114].)  When trial counsel added, "And if they hammered you a little bit on it –" the State objected on the grounds that it required the juror to make a determination prior to deliberations. (*Id.* at 140-41.)  The trial court sustained the objection.  (*Id.* at 141.)  On another occasion, trial counsel asked, "If you walked into the jury room and your head was spinning from what was going on, would you be able to pause and not go with their gut feelings or your gut feelings?" (*Id.* at 152.)  The prosecution objected to that question, and the trial court sustained the objection.  (*Id.*)  This

question, however, was legitimate because it queried the potential juror regarding

his ability to independently determine competency and to deliberate as an equal.

Similarly, in response to the prosecution's objection that it required

prejudgment of jury deliberations, the trial court asked trial counsel to rephrase the

question, "If you were developing your opinion as to what the verdict should be

and some of the other jurors disagree with you would you be willing –" (*Id.* at

177.)  The prosecution made the same objection to the question, "Now, if you are

considering that verdict in the jury room and other jurors are criticizing you or

talking to you and trying to persuade you otherwise, are you the type of person that

could stand up –", and the trial court ruled that while trial counsel could ask a juror

about his/her ability to follow instructions, he could not ask about anything more

specific.  (*Id.* at 184-85.)

### D.   PETITIONER WAS RESTRICTED FROM ASKING QUESTIONS RELATED TO LEGAL TERMINOLOGY, WHERE THAT TERMINOLOGY NEITHER CONSTITUTED NOR RELATED TO ELEMENTS OF COMPETENCY.

The trial court did not allow Petitioner to ask questions related to legal

terminology, even where the terminology at issue neither constituted nor related to

elements of competency.  For example, in response to an objection by the

Prosecution, the trial court asked trial counsel to rephrase the question, "Do you

understand [that "preponderance of the evidence"] means the greater weight of the

evidence?"  When trial counsel rephrased, and asked instead, "The court will tell you or charge you, Mr. Grogan, that preponderance of the evidence means a tipping of the scales of justice," the prosecution objected, and the trial court sustained the objection.  (*Id.* at  79-80.)

When questioning a different juror, trial counsel asked, "Do you realize that the standard of proof in a civil case is different from that in a criminal case?"  (C.T. Vol. II, at 244, R-41 [App. 115].)  The juror responded, "No I do not," and trial counsel added, "When the judge –."  (*Id.*)  The trial court asked Petitioner to refrain from instructing the jurors on that any further.  (*Id.*)  Also, when trial counsel asked, as a follow-up to his question, whether the juror could return a verdict that Petitioner was incompetent to stand trial if the evidence so proved, "Let me ask you the flip side, too.  Could you return a verdict, then, that Mr. Waldrip is competent to stand trial if the evidence proves such to you?" and the juror answered "Yes," the prosecution objected on the ground that the question implied a misstatement of the law concerning the burden of the prosecution in this case.  The judge sustained the objection.  (*Id.* at 328-29.)

Petitioner's *voir dire* questions were neither hypothetical nor sought prejudgment.  Even if this Court were to determine that they were, however, this

does not change the fact that the trial court unconstitutionally restricted Petitioner's

*voir dire*.

In resolving this issue on direct appeal, the Georgia Supreme Court held:

The trial court did not abuse its broad discretion in limiting the scope
of the voir dire at the competency trial by prohibiting questions of a
technical or legal nature, or questions which required the jurors to
prejudge the case.

*Waldrip v. State*, 267 Ga. 739, 742 (1997).  The state court's resolution of the

federal question is, however, an unreasonable application of clearly established

Supreme Court precedent.  Because the trial court prevented trial counsel from

inquiring into venire members' attitudes toward the mentally ill and into whether

they could carry out their duties as jurors, Petitioner was deprived of his right to a

fair trial by an impartial jury.

XXII.     CLAIM 25 MR. WALDRIP IS INCOMPETENT TO BE
          EXECUTED.

   A.     EXECUTING AN INCOMPETENT PERSON VIOLATES THE
          EIGHTH AMENDMENT'S PROHIBITION ON CRUEL AND
          UNUSUAL PUNISHMENT.

The Eighth Amendment to the United States Constitution prohibits, as cruel and unusual punishment, the execution of a person who is insane.  *Ford v. Wainwright*, 477 U.S. 399 (1986).  Because he suffers from paranoid schizophrenia and organic brain damage, Mr. Waldrip is unaware of the nature and extent of the punishment he is to suffer and the reasons for the punishment.  Therefore, Mr. Waldrip cannot be executed.

   B.     MR. WALDRIP'S EXECUTION IS NOT IMMINENT, BUT MR.
          WALDRIP BRINGS THIS CLAIM OUT OF CAUTION.

Since *Ford*, the Supreme Court has fixed the proper time for bringing a claim pursuant to the Eighth Amendment that a defendant is incompetent to be executed.  In *Stewart v. Martinez-Villareal*, the Court stated that a *Ford* claim is "not [ ] ripe for resolution until" the execution is scheduled."  523 U.S. 637, 645 (1998).  Therefore, Mr. Waldrip's claim that he is incompetent to be executed under *Ford* must be adjudicated if and when his execution becomes imminent. Although, Mr. Waldrip's execution is not presently scheduled, he advances this claim now out of an abundance of caution.

XXIII.    CLAIM 27:  PETITIONER WAS DEPRIVED OF A FAIR
          TRIAL BY THE INTRODUCTION OF EVIDENCE OF OTHER
          CRIMES, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH
          AND FOURTEENTH AMENDMENTS TO THE UNITED
          STATES CONSTITUTION.

The Trial Court erred in admitting into evidence Petitioner's prior

convictions for burglary, theft by receiving, driving under the influence, reckless

driving and leaving the scene of an accident, (T.T. Vol. XVII, at 3180-85, 3351-57,

R-62  [App. 17]; T.T. Vol. XVIII, at 3397-98, R-63 [App. 16]), in violation of the

Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The Prosecution relied upon these prior convictions both in the

guilt/innocence phase of trial, (T.T. Vol. XVII, at 3180-85, R-62 [App. 17]), and in

sentencing, (T.T. Vol. XVIII, at 3397-98, R-63 [App. 16]), as nonstatutory

aggravating circumstances, to argue that because Petitioner had prior felony

convictions, the jury was free to base the felony murder count on felonies at issue

in this prosecution, or on any other prior felony conviction. (T.T. Vol. XVII, at

3178-85, R-62 [App. 17].) These convictions, however, were the products of

Petitioner's unknowing and involuntary guilty pleas.  *See Boykin v. Alabama*, 395

U.S. 238 (1969).   Under *Boykin*, a prior conviction obtained by way of a guilty

plea is only valid if a criminal defendant is advised of his privilege against self-

incrimination, his right to a trial by jury and his right to confront his accusers.  Due

344

Process mandates that before a defendant enter a plea of guilty and waive certain rights, he must have knowledge of the particular right he is waiving.  In *Allen v. Thomas*, 161 F.3d 667 (11th Cir. 1998) (2002), the Eleventh Circuit reiterated this fundamental constitutional teaching, explaining that in order to be a valid waiver, "'[t]he record must show, or there must be an allegation and evidence which shows, that an accused...intelligently and understandingly' waived the rights implicated by a guilty plea."  *Id.* at 670 (citing *Boykin v. Alabama*, 395 U.S. 238).  Presuming waiver from "a silent record is impermissible."  *Carnley v. Cochran*, 369 U.S. 506, 516 (1962).  As the *Allen* court instructs, "[a]t a minimum, the would-be petitioner must know at the time of the guilty plea that the right [] exists, and he must realize he is giving up that right as part of his plea bargain."  161 F.3d at 670.

Petitioner is chronically and severely mentally ill.  He has faced criminal charges and pled guilty while suffering from severe mental illness.  At the time that Petitioner entered his guilty pleas, he was laboring under paranoid ideations and suppositions about the state's conspiracies to destroy both him and his family.  His guilty pleas were, in fact, Petitioner's attempt to distract the state, who Petitioner believed to be conspiring against him, from harming his family further. In fact,

345

counsel representing Petitioner during these prior proceedings have acknowledged

Petitioner's limited understanding of the charges he faced and have testified that:

> At this point, probably influenced by the Court's obvious annoyance, the ADA offered us a plea. It was an incredibly good offer, something like ten months or a year with time served, the remainder to run concurrent with the Brantley County sentence. The result would be that Tommy would serve no time on this case itself, given that he was going to have to serve more time in Brantley anyway. I recommended to Tommy that we accept the offer. Tommy refused.
>
> I really didn't think this offer was one Tommy should pass up, because I didn't think we were going to do any better if we continued on and we might easily do worse. I reiterated to Tommy the reasons we were unlikely to do better, and I explained how the concurrent sentences would mean no additional time for this conviction. But Tommy kept going on about how Clark and Kennedy were lying about him and how this was just a small part of Camden County's whole plot against him. Once again, he seemed incapable of focusing on the issue at hand, the burglary charge against him and the plea offered to resolve it in a beneficial way. Tommy seemed unable to appreciate the substantial benefits. Instead, he fixated on the perceived persecution of him and his family by law enforcement officers. He jut kept going on about the pervasive persecution he suffered at the hands of Camden County. I had been through this with Tommy before, and it's not that I wouldn't have been willing to attack Clark and Kennedy if I had thought it was the best defense for my client. But I had known Clark and Kennedy since I came to Camden County, and I knew two things about them for sure: they were both fair lawmen and were not likely to speak untruths, and they were will-liked and respected by the patriotic population of Camden County, who happened to sitting on our jury. I did not think attacking them would be the most effective representation of my client. I told Tommy all of this. He just continued to go on about Camden County, never responding to or addressing anything I was saying. It was frustrating because Tommy was so caught up in his paranoia that he

seemed unable to comprehend what I was trying to explain to him about the case.

Finally, somehow, I must have said something right: Tommy agreed to take the plea.  It was one of the most difficult plea negotiations I had ever worked, because it was impossible to keep Tommy focused on the real issues, or even to get him to discuss them.

(Affidavit of Gerald Wilkerson, Doc. 9, Ex. R-147 (E.H. 2), at 428-29 (filed 5/24/06) [hereinafter "Wilkerson Aff."] [App. 64].)  His guilty pleas, therefore, did not reflect a knowing and voluntary waiver of his right to contest the charges against him.  Rather, they reflected an overtly paranoid reaction to the circumstances he faced and a mentally ill assessment of the appropriate response to his current situation.   Thus, the jury's consideration of these convictions in determining the appropriate sentence rendered the entire proceedings against him fundamentally and constitutionally flawed.

The jury's consideration of these unconstitutionally obtained convictions was reinforced by the trial court's charge on felony murder, in which the trial court stated that the jury could base its felony murder conviction on Petitioner being a convicted felon in possession of a firearm. (T.T. Vol. XVII, at 3306, R-62 [App. 17].)  Petitioner was a convicted felon only because of his previous, unconstitutionally obtained convictions. The use of these unconstitutionally obtained convictions was clearly prejudicial to Petitioner in that the jury had the

347

opportunity to convict Petitioner on invalid and constitutionally impermissible evidence. *Johnson v. Mississippi*, 486 U.S. 578 (1988); *Pope v. State*, 256 Ga. 195, 345 S.E.2d 831 (1986).

Moreover, during the penalty phase of trial, the Prosecution retendered Petitioner's prior convictions, (T.T. Vol. XVIII, at 3397-98, R-63 [App. 16]), and actually argued in closing that Mr. Waldrip had committed other felonies and that the good Tommy Waldrip of old had been replaced by a hardened criminal. (*Id.* at 3495-97.) The Trial Court's reliance on a certified copy of the conviction to permit the convictions into evidence did nothing to preserve Petitioner's constitutional rights at issue in his capital trial given the unconstitutionality of the prior convictions.[17] Further, the Trial Court's instructions that the jury, in determining sentence, could consider all evidence admitted during both the guilt/innocence and penalty phases of trial, (*Id.* at 3536), left the jury free to base its sentencing determination on unconstitutionally obtained convictions as well. Finally, the prejudice that inheres in the admission of such evidence in Petitioner's case clearly outweighs its probative value in that Petitioner was convicted and sentenced to death based on constitutionally impermissible evidence.

---

[17]    The Trial Court erred in admitting the prior convictions based on a fundamental misunderstanding of the burden of proof for prior convictions under *Parke v. Raley*, 506 U.S. 20 (1992); (T.T. Vol. XVIII, at 3382-87, 3397-98, R-63 [App. 16].)

In resolving this issue, the Georgia Supreme Court held:

Appellant's contention that the trial court erred in admitting copies of his prior guilty pleas in aggravation during the sentencing phase of the trial is without merit for the following reasons:

> (a) Appellant received sufficient notice of the State's intention to introduce his prior convictions. OCGA § 17-10-2(a); *Ross v. State,* 254 Ga. 22(5)(a), 326 S.E.2d 194 (1985).
>
> (b) Copies of the documents relating to these guilty pleas contained sufficient indicia of voluntariness on their face to justify their admission. *Hammond v. State,* 260 Ga. 591, 598(7), 398 S.E.2d 168 (1990); *Pope v. State,* 256 Ga. 195, 209(17), 345 S.E.2d 831(1986).
>
> (c) Any erroneous statement by the prosecutor regarding the burden of proof required for introduction of the guilty pleas was cured by the trial court's instruction that the burden of showing that the pleas were knowing and voluntary rests with the State. *Pope v. State* at 209(17), 345 S.E.2d 831.

*Waldrip v. State*, 267 Ga. 739, 751 (1997).  The Georgia Supreme Court's

resolution was contrary to clearly established Supreme Court precedent and this

Court should grant the writ.

**XXIV.       CLAIM 28:  PETITIONER WAS DENIED HIS RIGHT TO A
              RELIABLE SENTENCING DETERMINATION BY A
              VERDICT FORM THAT VIOLATED HIS RIGHTS UNDER
              THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH
              AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

In order to impose a sentence of death in Georgia, a jury must find the

presence of at least one statutory aggravating circumstance.  In the instant case, the

state sought the death penalty based on O.C.G.A. § 17-10-30 (b)(2) & (7).

Specifically, the Trial Court provided the jurors with the following list of

aggravating circumstances:

>    (1)     that the offense of murder was committed while the offender
>    was engaged in the commission of kidnapping with bodily injury
>
>    (2)     that the offense of murder was committed while the offender
>    was engaged in the commission of aggravated battery
>
>    (3)     that the offense of murder was outrageously or wantonly vile,
>    horrible or inhuman in that it involved torture, depravity of mind, or
>    an aggravated battery to the victim.

(ROA, at 467, R-8 [App. 116].)

The facts and circumstances surrounding Petitioner's sentencing indicate that

the jury's sentencing determination was not a reasoned, reliable decision.

Confusion surrounded the sentencing phase of Petitioner's trial.  The jury was

unclear as to whether they could impose a life sentence, (Jury Notes, T.T. Vol. XX,

Doc. 9, Ex. R-65, at 137 (filed 5/24/06) [App. 117]), in no small part, because of a

jury form that lead them to believe that the death sentence was the appropriate

penalty.  The jury form, which was sent to the jury room as required by O.C.G.A. §

17-10-30, contained the following:

> (a) sentence the defendant, Tommy Lee Waldrip, to death
> by electrocution.

or

> (b)  and, notwithstanding the finding of the statutory
> aggravating circumstance(s), sentence the defendant,
> Tommy Lee Waldrip, to life imprisonment.

(ROA, at 467, R-8 [App. 116].)  This language clearly indicates that if the jurors

found aggravating circumstances to exist, they could only sentence Petitioner to

death by ignoring their own finding.  In fact, to sentence Petitioner to life, the

jurors would have had to ignore their verdict from the guilt/innocence phase of trial

(wherein they found Petitioner guilty of, *inter alia*, kidnapping with bodily injury

and six counts of aggravated assault).  Any system which requests jurors to cast

aside their own verdict, relying simply on a confusing and misleading verdict form,

deprives the defendant of the clear, reasoned and reliable sentencing determination

envisioned in *Woodson v. North Carolina*, 428 U.S. 280 (1976).

In addition, the verdict form contained constitutionally inaccurate and

misleading language regarding the (b)(7) aggravating circumstance.  The form read

as follows:  "The murder was outrageously or wantonly vile, horrible, or inhuman

351

*and* it involved torture; or depravity of mind; or aggravated battery to the victim,"
(ROA, at  467, R-8 (emphasis added) [App. 116].)  The statute, however, carefully
crafted and reviewed by the Georgia Supreme Court, actually requires that "[t]he
offense of murder . . . was outrageously or wantonly vile, horrible or inhuman **in
that it** involved torture, depravity of mind, or an aggravated battery to the victim."
O.C.G.A. § 17-10-30(b)(7) (emphasis added).  The trial jurors who sentenced
Petitioner to death did so based on an erroneous interpretation and/or version of the
statute, one that did not delineate correctly the requirements for a sentence of
death.  Further, the trial court erred when it allowed the state to use aggravated
battery and kidnapping with bodily injury to establish the (b)(2) statutory
aggravating circumstance because such "double-counting" fails to narrow the class
of individuals eligible for a sentence of death in violation of the Eighth
Amendment to the United States Constitution as well as *Zant v. Stephens*, 462 U.S.
862 (1983) and *Maynard v. Cartwright*, 486 U.S. 356 (1988).

   Where the determination of whether a human being is to live or die lies
within the discretion of a jury, that discretion must be limited and guided to ensure
that a sentence of death is not wantonly and freakishly imposed.  *Gregg v.
Georgia*, 428 U.S. 153 (1976).  In an attempt to ensure that "guided discretion" is
present in its capital proceedings, Georgia has included statutory aggravating

352

circumstances in its capital sentencing scheme. *See* O.C.G.A. § 17-10-30; *Zant v. Stephens*, 462 U.S. 862 (1983). Before a capital sentencing jury can impose a sentence of death, it must find the presence of at least one aggravating circumstance beyond a reasonable doubt. *Finney v. State*, 250 S.E.2d 388 (1978). By mandating this procedure, the legislature has attempted to "narrow" the class of murderers subject to capital punishment. *Zant v. Stephens*, 462 U.S. 862 (1983). In theory then, a sentencing jury in Georgia still has substantial discretion, but by requiring the finding of at least one aggravating circumstance, the legislature has attempted to guarantee that jury discretion will be controlled by objective standards to protect against discriminatory and irrational imposition of the ultimate punishment. As will be shown below, this narrowing function was not accomplished in Petitioner's case.

The mere presence of statutory aggravating circumstances does not automatically render a capital sentencing scheme constitutional. "[E]ach statutory aggravating circumstance must satisfy a constitutional standard. . . [which] genuinely narrow[s] the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 876-77 (footnote omitted). Thus, in order to pass constitutional muster, an aggravating circumstance

must genuinely distinguish in a rational, objective and evenhanded way, those few murders which warrant the imposition of a death sentence from the many which do not.

By allowing the charges of aggravated battery and kidnapping to serve as the underlying felony for felony murder **and** as the basis for the (b)(2) aggravating circumstance in this case, the Georgia capital sentencing scheme failed to narrow the class of "death eligible" individuals.

Theoretically, Georgia's capital sentencing scheme has three "planes" each of which must be passed in order for a crime to be death eligible. Each plane purports to narrow the class of death eligibility. On the first plane, murder is to be distinguished from all other classes of homicides. *Zant v. Stephens*, 462 U.S. 862 (1983). Felony murder falls under Georgia's definition of murder. The second plane is to further distinguish those murders that are potentially deserving of a sentence of death. Narrowing at this level is to be accomplished by finding at least one statutory aggravating circumstance beyond a reasonable doubt before a murder can be considered death eligible. Finally, the third level of narrowing is to separate those cases where death is to be imposed from those where it is not. This is accomplished by placing all relevant material before the sentencer who is to exercise sole and unbridled discretion to impose life or death.

At the third level, in order to meet constitutional standards, the sentencer must be afforded the opportunity to consider the unique circumstances of the crime and individualized characteristics of the defendant. *Gregg v. Georgia*, 428 U.S. 153 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Booth v. Maryland*, 482 U.S. 496 (1987); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Gardner v. Florida*, 430 U.S. 349 (1977).

It is between the second and third plane where the system has broken down in Petitioner's case. The use of aggravated battery and/or kidnapping with bodily injury as the predicate felony for both felony murder and the (b)(2) aggravator fails to provide any narrowing function. Under Georgia law, as soon as Petitioner was found guilty of felony murder he automatically became "death eligible" under O.C.G.A. § 10-17-30(b)(2). This aggravating circumstance served no narrowing function and was, therefore, constitutionally infirm.

The Georgia Supreme Court announced that a felony, for the purpose of establishing felony murder, "means any felony that is dangerous *per se*, or 'which by the attendant circumstances, create[s] a foreseeable risk of death.'" *Ford v. State*, 423 S.E.2d 255, 256 (1992) (citation omitted). As such, any felony that creates a foreseeable risk of death and can be used as the predicate felony in a felony murder conviction, is already encompassed in O.C.G.A. § 17-10-30(b)(2).

355

Thus, any time an individual is convicted of felony murder, (b)(2) is by necessity established.

The resulting system, where everyone who is found guilty of felony murder automatically satisfies a statutory aggravating circumstance, may lead to incongruous results. As the Supreme Court of Tennessee noted:

> The perverse result of the felony murder narrowing device is even more troubling because the usual class of first-degree murderers is made up largely of two groups of defendants -- felony murderers and premeditated and deliberated murderers. The only defendants who are eliminated by the felony murder narrowing device are those who kill with premeditation and deliberation -- i.e., in cold blood -- but not during the course of a felony.

*State v. Middlebrooks*, 840 S.W.2d 317, 345 (Tenn. 1992) (finding that double counting failed to serve the narrowing function required by the state and federal constitutions). "Thus a felony murder narrowing device excludes many cold-blooded killers while simultaneously making accidental killers and attenuated accomplices death eligible." Richard A. Rosen, *Felony Murder and the Eighth Amendment Jurisprudence of Death*, 31 B.C.L. Rev. 1103, 1129 (1990). The fundamental concept of punishment commensurate with criminal culpability is turned on its head.

Further, the impermissible consideration of the (b)(2) aggravating circumstance cannot be considered harmless in this instance. Under Georgia's

capital punishment scheme, the sentencer can impose a sentence of life for any

reason or no reason at all.  In addition, a decision to impose life does not require

unanimity. One juror's resolve not to impose death can deadlock a jury and mean a

sentence of less than death.  The cumulative effect of the jury's improper

consideration of the invalid (b)(2) aggravator cannot be measured.  There is a

significant probability that the mitigation presented could have convinced at least

one juror that the evidence in mitigation outweighed the single aggravating

circumstance and that life was the appropriate punishment.

The state habeas court found this Claim to be procedurally defaulted because

it had not been pursued on direct appeal, (Order Denying Relief, at 44-45, R-267

[App. 28]) and this Court found that the state procedural rule was adequate and

independent.[18]  Consequently, this Court can only reach the merits of this claim

upon a showing of cause and prejudice, *Dretke v. Haley*, 541 U.S. 386, 393 (2004),

or if not addressing the claim would be a miscarriage of justice. *Schlup v. Delo,*

513 U.S. 298 (1995); *Sawyer v. Whitley,* 505 U.S. 333 (1992).  Cause to excuse the

default rests upon trial counsel's (who was also appellate counsel) failure to

properly preserve the issue and then pursue it on appeal.  *See e.g., Murray v.*

*Carrier*, 477 U.S. 478 (1986).  Had trial counsel properly objected, the trial court

---

[18]      Mr. Waldrip objects to this finding.

would have corrected the error and the jury would have been properly guided in its

sentencing determination.  Had the trial court failed to correct the error and

appellate counsel properly pursued this issue on direct appeal, there is a reasonable

probability the outcome of the appeal would have been different, *i.e.*, the Georgia

Supreme Court would have reversed Petitioner's death sentence.  *Philmore v.*

*McNeil*, --- F.3d ----, No. 07-13637, 2009 WL 2181682, at *12 (11th Cir. 2009).

Thus, cause *and* prejudice have been established.  Moreover, as Petitioner is

actually innocent (*See* Volume III) his execution would be a fundamental

miscarriage of justice which would also excuse the default in this case.  *Wellons v.*

*Hall*, 554 F.3d 923, 935 (2009) ("but for a constitutional error, no reasonable juror

would have found the petitioner eligible for the death penalty under the applicable

state law.").

**XXV.     CLAIM 29:  BECAUSE THE JURY FAILED TO FIND THE EXISTENCE OF ANY STATUTORY AGGRAVATING CIRCUMSTANCES, PETITIONER HAS BEEN SENTENCED TO DEATH IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**

Georgia law provides that in order to sentence a capital defendant to a

sentence of death, "[t]he jury . . . shall designate in writing, signed by the foreman

of the jury, the aggravating circumstance or circumstances which it found beyond a

reasonable doubt."  O.C.G.A. § 17-10-30(c).

In the instant case, the jury did not "designate in writing. . . the aggravating circumstance or circumstances which it found beyond a reasonable doubt."  Instead, the only thing the jury did in this case was indicate on the verdict form supplied by the trial court that it had chosen to sentence Petitioner to death, there was no finding as to the existence of *any* aggravating factor beyond a reasonable doubt.  Without affirmative proof the jury found at least one aggravating circumstance beyond a reasonable doubt, there is no indication the death sentence in this case complies with *Zant v. Stephens*, or the heightened reliability required by the Eighth Amendment. *See, e.g., Simmons v. South Carolina*, 512 U.S. 154, 172 (1994) ("the [Eighth] Amendment imposes a heightened standard for reliability in the determination that death is the appropriate punishment in a specific case"); *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) (plurality opinion of STEWART, POWELL, and STEVENS, JJ.) *Godfrey v. Georgia*, 446 U.S. 420, 427-428 (1980),  *Mills v. Maryland,* 486 U.S. 367, 383-384 (1988).  Further, the sentence in this case does not satisfy the Supreme Court's mandate that  state courts replace "arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Woodson v. North Carolina*; 428 U.S. 280, 303 (1976).

The state habeas court found this claim to be procedurally defaulted because it had not been pursued on direct appeal, (Order Denying Relief, at 45 [App. 28]) and this Court found the state procedural rule to be adequate and independent.[19] Consequently, this Court can only reach the merits of this claim upon a showing of cause and prejudice, *Dretke v. Haley*, 541 U.S. 386, 393 (2004), or if not addressing the claim would be a miscarriage of justice. *Schlup v. Delo,* 513 U.S. 298 (1995), *Sawyer v. Whitley,* 505 U.S. 333 (1992). Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly preserve the issue and then pursue it on appeal. *See e.g., Murray v. Carrier*, 477 U.S. 478 (1986). Had trial counsel properly objected, the trial court would have corrected the error and the jury would have been properly guided in its sentencing determination. Had the trial court failed to correct the error and appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's death sentence. *Philmore v. McNeil,* --- F.3d ----, 2009 WL 2181682 at * 12 (11th Cir. 2009). Thus, cause *and* prejudice have been established. Moreover, as Petitioner is actually innocent (*See* Volume III) his execution would be a fundamental miscarriage of justice which would also excuse

---

[19]    Mr. Waldrip objects to this finding.

the default in this case.  *Wellons v. Hall*, 554 F.3d 923, 935 (2009) ("but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.").

**XXVI.   MR. WALDRIP'S SENTENCE OF DEATH IS
DISPROPORTIONATE WHEN COMPARED TO OTHERS
WHO HAVE COMMITTED SIMILAR CRIMES AND WHEN
COMPARED TO THE SENTENCES OF HIS CO-
DEFENDANTS, WHICH VIOLATES THE EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND THE CORRESPONDING PROVISIONS
OF THE GEORGIA CONSTITUTION.**

This Court did not find Claim 31 procedurally defaulted.  (*See* Procedural

Default Order, at 25-27 [App. 33].)  As such, it is before this Court on the merits.

The Georgia Supreme Court did find Mr. Waldrip's sentence proportionate, *see*

*Waldrip.* 267 Ga. at 313, it did not reach the question of whether the method of

determining that decision was constitutional.  As the state habeas court incorrectly

determined the question to be procedurally barred and refused to reach the merits

(*see* Order Denying Relief, at 45, R-267), this Court reviews this claim *de novo*.

*See Cone v. Bell*, 129 S. Ct. 1769, 1784 (2009).

In *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme

Court struck down all existing death penalty schemes as incompatible with the

protections of the Eighth and Fourteenth Amendments to the United States

Constitution.  Although each of the five justices who concurred in the *Furman*

Court's one-paragraph *per curiam* opinion advanced separate reasoning, the Court

has long since accepted the view that the fundamental basis of *Furman* was the

Court's unwillingness to tolerate the arbitrary and capricious manner in which

362

death sentences had been meted out in this nation.[20]   Indeed, it is fair to state that

Justice Stewart's comparison between receiving a sentence of death and being

struck by lightning is the very essence of *Furman*.  Justice Stewart wrote: "These

death sentences are cruel and unusual in the same way that being struck by

lightning is cruel and unusual."  *Furman v. Georgia*, 408 U.S. at 309 (opinion of

Stewart, J., concurring; citations and footnotes omitted).

Reacting to *Furman*, many states – particularly those in the deep South with

a long history of capital punishment – enacted new capital punishment schemes

aimed at sidestepping the concerns raised in *Furman*.  On July 2, 1976, the Court

issued opinions in five cases in which individuals had challenged the various

newly-enacted, post-*Furman* statutes.  The Court concluded that those states that

had carefully tailored the process of selecting those persons who may be sentenced

to die while still providing the sentencing body with the authority to consider the

unique circumstances of each defendant and crime were able to overcome the

constitutional concerns of *Furman*.  *Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek*

---

[20]    In *Zant v. Stephens*, 462 U.S. 862 (1983), for example, Justice Stevens, speaking for a majority of the Court, noted that a fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id*. at 874, quoting the plurality opinion of Justices Stewart, Powell and  Stevens in *Gregg v. Georgia*, 428 U.S. 153 (1976).

*v. Texas*, 428 U.S. 262 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976).  The Court

struck down those statutory schemes that automatically called for death sentences

upon particular classes of convicted murders without requiring "particularized

consideration of relevant aspects of the character and record of each convicted

defendant before the imposition upon him of a sentence of death."  *Woodson v.*

*North Carolina*, 428 U.S. 280, 303 (1976) (opinion of Justices Stewart, Powell and

Stevens); *Roberts v. Louisiana*, 428 U.S. 325 (1976).  It is the framework first

crafted in the *Gregg-Jurek-Proffitt* trilogy that forms the basis of our modern death

penalty jurisprudence.

Since *Furman v. Georgia*, 408 U.S. 238, 310, 313 (1973) (Stewart, J.

concurring) (White, J. concurring), the United States Supreme Court has required

states that permit capital punishment to institute procedures that would protect

against the "wanton" and "freakish" imposition of the death penalty and would

provide a "meaningful basis for distinguishing the few cases in which it is imposed

from the many cases in which it is not."  *Id*. at 313; *see also Parker v. Dugger*, 498

U.S. 308 (1991).

While a proportionality review is not constitutionally required where it is not

part of the state's statutory scheme for fair imposition of the death penalty, *Pulley*

*v. Harris*, 465 U.S. 37 (1984), in Georgia, a proportionality review is such a

statutory requirement, and one of the pillars of reliability in sentencing used by the Supreme Court to uphold the Georgia death statute. *Gregg v. Georgia*, 428 U.S. 153 (1976); O.C.G.A. § 17-10-35 (c)(3).[21]  This review in Petitioner's case included a comparison of "[similar] cases, considering both the crime and the defendant." *Waldrip v. State*, 482 S.E.2d 299, 313 (1997).  The Georgia Supreme Court has noted that it "will not affirm a sentence of death unless in similar cases throughout the state the death penalty has been imposed generally and not wantonly and freakishly." *Horton v. State*, 295 S.E.2d 281, 289 (1982).

A proportionality review of the facts in this case demonstrates that this is a not a death case.  The offense for which Petitioner was convicted cannot be said to have reflected a consciousness materially more depraved than that present in the case of other convictions where the death penalty is not imposed.  Cases similar to that of Mr. Waldrip's in all respects, including age, prior record, life and character of the accused, have resulted, with great frequency, in lesser punishments than death.  In fact, Georgia cases with facts more aggravated than that of Petitioner with regard to both the nature and circumstances of the offense, prior record, culpability and life and character of the accused, have resulted in lesser

---

[21]    With regard to the sentence the [Georgia Supreme Court] shall determine:  (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.  O.C.G.A. § 17-10-35 (c)(3).

punishments than death.  A list, with a brief description, of several of these cases is included as Appendix "GG".[22]  Moreover, in Petitioner's case in particular, both of the co-defendants received punishments less than death. As a review of Petitioner's co-defendants' cases and the cases in the attached appendix indicate, there is not a rational and constitutionally permissible way to distinguish the few cases in which the death penalty has been imposed including Petitioner's case, from the many similar or more aggravated cases in which a lesser punishment has been imposed. Thus, it is evident that the death sentence was sought and imposed in Petitioner's case in an arbitrary and disparate manner.[23]  Under the United States Supreme Court's reasoning in *Bush v. Gore*, 531 U.S. 98 (2000), such arbitrary deprivation of these most fundamental constitutional rights, the right to life and the equal protection of the laws, is simply untenable.

Further, Georgia's death penalty scheme is unconstitutional because it allows for a death *eligibility* finding that is not subject to the strictures the Sixth,

[22]    This list was originally included as Exhibit "GG" in the Appendix to Mr. Waldrip's Post-Hearing Brief.  Moreover, the arbitrary and disparate imposition of the death sentence on Petitioner is clearly evident when one compares his case to the cases of persons who the state has actually executed by since the death penalty was reinstated.  The list of defendants that the State of Georgia has executed, with a brief description, is included as Appendix "118".

[23]    The imposition of the death sentence in Mr. Waldrip's case was also the result of unprecedented ineffective assistance of counsel.  *See* Vol. I, Sections V, VI, VII, and VIII.

Eighth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Georgia Constitution.  In *United States v. Fell*, 217 F. Supp. 2d 469 (D. Vt. 2002), the Federal Death Penalty Act (FDPA) was declared unconstitutional for a number of reasons including defects in the *eligibility* phase of the capital proceedings.  Georgia's capital punishment scheme mirrors, in relevant respects, the FDPA, and thus suffers from the same fatal flaws. This Court should do as the court did in *Fell* and rule Georgia's capital punishment scheme unconstitutional.

In analyzing the FDPA, the *Fell* court explained that capital punishment for certain crimes "is as old as the nation itself" and that "[a]lso as old as the nation is the recognition that 'death is a different kind of punishment from any other which may be imposed in this country.'" *Fell*, 217 F.Supp.2d at 474 (quoting *Gardner v. Florida*, 430 U.S. 349 (1977)).  Thus, in order for a death penalty scheme to be constitutionally firm, "the sentencing body's discretion must be guided and limited in its 'eligibility' determination." *Id.* at 476 (citing *Tuilaepa v. California,* 512 U.S. 967, 971 (1994)).

The FDPA is functionally identical to Georgia's death penalty scheme.  The FDPA, like Georgia, does not require the presentation of statutory aggravating circumstances to the Grand Jury.  All that is required is that the government give

367

written notice of its intent to seek the death penalty within a reasonable time. *Id.* at

477; *see also* Georgia Uniform Superior Court Rule 34 and Unified Appeal Rule

II(C)(1) (prosecuting attorney must file with the clerk of the superior court a

written notice of an intention to seek the death penalty).  Second, in order for the

death penalty to be imposed, the FDPA, like O.C.G.A. section 17-10-30, requires

that a jury find beyond a reasonable doubt at least one statutory aggravating

circumstance.  *Fell*, 217 F. Supp. 2d at 476.  Thus, under the FDPA, like Georgia, it

is only after the jury finds beyond a reasonable doubt the existence of at least one

statutory aggravating circumstance that the defendant is *eligible* for a death

sentence.

The Court in *Fell* found the federal death penalty scheme unconstitutional

for a number of reasons.  First, the FDPA fails to comport with the requirement

that each and every element of the offense be presented to the Grand Jurors who

must return a true bill of indictment before a defendant can be forced to stand trial.

Under *Jones v. United States*, 526 U.S. 227 (1999), *Apprendi v. New Jersey*, 530

U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), statutory aggravating

circumstances, because they are a necessary predicate to the imposition of a death

sentence, are elements of the offense – regardless of what the state may label them

– and must be contained in the indictment and proven to a jury beyond a

reasonable doubt.  Georgia's death penalty scheme, like the FDPA, makes no provision for presenting these essential elements to the Grand Jury and is therefore constitutionally infirm.

The *Fell* court went on to note that the FDPA, like Georgia, applied a relaxed evidentiary standard in the penalty phase of capital trials for both parties, the prosecution and the defense.  *Fell*, 217 F.Supp.2d at 473-74, *Spivey v. State*, 253 Ga. 187, 202, 319 S.E.2d 420, 435 (1984) (the rules of evidence "may not be applied mechanistically" to exclude obviously reliable information from the jury at the sentencing phase of a death penalty case.).  While this is constitutionally required for the defense, *see Green v. Georgia*, 442 U.S. 95 (1979), it is constitutionally impermissible for the State, *see Fell*, 217 F.Supp.2d at 469.  The *Fell* court ruled expressly that "relaxed evidentiary standard[s] for the determination of death-eligibility factors will not satisfy the demands of due process and the Sixth Amendment rights of confrontation and cross-examination." *Id.* at 485.  Based in large part on that finding, the *Fell* court held:

> If the death penalty is to be part of our system of justice, due process of law and the fair-trial guarantees of the Sixth Amendment require that standards and safeguards governing the kinds of evidence juries may consider must be rigorous, and constitutional rights and liberties scrupulously protected.  To relax those standards invites abuse, and significantly undermines the reliability of decisions to impose the death penalty.

369

*Id.* at 491.  Thus, the court concluded the FDPA could not pass constitutional muster and ordered that the prosecution's notice of intent to seek the death penalty be dismissed.  *Id.*

Because Georgia's death penalty scheme is identical to the FDPA in all essential respects, it also suffers from the same constitutional infirmities.  Mr. Waldrip was tried under a scheme in which essential elements were not presented to the jury and where, during the critical penalty phase,  relaxed evidentiary standards were applied to the proof of essential elements of the offense.  This Court, like the court in *Fell*, should find that the death penalty scheme under which Mr. Waldrip was tried, convicted and sentenced to death is unconstitutional.

The fact that the Georgia Supreme Court considered a proportionality claim as part of Mr. Waldrip's direct appeal, *Waldrip*, 482 S.E.2d at 313, does little to rectify the abrogation of Petitioner's constitutional rights.[24]  Based on the record at that time, the Georgia Supreme Court found that Petitioner's sentence was not disproportionate to other similar cases.  The Court listed eight cases in the appendix to support its affirmance of the death penalty.  An adequate comparison

---

[24]   The Georgia Supreme Court has previously indicated that the propriety of a second proportionality review is an open question. *Fleming v. Zant*, 386 S.E.2d 339, 341 (1989) ("We do not reach the issue of whether there may be some circumstances under which a second proportionality review would be appropriate.").

between the facts and circumstances in Petitioner's case and those listed by the Georgia Supreme Court, however, demonstrates that death is a disproportionate punishment for Petitioner. The facts in each of these other cases are more egregious and each these defendant is more deserving of the death penalty, yet even some of these defendants are no longer under sentence of death.

Moreover, the proportionality review was constitutionally infirm because the constitutional mandate against disproportionate sentencing does not merely require that the Georgia Supreme Court be able to find other instances in which the death penalty is applied to similar facts, but rather, to view the state system as a whole to see that sentences are proportionate across the spectrum. There are many other murders much more excessive and aggravated than that for which Petitioner has received a sentence of death. In its proportionality review, the Court did not consider cases where the defendant faced the possibility of a death sentence but received a life sentence after the penalty phase, nor those cases where the State never sought a death sentence at all. To conduct an equitable proportionality review, it is critical that this Court review other similarly situated defendants in cases where life sentences resulted. If the list is broadened to include all cases where death has occurred, this Court will see further evidence that far more

371

heinous, torturous, and aggravated murders than the one at issue here have resulted in life sentences.

Petitioner's death sentence is also disproportionate to his two more culpable co-defendants, both of whom received life sentences. The Prosecution presented no evidence at trial to support a theory that Mr. Waldrip delivered any of the blows or gunshot wounds to the victim. Additionally, evidence not available at trial now proves that Mr. Waldrip was not even present when the victim was killed. Yet the two co-defendants who were actually present received life sentences.[25]

The goal of a proportionality review is that similarly situated defendants receive similar sentences, that the process be rational and not capricious, and that the ultimate sentence which the State can exact from a criminal be reserved for the most severe of murders. That is why the death penalty should be precluded in this case. A death sentence on this record would be clearly arbitrary and capricious by failing to distinguish why Mr. Waldrip deserves a death sentence, when Mr. Waldrip's more culpable co-defendants received life imprisonment.

---

[25] The state did not seek the death penalty against Mr. Livingston at trial and John Mark Waldrip received a life sentence from the jury at the conclusion of his penalty phase.

XXVII.     CLAIM 32:  THE DEATH PENALTY IS CRUEL AND
           UNUSUAL PUNISHMENT AND VIOLATES MR. WALDRIP'S
           RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND
           FOURTEENTH AMENDMENTS TO THE UNITED STATES
           CONSTITUTION.

The death penalty in Georgia, which in this case is to be carried out by lethal

injection, is cruel and unusual punishment under any circumstances.  Petitioner's

sentence of death, in particular, was imposed arbitrarily and capriciously, and

pursuant to a pattern and practice of discrimination in the administration and

imposition of the death penalty in Georgia, thereby rendering his sentence of death

unlawful and in violation of his rights under the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution.  Georgia's statutory

death penalty procedures, as applied, do not result in the fair, nondiscriminatory

imposition of the death sentence.  The death penalty is imposed arbitrarily,

capriciously, and discriminatorily in the State of Georgia, and was so imposed in

Petitioner's case.  Corgia cases similar to that of Petitioner with regard to both the

nature and circumstances of the offense, prior record, culpability, and life and

character of the accused, have resulted in lesser punishments than death.  In fact,

cases more aggravated than that of Petitioner with regard to both the nature and

circumstances of the offense, prior record, culpability, and life and character of the

accused, have resulted in lesser punishments than death.  Thus, there is no

constitutionally-permissible way to distinguish the few cases in which the death penalty has been imposed, and Petitioner's case in particular, from the many similar cases in which a lesser punishment has been imposed. *Furman v. Georgia*, 408 U.S. 238 (1972).

In both the United States and the State of Georgia, the death penalty has been, and continues to be, imposed discriminatorily against defendants who are alleged to have killed white victims, who are male, and who are poor. Petitioner's sentence of death was imposed because he is poor, he is male, and the victim in the case, Keith Evans, was white.

Moreover, studies show that approximately seventy percent (70%) of the population of Georgia who are not opposed to the death penalty believe that death should be imposed for **any** murder. State laws relating to venue, choice of counsel, the Unified Appeals Procedure, among other laws, as well as county, circuit and other rules relating to expenditures of funds for the defense of indigents amongst other rules render the Georgia statutory death penalty scheme arbitrary in its application and capricious in its results.

Additionally, the method of execution – death by lethal injection – constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution. When an individual is convicted of a capital offense in

Georgia and sentenced to death, the individual is executed by lethal injection.

O.C.G.A. § 17-10-38.  Petitioner contends that execution by lethal injection

violates the Eighth Amendment.

Moreover, in this particular case, and as detailed more fully above,

Petitioner did not participate in the death of the victim, yet he is the only co-

defendant sentenced to death.   The imposition of the death penalty upon Petitioner

is even more clearly cruel and unusual punishment and violates Petitioner's rights

under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution.

The state habeas court found this claim to be procedurally defaulted as it was

not pursued on appeal (Order Denying Relief, at 45 [App. 28]) and this Court

found that default to be adequate and independent.[26]  Consequently, this Court can

only reach the merits of this claim upon a showing of cause and prejudice, *Dretke*

*v. Haley*, 541 U.S. 386, 393 (2004), or if not addressing the claim would be a

miscarriage of justice. *Schlup v. Delo,* 513 U.S. 298 (1995),  *Sawyer v. Whitley,*

505 U.S. 333 (1992).     Cause to excuse the default rests upon appellate

counsel's  failure to properly preserve the issue and then pursue it on appeal.  *See*

*e.g., Murray v. Carrier*, 477 U.S. 478 (1986).  Had trial counsel raised the issue on

---

[26]    Mr. Waldrip objects to this finding.

motion for new trial and properly pursued this issue on direct appeal, there is a

reasonable probability the outcome of the appeal would have been different, *i.e.*,

the Georgia Supreme Court would have reversed Petitioner's death sentence.

*Philmore v. McNeil*, --- F.3d ----, No. 07-1367, 2009 WL 2181682, at * 12 (11th

Cir. July 23, 2009).   Thus, cause *and* prejudice have been established.  Moreover,

as Petitioner is actually innocent (*See* Volume III) his execution would be a

fundamental miscarriage of justice which would also excuse the default in this

case.  *Wellons v. Hall*, 554 F.3d 923, 936 (2009) ("but for a constitutional error, no

reasonable juror would have found the petitioner eligible for the death penalty

under the applicable state law.") (citation omitted).

## XXVIII.   CLAIM 33:  EXECUTION BY LETHAL INJECTION IS CRUEL AND UNUSUAL PUNISHMENT, AND IT WOULD BE A VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS FOR MR. WALRIP TO BE EXECUTED BY SUCH MEANS.

The method of execution in Georgia violates the Georgia and United States

constitutions.  As provided for in the protocols promulgated by the Georgia

Department of Corrections and demonstrated by a recent botched execution, lethal

injection constitutes cruel and unusual punishment in violation of the Eighth

Amendment to the United States Constitution, the Constitution of the State of

Georgia, and *Fleming v. Zant*, 386 S.E.2d 339 (Ga. 1989).

376

On October 5, 2001, the Georgia Supreme Court held that death by electrocution was unconstitutional and announced that all those inmates who had been sentenced to die by electrocution would now be subjected to lethal injection. *Dawson* v. *State*, 554 S.E.2d 137 (Ga. 2001). Since that time, the State has carried out nineteen (19) executions by lethal injection. One of these was that of Jose High, executed on November 6, 2001. Reports from witnesses of this execution indicate that prison officials botched this execution and inflicted unnecessary pain and suffering. The problems with Jose High's execution raise the serious specter that lethal injection in Georgia, as outlined in the State's lethal injection protocols or as carried out by the individuals implementing the protocols, is inflicting needless pain and suffering and thus creating a punishment that is cruel and unusual in violation of the Eighth Amendment.

Published reports indicate there were troubling problems with Jose High's death. The Atlanta Journal Constitution reported:

> High's execution was scheduled for 7 p.m., but was delayed beyond what was to be expected because prison officials could not find a suitable vein to support the shunt that was used to deliver the drugs.
>
> Department of Corrections spokesman Mike Light said contract emergency medical technicians had to abandon their attempts to insert needles into his arm after trying 15 to 20 minutes. Instead, they inserted one in his hand and, as a backup, a doctor inserted one between his shoulder and his neck.

* * *

During the procedure, he grimaced, appeared to cry, blinked rapidly and stared at the clock on the wall.  At one point, he cried out but his words were unintelligible because the microphone in the room was off.  He yawned twice before succumbing to the drugs.

Gang Leader Executed by Injection, Atlanta Journal-Constitution, page B3

November 7, 2001.

Based on the botched execution of November 6, 2001, it is clear that lethal injection, as it is being carried out under the protocol currently established by the Georgia Department of Corrections, creates an unacceptable risk of pain, suffering and disfigurement that violates the Eighth Amendment.

Three drugs are listed in the Lethal Injection Protocol, to be administered intravenously in the following order: Sodium Pentothal, Pavulon, and Potassium Chloride.  The amounts, rates of administration, and time intervals between the drugs to be administered are not clearly identified for any of these three drugs.

Concern over the amounts, rates of administration, and time intervals is very real. Sodium pentothal, for example, is a very short-acting anesthesia, meaning that, when given in an appropriate amount and administered properly, it renders a person unconscious quickly and begins to wear off quickly.  Its half-life in the brain, which is where it works as an anesthetizing agent, may be as short as one to two minutes.  Therefore, almost as soon as it begins working, it begins to dissipate

378

and it dissipates very quickly.  During surgical procedures, sodium pentothal is

typically used to render a person unconscious but additional drugs are administered

almost immediately thereafter to keep a patient unconscious and pain-free.

Sodium pentothal is also a drug whose appropriate dosage amounts are

susceptible to a number of factors, some well-recognized, others that are unknown.

For example, body weight, body fat, prior drug usage, the presence in the body of

other sedating agents, and the level of anxiety or stress, are all factors that play a

role in how high a dosage will be necessary successfully to anaesthetize a person.

For that reason, a medically qualified anesthesiologist makes an educated guess

before surgery as to the amount of the sodium pentothal to administer, and then

titrates that amount as it is going into the patient to ensure that the patient has been

rendered fully unconscious, adjusting and increasing the amount of the drug as

necessary.

It appears that Mr. High was crying and calling out in pain during his

execution.  This means that the initial drug did not properly anaesthetize him.  This

leaves open the very real possibility that either the dosages and the protocols used

by the State are flawed or that the people implementing them are improperly

trained.   Furthermore, it is troubling that "contract emergency medical

technicians" had to spend 20 minutes poking Mr. High with needles in a failed

379

attempt to find a vein.  This again points to problems with the protocols, the training, or both.

Petitioner concedes that the Supreme Court has recently rule the Kentucky lethal injection procedures constitutional because they contained safeguards precluding a substantial risk of harm. *See Baze v. Rees*, ___ U.S.___, 128 S.Ct. 1520 (2008).  Because these safeguards are not in the current protocols for the imposition of lethal injection in Georgia cases, the Georgia system is not substantially similar to the Kentucky Procedures, and, therefore, not constitutional under *Baze*.  The constitutional Kentucky Procedures provide numerous safeguards, oversight, and accountability.  (1)  The Kentucky Procedures provide for greater oversight by requiring, in writing, that each task be performed and completed by the designated person and that the designated person attest to the date and time of when their task was completed. (2)  The Kentucky Procedures explicitly list the preferential sites for IV insertion.  (3)  The Kentucky Procedures explicitly require the IV team members to check for infiltration prior to the chemicals flowing into the inmate's body.  (5)  In recognition of the physical and psychological harm that the inmate endures even prior to the flow of the chemicals, the Kentucky Procedures limit the IV access attempts to one hour.   Accordingly if access cannot be accomplished within one hour, a request will be made that the

380

execution be scheduled for a later date. (6)  The Kentucky Procedures require that the inmate be unconscious prior to injecting the pancuronium bromide. Kentucky specifically mandates that the Warden first ensure unconsciousness before telling the execution team to "proceed" with the lethal chemicals.  (7)  In addition, the Kentucky Procedures require that if the inmate is not unconscious within 60 seconds of the Warden's direction to "proceed" then the Warden will stop the injection at the primary site and restart the process at the secondary site.  (8) the Kentucky Procedures require 3 grams of Sodium Pentothal.  (9)  The Kentucky Procedures require specific professional standards for the IV team members.  (10) The Kentucky Procedures require that the members of the execution team and IV team train at least a specific number of times prior to an actual execution.   (11) The Kentucky Procedures require that the prison be prepared for a situation that a stay of execution is issued after the execution has commenced, and enumerates what safeguards are required.

As outlined in Justice Robert's opinion in *Baze*, the U.S. Supreme Court found the Kentucky Procedures constitutional because of the specifically enumerated safeguards drafted within the procedures.   These safeguards are absent from the Georgia Procedures, making their constitutionality undetermined by *Baze*.

381

The safeguards the Court explicitly relied upon to hold the Kentucky Procedures

constitutional are outlined below:

> (A)  To avoid a substantial risk of pain, and ensure that an adequate
> dose of sodium pentothal is delivered to the inmate, the U.S. Supreme
> Court found that, "the most significant [safeguard] is the written
> protocol's requirement that members of the IV team must have at least
> one year of professional experience as a certified medical assistant,
> phlebotomist, EMT, paramedic, or military corpsman." *Id.* at 1533.
> Underscoring the importance of these enumerated professional
> standards, the Court in *Baze* stated that the risk of maladministration
> is constitutionally objectionable when the administrators of the
> procedures are not trained and experienced personnel.

> (B)  The Kentucky Procedures are constitutional because of the
> safeguard requiring that the "IV team members, along with the rest of
> the execution team, participate in at least 10 practice sessions per
> year…These sessions, required by the written protocol, encompass a
> complete walk-through of the execution procedures, including the
> setting of IV catheters into volunteers." *Id.* at 1534.

> (C)  Another enumerated safeguard is that the Kentucky Procedures
> limit the time the IV team has to establish IV access to one hour. *Id.*
> There is no time restriction within the Georgia Procedures for
> obtaining IV access.

> (D)  The Court additionally stated that "Kentucky's protocol
> specifically requires the warden to redirect the flow of chemicals to
> the backup IV site if the prisoner does not lose consciousness within
> 60 seconds." *Id.*

Upon information and belief, the Georgia execution protocols do not

comport with those found to be constitutional in *Baze*, and thus, are not necessarily

constitutional.

The present use of lethal injection in Georgia leaves a high risk of substantial pain and suffering.  The infliction of gratuitous and wanton pain and suffering upon Petitioner by means of lethal injection is inconsistent with the evolving standards of decency that mark the progress of a maturing society and constitutes cruel and unusual punishment under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  *See Trop v. Dulles*, 356 U.S. 86 (1958).

Finally, the Georgia Legislature's decision that death-sentenced prisoners who were sentenced to execution by electrocution are to be executed by lethal injection subjects Petitioner to punishment in violation of his rights, including, but not limited to, due process and equal protection, under the United States and Georgia Constitutions.

At the time Petitioner was sentenced to death, the relevant sentencing statute provided that a person convicted of a capital crime could be sentenced to death by electrocution.  *See* O.C.G.A. §17-10-38(a) (1985 amend.).  The sentence proclaimed by the trial judge in Petitioner's case was "death by electrocution." (T.T., Vol. XVIII, at 3567, R-63.)  The verdict form signed by the foreman, declared Petitioner's sentence to be "death by electrocution."  (ROA, at 467, R-8 [App. 116].)

383

In 2000, the Georgia legislature amended O.C.G.A. Section 17-10-38, effective May 1, 2000. In subsection (a), the state substituted "lethal injection" for "electrocution" at the end of the first sentence and added the second sentence; in subsection (b), the state substituted "death" for "be electrocuted" and substituted "execution of the death sentence" for "electrocution", and added subsections (c) and (d).  The "Credit" section of the statute, was amended is as follows: "(Ga. L. 1924, p. 195, §1; Code 1933, §27-2512; Ga. L. 1937-38, Ex. Sess., p. 330, §1; Ga. L. 1985, p. 283, §1; *Ga. L. 2000, p. 947, §3*.)"  The editor's notes to this legislation referred to the legislative history of the amended statute, quoting provisions which had not been codified by the General Assembly.  Ga. L. 2000, p. 947 §§ 1 & 6.

Ga. L. 2000, p. 947, Section 1, not codified by the General Assembly, provides that:

> It is the intention of the General Assembly to provide for execution by lethal injection for persons sentenced to death after conviction of capital crimes committed on or after May 1, 2000.  It is the further intention of the General Assembly that persons sentenced to death for crimes committed prior to the effective date of this Act to be executed by lethal injection if the Supreme Court of the United States declares that electrocution violates the Constitution of the United States or if the Supreme Court of Georgia declares that electrocution violates the Constitution of the United States or the Constitution of Georgia.

Ga. L. 2000, p. 947, Section 6, not codified by the General Assembly, provides that:

Section 3 of this Act shall apply to persons sentenced to death for crimes committed on or after May 1, 2000. Code Section 17-10-38 as it existed prior to its amendment by Section 3 of this Act shall continue to apply with respect to crimes committed prior to May 1, 2000, except that Section 3 of this Act shall apply to all persons sentenced to death for crimes committed prior to May 1, 2000, if the Supreme Court of the United States declares that electrocution violates the Constitution of the United States or if the Supreme Court of Georgia declares that electrocution violates the Constitution of the United States or the Constitution of Georgia.

On October 5, 2001, in *Dawson v. State*, the Georgia Supreme Court declared that O.C.G.A. Section 17-10-38, was unconstitutional, in violation of the Georgia Constitution's ban on cruel and unusual punishment, insofar as it provided for death by electrocution.  In doing so the court assumed that the *uncodified provisions*, -- referred to in the editor's notes, had the force of law, i.e. were "portions of the statute."

Reasoning that the court has the power to sever an unconstitutional 'portion' of a statute and preserve the remainder if the remainder accomplishes the legislative purpose, under O.C.G.A. Section 1-1-3, the Georgia Supreme Court declared that "only those uncodified portions of [O.C.G.A. 17-10-38] that retained the use of electrocution for the punishment of capital offenses committed before May 1, 2000, are hereby declared void," and that those prisoners sentenced to death by electrocution could be lawfully executed by lethal injection.  *Dawson*, 554 S.E.2d at 144.

385

Yet the Georgia Supreme Court failed to recognize that due process protects against deprivation of life by arbitrary and irregular state action.  The fundamental contract between the American people and their government depends upon the confidence of the people that their governments will function in a way that preserves the integrity, coherence, and regularity of the law.  That contract is broken when, by legerdemain of state officials, the threads of fundamentally embedded assumptions, expectations, practices, established legal norms, and applicable law are stretched, twisted, or snapped in order to produce a desired result.  Constitutional outcomes are not conceived or born in a Procustean bed.

The question is what status and effect editor's notes providing information about legislative history and sections of an Act, expressly not codified in a statute's final form, have.  Black's Law Dictionary provides some guidance:

Statute: A formal written enactment of a legislative body, whether federal, state, city, or county.  An act of the legislature declaring, commanding, or prohibiting something; a particular law enacted and established by the will of the legislative department of government; **the written will of the legislature, solemnly expressed according to the forms necessary to constitute it the law of the state**.

Positive law:  Law actually and specifically enacted or adopted by proper authority for the government of an organized jural society.

Legislative act:  Enactment of laws.  Law (i.e. statute) passed by legislature in contrast to court-made law. One which prescribes what the law shall be in future cases arising under its provisions.

> Codification:  The process of collecting and arranging systematically,
> usually by subject, the laws of a state or country, or the rules and
> regulations covering a particular area or subject of law or practice . . .
> The end product may be called a code, revised code or revised
> statutes.

Black's Law Dictionary, Sixth Edition (emphasis supplied).

The Code of Georgia itself provides more specific direction. The powers and

duties of the "Code Revision Commission" are defined by O.C.G.A. §28-9-3.

Paragraph (9) authorizes the commission to: "To prepare, or provide for the

preparation of, and to include in the Code such annotations, historical notes,

research references, notes on law review articles, cross-references, summaries of

the opinions of the Attorney General of Georgia, editor's notes, Code Revision

Commission notes, comments, commentaries, rules and regulations, indexes,

tables, and other material as the commission **determines to be useful to users of**

**the Code**." *Id*.  (emphasis supplied).

O.C.G.A. Section 1-1-1, titled "Enactment of Code", provides:

> The **statutory portion** of the codification of Georgia laws prepared
> by the Code Revision Commission and the Michie Company pursuant
> to a contract . . . is enacted and shall have the effect of statutes enacted
> by the General Assembly of Georgia.  The statutory portion of such
> codification shall be merged with annotations, captions, catchlines,
> history lines, editorial notes, cross-references, indices, title and
> chapter analyses, and other materials pursuant to the contract and shall
> be published by authority of the state pursuant to such contract and
> when so published shall be known and may be cited as the 'Official
> Code of Georgia Annotated.'

*Id*. (emphasis supplied).

The 'Editor's notes', provided each year, to Section 1-1-1, quote an uncodified provision that speaks to what force is intended to be attached to matters other than the 'statute', that are included in the annotated Code:

> The text of Code sections and title, chapter, article, part, subpart, Code section, subsection, paragraph, subparagraph, division, and subdivision numbers and designations as contained in the Official Code of Georgia Annotated . . .as amended in [supplements] . . . is reenacted and shall have the effect of statutes enacted by the General Assembly of Georgia. **Annotations; editorial notes; Code Revision Commission notes; research references; notes on law review articles; opinions of the Attorney General of Georgia; indexes; analyses; title, chapter, article, part, and subpart captions or headings, except as otherwise provided in the Code; catchlines of Code sections or portions thereof, except as otherwise provided in the Code . . . are not enacted as statutes by the provisions of this Act.  Material which has been added in brackets or parentheses and editorial, delayed effective date, effect of amendment, or other similar notes within the text of a Code section by the editorial staff of the publisher in order to explain or to prevent a misapprehension concerning the contents of the Code section and which is explained in an editorial note <u>is not enacted by provisions of this section and shall not be considered a part of the Official Code of Georgia Annotated.</u>**

*Id*. (emphasis supplied).

Official enactment of the intention captured in the editor's notes, *supra*, is accomplished in O.C.G.A. Section 1-1-7:

> Unless otherwise provided in this Code, the descriptive headings or catchlines immediately preceding or within the text of the individual

> Code sections of this Code, except the Code section numbers included
> in the headings or catchlines immediately preceding the text of the
> Code sections, and title and chapter analyses do not constitute part of
> the law and shall in no manner limit or expand the construction of any
> Code section.  **All historical citations, title and chapter analyses,
> and notes set out in this Code are given for the purpose of
> convenient reference and do not constitute part of the law.**

*Id*. (emphasis supplied).  Thus, Petitioner maintains that the uncodified provisions

referenced in the editor's notes to the amended O.C.G.A. §17-10-30 are not

"portions" of the statute as the Georgia Supreme Court assumed.

Further, the former O.C.G.A. Section 17-10-38 was repealed by the

amended O.C.G.A. Section 17-10-38.  The new statute did not become *ipso facto*

applicable to inmates sentenced to death by electrocution for crimes committed

before May 1, 2000, upon the decision in *Dawson* because uncodified provisions in

the editor's notes had the force of law, or suddenly morphed into law.

Statutes are applicable on their effective dates.  At common law the repeal of

a criminal statute abated all prosecutions that had not reached final disposition in

the highest court authorized to review them.  *See Bell v. Maryland*, 378 U.S. 226,

230 (1964); *Norris v. Crocker*, 54 U.S. 429 (1852).  Abatement by repeal included

a statute's repeal and re-enactment with different penalties, and the rule applied

even when the penalty was reduced.  *Bradley v. United States*, 410 U.S. 605, 607-

608 (1973).  To avoid this result, legislatures employ the technique of a "savings

389

clause"; where the legislation enacted includes a specific clause stating that prosecutions of offenses under the repealed statute are not to be abated. *Id*. at 608; *Robinson v. State*, 256 Ga. 564, 350 S.E.2d 464 (1986). The Georgia legislature did not enact a specific "savings clause" in O.C.G.A. §17-10-38, effective date May 1, 2000. *Uncodified* provisions referenced in editor's notes are not enactments, although they may provide evidence of legislative purpose and intent, and are commonly used, as legislative history, in construing the words of a statute itself.

Nor did the Georgia legislature act to repeal the prior statute. However, the amended statute repealed the prior statute by implication. Repeals by implication, are not favored, and occur where there is an irreconcilable conflict between two statutes. *J.E.M. Ag. Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141-42 (2001); *Pipefitters Local Union v. United States*, 407 U.S. 385, 432-33 (1972). A statute providing that on conviction of a capital crime, the exclusive punishment options are life imprisonment or 'execution by lethal injection' and one providing exclusive punishment options of life imprisonment or 'execution by electrocution', are plainly irreconcilable. The portion of the later statute providing for 'execution by lethal injection' repeals the former portion providing for 'execution by electrocution' by implication.

However, in the absence of a specifically enacted "savings clause", either a 'demonstration of contrary congressional intent', or, a 'general savings statute' **may** operate to nullify abatement. *Pipefitters Local Union*, 407 U.S. at 432-33 (finding no evidence of legislative intent sufficient to overcome the rule that prosecutions under statutes impliedly or expressly repealed must abate, but finding a general savings statute applicable).

The only potentially applicable and legal death sentence, death by electrocution, to which Petitioner *might* have been constitutionally subjected before the Georgia Supreme Court's holding in *Dawson*, is now expressly unconstitutional. For the aforesaid reasons, to execute Petitioner by lethal injection, would be an irrevocable deprivation of life in violation of his due process and equal protection rights.

The state habeas court, in resolving the issue, addressed the merits and denied the claim stating:

> Petitioner claims that execution by lethal injection is cruel and unusual punishment and that his sentence of death by lethal injection is unconstitutional. The Georgia Supreme Court, however, has held to the contrary. *See Dawson v. State*, 554 S.E.2d 137 (2001). As such, Petitioner's claim is without merit.

(Order Denying Relief, at 46, R-267 [App. 28]). The state court's resolution of the issue is contrary to clearly established Supreme Court precedent, *i.e., Weems v.*

391

*United States*, 217 U.S. 349 (1910).  Nowhere in its "analysis" does the state

habeas court cite to the applicable United States Supreme Court precedent.

Further, the state habeas court's reliance on *Dawson v. State* is inapposite as

*Dawson* dealt solely with a challenge to the constitutionality of electrocution as the

means of execution.    Because the state court's resolution was contrary to *Weems*,

and because lethal injection is cruel and unusual punishment, this Court must grant

the writ and vacate Mr. Waldrip's death sentence.

XXIX.        CLAIM 35:  THE UNIFIED APPEAL PROCEDURE
             VIOLATED MR. WALDRIP'S  RIGHTS UNDER THE FIFTH,
             SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO
             THE UNITED STATES CONSTITUTION

Mr. Waldrip was tried under Georgia's Unified Appeal Procedure ("UAP"),

which is unconstitutional both on its face and as applied.  The UAP requires that

the trial court hold "conferences" with the defendant, defense counsel, and

prosecutor at various stages throughout the course of a capital case.  At each

conference, the court inquires of defense counsel whether he or she will raise

various issues at that particular stage of the proceeding, and further inquires of the

defendant whether he or she waives issues which have been discussed and not

raised.  The prosecutor is present at each conference.

The UAP violates important due process considerations in several respects.

First, it upsets the balance of power between the State and the accused in the

adversarial system by forcing the defense to disclose its strategy and tactics to the

prosecution.  This allows the State to learn at various junctures in the case the

intentions of the defense, without itself having to disclose any information.  This

also constitutes a violation of Mr. Waldrip's Sixth Amendment right to counsel by

forcing his attorneys to disclose privileged work product.

The UAP violates the right to counsel in at least two other respects.  First,

the procedure calls upon the defendant at each conference to inform the court

393

whether he is satisfied with the performance of defense counsel, an assessment that is impossible for a lay person to make competently. Further, the UAP does not provide the defendant with independent counsel to assist him in making this important judgment. Second, the UAP thrusts the court directly into the attorney-client relationship and requires counsel to advise the defendant of issues which have little, if any, relevance to the case. The UAP also violates a defendant's right to silence by encroaching upon the right to be heard through counsel with repeated inquiries addressed directly to the defendant about strategy and satisfaction with counsel.

Finally, the UAP denies a capital defendant his right to equal protection by imposing the numerous above-cited impediments and intrusions only on capital defendants. Because the UAP violates only a capital defendant's rights in so many ways, the reliability of a trial and sentencing hearing held pursuant to the UAP is compromised. The capital defendant is no longer afforded the basic right to be tried in a fundamentally fair proceeding. Because Mr. Waldrip was tried and convicted pursuant to this procedure, he was denied even the minimal fairness and reliability that is essential in capital cases in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

The state habeas court found this claim to be procedurally defaulted because it was not pursued on direct appeal. (Order Denying Relief, at 29, R-267 [App. 28].) This Court found the state court's finding of default to rest on an adequate and independent state rule and further ruled it would not address the merits but upon a showing of cause and prejudice.[27]  Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly preserve the issue and then pursue it on appeal. *See e.g., Murray v. Carrier*, 477 U.S. 478 (1986).  Had trial counsel properly objected, the trial court would have been duty-bound to include Petitioner in all aspects of his capital trial.  Further, if the trial court did not comply and appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's conviction and death sentence. *Philmore v. McNeil*, --- F.3d ----, No. 07-1367, 2009 WL 2181682, at * 12 (11th Cir. July 23, 2009).  Thus, cause *and* prejudice have been established.  Moreover, as Petitioner is actually innocent (*See* Volume III) his execution would be a fundamental miscarriage of justice which would also excuse the default in this case. *Wellons v. Hall*, 554 F.3d 923, 936 (2009) ("but for

---

[27]     Mr. Waldrip objects to this finding.

a constitutional error, no reasonable juror would have found the petitioner eligible

for the death penalty under the applicable state law.") (citation omitted).

## XXX.     CLAIM 36:  MR. WALDRIP'S DUE PROCESS AND EQUAL PROTECTION RIGHTS WERE VIOLATED WHEN THE SAME JURY THAT DECIDED HIS GUILT ALSO DECIDED THE SENTENCE IN HIS CASE, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION

Mr. Waldrip's right to due process and to an impartial jury that separately

decides guilt/innocence and sentencing was violated when his sentence was

determined by a jury that had already rejected his guilt phase defenses and

convicted him.  The jurors had already developed a bias against the credibility of

Mr. Waldrip and his case that disabled the jurors from sitting as fair and impartial

jurors on the crucial issue of penalty.  This error undermined the importance of

bifurcated capital proceedings and thus denied Mr. Waldrip his rights under the

Fifth, Sixth, Eighth and Fourteenth Amendments.[28]  *See Gregg v. Georgia*, 428

U.S. 153 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S.

262 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); *Roberts v.

Louisiana*, 428 U.S. 325 (1976).

---

[28]     This was particularly true in Mr. Waldrip's case, where several jurors determined the sentence before evidence was closed at guilt/innocence.  *See* Claim Four, *supra*

The jurors' biases likely originated with the "death qualification" process. By this process, jurors who must first decide the issue of the defendant's guilt/innocence were asked to consider whether they would be able to inflict a particular punishment. *See Witherspoon v. Illinois*, 391 U.S. 510 (1968); O.C.G.A. § 15-12-164(a)(4). Surely, those "death qualified" jurors were then prone to convict.[29] By focusing the jurors' attention on punishment before they have been asked to determine whether or not the defendant is even guilty erodes the right to a "[f]air trial by a panel of impartial, indifferent jurors." A failure to afford a criminal defendant this right "violates even the minimal standards of due process." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (quoting *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961).)

These procedures also undermine the constitutional requirement that every capital defendant receive an individualized sentencing determination, *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989); *Tison v. Arizona*, 481 U.S. 137, 149 (1987); *Spaziano v. Florida*, 468 U.S. 447 (1984); *Enmund v. Florida*, 458 U.S. 782 (1982), taking into consideration all evidence in mitigation, *Morgan*, 504 U.S. at 738; *Eddings v. Oklahoma*, 455 U.S. 104, 114-115 (1982); *Lockett v. Ohio*, 438

---

[29]    *Accord* John H Blume, *et al.*, <u>Probing "Life Qualification" Through Expanded *Voir Dire*</u>, 29 Hofstra L. Rev. 1209, 1232 (2001) ("[E]xposure to the death qualification process makes a juror more likely to assume the defendant will be convicted and sentenced to death….").

U.S. 586, 604 (1978).  Jurors who were prepared to impose a death sentence during *voir dire* and adopted the State's position during the guilt/innocence phase cannot sit as impartial decision-makers during the penalty phase.  Mr. Waldrip was thus denied his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

The state habeas court found this claim to be procedurally defaulted because it was not pursued on direct appeal.  (Order Denying Relief, at 19, R-267 [App. 28].)  This Court found the state court's finding of default to rest on an adequate and independent state rule and further ruled it would not address the merits but upon a showing of cause and prejudice.[30]  Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly preserve the issue and then pursue it on appeal.  *See e.g., Murray v. Carrier*, 477 U.S. 478 (1986).  Had appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's conviction and death sentence.  *Philmore v. McNeil*, --- F.3d ----, No. 07-1367, 2009 WL 2181682, at * 12 (11th Cir. July 23, 2009).  Thus, cause *and* prejudice have been established. Moreover, as Petitioner is actually innocent (*See* Volume III) his execution would be a fundamental miscarriage of justice which would also excuse the default in this

---

[30]    Mr. Waldrip objects to this finding.

case. *Wellons v. Hall*, 554 F.3d 923, 935 (2009) ("but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.") (citation omitted).

XXXI.   **CLAIM 37: THE TRIAL COURT VIOLATED MR. WALDRIP'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY EXCUSING FOR CAUSE JURORS WHOSE VIEWS ON THE DEATH PENALTY WERE NOT EXTREME ENOUGH TO WARRANT *WITHERSPOON* EXCLUSION.**

   A.   **THE TRIAL COURT IMPROPERLY STRUCK JURORS UNDER *WITHERSPOON*.**

At trial, a number of potential jurors were erroneously excused for cause, based on their alleged views against inflicting capital punishment. Although veniremembers may be excluded properly for bias, either against the death penalty or for it, that bias must rise to a certain level before a potential juror may properly be excused for cause. The United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 523 (1968), set the initial standard; a juror whose "attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's guilt" is properly excluded. The Court later modified this standard in *Adams v. Texas*, 448 U.S. 38 (1980). In that case, the Court noted that the standard for *Witherspoon* claims is the same as for claims of any other sort of bias, namely the "prevent or substantially impair" standard. *Adams*, 448 U.S. at 38. The current

399

test is the "prevent or substantially impair" test enunciated in *Adams* and

*Wainwright v. Witt*, 469 U.S. 412 (1985).  *Green v. Georgia*, 519 U.S. 145, 145-46

(1996) (quoting *Witt*, 469 U.S. at 424 (setting forth the standard as "whether these

views would prevent or substantially impair the performance of his duties as a

juror in accordance with his instructions and his oath").

   A capital defendant's right to an impartial jury prohibits the exclusion of

venire members "simply because they voiced general objections to the death

penalty or expressed conscientious or religious scruples against its infliction."

*Witherspoon*, 391 U.S. at 522 (footnote omitted).  "To permit the exclusion for

cause of other prospective jurors based on their views of the death penalty

unnecessarily narrows the cross section of venire members.  It 'stack[s] the deck

against the [defendant].'"  *Gray v. Mississippi*, 481 U.S. 648, 658 (1987) (quoting

*Witherspoon*, 391 U.S. at 523).

   *Witherspoon* dictates that jurors who express disapproval of the death

penalty are nonetheless qualified to serve, as long as their disapproval is not so

strong that they are "irrevocably committed . . . to vote against the penalty of death

regardless of the facts and circumstances that might emerge in the course of the

proceedings."  *Witherspoon*, 391 U.S. at 523 n.21.  *See also Darden v. Wainwright*,

477 U.S. 168, 178 (1986) (reiterating the holding in *Witherspoon*, and finding that

a prospective juror may be excluded for cause only if "he could not under any circumstance recommend the death penalty"). Even jurors who "firmly believe" that the death penalty is wrong can still serve as long as "they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

Although the decision of the trial court to strike a juror is within that court's discretion, *Brown v. State*, 490 S.E.2d 75, 79-80 (1997), when a trial court misapplies *Witherspoon* and excludes from a capital jury a prospective juror who in fact is qualified to serve, a death sentence cannot stand. *Davis v. Georgia*, 429 U.S. 122 (1976) (*per curium*). In determining whether the trial court abused its discretion, the reviewing court must examine the record as a whole, in addition to particular jurors' statements.

During voir dire at the Underlying Trial, the trial court improperly excused for cause several jurors who were qualified to be seated under *Witherspoon*. These errors worked to deny Petitioner his constitutional rights to a fair trial and an impartial jury.

In the instant case, several venirepersons who were not opposed to the death penalty in principle but leaned toward a life sentence prior to hearing the evidence

401

were improperly excused for cause.  Leaning toward life is not a valid reason to

excuse a juror for cause.

In *Davis v. Maynard*, 869 F.2d 1401 (10th Cir. 1989), the Tenth Circuit

found that whether or not a prospective juror's conscience would suffer by

imposing the death penalty was irrelevant to his qualifications as a juror.  The

Tenth Circuit went on to say that exclusion is justified only when a potential juror

is incapable of subordinating his scruples or conscience to his duty as a juror.  *Id*.

at 1408.

The trial court should not have dismissed jurors who merely expressed some

leaning toward a life sentence.  For example, Tina Wood did not want to

personally be the one who says a defendant should die.  (T.T. Vol. IV, at 1076-79,

R-49 [App. 119].)  She said she was not opposed to the death penalty, and could

consider all sentencing alternatives, but could not personally vote for the death

penalty, and Sherry Gately said she did "not at this time know whether or not [she]

could be in favor of the death penalty."  (T.T. Vol. II, at 429, R-47 [App. 120].)

She said she had "a very strong conscience about the death penalty," "a strong

belief that there is a stronger power that will take the revenge."  (*Id.* at 430.)  When

asked if her opposition was such that she would not vote for the death penalty

under any circumstances, she said she did not know.  She indicated that she had

402

less faith in the legal system than most, and a general distrust of attorneys.  She

said she did not know if she could consider the death penalty, and said she didn't

think she could set aside her personal beliefs.  Cindy Gaskins said she was not

conscientiously opposed to the death penalty, but maybe had some reservations

about its use in general.  (*Id.* at 326.)  She did not think that those reservations

would prevent her from making an impartial decision on the issue of guilt or

innocence or on the issue of punishment.  She gave very conflicting answers.  At

times she seemed ready to say she would always impose the death penalty, that

there must be a good case against the defendant to bring him to this stage, that she

couldn't be impartial.  At other times, though, she clearly says she would be able to

set aside her opinions and render an impartial decision.[31]

### B.   THE TRIAL COURT USED SELECTIVE INTERVENTION TO DISQUALIFY VENIREMEMBERS WHO HAD PERSONAL SCRUPLES AGAINST THE DEATH PENALTY.

In the process of improperly excusing jurors under *Witherspoon*, the trial

court was less than even-handed in its dealings with people who opposed the death

penalty (as compared to those who supported it).  Those potential jurors who stated

they had hesitations about applying the death penalty were treated dramatically

differently than those who stated they had no problems with capital punishment.

---

[31]   Petitioner's rights were also violated when other jurors were not struck for cause.

403

The trial court used leading questions to qualify pro-death penalty veniremembers and to disqualify those who expressed hesitation regarding the application of the death penalty.

A few examples demonstrate this disturbingly uneven approach. For those potential jurors who expressed hesitation to apply the death penalty, the trial court intervened with *Witherspoon* questions, and for those who indicated pro-death penalty attitudes, the trial court intervened to rehabilitate. On the other hand, the trial court actively sought to rehabilitate potential jurors LaRue Davis (143), Margaret Lynch (212), and Perry Gant (186). (T.T. Vol. III, at 762-66, R-48 [App. 105]; T.T. Vol. V, at 1161-66, R-50 [App. 121]; T.T. Vol. IV, at 1001-03, R-49 [App. 119].)

In *State v. Biegenwald*, 594 A.2d 172, 192-94 (N.J. 1991), the New Jersey Supreme Court noted that "the purpose of *voir dire* is not to elicit from a potential juror the correct answer; it is to draw out the . . . juror's view." In that case, the trial court had used "a series of leading close-ended questions. . . . [The judge's initial questions] were too often followed by close-ended, suggestive questions that, not surprisingly elicited the obvious 'correct' response." For those reasons, the New Jersey Supreme Court granted a new trial.

404

Similarly, in *State v. Williams*, 550 A.2d 1172, 1182, 1186 (N.J. 1988), the New Jersey Supreme Court reversed a death sentence in part because of the nature of the questions in *voir dire*. "[T]he tenor of the questions often appears to lead the juror inevitably to the 'correct' response." The New Jersey Supreme Court noted that in capital cases, the *voir dire* examination should use "open-ended questions, which in our opinion are most likely to provide counsel and the court with insight into jurors' opinions and biases."

*Witherspoon* and *Witt* both stress the importance of even-handed jury selection. *Voir dire* is designed to be a "quest . . . for jurors who will conscientiously apply the law and find the facts." *Witt*, 469 U.S. at 423. In this case, the trial court used leading and suggestive questions which had the practical effect of eliciting legally appropriate responses only from potential jurors who expressed support for the death penalty. Those veniremembers who hesitated were encouraged by the trial court's leading questions to provide answers that facilitated their disqualification. For this reason, the questioning "crossed the line of neutrality" and "produced a jury uncommonly willing" to impose the maximum sentence. *Witherspoon*, 391 U.S. at 520-21.

The state habeas court found this claim to be procedurally defaulted as it was not pursued on appeal (Order Denying Relief, at 17, R-267 [App. 28]) and this

405

Court found that default to be adequate and independent.[32]  Consequently, this

Court can only reach the merits of this claim upon a showing of cause and

prejudice, *Dretke v. Haley*, 541 U.S. 386, 393 (2004), or if not addressing the claim

would be a miscarriage of justice. *Schlup v. Delo,* 513 U.S. 298 (1995); *Sawyer v.*

*Whitley,* 505 U.S. 333 (1992).   Cause to excuse the default rests upon appellate

counsel's  failure to properly preserve the issue and then pursue it on appeal.  *See*

*e.g., Murray v. Carrier*, 477 U.S. 478 (1986).  Had trial counsel properly objected

to the improper excusal of jurors, the trial court either would not have struck them

for cause (thereby ensuring a fair and reliable capital jury) or if the court continued

its practice unabated, and counsel raised the issue on direct appeal, there is a

reasonable probability the outcome of the appeal would have been different, *i.e.*,

the Georgia Supreme Court would have reversed Petitioner's death sentence.

*Philmore v. McNeil*, --- F.3d ----, No. 07-1367, 2009 WL 2181682 at * 12 (11th

Cir. 2009).   Thus, cause *and* prejudice have been established.

---

[32]      Mr. Waldrip objects to this finding.

XXXII.    **CLAIM 38:  THE TRIAL JUDGE UNDULY RESTRICTED MR. WALDRIP'S VOIR DIRE IN THE GUILT/INNOCENCE PHASE OF TRIAL, WHICH VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND SENTENCING UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The trial court's restriction of Petitioner's *voir dire*, in particular its restriction of Petitioner's ability to ask veniremembers about their beliefs about prison and the practicalities of "life imprisonment," violated Petitioner's constitutional right to a fair trial.  *Simmons v. South Carolina,* 512 U.S. 154 (1994); *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412 (1985).  More specifically, the death qualification questions asked by the trial court did not meet the constitutional standards of specificity and clarity established in *Witherspoon*, 391 U.S. at 522-23.  *See also Boulden v. Holman*, 394 U.S. 478 (1969); *Maxwell v. Bishop*, 398 U.S. 262 (1970).  The trial court's undue restriction on Petitioner's right to follow up on the trial court's *Witherspoon* and reverse-*Witherspoon* questions rendered the *voir dire* incomplete and nullified the purpose of *voir dire*.

The purpose of *voir dire* is to ensure a defendant's Sixth Amendment right to an impartial jury.  *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("Without an adequate *voir dire* the trial judge's responsibility to remove

prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."). As such, the inquiry must provide the defense with sufficient information to exercise its challenges. *See Rosales-Lopez*, 451 U.S. at 188; *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973) (requiring that *voir dire* include "questions that permit the intelligent exercise of challenges by counsel"). The trial court's failure to permit adequate questioning of prospective jurors as to bias constituted a deprivation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The defendant in any criminal trial is constitutionally entitled to a jury composed of individuals with a "mental attitude of appropriate indifference." *United States v. Wood*, 299 U.S. 123, 145-46 (1936). *See also Gardner v. Florida*, 430 U.S. 349 (1977); *Turner v. Murray*, 476 U.S. 28 (1986). In addition to being unbiased, the jurors need to appear unbiased as well. *See Aldridge v. United States*, 283 U.S. 308, 315 (1931); *Estelle v. Williams*, 425 U.S. 501, 503-04 (1976); *Turner v. Louisiana*, 379 U.S. 466 (1965) (holding that the Due Process clause requires inquiry into jurors' impartiality). This is because the choice between death and life in a capital murder case is the most serious decision ever faced by a juror. Defense counsel must have the ability to determine a juror's thought

processes and biases about capital punishment.  Without determining what a juror

thinks about his/her possible options, it is impossible to ascertain his/her true

feelings about the death penalty.

A.    THE TRIAL COURT UNCONSTITUTIONALLY
      RESTRICTED PETITIONER'S VOIR DIRE REGARDING
      POTENTIAL JUROR PREJUDICES AND BIASES.

The trial court, in violation of Petitioner's constitutional rights, did not allow

Petitioner to question potential jurors on their possible prejudices and biases.  For

example, the trial court sustained the Prosecution's objection to trial counsel's

question, "You believe in the presumption of innocence?"  (T.T., at 643, R-48

[App. 105].)

Additionally, Petitioner asked, "[i]s there any other mitigating circumstance

that you could think of that you would consider besides the ones you have told me,

self-defense, protecting property or protecting a family member?"  (*Id.* at 783.)

The prosecution objected, claiming that the question was "delving into specific

circumstances under which she would reach any one verdict or the other."  (*Id.*.)

The trial court sustained the objection.  Similarly, the trial court sustained the

prosecution's objection to trial counsel's question, "Under [circumstances in which

no mitigating evidence is presented but aggravating evidence is presented] is the

only verdict that you would be willing to return would [sic] be the death penalty?"

The trial court's determination that this question sought prejudgment on the juror's part was in error.  (*Id.*)  The question was proper because it sought vital information related to the juror's ability to follow the law, and related to the juror's prejudice toward Petitioner.

Furthermore, when trial counsel asked whether the fact that someone is arrested and made to stand trial makes the juror think that person is guilty, the prosecution objected on the grounds that the judge previously ruled out that question during the motions stage.  (T.T., at 816, R-49 [App. 119].)  The trial court agreed, and sustained the objection.  (*Id.*)  This was clearly error, because trial counsel's question was permissible, relating as it does to prejudice against the defendant based on the mere fact that he had been arrested.  (T.T., at 1349-50, R-51 [App. 122].)

The United States Supreme Court has avoided requiring certain words or phrases to be used in *voir dire*, and indicated instead that "[t]he critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators.  What matters is how they might be understood – or misunderstood – by prospective jurors."  *Witherspoon*, 391 U.S. at 515 n.9.  In order to determine how the words were understood – or misunderstood – counsel must be permitted to question the veniremembers.

410

As a result, the United States Supreme Court has reversed convictions where general *voir dire* was unduly restricted. *See Morford v. United States*, 339 U.S. 258 (1950). It is clear that *voir dire* of prospective jurors must be sufficient to reveal potential bias. *See Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991). Within those bounds, the court has broad discretion as to the manner and content of the questions to be asked. *See id*.; *Rosales-Lopez v. United States*, 451 U.S. 182 (1981). This discretion is not infinite, but is "subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

A juror's understanding of sentencing alternatives bears directly on his or her attitude toward the death penalty. The trial court should have permitted questioning regarding each juror's understanding of life imprisonment. For example, veniremember LaRue Davis's testimony illustrates one kind of misunderstanding that may have been shared by other venire members. She clearly believed that a defendant sentenced to life in prison would be paroled after less than ten years. She also indicated that this belief would strongly influence any sentencing decisions she made. She said that a convicted murderer should receive the death penalty to prevent the victim's family from worrying about his possible parole.

411

Trial counsel was not permitted to question other potential jurors as to their understanding of parole eligibility, and as such was prevented from demonstrating how many other potential jurors held the same (or more significant) misunderstanding and how it would have affected (or did affect) their sentencing decisions.  Jurors who believe that life means only a few years in prison are much more likely to sentence guilty defendants to death than are jurors who correctly understand that life means dying in prison.

It should be noted, however, that the jury returned to the trial court with the question of whether life imprisonment meant no opportunity for parole.  Certainly, then, Ms. Davis's misconception is not an uncommon one, and likely may have been held by other veniremembers.  "Public opinion and juror surveys support the commonsense understanding that there is a reasonable likelihood of juror confusion about the meaning of the term 'life imprisonment.'"  *Simmons*, 512 U.S. at 170 n.9

If *voir dire* is limited or cursorily conducted, an accurate picture of jurors' biases will not be drawn.  When the questioning is not thorough, the court is effectively relying on potential jurors to reveal their own biases.  A Michigan court described this circumstance:

> [W]e do not subscribe to a jury selection procedure that effectively makes the potential juror the determiner of whether the juror should

412

> appropriately serve as a venireman in the case. Further, a potential
> juror's self-analysis . . . need not necessarily control the determination
> of the juror's impartiality; rather, that determination is reserved for the
> trial judge after sufficient inquiry.

*People v. Tyburski*, 494 N.W.2d 20, 23 n. 4 (Mich. Ct. App. 1992). That case

involved a highly publicized murder (highly publicized because the defendant

allegedly killed his wife and stored her in a freezer in the basement for a number of

years), and the court on appeal found that the *voir dire* was insufficient to

determine if there were any biased members on the jury. "Without the benefit of

any probing questions, we do not know what answers the veniremen would have

given and what such answers would have meant to defendant in exercising a

challenge for cause or a peremptory challenge." *Id.* at 27.

Because trial counsel was unable to ask such "probing questions,"

veniremembers' biases were revealed only when individual potential jurors chose

to reveal them. LaRue Davis's partiality and misunderstanding of sentencing

alternatives were revealed during *voir dire*, but numerous other veniremembers

were not put through the sort of questioning necessary to reveal similar or worse

biases.

The Georgia Supreme Court addressed the merits of this claim and found:

> Voir dire on this issue is generally not permitted, since a prospective
> juror's views on this subject are extraneous to the ability to serve.
> *Burgess v. State,* 264 Ga. at 780, 450 S.E.2d 680. Even if appellant

413

had been permitted to identify jurors like Davis, who were concerned
about the possibility of parole, disqualification would not be
automatic, since it would still have to be shown that the jurors' views
would not permit them to consider evidence in mitigation or the
option of a life sentence. *Wainwright v. Witt,* 469 U.S. at 424-426, 105
S.Ct. at 852-854.

The scope of voir dire and the propriety of the particular questions
asked should be left to the sound discretion of the trial court. *Spencer
v. State,* 260 Ga. 640, 641(1)(d), 398 S.E.2d 179 (1990).    The
extensive voir dire lasted eight days, and the questions permitted by
the trial court were sufficient to permit the discovery of bias or
prejudice held by any prospective juror. *Thornton v. State,* 264 Ga.
563, 573(13)(c), 449 S.E.2d 98 (1994); *Curry v. State,* 255 Ga. 215,
217-18(2)(b), 336 S.E.2d 762 (1985)

*Waldrip v. State*, 482 S.E.2d 299, 308 (Ga. 1997).  The Georgia Supreme Court's

resolution of the issue was contrary to clearly established Supreme Court

precedent, *i.e.*, *Turner v. Louisiana*, 379 U.S. 466 (1965); *Simmons v. South

Carolina,* 512 U.S. 154 (1994), because the court failed to apply the federal law.

Assuming the Georgia Supreme Court applied the correct federal law, it did so

unreasonably.  28 U.S.C. §2254(d)(1).

414

XXXIII.    CLAIM 39:  MR. WALDRIP'S SENTENCE OF DEATH IS
BEING EXACTED PURSUANT TO A PATTERN AND
PRACTICE OF GEORGIA'S PROSECUTING AUTHORITIES,
COURTS AND JURIES TO DISCRIMINATE ON GROUNDS
OF RACE, GENDER, AND POVERTY IN THE
ADMINISTRATION OF RIGHTS GUARANTEED BY THE
EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION.

The death penalty in the United States, and particularly in the State of

Georgia, has been discriminatorily imposed against poor persons and against

persons convicted of killing a white person.  The probability of execution is

overwhelmingly greater in cases where, as in this case, the accused is poor and

male and the victim is white.  Petitioner's death sentence was imposed pursuant to

this pattern of racial, economic and sexual discrimination.  Furthermore, the lack of

a uniform standard for seeking the death penalty in Georgia results in a system in

which the death penalty is imposed in an arbitrary and capricious manner; and, in

Petitioner's case – freakishly.

The discriminatory imposition of the death penalty is demonstrated both by

statistical evidence and by independent indicia that show that Petitioner was

specifically discriminated against because he is a poor male and because his victim

was white.

In the early 1980s, researchers conducted a study whereby they traced cases

that had gone through the Georgia court system to see if there was any statistical

415

evidence demonstrating that factors of race, sex or economic status of the accused

and victim had a predictable outcome on the imposition of the death penalty in

capital cases.  In the now famous "Baldus" study, researchers concluded that,

indeed, there were such connections.  One of the most surprising and significant

results of the Baldus analysis was the established connection between the race of

the **victim**, rather than the race of the defendant, and the imposition of death.  For

example, the Baldus study found that defendants charged with killing a white

victim in Georgia were 4.3 times more likely to receive a death sentence than

defendants charged with killing a black victim.  *See McCleskey v. Kemp*, 481 U.S.

279, 321 (1987) (Brennan, J., dissenting).  These connections are clearly apparent

in the prosecution and conviction of Petitioner.

Petitioner acknowledges that, at this time, to succeed with a Fourteenth

Amendment claim, he must demonstrate either that the decision makers in his case

acted with discriminatory purpose, or that the decision makers possessed racial

biases that created "an 'unacceptable risk' that race affected the sentencing

decision." *Dobbs v. Zant*, 720 F. Supp. 1566, 1572 (N.D. Ga. 1989), *aff'd* 946 F.2d

1519 (11th Cir. 1991).  *See also McCleskey*, 481 U.S. at 309.  For this reason,

Petitioner moved this Court for an order allowing the depositions of the decision

makers in his case.  Depositions were necessary to allow Petitioner to put before

416

this Court such additional information to show that virtually everyone involved in this case, including members of the jury, held racist views that impermissibly played a role in the consideration of the sentence imposed upon Mr. Waldrip.  (*See* Motion for Protective Order to Prohibit Petitioner From Taking the Deposition of the Trial Judge and Prosecutors (12/23/98), Doc. 70, Ex. P-37 (filed 7/31/09) [App. 123]; Motion for Protective Order to Prohibit Petitioner from Taking the Depositions of Trial Jurors (12/23/98), Doc. 46, Ex. R-311 (filed 5/24/06) [App. 124].)  These motions were denied by this Court.  (*See* Order Upon Petitioner's Motions For Leave Of Court To Take The Depositions Of The Judge And Prosecutors: and The Jurors (6/24/99), Doc. 46, Ex. R-312 (5/24/06) [App. 125].)

In addition, to the extent that Petitioner has been denied funds for investigation and expert assistance, he has been unable to investigate in any detail the racism that plagues trials in the Northeastern Judicial Circuit.  (*See* Petitioner's *Ex Parte* Motion for Funds for Discovery Costs, Attorneys' Fees, Mitigation Expenses, Investigation Fees, Expert Assistance and Hearing Expenses filed August 3, 1998 and its supporting Memorandum, Doc. 70, Ex. P-38 (filed 7/31/09) [App. 126].)  Both the lack of funds and the Court's decision to prohibit Petitioner from questioning the prosecuting attorneys and jurors on the issue of

417

racism have denied Petitioner his right to a full and fair evidentiary hearing in state court.[33]

A death sentenced inmate is entitled to habeas corpus relief under the Fourteenth Amendment to the United States Constitution if he can show purposeful discrimination by decision makers in his case, or under the Eighth Amendment if he can demonstrate a substantial likelihood that racial considerations played a role in the decision to impose a sentence of death rather than one of life. *McCleskeey,* 481 U.S. 279. Petitioner has done just that. The decision to seek the death penalty in Petitioner's case and the sentence of death itself were the direct result of the inherent discrimination in Georgia's death penalty statute, the racial discrimination of the Prosecution and the trial court in his case, and the racial bias of the jurors.

---

[33] Trial counsel filed pretrial motions alleging that the death penalty in Georgia and as applied in this case was arbitrarily applied based on the class of the defendant and of the victim. (*See* ROIA, at 188-191, R-1 (Motion to Strike and Quash as Unconstitutional the Georgia Statutes Providing For Imposition of Death Penalty, and Their Application in this Case) [App. 127]) To the extent that trial counsel failed to present this issue adequately to the trial court, they were ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984). To the extent that appellate counsel failed to litigate this issue effectively on appeal, counsel rendered constitutionally deficient performance and Petitioner was thereby prejudiced. *Id.; Williams v. Turpin*, 87 F.3d 1204, 1210 (11th Cir. 1996). In any event, this claim must be considered on the merits to avoid a miscarriage of justice. O.C.G.A. § 9-14-48(d). While the Georgia Supreme Court has not defined the scope of this exception to procedural default rules, this case clearly represents a miscarriage of justice because this claim affects fundamental rights and requires reversal without a showing of prejudice.

Further, the lack of a uniform standard for seeking the death penalty across Georgia renders Petitioner's death sentence unconstitutional under the Supreme Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000).  When fundamental rights are involved, the Equal Protection Clause of the Fourteenth Amendment requires that there be "uniform" and "specific" standards to prevent the arbitrary and disparate treatment of similarly situated people.  *Bush*, 531 U.S. at 98.  In *Bush v. Gore*, the Supreme Court was confronted with an opinion by the Florida Supreme Court that did not set forth uniform standards in its opinion ordering a recount. The Supreme Court held that such a recount would not respect the "equal dignity owed to each voter."  *Id.* at 104.

The Georgia death penalty system concerns a right even more fundamental than the right to vote – the right to life.  As was true in the Florida recount, Georgia's lack of statewide standards to guide prosecutors in determining which cases warrant seeking the death penalty inevitably leads to the disparate treatment of similarly situated people accused of potentially capital offenses.

Those principles require that the method of deciding which defendants may face the death penalty be subject to at least as much scrutiny as the process of

419

counting votes.[34]  The need for equality and non-arbitrariness when the State seeks

to deprive a citizen of his life outweighs any benefits of unbridled prosecutorial

discretion.

---

[34]  While the Supreme Court stated that its holding in *Bush v. Gore* was limited to the facts of that case, the principles it announced are sound and must be subject to respect as precedent.  The *per curium* opinion explained the narrow scope of its holding by distinguishing the somewhat unusual situation of a court-ordered statewide recount from an ordinary election.  In ordinary elections, the Court said, the Equal Protection Clause does not prohibit counties from developing "different systems for implementing elections."  *See Bush*, 531 U.S. at 109.  One reason for this distinction is that once ballots have been cast, the "factfinder confronts a thing, not a person," and thus "[t]he search for intent can be confined by specific rules designed to ensure uniform treatment."  *Id.* at 106.  Also, individual counties may have "expertise" that justifies letting them choose their own methods of conducting elections.  *Id.* at 109.  Another explanation is that "local variety [in voting machines and procedures] can be justified by concerns about cost, the potential value of innovation, and so on" whereas a "different order of disparity" occurs when, after ballots have been cast, physically identical ballots are hand-counted according to different rules.  *Id.* at 134 (Souter, J., dissenting).

These explanations, however, simply do not serve as an adequate basis for not applying the *Bush* Equal Protection rule to Georgia's death penalty system.  Just as Florida counties can use different voting machines in their elections, Georgia circuits can certainly have separate prosecutors and can structure those prosecutors' offices differently; this allows the flexibility demanded by limited budgets and justified by local expertise, and takes into account the potential for innovation inherent in a system of local control.  With regard to the Court's distinction between a "thing" and "person," although it is true that prosecutors charged with deciding when to seek the death penalty confront people and not things, this does not diminish the Equal Protection Clause's requirement of non-arbitrariness.  While it might be easier to design standards about whether to count "hanging chads" as legal votes, it is certainly possible to write standards to guide prosecutors in deciding whom to prosecute for capital murder.  *See, e.g.*, United States Attorneys' Manual §9-10.010 *et seq.* (1995) (laying out "federal protocol" for capital cases); U.S. Dep't of Justice, The Federal Death Penalty System:  Supplementary Data, Analysis and Revised Protocols for Capital Case Review (2001), http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm.

**A.    BECAUSE THE RIGHT TO LIFE IS A FUNDAMENTAL RIGHT WHICH MUST BE SUBJECT TO AT LEAST THE SAME CONSTITUTIONAL PROTECTIONS AS THE RIGHT TO VOTE, THE STATE CANNOT DEPRIVE ITS CITIZENS OF THEIR LIVES IN A DISPARATE AND ARBITRARY MANNER.**

Since the right to life is fundamental, when a State implements a death penalty system, it must establish mechanisms to ensure that the system values the lives of its citizens equally.  In *Bush*, the Supreme Court noted that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush*, 531 U.S. at 104-05.  By the same reasoning, since the Constitution has ensured the right to life and to the equal protection of the laws, a State may not, by arbitrary and disparate treatment, value one person's life over that of another.

The duty of this Court to protect against the arbitrary taking of Petitioner's life is heightened by the fact that, unlike the right to vote, the right to life is contained in the text of the Constitution:  the Fifth and Fourteenth Amendments provide that neither the federal government nor the states shall deprive any person of "life, liberty, or property" without due process of law.  U.S. Const. amend. V; amend. XIV, § 1.  Indeed, the United States Supreme Court has long recognized

421

the fundamental nature of the right to life, particularly in the context of the death penalty.[35]

In addition, Georgia's lack of standards to ensure the non-arbitrary imposition of the death sentence is sufficient in itself to establish an Equal Protection violation; a showing of intentional discrimination against a protected class is not required.[36]  Unlike these traditional Equal Protection claims of intentional discrimination against a protected class, claims like this one and the one in *Bush* are not based on an individual act of discrimination, but rather challenge a system in which uncontrolled official discretion makes arbitrary and unequal treatment inevitable.

**B.  THE LACK OF A UNIFORM STANDARD GUIDING PROSECUTORS WHEN TO SEEK THE DEATH PENALTY HAS LED TO THE ARBITRARY AND DISPARATE TREATMENT OF SIMILARLY SITUATED DEFENDANTS, PARTICULARLY IN CASES SUCH AS PETITIONER'S.**

Georgia has 159 counties, administratively grouped into 48 and now 49 circuits.  (These circuits are further administratively grouped into 10 judicial

---

[35]  *See Furman v. Georgia*, 408 U.S. 238, 359 (1972) ("because capital punishment deprives an individual of a fundamental right (i.e., the right to life), . . . the State needs a compelling interest to justify it.")

[36]  *See Bush*, 531 U.S. at 106.  While in traditional claims of discrimination against individuals, courts require evidence of discriminatory intent by a state actor in that particular case, *see, e.g., McCleskey v. Kemp*, 481 U.S. 279 (1987), in *Bush*, the Court did not require any such showing.

districts.)  Each circuit has an elected District Attorney, and it is this prosecutor

who decides whether to seek the death penalty in any given case.

Unlike most states, Georgia has an exceptionally broad definition of murder.

O.C.G.A. 16-5-1 (defining murder as causing the death of another with "malice

aforethought, either express or implied" or causing the death of another "in the

commission of a felony").  There is no crime of "capital murder" as there is in

other states, and Georgia does not have second and third degree murder.  O.C.G.A.

17-10-30(b) sets out ten aggravating factors, one of which must be found before

the death penalty can be imposed, but those factors are so broad that they apply to

virtually any murder.  For example, any murder committed in the commission of

another capital felony, aggravated battery, burglary or arson in the first degree is

death eligible.  O.C.G.A. 17-10-30(b)(2).  Any murder committed for the "purpose

of receiving money or any other thing of monetary value" is death eligible.

O.C.G.A. 17-10-30(b)(4).  And a catch-all provision, subsection (b)(7), allows

imposition of the death penalty if the murder was "outrageously or wantonly vile,

horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated

battery to the victim."  Thus, Georgia prosecutors can seek the death penalty in

virtually any murder case.  Georgia prosecutors, nonetheless, do not seek death in

the overwhelming number of eligible cases.

Georgia law provides no standards to guide the district attorneys in their decisions as to when to seek the death penalty. Instead, the prosecutor in each circuit makes this decision on his or her own, according to unwritten and widely varying standards. The result is that whether a person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred, the quality of the court-appointed lawyer for the accused, and, even more disturbingly, the race of the victim.[37]

The state habeas court found this claim to be procedurally defaulted because it was not pursued on direct appeal. (Order Denying Relief, at 19, R-267 [App. 28].) This Court found the state court's finding of default to rest on an adequate and independent state rule and further ruled it would not address the merits but upon a showing of cause and prejudice.[38] Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly preserve the issue and then pursue it on appeal. *See e.g., Murray v. Carrier*, 477 U.S. 478 (1986). Had trial counsel properly objected, the trial court would have been duty-bound to include Petitioner in all aspects of his capital trial. Further, if the trial

---

[37] *See McCleskey v. Kemp*, 481 U.S. 279 (1987) (allowing Georgia to carry out executions even though a person is four times more likely to be sentenced to death if the victim was white than if the victim was African-American).

[38] Mr. Waldrip objects to this finding.

court did not comply and appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's conviction and death sentence.  *Philmore v. McNeil*, --- F.3d ----, No. 07-13637, 2009 WL 2181682, at * 12 (11th Cir. July 23, 2009).  Thus, cause *and* prejudice have been established.  Moreover, although the Supreme Court has not defined "fundamental miscarriage of justice" clearly a death sentence predicated on race would constitute a miscarriage of justice which would also excuse any default.

XXXIV.    **CLAIM 40: THE COURT'S LIMITED VENUE CHANGE FOR THE GUILT/INNOCENCE AND SENTENCING PHASES OF TRIAL VIOLATED MR. WALDRIP'S RIGHT TO A FAIR TRIAL UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The trial court's purpose for changing venue to Gwinnet County for the guilt/innocence and penalty phase of the trial was to ensure Petitioner's right to a fair trial by an impartial jury unaffected by prejudicial pretrial publicity.  The limited transfer to Gwinnet County, however, was insufficient to remove doubt about the impartiality of the jury that heard the trial.  The same prejudicial pretrial publicity that infected Dawson County and its neighbors had spilled into Gwinnet County.  Because the trial court had no reason to select Gwinnet County, versus other counties that do not share any media sources with Dawson County (and thus had no possibility of being infected with prejudicial pretrial publicity), the trial court erred in not transferring venue for the Underlying Trial to a location that posed no risk of a biased jury pool.

A.    **THE TRIAL COURT CHANGED THE VENUE TO GWINNETT COUNTY, IGNORING THE VENUES PROPOSED BY THE DEFENSE AND THE PROSECUTION.**

On July 10, 1991, the Defense filed its <u>Motion to Change of Venue</u> (the "<u>Original Motion to Change Venue</u>"), which was unopposed by the Prosecution. (*See* ROIA, at 211-15, R-1.[App. 106].)  As was discussed above in Claim VIII,

426

the Prosecution and the Defense entered into the Venue Stipulation that was approved by the Trial Court.  (P.T. (8/28/91) Vol I, at 5, R-22 [App. 107].)  The trial court heard additional evidence, that supported the Venue Stipulation.  On December 6, 1991, the trial court granted the Defense's <u>Original Motion to Change Venue</u>.  (*See* ROIA, at 921-22, R-1 (<u>Order Granting Change of Venue</u>) [App. 108].)  The trial court requested that the parties propose three venues for the Underlying Trial.  (*Id.* at 922.)  The prosecution and defense could not come to an agreement on a proposed venue.  (*Id.* at 989 (the Defense's <u>Response to Court Order of December 6, 1991, as to Venue</u>).)

On August 16, 1994, the trial court announced that it had decided not to accept the parties' proposed venues and had chosen Gwinnett County.  (*See* Record on Appeal (ROA), Doc. 9, Ex. R-6, at 69-70 (filed 5/24/06) (<u>Change of Venue for Trial on the Indictment</u>) [App. 128].)  This limited venue change, unfortunately, did not eliminate the doubt caused by the pervasive prejudicial pretrial publicity that infected Dawson County and caused the venue change in the first place.

**B.    THE TRIAL COURT ERRED IN NOT MOVING VENUE FURTHER FROM DAWSON COUNTY THAN GWINNETT COUNTY BECAUSE IT WAS INHERENTLY PREJUDICIAL.**

Because Gwinnet County was infected with the same publicity as Dawson County, it created a trial atmosphere that was "utterly corrupted" by the media

427

coverage.  *Dobbert v. Florida*, 432 U.S. 282, 303 (1977).  This resulted in a jury pool that was inherently biased against Petitioner.

Dawson County's two biggest media outlets, the Gainesville Times newspaper and the WDUN radio station also circulate/cover Gwinnet County.  If the whole purpose of transferring venue is to escape prejudicial pretrial publicity, it is illogical to transfer venue to a location with the same media coverage.  Because the murder of Mr. Evans became a sensationalistic news story, which occurred within the boundaries of the media's primary market, the media paid more attention to it than if it had been elsewhere in the state. (P.T. (8/29/91), Doc. 9, Ex. R-24, at 75-77 (filed 5/24/06) [App. 129].)  Therefore, because the Trial Court considered that the pretrial publicity in Dawson County created an unacceptable risk of bias, that finding should have precluded transfer to Gwinnet County because of the inherent prejudice there.

**C.   THE TRIAL COURT ERRED IN NOT MOVING VENUE FURTHER FROM DAWSON COUNTY THAN GWINNETT COUNTY BECAUSE THE GWINNETT COUNTY VENIRE WAS ACTUALLY PREJUDICIAL.**

Various venirepersons during the guilt/innocence phase of the trial were infected with prejudice and bias resulting from pretrial publicity.  Aside from the fact that several venirepersons were acquainted with Dawson County and its

428

inhabitants,[39] several venirepersons testified as to the pretrial publicity to which

they had been exposed, and about which they had developed opinions.  For

example, several venirepersons testified that they had received the Gainesville

Times, in which the case received coverage, and had read articles concerning the

case.  Venireperson Hinson had read an article and seen photos of the defendant in

the Gainesville Times during the week of voir dire.  (T.T. Vol. IV, Doc. 9, Ex. R-

49, at 842 (filed 5/24/06) [App. 119].)  Hinson testified that the photo was one "of

the defendant, I believe it was maybe shot entering the courtroom, I think I recall

him being in a similar suit than [sic] as the one he was in."  (*Id.*)  Hinson added

that the article he had read mentioned that Mr. Evans had been a material witness

to another prosecution, and had mentioned Tommy Lee's co-defendants.  (*Id.*)

When asked to describe what he thought the case was about, from reading the

---

[39]     For example, several venirepersons testified that they had heard about Dawson County.
Others had been through Dawson County, such as venirepersons Sonnenschein (T.T. Vol.
VII, Doc. 9, Ex. R-52, at 1441 (filed 5/24/06) [App. 130].), Champa (T.T. Vol. IV, at
953, 970, R-49), and Jones (*Id.* at 1051), who characterized its inhabitants as
"[g]enerally…real nice." (*Id.*) Venireperson Bonita RaguetChampa characterized it as
"rural."  (*Id.* at 970.)  Venireperson Bonita Raguet stated that he had been to Dawson
County, (T.T. Vol. VI, at 1365, R-51), as did venirepersons Pike (T.T. Vol. IV, at 1033,
R-49) and Gant (*Id.* at 1004).  Still others had spoken to individuals who lived there or
had acquaintances or friends who lived there.  For example, venireperson Baca had not
only been to Dawson County, but had interacted with people who lived there.  (T.T. Vol.
III, at 713-714, R-48 [App. 105].)  Venireperson Zappia testified that she had had been
through Dawson County and had an acquaintance there.  (T.T. Vol. IV, at 1086-87, R-49
[App. 119].)  Similarly, venireperson Mock testified that she had been to Dawson County
and had a friend who had a residence there.  (T.T. Vol. VI, at 1324, R-51 [App. 122].)

article, Hinson replied, "A murder charge with three defendants involved and a man, from the article, a man who was a material witness to another case, but the article, I'm not clear who the other case is against, I don't know whether that case is against your client or not." (*Id.* at 843.)

Other venirepersons had read about the case in other newspapers or publications. For example, venireperson Rumph recalled having read an article, which appeared in the Atlanta Journal-Constitution, "discussing some of the allegations" including "murder" and "kidnapping." (T.T. Vol. V, at 1190, R-50 [App. 121].) Similarly, venireperson Rockett remembered Keith Evans's name from reading newspaper articles about the case. (*Id.* at 1208.) Rockett added that he "[wasn't] sure" whether he could put aside what he had read in making a determination about the case because, as he said, "for example, if I remembered something that seemed overwhelming to me, then I think it would influence me." (*Id.*) Venireperson Mock also recalled having read about the case in the paper. (T.T. Vol. VI, at 1325, R-51.) Venireperson Owens particularly recalled newspaper headlines concerning the case. (*Id.* at 1375.) Finally, certain venirepersons, such as venireperson Walters, recognized the names of people involved in the case and the "situation" from having heard about it on television. (T.T. Vol. III, at 799-800, R-48 [App. 105].)

In fact, one of the venire members who was infected with inherent and actual prejudice due to pretrial publicity was impaneled on the jury. In response to questions as to whether she had read or heard about the case or anything concerning the death of Keith Evans, Venireperson/Juror Claudon replied, "Not concerning the death of Keith Evans, but after I left yesterday Mr. Waldrip's name sounded familiar." (T.T. Vol. II, at 296, R-47 [App. 120].)  Later in her testimony, she was questioned as to this statement. She said, "It [the Waldrip name] kind of rings a bell. I don't know if I heard it on the news or read it in the paper or where." She continued, "It just rung a bell and I can't remember where I heard it or if I saw it, like I say, if I saw it on the news or read it in the paper or, I do try to read the paper as often as I can, but I don't know where, if it, if it is just a name of somebody I may have once known long, long ago, but it rings a bell." (*Id.* at 305.)

Ms. Claudon's testimony indicates that the news coverage of the murder and the investigation did reach outside Dawson County and into Gwinnett County, as she recalled having read or seen the name Waldrip in the news. Perhaps other impaneled jurors also saw or read news accounts that they did not instantly recall during voir dire, or did not reveal during voir dire. Without more detailed questioning during voir dire, it was impossible to tell whether any of the other jurors were unduly exposed to pretrial publicity. Regardless, there is ample

431

evidence that the venue in Gwinnett County was inherently prejudicial, and that the Gwinnett County venire was actually prejudicial.  For these reasons, the trial court's failure to move the case to a venue further away from Dawson County than Gwinnett County was error, and should not stand.

The state habeas court found this claim to be procedurally defaulted because it was not pursued on direct appeal.  (Order Denying Relief, at 16-17, R-267 [App. 28].)  This Court found the state court's finding of default to rest on an adequate and independent state rule and further ruled it would not address the merits but upon a showing of cause and prejudice.[40]  Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly preserve the issue and then pursue it on appeal.  *See e.g., Murray v. Carrier*, 477 U.S. 478 (1986).  Had trial counsel properly objected, the trial court would have conducted an appropriate change of venue.  However, if the trial court failed to properly change venue, appellate counsel could have pursued this issue on direct appeal, where there would have been a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's death sentence.  *Philmore v. McNeil*, --- F.3d ----, No. 07-13637, 2009 WL 2181682, at * 12 (11th Cir. July 23, 2009).  Thus, cause *and* prejudice have

---

[40]     Mr. Waldrip objects to this finding.

432

been established.  Moreover, as Petitioner is actually innocent (*See* Volume III) his

execution would be a fundamental miscarriage of justice which would also excuse

the default in this case.  *Wellons v. Hall*, 554 F.3d 923, 936 (2009) ("but for a

constitutional error, no reasonable juror would have found the petitioner eligible

for the death penalty under the applicable state law.") (citation omitted).

**XXXV.    CLAIM 41:  BY NOT REMOVING CERTAIN JURORS FOR CAUSE, THE TRIAL JUDGE VIOLATED MR. WALDRIP'S RIGHT TO A FAIR TRIAL AND SENTENCING UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Petitioner's rights to a fair trial and sentencing were violated when several venire members – including, but not limited to LaRue Davis, Perry Gant and Margaret Lynch – were not dismissed for cause even though they showed a clear bias against Petitioner.  Each of these jurors should have been removed because each expressed evident bias against the Petitioner during *voir dire*.  Because the Trial Court did not excuse these jurors for cause, as it should have, the Defense was forced to use its valuable peremptory strikes to remove these three jurors.  For these reasons, Petitioner's constitutional rights were violated.

A criminal defendant has a fundamental right to an impartial jury that will perform its legal duty.  A cornerstone of this constitutional right is the court's duty and power to remove biased and improper venire members from the jury pool for cause.  *Witherspoon v. Illinois*, 391 U.S. 510 (1968); *Wainwright v. Witt*, 469 U.S. 412 (1985).

A.   **THE TRIAL COURT ERRED IN FAILING TO EXCUSE FOR CAUSE VENIREPERSONS WHOSE VIEWS ABOUT THE DEATH PENALTY WERE SO FIXED THAT THEY WERE INCAPABLE OF CONSIDERING A SENTENCE OTHER THAN DEATH**

Potential jurors LaRue Davis and Margaret Lynch both expressed during *voir dire* a clear predisposition to apply the death penalty.  The standard for disqualification for strong pro-death penalty opinions is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Witt*, 469 U.S. at 412.

1.   **Venireperson LaRue Davis Stated that She Would Sentence to Death Any Individual Who Had Committed Murder, and Would Not Consider Any Mitigating Factors Other than Self-Defense and/or Accident.**

Venireperson Davis began her testimony by saying that a person found guilty of murder "should not be allowed to live and that the family of the victim should not have to worry about him being up in jail and possibly out on parole after so many years and be out on the street again."  (T.T. Vol. III, Doc. 9, Ex. R-48, at 765 (filed 5/24/06).)  She also said that "[i]f a person is, has murdered someone in blood, cold blood, has no remorse for it and because of all the evidence that is presented he is determined to be guilty of it, than he should have the electric chair."  (*Id.* at 775.)

Although Davis answered questions about whether she would follow the judge's instructions over her personal beliefs about the death penalty and about

whether she could give fair consideration to all sentencing alternatives in the affirmative, *Nance* indicates that the trial court erred in not striking her for cause. Davis's statement is similar to those of the juror in *Nance*, who said that she would follow the law, and then said she would vote for the death penalty.  As a result, Davis should have been excused for cause.

Also, although she later testified that she "wouldn't just give the death sentence just to anybody," she was referring to the fact that she would not give the death penalty to a person who killed someone in self-defense or by accident.  (*Id.* at 778.)  Thus, she had a fixed opinion as to mitigating circumstances; she was willing to consider only certain legal defenses as mitigation.  Davis's view on mitigating evidence indicates that she would not be able to follow the law, which requires jurors to look at *all* mitigating evidence.  Similarly, her views on the possibility of rehabilitation were completely clouded by her belief that a murderer should get the death penalty.  As she explained,

> There is a possibility that that person could be rehabilitated in his term, life term, and if he is, I'm sure that if he was on parole, it would be the decision of a lot of judges and lawyers and so forth and they would consider whether he would deserve to be out on parole and so, but if he is just definitely a murderer, has no remorse for his crime, I think he should have the electric chair.

(*Id.* at 780.)  Although upon a cursory reading of the transcript, Davis seemed open to considering the possibility that a convicted murderer could be rehabilitated, her true feelings eventually came out.  At one point, while stating that she would be

willing and able to follow the court's instructions as to applying the death penalty, she said that she did not think she would be able to go against the other jurors. (*Id.* at 785.)

Defense counsel is entitled to ask whether a particular juror would always vote to apply the death penalty in the event of a conviction. *See Morgan v. Illinois*, 504 U.S. 719, 736 (1992). "A capital defendant may challenge for cause any prospective juror who maintains such views [i.e., who will automatically vote for the death penalty]. If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.* at 729. A defendant must be permitted to ask not only whether a venire member will be able to follow the law, but also whether they will always vote to impose the death penalty. Here, trial counsel asked at a bench conference whether he could ask Davis whether she would automatically vote for the death penalty.[41] (T.T. Vol. III, at 774, R-48.)

Based on her fixed opinion, the Trial Court should have struck venireperson Davis for cause.

---

[41]   The trial court permitted trial counsel to ask the questions, but then Former Trial Counsel inexplicably failed to do so. This was constitutionally deficient representation under *Strickland v. Washington*, 466 U.S. 668 (1984).

2.   **Venireperson Margaret Lynch Stated that She Would
Sentence to Death Any Individual Who Had Committed
Murder, and Would Not Consider Any Mitigating Factors
Other than Self-Defense and/or Accident.**

Like venireperson Davis, venireperson Lynch also expressed fixed pro-death

penalty views during *voir dire*.  For example, she indicated her preference for the

death penalty as follows:

> If a person is, I guess the different things of murder, **if it was self-
> defense or an accident, that is a different story, I feel**.  I feel with
> hatred and anger and really, I mean, proven that they did it with lots of
> witnesses and evidence, then I feel like the death penalty is the best
> and not life imprisonment.  **I don't feel like they should be able to
> live if they have taken someone's life**.

(T.T. Vol. V, Doc. 9, Ex. R-50, at 1163 (filed 5/24/06) (emphasis supplied).)

Although she said that although she "would listen to all the sides ... [she] feel[s]

like the death penalty should be, you know, a means to handle things like that [i.e.,

in cases 'where there is anger, vindictiveness and a lot of witnesses']."  (*Id.* at

1177.)

Trial counsel moved to excuse Lynch for cause, arguing that her "fixed

opinion" disqualified Lynch.  As to mitigating circumstances, he pointed out that

Lynch did not list any that were not legal defenses, such as self-defense or

accident.  (*Id.* at 1182-83.)  Thus, like Davis, Lynch indicted her belief that

mitigating circumstances were not valid reasons to abstain from sentencing a

defendant to death.  For all of the above reasons, Lynch was predisposed to render

438

a sentence of death rather than life imprisonment, and the trial court should have struck her for cause.[42]

**B.    THE TRIAL JUDGE ERRED IN NOT EXCUSING CERTAIN VENIREPERSONS FOR CAUSE, WHERE THEY EXHIBITED BIAS AGAINST DEFENDANT DURING *VOIR DIRE*.**

A juror must be excused for cause if their beliefs would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (footnote omitted).  Because "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear," *id.* at 424-25, courts should err on the side of striking for cause.

During *voir dire*, Venireperson Gant expressed his prejudice against Petitioner because of the long list of witnesses that the Prosecution announced at the beginning of *voir dire*.  (T.T. Vol. IV, Doc. 9, Ex. R-49, at 1011-12 (filed 5/24/06).)  Gant went so far as to doubt his own ability to remain impartial, observing,

Q. (By Brannon):   Is that an opinion you still hold?

---

[42]    The trial court should have struck other jurors for cause, including, but not limited to, Derek Cook, Shirley Neal, Susan King, Pamela Rockett, Holly Mock and Melissa McMillin.

A. (Gant):   No.  As of right this minute, yes the opinion I hold.  But I had asked could I get that out   of my mind and be a juror, sure, I can, but I   don't know that you want to take that  chance.   If  you  was  my lawyer, I wouldn't want you taking that chance.

(*Id.* at 1023.)  The trial court attempted to rehabilitate Gant, but he vacillated throughout the Court's questioning and kept saying the weight of the number of witnesses made him think that the Prosecution's case was too strong to overcome. The trial court, however, did not strike Gant.  This was improper and violated Petitioner's constitutional right to a fair and impartial jury.

## C.   THE TRIAL JUDGE ERRED IN NOT EXCUSING CERTAIN VENIREPERSONS FOR CAUSE, WHERE THEY EXHIBITED A MISUNDERSTANDING OF PAROLE ELIGIBILITY.

A juror's understanding of different sentencing alternatives directly affects his views on the death penalty.  If, for example, a juror believes that a defendant receiving a life sentence will be paroled in a certain amount of time, that juror might be more likely to impose a death sentence.  *Voir dire* testimony from potential juror LaRue Davis indicates that she clearly believed that a defendant sentenced to life in prison would be paroled after seven or eight years.  This inaccurate understanding of parole eligibility made her hesitant about non-death sentences for defendants charged with murder; she did not want a victim's family to have to worry about the defendant being out on the streets again after such a short period of time.

Davis should have been excused for cause based on this inaccurate

understanding of parole eligibility.  Because the motion was denied, the defense

was forced to use one of its peremptory challenges to excuse Davis.  Leaving

Davis on the jury would have tainted the jury deliberations by "creating a false

choice between sentencing petitioner to death and sentencing him to a limited

period of incarceration."  *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994).

In *Simmons*, the United States Supreme Court recognized the danger in

jurors having flawed understandings of a defendant's parole eligibility.  For that

reason, the Court found that due process requires that a capital defendant be

allowed to instruct the jury that he is ineligible for parole if the prosecution argues

that the defendant presents a future danger.  *Id.*  There is no logical reason to limit

*Simmons* to jury instructions.  *See Goins v. Angelone*, 52 F. Supp. 2d 638, 673

(E.D. Va. 1999) (holding that there was no reason to distinguish between

addressing parole eligibility in *voir dire* and addressing it through a jury

instruction).[43]

---

[43]     At the time of trial, there were only two sentencing alternatives for the jury, death and life
with the possibility of parole.  *See* O.C.G.A. §17-10-16 (1994).  Since that time, however,
Georgia has enacted a third possibility, life without possibility of parole.  *See* O.C.G.A.
§17-10-16 (2002). Because of that change, in Georgia there is now a statutory right in
Georgia to examine prospective jurors regarding their ability and willingness to consider
life sentences, both life with the possibility of parole and life without the possibility of
parole.  *See* O.C.G.A. §15-12-133 (allowing counsel to ask venire members about "any
fact or circumstance indicating any inclination, leaning, or bias which the juror might
have respecting the subject matter of the action or the counsel of parties thereto").  Given

(Continued)

441

Petitioner had a constitutional right to a jury that was not biased toward inflicting the death penalty for any reason, including ignorance about a life sentence. Davis's belief that a life sentence would permit a defendant to be paroled after seven or eight years was clearly inaccurate, and interfered with her ability to "fairly [] consider a life sentence." As such, venireperson Davis should have been excused for cause.

The Georgia Supreme Court addressed the merits of this claim and found: (1) as to juror Davis, the "final distillation of [her] thoughts . . . . support the trial court's finding that [she] was qualified to serve as a juror." *Waldrip v. State*, 267 Ga. 739, 744 (1997); (2) as to juror Gant "[t]he trial court's finding that Gant was qualified is consistent with the general rule that a juror who merely leans one way or another, before hearing any evidence, is not subject to disqualification" and that, although he "initially stated that he would not make a very good juror, ... [his] assurances of his ability to follow the court's instructions and decide the case solely on the evidence" justified the trial court's failure to strike for cause. *Id.* at 745; and (3) as to juror Lynch, although she "initially stated that the death penalty was appropriate for murder committed with anger, hatred, or premeditation" her later

---

(Continued)

> *Simmons*, it was improper for the trial court to limit Petitioner's *voir dire* on parole eligibility bias.

equivocal responses "viewed in their entirety, support the trial court's conclusion that she was qualified to serve as a juror." *Id*.  The state courts' determination of this issue is an unreasonable application of clearly established Supreme Court precedent, *i.e., Wainwright v. Witt,* 469 U.S. at 424.  Clearly, the jurors in question expressed opinions and beliefs that would have substantially impaired their ability to follow the instructions of the court and to do their duty as jurors.  This Court should grant the writ.

XXXVI.   **CLAIM 42:  PETITIONER WAS DENIED A FUNDAMENTALLY FAIR COMPETENCY PROCEEDING AND TRIAL BY THE UNDERREPRESENTATION OF HISPANIC PEOPLE IN THE GRAND AND TRAVERS JURY POOLS IN BOTH HALL COUNTY, GEORGIA AND GWINNETT COUNTY, GEORGIA, IN VIOLATION OF THE FIFTH SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Petitioner's trial to determine his competency occurred in September 1994, in Hall County, Georgia.  Petitioner's criminal trial occurred in October 1994, in Gwinnett County, Georgia.  Both the grand and traverse jury pools in Hall and Gwinnett Counties reflected a systematic exclusion and under representation of Hispanic persons, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Georgia Constitution.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979), requires that in determining whether the Sixth Amendment's guarantee to a fair cross-section has been violated, evidence that:

(1)    the group alleged to have been excluded is a "distinctive" group in the community;

(2)    the representation of the group in jury pools was not fair and reasonable in relation to the number of such persons in the community; and

(3)    the under representation was due to systematic exclusion of the group in the jury selection process.

As recently as 2002, Hall County Georgia, where Mr. Waldrip's competency hearing and capital trial were conducted, some jurists have found a cognizable group (Hispanics) have been significantly under represented.  *See Smith v. State*, 571 S.E.2d 740 (Ga. 2002)  Although the Court held that the defendant in Smith did not establish systematic exclusion of Hispanic persons from the grand and traverse jury lists, Smith's failures to provide sufficient evidence of the constitutional violation does nothing to diminish the violation itself.   As the dissent noted, the trial court, when confronted with Smith's evidence, found systematic exclusion.

The most compelling evidence of systematic exclusion presented on the present case is the fact that no information on the ethnicity of potential grand jurors was requested or recorded.  Logically, if Hispanics are not identified or tracked, they are susceptible to systematic exclusion and the system is susceptible to abuse.

Id. at 751.

Because Hispanics are a cognizable group and their under representation by 1994 was clear, the jury commission should have deviated from the 1990 Census numbers, estimated a larger number of Hispanics in Hall County and raised the percentage of Hispanics on the jury lists.

Similarly, Petitioner's criminal jury in Gwinnett County, Georgia was chosen from a jury pool which systematically excluded Hispanics.  Like Hall County, the Jury Commissioner did not even recognize Hispanics as a cognizable class, even as late at 2000.  (*See* Transcript of *Georgia v. Harris*, D. 9, R-262, Appendix of Petitioner's Post-Hearing Brief at II [App. 143].) Because the jury pools from which Mr. Waldrip's competency  and trial juries were selected under represented a cognizable group, his Sixth Amendment rights to a fair cross section were denied.  *Taylor v. Louisiana*, 419 U.S. 522 (1975).

The state habeas court found this claim to be procedurally defaulted because it was not pursued on direct appeal.  (Order Denying Relief, at 47, R-267 [App. 28]).  This Court found the state court's finding of default to rest on an adequate and independent state rule and further ruled it would not address the merits but upon a showing of cause and prejudice.[1]  Cause to excuse the default rests upon

---

[1]      Mr. Waldrip objects to this finding.

trial counsel's (who was also appellate counsel) failure to properly preserve the issue and then pursue it on appeal.  *See, e.g.*, *Murray v. Carrier*, 477 U.S. 478 (1986).  Had trial counsel properly objected, the trial court would have been duty-bound to include Petitioner in all aspects of his capital trial.  Further, if the trial court did not comply and appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, i.e., the Georgia Supreme Court would have reversed Petitioner's conviction and death sentence.  Philmore v. McNeil, --- F.3d ----, No. 07-13637, 2009 WL 2181682, at *12 (11th Cir. July 23, 2009).  Thus, cause and prejudice have been established.

XXXVII.    **CLAIM 68:  THE TRIAL COURT'S IMPROPER RULINGS DURING MR. WALDRIP'S COMPETENCY AND CRIMINAL TRIALS DENIED PETITIONER HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Errors committed by the Trial Court, when considered both separately and cumulatively, denied Petitioner his rights to a fair trial, due process and the equal protection of the laws, in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

A.    **THE TRIAL COURT FAILED TO GIVE THE FORMER MENTAL HEALTH EXPERTS SUFFICIENT TIME AND MATERIALS TO PERFORM PROPER COURT-ORDERED PSYCHIATRIC/PSYCHOLOGICAL EVALUATIONS.**

On April 28, 1993, the Trial Court ordered the Competency Hearing at the request of Former Trial Counsel.  (ROIA, at 1339-40, P-30.)  Thereafter, the Trial Court ordered the evaluation of Petitioner by the Prosecution's Former Mental Health Experts.  (ROIA, at 1387-88, R-1 (Order for Mental Evaluation Re: Comp. To Stand Trial).)  The Trial Court, however, ordered the evaluation to be completed by August 31, 1994.  (ROA Vol. I, at 31-34, R-6 (Order for Mental Evaluation).)  This compelled the Prosecution's Former Mental Health Experts to truncate their evaluation.  (C.T. Vol. V, at 728-29, R-44 (testimony of Dr. Storms that he did not have the time or information necessary to diagnose Petitioner appropriately); Affidavit of Dr. Storms, Doc. 9, Ex. R-147 (E.H. 2), at 384-89

(filed 5/24/06) (Affidavit of Dr. Storms stating he did not have sufficient time or information).)  By limiting the time permitted for the Prosecution's Former Mental Health Experts to complete their evaluations of Petitioner, the experts were unable to gather and evaluate critical information about Petitioner, including his social history and background.  Thus, because the Trial Court set impossible deadlines, the Prosecution's Former Mental Health Experts could not perform appropriate evaluations of Petitioner under *Ake v. Oklahoma*, 470 U.S. 68 (1985).

### B.   THE TRIAL COURT FORCED PETITIONER TO ASSESS HIS LAWYERS' PERFORMANCE THROUGHOUT THE PROCEEDINGS IN VIOLATION OF HIS RIGHTS TO REMAIN SILENT AND TO EFFECTIVE ASSISTANCE OF COUNSEL.

The Trial Court asked Petitioner throughout the Underlying Trial how well he thought he was being represented.  (*See*, *e.g.*, T.T. Vol. XVII, at 3158, R-62; T.T. Vol. XVIII, at 3550-52, R-63.)  When represented by counsel, a criminal defendant has the right to be heard through said counsel.  *Herring v. New York*, 422 U.S. 853, 860 (1975) (stating that a defendant has a constitutional right to be heard through counsel).  By repeatedly asking Petitioner about the performance of Former Trial Counsel, the Trial Court imposed unnecessary and useless tension between Petitioner and his counsel.  The Trial Court's question, moreover, served no meaningful purpose because a lay person, especially one suffering from mental illness, cannot accurately assess the performance of his legal counsel at the time of

trial.  Petitioner had no frame of reference to determine if his Former Trial Counsel were doing a reasonable job in representing him in his capital case.  In addition, because the Trial Court was questioning Petitioner, Former Trial Counsel had to waste precious time preparing Petitioner for the questions.  The Trial Court's unnecessary and unconstitutional intrusion into the attorney-client relationship served only to abrogate Petitioner's rights as guaranteed under Fifth, Sixth, Eighth and Fourteenth Amendments.

### C.   THE TRIAL COURT DENIED PETITIONER'S REQUEST TO HOLD THE SUPPRESSION HEARING *IN CAMERA*.

At the motions hearing on August 26, 1991, the Trial Court denied the Defense's motion to hold the hearing on his suppression motion *in camera*.  (P.T. (8/26/91) Vol. I, Doc. 9, Ex. R-18, at 12 (filed 5/24/06).)  This was clearly improper.  First, and foremost, the suppression hearing was to determine if the Prosecution had evidence that was inadmissible.  Therefore, by definition, the inadmissible evidence was going to be discussed in the courtroom.  By allowing the public and, specifically the press, into the hearing, the Trial Court ensured that the jury pool would be exposed to inadmissible and prejudicial evidence.  Given that the Trial Court declared certain evidence, such as Petitioner's statements to Sheriff Chester in Contact 5, inadmissible, that evidence should never have reached the jury.  Because the Trial Court did not hold the hearing *in camera,* the press reported that inadmissible evidence and it tainted the jury pool.

Second, the Trial Court should have conducted Petitioner's suppression hearing separate and apart from that of his co-defendants.  The Trial Court held that this was unnecessary because any favorable information discovered during the hearing would have to be disclosed to the co-defendants by the Prosecution pursuant to *Brady* and its progeny.  (P.T. (8/26/91) Vol. I, at 12, R-18 ("The Motion to hold the Defendant Tommy Lee Waldrip's Motion to Suppress Statements and Other Evidence Received in Camera is denied.").)  While the disclosure requirement does exist, it does not necessarily require the co-defendants to be present at a joint hearing, because any favorable information can be disclosed after the hearing.  This separate hearing would have caused no harm.  The joint hearing, and the co-defendants' presence, however, did prejudice Petitioner because the co-defendants and Petitioner had antagonistic defenses.  Therefore, the co-defendants had incentive, on occasion, to argue in opposition to Petitioner, which prejudiced his motions to suppress.  Therefore, Petitioner's right to a fair and full hearing on his motions to suppress was violated because he not only had to argue against the Prosecution, but on occasion, he had to argue against his co-defendants as well.

450

### D.   THE TRIAL COURT IMPROPERLY ALLOWED THE PROSECUTION TO RECALL WITNESSES IN PRETRIAL HEARINGS.

In several instances throughout the pretrial hearings, the Trial Court improperly allowed the Prosecution to recall witnesses because it simply forgot to produce evidence.  (*See, e.g.*, P.T. (8/26/91) Vol. II, at 190, R-19 (further direct testimony of Sheriff Chester).)  For example, during the suppression hearing on August 26, 1991, the Prosecution had Sheriff Chester testify about his contacts with Petitioner.  (*See id.* at 141-159.)  The Defense crossed him on that testimony. (*See id.* at 159.)  Nonetheless, after the Prosecution excused Sheriff Chester and had Jailer Martin testify, the Prosecution requested, and the Trial Court granted, permission to recall Sheriff Chester because DA Fuller failed to ask him some questions.  (*See id.* at 190.)  This was beyond the bounds of redirect and entered into new ground that had not been previously discussed.[44]  (*See id.* at 190-92.) This was improper and prejudicial to Petitioner because it allowed the Prosecution to produce evidence that it had strategically decided not to present before and it also allowed the Prosecution to gain the tactical advantage of knowing the Defense's cross-examination and theory with the witnesses prior to presentation of

---

[44]   Ironically, it was here that DA Fuller suborned perjury, because he directly asked Sheriff Chester if Petitioner had ever asked for a lawyer, and Sheriff Chester testified that Petitioner had not.  It is clear that Sheriff Chester lied, the Prosecution suborned the perjury and Former Trial Counsel was completely unaware of the State's misconduct. (Brannon Aff., at 138-146, R-147 [App. 26].)

the belated testimony.  Moreover, because the Trial Court did not sequester Sheriff

Chester, he was able to mold, re-characterize and reformulate his testimony having

heard all of the previous testimony.

### E.   THE TRIAL COURT PERMITTED IMPROPER REDACTIONS OF PETITIONER'S STATEMENTS.

During SA Attaway's testimony, the Prosecution submitted Petitioner's

three long uncounseled statements into evidence (from Contacts 6, 8 & 9).  (T.T.

Vol. XIII, at 2701-02, 2720-22, 2729-30, R-58.)  The transcripts of the statements

were admitted into evidence and the tapes of the interviews were played for the

jury.  Due to several pretrial rulings, certain parts of these statements had already

been suppressed.  Instead of creating new transcripts that omitted the suppressed

portions and contained seamless testimony, the Prosecution simply blacked-out the

suppressed portions making them unreadable.  (*Id.* at 2718-20, 2741.)  Obviously,

the jury was able to ascertain that certain information was being kept from them by

these blacked-out portions.  Moreover, instead of creating new tapes of the

interviews that did not include the suppressed portions, the Prosecution had a

person listen to the tapes on headphones who would cut out the audio to the

courtroom when suppressed portions were playing.  Thus, as the tapes played for

the jury, the jurors heard long periods without audio as the person listening on

headphones waited for the suppressed portion to finish.  (*Id.* at 2742.)  Said

procedure also explicitly showed the jury that portions of the statements had been

suppressed and necessarily raised questions about what information had been

deleted and why.  Former Trial Counsel objected to this procedure, but the Trial

Court overruled it.  (*Id.* at 2701, 2741-42.)  Former Trial Counsel also asked for a

mistrial, and the Trial Court denied it. (*Id.* at 2742.)

This procedure prejudiced Petitioner because it alerted the jury that evidence

was being kept from them and, given the circumstances, its suppression was likely

at the behest of Petitioner.  Thus, the Trial Court encouraged the jury to speculate

about the suppressed portions of the uncounseled statements.  This in turn,

undermined the reliability of the jury's verdict.  Moreover, there was no principled

reason to submit the evidence in the manner the Prosecution proposed and the Trial

Court permitted, because it would have been simple to create transcripts and tapes

that smoothly hid the suppressed portions.  By not sustaining the Former Trial

Counsel's objection and compelling the Prosecution to change the format of their

evidence, the Trial Court violated Petitioner's rights under the Fifth, Eighth and

Fourteenth Amendments.

### F.    THE TRIAL COURT PERMITTED EMOTIONAL DISPLAYS BY MEMBERS OF VICTIM'S FAMILY IN THE COURTROOM.

In its <u>Order on Motion to Prohibit Evidence, Argument and Prejudicial</u>

<u>Behavior in the Courtroom Regarding Impact of the Crime on the Victim's Family</u>

<u>and Community</u>, the Trial Court refused to admonish spectators, particularly Mr.

Evans's family, against "disapproval, approval, or emotion" during the Underlying

Trial.  (*See* ROIA, at 1205-08, R-1.)  Furthermore, the Trial Court failed to stop

emotional outbursts by the victim's family during the Underlying Trial.  (C.T. Vol.

I, Doc. 9, Ex. R-40, at 51-52 (filed 5/24/06).)  By not admonishing the spectators,

specifically Mr. Evans's family, the Trial Court allowed the spectators to

improperly influence the jury.  While the Trial Court instructed the Prosecution to

explain proper behavior in the courtroom, (*see* ROIA, at 1207, R-1), the

Prosecution had no incentive to do a compelling job and, more importantly,

instructions from the bench carry much more weight.  Moreover, once spectators

started to react inappropriately during the trial, the Trial Court failed to take

appropriate steps to ameliorate the problem.  Therefore, Petitioner was prejudiced

because emotion and passion infected the jury, and this Court must grant Petitioner

full habeas relief.

### G.   THE TRIAL COURT IMPROPERLY PERMITTED EVIDENCE OF A PROBATION WARRANT INTO EVIDENCE.

During the guilt/innocence portion of the Underlying Trial, the Trial Court

improperly allowed former Lumpkin County Sheriff's Office investigator Stephen

Hawk to testify that he arrested Petitioner on a probation revocation warrant.  (T.T.

Vol. XI, Doc. 9, Ex. R-56, at 2199-2201 (filed 5/24/06).)  This evidence

impermissibly put Petitioner's character at issue because the jury learned that

Petitioner was on probation and, therefore, had been convicted of an earlier crime. This evidence, therefore, tainted the jury because they may have improperly inferred that Petitioner was more likely to commit the alleged crimes because he was "bad," since he had already been convicted of a prior, unrelated, crime. Moreover, this evidence was completely unnecessary because the Defense was willing to stipulate that Petitioner had been arrested on April 16, 1991.  (*Id.*)  Thus, the only purpose for introducing the arrest and Mr. Hawk's testimony was to let the jury know that Petitioner was on probation at the time of his arrest – the one thing that was absolutely forbidden.

### H.    THE TRIAL COURT PERMITTED PHYSICAL EVIDENCE TO REMAIN IN PLAIN VIEW.

During most of the trial, the Prosecution placed physical evidence on the Prosecution's table in plain view of the jury.  This evidence included such items as blood spatters, gruesome photographs and the gun that killed Mr. Evans.  The Prosecution's placement of these unsubmitted items in front of the jury, day in and day out, during the Underlying Trial was highly prejudicial to Petitioner.  It served no other purpose but to inflame the passions of the jury and have the jury convict Petitioner based on emotion instead of rational belief.  The Trial Court did not compel the Prosecution to remove the items, which were also in plain view of the

Trial Court, until the Former Trial Counsel objected.[45]  Trial Court should have *sua sponte* corrected this highly prejudicial situation as soon as it occurred.

I.   **THE TRIAL COURT DENIED FORMER TRIAL COUNSEL AN OPPORTUNITY TO CONDUCT THOROUGH CROSS-EXAMINATIONS.**

Throughout the Underlying Trial, including the Competency Hearing and both phases of the capital trial, the Trial Court precluded Former Trial Counsel from thoroughly cross-examining Prosecution witnesses, in violation of the Due Process Clause of the Fifth Amendment and the Confrontation Clause of the Sixth Amendment.  These instances are briefly detailed below.

1.   During the Competency Hearing, the Trial Court prohibited the Former Trial Counsel from performing necessary cross-examination of Prosecution Former Mental Health Expert, Dr. Storms.  (C.T. Vol. V, at 683-85, R-44.) The Trial Court did not allow Mr. Brannon to investigate whether Dr. Storms' analysis, based on Petitioner's ability to remember his childhood and background, was a reliable predictor of competency.

2.   In that same episode, the Trial Court precluded Ms. Watson from cross-examining Dr. Storms, even though the Trial Court believed and stated that Ms. Watson understood the specific issue involved and that the Trial Court believed Mr. Brannon was confused.  Given that the jury was not in session, the Prosecution would not have been prejudiced by Former Trial Counsel switching roles, but the Trial Court still forbade it – to the great prejudice of Petitioner.

---

[45]   To the extent that this Court blames the delay on removing the evidence from the plain view of the jury on Former Trial Counsel's failure to object earlier to the evidence, Former Trial Counsel's delay was objectively unreasonable and prejudiced Petitioner.

3.    During the guilt/innocence phase of the Underlying Trial, the Trial Court
      precluded Former Trial Counsel from questioning Robert Garner about
      where he was being held.  (T.T. Vol. IX, Doc. 9, Ex. R-54, at 1896-97 (filed
      5/24/06).)  Former Trial Counsel's cross-examination was further impeded
      because of the Prosecution's late disclosure of impeachment evidence
      regarding Mr. Garner.

4.    During the guilt/innocence phase of the Underlying Trial, the Trial Court
      limited Former Trial Counsel's cross-examination of Prosecution witness
      Thomas Hitchcock.  (T.T. Vol. X, Doc. 9, Ex. R-55, at 2026 (filed 5/24/06).)
      The Trial Court forbade Former Trial Counsel from questioning Mr.
      Hitchcock about any prior felony conviction except ones that had no
      reported disposition on the GCIC.

5.    During the guilt/innocence phase of the Underlying Trial, the Trial Court
      severely limited Former Trial Counsel's cross-examination of SA Attaway.
      First, the Trial Court refused to compel SA Attaway to answer questions
      regarding matters he specifically addressed in his direct examination.  (T.T.
      Vol. XIV, Doc. 9, Ex. R-59, at 2769, 2770-71 (filed 5/24/06).)  Second, after
      SA Attaway admitted that he told Petitioner things in his interrogation that
      were not true, and yet stated that he did not lie, the Trial Court refused to let
      Mr. Brannon cross-examine him on that point.  (*Id.* at 2786.)

## J.    THE TRIAL COURT PERMITTED PURELY SPECULATIVE TESTIMONY.

The Trial Court improperly admitted the following speculative and

prejudicial evidence and testimony that individually and collectively rendered

Petitioner's Trial unfair and the juries' verdicts unreliable.

1.    The Trial Court improperly allowed witness Dr. Lower to speculate whether
      Petitioner understood a disclosure form provided by the doctor. (C.T. Vol.
      V, at 745-46, R-44.)

2.      The Trial Court impermissibly allowed witness SA Berry to speculate on the origin of glass shards. (T.T. Vol. X, at 2086-87, R-55.)

3.      The Trial Court impermissibly allowed witness ADA George to testify as both a glass expert and accident reconstruction expert. (T.T. Vol. XII, at 2373-74, R-57.)

4.      The Trial Court impermissibly allowed witness ADA George to testify to information outside his realm of expertise. (*Id.* at 2377-78.)

5.      The Trial Court impermissibly allowed witness ADA George to testify as to whether a person could conceal themselves in a certain area. (*Id.* at 2379.)

6.      The Trial Court impermissibly allowed witness Connie Pickens to speculate that fire or heat is an effective way to destroy bodily fluid evidence. (*Id.* at 2424-41.)

7.      The Trial Court impermissibly allowed purely speculative testimony by Connie Pickens. (*Id.* at 2438.)

8.      The Trial Court impermissibly allowed witness Dr. Hanzlick to testify as to the pain involved in the death of Keith Evans. (T.T. Vol. XIII, at 2597-99, R-58.)

9.      The Trial Court impermissibly allowed Dr. Hanzlick to theorize that the victim would have survived if his gunshot wounds had been treated.  (*Id.* at 2601-02.)

10.     The Trial Court impermissibly allowed witness SA Attaway to testify concerning reasons for lack of evidence at crime scenes. (*Id.* at 2654-55.)

11.     The Trial Court impermissibly allowed witness SA Attaway to engage in speculative testimony concerning the third person involved at the crime scene. (T.T. Vol. XIV, Doc. 9, Ex. R-59, at 2816-17 (filed 5/24/06).)

**K.    THE TRIAL COURT ALLOWED PROSECUTION EXPERTS TO TESTIFY OUTSIDE THEIR REALMS OF EXPERTISE.**

During both the Competency Hearing and the Underlying Trial, the Trial Court allowed Prosecution witnesses to testify outside their realms of expertise. This was improper and particularly prejudicial to Petitioner because experts have additional credibility that lay witnesses do not have in front of juries. *See Ake v. Oklahoma,* 470 U.S. 68, 81 (1985).  Therefore, when experts testify outside their realm of expertise, or when non-experts testify as experts, that testimony is given additional weight by the jury that it does not deserve.  By allowing this to happen, the Trial Court is constructively bolstering the credibility of the Prosecution's witnesses and case, to the severe detriment of Petitioner.

**1.    The Trial Court Improperly Allowed Dr. Hanzlick to Testify Regarding the Pain of Mr. Evans's Injuries.**

Dr. Hanzlick was the medical examiner who performed the autopsy on Mr. Evans. (T.T. Vol. XII, at 2526, R-57.)  Dr. Hanzlick is a forensic pathologist, (*id.* at 2522), "who conducts death investigations . . . [and his] main job is to try to determine the cause of death, what actually killed the person and then render an opinion as to the manner of death . . . ."  (*Id.* at 2523.)  Dr. Hanzlick is not an expert in pain or the nervous system.  His qualifications were not examined on these subjects and his medical report that was produced to the Defense did not discuss or opine on the possible pain Mr. Evans suffered as a result of being shot

by John Mark.  Simply, he was not presented as an expert on these subjects.

Nonetheless, the Prosecution asked Dr. Hanzlick to speculate as to the pain Mr.

Evans suffered when he was shot by Paul's shotgun.  The Trial Court improperly

permitted Dr. Hanzlick to answer, over the Defense's objection.  (T.T. Vol. XIII, at

2597-99, R-58.)  Obviously, this was prejudicial, irrelevant testimony that was

given the imprimatur of expert testimony, even though Dr. Hanzlick brought

nothing to the testimony beyond his lay experience.  Moreover, this testimony did

nothing to prove the Prosecution's case against Petitioner, other than to increase

the jury's anger and sympathy over the tragic events that unfolded against Mr.

Evans.  Petitioner was clearly prejudiced by this improper testimony.

> 2. **The Trial Court Improperly Allowed Serologist Connie Pickens to Testify Regarding the Use of Fire to Destroy Evidence.**

Ms. Pickens was a forensic serologist, who identifies and classifies bodily

fluids for the GBI's State Crime Lab.  (T.T. Vol. XII, at 2405-06, R-57.)  In her

testimony, Ms. Pickens was unable to link any evidence with Petitioner.  (*Id.* at

2405-49.)  The Trial Court, however, allowed Ms. Pickens to testify that fire, such

as the one that burned Mr. Evans's truck, would be a "very effective" way to

destroy evidence.  (*Id.* at 2425 (Former Trial Counsel moved to strike this

testimony at T.T. 2426).)  This testimony was improper and prejudicial.  Ms.

Pickens had no expertise in the destruction of evidence, but her statements on the

subject were given extra credibility because of her position at the State Crime Lab. (Crime Lab Report, Doc. 9, Ex. R-173 (E.H. 28), at 8228-39 (filed 5/24/06).)  The Crime Lab report did not disclose this realm of testimony; therefore, Ms. Pickens was testifying beyond her expertise and the Trial Court should have struck her comment and provided a limiting instruction to the jury.

## L.     THE TRIAL COURT FAILED TO ENFORCE THE RULE OF SEQUESTRATION.

Several times throughout the Underlying Trial, the Trial Court failed to enforce the rule of sequestration on Prosecution witnesses, which allowed them to collude and conform their testimony to what had already been presented to the jury.[46]  (*See, e.g.*, P.T. (8/26/91) Vol. I, at 30-31, R-18 (both Sheriff Chester and SA Berry were allowed to remain in the courtroom before they testified).)  The Trial Court's failure to enforce the Rule of Sequestration was particularly disastrous in the August 26, 1991, hearing, because Sheriff Chester was recalled to the stand after Ms. Martin testified, and after he had a private conversation with ADA Darragh.  (*Id.*)  He then falsely testified that Petitioner had never requested counsel.  Thus, Sheriff Chester was able to mold his testimony to other witnesses including SA Berry, who interrogated Petitioner before and after his request for

---

[46]     Ironically, the Trial Court strictly enforced the Rule of Sequestration, for no apparent purpose, during closing argument of the guilt/innocence phase of the Underlying Trial. (*See* T.T. Vol. XVII, Doc. 9, Ex. R-62, at 3153-55, 3157 (filed 5/24/06).)  The only thing that this prevented was Petitioner's family from witnessing the closing arguments.

counsel, and Ms. Martin, who testified about Petitioner's instability on April 18, 1991.  (*Id.*)  Moreover, Sheriff Chester was able to consult with the Prosecution about his testimony midway through the hearing.  (*Id.*)  All in all, the Trial Court's failure to enforce the Rule of Sequestration on Prosecution witnesses was prejudicial to Petitioner and rendered the Underlying Trial unfair and the juries' verdicts unreliable.

### M.   THE TRIAL COURT PERMITTED PREJUDICIAL AND INACCURATE DEMONSTRATIVE EVIDENCE.

Twice during the Underlying Trial, the Trial Court improperly allowed the Prosecution to use inaccurate and prejudicial demonstrative evidence. First, the Prosecution presented a "rough sketch" by SA Attaway of an area near the Grave Site that purportedly depicted where certain evidence was collected. (T.T. Vol. XIII, at 2679-81, R-58 (Exhibit 139).)  This exhibit was admittedly inaccurate and did not present the jury a correct picture of the crime scene or the evidence collection.  Its admission and use violated Petitioner's rights under the Due Process Clause of the Fifth Amendment.

Second, the Trial Court improperly admitted an inaccurate map of Dawson and Gilmer County with SA Attaway's inaccurate notations.  (*Id.* at 2739 (Exhibit 117).)  This map did not assist the jury in any way, but rather prejudiced them against Petitioner because it included the Prosecution's improper and inaccurate annotations.

**N.     THE TRIAL COURT PERMITTED A JUROR TO ASK QUESTION DURING TRIAL IN OPEN COURT.**

The Trial Court violated Petitioner's constitutional rights to a fair trial by an impartial jury of his peers when it allowed a juror to ask a question to the Prosecution in the midst of the Underlying Trial.  (*Id.* at 2722.)  During SA Attaway's testimony regarding Petitioner's uncounseled custodial statements (the most critical portion of the Prosecution's case), the Trial Court allowed a juror to ask ADA Darragh about the transcript of one of the statements.  (*Id.*)  This was improper for at least two reasons.  First, this allowed the Prosecution to correct its confusing presentation with direct assistance from the juror.  Second, obviously, this creates a rapport between the jury, the neutral decision-maker in Petitioner's Underlying Trial, and the Prosecution, who were attempting to improperly convict and sentence Petitioner to death.  Thus, the Prosecution was able to make a more effective presentation with the assistance of the Trial Court and the jury, as well as, build a rapport with the jury that tainted their impartial decision-making process.

The Trial Court should have precluded the juror from asking the question, and barring that, should have precluded the Prosecution from answering it.  By not stopping the juror's question and the Prosecution's answer, the Trial Court violated Petitioner's right to a fair trial by an impartial jury of his peers under the Fifth,

Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the analogous provisions of the Georgia Constitution.

   **O.   THE TRIAL COURT REFUSED TO GRANT MISTRIALS WHEN PROPERLY REQUESTED BY THE FORMER TRIAL COUNSEL.**

On several occasions throughout the Underlying Trial, the Prosecution's improper behavior was so prejudicial to Petitioner that Former Trial Counsel moved for a mistrial. (*See*, *e.g.*, C.T. Vol. III, at 448-55, Ex. R-42; T.T. Vol. XIII, at 2742, Ex. R-58.)  For example, the Prosecution, showing a complete lack of good faith, presented Petitioner's uncounseled custodial statements to the jury in a fashion that highlighted the fact that Petitioner had succeeded in getting certain portions suppressed.  Former Trial Counsel moved for a mistrial, but it was denied. (T.T. Vol. XIII, at 2742, R-58.)  This was improper because the uncounseled statements were the Prosecution's entire case against Petitioner and they were presented in an extraordinarily prejudicial fashion in contempt of the Trial Court's orders.

   Further, in the Prosecution's opening statement in the Competency Hearing, the Prosecution specifically mentioned the charges against Petitioner, particularly murder.  (C.T. Vol. III, at 448, Ex. R-42.)  This comment, which the Prosecution repeated throughout the Competency Hearing, was highly prejudicial and irrelevant.  The crimes at issue have no bearing on the question of whether

Petitioner was competent to stand trial.  Because Petitioner is presumed innocent at the time of the Competency Hearing, the Prosecution was estopped from arguing that Petitioner's alleged criminal conduct showed his ability to comprehend complex tasks.  Criminal defendants are awarded these protections to ensure that our judicial system seeks truth and justice, not simply convictions.  We protect every defendant, even the guilty, from unfair attacks on their past, from coercion and from uncounseled self-incriminations, so that the innocent will, hopefully, go free.  Because the comments were so prejudicial, the Trial Court should have granted Petitioner's request for a mistrial.

### P.     THE TRIAL COURT REQUIRED PROPOSED JURY INSTRUCTIONS PREMATURELY.

Despite statutory guidelines specifically addressing the issue, the Trial Court set its own deadline for the parties to submit jury instructions.  (ROA, at 101-02, R-6.)  This deadline was earlier than that required by the UAP, which is in itself overly restrictive.  Because Former Trial Counsel were understaffed and underfunded and overworked, they did not meet the deadline imposed by the Trial Court.  (T.T. Vol. XIII, at 2742, R-58.)  The Trial Court declared that it would "not consider any of the defendant's requested charges being timely filed."  (*Id.*)  The Trial Court did state that it would "attempt" to give them full consideration, but that he would not consider them timely.  To the extent that the Trial Court did not consider any charge thoroughly because Former Trial Counsel missed the Trial

465

Court's unreasonably premature deadline, the Trial Court violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.[47]

### Q.   THE TRIAL COURT REFUSED TO ISSUE LIMITING INSTRUCTIONS AT THE TIME EVIDENCE WAS ADMITTED FOR LIMITED PURPOSES.

The Trial Court consistently refused to issue limiting instructions at the time the Prosecution admitted evidence for limited purposes.  For example, at the close of the Prosecution's evidence, it admitted two paper documents that were being admitted only for the purpose of showing Petitioner was a convicted felon to satisfy one of the elements of the charge of possession of a firearm as convicted felon. (T.T. Vol. XIV, Doc. 9, Ex. R-59, at 2853 (filed 5/24/06).) It was not to be considered as character evidence and, in fact, it would be a violation of Petitioner's due process rights for it to be so considered.  The Trial Court refused to provide a limiting instruction at the time this evidence was admitted, but rather waited until the end of trial. (*Id.* at 2855.)

Moreover, the Trial Court failed to issue a limiting instruction when it allowed the admission of Garner's testimony because of an alleged conspiracy and the testimony of Stephen Hawk about Petitioner's arrest.

---

[47]   To the extent this Court considers the Trial Court's deadline to have been proper and feels that Former Trial Counsel should have met the Trial Court's deadline for jury charges, then Former Trial Counsel's performance was constitutionally deficient and Petitioner was prejudiced thereby.

**R.    THE TRIAL COURT DENIED A DIRECTED VERDICT.**

Petitioner is innocent of the capital crimes for which he was convicted.  The

Prosecution's only evidence against Petitioner was his uncorroborated,

uncounseled, false confessions.  All of the other evidence presented by the

Prosecution failed to place Petitioner even at the scene of the crime, much less

prove that Petitioner killed Mr. Evans.  Because the Prosecution failed to submit a

case which would lead a rational, reasonable jury to convict Petitioner, the Trial

Court violated his constitutional right of due process when it failed to grant Former

Trial Counsel's motion for a directed verdict.  (*Id.* at 2855-73.)  Because the Trial

Court failed to protect Petitioner's rights, the Trial Court allowed the jury to

arbitrarily convict Petitioner based on passion and a sense of duty to Keith Evans's

family.

**S.    THE TRIAL COURT FAILED TO QUASH THE
       PROSECUTION'S APPLICATION TO SEEK THE DEATH
       PENALTY.**

Former Trial Counsel filed a motion to quash the Prosecution's application

to seek the death penalty.  The Trial Court denied it.  (*See* ROIA, at 188, R-1

(Motion to Strike and Quash, As Unconstitutional the GA Statutes, Providing for

the Imposition of the Death Penalty and Their App. to this Case); ROIA, at 1108,

R-1 (Order on Motion to Preclude the State from Seeking the Death Penalty Due to

Violations of Due Process, Equal Protection And Right to Counsel Guaranteed by the Constitution. of the United States and the GA Constitution).)  The death penalty is imposed in an arbitrary and capricious manner in Georgia and it was done so here.  The decision to seek the death penalty was in part based on Mr. Evans being a well-known, white victim and Petitioner being a poor, politically and socially powerless defendant who would not have the necessary economic support to mount an appropriate defense to a capital murder charge.  Further, the Prosecution's decision to seek the death penalty against Petitioner was not based on retributive standards, but rather was influenced by an emotional and political decision designed to satisfy the citizens of Dawson County, a large percentage of whom were related to, went to school with, or had helped search for Mr. Evans. The Prosecution has admitted that it believed Petitioner to be the least culpable person, even under its incorrect theories of guilt.  The Trial Court, itself, came to this realization after the Underlying Trial was completed.  (*See* ROA Vol. IV, Doc. 9, Ex. R-9, at 755 (filed 5/24/06) (Report of Trial Judge).)  By not quashing the Prosecution's notice to seek the death penalty, the Trial Court violated Petitioner's rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Georgia Constitution and allowed a death sentence to be imposed in an arbitrary and capricious manner.

## T.   THE TRIAL COURT LIMITED AREAS OF TESTIMONY OF DR. CURRIE, THE DEFENSE FORMER MENTAL HEALTH EXPERT.

The voluntariness and credibility of Petitioner's uncounseled custodial statements was a question for the jury.  *See Jackson v. Denno*, 378 U.S. 368, 391 (1964).  If a juror finds a statement involuntary, then it must disregard the statement.  *See id*. ("When there is a conflict of evidence as to whether a confession is or is not voluntary, if the court decides that it is admissible, the question may be left to the jury, with the direction that they should reject the confession if, upon the whole evidence, they are satisfied it was not the voluntary act of the defendant." (internal quotations and citations omitted)).  A defendant's mental illness affects the voluntariness of a statement.  *See Blackburn v. Alabama*, 361 U.S. 199 (1960).  In complete disregard for this well-established constitutional precedent, the Trial Court limited Dr. Currie's testimony during the guilt/innocence phase of the Underlying Trial.  (T.T. Vol. XV, Doc. 9, Ex. R-60, at 2942-63 (filed 5/24/06).)  Out of an incorrect concern about allowing Dr. Currie to testify about the credibility of Petitioner's statements, the Trial Court repeatedly warned Former Trial Counsel and Dr. Currie about the contours of his testimony.  (*Id.*)  This was improper because the Prosecution had the burden to show that Petitioner's statements were voluntary and credible.  Moreover, Petitioner had the right to attack those issue based on Petitioner's mental illness, including, but not

469

limited to, his obsession with conspiracies and his desire to protect his family.

Thus, the Trial Court's repeated warnings to Former Trial Counsel and its

limitations on Dr. Currie's testimony were improper, unconstitutional and severely

prejudiced Petitioner, especially when his statements constituted the Prosecution's

entire case.

### U.    THE TRIAL COURT FAILED TO COMPEL THE PROSECUTION TO OPT BETWEEN MUTUALLY EXCLUSIVE THEORIES OF GUILT.

During the Prosecution's case, it never chose a single consistent theory of

guilt.  The Prosecution alternated among several guesses: (a) Petitioner actually

struck Mr. Evans (a theory for which the Prosecution had virtually no evidence and

which was later dropped during closing argument (T.T. XVII, at 3176, R-62); (b)

Petitioner was the mastermind behind the death of Mr. Evans (for which the

Prosecution had no evidence); and (c) Petitioner was present when Mr. Evans was

killed and, thus, was a party to the crime.  The first two of these hypotheses, the

weakest theories of guilt, would qualify Petitioner for capital punishment under

*Tison* and *Enmund*.  The last would not, because it does not show that Petitioner's

participation was major or that he had the requisite mental state of reckless

indifference.  *See Tison v. Arizona*, 481 U.S. 137, 156-57 (1987); *Enmund v.*

*Florida*, 458 U.S. 782 (1982).

Former Trial Counsel objected to these multiple theories because any conviction by the jury would be impossible to parse.  (T.T. Vol. XIV, at 2855-73, R-59; T.T. Vol. XV, at 2890-93, R-60.)  The Trial Court did not require the Prosecution to select a theory because it was going to provide an *Enmund* filter instruction, in the penalty phase to cure the Petitioner's concerns.  (T.T. Vol. XV, at 2892-93, R-60.)  This was highly improper because Petitioner should not be required to endure the penalty phase if he is ineligible for the death penalty.[48] Moreover, because jurors often reach decisions about punishment before being instructed by the court, which did happen here (Affidavit of Clara Booher, Doc. 9, Ex. R-147 (E.H. 2), at 186-7 (filed 5/24/06) [hereinafter "Booher Aff."]; Affidavit of Richard Baca, Doc. 9, Ex. R-147 (E.H. 2), 173-75 (filed 5/24/06) [hereinafter

---

[48]    Moreover, the Trial Court's *Enmund* filter instruction was rendered useless by the Prosecution's highly inflammatory and improper closing argument in the sentencing phase.    ADA Darragh purposefully attempted to confuse the jury regarding the importance of their determination of Petitioner's involvement in Mr. Evans's death, arguing:

> I don't know, I cannot know on what basis you decided, whether he directly struck blows or whether he didn't, whether he was a party or whether he was one who – whether he was a party by directly committing or whether he was a party by being involved and helping and aiding, whether he struck the blows, whether he didn't.  **It doesn't matter.**  In the context of this case and the terms which you can find as aggravating circumstances in this case to support a justice-related verdict of the death penalty, **it doesn't matter.**

(T.T. XVIII, Doc. 9, Ex. R-63, at 3497 (filed 5/24/06) (emphasis supplied).)

"Baca Aff."]), the *Enmund* filter instruction was useless and failed to protect Petitioner's constitutional rights.

## V.   THE TRIAL COURT INSTRUCTED JURORS TO PREPARE FOR THE POSSIBILITY OF A PENALTY PHASE.

Early in the guilt/innocence portion of the Underlying Trial, the Trial Court told the jury to prepare for the possibility of a penalty phase.  (T.T. Vol. XVI, Doc. 9, Ex. R-61, at 3118 (filed 5/24/06).)  This severely prejudiced Petitioner because it suggested to the entire jury that the Trial Court believed Petitioner was guilty and that the jury should find him so.  There was absolutely no reason to tell the jury about the penalty phase at this point in the Underlying Trial.  In fact, the entire purpose of the penalty phase is to insulate the jury's decision on guilt or innocence from prejudicial evidence and argument regarding sentencing.  By infusing penalty phase issues into the guilt/innocence phase, the Trial Court violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

## W.   THE TRIAL COURT SUBMITTED THE INDICTMENT TO THE JURY WITH HANDWRITTEN EDITS AND REDACTIONS.

Over the objection of Former Trial Counsel, the Trial Court allowed the indictment, which had originally named three defendants and included many counts that had been stricken (11, 17 & 18), to go to the jury with edits and redactions. (T.T. Vol. XVII, at 3148-51, 3320-21, R-62.)  This was improper and prejudicial to Petitioner because it allowed the jury to speculate on the counts and

472

statements that were "whited-out" of the indictment.  The Trial Court should have

instructed the Prosecution to draft another indictment that was appropriate to go to

the jury, especially since the indictment itself is not evidence.  (*Id.* at 3288 ("You

[the jury] should not consider the indictment as evidence or implication of guilt.").)

Because the jury was provided an incomplete, misleading and prejudicial

indictment, the jury's verdict is unreliable.  This Court must grant Petitioner full

habeas relief.

## X.    THE TRIAL COURT IMPROPERLY RESPONDED TO JURY QUESTIONS.

During the course of the Underlying Trial, the jury submitted several

questions to the Trial Court.   The jury asked four questions during their

deliberations regarding guilt and asked two questions during their deliberations

regarding sentencing.

### 1.    The Trial Court Improperly Responded to the Four Questions asked by the Jury in the Guilt/Innocence Phase of the Underlying Trial.

#### i.    The Court Failed to Allow the Jury to Have Copies of the Transcripts of the Trial or Tapes of Petitioner's Uncounseled Statements.

The jury's first and last question to the Trial Court was whether they could

have copies of the transcripts of the trial.  In both instances, the Trial Court denied

473

the jury's request and Former Trial Counsel did not object.[49]  Given the complex

nature of the case, and the nuances of the testimony, and the fact that the

Prosecution's witnesses were unable to physically link Petitioner to Mr. Evans's

murder, the Trial Court's decision not to provide the transcripts to the jury was

improper and prejudiced Petitioner.

The Trial Court also refused to provide the tapes of Petitioner's uncounseled

custodial statements of April 18th (Contact 6), April 19th (Contact 8) and April 22nd

(Contact 9) when the jury requested them.[50]  These statements by Petitioner were

the Prosecution's only real evidence linking Petitioner to the murder.  If the jury

had been able to re-listen to the tapes, the jurors would have heard how internally

inconsistent the statements are and how inconsistent the statements are with the

Prosecution's physical evidence.  With no evidence to convict Petitioner, it is clear

that the jury's only choice would have been to acquit Petitioner.  Moreover, the

tapes show how involuntary and incredible Petitioner's statements really were.

Thus, the failure to provide the tapes to the jury violated Petitioner's right of due

process and rendered his conviction unreliable.

---

[49]     Former Trial Counsel's failure to object was objectively unreasonable under the
circumstances and prejudiced Petitioner.

[50]     Former Trial Counsel objected to the tapes being delivered to the jury.  This was
objectively unreasonable and prejudiced Petitioner.  Nonetheless, because of the highly
prejudicial way the tapes were played to the jury, the Prosecution could not have
presented them to the jury without reformatting the new tapes.

> **ii.   The Trial Court's Response to the Jury that it Could Find Petitioner "Guilty of Malice Murder as a 'Party' to the Murder" was Improper and Highly Prejudicial.**

The third question the jury asked the Trial Court during the guilt/innocence phase of the Underlying Trial was, "Can we find a defendant guilty of malice murder as merely a party to a crime? We have found confusion in the instructions on description of homicide."  The Court responded by only saying "You may find a defendant guilty of malice murder as a 'party' to the murder."  The defense objected to this instruction, arguing:

> Your Honor, we did object to that response by the Court in that the note stated merely party which shows a perhaps confusion of the meaning of "party," and perhaps confusion with the other Court's instructions on mere presence and mere association, and we requested the Court not only to inform them about parties but to reinstruct them or point them again to the instructions on mere association and mere presence.

(T.T. Vol. XVII, at 3333, R-62 (Argument of Anne Watson).)  The Trial Court's response, over Former Trial Counsel's objection, was improper and highly prejudicial to Petitioner, especially in conjunction with the Trial Court's failure to compel the Prosecution to choose a theory of guilt.[51]  Because the Trial Court did not give further instructions explaining the difference between presence,

---

[51]   The Trial Court's response was also extremely prejudicial because the jury was prejudging sentencing during the guilt/innocence phase.  Because the Trial Court did not reemphasize the difference between presence, association and being a party, it is even more obvious that Petitioner was convicted by the jury under a theory in which he was not death-eligible under *Enmund*.

association and being a party to a crime, the jury was left to speculate what "party" meant. Since the jury used the term "mere party," this Court must assume that the jury believed that Petitioner had little, if any, actual participation in the murder of Mr. Evans. Thus, the Trial Court's response does not alleviate the doubt that the jury misunderstood the instructions and improperly convicted Petitioner.

> ### 2. The Trial Court Improperly Responded to Two Questions in the Penalty Phase of the Underlying Trial.

> #### i. The Trial Court Violated Petitioner's Rights to a Full and Fair Sentencing Hearing When it Improperly Responded to the Jury's Question Regarding Parole.

During the sentencing phase of the Underlying Trial, the jury asked two questions. First, the jury asked: "Does life imprisonment mean no chance of parole?" The Trial Court responded:

> You shall not consider the question of parole. Your deliberations must be limited to whether this defendant shall be sentenced to death or whether he shall be sentenced to life in prison. You should assume that your sentence, whichever it may be, will be carried out.

In light of *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Trial Court's response was incorrect and severely prejudiced Petitioner. If Petitioner had been sentenced to life, it would have been life with the possibility of parole, but the possibility would have been remote and distant. By not explicitly stating that in its response, the Trial Court allowed the jury to speculate as to the definition of "life imprisonment." As the United States Supreme Court Stated in *Simmons*: "The

jury was left to speculate about petitioner's parole eligibility when evaluating

petitioner's future dangerousness, and was denied a straight answer about

petitioner's parole eligibility even when it was requested." *Id*. at 165-66.

The facts here are remarkably similar to the facts in *Simmons*.  In *Simmons*,

after ninety minutes of deliberation, the jury asked "Does the imposition of a life

sentence carry with it the possibility of parole?"  *Id*. at 160.  The trial court, over

the defense's objection, responded:

> You are instructed not to consider parole or parole eligibility in reaching your verdict. Do not consider parole or parole eligibility. That is not a proper issue for your consideration. The terms life imprisonment and death sentence are to be understood in their plan [sic] and ordinary meaning.

*Id*.  (This response is eerily similar to the response of the Trial Court).  Thus, the

Trial Court violated Petitioner's Fifth, Eighth and Fourteenth Amendment rights

when it failed to accurately respond to the jury's question on parole eligibility.

ii.    **The Trial Court Violated Petitioner's Right to a Full and Fair Sentencing Hearing and His Right to Remain Silent when it Improperly Responded to the Jury's Question about His Failure to Testify.**

The second question the jury asked was, "Could Tommy Waldrip have

goton [sic] up during the sentencing phase of trial to speak to the jury?"  The Trial

Court responded:

> A defendant is permitted, but never required, to testify.  You are to draw no conclusions harmful to the defendant because he did not testify.

477

This was improper because the Trial Court invited the jury to speculate why Petitioner did not testify by telling them that he is "permitted" to testify.  There was no purpose in telling the jury that during deliberations. The Trial Court should have told the jury that Petitioner "need not" testify.  This would have removed the possibility of any speculation and consideration by the jury about his failure to testify, which is the primary issue.  By allowing the jury to speculate and consider Petitioner's failure to testify for no reason, the Trial Court violated Petitioner's constitutional right to a fair jury and to remain silent.

### Y. THE TRIAL COURT IMPROPERLY SUSTAINED THE PROSECUTION'S OBJECTIONS TO TESTIMONY OFFERED BY PETITIONER DURING PENALTY PHASE.

It is well-established that neither the Prosecution nor the Trial Court can limit the jury's access to mitigation evidence.  *See Mills v. Maryland*, 486 U.S. 367 (1988); *Lockett v. Ohio*, 438 U.S. 586 (1978).  Moreover, Petitioner has more than the right to present mitigating evidence; he has a right for the jury to consider that evidence.  *See Penry v. Johnson*, 532 U.S. 782 (2001).  These rights were violated when the Trial Court improperly sustained the Prosecution's objections to Former Trial Counsel's questioning of witnesses during the penalty phase.  (T.T. Vol. XVIII, at 3403, 3405, 3406, 3422, R-63 (Ms. Watson argues lenient evidentiary standards in penalty phase).)

478

The United States Supreme Court examined this issue in *Green v. Georgia*, 442 U.S. 95 (1979). In *Green*, the Supreme Court concluded that it was a violation of the defendant's due process rights to prohibit the introduction of relevant evidence in the penalty phase because of mechanical application of the hearsay rules of evidence. *Id*. at 97. Thus, Petitioner's relevant and reliable evidence should have been admitted over the Prosecution's objections. For instance, the Defense should have been allowed to introduce hearsay evidence of Petitioner's intention to continue his religious training in prison. (T.T. Vol. XVIII, at 3403, R-63.) Therefore, Petitioner's sentencing hearing was rendered unreliable.

## Z.   THE TRIAL COURT OVERRULED PROPER OBJECTIONS MADE BY FORMER TRIAL COUNSEL.

The Trial Court improperly overruled the following proper objections made by Former Counsel that individually and collectively rendered the Underlying Trial unfair and juries' verdicts unreliable.

1.   The Trial Court improperly overruled the Former Trial Counsel's objection regarding the manner in which the hearing was being held under the Unified Appeals Procedure. (P.T. (6/21/91), Doc. 9, Ex. R-11, at 15-16 (filed 5/24/06).)

2.   The Trial Court improperly overruled Former Trial Counsel's objection regarding the relevancy of witness testimony regarding courtroom security. (P.T. (7/12/91), Doc. 9, Ex. R-13, at 80 (filed 5/24/06).)

3.    The Trial Court improperly overruled Former Trial Counsel's objection regarding the failure to sever pretrial proceedings. (P.T. (8/12/91), Doc. 9, Ex. R-15, at 28-30 (filed 5/24/06).)

4.    The Trial Court improperly overruled Former Trial Counsel's objection regarding the selective enforcement of the sequestration rule. (P.T. (8/26/91) Vol. I, Doc. 9, Ex. R-18, at 30-31 (filed 5/24/06).)

5.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit D, the certified copy of the search warrant for the Gilmer County property. (P.T. (10/21-22/91) Vol. III, Doc. 9, Ex. R-34, at 273-74 (filed 5/24/06).)

6.    The Trial Court improperly overruled Former Trial Counsel's objection to the hearsay testimony by Agent Stone. (*Id.* at 275.)

7.    The Trial Court improperly overruled Former Trial Counsel's objection to the limited change of venue. (C.T. Vol. I, Doc. 9, R-40, at 2-3 (filed 5/24/06).)

8.    The Trial Court improperly overruled Former Trial Counsel's objection to the victim's family's proximity to trial proceedings and to their presence during the sequestered *voir dire* of the jurors. (*Id.* at 51-52.)

9.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's statement that Mr. Waldrip has been charged with murder. (C.T. Vol. III, at 448-55, R42.)

10.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's argument in opening statements. (*Id.* at 463.)

11.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution implying that Former Trial Counsel had an obligation to  (a)

have defendant treated and (b) to make motions for that purpose. (*Id.* at 509.)

12.    The Trial Court improperly overruled Former Trial Counsel's objection to the use of word "murder" in the Prosecution's opening statements at the Competency Hearing. (C.T. Vol. IV, Doc. 9, Ex. R-43, at 523-35 (filed 5/24/06).)

13.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's questioning of Dr. Currie about the fact pattern of the murder case during the Competency Hearing. (*Id.* at 567-68.)

14.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's questioning of Dr. Currie about the facts of the murder case during the Competency Hearing. (*Id.* at 579-80.)

15.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's questions posed to Dr. Currie concerning facilities where Petitioner has been housed. (*Id.* at 599-603.)

16.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's references to John Mark Waldrip. (*Id.* at 603.)

17.    The Trial Court improperly overruled Former Trial Counsel's objection to Dr. Storms's testimony to whether or not Petitioner's ability to relate superficial information from memory results in a conclusion that Petitioner could communicate with lawyers and understand the charges against him. (C.T. Vol. V, Doc. 9, Ex. R-44, at 685-86 (filed 5/24/06).)

18.    The Trial Court improperly overruled Former Trial Counsel's objection to the  conclusory testimony by Dr. Storms. (*Id.* at 689.)

19.    The Trial Court improperly overruled Former Trial Counsel's objection to the relevance and generality of the testimony by Dr. Storms concerning an

individual's ability to understand the proceedings against him as being determinable by the level of sophistication involved in the crime charged. (*Id.* at 690.)

20.    The Trial Court improperly overruled Former Trial Counsel's objection to the conclusory testimony by Dr. Storms as improper in that Dr. Storms stated that how the Petitioner looked related to Petitioner's level of understanding and competency. (*Id.* at 701.)

21.    The Trial Court improperly overruled Former Trial Counsel's objection to the testimony of Dr. Lower based on inadequate foundation to speculate on whether the Petitioner understood his rights and the limits of confidentiality. (*Id.* at 746.)

22.    The Trial Court improperly overruled Former Trial Counsel's objection to Dr. Kugler's testimony as repetitive and cumulative. (*Id.* at 767-77.)

23.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's repetitive questioning on the issue of defendant's silence. (*Id.* at 789-90.)

24.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's questioning of Petitioner about the facts of, and his participation in, the murder case as violating the tenets of the Competency Hearing and as invading the province of the impending guilt-innocence phase.   (*Id.* at 828-31 (Former Trial Counsel states that this objection is a continuing objection).)

25.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's improper questioning of Petitioner about prior events in the courtroom. (*Id.* at 831-32.)

26.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's questioning Mr. Waldrip about "guilt".

27.  The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's use of the word "guilt" as the descriptive term that the Prosecution suggests made Petitioner unable to communicate with his lawyers. (*Id.* at 866.)

28.  The Trial Court improperly overruled Former Trial Counsel's objection to being unable to communicate with the Petitioner regarding the Petitioner's fifth amendment privilege. (*Id.* at 867-69.)

29.  The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution introducing evidence of prior convictions. (*Id.* at 869-70.)

30.  The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution reading a conviction into record. (*Id.* at 871-72.)

31.  The Trial Court improperly overruled Former Trial Counsel's objection to the excusal of prospective juror Wright. (T.T. Vol. II, Doc. 9, Ex. R-47, at 256-57 (filed 5/24/06).)

32.  The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's opening statement. (T.T. Vol. IX, Doc. 9, Ex. R-54, at 1724 (filed 5/24/06).)

33.  The Trial Court improperly overruled Former Trial Counsel's objection to the introduction of Prosecution's exhibit 106, Keith Evans's testimony from first armed robbery trial. (*Id.* at 1761-63.)

34.  The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's introduction of portions of Petitioner's April 19, 1991 statement. (*Id.* at 1863.)

35.  The Trial Court improperly overruled Former Trial Counsel's objection to the testimony of Robert Garner concerning his phone call with John Mark Waldrip. (*Id.* at 1866-76.)

36.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's reference to John Mark Waldrip as being located in
        Petitioner's apartment during phone conversation. (*Id.* at 1886.)

37.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the testimony of Thomas Hitchcock. (T.T. Vol. X, Doc. 9, Ex. R-55, at
        2007-09 (filed 5/24/06).)

38.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution leading witness Hitchcock. (*Id.* at 2014.)

39.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's introduction of Prosecution exhibit 125,  insurance card.
        (*Id.* at 2065-70.)

40.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the autopsy photos. (*Id.* at 2153-56.)

41.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibits 190-P, 197-P, and 189-P, photographs of Grave
        Site and body. (*Id.* at 2170-71.)

42.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution introducing testimony by Stephen Hawk regarding arrest of
        Petitioner for probation violation. (T.T. Vol. XI, Doc. 9, Ex. R-56, at 2199-
        2200 (filed 5/24/06).)

43.     The Trial Court improperly overruled the Former Trial Counsel's objection
        to the Prosecution's exhibits 113-P , 114-P, 111-P, and 134-P, photographs
        of Grave Site. (*Id.* at 2247-48.)

44.    The Trial Court improperly overruled Former Trial Counsel's reiterated objection regarding the Trial Court's admittance of Petitioner's statements. (*Id.* at 2334.)

45.    The Trial Court improperly overruled Former Trial Counsel's objection to witness Connie Pickens's testimony. (T.T. Vol. XII, at 2424-26, R-57.)

46.    The Trial Court improperly overruled Former Trial Counsel's objection to testimony by witness Pickens. (*Id.* at 2439.)

47.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibits 27-A, B, C, E, F, G, H, I, J, K, L, M, & 18, photographs of Grave Site and Hugh Stowers Road Site. (*Id.* at 2442-44, 2453.)

48.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibits 8, 41, 42, 44, 46, 47, 49, 50, 51, 52, 53, 86, 60, 26, 61, 27-O, 27-P, plaster casts of tires, glass and items recovered from the truck. (*Id.* at 2506-09.)

49.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibits 324-P, 320-P, and 87-P, photographs of pre-autopsy examination of Keith Evans (focus on clothing). (*Id.* at 2540-44.)

50.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 318-P, photographs pre-autopsy. (*Id.* at 2560.)

51.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 70-P, 71-P, 78-P, 72-P, 108-P, and 74-P, post autopsy photographs. (T.T. Vol. XIII, at 2568, R-58 .)

52.    The Trial Court improperly overruled Former Trial Counsel's objection to all of the Prosecution's exhibits that are photographs. (*Id.* at 2575.)

53.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibits 74, 108, 70, 71, 78, 72, 76, 104, 319, 315, 318, 73,
        and 103, post-autopsy photographs. (*Id.* at 2576-78.)

54.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibit 108. (*Id.* at 2578.)

55.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibit 73-P & 76-P, photographs post-autopsy. (*Id.* at
        2579.)

56.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibit 319-P & 315-P, photographs of wounds (post-
        autopsy). (*Id.* at 2580.)

57.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibits 318 and 103, post-autopsy photographs of victim
        (head/torso). (*Id.* at 2585.)

58.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibit 78-P, an x-ray photograph.. (*Id.* at 2589-90.)

59.     The Trial Court improperly overruled Former Trial Counsel's objection to
        testimony by Dr. Hanzlick. (*Id.* at 2597-98.)

60.     The Trial Court improperly overruled Former Trial Counsel's objection to
        the Prosecution's exhibit 137, copy of indictment and sentence, sentence and
        guilty plea from Bentley, GA. (*Id.* at 2640.)

61.     The Trial Court improperly overruled Former Trial Counsel's objection to
        speculative testimony by SA Attaway. (*Id.* at 2655.)

62.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 63, a brown wash cloth. (*Id.* at 2670-74.)

63.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 285-P, photograph of scene.  (*Id.* at 2672.)

64.    The Trial Court improperly overruled Former Trial Counsel's objection to hearsay testimony from SA Attaway about Petitioner's statements in relation to exhibit 63, the brown wash cloth. (*Id.* at 2674.)

65.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibits 63 and 285-P, the brown wash cloth and photograph of Grave Site. (*Id.* at 2675.)

66.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 139, wash cloth (w/body fluid). (*Id.* at 2679-80.)

67.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 96, rights from/waiver certificate. (*Id.* at 2696.)

68.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibits 99 and 99-A, transcript and microcassette of conversation between SA Attaway and Petitioner. (*Id.* at 2701.)

69.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's introduction of tape-recorded statement concerning the use of a chainsaw as incendiary device. (*Id.* at 2702-03.)

70.    The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 117, a map with notations for jury. (*Id.* at 2739-40.)

71.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's misconduct as prejudicial with respect to the manner in which Prosecution's exhibits 100 and 100-A were prepared, transcript and tape. (*Id.* at 2740-43.)

72.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's indiscriminate reading of the transcript of the Petitioner's statement. (T.T. Vol. XIV, Doc. 9, Ex. R-59, at 2813 (filed 5/24/06).)

73.   The Trial Court improperly overruled Former Trial Counsel's objection to speculative testimony by SA Attaway that someone, at some point in time, smoked a cigarette while standing in a particular area for a period of time long enough to smoke the two cigarettes found in the area. (*Id.* at 2817.)

74.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 65, the Gilmer County shotgun shell. (*Id.* at 2828.)

75.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 77, the minishell (from War Hill). (*Id.* at 2829.)

76.   The Trial Court improperly overruled the Former Trial Counsel's objection to the Prosecution's exhibit 142, fascimile document (conviction) Petitioner's probation violation. (*Id.* at 2829-34.)

77.   The Trial Court improperly overruled Former Trial Counsel's objection to not removing the charge of aggravated battery. (*Id.* at 2844.)

78.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 142, fascimile document regarding Petitioner's probation violation. (*Id.* at 2844-45.)

79.   The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's use of exhibit 137 and 142, documents (conviction) Petitioner's probation violation. (*Id.* at 2845-46.)

80. The Trial Court improperly overruled Former Trial Counsel's objection and request that the jury be instructed (prior to Defense's evidence) on both Prosecution's exhibits 142 and 137, documents (conviction) Petitioner. (*Id.* at 2845-47.)

81. The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibits 137 and 142, documents regarding Petitioner's conviction adjudication. (*Id.* at 2847.)

82. The Trial Court improperly overruled Former Trial Counsel's objection to the use of death penalty in this case. (*Id.* at 2855-57.)

83. The Trial Court improperly overruled Former Trial Counsel's objection to the Trial Court's reserving its ruling on whether to quash death penalty. (*Id.* at 2859.)

84. The Trial Court improperly overruled Former Trial Counsel's objection to the speculative questioning of witness Dr. Burton. (T.T. Vol. XV, Doc. 9, Ex. R-60, at 2931-33 (filed 5/24/06).)

85. The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's posing hypothetical questions to witness Dr. Currie. (*Id.* at 2990-91.)

86. The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's cross-examination of witness Peterson. (T.T. Vol. XVI, Doc. 9, Ex. R-61, at 3072-73 (filed 5/24/06).)

87. The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's cross-examination of witness Peterson about hair samples. (*Id.* at 3074.)

88.     The Trial Court improperly overruled Former Trial Counsel's objection to the jury charges that say malice aforethought can be inferred from reckless disregard for human life. (T.T. Vol. XVII, at 3129-30, R-62.)

89.     The Trial Court improperly overruled Former Trial Counsel's objection to the submission of the indictment to the jury as being confusing and misleading. (*Id.* at 3146-50.)

90.     The Trial Court improperly overruled Former Trial Counsel's restatement of them objection to evidence that pertained to pretrial motions. (*Id.* at 3155-56.)

91.     The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's improper and unreasonable, recidivism notice due to the fact that the Prosecution sent notice on 9/30/94. (T.T. Vol. XVIII, at 3362, R-63.)

92.     The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's use of the recidivist statute, 17-10-2. (*Id.* at 3364.)

93.     The Trial Court improperly overruled Former Trial Counsel's objection to the admission of prior convictions. (*Id.* at 3367-94.)

94.     The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 1, Petitioner's burglary charge document. (*Id.* at 3369-71.)

95.     The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 2, Petitioner document sentencing/plea change. (*Id.* at 3371-74.)

96.     The Trial Court improperly overruled Former Trial Counsel's objection to the Prosecution's exhibit 3, Petitioner document for sentencing purposes (theft, DUI;) petition to enter plea of guilty. (*Id.* at 3375-94.)

490

97.   The Trial Court improperly overruled the Former Trial Counsel's objection
to the Prosecution's questiong of Linda Waldrip about  her responses on her
application for insurance. (*Id.* at 3461-62.)

98.   The Trial Court improperly overruled Former Trial Counsel's objection to
the Prosecution's questioning of Linda Waldrip as toTommy Lee's
relationship with Lynn Libscomb.   (*Id.* at 3462-63.)

99.   The Trial Court improperly overruled Former Trial Counsel's objection to
the Prosecution's closing argument. (*Id.* at 3508-09.)

100.   The Trial Court improperly overruled Former Trial Counsel's objection to
the Prosecution's closing argument. (*Id.* at 3512-13.)

101.   The Trial Court improperly overruled Former Trial Counsel's objection to
the Prosecution's entire closing argument. (*Id.*)

## AA.   The Trial Court Admitted Irrelevant and Prejudicial Evidence.

The Trial Court improperly admitted the following irrelevant and prejudicial

evidence that individually and collectively rendered Petitioner's Underlying Trial

unfair and juries' verdicts unreliable.

1.   The Trial Court erred in allowing the Prosecution's statement that Petitioner
had been charged with murder. (C.T. Vol. III, at 448-55, R-42.)

2.   The Trial Court erred in allowing the Prosecution's argument in opening
statements. (*Id.* at 463.)

491

3.      The Trial Court erred in allowing implications that Former Trial Counsel have an obligation to have Petitioner treated by a mental health expert. (*Id.* at 509.)

4.      The Trial Court erred in allowing the use of word "murder" in the Prosecution's opening statements. (C.T. Vol. IV, Doc. 9, Ex. R-43, at 523-25 (filed 5/24/06).)

5.      The Trial Court erred in allowing questioning of Dr. Currie about the fact pattern of the murder case. (*Id.* at 567.)

6.      The Trial Court erred in allowing the Prosecution's questioning of Dr. Currie about the facts of the murder case. (*Id.* at 579-80.)

7.      The Trial Court erred in allowing questions posed to Dr. Currie concerning facilities where Petitioner had been housed. (*Id.* at 599-603.)

8.      The Trial Court erred in admitting references to John Mark Waldrip as prejudicial. (*Id.* at 603.)

9.      The Trial Court erred in admitting Dr. Storms's testimony regarding whether or not Petitioner could relate superficial information from memory. (C.T. Vol. V, Doc. 9, Ex. R-44, at 685-86 (filed 5/24/06).)

10.     The Trial Court erred in admitting the testimony of Dr. Storms. (*Id.* at 689.)

11.     The Trial Court erred in admitting testimony by Dr. Storms concerning the types of crimes committed by those suffering from mental illness. (*Id.* at 690.)

12.     The Trial Court erred in admitting conclusions drawn by Dr. Storms based on how the Petitioner looked. (*Id.* at 701.)

13.     The Trial Court erred in admitting testimony of Dr. Lower about whether the Petitioner understood his rights and the limits of confidentiality. (*Id.* at 746.)

14.     The Trial Court erred in admitting Dr. Kugler's testimony. (*Id.* at 767-77.)

15.     The Trial Court erred in allowing the Prosecution to introduce evidence, by way of testimony of Dr. Kugler, which was both repetitive and cumulative. (*Id.* at 768.)

16.     The Trial Court erred in allowing the Prosecution to question Dr. Kugler repeatedly on the issue of Petitioner's silence. (*Id.* at 789-90.)

17.     The Trial Court erred in allowing questioning of Petitioner about the facts of murder. (*Id.* at 830-31.)

18.     The Trial Court erred in allowing questioning of Petitioner about his "guilt". (*Id.* at 861-66.)

19.     The Trial Court erred in allowing use of word "guilt". (*Id.* at 866.)

20.     The Trial Court erred in admitting evidence of Petitioner's prior convictions. (*Id.* at 869.)

21.     The Trial Court erred in allowing the Prosecution to read a conviction into record. (*Id.* at 871.)

22.     The Trial Court erred in allowing the Prosecution to introduce exhibit 106, Keith Evans's testimony from the John Mark Waldrip trial. (T.T. Vol. IX, at 1761-63, R-54.)

23.     The Trial Court erred in allowing the Prosecution to introduce portions of Petitioner's statements from April 19, 1991. (*Id.* at 1863.)

493

24.    The Trial Court erred in allowing the Prosecution to introduce the testimony of Robert Garner concerning his phone call with John Mark Waldrip. (*Id.* at 1866-76.)

25.    The Trial Court erred in allowing the Prosecution to reference John Mark Waldrip as being located in Petitioner's apartment. (*Id.* at 1886.)

26.    The Trial Court erred in allowing testimony of Thomas Hitchcock. (T.T. Vol. X, at 2007, R-55.)

27.    The Trial Court erred in allowing the introduction of Prosecution exhibit 125, (Linda) Waldrip's insurance card. (*Id.* at 2063-70.)

28.    The Trial Court erred in allowing the Prosecution to introduce autopsy photographs. (*Id.* at 2153-56.)

29.    The Trial Court erred in allowing the Prosecution to introduce exhibits 190-P, 197-P and 189-P, photographs of Grave site and body. (*Id.* at 2170-71.)

30.    The Trial Court erred in allowing the Prosecution to introduce exhibits 127-P, 133-P, 134-P, 116-P, 119-P, 125-P, 113-P, 114-P, 111-P, photographs of the Grave Site and surrounding (wooded) area. (T.T. Vol. XI, at 2247-48, R-56.)

31.    The Trial Court erred in admitting the conversation between John Mark Waldrip and Petitioner to be admitted. (*Id.* at 2334.)

32.    The Trial Court erred in allowing witness Raymond George to testify as a glass expert, a crime scene reconstructionist, and an accident reconstructionist. (T.T. Vol. XII, at 2373-79, R-57.)

33.     The Trial Court erred in allowing witness Connie Pickens to testify as a crime scene reconstruction expert. (*Id.* at 2424-41.)

34.     The Trial Court erred in admitting testimony concerning burning as a manner to destroy evidence. (*Id.* at 2438-39.)

35.     The Trial Court erred in allowing the Prosecution to introduce exhibits 18, 27-A, B, C, E, F, G, H, I, J, and L, photographs of Hugh Stowers Road Crime Scene/Grave Site. (*Id.* at 2442-53.)

36.     The Trial Court erred in allowing the Prosecution to introduce exhibits 27-M, & 27-K, photographs of Hugh Stowers Road Crime Scene. (*Id.* at 2453.)

37.     The Trial Court erred in allowing the Prosecution to introduce exhibit 35, soil sample retrieved from boots from Gilmer County site. (*Id.* at 2464.)

38.     The Trial Court erred in allowing the Prosecution to introduce exhibits 8, 41, 42, 44, 46, 47, 49, 50, 51, 52, 53, 86, 60, 26, 61, 27-O, and 27-P, plaster casts of tires, glass and items recovered from the truck. (*Id.* at 2506-07.)

39.     The Trial Court erred in allowing the medical examiner to testify concerning the amount of pain involved with the injuries at issue. (T.T. Vol. XIII, at 2597-99, R-58.)

40.     The Trial Court erred in allowingthe Prosecution to introduce exhibits 87-P, 320-P, and 324-P, photographs of autopsy examination of Keith Evans (clothing focus) (T.T. Vol. XII, at 2541-45, R-57.)

41.     The Trial Court erred in allowing the Prosecution to introduce exhibits 78-P, 74-P, 108-P, 71-P, 70-P, 72-P, 73-P, 76-P, 315, 319, 103-P, 104-P, and 318-P, photographs post-autopsy. (*Id.* at 2560-63; T.T. Vol. XIII, at 2588, R-58.)

42.   The Trial Court erred in allowing the Prosecution to introduce exhibits 78-P, 74-P, 108-P, 71-P, 70-P, and 72-P, post-autopsy photographs. (T.T. Vol. XIII, at 2578, R58.)

43.   The Trial Court erred in allowing the Prosecution to introduce exhibit 73-P and 76-P, photographs post-autopsy. (*Id.* at 2580.)

44.   The Trial Court erred in allowing the Prosecution to introduce exhibit 315-P and 319-P, photographs of post-autopsy wounds. (*Id.* at 2584.)

45.   The Trial Court erred in allowing the Prosecution to introduce exhibit 103-P, 104-P, and 318-P, photographs of post-autopsy (facial wounds). (*Id.* at 2588.)

46.   The Trial Court erred in allowing the Prosecution to introduce exhibit 78, x-ray photograph. (*Id.* at 2590.)

47.   The Trial Court erred in allowing the Prosecution to introduce exhibit 137, copy of indictment and sentence, and guilty plea from Bentley, GA. (*Id.* at 2639.)

48.   The Trial Court erred in allowing SA Attaway to testify to Petitioner's alleged statements concerning the location of the gun. (*Id.* at 2673-74.)

49.   The Trial Court erred in admitting Prosecution exhibit 96 into evidence, rights form/waiver certificate. (*Id.* at 2696.)

50.   The Trial Court erred in admitting Prosecution exhibit 99-A and exhibit 99, transcript microcassette of interrogation of Petitioner by SA Attaway. (*Id.* at 2702.)

51.   The Trial Court erred in allowing the Prosecution to introduce exhibits 100 & 100-A, transcript and tape. (*Id.* at 2721.)

52.    The Trial Court erred in allowing the Prosecution to play exhibit 100 and 100-A, transcript and tape (continued). (*Id.* at 2721-22.)

53.    The Trial Court erred in allowing the Prosecution to introduce exhibit 117, map with notations for jury. (*Id.* at 2739; T.T. Vol. XIV, at 2836-37, R-59.)

54.    The Trial Court erred in allowing the Prosecution to introduce exhibit 65, Gilmer County shotgun shell. (T.T. Vol. XIV, at 2828, R-59.)

55.    The Trial Court erred in allowing the Prosecution to introduce exhibit 77, minishell (from War Hill). (*Id.* at 2829.)

56.    The Trial Court erred in allowing the Prosecution to introduce exhibit 142, facsimile document. (*Id.* at 2834.)

57.    The Trial Court erred in allowing the Prosecution to introduce exhibit 137(a), document of conviction and adjudication of Petitioner. (*Id.* at 2853.)

58.    The Trial Court erred in allowing speculative questioning of Dr. Burton about why a suspect might burn clothes and/or shoes. (T.T. Vol. XV, Doc. 9, Ex. R-60, at 2931-33 (filed 5/24/04).)

59.    The Trial Court erred in allowing the Prosecution to pose hypothetical questions to witness Dr. Currie which were irrelevant because they did not address the purpose of this inquiry. (*Id.* at 2990-91.)

60.    The Trial Court erred in allowing the Prosecution to conduct questioning of Linda Waldrip about her responses on her application for insurance. (T.T. Vol. XVIII, at 3461-62, R-63.)

61.    The Trial Court erred in allowing the Prosecution to conduct questioning of Linda Waldrip as to Petitioner's relationship with Lynn Libscomb. (*Id.* at 3462-63.)

62.    The Trial Court erred in allowing the Prosecution to introduce prior convictions of Petitioner at the sentencing phase of the trial. (T.T. Vol. XVIII, at 3367-94, R-63.)

As a result of these and other improper trial court rulings pled throughout this Brief, Petitioner was denied his rights to due process and equal protection under the United States Constitution.

The state courts found that the portion of this claim wherein Petitioner challenged improperly admitted hearsay of Robert Garner and the victim and wherein Petitioner challenged the admission of the probation warrant, had been raised and addressed on direct appeal.  In each instance, the Georgia Supreme Court addressed those portions of the claim on the merits.  The Georgia Supreme Court's resolution of the claim, however, is an unreasonable application of clearly established Supreme Court precedent, namely *Crawford v. Washington*, 541 U.S. 36 (2004).[52]

---

[52]    There is no issue as to the retroactive application of *Crawford* as Petitioner objected on confrontation clause grounds at trial and properly pursued the claim on direct appeal.

As to the remainder of the claim, the state habeas court found it to be procedurally defaulted because it had not been pursued on direct appeal. This Court subsequently found that the state court's application of the procedural default rule was adequate and independent and further ruled it would not address the merits but upon a showing of cause and prejudice.[53] Cause to excuse the default rests upon trial counsel's (who was also appellate counsel) failure to properly preserve the issue and then pursue it on appeal. *See e.g.*, *Murray v. Carrier*, 477 U.S. 478 (1986). Had trial counsel properly objected and appellate counsel properly pursued this issue on direct appeal, there is a reasonable probability the outcome of the appeal would have been different, *i.e.*, the Georgia Supreme Court would have reversed Petitioner's conviction and death sentence. *Philmore v. McNeil*, --- F.3d ----, No. 07-13637, 2009 WL 2181682 at *12 (11th Cir. July 23, 2009). Thus, cause *and* prejudice have been established. Moreover, as Petitioner is actually innocent (*See* Volume III) his execution would be a fundamental miscarriage of justice which would also excuse the default in this case.

---

[53]      Mr. Waldrip objects to this finding.

**XXXVIII.   CLAIM 69:  MR. WALDRIP'S TRIAL WAS FRAUGHT WITH PROCEDURAL AND SUBSTANTIVE ERRORS, WHICH CANNOT BE HARMLESS WHEN VIEWED AS A WHOLE, SINCE THE COMBINATION OF ERRORS DEPRIVED HIM OF THE FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE ANALOGOUS PROVISIONS OF THE GEORGIA CONSTITUTION**

It is beyond dispute that due process analysis requires a flexible, not fixed,

approach.

> [Our] decisions underscore the truism that "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 (1961).  '**[D]ue process is flexible and calls for such procedural protections as the particular situation demands**.'   *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett v. Kennedy*, 416 U.S., at 167-68 (Powell, J., concurring in part); *Goldberg v. Kelly*, 397 U.S. 254, 263-266 (1970); *Cafeteria Workers v. McElroy*, 367 U.S., at 895.   More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *See*, *e.g. Goldberg v. Kelly*, 397 U.S., at 263-71.

*Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976) (emphasis supplied). *Mathews*, of course, dealt with the fundamental question of the necessity of requiring formal hearings on disputed issues. The Supreme Court's analysis of the considerations regarding the necessity of procedural safeguards is highly enlightening and instructive. *Mathews* teaches that it is not enough for the Government to simply provide "a process" to dispose of disputed matters. Rather, the process must be fair to all parties and must be flexible enough to accommodate the particular litigation involved. A capital defendant has a "constitutional right to a fair trial regardless of . . . [the crime]." *Heath v. Jones*, 941 F.2d 1126, 1131 (11th Cir. 1991).

Petitioner did not receive the fundamentally fair trial to which he was entitled under the Eighth and Fourteenth amendments. The process itself failed him. It failed because of the sheer number and types of errors involved in his trial that, when considered as a whole, virtually dictated the sentence that he would receive.

There are many flaws in the system under which Petitioner was sentenced to death. They have been pointed out not only in this Brief and the Evidentiary Hearing, but also in Amended Petition, Petitioner's Direct Appeal and Motion for New Trial. While there are means for addressing each individual error, the fact is that addressing these errors on an individual basis will not afford adequate

safeguards against an improper conviction and improperly imposed death sentence – safeguards that are required by the Constitution.  Rather, these claims must be considered in the aggregate, for when the separate infractions are viewed in their totality, it is clear that Petitioner did not receive the fundamentally fair trial to which he was entitled under the Eighth and Fourteenth Amendments.  The numerous constitutional claims in this petition show that all proceedings here were fundamentally flawed.

The Supreme Court has reiterated the point that death is an unusual penalty, unique in its severity, and thus that greater caution and safeguards must be utilized to ensure the constitutional validity of each death sentence:

> [D]eath is a different kind of punishment from any other which may be imposed in this country . . . .  From the point of view of the defendant, it is different both its severity and its finality.  From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.

*Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) (citations omitted).  This same principle was posited in *Woodson v. North Carolina*, 428 U.S. 280 (1976):

> Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  **Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.**

*Woodson*, 428 U.S. at 305 (emphasis supplied).  Death is "an unusually severe punishment, unusual in its pain, in its finality, and in its enormity."  *Furman v. Georgia*, 408 U.S. 238, 287 (1973) (Brennan, J., concurring).  It differs from lesser sentences "not in degree but in kind.  It is unique in its total irrevocability."  *Id*. at 306 (Stewart, J., concurring).  The severity of the sentence "mandates careful scrutiny in the review of any colorable claim of error."  *Zant v. Stephens*, 462 U.S. 862, 885 (1983).  Accordingly, the cumulative effects of errors, alleged by the State to be harmless, must be carefully scrutinized in capital cases.

This rationale has been applied to both the guilt/innocence and sentencing phases of a capital defendant's trial:

> To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination.  **The same reasoning must apply to rules that diminish the reliability of the guilt determination.**

*Beck v. Alabama*, 447 U.S. 625, 638 (1980) (footnote omitted) (emphasis supplied).

A series of errors may accumulate into a very real, prejudicial effect.  The burden remains on the Prosecution to prove that the individual errors did not affect the verdict, and more importantly, that the cumulative impact of these errors did not affect the verdict.  In Petitioner's case, the Prosecution cannot sustain this burden and relief is therefore mandated.

The cumulative effect of the statutory and constitutional errors which occurred at Petitioner's pre-trial hearings, Competency Hearing, guilt/innocence phase of the Underlying Trial, sentencing phase of the Underlying Trial, and the Direct Appeal deprived Petitioner of due process, a fair trial, and a reliable determination of punishment, in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

The state habeas court found this claim to be procedurally defaulted because the claim was not pursued on direct appeal.  (Order Denying Relief, at 46, R-267.) This Court found the state court's application of the procedural default rested upon adequate and independent state grounds and determined that it would only address the merits of the claim if Petitioner could establish cause and prejudice to excuse the default.[54]  However, because the Georgia Supreme Court has repeatedly held that under Georgia law, cumulative error analysis is not allowed and that each error must be evaluated individually, Petitioner, by definition, could not establish prejudice.  The Georgia Supreme Court's rulings that no cumulative error analysis is to be applied is contrary to clearly established Supreme Court precedent.  *Kyles v. Whitley*, 514 U.S. 419 (1995); *Strickland v. Washington*, 466 U.S. 668 (1984); *Berger v. United States*, 295 U.S. 78 (1935).  In *Kyles, Strickland,* and *Berger*, the

---

[54]    Mr. Waldrip objects to this finding.

Supreme Court considered the cumulative effect of numerous errors, and in *Kyles*

and *Berger*, found the cumulative effect of the errors warranted relief.  *See also*

*Hill v. Turpin*, 135 F.3d 1411 (1998) (prosecutors repeated *Doyle* violation

warranted habeas relief).  Thus, regardless of whether trial counsel would have

objected and appellate counsel pursued the issue on appeal, Georgia law prohibits

the accumulation of harm, and pursuing this federal claim in the state courts was

futile.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

### GAINESVILLE DIVISION

| | | |
|---|---|---|
| TOMMY LEE WALDRIP, | : | |
| | : | CIVIL ACTION NO. |
| Petitioner, | : | 2:06-CV-00062 |
| | : | |
| v. | : | HABEAS CORPUS |
| | : | |
| WILLIAM TERRY, | : | |
| WARDEN, Georgia Diagnostic | : | |
| And Classification Center, | : | |
| | : | |
| Respondent. | : | |

## PETITIONER'S <u>CORRECTED</u> BRIEF
## IN SUPPORT OF HIS CLAIMS FOR HABEAS RELIEF

### VOLUME III

Jeffrey L. Ertel
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Atlanta, Georgia 30303

Lawrence J. Fox (PA I.D. 15261)
David J. Kessler (PA I.D. 81551)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA   19103-6993
(215) 988-2700

*Attorneys for*
Petitioner Tommy Lee Waldrip

# ACTUAL INNOCENCE

XXXIX.    MR. WALDRIP IS ACTUALLY INNOCENT OF THE CRIMES
          FOR WHICH HE IS SENTENCED TO DIE.

A.    INTRODUCTION

Tommy Lee Waldrip ("Petitioner" or "Tommy"), did not kill Keith Evans,
nor was he even present when Keith Evans was killed. [1]  This argument
demonstrates why Tommy's innocence entitles him to full habeas review of all of
his claims, and why his execution would violate the United States Constitution.

Tommy was convicted almost exclusively on the basis of incriminating
statements that he made to police during their investigation of the death of Keith
Evans.  These statements were the product of Tommy's severe mental illness and
his irrational insistence on going to any length to protect his family from what he
saw as a "conspiracy" against them.  John Mark Waldrip now has come forward
and admitted that he killed Mr. Evans and that his father attempted to cover for
him.  Additionally, Tommy has discovered new evidence of his own mental illness
that casts serious doubt on the credibility of any statements he made.

A colorable claim of innocence – either of guilt or of penalty – is sufficient
to require this Court to review all error asserted to give rise to an unconstitutional

---

[1]    The sufficiency of the evidence was challenged on direct appeal and is a separate claim
here.  *See* Vol. II, Section XIV.  Because it was not procedurally defaulted, it does not
require additional briefing for this Court to consider this claim on its merits.  It provides a
more detailed picture of the sparseness of the evidence at trial – a sparseness that was
exacerbated by the focus in the jury instructions on the nature of the crimes rather than on
Mr. Waldrip's role in the crimes.  *See* Vol. I, at Section X, above.

finding of guilt or sentence of death.  Tommy's claim of innocence is more than

colorable, and accordingly it mandates a full review of Tommy's conviction.

Nevertheless, this argument is presented here last, because courts that have

considered the issue have recognized that they may be able to reach the

constitutional claims and grant relief without ever addressing whether the person

committed the crime or deserved the penalty.  *Dretke v. Haley*, 541 U.S. 386, 393-

94 (2004) ("[A] federal court faced with allegations of actual innocence, whether

of the sentence or of the crime charged, must first address all non-defaulted claims

for comparable relief and other grounds for cause to excuse the procedural

default.").

A petitioner may avoid a procedural bar to the consideration of the merits of

his constitutional claims if he can "show that it is more likely than not that no

reasonable juror would have convicted him in light of the new evidence." *Schlup*

*v. Delo*, 513 U.S. 298, 327 (1995).  Put another way, a court need only find it

"more likely than not that any reasonable juror would have reasonable doubt"

about the petitioner's guilt.  *House v. Bell*, 547 U.S. 518, 537 (2006).  The Court

must not consider this new evidence in a vacuum.  "[A]lthough 'to be credible' a

gateway claim requires 'new reliable evidence – whether it be exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence

– that was not presented at trial,' *the habeas court's analysis is not limited to such evidence*." *Id.* (emphasis supplied) (internal citations omitted).  Instead:

> Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record.  If new evidence so requires, this may include consideration of the credibility of the witnesses presented at trial.

*Id.* at 538-39 (internal citations omitted).  Thus, the standard requires this Court to take into account the entire mix of evidence – both the evidence presented at trial and the new evidence – when considering whether any reasonable juror would have reasonable doubt as to Tommy's guilt.  Here, the mix of evidence shows that Tommy's innocence entitles him to habeas relief – even if constitutional error had not pervaded his interrogation and trial (which it did) – and it certainly warrants this Court's solicitude in its review of the constitutional error set forth above.

### B.    THE MIX OF EVIDENDCE DEMONSTRATING TOMMY'S INNOCENCE

#### 1.    John Mark Waldrip Murdered Keith Evans.

John Mark Waldrip, Tommy's eldest son – accompanied by Howard Livingston – killed Keith Evans.  In sworn testimony developed after Tommy's trial, John Mark unequivocally admitted that he murdered Mr. Evans, that Tommy in no way contributed to the death of Mr. Evans, and that Tommy was not present when Mr. Evans was killed.  (Affidavit of John Mark Waldrip, Doc. 9, Ex. R-147 (E.H. 2), at 129 (filed 5/24/06) [hereinafter "John Mark Waldrip Aff."] [App.

131].)  Tommy did not know John Mark would kill Mr. Evans and he was not on hand when it happened.  In short, Tommy is actually innocent of the crime of which he was convicted – and, because he neither killed nor intended to kill anyone, he is actually innocent of the death penalty as well.

John Mark testified that the murder of Mr. Evans was not a planned event. (John Mark Waldrip Aff., at 129-30, R-147 [App. 131].)  John Mark wanted to scare Mr. Evans out of testifying at his upcoming trial, so he and his uncle, Howard Livingston, staked out the route that Mr. Evans frequently travelled after work, then forced Mr. Evans' automobile off of the road.  (*Id.*).  Although John Mark originally planned to threaten Mr. Evans with a shotgun, the situation spun out of control when Mr. Evans bent down in his truck.  (*Id.* at 130.)  Thinking that Mr. Evans was reaching for a weapon, John Mark shot him.  (*Id.*)

John Mark assumed Mr. Evans was dead and panicked.  He climbed into Mr. Evans' truck and, followed by Mr. Livingston, began driving around searching for a place to hide Mr. Evans' body.  (*Id.* at 130-31.)  When he arrived at Hugh Stowers Road, he discovered that Mr. Evans was still alive.  (*Id.* at 131.)  John Mark then struck Mr. Evans repeatedly until he died.  (*Id.*).

At this point, John Mark drove to Tommy's house, woke his father, and asked for his assistance.  (*Id.*)  Tommy helped John Mark bury the body and burn

the truck.  (*Id.* at 132.)  He then told his son that he would take the blame for the crime, if it came to that:

> Daddy told me that he was old and had lived his life. He said that I had my whole life in front of me and that he was going to take the rap. Daddy told me to tell him everything that happened and he would take care of the rest if the police ever started coming down on us.  He told me that under no circumstance should I admit to killing Keith Evans. I understood what he was doing for me and I told him okay.

(*Id.* at 132.)

John Mark thus denied any involvement in the murder to the police and perjured himself at his own trial.  (*Id.* at 132-33.)  John Mark did not tell Tommy's attorneys what really happened on the night Mr. Evans was murdered, and he let his father stand trial for a capital offense.

John Mark's culpability was not lost on the prosecution.  Among the many pieces of evidence unlawfully concealed from defense counsel was an April 16, 1993 letter from the District Attorney's office to the Sentence Review Panel regarding John Mark's sentencing on two armed robberies occurring in January 1990.  (Letter from DA to Superior Courts Sentence Review Panel, Doc. 9, Ex. R-165 (E.H. 20), at 5610-13 (filed 5/24/06) (Br. Ex. "III") [App. 101].)  In this letter, the District Attorney's office described John Mark as a "mindless, rabid shark" and the most culpable person in the death of Mr. Evans.  *Id.*  Despite the impeachment value of this letter, it was not disclosed to defense counsel until after Tommy's direct appeal.

### 2.     There Is No Evidence Linking Tommy Waldrip To The Murder.

The newly discovered affidavit of John Mark, as corroborated by the letter from the district attorney's office, is consistent with the complete lack of physical evidence presented at trial.  The state offered no physical evidence – such as footprints, fingerprints, hair, or blood – to show that Tommy contributed to the death of Mr. Evans, or even that Tommy was at the scene of the murder.[2]  This is not to say that no evidence was found.  To the contrary, the tragic events that led to the death of Mr. Evans spanned multiple locations and involved a thick trail of evidence.  The problem for the prosecution was that none of this evidence could be tied to Tommy.

For instance, investigators found several sets of footprints at the crime scene, but none could be linked to Tommy.  (T.T. Vol. XI, Doc. 9, Ex. R-56, at 2262 (filed 5/24/06) [App. 133].)  Similarly, cigarette butts found at the site were tested for saliva, but the crime lab could not connect those to Tommy, either.  (T.T. Vol. XIII, Doc. 9, Ex. R-58, at 2751-52 (filed 5/24/06) [App. 19].)  The same can be said for the other evidence found, which included a wrist watch, fast food chain cup, beer cans, broken automotive glass, a glove, a single cassette tape, a box of

---

[2]     In a separate claim – under *Jackson v. Virginia*, 443 U.S. 307 (1979) – Mr. Waldrip has consistently attacked the sufficiency of the evidence to support his conviction.

cassette tapes, a gasoline container cap, a front license plate, a plastic limestone bag, a wheel weight, a piece of dress shirt, a button, numerous blood spatters, and hair – none of this could be linked with Tommy.[3]  (T.T., Vol. X, Doc. 9, Ex. R-55, at 2052-53, 2086, 2132 (filed 5/24/06) [App. 37]; T.T., Vol. XI, Doc. 9, Ex. R-56, at 2244, 2286-87, 2294 (filed 5/24/06) [App. 133].)

This cornucopia of evidentiary material demonstrates how unplanned and hastily executed this crime was.  It was a clumsy, brutal, and partially-bungled crime that left vast swaths of material for investigators to comb through.  Still, they found *no* fingerprints, hair, fibers or blood that could tie Tommy to the scene of Mr. Evans' death.  In short, the prosecution produced nothing demonstrating that Tommy was involved in anything more than helping his son hide the body of Mr. Evans.  An accessory after the fact is not a murderer.

The lack of physical evidence and the absence of any eye-witness testimony at trial suggest how important Tommy's "confessions" became to the prosecution and lay bare the fragility of the conviction itself.  They also demonstrate why the

---

[3]    There was one piece of evidence that was equally attributable to multiple people: The insurance card that was in his wife's car, a car that was driven at times by Tommy, by John Mark, and by others.  Nothing could be made from it other than the bare fact that Tommy and others had at times driven the car and that that car was at the crime scene.

constitutional errors that surrounded those confessions and the suppression of evidence that would undermine them require careful attention from this Court.[4]

### 3.    Tommy Waldrip Suffers from Severe Mental Illness.

Given the complete lack of any physical evidence linking Tommy to the murder, the prosecutors were forced to rely almost exclusively on purportedly inculpatory statements that Tommy made to investigators in a hapless effort to cover for his son.  It must have been readily apparent to the investigators who originally interviewed Tommy that he suffered from a severe mental illness, given how incoherent his statements were and how readily he adapted his story to fit the facts that investigators revealed to him.  The prosecution, however, vehemently contested any suggestion that Tommy was mentally ill, going so far as to withhold critical evidence of Tommy's severe mental illness from defense counsel.

Tommy's mental infirmities undoubtedly impacted his defense.  Tommy's former trial counsel, who first interviewed Tommy in April 1991, recalled the difficulties communicating with Tommy about his case because of Tommy's obsession with a "trick television" that Tommy believed the police used to watch

---

[4]    For example, given the absence of physical evidence tying Tommy to the crime, another piece of exculpatory evidence that was suppressed – the results of a polygraph exam that showed that another son, Paul Waldrip, was deceptive in his answers to questions regarding the murder – would have been significant for the jury to know as it shows that Tommy's incriminatory statements may have been wholly unreliable because he was protecting someone else.  (*See* Polygraph Exam Official Report, Doc. 9, Ex. R-175 (E.H. 30), at 9145-63 (filed 5/24/06) [App. 134].)

him throughout the day and also used to program his thoughts. (C.T., Doc. 9, Ex. R-42, at 470-76, 480-84 (filed 5/24/06) [App. 73]; Watson Aff., Doc. 9, Ex. 147 (E.H. 2), at 155-56 [App. 51].) Later, the court-appointed defense expert summarized Tommy's infirmities, and eventually testified that Tommy was "mentally ill," and "psychotic" and that he suffered from "a delusional disorder or a paranoid disorder" and had no more than a superficial understanding of his situation. (C.T., Doc. 9, Ex. R-43, at 551-54 (filed 5/24/06) [App. 74]).

Three prosecution experts, however, disagreed, and testified that Tommy was not psychotic. (C.T., Doc. 9, Ex. R-44, at 726, 736, 764, 784 (filed 5/24/05) [App. 70].) During the course of state habeas proceedings, crucial information came to light regarding these expert evaluations from the court and the defense. This newly discovered evidence not only calls into question the testimony of these experts, but confirms that Tommy was mentally ill and incompetent at the time of trial. From the information now available – including the suppressed evidence and the more complete social history that was also developed during the state habeas proceedings – and based on an examination of Mr. Waldrip, Dr. Merikangas has now been able to document how extensive Tommy's mental illness is.

First, two of the prosecution's mental health experts opined that Tommy was not psychotic based on Tommy's scores on the Minnesota Multiphasic Personality Inventory-2 ("MMPI-II"). Although the prosecution introduced a summary of

Tommy's scores to bolster this testimony, the prosecution concealed the

underlying test results, which were *miscalculated*, and which, when corrected,

show that Tommy actually scored "within the abnormally elevated range for the

'Schizophrenia' scale." (Affidavit of Eric Y. Drogin, J.D., PhD., ABPP, Doc. 9,

Ex. R-147 (E.H. 2), at 220-21, ¶¶ 10-14 (filed 5/24/06) [App. 71].)

   Second, the same two experts discounted Tommy's delusions due to an

assumed lack of a history of mental illness. (*See* C.T., at 726, 784, R-44 [App.

70].) However, during the state habeas proceedings, a parole report that had been

withheld from the defense disclosed that Tommy had documented mental health

problems dating back seven years before Mr. Evans was murdered – a fact that was

bolstered by the social history developed during the state habeas proceedings.[5]

(Tommy Lee Waldrip Parole Reports, Doc. 9, Ex. R-166 (E.H. 21), at 5971-6018

(filed 5/24/06) [App. 99].) According to the parole report, Tommy was unstable

during his incarceration and repeatedly stated that he needed to be released to help

take care of his family. (*Id*. at 6006-07.)

   Third, the prosecution also withheld the notes of another of its testifying

experts, Dr. Lower, who testified at the Competency Hearing that Tommy was "in

good touch with reality." (C.T., at 764, R-44 [App. 70].) Contrary to his

---

[5]      (See Vol. I, Section V, above; Vol. II, Sections XI, XII, above.)

testimony, Dr. Lower's suppressed notes reveal that Tommy suffered from (1) retarded psychomotor activity; (2) a moderate degree of psychiatric illness; and (3) persecutory delusional disorder.  (Dr. Lower's Notes, Doc. 9, Ex. R-177 (E.H. 32), at 9623-28 (filed 5/24/06) [App. 96].)  The outpatient interview notes of another testifying expert, Dr. Storms, likewise withheld until the state habeas proceedings, reveal that Tommy had a mistrust of law enforcement and that he heard voices through the television, VCR and the monitor – all of which were contrary to Dr. Storms' testimony that Tommy was "too well oriented to reality" and "gave no indication of psychosis."  (C.T., at 736, R-44 [App. 70].)

Finally, Marion Dacus, an inmate housed with Tommy before trial, told state officials that Tommy feared that the FBI was watching him and "knows what he thinks."  Appendix of Certificate of Probable Cause, Dacus Report, Doc. 9, Ex. R-274, at DA-1470 (Exhibit M) (filed 5/24/06) [App. 98].  He also described how Tommy believed that his wife and son were speaking with him over the jail speakers.  (*Id*.)

All of this information shows why Tommy was peculiarly susceptible to providing falsely inculpatory statements – improperly masking factual innocence. *See* Vol. I, Section IX, above.  That distinction makes this a decidedly different case from the ones in which a person seeks to use mental illness as legal "innocence" to excuse his actual commission of a crime.  *See, e.g., Boyde v. Brown*, 404 F.3d 1159, 1168-69 (9th Cir. 2005).

**4.     Tommy Waldrip's Inconsistent Statements Regarding The Murder Make Plain That He Was Not Involved.**

The recently-discovered evidence of Tommy's mental illness helps explain the statements he made to investigators over five days in April of 1991.[6]  When viewed in light of his mental illness and against the backdrop of a crime scene totally devoid of any evidence that Tommy was present during the murder, it also demonstrates that Tommy tailored his statements to fit the evidence revealed to him – which in turn explains why the statements are so wildly inconsistent.

Tommy related conflicting stories about who was present and how the pursuit began, as well as how the murder of Mr. Evans came about and the details of that event.  Tommy first claimed that he decided to follow Mr. Evans after Mr. Evans' truck met the car that Tommy was driving at a four-way intersection.  (Trial Exhibits, April 22, 1991 Statement, Doc. 9, Ex. R-64, at State's Exhibit 101A, p. 19 (filed 5/24/06) [hereinafter April 22 Statement] [App. 135].)  But Tommy, supposedly the driver, could not describe anything of the route that he took when they happened across Mr. Evans.  (*Id.* at 19-22.)

Tommy had similar problems with the shotgun.  It was at first in the trunk and then in the backseat.  (Trial Exhibits, April 19, 1991 Statement, Doc. 9, Ex. R-

---

[6]     The fact that these uncounseled statements were involuntary and the result of unconstitutional interrogations provide an independent constitutional basis for overturning Tommy's conviction and death sentence.  *See* Vol. I, Section VIII, above.

64, at State's Exhibit 100A, at pp. 2-3 (filed 5/24/06) [hereinafter April 19 Statement] [App. 136].)  The shotgun was his; then he did not know whose it was; finally, "it dawned on him" that Paul owned a shotgun with his name inscribed on it.[7]  (April 22 Statement, at 2-3, R-64 [App. 135].)  Tommy also could not accurately describe how Mr. Evans was shot.  He claimed Mr. Evans was shot twice in the head.  (Trial Exhibits, April 18, 1991 Statement, Doc. 9, Ex. R-64, at State's Exhibit 99A, p. 9 (filed 5/24/06) [hereinafter April 18 Statement] [App. 137].)  In actuality he was shot once in the shoulder and once in the neck.  (T.T. Vols. XII, at 2530-33, R-57 (filed 5/24/06) (trial testimony of Dr. Hanzlick)[8] [App. 18].)  Moreover, Tommy could not properly identify Mr. Evans' clothing, describing his shirt as a "sport shirt" (April 18 Statement, at 15, R-64 [App. 137]), when, in fact, Mr. Evans was wearing a button-down shirt with cuffs on the night he died (T.T. Vol. XII, at 2532-35, R-57 (citing Physical Exhibit of t-shirt, Prosecution's Exhibit 55-a) [App. 18].)

Tommy's story completely broke down when he tried to explain what happened after Mr. Evans was shot.  He stated that he was driving Mr. Evans'

---

[7]    Paul was Tommy's youngest son – the one whose polygraph was suppressed.

[8]    Likewise, Tommy was unable to explain what happened to the spent shotgun shells. *Compare* April 18 Statement, at 9, R-64 (does not know what happened to shells), with April 19 Statement, at 10, R-64 (stating that shells were thrown out the window while driving down the road) [App. 137 & App. 136].

truck, then he said he was driving the Ford Tempo, then he reiterated that he was driving the truck. (April 18 Statement, at 2-3, R-64 [App. 137].) The next day he said that he followed John Mark who was driving the truck. (April 19 Statement, at 10, R-64 [App. 136].) When confronted with the fact that the police had uncovered three distinct footprints at the Hugh Stowers Road site, Tommy explained his initial version of events – in which he had said that only he and Howard were present at the scene – by "explaining" that he had "changed shoes" at the crime scene, implying that two of the different shoe patterns belonged to him. (April 18 Statement, at 12-13, R-64 [App. 137].) Later Tommy stated that he was wearing "cheap tennis shoes" (April 22 Statement, at 9, R-64 [App. 135]), but that Howard had changed his shoes at the crime scene. (April 19 Statement, at 17, R-64 [App. 136].) He initially described burning his clothes in the truck and changing into his other son's (Paul's) clothing. (April 18 Statement, at 14, R-64 [App. 137].) Later he said that he changed his clothes when he returned to his house. (April 19 Statement, at 13, R-64 [App. 136].)

In short, despite his repeated efforts to place himself at the scene of the crime, Tommy's stories were on their face implausible – and given the mix of evidence as it is now known, they serve actually to undermine any confidence that Tommy participated in killing Mr. Evans.

## C.    ARGUMENT

Keith Evans' murder called out for justice and the Dawson County police delivered Tommy Waldrip.  Tommy was an easy patsy who was well-known to the sheriff.  Given his mental illness and delusions of persecution, it was a simple matter to elicit a "confession" from Tommy when he thought he could protect his son.  When his story got too convoluted and too incredible, the police helped him, over the course of several days, to adapt his "confession" to fit the evidence found at the crime scenes.  In the end, it did not matter that both John Mark Waldrip (the one referred to by the prosecution as the most culpable and a "rabid shark") and Howard Livingston – the two people responsible for Mr. Evans' death – were only to serve life in prison.  Someone would be sentenced to death for this horrific crime.  This Court should care that the wrong man was sentenced to death and that significant constitutional error allowed that to happen.

Under *House*, a "colorable claim of innocence" – either of guilt or of penalty – is sufficient to require this Court to review all error giving rise to an unconstitutional finding of guilt or sentence of death.  Thus, regardless of this Court's analysis of otherwise procedurally defaulted claims, the colorable claim of innocence requires that Tommy's claims be reviewed on their merits.

Tommy's case goes even further, however.  Although the Supreme Court has not yet addressed a case in which a freestanding claim of actual innocence was sufficient to warrant habeas relief, a majority of justices agree that such a claim is cognizable under the right circumstances and may support the grant of a writ.  Such circumstances are present here.  For the reasons set forth below, the writ should be granted – whether through review of the other constitutional error that tainted the trial below, or because this Court grants relief on innocence alone.

1.    **Tommy's Actual Innocence Claim Provides A Gateway To Address Any And All Procedurally Defaulted Claims.**

Tommy's colorable claim of innocence serves as a gateway to review any claims that the Court would otherwise deem unreviewable – and, for that reason, it is the *last* step in the Court's cause and prejudice analysis.  *Dretke v. Haley*, 541 U.S. 386, 394 (2004).  Generally, "[u]nless a habeas petitioner shows cause and prejudice a court may not reach the merits of . . . new claims, not previously raised . . . or . . . procedurally defaulted claims in which the petitioner failed to follow applicable state procedural rules in raising the claims."  *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992) (internal citations omitted).  However, the Supreme Court has held that even if a state prisoner cannot meet the cause and prejudice standard, a federal court may hear the merits of his claim if he demonstrates that "the failure to hear the claims would constitute a 'miscarriage of justice.'"  *Id.* at 339.  This "miscarriage of justice exception" allows the Court to hear procedurally defaulted

claims if petitioner establishes a colorable claim of factual innocence under

probative evidence.  *Id*.; *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986)

("[I]n an extraordinary case, where a constitutional violation has probably resulted

in the conviction of one who is actually innocent, a federal habeas court may grant

the writ even in the absence of a showing of cause for the procedural default.").

In capital cases, the actual innocence inquiry takes on two dimensions: (1)

innocence of the crime, and (2) innocence of death.  The first is easier to

understand conceptually, as it refers to those cases in which the person convicted

did not actually commit the crime (*i.e.*, another person committed the crime, and

the convicted defendant did not participate).  *Sawyer v. Whitley*, 505 U.S. 333, 341

(1992).  The second "actual innocence" consideration has been described as

"innocence of death," and encompasses those situations in which the convicted

party is not eligible for the death penalty under state and/or federal law.  Each of

these situations is present here.

### i.    Tommy's Actual Innocence Provides A Gateway To All Claims.

The Supreme Court has held that when a petitioner who has been sentenced

to death raises a claim of actual innocence, he may avoid a procedural bar to the

consideration of the merits of his constitutional claims if he can "show that 'a

constitutional violation has probably resulted in the conviction of one who is

actually innocent.'"  *Schlup v. Delo*, 513 U.S. 298, 326-26 (1995) (*quoting Murray*

592 of 600

*v. Carrier*, 477 U.S. 478, 496 (1986). "[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316. Given the new evidence – and the absence of old evidence to tie Tommy to the murder – it is "more likely than not any reasonable juror would have reasonable doubt" about his guilt. *House v. Bell*, 547 U.S. 518, 537 (2006).

The new evidence Tommy has discovered and presented to the court is especially compelling. Tommy's conviction was never based on physical evidence or eye-witness testimony. As demonstrated above, investigators found considerable evidence at the crime scene, but none of this evidence tended to prove that Tommy was involved in Mr. Evans' death. Likewise, the admitted perpetrator of the crime swore that Tommy was not involved. Rather, Tommy's conviction turned on his own illegally obtained and improperly coerced statements.

If the impropriety surrounding Tommy's interrogation did not already call into question the reliability of his statements, the new evidence regarding his mental health certainly does. *See Singletary v. Fischer*, 365 F. Supp. 2d 328, 338 (E.D.N.Y. 2005) (calling into question conviction based on unreliable confession). Tommy's serious mental illness explains why he would lie about committing a

heinous crime, especially if he thought he was protecting his sons. *See Crane v. Kentucky*, 476 U.S. 683, 688 (1986) (explaining that even where a confession is legally voluntary – which is not the case here – it still may not be reliable). Add to this that (1) John Mark's affidavit directly contradicts Tommy's statements, (2) the statements are internally inconsistent and unreliable, and (3) there is no physical evidence linking Tommy to the murder – and the evidentiary picture becomes even more compelling than the one in *House*. There is absolutely *no* reliable evidence linking Tommy to the crime. Surely, then, at least one juror would have "reasonable doubt" about Tommy's guilt if weighing the old and new evidence together. Accordingly, Tommy has demonstrated his "colorable claim" to actual innocence to a sufficient degree that the Court may, at the least, review all of his otherwise defaulted claims.

### ii.    Tommy Is Innocent of the Death Penalty.

The evidence that demonstrates that Tommy was not a participant in the murder of Mr. Evans is even more critical to the jury's determination that Petitioner was death eligible, because under *Enmund* and *Tison,* Petitioner is only eligible for the death penalty if he killed, intended to kill, or attempted to kill Keith Evans, or if he participated so significantly in the underlying felony of a felony-murder that he exhibited reckless indifference to human life, *See Enmund v. Florida,* 458 U.S. 782, 797 (1982); *Tison v. Arizona,* 481 U.S. 137, 158 (1987);

(*See also*., Vol. I, at Section XII, above.)  Under *Enmund* and *Tison*, "A petitioner who claims that he is ineligible for the death penalty may obtain review of defaulted federal claims only if he shows that 'no reasonable juror would have found [him] eligible for the death penalty under the applicable state law' had the jury heard the evidence his lawyer failed to present at trial or sentencing." *Downs v. McNeil*, 520 F.3d 1311, 1325-26 (11th Cir. 2008) (*quoting Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).  Here, as discussed above, there is no reliable direct evidence to link Petitioner to the kidnapping, battery or murder itself, sufficient for a juror reasonably to find that either aggravating circumstance applied to his individual conduct.  *See Sawyer v. Whitley*, 505 U.S. 336, 349 (1992); see also Vol. I, at Section XII, above (explaining how the jury instructions impermissibly instructed the jurors that they needed only to find that Mr. Waldrip was a "party" to the aggravating circumstances in order to find those circumstances.) (Jury Instructions).  Moreover, even when a jury convicts a defendant, residual doubt about that defendant's guilt may be a mitigating factor at sentencing.  As well, during the state habeas proceedings, additional mitigating evidence has been uncovered that more than offsets the evidence presented in aggravation. This Court has now read all of the other claims; if all of the old evidence and all of the evidence discovered during the state habeas proceedings had been before the jury[9]

---

[9]      It is presumed that a jury in a retrial would not engage in misconduct such as occurred in

(Continued)

when it considered whether to sentence him to death, it is reasonably probable that at least one would have demurred to the sentence. Accordingly, the colorable claim of innocence of the death penalty allows this Court to review all constitutional error pertaining to the penalty phase – even if it would otherwise have been defaulted – in order to avoid a miscarriage of justice. *See Sawyer,* 505 U.S. at 349.

John Mark took full responsibility for Mr. Evans' death. There is no offsetting evidence demonstrating that Tommy either participated in the killing or intended for it to happen. Even if Tommy's statements provide some evidence that Tommy intended to kill Mr. Evans – which, in light of what is now known, they do not – that evidence must be reconsidered in light of Tommy's mental illness.

### 2. Tommy Is Actually Innocent of the Murder of Keith Evans and Imposition of the Death Penalty Violates the Eighth and Fourteenth Amendments.

The inconsistent and conflicting statements that Tommy made to investigators, when viewed through the prism of John Mark's new affidavit and the recent evidence of Tommy's severe mental illness and other evidence that came to light during the state habeas proceedings – and when contrasted against the complete lack of evidence at trial that Tommy was Keith Evans' murderer – lead to

---

(Continued)

the first trial.

the inescapable conclusion that Tommy was wrongly convicted of this capital offense.  Accordingly, his execution would violate the Eighth and Fourteenth Amendments of the United States Constitution.

The Supreme Court has not definitively addressed the circumstances under which a petitioner may be entitled to stand-alone habeas relief based on a showing of actual innocence.  Consequently, courts have preferred to first examine whether newly discovered evidence is sufficient, when paired with record evidence, to trigger a full review of petitioner's conviction, and from there determine whether there is some other settled basis for granting habeas relief.  Given the strength of the constitutional claims here, the Court need not reach the separate, stand-alone actual innocence question, as Tommy is entitled to relief on many other grounds.  Nevertheless, stand-alone relief is also cognizable and available to Tommy.

### i.    It Is Unconstitutional To Execute An Innocent Person.

In *Herrera v. Collins*, 506 U.S. 390, 419 (1993), a habeas petitioner argued that he was actually innocent of the crime of which he was convicted, and his execution would violate the Eighth and Fourteenth Amendments of the United States Constitution, regardless of whether any constitutional error infected his prosecution.  *Id.* at 402.  A plurality of the Court assumed, without deciding, "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant

federal habeas relief if there were no state avenue open to process such a claim," but nevertheless determined that petitioner's claim was insufficient to warrant such relief. The Court was able to avoid articulating a standard because in Herrera's case, the newly discovered evidence fell "far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo*, to exist." *Id.* at 417, 419.

Nevertheless, at least five justices (and possibly six, counting Justice White) stated that a freestanding actual innocence claim is cognizable in a capital case, under the right circumstances. Justice O'Connor, in a concurring opinion joined by Justice Kennedy, stated "the execution of a legally and factually innocent person would be a constitutionally intolerable event." *Id.* at 419. Justice White similarly stated that he "assume[d] that a persuasive showing of 'actual innocence' . . . would render unconstitutional the execution of petitioner . . . ." *Id.* at 429. Justice Blackmun, in a dissent joined by Justices Stevens and Souter, opined that a state would violate the Eighth and Fourteenth Amendments if it executed a person who is actually innocent. *Id.* at 437.

The Court declined the opportunity to reverse course in *House v. Bell*, 547 U.S. 518, 555 (2006). There, the Court concluded that "much as in *Herrera*, . . . whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it." *Id.*; *see also id.* at 556 ("Because I do not think that House has

satisfied the actual innocence standard set forth in *Schlup*, I do not believe that he has

met the higher threshold for a freestanding innocence claim, assuming such a claim

exists.") (Roberts, C.J., concurring in part and dissenting in part).

There is growing sentiment in the courts of appeal, and in the Eleventh

Circuit Court of Appeals in particular, that a free-standing actual innocence claim

exists. *See, e.g.*, *Mize v. Hall*, 532 F.3d 1184, 1195 (11th Cir. 2008) (setting forth

in dicta that an actual innocence claim must do more than simply "demonstrate that

'it is more likely than not that no reasonable juror would have found petitioner

guilty beyond a reasonable doubt.'" (*quoting Schlup v. Delo*, 513 U.S. 298, 327

(1995)); *Davis v. Terry*, 465 F.3d 1249, 1251, n.1 (11th Cir. Ga. 2006) ("The

viability of [a freestanding actual innocence] claim remains an open question . . . .

); *id.* at 1250-52 (Barkett, J., dissenting) (opining that execution of an actually

innocent person would violate the Eighth and Fourteenth Amendments)*; Felker v.*

*Turpin*, 101 F.3d 657, 665 (11th Cir. 1996) (explaining *sua sponte* that "a post-trial

confession from another person would be relevant to a *Herrera v. Collins*…claim

of actual innocence[.]"). Given the fact that neither the United States Supreme

Court nor the Eleventh Circuit Court of Appeals has fleshed out the contours of

such a claim, however, Mr. Waldrip notes only that under *Mize*, 532 F.3d at 1195,

the court has suggested that "it would necessarily be more difficult to establish a

freestanding actual innocence claim than it is to establish actual innocence under

the fundamental miscarriage of justice exception" – a conclusion that mirrors

Justice Blackmun's dissent in *Herrera*, where he recommended that a successful

petitioner "must show not just that there was probably a reasonable doubt about his

guilt but that he is probably actually innocent." *Herrera*, 506 U.S. at 434-35

(Blackmun, J., dissenting).  Justice Blackmun's dissent is instructive in that he

recommends that "the court charged with deciding such a claim should make a

case-by-case determination about the reliability of the newly discovered evidence

under the circumstances [and] then should weigh the evidence in favor of the

prisoner against the evidence of his guilt." *Id.* at 443.  It appears, therefore, that

the weighing of old and new evidence countenanced in *House* and set forth above

could – if compelling enough – warrant relief even if there were no constitutional

error.  Mr. Waldrip submits that the old and new evidence shows not just

"colorable" but "probable" innocence.

## D.    CONCLUSION

The old and new evidence, when taken together, demonstrate Mr. Waldrip's

colorable, indeed, probable innocence.  The briefs submitted are replete with

significant constitutional error, only some of which this Court has found defaulted.

Accordingly, whether the Court determines to reach this claim or to reach through

the claim to any constitutional error that it would otherwise find defaulted, the writ

should be granted.

## XL.   CONCLUSION TO THE BRIEF

For all the reasons mentioned above, Mr. Waldrip respectfully requests relief from the Court.

Respectfully submitted,

/s/ *Jeffrey L. Ertel*
Jeffrey L. Ertel
State Bar No. 249966
Federal Defender Program, Inc.
100 Peachtree Street
Atlanta, Georgia 30303

/s/ *David J. Kessler*
Lawrence J. Fox (PA I.D. 15261)
David J. Kessler (PA I.D. 81551)
DRINKER BIDDLE & REATH LLP
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
(215) 988-2700

*Attorneys for*
*Petitioner Tommy Lee Waldrip*